*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

---

*Guy Balcom*
*January 21, 2014*



172 East 8th Avenue
Eugene, OR 97401

*Original File dotson_4PP.pdf*
*Min-U-Script® with Word Index*

Exhibit 1 - Page 1 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CONRAD GREEN II, an        )
individual by and through his    )
Guardian ad litem Derek Johnson,)
        Plaintiff,               )
   v.                            )No. 6:13-cv-01855-T
CORIZON HEALTH, INC., a          )
Tennessee Corporation; et al.,   )
        Defendants.              )

DEPOSITION OF GUY BALCOM

January 21, 2014

Tuesday

1:30 P.M.

        THE VIDEOTAPED DEPOSITION OF GUY BALCOM was
taken at 172 East 8th Avenue, Eugene, Oregon,
before Eleanor G. Knapp, CSR-RPR, Certified
Shorthand Reporter in and for the State of Oregon.

INDEX

WITNESS........................................PAGE

GUY BALCOM

        BY MR. ROSENTHAL                       4

        BY MR. NEWTON-TAPIA                    98

EXHIBITS.......................................PAGE

No. 14   Diagram                              19

No. 15   Memo, 2/13/13 by Balcom              25

No. 16   Diagram                              40

No. 17   Stills from videotape               57

No. 18   Memo, 2/13/13 by Burnette            75

No. 19   2/13 Above & Beyond Awards           87

No. 20   Emergency Log Book entries           87

No. 21   Order of Commitment                  88

No. 22   Resident Transaction Receipt         89

No. 23   Inmate Observation Report Form       92

No. 24   Citation to Appear                   94

Page 2

APPEARANCES

For the Plaintiff:

    ROSENTHAL GREENE & DEVLIN
    121 SW Salmon Street, Suite 1090
    Portland, OR 97204
    503-228-3015
    BY:  MR. ELDEN ROSENTHAL
         MR. JOHN DEVLIN

For Corizon Defendants:

    STEWART SOKOL & GRAY, LLC
    2300 SW First Avenue, Suite 200
    Portland, OR 97201
    503-221-0699
    BY:  MR. JAMES DAIGLE (telephonically)
         MR. ROBERT COLEMAN

For Lane County Defendants:

    OFFICE OF LEGAL COUNSEL
    LANE COUNTY COURTHOUSE
    125 East 8th Avenue
    Eugene, OR 97401
    541-682-3728
    BY:  MR. SEBASTIAN NEWTON-TAPIA

Videotaped by:

    VERBATIM VIDEO, BEN BOCHNER

Reported by:

    ELEANOR G. KNAPP, CSR-RPR
    CC REPORTING & VIDEOCONFERENCING

Page 4

1            GUY BALCOM,
2  having been first duly sworn to testify the truth,
3  the whole truth, and nothing but the truth, was
4  examined and testified as follows:
5
6            EXAMINATION
7  BY MR. ROSENTHAL:
8      Q.   Mr. Balcom, my name is Elden Rosenthal.
9  I'm a lawyer from Portland.  I represent the family
10 of Kelly Green.  I don't know whether anybody's
11 mentioned to you, but Mr. Green passed away in
12 December so I actually represent the estate.  Okay?
13     A.   (Witness nodded head.)
14     Q.   It's necessary for you to answer out loud,
15 please.
16     A.   Okay.  Yes.
17     Q.   My purpose here today is to find out what
18 you know about the circumstances with Mr. Green on
19 February 11th, February 12th of 2013.  If my
20 question is unclear, if you are not sure what I'm
21 asking, please say so so I can repeat my question.
22     A.   Okay.
23     Q.   Then if you'd do the court reporter a
24 favor and try to not answer until my question is
25 over, that will make it easier on her.

Exhibit 1 - Page 2 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

---

Page 25

1  wrote to Lieutenant Ewing.  We'll mark it as Exhibit
2  15.
3           (Deposition Exhibit No. 15
4           marked for identification.)
5  **BY MR. ROSENTHAL:**
6  **Q.**   Who is Lieutenant Ewing?
7  **A.**   He was the lieutenant in the -- covering
8  the security area, security section.
9  **Q.**   So is that who you reported to that day?
10 **A.**   Correct.
11 **Q.**   And you wrote this report the next day?
12 **A.**   That same day.
13 **Q.**   Well, it was February 12th when it
14 happened.  So is the date line just wrong?
15 **A.**   Evidently it is, yes.
16 **Q.**   Did you type it or did you dictate it?
17 **A.**   I typed it.
18 **Q.**   So if there was a mistake made on the date
19 line, that was just a mistake that you made?
20 **A.**   Correct.
21 **Q.**   All right.  I'd like you to skip down to
22 the seventh line, the sentence that begins, "While
23 Green was being tended to."  Do you see that?
24 **A.**   Yes.
25 **Q.**   I was just going to read it [reading]:

---

Page 26

1           While Green was being tended to by medical
2       staff, I could hear him talking and seen him
3       attempting to move his arms while they were
4       being restrained by staff.
5           Does that refresh your recollection about
6  whether or not you could hear him talking?
7  **A.**   Yes.
8  **Q.**   What do you remember him --
9  **A.**   He was kind of mumbling.  I don't remember
10 exactly what he was saying.
11 **Q.**   Could you make out anything that he was
12 saying?
13 **A.**   Yes, but I don't remember exactly what it
14 was.  I think he was saying there that he wanted --
15 just wanted to die, but I don't know positive.
16 **Q.**   Did he say anything about being paralyzed
17 or about not being able to move?
18 **A.**   Not there, no.
19 **Q.**   All right  So then you said --
20 **A.**   Not that I heard.
21 **Q.**   Okay.  Then you said you saw him
22 attempting to move his arms.  Can you describe what
23 you saw, please?
24 **A.**   Well, he was being restrained.
25 **Q.**   How was he being restrained?

