*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

*Mark Begines*
*January 27, 2014*



CC Reporting & Videoconferencing
172 East 8th Avenue
Eugene, OR 97401

*Original File WhiteKirstin_4PP.pdf*
*Min-U-Script® with Word Index*

Exhibit 2 - Page 1 of 3
Dec'l of JTD

Kelly Conrad Green II v  
Corizon Health, Inc., et al.
Mark Begines  
January 27, 2014

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CONRAD GREEN II, an         )  
individual by and through his     )  
Guardian ad litem Derek Johnson,)  
        Plaintiff,        )  
  v.                            )No. 6:13-cv-01855-T  
CORIZON HEALTH, INC., a           )  
Tennessee Corporation; et al.,    )  
        Defendants.       )

DEPOSITION OF MARK BEGINES

January 27, 2014

Tuesday

11:51 A.M.

THE VIDEOTAPED DEPOSITION OF MARK BEGINES was taken at 172 East 8th Avenue, Eugene, Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

INDEX

WITNESS..........................................PAGE

MARK BEGINES

    BY MR. ROSENTHAL                               4

EXHIBITS:  None marked.

Page 2

APPEARANCES

For the Witness:

    EUGENE CITY ATTORNEY'S OFFICE  
    125 East 8th Avenue, 2nd Floor  
    Eugene, OR 97401  
    541/682-8447  
    BY:  MR. BEN MILLER

For the Plaintiff:

    ROSENTHAL GREENE & DEVLIN  
    121 SW Salmon Street, Suite 1090  
    Portland, OR 97204  
    503-228-3015  
    BY:  MR. ELDEN ROSENTHAL  
        MR. JOHN DEVLIN

For Corizon Defendants:

    STEWART SOKOL & GRAY, LLC  
    2300 SW First Avenue, Suite 200  
    Portland, OR 97201  
    503-221-0699  
    BY:  MR. JAMES DAIGLE  
        MR. ROBERT COLEMAN

For Lane County Defendants:

    OFFICE OF LEGAL COUNSEL  
    LANE COUNTY COURTHOUSE  
    125 East 8th Avenue  
    Eugene, OR 97401  
    541-682-3728  
    BY:  MR. SEBASTIAN NEWTON-TAPIA

Also Present:  MS. JAMIE IBOA

Videotaped by:  VERBATIM VIDEO, BEN BOCHNER

Reported by:  ELEANOR G. KNAPP, CSR-RPR

Page 4

1      MARK BEGINES,
2 having been first duly sworn to testify the truth,
3 the whole truth, and nothing but the truth, was
4 examined and testified as follows:
5
6      EXAMINATION
7 BY MR. ROSENTHAL:
8   Q.   Hi.  My name is a Elden Rosenthal.  I'm a
9 lawyer in Portland.  Mr. Devlin and I represent the
10 estate of Kelly Green.  The gentleman that this case
11 is about has passed away since your pickup.
12      My goal here is to find out information.
13 I'm not going to try to trick you and play word
14 games.  So if I ask a question that's confusing,
15 please ask me to clarify what I'm asking you.
16 Thanks.
17      And it's a normal habit in conversation
18 when you know the question to start answering before
19 the question ends.  I do it all the time.  But in
20 this process it's best for the court reporter if you
21 are sure I'm done before you start talking.
22   A.   Okay.
23   Q.   Thanks.  I just interviewed Mr. Mitchell,
24 so I don't need to go over this in great detail.
25 What I want to find out is if there's some things

