*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

*Patricia Bichsel*
*February 25, 2014*



CC REPORTING & VIDEOCONFERENCING
172 East 8th Avenue
Eugene, OR 97401

*Original File*
*Min-U-Script® with Word Index*

Exhibit 3 - Page 1 of 4
Dec'l of JTD

| Kelly Conrad Green II v | Patricia Bichsel |
| --- | --- |
| Corizon Health, Inc., et al. | February 25, 2014 |

```
            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF OREGON


KELLY CONRAD GREEN II, an      )
individual by and through his  )
Guardian ad litem Derek Johnson,)
           Plaintiff,          )
    v.                         )No. 6:13-cv-01855-T
CORIZON HEALTH, INC., a        )
Tennessee Corporation; et al., )
           Defendants.         )


            DEPOSITION OF PATRICIA BICHSEL
                 February 25, 2014
                    Tuesday
                    2:40 P.M.


        THE VIDEOTAPED DEPOSITION OF PATRICIA
BICHSEL was taken at 172 East 8th Avenue, Eugene,
Oregon, before Eleanor G. Knapp, CSR-RPR, Certified
Shorthand Reporter in and for the State of Oregon.
```

Page 3

INDEX

WITNESS..........................................PAGE

PATRICIA BICHSEL

    BY MR. DEVLIN                                       4


EXHIBITS....................................REFERRED

No. 3    Drill Down Detail Report              16

No. 5    Initial Assessment Instrument, 2/11/13  19

No. 6    Adult Corrections Book In Form        8, 15

Page 2

```
                  APPEARANCES


    For the Plaintiff:

        ROSENTHAL GREENE & DEVLIN
        121 SW Salmon Street, Suite 1090
        Portland, OR 97204
        503-228-3015
        BY:  MR. JOHN DEVLIN

    For Corizon Defendants:

        STEWART SOKOL & GRAY, LLC
        2300 SW First Avenue, Suite 200
        Portland, OR 97201
        503-221-0699
        BY:  MR. ROBERT COLEMAN (via speakerphone)


    For Lane County Defendants:

        OFFICE OF LEGAL COUNSEL
        LANE COUNTY COURTHOUSE
        125 East 8th Avenue
        Eugene, OR 97401
        541-682-3728
        BY:  MR. SEBASTIAN NEWTON-TAPIA

    Videotaped by:

        STAFFORD VIDEO, MARK STAFFORD

    Reported by:

        ELEANOR G. KNAPP, CSR-RPR
        CC REPORTING & VIDEOCONFERENCING
```

Page 4

1        PATRICIA BICHSEL,
2  having been first duly sworn to testify the truth,
3  the whole truth, and nothing but the truth, was
4  examined and testified as follows:
5
6         EXAMINATION
7  **BY MR. DEVLIN:**
8    **Q.**   Good afternoon.
9    **A.**   Good afternoon.
10   **Q.**   What's your current job?
11   **A.**   Corrections deputy at Linn County.
12   **Q.**   How long have you worked for the Lane
13  County sheriff's office?
14   **A.**   Linn County?  I've worked --
15   **Q.**   Oh, Linn County.
16   **A.**   Sorry.  Yeah, Linn.  I've worked for about
17  six months now.
18   **Q.**   And what was your job before you started
19  at Linn County?
20   **A.**   Corrections deputy at Lane County.
21   **Q.**   How long did you work at Lane County?
22   **A.**   This is where it gets difficult.  A total
23  of about three years.  I worked about five months as
24  my last job at Lane County as a corrections officer.
25  A year before that, that whole year, I was a records

