*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

*Donald Burnette*
*February 27, 2014*



172 East 8th Avenue
Eugene, OR 97401

*Original File klotz_4PP.pdf*
*Min-U-Script® with Word Index*

Exhibit 6 - Page 1 of 7
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Donald Burnette
February 27, 2014

---

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CONRAD GREEN II, an          )

individual by and through his      )

Guardian ad litem Derek Johnson,)

        Plaintiff,          )

   v.                              )No. 6:13-cv-01855-T

CORIZON HEALTH, INC., a            )

Tennessee Corporation; et al.,   )

        Defendants.         )

DEPOSITION OF DONALD BURNETTE

February 27, 2014

Thursday

9:00 A.M.

THE VIDEOTAPED DEPOSITION OF DONALD
BURNETTE was taken at 172 East 8th Avenue, Eugene,
Oregon, before Eleanor G. Knapp, CSR-RPR, Certified
Shorthand Reporter in and for the State of Oregon.

---

INDEX

WITNESS.......................................PAGE

DONALD BURNETTE

   BY MR. DEVLIN                    4, 91

   BY MR. NEWTON-TAPIA              90

EXHIBITS...............................REFERRED

No. 3    Drill Down Detail Report          18

No. 17   Stills from Videotape          65, 71

No. 18   Memo (Burnette)          5, 17, 20, 36,

                      48, 52, 66, 76, 84

No. 23   Inmate Observation Report Form    34, 37,

                      43, 45, 59

No. 26   Log notes          5, 17, 31, 75

No. 59   Suicide Precaution Form          28

---

Page 2

APPEARANCES

For the Plaintiff:

   ROSENTHAL GREENE & DEVLIN
   121 SW Salmon Street, Suite 1090
   Portland, OR 97204
   503-228-3015
   BY:  MR. JOHN DEVLIN
      MR. ELDEN ROSENTHAL (via speakerphone)

For Corizon Defendants:

   STEWART SOKOL & GRAY, LLC
   2300 SW First Avenue, Suite 200
   Portland, OR 97201
   503-221-0699
   BY:  MR. ROBERT COLEMAN (via speakerphone)

For Lane County Defendants:

   OFFICE OF LEGAL COUNSEL
   LANE COUNTY COURTHOUSE
   125 East 8th Avenue
   Eugene, OR 97401
   541-682-3728
   BY:  MR. SEBASTIAN NEWTON-TAPIA

Videotaped by:

   STAFFORD VIDEO, MARK STAFFORD

Reported by:

   ELEANOR G. KNAPP, CSR-RPR
   CC REPORTING & VIDEOCONFERENCING

---

Page 4

1     DONALD BURNETTE,
2 having been first duly sworn to testify the truth,
3 the whole truth, and nothing but the truth, was
4 examined and testified as follows:
5
6       EXAMINATION
7 BY MR. DEVLIN:
8   Q.  Good morning.  My name is John Devlin.
9 I'm a lawyer up in Portland, and I've brought a
10 lawsuit for the estate of Kelly Green against a
11 number of defendants based on an incident that
12 happened back in February 2013, last year.  I've
13 just asked you to come here this morning because I
14 have some questions about what you saw and heard
15 that day.
16   A.  Sure.
17   Q.  This is the way I get to talk to you and
18 find out more than you've written in the memos and
19 things.
20     If you need to take a break, we'll take a
21 break whenever you want.  And if you don't
22 understand one of my questions, let me know what you
23 don't understand and I'll try to ask a better
24 question.
25   A.  Okay.