---

Page 27

1  **A.**   There were a couple of deputies -- a
2  deputy on each arm holding him down while he was
3  being assessed by the nurse.
4  **Q.**   Was he on his back?
5  **A.**   Yes.
6  **Q.**   Was he handcuffed?
7  **A.**   No.
8  **Q.**   So one deputy was holding one arm, and the
9  other deputy was holding the other arm?
10 **A.**   Correct.  Just holding him down, and he is
11 shrugging and trying to attempt to move.
12 **Q.**   Could you tell whether he was able to move
13 his hands?
14 **A.**   From what I recall, yes.  He was trying
15 to, you know, shrug.
16 **Q.**   Well, so the reason -- I'm being a little
17 particular here with you, but shrugging, to me, I
18 think of the shoulders whereas my question was could
19 he move his hands.  Did you see whether he was
20 moving his hands?
21 **A.**   I don't recall.
22 **Q.**   Do you recall whether he was moving his
23 forearm?
24 **A.**   I don't recall because that's -- from what
25 I remember, that's where they were holding him was

---

Page 28

1  on his forearms.
2  **Q.**   The movement you recall was more in the
3  shoulder area?
4  **A.**   (Witness nodded head.)
5  **Q.**   Is that a yes?
6  **A.**   Yes.
7  **Q.**   All right.  Did you hear anybody trying to
8  locate any particular medical equipment?
9  **A.**   When I got there I overheard somebody --
10 don't know who it was -- say -- telling them to get
11 a board.  I said, "We don't have a board," or
12 somebody did.  And then somebody sent Dotson to go
13 get a wheelchair.
14 **Q.**   By board did you mean a backboard?
15 **A.**   Correct.
16 **Q.**   To your knowledge, prior to this event was
17 it your understanding whether there was a backboard
18 in the jail?
19 **A.**   There used to be prior to this, but I
20 don't know whatever happened to it.
21 **Q.**   Where did it used to be kept?
22 **A.**   In the medical area.
23 **Q.**   In the medical area?
24 **A.**   Correct.
25 **Q.**   That's the area that Corizon at this point

---

Exhibit 1 - Page 3 of 13
Dec'l of JTD

Page 29

1  in time was responsible for?
2    **A.**   Correct.
3    **Q.**   Did you hear anyone say anything about
4  whether or not his neck -- Mr. Green's neck needed
5  to be stabilized?
6    **A.**   No, not that I recall.
7    **Q.**   So Dotson went to get a wheelchair.  Where
8  would the wheelchair have been?
9    **A.**   In the medical area.
10    **Q.**   How far away is the medical area from this
11  courtroom?
12    **A.**   It's on the first floor.  The courtroom is
13  on the second floor.
14    **Q.**   So if I was just walking at kind of a
15  normal pace -- not running -- if I was walking at a
16  normal place, how would I get there?  How long would
17  it take?
18    **A.**   Well, you'd have to take an elevator down,
19  go to the medical area, take the elevator back up.
20  Five minutes?
21    **Q.**   How far is it from the door into the
22  courtroom to the elevator?
23    **A.**   50 feet.  40 feet.
24    **Q.**   Then how far is it from the elevator to
25  where the wheelchair was?

Page 30

1    **A.**   Maybe a hundred feet.
2    **Q.**   And there would be no practical way to
3  bring the wheelchair up a stairway?  The practical
4  thing would be to use the elevator?
5    **A.**   There is no stairway.
6    **Q.**   There is no stairway.  Okay.
7    **A.**   At least that's accessible to inmates.
8  There's an emergency stairway for fire, emergency,
9  stuff like that.  But only in a fire emergency will
10  an inmate go in that emergency stairwell.
11    **Q.**   What about Sheriff Dotson trying to get a
12  wheelchair as quickly --
13    **A.**   No.  You have to go get a special set of
14  keys, the whole -- yeah.
15    **Q.**   So Mr. Dotson, is he a sergeant or deputy?
16    **A.**   He's a deputy.
17    **Q.**   Deputy Dotson comes in with the
18  wheelchair.  Has Mr. Green been moved prior to --
19    **A.**   No.
20    **Q.**   You've got to do us a favor and let me
21  finish my question.
22    **A.**   Sorry.
23    **Q.**   Mr. Green had not been moved while Deputy
24  Dotson was looking for the wheelchair.  Right?
25    **A.**   No.

Page 31

1    **Q.**   Am I correct in what I said?
2    **A.**   Correct.  Yes.
3    **Q.**   Okay.  All right.  So then did anybody ask
4  Mr. Green to get into the wheelchair?
5    **A.**   I don't recall.
6    **Q.**   How did Mr. Green get into the wheelchair?
7    **A.**   He was assisted into the chair with -- by
8  Deputy Peters, I believe, and Dotson.
9    **Q.**   Can you describe for me how they got him
10  into the wheelchair?
11    **A.**   I believe each one, from what I recall,
12  grabbed an arm under his armpit and lifted him up,
13  set him in the wheelchair.
14    **Q.**   So I'm going to take my mic off and come
15  stand by you.  And I want you to show how they held
16  him when they were putting him in the wheelchair.
17    **A.**   It would be similar to this
18  (demonstrating).
19    **Q.**   So they would have picked him up off the
20  ground in that kind of a hold?
21    **A.**   Correct.  Correct.
22    **Q.**   Was anybody holding his head or neck while
23  the two sheriffs were putting him in the wheelchair?
24    **A.**   I don't recall.
25    **Q.**   Did Mr. --

Page 32

1    **A.**   I don't believe so, but I don't recall
2  anybody holding.
3    **Q.**   Did Mr. Green appear to be resisting their
4  efforts?
5    **A.**   At the time, no.
6    **Q.**   Did he appear to be helping their efforts?
7    **A.**   No.
8    **Q.**   Would it -- how would you describe how his
9  body was moving or not moving while they were
10  putting him in the wheelchair?  How would you
11  describe it?
12    **A.**   Kind of dead weight.
13    **Q.**   When they got him in the wheelchair, was
14  there any difficulty in getting him positioned so
15  that they could use the wheelchair?
16    **A.**   He had Deputy -- well, he was put in --
17  from what I recall, he was put in the wheelchair.
18  Deputy Dotson tried to turn him around to drive --
19  pushing it forward, and he slid out of the chair.
20  So they repositioned him --
21    **Q.**   Wait.
22    **A.**   -- put him back in the chair.
23    **Q.**   I want to understand what you mean by
24  "slid out of the chair."  Did he fall to the floor?
25    **A.**   Our chairs don't have any feet restraints