Page 9

1   **A.**   We switch calls.
2   **Q.**   Right.  So if it was his case, would he be
3   the one that would be primarily responsible for
4   doing any physical examination or testing of
5   reflexes, and things like that?
6   **A.**   Not necessarily.  We operate as a team so
7   we always -- you know, if -- during questioning if
8   he forgets something, maybe I will mention it to
9   either the patient or Mitchell so that we both have
10  an idea and we are on the right track or the same
11  idea.
12  **Q.**   Do you remember anything that Mr. Green
13  said in the first few moments that you were in the
14  jail cell with him, in your first conversation with
15  him?
16  **A.**   Well, yeah.  I remember when we entered
17  into the room, walked over to him, wanted to make
18  sure that he didn't have something under the
19  blankets, because they were nice and smooth, not
20  like ruffled up like he had been moving around.  His
21  hands were -- appeared to have his hands like this.
22  So I came over to him -- I can't remember if I
23  introduced myself, whatever the case may be.  But I
24  lifted up the blanket and his hands were just like
25  this.

Page 10

1       And I don't recall what I said to him, but
2   I ended up putting my hand onto his temporal area to
3   hold his -- yeah, like this -- to be able to hold
4   his head straight so he didn't move side to side.
5   **Q.**   Why did you do that?
6   **A.**   C spine precautions.  If there's a head
7   injury, you know, we need to rule out that there's
8   nothing else such as spinal trauma.  And if that's
9   the case, then we need to take C spine.
10  **Q.**   So I interrupted what you were telling me.
11  So you reached over and you grabbed his forehead.
12  Do you remember anything about that initial
13  conversation with him?
14  **A.**   I don't know at what point in time he
15  ended up saying -- you know, how I asked him a
16  question, "Hey, can you move your fingers or move
17  your toes for me?"  But he said, "I can't move
18  anything."  And then I -- I ended up going down -- I
19  remember reaching down and grabbing some of his arm
20  hairs.
21  **Q.**   His arm hairs?
22  **A.**   Yeah, just to tug on them which would
23  cause some stinging pain in a sense to see if he
24  could feel that.  I grabbed some arm hairs.  I said,
25  "Can you feel that?"  He is like, "No."

Page 11

1       And then at one point in time I asked
2   Mitchell to do the same with the leg.  "Can you feel
3   that?"  He is like, "No."
4       I can't recall if Mitchell ended up
5   touching his feet.  I asked him at one point in
6   time, "Wiggle your toes," because I could see that
7   they were moving slightly.  And I've been on a few
8   other incidences where there's been some paralysis
9   on patients out in the field and I've seen that
10  before.
11  **Q.**   That their toes will wiggle?
12  **A.**   It's not like big movements.  It's very
13  small movements.  And then --
14  **Q.**   So you asked him if he could move his
15  toes?
16  **A.**   Yeah.  And he said no, he can't move
17  anything.
18  **Q.**   But you saw they were moving slightly?
19  **A.**   Just very little.
20  **Q.**   And he said that he couldn't move them?
21  **A.**   Yeah.  And he didn't have any feeling.
22  **Q.**   Do you remember when your partner picked
23  his arm up and asked him if he could hold his arm
24  up?
25  **A.**   No.

Page 12

1   **Q.**   Do you remember your partner doing the
2   Babinski on the bottom of his foot?
3   **A.**   No.  I don't recall that.
4   **Q.**   Was it pretty obvious to you within a few
5   minutes in the jail cell that there was a probable
6   spinal cord injury?
7   **A.**   Yes.
8   **Q.**   What did -- and did you and your partner
9   verbalize it to each other, "Uh-oh, we've got a
10  spinal cord injury here"?
11  **A.**   Yeah. I remember talking to Mitchell
12  after looking at -- I believe it was after looking
13  at his vital signs.  You know, whether or not this
14  guy was faking or not, his vital signs are pointing
15  to neurogenic shock, which would indicate spinal
16  cord injury.  It fits the full criteria.
17       And I remember saying that, "This is not
18  for us to determine if he is faking.  We need to
19  properly treat him and take him to the hospital and
20  have him evaluated.  This is a full trauma
21  activation so we need to get this rolling."
22  **Q.**   Had somebody suggested to you he might be
23  faking?
24  **A.**   I don't remember that.
25  **Q.**   I was just curious why you said it that