Page 21

1  Q.  Sure.
2  A.  So we'll deal with it how we can at the
3  time.
4  Q.  And then on the third page there's a box
5  towards the bottom that says "Medical contacted."
6  And in this case it's checked off.  Do you know -- I
7  know you didn't check it off, but just in general in
8  Lane County when is that box checked off?
9  A.  That's actually, you have to do it during
10 -- while you are in this area of the computer for
11 the initial assessment form or questions, as I call
12 them, and you have to physically click through them
13 as in there's several different pages that pop up
14 with all this information.  Okay, this.  Okay, this.
15      And then this part, the bottom part,
16 actually wouldn't -- it doesn't automatically fill
17 or anything.  And the only reason you would actually
18 say medical contacted or put any of these is if you
19 actually did that because you don't -- you don't
20 have to mark anything here.  You can just go on.
21      And me, myself, unless I actually, you
22 know, filled out a suicide precaution form, I
23 wouldn't have checked it because you don't need to.
24 It's just an added step on there.
25      So if you did, yes, you put that.  It

Page 22

1  notifies whoever or it says -- so we can look back
2  and see, oh, yeah, there is a suicide precaution
3  form here -- oh, there is -- you know, a supervisor
4  was contacted.
5  Q.  So again, I appreciate you didn't fill it
6  out.  But in your training at the sheriff's office,
7  would you have checked medical contacted because you
8  had --
9  A.  Only if I had contacted medical.  I would
10 not have done it any other time.
11 Q.  About a particular issue related to the
12 inmate?
13 A.  Yeah.  I'd say, "Hey" -- call them or go
14 see them myself.  I would say, "Hey, you know, I
15 think -- you know, this inmate came in, this
16 arrestee came in.  He has these issues.  He is doing
17 this.  Do you think you should look at him?  I
18 think, you know, there's something there that might
19 need to be seen," because otherwise there's no
20 reason to contact medical.
21 Q.  Okay.  And then while you were working at
22 the Lane County jail then in February 2013, when
23 were the initial medical assessments being done of
24 the folks brought into the jail?
25 A.  As soon as they enter our book in area.

Page 23

1  As I said, when you -- after you go talk to the
2  officer, you get the person in our facility, I have
3  them face what's called the booking wall.  So you
4  are asking them before -- they are still handcuffed.
5  You are still assessing them, the assessment
6  questions.  And you ask them, as I stated, "Are you
7  ill, injured," any of that.
8       That's when you are assessing them.  You
9  are figuring out what's going to happen with them,
10 where you are going to put them, how are they
11 feeling at the time.  That's the time that you are
12 asking those questions.
13      This form is filled out later.  I can't
14 tell you exactly times later because -- as in hours,
15 minutes, seconds -- due to the how fast and how many
16 book ins we're doing and how many people are in book
17 in.  Most deputies, such as myself, write it down to
18 make sure I have it to put on the form.  Some
19 deputies are really good and actually remember them.
20 I can sometimes remember face to face -- oh, yes, I
21 know this person.  I remember what he said.  And
22 that is when this is filled out.
23 Q.  But was there a separate assessment that
24 was done by someone from Corizon?
25 A.  I wouldn't know that.  Honestly, if I had

Page 24

1  called -- as a deputy had called Corizon, said,
2  "Hey, this person needs looked at," they came down
3  and I was -- I would be with them or a deputy would
4  be with them when they did this assessment or
5  somebody would be with them or they'd be talking
6  through the door because they can't -- we can't let
7  them enter because it's too dangerous or whatever
8  might happen -- either a deputy is with them and
9  sometimes they would talk to them through the door
10 by themselves because you don't need a deputy there
11 to talk through a door.  There would have to be a
12 deputy, though, if there was contact.
13      At this -- I don't remember this time.
14 Most of the time when I contact medical and they
15 come down I would escort them and tell them, "Hey,
16 what's up with this person," and then I would be
17 with them while they are interviewing and talking to
18 this person.
19 Q.  But in terms of the routine person, was
20 there some step where an initial -- Corizon was
21 doing some initial medical assessment of a person
22 when they were brought into the jail?
23 A.  If needed.
24 Q.  No, I mean just everybody who comes in.
25 A.  Oh.  Not everybody that comes in is seen