---

Exhibit 6 - Page 2 of 7
Dec'l of JTD

Page 13

1 unusual. I mean, there was a number of deputies,
2 three or four deputies at least. And when you have
3 that many people moving someone -- I'm assuming it
4 was in a wheelchair because when I walked around I
5 believe he was in a wheelchair -- you know, that's
6 going to make more of a noise than what you are
7 accustomed to hearing and so we would go and check
8 on it. Not our job but, you know, being in seg/med,
9 hearing that, walked around to see what was going
10 on.
11         And like I said, saw what looked like was
12 someone that was going to be coming to me so I went
13 back and got the seg cell ready.
14    Q.   And so as I recall from going through the
15 jail, it's -- I mean, I can't -- what would you
16 estimate? It's pretty close from the seg/med office
17 to the medical office. It's basically right around
18 the corner?
19    A.   It's right around the corner -- 20, 30
20 feet just because you have to go around a small -- a
21 small wall.
22    Q.   And then I recall there's one or two doors
23 that separate it. But at least one of those doors
24 you remember was open?
25    A.   One door in between seg/med and the

Page 14

1 corridor that goes into medical. That was open.
2 And then there was -- they were in the room closest
3 to me, I believe. That door was also open.
4    Q.   And so do you remember whether you ever
5 actually went into the room where Mr. Green was
6 being worked on?
7    A.   Just at the door. And it was just
8 briefly.
9    Q.   So when you -- so you were able to look?
10 You got close enough to look in the door?
11    A.   Yes.
12    Q.   Do you remember at all what you saw was
13 going on when you looked in?
14    A.   I saw the deputies restraining Mr. Green,
15 Mr. Green sitting in the wheelchair. And I remember
16 PA White being in there. I don't remember what she
17 was doing. Like I said, it was a brief -- I looked
18 in there, saw that this was probably someone that
19 was coming to me based on the fact that there was
20 four officers restraining him -- three or four. And
21 so then I left.
22    Q.   And when you used word restraining -- I
23 know from talking to the officers there were people
24 basically at his arms holding his arms down.
25    A.   Correct.

Page 15

1    Q.   In the time you saw him, did you see him
2 doing any movements or resisting in any way?
3    A.   I did not. But like I said, it was very
4 -- it was just a very brief look in there, see what
5 was going on, and go get my area ready.
6    Q.   I just want to make sure I understand what
7 you meant by restraining. It was more they were
8 holding.
9    A.   They were -- one officer was holding an
10 arm down onto the chair, on the arm. The other
11 officer was holding an arm. I'm not sure if it was
12 on the chair or they just had it. I can't remember
13 if there was officers restraining his legs, but that
14 would be typical for someone that you expected to
15 resist.
16    Q.   Did you talk -- before you went back to
17 seg/med, did you talk to anyone about -- get any
18 more information about what had happened or what was
19 going on with Mr. Green, anything like that?
20    A.   No.
21    Q.   So you just assumed that he was going to
22 be coming over to you because of the number of
23 deputies around him?
24    A.   Four officers restraining, yeah. I
25 figured good chance he was coming to my segregation

Page 16

1 side.
2    Q.   And tell me if I've got it wrong, but the
3 reason you would assume that was because of a
4 segregation or a disciplinary problem as opposed to
5 suicide watch, for example.
6    A.   Correct.
7    Q.   Or a medical problem.
8    A.   Correct.
9    Q.   So do you know -- so it sounds like you
10 recognized PA White by sight. You knew who she was?
11    A.   Yes. Yes.
12    Q.   Did you know who Vicki Thomas was?
13    A.   No.
14    Q.   Do you recall overhearing any discussion
15 while you were in the medical area -- and I
16 appreciate it was for a brief time. I just want to
17 make sure.
18    A.   I understand. No, I don't.
19    Q.   Any discussion about the idea of whether
20 or not Mr. Green needed to go to the hospital?
21    A.   No.
22    Q.   Or whether an ambulance needed to be
23 called for him?
24    A.   No.
25    Q.   All right. So looking at your -- if you

Exhibit 6 - Page 3 of 7
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Donald Burnette
February 27, 2014

Page 61

1    A.    No.
2    Q.    Let me just check and see if we can close
3    off.
4        MR. NEWTON-TAPIA: We have another ten
5    minutes.
6        MR. DEVLIN: Let me just check this
7    here and see if we can close off.  Okay.  I can ask
8    about this.
9    BY MR. DEVLIN:
10   Q.    So at any point between the time -- so let
11   me finish this off.  According to your memo it looks
12   like after Mr. Pleich left the next event that
13   happened of any significance was that you were
14   relieved by Deputy Correll?
15   A.    Correct.
16   Q.    And at the time you were relieved by
17   Deputy Correll no one from Corizon medical had yet
18   come to see Mr. Green?
19   A.    Correct.
20   Q.    Do you recall discussing at any point from
21   the time Mr. Green got to seg/med to when you left
22   duty that day talking to your sergeants about what
23   was going on with Mr. Green?
24   A.    Yes.
25   Q.    Tell me what you remember about that.