Exhibit 1 - Page 4 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

---

Page 33

1  or foot pegs, nothing.  All it is is a chair.  So
2  his feet were dangling.
3         So when he -- yeah, he didn't fall
4  completely out of the chair.  He was starting to
5  slide.  His butt was starting to scoot out of the
6  seat.
7     **Q.**   So maybe could you back up a little bit?
8  Hang on a second.
9         **MR. ROSENTHAL:** Can you -- can you see
10  what he's doing, Mr. Videographer?
11         **THE VIDEOGRAPHER:** Yes, sir?
12         **MR. ROSENTHAL:** Can you see what he's
13  doing?
14  **BY MR. ROSENTHAL:**
15     **Q.**   Okay.  So show me how far he came out of
16  the chair.
17     **A.**   I don't recall how far he actually came
18  out.  But he didn't fall on the ground.  He was --
19  slid out like this.  His butt was sliding out of the
20  seat.
21     **Q.**   So his butt was moving forward on the
22  seat.
23     **A.**   Correct.
24     **Q.**   What was happening to his legs while that
25  was going on?

---

Page 34

1     **A.**   They were just sitting there.
2     **Q.**   Did they get underneath him?  Did the legs
3  kind of get underneath him?
4     **A.**   I -- I believe that's what kind of helped
5  pull him out of the seat a little bit.
6     **Q.**   Was he grabbing onto the arms?
7     **A.**   No.  His arms were on it, but he wasn't --
8  I don't believe he was grasping them.
9     **Q.**   So -- but he did not fall out of the
10  chair?
11     **A.**   I don't believe so.
12     **Q.**   So then how was he repositioned?
13     **A.**   He was pulled back so his butt's back in
14  the back of the seat.
15     **Q.**   How was that done?
16     **A.**   They grabbed him by the -- under the arms
17  again and pulled him back.
18     **Q.**   Did anybody grab his hips to get his butt
19  back into the chair?
20     **A.**   Not that I recall.
21     **Q.**   All right.  So now he is repositioned in
22  the chair.  How was his head?  Was it up or was it
23  off to the side?
24     **A.**   I believe it was up.
25     **Q.**   Straight up like your head is right now?

---

Page 35

1     **A.**   Correct.
2     **Q.**   Did you hear Mr. Green say anything during
3  this?
4     **A.**   No.
5     **Q.**   All right.  So now he is sitting up in the
6  chair again.  Did anybody hold him so that he didn't
7  slide out again?
8     **A.**   I believe -- from what I recall, Dotson
9  held onto his sweat shirt.  He was wearing a sweat
10  shirt over his -- and held his shoulders in, and
11  then he backed out so his feet wouldn't go under the
12  -- the chair.
13     **Q.**   Where was Dotson holding his sweat shirt?
14     **A.**   I believe it was just up here, shoulders.
15     **Q.**   Was Dotson pushing the wheelchair?
16     **A.**   No, he was pulling the wheelchair at this
17  time.
18     **Q.**   Okay.  So you tell me if I've got this
19  right.  I'm going to twirl you sideways here.  So
20  Dotson was where I am?
21     **A.**   Correct.
22     **Q.**   And he had him here?
23     **A.**   I don't believe it was straight there.  I
24  think he had him like --
25     **Q.**   Had him like here?

---

Page 36

1     **A.**   Correct.
2     **Q.**   Did he also have him here?
3     **A.**   No.
4     **Q.**   And then Dotson was pulling the
5  wheelchair?
6     **A.**   Correct.
7     **Q.**   Thank you.  What were you doing while
8  everything that you've just described was going on?
9     **A.**   I was looking at his -- not his arrest
10  record but what he was being held for at this time
11  and getting statements from the Eugene officers to
12  see what -- what happened.
13     **Q.**   You weren't taking -- were you taking
14  notes at the time?
15     **A.**   No.
16     **Q.**   So you were just talking to everybody?
17     **A.**   Correct.
18     **Q.**   And how did you find out what charges he
19  wanted?  Where did you get that information?
20     **A.**   Off the computer.
21     **Q.**   Where is the computer?
22     **A.**   At the visiting desk.
23     **Q.**   And the visiting desk is outside the door?
24     **A.**   Correct.
25     **Q.**   Where were you standing as Dotson pulled

---

Exhibit 1 - Page 5 of 13
Dec'l of JTD

Page 37

1   the wheelchair out the door?
2       A.   I believe I was -- I was in the courtroom
3   because I followed him out.  I believe I was in this
4   -- up front by the desk.
5       Q.   And then as the wheelchair went out of the
6   courtroom, did you follow the wheelchair?
7       A.   Correct.
8       Q.   Where were Mr. Green's feet as he was
9   being pulled out of the courtroom?
10      A.   Dangling -- not dangling.  They were
11  dragging on the floor.
12      Q.   So then was he taken to the elevator?
13      A.   Correct.
14      Q.   Did his feet continue to drag behind the
15  wheelchair?
16      A.   Yes.
17      Q.   And he was put in the elevator?
18      A.   Yes.
19      Q.   Were you in the elevator with him?
20      A.   Yes.
21      Q.   Who else was in the elevator?
22      A.   Don't recall.
23      Q.   Did Mr. Green say anything?
24      A.   I don't believe he said anything in the
25  elevator.