Page 25

1  by medical at the time that I was working. They
2  have a done a lot of changes, I know.
3       Not everybody was unless there's -- you
4  know, obviously if they are withdrawing or going to
5  have a medical issue or if I feel that, hey, this
6  guy is not standing by himself very well or whatever
7  is happening, we have medical come up and clear them
8  to enter our facility.
9       If this person is, you know, walking of
10 his own accord into our facility and even if they
11 are agitated -- if they deny having medical issues
12 and I'm, like, you know, actually, no, I don't think
13 he has anything that we can -- you know, there's no
14 medications, he's not withdrawing, it's not
15 something he is going, right now, to, you know, have
16 any issue with, then I most likely would not have
17 had medical come look unless I had a legit reason to
18 have them come up to book in to check this person.
19   Q.   Right. So while you were a records clerk,
20 to your knowledge just the average person brought
21 in --
22   A.   No.
23   Q.   -- wasn't get a medical screening from
24 Corizon?
25   A.   No, not as a records officer. I wasn't

Page 26

1  really paying much attention to that as a records
2  officer because I was actually very busy doing these
3  things. But not everybody gets looked at.
4    Q.   So then, last topic, do you -- you
5  referenced at some point hearing something about
6  what happened to Mr. Green. Can you tell me what
7  you heard about?
8    A.   Actually, I believe it was the next day
9  that I was on shift. And I can't tell you what day
10 or time. Just hearing about something that happened
11 up in court and how the person might have hurt
12 themselves.
13      I was like, oh, that's -- that's really
14 bad. That's kind of -- you know, I don't know, for
15 lack of a better term, that sucks.
16      But that's basically what I heard. As I
17 said, I'm a records officer. I just hear it. I
18 wasn't there, you know, so I can't say anything
19 about it. Just hearing about what happened because
20 it's a jail. We are not a huge jail so we kind of
21 hear about all the inmates, you know, and what
22 happens, you know, with them.
23      And I just heard he was in court and had
24 done something to hurt himself. And that's really
25 all I heard.

Page 27

1    Q.   And do you recall ever hearing anything in
2  the, you know, days after this happened with
3  Mr. Green about the idea that he hadn't been taken
4  to the hospital for several hours?
5    A.   I had heard that after leaving the
6  courtroom he was escorted to our segregation unit.
7  And this is just I heard it; I don't know if this is
8  what happened. And then after being in our
9  segregation unit, he had been looked at -- I don't
10 know if previously, that time, after -- and they
11 needed him taken to a hospital which I assume
12 happened because I don't believe I was there when
13 that happened. I could have been, but I don't
14 recall. And that is what I'd heard.
15   Q.   But in addition to that, any -- did you
16 hear anything about the idea that there had been
17 some sort of delay or that, you know, he had been
18 cleared earlier? Anything --
19   A.   I had heard that he had been taken from
20 the courtroom to our segregation unit. Again, I
21 just heard it; I wasn't there.
22      That he had been seen as -- I don't know
23 if medical had checked him out. I don't know who
24 said this or where this had come from, that, oh, he
25 might -- you know, he might just be faking it. You

Page 28

1  never know.
2       And I had heard he was still acting really
3  crazy at the time and that's why he was taken to our
4  segregation unit, because we don't -- we only have,
5  like, six cells. We don't have a ton of room. So
6  unless he was doing something to really regulate
7  being put into a segregation cell, then he wouldn't
8  have been.
9       But I was told he was still being crazy
10 and they decided to take him to segregation out of
11 the courtroom. And I don't know -- again, I don't
12 know if medical looked at him then or after what had
13 happened. So I had heard he got put in a
14 segregation cell and later on had to be transported
15 to the hospital.
16   Q.   And, last one, anything about the idea
17 that the deputy at segregation had tried to contact
18 medical that afternoon and hadn't got any response,
19 anything like that?
20   A.   I wouldn't know. I hadn't heard anything
21 about that either way. I hadn't heard negative or
22 positive about that.
23   Q.   From your perspective as a records officer
24 and then again as a deputy before you left the Lane
25 County sheriff's office, are there any changes to