Page 62

1    A.    Somewhere in about the middle of this time
2    frame here I called -- I believe I got ahold of
3    Sergeant Davis.
4    Q.    That's Darreyl?
5    A.    Darreyl Davis, and basically told him the
6    same thing that I told Corizon, to give him an
7    update.  Being my sergeant, I wanted to keep him in
8    the loop.  And he asked if I informed medical, which
9    I said yes.  He said, "Okay.  Continue on."
10   Q.    Do you recall whether you had that
11   discussion before your lunch break or after?
12   A.    That I do not.  If I had to guess, I would
13   say before my lunch break because, you know, that's
14   I believe when I was making most of the calls and
15   such.  But I -- I don't remember exactly whether it
16   was before or after I got back.
17   Q.    So there's the one call where you got
18   Sergeant Davis.  Did you talk to anybody -- were
19   there any other calls with a sergeant that day?
20   A.    Just that one.
21   Q.    One time.  And do you recall Sergeant
22   Davis telling you to document everything?
23   A.    That was the next day.
24   Q.    Oh, to write the memo.
25   A.    Correct.

Page 63

1    Q.    Okay.  But not at the time?
2    A.    Yeah.  Correct.  Yeah, this memo was
3    submitted the next day after I came back in.
4    Q.    But as opposed to the next day, you don't
5    have a memory of when you talked to Sergeant Davis
6    that same day of him telling you, "Make sure you
7    document what you are doing," that kind of thing?
8    A.    You mean as far as log notes or this memo
9    specifically?
10   Q.    Not the memo specifically.  Here's what I
11   have in mind.
12   A.    The sergeants always tell us to make log
13   notes so I am sure that he said, "Make sure you
14   document."
15   Q.    And when you talked to Sergeant Davis, did
16   he say anything to you about the idea that anyone
17   from Corizon had said that Mr. Green needed to go to
18   the hospital?
19   A.    No.
20   Q.    He didn't say that someone from Corizon
21   had said to him, Sergeant Davis, that Mr. Green
22   needed to go to the hospital?
23   A.    No.
24        MR. DEVLIN: Well, this is probably a
25   good time for a break.  I'm actually through a fair

Page 64

1    amount of it.
2        Mr. Coleman, just so Deputy Burnette
3    can plan his day, are you planning to ask questions
4    of him?
5        MR. COLEMAN: No, I was not.
6        MR. DEVLIN: Great.  Let's take our
7    break and we can get organized.  I don't think I'll
8    have much more for you.
9        THE WITNESS: Okay.
10       THE VIDEOGRAPHER: We'll go off the
11   record.  Our time is 10:23.
12       (Recess:  10:23 to 11:07 a.m.)
13       THE VIDEOGRAPHER: We are back on the
14   record.  Our time is 11:07.
15   BY MR. DEVLIN:
16   Q.    Great.  I want to clean up a couple of
17   loose ends from what we already talked about, so
18   I'll jump around a bit and then we'll finish this
19   off here.
20   A.    Sure.
21   Q.    The nurse that you -- the person from
22   Corizon that you talked to that you thought was a
23   nurse, do you remember if it was a male or a female?
24   A.    Female.
25   Q.    I'm showing you what's been marked as