Page 38

1       Q.   Did he say anything from the time he left
2   the courtroom till he got to the elevator?
3       A.   Not that I can recall.
4       Q.   So then did he say anything from the time
5   that he left the elevator -- now what floor -- that
6   would be on the first floor?
7       A.   Elevator -- the visiting area is on the
8   second floor.
9       Q.   So the elevator went down to the first
10  floor.
11      A.   Correct.
12      Q.   And as you took him -- did Dotson continue
13  to move the wheelchair into the medical area?
14      A.   Yes.
15      Q.   Is the medical area called the infirmary
16  or is it just --
17      A.   It's just called medical.
18      Q.   So as Dotson was -- did he again pull the
19  wheelchair?
20      A.   Yes.
21      Q.   Was he still holding onto the sweat shirt?
22      A.   I believe so.
23      Q.   And were you walking behind?
24      A.   Correct.
25      Q.   Was there anyone between you and the

Page 39

1   wheelchair?
2       A.   I don't recall.  There was -- there was a
3   number of people milling around.  Medical staff went
4   down the elevator with us, so I don't remember the
5   placement of everybody at the -- as we walked down
6   to medical.
7       Q.   Were his feet dragging as he went down the
8   hallway to the medical area?  Were Mr. Green's feet
9   dragging?
10      A.   I believe so.  They may have not been
11  dragging.  I don't remember how in proportion his
12  legs were to the -- to the wheelchair seat.  So I
13  don't know if they were fully dragging or just kind
14  of a dangle.
15      Q.   Did you see Mr. Green voluntarily move at
16  any time from the time you first came into the
17  courtroom until the time he was taken into the
18  medical area?
19      A.   When I arrived at the courtroom?
20      Q.   Oh, you told us about the feet moving and
21  the shrugging.
22      A.   Yes.
23      Q.   Anything other than that?
24      A.   Not that I can recall.
25      Q.   Do you recall him making any voluntary

Page 40

1   movements while he was in the wheelchair?
2       A.   Before or after he was in medical?
3       Q.   Before he got into medical.
4       A.   Not that I recall.
5       Q.   Did you stay with him in medical?
6       A.   I was there -- yes, I was there the whole
7   time.  I wasn't in the exam room with him the whole
8   time, but I was in medical the whole time.
9       Q.   How many rooms are in the medical area?
10      A.   Exam rooms?
11      Q.   I want to know what the layout is in the
12  medical area.
13      A.   There's two holding rooms.  And as you
14  walk in the medical door, two holding rooms on your
15  right and left.  The medical records area or the --
16  their desks are on the -- as you're walking down the
17  hall are on the right.  Exam room right on your left
18  past the first holding area.
19      Q.   Tell you what, I think it would be better
20  to make a drawing because I was with you and then I
21  lost you in your explanation.
22           So if you could just make a -- show the
23  door into the medical area.
24      A.   (Marking.)  Okay.  This is a rough sketch.
25           (Deposition Exhibit No. 16

Exhibit 1 - Page 6 of 13
Dec'l of JTD

Page 41

1      marked for identification.)
2  **BY MR. ROSENTHAL:**
3    **Q.**  I get it.  So I've labeled it Exhibit 16.
4  Would you write "door" where the door is, please?
5         **MR. NEWTON-TAPIA:** Elden, could we
6  mark this as confidential?
7           **THE WITNESS:** This is a security
8  concern.
9         **MR. NEWTON-TAPIA:** Since it's inside
10 of the jail.
11         **THE WITNESS:** Yes.
12 **BY MR. ROSENTHAL:**
13   **Q.**  Okay.  So the door you came in is the
14 one --
15   **A.**  This one here.
16   **Q.**  Just put a 1 there.
17   **A.**  (Marking.)
18   **Q.**  So where was Mr. --
19   **A.**  This is the exam room he was in.
20   **Q.**  So could you put a G and circle it?
21   **A.**  (Marking.)
22   **Q.**  Thank you.  When -- and you were in that
23 room with him?
24   **A.**  I was standing in the threshold of the
25 door.

Page 42

1    **Q.**  Did you watch while the nurses --
2    **A.**  Most of the time.  There were times where
3  I was mingling out here.  Most of the time I was
4  right there.
5    **Q.**  Did you watch while his head was stitched
6  up?
7    **A.**  For some of it, yes.
8    **Q.**  Did Mr. Green indicate that he was
9  uncomfortable in any way while he was in that room
10 that you heard?
11   **A.**  Did he say he was uncomfortable?
12   **Q.**  "It hurts" or "ouch" or anything?
13   **A.**  No.  No.
14   **Q.**  Was he lying on a table?
15   **A.**  He was sitting in a wheelchair.
16   **Q.**  So he wasn't taken out of the wheelchair?
17   **A.**  No.
18   **Q.**  So his head was stitched while he was
19 sitting in a wheelchair?
20   **A.**  Correct.
21   **Q.**  Who did the stitching?
22   **A.**  PA Kris White.
23   **Q.**  Did anybody hold Mr. Green's head or neck?
24   **A.**  I believe Nurse --
25   **Q.**  You need to --

Page 43

1    **A.**  Sorry.
2    **Q.**  I've got to be able to --
3    **A.**  Sorry.
4    **Q.**  Did anybody hold his head and neck while
5  he was being stitched?
6    **A.**  Nurse Fagan held his head while he was
7  being stitched up.
8    **Q.**  Did anybody at any time ask for any kind
9  of a neck brace or neck restraint that you heard?
10   **A.**  Not that I recall.
11   **Q.**  Did you hear Mr. Green say anything while
12 he was being stitched up about whether he could move
13 or not?
14   **A.**  I believe down there he said, "I can't" --
15 "I can't move."
16   **Q.**  Did you hear what any medical person said
17 in response to that?
18   **A.**  No.  I don't recall.
19   **Q.**  Did you hear any medical personnel say
20 anything about -- to Mr. Green while he was in the
21 courtroom?
22   **A.**  No.
23   **Q.**  How long, ballpark, did it take to stitch
24 up his head?
25   **A.**  15 minutes maybe.

Page 44

1    **Q.**  Whose decision was it as to where
2  Mr. Green would then go?
3    **A.**  It's security's decision at that time.
4  And he was placed in a segregation cell on a suicide
5  watch.
6    **Q.**  What individual made the decision?  Was it
7  you?
8    **A.**  Yes.
9    **Q.**  And --
10   **A.**  Well, it wasn't necessarily me.  The
11 policy is that if he is suicidal he is going to be
12 placed in seg/med on a suicide watch.  So the
13 deputies made a decision before I did even.  So --
14   **Q.**  Is there a policy about whether or not a
15 person receives mental health screening if they are
16 a suicide risk?
17   **A.**  I am -- I'm not sure if there's a policy
18 on it, but mental health -- we have three mental
19 health specialists that interview everybody in the
20 facility that either requests to talk to them or has
21 a history of mental health issues.
22   **Q.**  When do those interviews take place?  Let
23 me rephrase that.  If a person has a history of
24 mental health issues, when do they talk to a mental
25 health specialist?