Exhibit 6 - Page 4 of 7
Dec'l of JTD

Page 65

1 Exhibit 17. And Exhibit 17 is a series of stills
2 that I created from the video in the jail. And the
3 one I'm showing you, it's got a compression number.
4 That's how we tell the difference. It says
5 Compression 30. Can you just tell me, is that a
6 picture of you?
7   A.  Yes.
8   Q.   So I'm trying to piece together whether --
9 do you remember whether you played some role in
10 bringing the wheelchair to the courtroom or getting
11 it close to the courtroom at all?
12   A.   Medical -- I'm trying to figure out where
13 this is. So there's the medical clinic. This
14 doesn't look like intake.
15   Q.   I believe, but I'm not sure, that you are
16 walking towards the gate where you get to the
17 elevators, if that makes sense?
18   A.   Oh, yes. Okay. I was thinking -- trying
19 to get it oriented to segregation. Yeah, this is
20 outside. I didn't remember that, but I must have.
21 This is the wheelchair going up.
22   Q.   Okay. But even seeing that, you don't
23 have a memory of doing it at all?
24   A.   No. We wheel wheelchairs out for people
25 to pick up all the time.

Page 66

1   Q.   When you say for people to pick up --
2   A.   Another area. Like because we can only go
3 so far, like with me being in segregation, I
4 wouldn't leave, you know, that -- that general area
5 to wheel a wheelchair maybe out to an elevator, but
6 certainly not go to the second floor.
7   Q.   I see. So -- and again, this is trying to
8 piece this together. But even if that's you
9 bringing the wheelchair --
10   A.   This is me.
11   Q.   Right. But if it's at the time where you
12 are bringing it from the medical area to provide to
13 Mr. Green, you would not have gotten in the elevator
14 to go where the courtroom was. You would have just
15 probably left it in the elevator area.
16   A.   Or the sally port, yeah.
17   Q.   That makes sense. All right.
18       All right. So going back to your Exhibit
19 18, your memo that you wrote, I think we were at the
20 point, second paragraph from the bottom, where you
21 wrote [reading]: At 1530 hours I was relieved
22    from duty by DS Correll.
23       So that's Deputy Correll?
24   A.   Yes.
25   Q.   [Reading]: I informed DS Correll of

Page 67

1   Green's situation. After leaving my seg/med
2 post, I passed through medical and gave them
3 an update on Green.
4       So first, I assume just typically as part
5 of your duties when the seg/med officer takes over
6 for the new shift, you walk him through what's going
7 on with everybody on the unit?
8   A.   Correct.
9   Q.   Do you remember at all specifically what
10 you told Deputy Correll about Mr. Green?
11   A.   Not exactly. It would be my concerns that
12 he'd been in the same position that we left him and
13 that -- I probably described the incident as it was
14 relayed to me, the incident being what had happened
15 in the courtroom.
16   Q.   And do you think you would have told
17 Deputy Correll about the idea that you had contacted
18 medical a couple of times and no one had come yet?
19   A.   Most likely, yes. I -- I only say that
20 because I'm not a hundred percent sure. I just
21 can't remember the exact conversation. But
22 especially with this situation, I would have given
23 him a detailed account of what had happened up to
24 that point.
25   I assume the basic idea overall is that

Page 68

1 you are trying to give the person whatever
2 information you think is important so that can keep
3 -- basically take over for you seamlessly.
4   A.   Correct.
5   Q.   And do you remember at all what Deputy
6 Correll's reaction or response was when he heard
7 what was going on with Mr. Green?
8   A.   No real like response. I mean just okay,
9 you know. You get the information as it's given to
10 you, and then you run with it.
11   Q.   Okay. And then you wrote [reading]:
12   After leaving my seg/med post, I passed
13   through medical and gave them an update on
14   Green.
15       Do you remember who you talked to at that
16 point?
17   A.   I don't. And as I was explaining to my
18 lawyer, at the time medical was fairly new and I'd
19 had little interaction with them. So I wasn't
20 really familiar with most of the medical staff at
21 that time. Of course now I am because I've dealt
22 with them on a daily basis. But at that time I
23 wasn't familiar with the names and faces as much.
24   Q.   On a typical day when you are done with
25 your shift, do you have to pass through medical in

Exhibit 6 - Page 5 of 7
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Donald Burnette
February 27, 2014