Exhibit 1 - Page 7 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

Page 49

1  a contract with municipal court that he will be
2  released from custody.  They will drop their charges
3  and he will be released from custody.
4  Q.   Who has the contract with municipal court?
5  A.   The sheriff's office.
6  Q.   Have you seen this document?
7  A.   I don't know if I've seen the full
8  contract, but I've seen parts of it, yes.
9  Q.   So is it up to the discretion of the
10 sheriff's office as to whether or not to release the
11 inmate?
12 A.   Yes.
13 Q.   And the court has no say-so in the matter
14 at all?
15 A.   Well, it's in the contract that you will
16 call them.
17 Q.   You will call the court?
18 A.   Call the court or a member of the court
19 and say So-and-so needs to go to the hospital for --
20 you can't give a detailed reason, but he needs to go
21 to the hospital for -- to get checked out for
22 whatever the issue is without going into detail for
23 HIPAA reasons.
24      And they'll say, "We'll release our
25 charges.  Just give him a court date and time and he

Page 50

1  will report to court when he gets out of jail -- or
2  out of the hospital."
3  Q.   So did you make that call in this case?
4  A.   No.
5  Q.   Have you made those kind of calls?
6  A.   Numerous times.
7  Q.   Who do you call when you make the call?
8  A.   Whoever the designated person is at that
9  particular court.
10 Q.   Well, for the Eugene municipal court who
11 do you call?
12 A.   I don't remember who they -- what their
13 name is.  I believe it was Michelle Dunn, but I
14 can't -- I can't recall for sure.  There was two or
15 three people.
16 Q.   Do you know what her position is with the
17 court?
18 A.   I'm assuming it's just a court clerk.  I
19 don't know.
20 Q.   So you don't call the judge?
21 A.   No.
22 Q.   And it doesn't matter what the charge is
23 as long as it's a municipal charge.  Am I correct?
24 A.   Correct.
25 Q.   So any municipal charge if the inmate

Page 51

1  needs to go to the hospital -- is the call made
2  before they are taken out of the jail?
3  A.   No.  You have to verify whether or not
4  they want to release them.
5  Q.   Whether the court wants to release them?
6  A.   Whether the court wants to release them or
7  not.
8  Q.   So the clerk of the court that you call
9  can then say yes or no.
10 A.   Yes.  They look at their history, and they
11 have a -- what they call a P code, which is a -- I'm
12 assuming it stands for priority code -- on how bad
13 the judge basically wants to keep them in jail.  The
14 judge assigns the P code.  From my understanding,
15 the judge assigns the P code.
16 Q.   So I want to know what it is you said to
17 Corizon Nurse Thomas about Mr. Green being released.
18 A.   I told her, "If he needs to go to the
19 hospital, we can get him released," because he was
20 there for criminal mischief or something.  I don't
21 remember what the charge -- something relatively
22 minor.
23 Q.   What did Nurse Thomas say?
24 A.   I don't remember the exact verbiage, but
25 okay.  I don't remember the exact verbiage.

Page 52

1  Acknowledged what I told her.
2  Q.   Okay.  But did she say, "Yes, we need to
3  get him to the hospital to get checked"?
4  A.   No.  No.  If that was the case, he would
5  have been transported at that time.
6  Q.   All right.  So your understanding from
7  that back and forth was that Nurse Thomas didn't
8  think he needed to go to the hospital?
9  A.   Correct.
10 Q.   What did you mean by providing a courtesy
11 transport?
12 A.   If people in this circumstance -- well,
13 not necessarily this one -- but in other
14 circumstances, if they are injured or they can't
15 make it to the hospital themselves, because we are
16 located quite a ways from the hospital, we'll drive
17 them to the hospital and walk them into the ER.
18 Q.   And then just leave them?
19 A.   Yeah.  Pretty much.
20 Q.   You won't even wait to see what the
21 hospital is going to do?
22 A.   No.  We'll just give them -- you know,
23 walk them to the desk there -- "This is So-and-so.
24 This is his injury" -- and pretty much walk away.
25 Q.   So if the inmate wants to then turn around

Exhibit 1 - Page 8 of 13
Dec'l of JTD

Page 53

1 and go home --
2   **A.**   They do.
3   **Q.**   -- that's their prerogative?
4   **A.**   Yeah. It happens quite often. Very
5 often.
6   **Q.**   All right. So I've read in some of these
7 reports "hold dropped" or "dropping the hold" as
8 opposed to dropping the charges.
9   **A.**   Dropping the charges -- hold charge is the
10 same thing.
11   **Q.**   So Mr. Green was being held in jail on
12 several criminal charges?
13   **A.**   Again, I don't know the charges.
14       **MR. ROSENTHAL:** Could I have the
15 exhibit stack?
16   **A.**   From what I recall there were a couple of
17 municipal charges.
18 **BY MR. ROSENTHAL:**
19   **Q.**   Hang on. I've got them here. So he was
20 being held on criminal mischief 2, assault,
21 recklessly endangering another person, and two
22 disorderly conducts.
23   **A.**   Okay.
24   **Q.**   So if Nurse Thomas had said, "Yes, he
25 needs to go to the hospital," would those charges

Page 54

1 have been dismissed?
2   **A.**   No. They would have been -- the hold --
3 the charge would have been dropped at the time, and
4 he would have been given a court date for a later
5 time.
6   **Q.**   To be re-arraigned?
7   **A.**   He was already arraigned. He would be
8 given a court date for a later time to be sentenced.
9   **Q.**   Without a trial?
10   **A.**   Or a trial, because he would have been
11 given a court-appointed attorney.
12       **THE VIDEOGRAPHER:** Excuse me, Counsel.
13 I need to change tapes.
14       **MR. ROSENTHAL:** Okay.
15       **THE VIDEOGRAPHER:** We are off the
16 record.
17     (Recess: 2:34 p.m to 2:36 p.m.)
18       **THE VIDEOGRAPHER:** We're back on
19 record.
20 **BY MR. ROSENTHAL:**
21   **Q.**   I want go back into the courtroom with you
22 for a minute. Was the Corizon person who was in
23 charge, was that Ms. White?
24   **A.**   No. She's just the physician's assistant.
25 I believe -- I can't remember what her title is, but