Page 69

1 order to leave?
2 **A.** No, because typically I usually work in
3 book in. And so we would leave right from book in
4 out of the secure area and we would never pass
5 through medical.
6 Being in -- are you talking about on a
7 daily basis or in seg/med?
8 **Q.** On a different day when you are just doing
9 seg/med --
10 **A.** Sorry.
11 **Q.** -- would you have to pass through medical?
12 **A.** No.
13 **Q.** So that was -- you went out of your way to
14 go to the medical office to give them an update?
15 **A.** Yes.
16 **Q.** Do you remember at all what -- whoever you
17 talked to, do you remember what you told them at
18 that time?
19 **A.** I gave them an update of what I had
20 observed since I had got Mr. Green. Told them my
21 concern that, you know, as of yet I hadn't seen any
22 movement until the blanket was placed on him.
23 Obviously I can't see movement then. Tried to
24 update what I had -- anything that had happened,
25 like mental health had seen him.

Page 70

1 **Q.** And so -- and again, at this time back in
2 December 2013, you knew PA White by sight so you
3 didn't talk to PA White.
4 **A.** She was not there. She was not in the
5 immediate area where I saw her. So I talked with
6 someone behind the medical desk. I know that was a
7 nurse. I mean, I was recognizing them as nurses.
8 Just can't remember which one it was.
9 **Q.** And so -- and I appreciate you don't
10 remember exactly what you said. You would have told
11 them in sum and substance, A, from what you observed
12 Mr. Green had not moved in several hours.
13 **A.** I just don't remember word for word, but I
14 did pass on that he hadn't moved and the
15 conversations I'd had with him, that he had stated
16 that he was paralyzed.
17 **Q.** And do you recall what the reaction was of
18 the medical person when you talked to them?
19 **A.** I believe what they said was that he was
20 going to be seen.
21 **Q.** Okay.
22 **A.** They were trying to get around to him. I
23 had the sense they had been very busy that day and
24 they were going to get to him as soon as they could.
25 **Q.** Similar reaction to what you had gotten

Page 71

1 earlier?
2 **A.** Correct.
3 **Q.** So I'll just show you this picture out of
4 Exhibit 17. And it's Compression 294 for the
5 record. So this is taken from Mr. Green's cell, and
6 I can tell you that the woman on the left is a nurse
7 named Leah Smith and the woman on the right is a
8 nurse named Sharon Fagan.
9 Looking at that, does that help you at all
10 know which person you talked to just before you left
11 work?
12 **A.** I would say, if memory serves, that it was
13 most likely Leah. I remember the dark hair now.
14 But, you know, a hundred percent -- I couldn't a
15 hundred percent sure say who it was.
16 But I can tell you whoever it was was
17 sitting at the left desk, if that helps at all.
18 **Q.** Okay.
19 **A.** When you go back there, they have a left
20 desk and a right desk. It was whoever was sitting
21 at the left desk was who I stopped and talked to.
22 **Q.** I just knew they were so different
23 physically, I didn't know if it would help.
24 **A.** If -- I believe it was Leah. But just
25 because there's -- you know, thinking about all the

Page 72

1 different things -- and again, not -- in my mind it
2 not being as serious as what it turned out to be, I
3 guess it just didn't, you know, make the impression
4 that it probably would have had I known it was as
5 serious as it was.
6 **Q.** So when you were leaving work -- so after
7 you left medical, then did you just go -- that was
8 the end of the day, you went home?
9 **A.** Yes.
10 **Q.** So as you left work that day, what did you
11 think was going on with Mr. Green?
12 **A.** He had a head injury. Obviously.
13 **Q.** You say obviously because you could see
14 the stitches?
15 **A.** The stitches and the -- the split to the
16 head. You know, some mental health issues. I was
17 concerned that there was, you know, maybe something
18 more going on, concussion or something like that.
19 But not being a medical expert, not -- you know,
20 other than the fact that it was just unusual that he
21 hadn't moved for that length of time, you know, not
22 having any real thing to base it on. I mean, I
23 wasn't going over it too much.
24 I passed on the information and, you know
25 -- I'm trying to see how to explain it. Once I pass