Page 55

1 it was Vicki Thomas.
2   **Q.**   It was Ms. Thomas?
3   **A.**   Yes.
4   **Q.**   Did you hear anybody ask or talk about
5 whether a physician should be called?
6   **A.**   Not that I recall, no.
7   **Q.**   What was going on -- what were the nurses
8 doing to Mr. Green in the courtroom?
9   **A.**   Evaluating him. I don't know what they
10 were -- tests they were running on him.
11   **Q.**   Well, what did you observe if anything?
12   **A.**   I didn't see anything. I was getting
13 information on him, talking to the EPD officers,
14 finding out what his charges were.
15   **Q.**   Why were you finding out what his charges
16 were?
17   **A.**   Because that's the -- one of the first
18 things you do as a sergeant to feel out -- to see if
19 they can -- even a possibility of release. You have
20 to find out who the individual is to, you know, see
21 what your possibilities are.
22   **Q.**   Now, skipping ahead to when he was being
23 sutured, who was it that was stabilizing his neck
24 while he was being sutured?
25   **A.**   Nurse Fagan.

Page 56

1   **Q.**   And how was she doing that?
2   **A.**   She was standing behind him, had her hands
3 cupped around the side of his head like this
4 (demonstrating).
5   **Q.**   When Nurse Thomas was done and the
6 suturing was complete, I take it he was bandaged in
7 some way?
8   **A.**   Nurse Thomas did not suture him.
9   **Q.**   I'm sorry. I'm getting confused on who
10 did what. Was it White that sutured him?
11   **A.**   Yes.
12   **Q.**   When White completed her work, was there
13 some kind of bandage put on the top of his head?
14   **A.**   I don't recall if there was or not.
15   **Q.**   Okay. Who said to you, "He's done. Take
16 him away"?
17   **A.**   I believe Nurse -- or PA White did.
18   **Q.**   And you had already decided where you were
19 going to take him?
20   **A.**   Correct.
21   **Q.**   What room -- what jail cell room did you
22 take him to?
23   **A.**   He was taken to the segregation area where
24 all of our 15-minute suicide watches, high-risk
25 suicide watches are placed. I believe he was placed

Exhibit 1 - Page 9 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

Page 65

1  off?
2  **A.**  I don't recall.
3  **Q.**  Is it jail policy that a civilian can keep
4  his civilian clothes on in a segregation cell?
5  **A.**  Negative.
6  **Q.**  What's the jail policy?
7  **A.**  If he was being placed on a 15-minute
8  suicide watch, you have -- on a 15-minute suicide
9  watch you have no shirt and no pants.  You only have
10  what we call a smock.
11  **Q.**  While Mr. Green was being transported from
12  the medical area to the jail cell, did he appear to
13  move at all in the wheelchair?
14  **A.**  I don't recall.
15  **Q.**  Did you -- what did you think was going on
16  with him during that time period?  Did you think he
17  was conscious?
18  **A.**  He was conscious, yes.
19  **Q.**  Was he talking?
20  **A.**  I don't know if he was talking -- I don't
21  recall him talking from -- taking him from medical
22  to seg. I don't recall him talking there.
23  **Q.**  Did you think he was paralyzed?
24  **A.**  No.
25  **Q.**  Did you think he was faking being

Page 66

1  paralyzed?
2  **A.**  No.  Not at the time.
3  **Q.**  Did you think he was just being limp and
4  uncooperative?
5  **A.**  Yes.
6  **Q.**  Had you --
7  **A.**  Which happens quite often.
8  **Q.**  Did you ask any of the nurses whether he
9  was paralyzed?
10  **A.**  No.
11  **Q.**  All right.  So you get into the jail cell.
12  And so now he needs to get his civilian clothes off.
13  **A.**  Correct.
14  **Q.**  Did you ask him to take his clothes off?
15  **A.**  I don't recall.
16  **Q.**  Did you help him take his clothes off?
17  **A.**  Yes, we helped him take his clothes off.
18  **Q.**  How did you do that?
19  **A.**  I don't recall if we did it in the chair
20  -- well, I don't recall if we took his shirt off in
21  the chair or if we laid him on the bunk.
22  **Q.**  Did he cooperate in having his clothes
23  removed?
24  **A.**  Was he resistive?  No.  Did he cooperate?
25  No.

Page 67

1  **Q.**  Was he limp during the whole process?
2  **A.**  Pretty much, yes.
3  **Q.**  Was his head rolling around?
4  **A.**  Rolling around?
5  **Q.**  Rolling around, like this.
6  **A.**  I don't -- I don't think so.  Not that I
7  recall.
8  **Q.**  Did he fall off of the chair at any time?
9  **A.**  I don't believe so.
10  **Q.**  Were you able to get his clothes off?
11  **A.**  Yes.
12  **Q.**  Had he defecated in his trousers?
13  **A.**  Yes.
14  **Q.**  Had he urinated?
15  **A.**  I don't recall he urinated.
16  **Q.**  How did you know that he had defecated?
17  **A.**  Because of the smell and feces.
18  **Q.**  Who took his pants off?
19  **A.**  Dotson and I attempted to.  Both of us
20  started getting sick so --
21  **Q.**  Getting sick from just the odor?
22  **A.**  Yes.
23  **Q.**  Do you have children?
24  **A.**  Yes.
25  **Q.**  Did it smell different than when your

Page 68

1  children had their diapers changed?
2  **A.**  It smelled like feces.
3  **Q.**  Did it smell the same as when your
4  children's diaper needed to be changed?
5  **A.**  I don't know.
6  **Q.**  Did you get sick when you changed your
7  children's diapers?
8  **A.**  Sometimes.
9  **Q.**  Did both of you get sick?
10  **A.**  He started dry-heaving and so did I.
11  **Q.**  So what did you do?
12  **A.**  I exited the cell.
13  **Q.**  Does Dotson have children?
14  **A.**  I don't believe so.
15  **Q.**  He just laid there in his feces -- Green
16  just laid there on the bunk in his feces?
17  **A.**  After we removed the clothes?
18  **Q.**  Did you come back in and remove his
19  clothes?
20  **A.**  I attempted to.  Then I had to go back
21  out. DS Burnette finished removing his clothes.
22  **Q.**  Does Burnette have kids?
23  **A.**  Yes.
24  **Q.**  Did he complain about the odor?
25  **A.**  I don't think he complained about it.  He