ccreporting.com
541-485-0111

Exhibit 6 - Page 6 of 7
Dec'l of JTD

Page 89

1  are my questions.  Mr. Coleman, do you have any
2  questions?
3      **MR. COLEMAN:** None at this time.
4  Thanks, John.
5      **MR. DEVLIN:** Okay.
6      **MR. COLEMAN:** When are we getting --
7      **MR. NEWTON-TAPIA:** I've got a couple
8  more questions first.
9      **MR. COLEMAN:** I'm sorry.
10
11      **EXAMINATION**
12  **BY MR. NEWTON-TAPIA:**
13    **Q.**   Your previous testimony was that you
14  contacted medical at least two times during your
15  shift and one at the end.  Is that correct so far?
16    **A.**   Yes.
17    **Q.**   And if I recall correctly, you said that
18  you spoke with a nurse.  Is that correct as well?
19    **A.**   Yes.
20    **Q.**   I see that there are different categories
21  of medical staff there that day, including a CMA.
22  Do you know what a CMA is?
23    **A.**   Yes.
24    **Q.**   Would you know the CMA, for instance,
25  based on the color of clothes or some other

Page 90

1  designation to show that that CMA is not a nurse?
2    **A.**   No.
3    **Q.**   Is it possible that you spoke with a CMA?
4    **A.**   It is possible, yes.
5    **Q.**   There's also a category called
6  administrative assistant.  Do you know whether the
7  administrative assistant is dressed in a different
8  kind of clothing or something that would designate
9  them as not a nurse?
10    **A.**   No.
11    **Q.**   Is it possible you spoke with an
12  administrative assistant?
13    **A.**   Yes.  I say that just because at the time,
14  being unfamiliar with them, I wasn't recognizing
15  voices.
16    **Q.**   Okay.  You were also asked concerning your
17  knowledge of release decisions.  Is -- as -- on the
18  seg/med post, would you ordinarily be told about
19  release decisions?
20    **A.**   Only when it was just prior to them
21  getting released so I could get them prepared to go
22  up to book in.
23    **Q.**   So you wouldn't be told that, for
24  instance, the decision was in the works?
25    **A.**   Not necessarily.  It's possible, but they

Page 91

1  don't -- they don't always have to let the post
2  officer know.
3      **MR. NEWTON-TAPIA:** Thank you.  Nothing
4  further.
5
6      **FURTHER EXAMINATION**
7  **BY MR. DEVLIN:**
8    **Q.**   Just to follow up, Deputy -- again, I just
9  want to make sure I've got this right because
10  Mr. Newton-Tapia asked you some follow-up questions
11  here.  When you spoke on the phone the first time
12  with -- before your lunch break with someone from
13  Corizon, from the conversation, from the back and
14  forth in the conversation, your belief was the
15  person you to were talking to was someone with
16  medical training?
17    **A.**   Correct.
18    **Q.**   As opposed to an administrative assistant?
19    **A.**   Correct.
20    **Q.**   And similarly in the second conversation
21  after your lunch break over the phone, based on what
22  was being said back and forth, your belief was you
23  were talking with someone with medical training?
24    **A.**   Yes.
25    **Q.**   Most likely a nurse?

Page 92

1    **A.**   Correct.
2    **Q.**   Both times?
3    **A.**   Yes.  And just based on the number that I
4  called.
5    **Q.**   And it was a female both times you talked
6  to on the phone?
7    **A.**   It was a female both times.  Actually, all
8  three times.  When I left the post it was also a
9  female that I spoke with.
10    **Q.**   And again, when you did it face to face,
11  based on the kind of conversation you had with the
12  person, you believed that person also had medical
13  training?
14    **A.**   At that time I recognized them as a nurse
15  because then I -- I mean, again, recognizing the
16  nurses, them just coming in, then I saw them face to
17  face.  Not committing it to memory because you get a
18  lot of names and a lot of faces with the nurses
19  coming in, new medical, so I just don't recall who
20  it was.  Like I said, I believe it was Leah, but it
21  just didn't stick in my mind at that time.
22      **MR. DEVLIN:** Just -- that's fine.
23  Just wanted to clarify that.  Okay.
24      **MR. NEWTON-TAPIA:** That's it.
25    (The deposition was concluded at 11:42 a.m.)

Exhibit 6 - Page 7 of 7
Dec'l of JTD