Exhibit 1 - Page 10 of 13
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Guy Balcom
January 21, 2014

Page 69

1 gave me a bad time about it.
2 Q. Did he think it was funny?
3 A. I think he did.
4 Q. Did you think it was funny?
5 A. That I almost threw up? Yes.
6 Q. I've watched the video. There was a woman
7 in the hallway that somebody was talking to about
8 it. Do you remember that?
9 A. I believe Rahm and Dodds were in the
10 hallway.
11 Q. So did you go back into the room after the
12 odor got to you or did you not go back into the
13 room?
14 A. I exited the first time. Then I attempted
15 to go back in, and I don't think I made it all the
16 way back in the room. Then I exited again and
17 Burnette removed his clothe.
18 Q. Did anybody clean his bottom?
19 A. No.
20 Q. So did he lay naked on the bunk?
21 A. Yes.
22 Q. Did you ever go back into the room that
23 shift?
24 A. No.
25 Q. Did you ever look into the room again that

Page 70

1 shift?
2 A. No.
3 Q. Whose responsibility was it to be looking
4 in?
5 A. DS Burnette was assigned to that post that
6 day. And he was on a 15-minute watch. He was
7 checked every 15 minutes and sometimes more often.
8 Q. How does the system work so nobody misses
9 getting checked every 15 minutes?
10 A. There's a check sheet. You write down the
11 time. You write down what the inmate is doing.
12 Q. How is the officer reminded as to when the
13 15 minutes is up so he has to be checked again?
14 A. Some of them use a timer, and some just
15 look at their watch.
16 Q. Are the checks done by going into the
17 cell?
18 A. No. Checks are done through the glass.
19 Q. Not by video?
20 A. There's also video.
21 Q. So can the check be done by video?
22 A. No.
23 Q. The check has to be done on the glass?
24 A. Yes. You have to see them in person. You
25 can't see them through the video.

Page 71

1 Q. But you don't have to go into the room?
2 A. Correct.
3 Q. Do you recall Mr. Green saying that he
4 couldn't move while you were trying to take his
5 clothes off?
6 A. I think he was saying that as -- yes, as
7 we were removing his clothes at some point. I don't
8 recall the exact moment.
9 Q. Did you think he was lying?
10 A. At the time, yes.
11 Q. Why did you think he was lying?
12 A. Because he had been evaluated by the
13 nurses. And it happens quite often.
14 Q. What happens quite often?
15 A. Where they -- inmates will play limp, for
16 lack of better terms.
17 Q. How often have you had an inmate play limp
18 and shit on himself?
19 A. It's happened.
20 Q. How often?
21 A. I don't have a number.
22 Q. When is the last time it happened?
23 A. I don't recall the last time it's
24 happened.
25 Q. Has it happened since Mr. Green's event?

Page 72

1 A. Not that I recall.
2 Q. So does it happen less than once a year?
3 A. It probably happens a couple of times a
4 year.
5 Q. That an inmate will pretend to be
6 paralyzed and will defecate on themselves?
7 A. Not necessarily that they all pretend to
8 be paralyzed, but they definitely defecate on
9 themselves.
10 Q. When's the last time, other than
11 Mr. Green, that an inmate pretended to be paralyzed
12 and then defecated on himself?
13 A. I don't -- I don't recall a definite date.
14 Q. Has it ever happened?
15 A. I think so, yes.
16 Q. When?
17 A. I don't have a definite date.
18 Q. Who?
19 A. I don't -- I have no idea who.
20 Q. How often has it happened?
21 A. It's probably happened a dozen times in my
22 career, a half dozen times. I don't recall.
23 Q. Somewhere between half a dozen and a
24 dozen?
25 A. Yes.

Exhibit 1 - Page 11 of 13
Dec'l of JTD

Page 85

1 don't know if Corizon saw that they didn't have this
2 stuff and purchased it or if it was prompted from
3 another source.
4   **Q.**  How did you hear about it?
5   **A.**  Just word of mouth.
6   **Q.**  Why wasn't Mr. Green released after his
7 head was stitched up?
8   **A.**  Because the medical staff didn't tell me
9 that he needed to be released, he needed to go to
10 the hospital.
11   **Q.**  They didn't tell you that?
12   **A.**  Correct.
13   **Q.**  And the judge had ordered him to be held?
14   **A.**  Yeah.  Two or tree days, something like
15 that.
16   **Q.**  We've been going a little over an hour.  I
17 would like to take a five-minute break so I can
18 organize how to wrap this up.  Okay?
19   **A.**  Okay.
20      **MR. ROSENTHAL:** Let's take a
21 five-minute break, please.
22      **THE VIDEOGRAPHER:** We're off the
23 record.
24      (Recess:  3:12 to 3:18 p.m.)
25      **THE VIDEOGRAPHER:** We're back on the

Page 86

1 record.
2 **BY MR. ROSENTHAL:**
3   **Q.**  Could you look at Exhibit 17 again, the
4 pictures.  And I'd like you to jump ahead to
5 Compression 294.  It's a few beyond where we were.
6 Can you identify who is in that picture?
7   **A.**  To the left I think that's Nurse Smith and
8 Nurse Fagan in the middle.  And I don't know for
9 sure but possibly Deputy Correll.
10   **Q.**  I --
11      **MR. COLEMAN:** I apologize.  Where were
12 you?
13      **MR. ROSENTHAL:** Compression 294.  It's
14 this picture.
15 **BY MR. ROSENTHAL:**
16   **Q.**  Then the next page, Compression 299, does
17 that help you as to whether that's Correll or not?
18   **A.**  No.  I can't see his face.  The only
19 reason I think it's Correll is because he relieved
20 Deputy Dotson from that post on swing shift.  And he
21 is bald.
22   **Q.**  In terms of in the courtroom again, did
23 you tell me Thomas and White and Fagan were all in
24 the courtroom?
25   **A.**  I don't know if Vicki Thomas was there or

Page 87

1 not.  I don't recall.
2   **Q.**  Did you receive some type of an award for
3 your activities that day?
4   **A.**  I did.
5   **Q.**  Who gave that to you?
6   **A.**  Administration, I guess.
7   **Q.**  Who nominated you for it?  Do you know?
8   **A.**  I think -- not certain -- I think it was
9 Sergeant Darreyl Davis.  And it would have had to
10 have been passed down, I guess, or signed off on by
11 Lieutenant Ewing.
12   **Q.**  What is your understanding of the reason
13 that you received the award?
14   **A.**  For taking control of the incident.
15      (Deposition Exhibit No. 19
16      marked for identification.)
17 **BY MR. ROSENTHAL:**
18   **Q.**  So Exhibit 19, is that the notification
19 you received of the award?
20   **A.**  Yes.
21   **Q.**  So do you agree that Mr. Green was
22 properly taken care of?
23   **A.**  At the time, yes -- or I assumed that he
24 had.
25      (Deposition Exhibit No. 20

Page 88

1      marked for identification.)
2 **BY MR. ROSENTHAL:**
3   **Q.**  I'm marking as Exhibit 20 a document that
4 appears to be a notebook.  It's called the emergency
5 logbook.  Am I right about that?
6   **A.**  That's what it says.
7   **Q.**  Is it just a three-ring binder?
8   **A.**  I have no idea what this is.  Never seen
9 it before.
10   **Q.**  Look at page 2.  You see there's an entry
11 at 1043?  You see that?
12   **A.**  Yep.
13   **Q.**  You recognize that handwriting?
14   **A.**  No.
15   **Q.**  Then there's an entry at 1645.  Do you
16 recognize that handwriting?
17   **A.**  No.
18   **Q.**  Do you know who Badge 279 is?
19   **A.**  No idea.
20      **MR. COLEMAN:** Sorry, Elden.  Did you
21 mark this as an exhibit?
22      **MR. DEVLIN:** 20.
23   **A.**  This must -- well, this might be a log
24 note from the control -- our control center.
25 **BY MR. ROSENTHAL:**

Exhibit 1 - Page 12 of 13
Dec'l of JTD

Page 97

1   **A.** I don't -- I don't recall. Did I ask him
2   in the video?
3   **Q.** Did you see yourself asking him that in
4   the video?
5   **A.** I don't recall if I did or not.
6   **Q.** And what was going through your mind as
7   you took his clothes off and he then fell out of the
8   wheelchair? Did you think he was just faking it?
9   **A.** Didn't really think about it.
10  **Q.** Were you relying upon the Corizon's
11  nursing staff's assessment that he was
12  neurologically intact?
13  **A.** Yes.
14  **Q.** Would you have handled him that way if you
15  had been told that he had a spinal cord injury?
16  **A.** Oh, not -- no.
17  **Q.** What would you have done?
18  **A.** I could have called EMS.
19  **Q.** Do you have any criticism whatsoever of
20  the Lane County sheriff's officers' handling of the
21  events during your shift on February 12th?
22  **A.** Of the deputy staff? No. None at all.
23  **Q.** Do you have any criticism at all of the
24  Corizon staff?
25  **A.** Only that obviously he was misdiagnosed.

Page 98

1   **Q.** Have you suggested to anyone in command
2   that there an investigation as to how there can
3   be a misdiagnosis of someone being quadriplegic?
4   **A.** No.
5   **Q.** To your knowledge, has there been any
6   investigation whatsoever by the Lane County
7   sheriff's office about what went wrong in the
8   Corizon office?
9   **A.** No.
10  **MR. ROSENTHAL:** That's all. Thanks.
11  **MR. NEWTON-TAPIA:** I've got a few.
12
13  **EXAMINATION**
14  BY MR. NEWTON-TAPIA:
15  **Q.** Would you refer to Exhibit 16, your
16  diagram?
17  **A.** Oh, my diagram. This is medical.
18  **Q.** Is that within the secured facility, the
19  jail facility?
20  **A.** Yes.
21  **Q.** Is it accessible to outside individuals,
22  for instance, at request?
23  **A.** No.
24  **MR. NEWTON-TAPIA:** I'd ask that it be
25  marked as confidential. Do you have any objection

Page 99

1   to that?
2   **MR. ROSENTHAL:** No objection. You can
3   just write it right on there.
4   BY MR. NEWTON-TAPIA:
5   **Q.** Would you, please.
6   **A.** (Marking.)
7   **Q.** You were asked concerning dropped charges,
8   and I believe your answer was dropped so they could
9   attend trial. Is that pretty close to your
10  recollection?
11  **A.** For -- if he was to be released the
12  charges would be dropped?
13  **Q.** Yes.
14  **A.** They wouldn't necessarily be dropped.
15  They are set out for a farther court date. He would
16  just be released from our custody.
17  **Q.** So in terms of criminal prosecution, it
18  actually doesn't affect it at all. Right?
19  **A.** Correct.
20  **Q.** Thank you. Referring to the still videos
21  previously marked as Exhibit No. 17, are those
22  interior parts of the jail facility?
23  **A.** The whole thing is interior of the jail.
24  **Q.** Are those areas that are accessible by
25  tour or otherwise to outside people?

Page 100

1   **A.** No.
2   **MR. NEWTON-TAPIA:** I'd ask that it's
3   marked as confidential, Exhibit 17. Any objection?
4   **MR. ROSENTHAL:** Yes, I object.
5   **MR. NEWTON-TAPIA:** Nothing further.
6   **MR. COLEMAN:** I'll reserve.
7   **MR. ROSENTHAL:** Okay. Do you want him
8   to read? Do you want him to read and sign?
9   **MR. NEWTON-TAPIA:** What he is asking
10  is do you want to have an opportunity to be able to
11  read your transcript to make sure that the court
12  reporter got all of your words correct?
13  **THE WITNESS:** Sure, yes.
14  **MR. NEWTON-TAPIA:** Yes, we will.
15  **MR. ROSENTHAL:** Fine. That's all.
16  Thank you.
17  **THE VIDEOGRAPHER:** We are off the
18  record.
19  (The deposition was concluded
20  at 3:46 p.m.)

Exhibit 1 - Page 13 of 13
Dec'l of JTD