Kelly Green, 6/20/14                                    Johnson vs. Corizon Health, Inc.

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

DEREK JOHNSON, Personal )
Representative of KELLY CONRAD GREEN )
II, deceased; KELLY CONRAD GREEN and )
SANDY PULVER, )
          )
       Plaintiffs, )
          )
   vs.    ) Case No.
          ) 13-cv-01855-TC
CORIZON HEALTH, INC., a Tennessee )
Corporation; LANE COUNTY, an Oregon )
county; DR. CARL KELDIE, an )
individual; DR. JOE PASTOR, an )
individual; BECKY PINNEY, an )
individual; DR. JUSTIN MONTOYA, an )
individual; VICKI THOMAS, an )
individual; KIRSTIN WHITE, an )
individual; JACOB PLEICH, an )
individual; SHARON FAGAN, an )
individual; ROB DOTSON, an )
individual; GUY BALCOM, an )
individual; DONALD BURNETTE, an )
individual; JOHN DOES 1-10, )
          )
       Defendants. )

DEPOSITION OF

KELLY CONRAD GREEN

Taken in behalf of the Defendants

* * *

June 20, 2014

121 S.W. Salmon Street

Portland, Oregon

Robert J. Lehmann, CSR
Court Reporter

---

**Page 2**

APPEARANCES:
For the Plaintiffs:   MR. ELDEN ROSENTHAL
                      Attorney at Law
                      Suite 1090
                      121 S.W. Salmon Street
                      Portland, Oregon 97204
For the Defendant,    MR. JAMES M. DAIGLE
Corizon:              Attorney at Law
                      Suite 200
                      2300 S.W. First Avenue
                      Portland, Oregon 97201
For the Defendant,    MR. SEBASTIAN TAPIA
Lane County:          Office of Legal Counsel
(Via telephone)       Lane County Courthouse
                      125 E. 8th Avenue
                      Eugene, Oregon 97401
Also Present:         Ms. Sandy Pulver

INDEX

EXAMINATION BY:                                  PAGE NO.

Mr. Daigle                                       3 - 165

EXHIBITS                                         PAGE NO.

No. 501 Medical chart note of 9-12-13            121

No. 502 Medical chart note of 10-16-07           125

No. 503 Psychologist Notes of 10-23-11           128
        and 11-14-11
No. 504 Psychologist Evaluation of               131
        2-16-12 and 2-21-12

No. 505 Western State Hospital Progress          133
        Record
No. 506 Behavioral Health Evaluation of          135
        8-15-03

---

**Page 3**

PORTLAND, OREGON; FRIDAY, JUNE 20, 2014
8:59 a.m.
* * *

KELLY CONRAD GREEN
called as a witness in behalf of the Defendants,
having first been sworn by the Reporter,
testifies as follows:
EXAMINATION
BY MR. DAIGLE:
 Q.   Good morning, Mr. Green. Again, my name is
James Daigle, and I represent Corizon and some of
their employees in the matter involving your son, and
we're here today to talk to you about the case and
about your claims, and basically doing a lot of kind
of background information.
 A.   Uh-huh.
 Q.   This is a semiformal process, but it has, you
know, all the trappings of being in a courtroom in the
sense that, you know, this is under oath.
 A.   Correct.
 Q.   And your testimony has to be as complete and
accurate as you can make it. Okay?
 A.   Uh-huh.
 Q.   And, of course, if you say something
different today than you do later, there will be a

---

**Page 4**

1  transcript to point out the differences. Okay?
2   A.   Uh-huh.
3   Q.   So be very careful about your testimony. All
4  right?
5   A.   Understood, sir.
6   Q.   All right. I'm sure that Mr. Rosenthal has
7  gone over kind of the process with you to orient you
8  to it, but I'll just do it again here on the record
9  briefly.
10      This is, you know, semiconversational in the
11  sense that, you know, I'm asking questions and you're
12  answering. We're trying not to talk over each other
13  so Mr. Lehmann here can get a complete and accurate
14  transcript. Okay?
15   A.   Yes, sir.
16   Q.   And please try to answer with yeses or noes,
17  and you're doing a great job so far, and if you don't
18  and you shake your head or something, I may ask you to
19  give a verbal response. Okay?
20   A.   Okay.
21   Q.   I'm not trying to be rude. I understand you.
22  He just wants to get it on the record. Okay?
23   A.   Yes, sir.
24   Q.   Anytime you want to take a break, it's not an
25  endurance contest. Just let me know, we'll take a

1 (Pages 1 to 4)

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

Page 25

1  Q. Or just by yourself?
2  A. Just by myself.
3  Q. Okay. Were you arrested by a City of Eugene
4  officer or Lane County?
5  A. City of Eugene, sir.
6  Q. All right. Who was the person that you were
7  alleged to have menaced?
8  A. Sandra.
9  Q. Okay. And do you know the circumstances
10 surrounding the decision to dismiss the charge?
11 A. I do, sir.
12 Q. And can you tell me a little bit about that,
13 please?
14 A. Yes, sir. Sandra didn't pursue the charges.
15 Q. Okay. And what initiated the police contact
16 with you? Was it a 911 call?
17 A. I believe it was.
18 Q. All right. And do you know who made the
19 phone call?
20 A. Sandra.
21 Q. And was this at your home where this took
22 place?
23 A. Yes, sir.
24 Q. All right. Have you had any other arrests?
25 A. No, sir.

Page 26

1  Q. Okay. Have you had any other marriages other
2  than the one to Sandra?
3  A. We remarried.
4  Q. Okay. During what time -- so you got
5  divorced, then you got remarried. So tell me the time
6  period of the first marriage and then the divorce, and
7  the time period of the second.
8  A. Yes, sir. We were married in November of
9  '81, legally divorced in spring of '89. We got back
10 together in fall of '89, then we stayed together,
11 lived together, and remarried in May of 2000, and
12 divorced in spring of 2005.
13 Q. So, during that time period of the early '90s
14 to 2000 when you got remarried, the two of you were
15 living together most of that time?
16 A. The whole time.
17 Q. Okay.
18 A. Like a family.
19 Q. And what year was Casey born?
20 A. He was born in 1985.
21 Q. Was that just before you deployed for boot
22 camp or after?
23 A. That was after.
24 Q. I can't remember his birth date.
25 A. He was born on May 21st of 1985, and I went

Page 27

1  in the Army in October of '88.
2  Q. And did the family stay in the Eugene area
3  while you went to boot camp?
4  A. Yes, sir.
5  Q. And did they move up to Fort Lewis area while
6  you were stationed there?
7  A. After I was reassigned to Fort Lewis, they
8  moved up.
9  Q. Okay. So, I assume you went to boot camp,
10 and then you went to an MOS school?
11 A. Yes, sir.
12 Q. Was that also in Fort Knox?
13 A. Yes, sir, it was.
14 Q. All right. So boot camp is three months.
15 How long was your MOS school? Another three months or
16 so?
17 A. I am unsure of that, sir.
18 Q. Okay.
19 A. I don't remember.
20 Q. And Thomas is your second?
21 A. Yes, sir.
22 Q. And what year was he born?
23 A. He was born in 1986.
24 Q. That's right. You already told me that. And
25 so was he born up in the Fort Lewis area?

Page 28

1  A. He was born in Eugene, Oregon.
2  Q. In Eugene?
3  A. Uh-huh.
4  Q. Did Sandy go down there to deliver Thomas to
5  be near family?
6  A. Yes, sir.
7  Q. Was that the idea?
8  A. Yes, sir.
9  Q. Have you reviewed any documents to get ready
10 for your deposition today?
11 A. No, sir.
12 Q. Have you ever reviewed any medical records
13 relating to Casey's medical care at any point in time?
14 A. No, sir.
15 Q. Have you ever assisted in requesting medical
16 records from any facility relating to your son?
17 A. I did.
18 Q. Okay. And which facilities?
19 A. That was Sacred Heart, RiverBend,
20 Springfield, Oregon.
21 Q. Have you ever talked to anybody that provided
22 any type of medical services at the Lane County jail?
23 A. Pardon me, sir?
24 Q. Have you ever talked to anybody who has
25 provided medical services at the Lane County jail,

7 (Pages 25 to 28)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 2 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

Page 33

1  you thought that he needed to be at the Johnson Unit?
2      A.  Correct, sir.
3      Q.  And you're referring to the University
4  District --
5      A.  Yes, sir.
6      Q.  -- Sacred Heart facility?
7      A.  Yes, sir.
8      Q.  Had he ever been to the Johnson Unit on any
9  prior occasions?
10     A.  No, sir.
11     Q.  So how is it that you were aware of the
12 Johnson Unit and that that was potentially an
13 appropriate place for him to be?
14     A.  Well, I knew it was a medical facility for
15 mentally ill people. I visited a cousin once there.
16     Q.  Okay. So just from prior experience you were
17 aware of the Johnson Unit?
18     A.  Yes, sir.
19     Q.  Had any of Casey's medical providers at any
20 time told you that the Johnson Unit was an appropriate
21 place for Casey to be?
22     A.  I can't exactly remember that.
23     Q.  So this was just something that you had
24 arrived on from your own experiences?
25     A.  Right.

Page 34

1      Q.  It wasn't something that somebody had told
2  you or --
3      A.  Right.
4      Q.  Is that correct?
5      A.  Yeah. I knew my son.
6      Q.  So that was the first arrest; is that
7  correct?
8      A.  Yes. To my knowledge.
9      Q.  All right. And you said that Tom had called
10 you. Did Tom say how he found out? I'm assuming that
11 Prince William called him.
12     A.  Was driving by and seen Casey, yes.
13     Q.  And Prince William called Tom?
14     A.  Right.
15     Q.  And then Tom called you?
16     A.  Right.
17     Q.  So, on this first time that he was arrested,
18 and was this in December of 2012?
19         (Ms. Pulver left the room.)
20     A.  I don't think it was the -- it was not the
21 last time. It was the first time, so I'm unsure of
22 the date on that at this time, when he went in on that
23 one.
24     Q.  So you're certain it was the first time that
25 he'd been arrested in Lane County?

Page 35

1      A.  To my knowledge, sir, yes.
2      Q.  Okay. I'm not trying to distort your memory
3  here.
4      A.  Yes, sir.
5      Q.  I'm just trying --
6      A.  Yes, sir.
7      Q.  Yeah. So you made a phone call and talked to
8  a person, conveyed information about your son's
9  medical issues. Did you go down to the jail to talk
10 to anybody?
11     A.  I did not.
12     Q.  Okay. Why not?
13     A.  Because of my work schedule.
14     Q.  Okay. Do you know if anybody in the family
15 went to go talk to anybody at the jail?
16     A.  Absolutely, sir.
17     Q.  And who in the family?
18     A.  My mother.
19     Q.  Okay.
20     A.  Sandy's mother.
21     Q.  And remind me your mother's name.
22     A.  Deanna Green.
23     Q.  Deanna Green. And Sandy's mother, what is
24 her name?
25     A.  Louise Vincent.

Page 36

1      Q.  V-I-N-C-E-N-T?
2      A.  Yes, sir.
3      Q.  Okay.
4      A.  And Sandra.
5      Q.  And Sandra went as well?
6      A.  Yes, sir.
7      Q.  Where was Sandra living at that time?
8      A.  She was living in her residence in Bothell,
9  Washington.
10     Q.  Okay. So did you talk to your mother, Deanna
11 Green, about her visit to the jail during the period
12 of Casey's first arrest at Lane County?
13     A.  Yes, sir.
14     Q.  All right. And what did she say about that
15 visit?
16     A.  Casey didn't want to see her. He didn't want
17 to see any visitors.
18     Q.  So is it true that none of the three
19 individuals that you said visited saw Casey?
20     A.  Nobody did.
21     Q.  All right. Did any of the three of them
22 relate any conversations that they had with any of the
23 employees at the jail?
24     A.  I don't know, sir, if they did or not.
25     Q.  So, other than the one phone call that you

9 (Pages 33 to 36)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 3 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

### 57

1  Q. Okay. And who were Casey's friends during
2  this time period?
3  A. I can't remember the names of all the
4  neighborhood kids and stuff at this point.
5  Q. Is there any one person in Casey's life
6  during that time period that you would say was his
7  closest friend?
8  A. Yes.
9  Q. Who was that person?
10 A. That was Chris Jett, J-E-T-T.
11 Q. Do you know where Chris lived?
12 A. Eugene, Oregon.
13 Q. Eugene. And were they high school
14 classmates?
15 A. They all grew up together, grade school on.
16 Q. And 2004, how old was Casey?
17 A. He was born in '85, so...
18 Q. Roughly 19?
19 A. Yes, sir.
20 Q. Had Casey told you what he wanted to do for
21 work or the things, you know, after he's out of high
22 school?
23 A. He wanted to become a Navy Seal.
24 Q. A Navy Seal?
25 A. Yes, sir.

### 58

1  Q. Did he ever make any efforts to try to get
2  into the Navy?
3  A. No, sir.
4  Q. Did he have any other types of avocations,
5  hobbies he said he was interested in?
6  A. Hunting and fishing.
7  Q. Anything else?
8  A. Camping, that kind of stuff.
9  Q. And so was he working at the time that that
10 incident happened at your family picnic?
11 A. No.
12 Q. Had he had any employment prior to that?
13 A. He -- I don't want to get out of line here.
14 No. He only had about two jobs in his whole entire
15 lifetime. They weren't for very long. His mind just
16 wouldn't work like ours does.
17 Q. Did the officers that showed up to the
18 picnic, did they take him to a hospital?
19 A. They did.
20 Q. All right. And do you remember what hospital
21 he was taken to?
22 A. Roseburg Medical Center, Roseburg, Oregon.
23     (Ms. Pulver entered the room.)
24 Q. And I assume that you went, or at least went
25 in your own car to the hospital as well.

### 59

1  A. Yes, sir.
2  Q. And tell me a little bit about what happened
3  at the hospital and what the resolution, if anything,
4  was.
5  A. Basically, I was thinking there was going to
6  be some kind of bad charges going on, but it never
7  happened. They went straight to the medical side of
8  the mental side, and that's when we found out that he
9  was diagnosed.
10 Q. Okay.
11 A. So nothing happened with the incident.
12 Q. And to your memory, what was the specific
13 diagnosis that he got?
14 A. Paranoid schizophrenic.
15 Q. And I take it that was the first formal
16 diagnosis of any type --
17 A. Yes, sir.
18 Q. -- relating to a mental health issue.
19 A. Yeah. I knew my life was going to change.
20 Q. Had you had any experience with paranoid
21 schizophrenia before this happened to your son in
22 spring of '04?
23 A. No, sir.
24 Q. And I take it then you did some reading about
25 it after your son got that diagnosis.

### 60

1  A. Uh-huh.
2  Q. Yes?
3  A. Yes, sir.
4  Q. Okay.
5  A. Sorry.
6  Q. I told it you would happen.
7  A. You did.
8  Q. Okay. So was he an inpatient at Roseburg for
9  any period of time?
10 A. Yes, sir.
11 Q. All right. Do you know about how long he was
12 there?
13 A. About two weeks.
14 Q. And so what happened when he was released
15 from the hospital?
16 A. He was in custody of his mother and went with
17 his mother to Bothell, Washington.
18 Q. So spring of 2004 he moves from living with
19 you to Bothell?
20 A. He was actually living with his mom. I just
21 had them for a period of time --
22 Q. For a visit?
23 A. -- to visit.
24 Q. So they were there for a week or two weeks or
25 something?

15 (Pages 57 to 60)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 4 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

---

Page 85

1   Q. Did he ever fill prescriptions on his own?
2   A. Never.
3   Q. It was always one of you two?
4   A. Always.
5   Q. And would these be called in to the pharmacy
6   by his physician?
7   A. We would do it. Sometimes it would be done
8   through the facilities that he was in, something like
9   that, yeah.
10  Q. And what form did the medications come in?
11  You said he would get shots.
12  A. Uh-huh.
13  Q. Did he also take pills?
14  A. Yes, sir.
15  Q. And are these pills in like 30-day --
16  A. Uh-huh.
17  Q. -- amounts?
18  A. Yes, sir; sometimes longer, more.
19  Q. Did he ever get prescriptions filled and not
20  take them in order to make you guys think that he was
21  taking them?
22  A. No, sir. We monitored that very closely. We
23  never left it up to his own accord or responsibility
24  to take medication. We would give it to him.
25  Q. So I'm thinking about the periods of time

Page 86

1   when he's not in your house.
2   A. Uh-huh.
3   Q. Like when he was down in Eugene and he would
4   come for a couple of days and then be gone for three
5   or four days.
6   A. Uh-huh.
7   Q. Did the medications stay at your house?
8   A. No, sir. It would come with him.
9   Q. So he kept them on his person or in his bag?
10  A. For traveling, stuff like that, you know, if
11  he was coming to see me. I remember times when he did
12  take medication. I remember a lot of times when he
13  didn't or wouldn't.
14  Q. So I'm trying to figure out how it was that
15  you monitored his intake of medications when he was
16  out, you know, sleeping in the park or what have you.
17  A. Oh. We didn't have any control over that
18  then.
19  Q. So, if he was in the house and living with
20  you, you guys tried to monitor as best you can that he
21  was actually taking the meds.?
22  A. Correct.
23  Q. And did you guys sit there and sit with him
24  or whatever and watch him take them?
25  A. Yes, sir, many a times.

Page 87

1   Q. I'm just trying to figure out if that was
2   your routine or --
3   A. Yes.
4   Q. -- it was just sometimes you would?
5   A. Copy that, sir, yeah.
6   Q. That when he was in the house, you would
7   watch him take them?
8   A. Yes, sir.
9   Q. And that when he was out of -- were there
10  periods of time when he was living in the house and
11  not taking the meds.?
12  A. Yes.
13  Q. All right. I don't want you to generalize
14  too much, but can you give me an idea as to whether or
15  not there was any pattern or percentage of the time
16  that you could say he was off versus on medications
17  while he was in your house?
18  A. A generalization of that, sir, would be
19  summed up he was more off of his medication than on
20  medications.
21  Q. When he was in your house?
22  A. Right, over the years.
23  Q. By a large margin or are we talking 50-50
24  or --
25  A. I'm going to say a large margin. I mean, his

Page 88

1   side effects were so bad. His hands would just shake
2   uncontrollably. I mean, he looked like a mess. You
3   take him somewhere, to a fast-food restaurant, people
4   commented on it.
5   Q. Were his medications ever changed in order to
6   try and --
7   A. Yes.
8   Q. -- alleviate these side effects?
9   A. Yes, sir.
10  Q. Were those ever helpful in --
11  A. Certainly never hit the bull's eye.
12  Q. So he was civilly committed in October or
13  November of 2011?
14  A. Yes, sir.
15  Q. And then was that at a hospital for some
16  period of time?
17  A. Yes. That was at Navos in West Seattle,
18  Washington.
19  Q. And how long was he there at Navos?
20  A. I believe it was eight months.
21  Q. And was that entire eight months all
22  inpatient?
23  A. All inpatient.
24  Q. Did he ever leave the facility for any
25  reason?

22 (Pages 85 to 88)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 5 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

                                    89
1    A. Never.
2    Q. And so during the time period that he was at
3    Navos, were you still living in the Bothell area?
4    A. Yes, sir.
5    Q. For the entire eight months?
6    A. No, sir.
7    Q. All right. Tell me what time period you were
8    living in the Bothell area.
9    A. I left the Bothell area in January of 2012
10   and moved back to Eugene, Oregon.
11   Q. So, shortly after he was committed, you moved
12   to Eugene?
13   A. Correct.
14   Q. All right. And was it roughly July that he
15   was released from inpatient treatment or the civil
16   commitment?
17   A. No. He went from there to Western State.
18   Q. Okay.
19   A. And that was -- I believe it was eight months
20   in Navos, and then from there he went immediately to
21   Western State.
22   Q. So, when we're talking about the eight-month
23   time period, that includes both Navos and Western
24   State?
25   A. No, sir.

                                    90
1    Q. Just Navos?
2    A. Yes, sir.
3    Q. How long was he at Western State?
4    A. He was at Western State from after that
5    period of eight months until May of 2012. That's when
6    he was released from Western State.
7    Q. So let's back up a second.
8    A. Okay.
9    Q. Because I think that doesn't add up.
10       (Ms. Pulver left the room.)
11   A. Okay.
12   Q. October or November of 2011 --
13   A. Okay. I get you.
14   Q. -- plus eight months --
15   A. Right, right.
16   Q. -- takes us to June.
17   A. Right. You're absolutely right. I know he
18   was in Navos for eight months, and I know that he
19   ultimately got out of Western State in May of -- no,
20   that was May -- it had to be May of 2011. I'm off one
21   year, because his incident was in February of 2012.
22       MR. ROSENTHAL: No, you got the year wrong.
23   Q. (By Mr. Daigle) 2013.
24   A. Was it 2013? Right. Thank you, sir.
25   Q. And the records are going to tell us when he

                                    91
1    was in there.
2    A. Sure.
3    Q. I'm just --
4    A. Just checking me, right.
5    Q. No, no. I'm just trying to get a general
6    sense, you know, of where you were and where he was
7    during certain time periods.
8    A. I took a job promotion in January of 2012 to
9    go down to Eugene.
10   Q. All right. So that we're clear on.
11   A. Okay.
12   Q. You went down there in January?
13   A. Yes, sir.
14   Q. All right. So, when you got that job in
15   January of 2012 --
16   A. Yes, sir.
17   Q. -- did you come back to the Seattle area
18   or -- and I don't know where Navos is. Is it in
19   Seattle?
20   A. Yes, sir.
21   Q. Did you come back to Seattle to visit --
22   A. Yes.
23   Q. -- Casey while he was still at Navos?
24   A. Yes, a couple of times.
25   Q. And were those like weekend visits?

                                    92
1    A. Yes.
2    Q. Okay. So how did it appear to you that he
3    was doing while he was at Navos?
4    A. Not well at all.
5    Q. And do you remember roughly when it was that
6    you went up to visit?
7    A. It was -- it would -- I was -- it would be
8    right around -- there was one time in the springtime,
9    a couple of times in the springtime when I came up and
10   seen all the kids.
11   Q. And when you say he wasn't doing well, did it
12   appear to you that he was getting worse?
13   A. He was doing okay himself. He hated that
14   place immensely.
15   Q. All right. When you say not doing well, you
16   know, I get the sense that medically he's not doing
17   well.
18   A. Yeah. Medically, he was medicated, he had to
19   be, but the people at Navos -- it was a hard job. He
20   was not doing well there with them.
21   Q. Because he didn't like them and he didn't
22   like the fact that his freedom had been restricted?
23   A. That, too, but they were just very unruly,
24   poor people. I didn't even care for them when I went
25   to visit him.

                                    23 (Pages 89 to 92)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 6 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

### Page 101

1  A. No, sir.
2  Q. Did she get married to Jamie?
3  A. No, sir.
4  Q. Okay. And how about Tom? Where did he go?
5  A. Thomas moved to -- he moved back down to
6  Eugene for a period of time, and then he moved up to
7  Bellingham, Washington.
8  Q. Does your sister still live up there?
9  A. Uh-huh.
10 Q. And does he still live in Bellingham?
11 A. Yes, sir.
12 Q. Okay. So how long, roughly, was he homeless
13 in the Seattle area after release from Western State?
14 A. About two and a half months.
15 Q. Then what did he do?
16 A. He called me up one day on the telephone and
17 checked in, and I told him the same thing that we, all
18 of us in the family tell him every time when he called
19 is that we love him, concerned, why don't you come
20 home, and he actually took me up on it that time.
21 Q. So how did he get down to Eugene?
22 A. I told him that I would purchase him a train
23 ticket from Seattle and that he was going to have to
24 get on the bus on his own -- or get on the train on
25 his own accord, and to give me a call if he got on the

### Page 102

1  train, and we'd pick him up.
2  Q. So I guess that he did that.
3  A. He did do that.
4  Q. Okay. And roughly when did he arrive in
5  Eugene?
6  A. August 7th.
7  Q. August 7th. Tell me about his living
8  situation from August 7th up until what I understand
9  is around a September 12 visit to the hospital.
10 A. It was sporadic. It was not etched in stone.
11 We had some good days, a lot of bad days. There was
12 multiple times that he made his own choice to leave.
13 There was a couple of times we asked him to leave, and
14 pretty much about it.
15 Q. And what was the name of the apartment
16 complex where you were living at the time?
17 A. That was the Village Apartments.
18 Q. Okay. Any comments from any of the residents
19 or management of the Village Apartments during that
20 time about Casey's behavior?
21 A. Yes. That was with Tony and his wife,
22 Lavonne. They were the managers then. That's when we
23 were getting complaints.
24 Q. Did you ever observe any either threatening
25 or violent behavior by Casey towards anybody at the

### Page 103

1  Village Apartments?
2  A. No.
3  Q. So describe for me in a little more detail
4  about the specific issues that you were having with
5  Casey during the August to September 2012 time period.
6  A. Just basically that one incident that I told
7  you about. Is that what you're asking, about Village,
8  when the gal was taking her groceries in?
9  Q. So that was during that August to September
10 period?
11 A. Yes, sir.
12 Q. Anything else that you recall?
13 A. He would be sitting out on the picnic bench
14 smoking cigarettes and talking to himself, and it
15 scared people. Again, my mother would get the phone
16 call or a knock on the door, in some cases both.
17 Q. So do you know what types of things he would
18 be talking about when he was out there on the bench?
19 A. No, sir.
20 Q. And did anybody ever articulate what it was
21 that scared them other than the fact that he was
22 talking to himself?
23 A. One time I do remember what that was, but it
24 happened over at my place, at the Parkside with
25 Crystal.

### Page 104

1  Q. What was that?
2  A. He was screaming at the top of his lungs out
3  in the front of the house that he needed new teeth.
4  Q. Okay. That was the extent of it?
5  A. Uh-huh.
6  Q. And somebody reported that to you?
7  A. Yes. That scared them.
8  Q. All right. So now let's talk about what led
9  to his going to RiverBend in -- maybe I don't have
10 that right. He went to the hospital in early
11 September. Right?
12 A. Uh-huh.
13 Q. Is that RiverBend or the university?
14 A. That was RiverBend, sir.
15 Q. Okay. And did you take him there?
16 A. Yes.
17 Q. Okay. And did your mother go with you?
18 A. Yes.
19 Q. Anybody else with you at the time?
20 A. No, sir.
21 Q. And what was it that led you to take Casey to
22 the RiverBend hospital?
23 A. Well, we finally got to an area and a time
24 period where he was willing to be fully medicated and
25 be checked, and so that's what the agreement was, that

26 (Pages 101 to 104)

Page 105

1  we'd go down to the emergency room, see a doctor to
2  get on medication, and do like we've always done,
3  start over.
4      Q.  Had he essentially lost contact with his
5  medical provider from the Seattle area once he came to
6  Eugene?
7      A.  I believe he did, sir, yes.
8      Q.  Okay.  So there was no longer access to the
9  medications that were being prescribed up there; is
10 that --
11     A.  Let me back up, sir. I'm unsure of that.
12 All I do know is that for quick medication, we were
13 going to take him to the emergency room.
14     Q.  Okay.  And was there anything specifically
15 that happened that made you decide that you need to
16 get him to the hospital?
17     A.  Just to be able to get the medication,
18 just -- you know, we couldn't go down to, you know,
19 anyplace at Albertsons and get medication, so we knew
20 that somebody had to see him.
21     Q.  Right.  Did he make any threats of self-harm
22 in the August-September time period?
23     A.  I never heard any of it myself.
24     Q.  Did anybody else report any threats of
25 self-harm?

Page 106

1      A.  I believe so.
2      Q.  Who was that?
3      A.  I believe that that was the social worker at
4  Sacred Heart RiverBend in Springfield, when he was
5  being evaluated.
6      Q.  So that was in September of 2012 he made
7  threats of self-harm?
8      A.  Yes, sir.
9      Q.  And did that social worker relate that
10 incident to you?
11     A.  He did. He left the door closed and came to
12 our room that me and Mom were in and said that, that
13 they were going to admit him in the Johnson Unit.
14     Q.  Okay.  So this is a male social worker?
15     A.  Yes, sir.
16     Q.  Do you remember the person's name?
17     A.  I do not.
18     Q.  So, when you say the male social worker left
19 the door closed, is that the door to the room that
20 Casey was in?
21     A.  Correct.
22     Q.  And then came into the room where you were?
23     A.  Uh-huh.
24     Q.  Were you out in the waiting area?
25     A.  Yes.

Page 107

1      Q.  All right.
2      A.  That's where they wanted us to be.
3      Q.  Is this the emergency room area of that
4  hospital?
5      A.  Yes, sir.
6      Q.  My understanding is that they don't have a
7  mental health ward at RiverBend.
8      A.  They don't.
9      Q.  That they move people over to the university
10 hospital for that.  Correct?
11     A.  Yes, sir.
12     Q.  Is there a reason why you guys didn't go
13 directly to the Johnson Unit or to the University
14 District as opposed to going straight to RiverBend?
15     A.  No.  In my mind at the time, it felt prudent
16 to me to make sure that he was examined.
17     Q.  Earlier in your deposition, I got the
18 impression that you were aware of the Johnson Unit and
19 knew that it was at the university hospital.
20     A.  Yes, correct, sir.
21     Q.  In September of 2012, did you have that
22 awareness that the Johnson Unit was at the University
23 District hospital?
24     A.  Yes, sir.
25     Q.  So help me with this.  Was it your impression

Page 108

1  that he could only be examined at RiverBend and they
2  didn't have people to examine him at the university?
3      A.  Well, I've just heard through the grapevine
4  and people that I know that there's a process that you
5  have to go through to be admitted in the Johnson Unit,
6  friends, acquaintances, just hearsay, eavesdropping.
7  I've heard that, so -- but, to me, I felt it prudent
8  to take him to the emergency room.
9      Q.  So it's been a while since I've been down to
10 Eugene, so does the University District not have an
11 emergency room?
12     A.  No, sir.
13     Q.  They don't?
14     A.  No, sir.
15     Q.  So everybody who has an ambulance ride goes
16 straight to RiverBend; is that your understanding?
17     A.  That's the new big one, yeah.
18     Q.  That's on what, the north side of
19 Springfield?
20     A.  Springfield, yes, sir.
21     Q.  So let's get back to the conversation with
22 the social worker at RiverBend.  They came to your
23 room, and what did he say?
24     A.  He came into the room and was kind of
25 chuckling a little bit and said that Casey almost had

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

**Page 109**

1  him.
2  Q. What did he mean?
3  A. That meant that he was almost ready to
4  declare that Casey was okay and didn't need to go to
5  the Johnson Unit until the social worker asked if he
6  felt like he ever wanted to hurt himself, and at that
7  point when he said that, he told us that Casey said,
8  Well, maybe I'm just going to leave here tonight and,
9  I believe, do myself in. I don't know. I can't
10 remember what he said, but I know it was to hurt
11 himself.
12 Q. Okay.
13 A. I can't remember right now.
14 Q. Were you left with the impression that Casey
15 had told the social worker that, when he said do
16 himself in, I'm assuming that that was your
17 understanding that Casey made comments about
18 committing suicide.
19 A. Correct.
20 Q. Prior to September of 2012, had Casey ever
21 made any, whether it be threats or statements or
22 anything verbally that made you think that he would be
23 suicidal or made overt threats of suicide?
24 A. There were a couple of times over the years.
25 Q. And can you tell me what you remember about

**Page 110**

1  any prior episodes?
2  A. Just -- I can't exactly remember how it all
3  went down, sir; just knowing that I do recall a couple
4  of times just maybe getting on him a little bit about,
5  you know, getting chores done and doing stuff, and
6  he'd be frustrated and would be -- I remember one time
7  he said, Maybe I should just check out, or something
8  like that. I can't really --
9  Q. Nothing more specific than that, just was it
10 kind of an inkling that you had?
11 A. Well, he did state it, but it never took me
12 to the point where I needed to sit him down and say,
13 Son, do you really feel like doing this? It was
14 just -- no, it didn't strike me like that.
15 Q. Had you had any prior experiences with
16 suicide in your lifetime? Not you specifically, but
17 people you know, friends, family?
18 A. Yes.
19 Q. And tell me about that.
20 A. I have an uncle that committed suicide back
21 in 1964 on my mother's side, and then I had an aunt
22 that committed suicide in, I could be off a year on
23 this one, '95, '96.
24 Q. Mom's side or dad's side?
25 A. Mom's side.

**Page 111**

1  Q. I'm sorry. What year did you say?
2  A. 1995 or '96. It was one of those.
3  Q. And were either of these individuals people
4  you were close to?
5  A. I did not know my uncle, and I wasn't really
6  close to my aunt.
7  Q. Where did she live?
8  A. She lived in Springfield, Oregon.
9  Q. Do you want to take a short break?
10 A. I would, yeah.
11    (A discussion was held off the record.)
12    (A recess was taken from 11:41 a.m. to 12:30
13 p.m.)

**Page 112**

1         AFTERNOON SESSION
2            12:30 p.m.
3               * * *
4  (Ms. Pulver is not present.)
5  BY MR. DAIGLE:
6  Q. And we were talking a little bit about the
7  September visit to RiverBend, and then did he go to
8  the Johnson Unit?
9  A. Yes, sir.
10 Q. And how long did he stay there,
11 approximately?
12 A. Approximately four days, I believe, sir.
13 Q. Okay. And while he was at the Johnson Unit,
14 did you visit there?
15 A. Yes.
16 Q. All right. Did you talk to any of his
17 doctors about the plan, the plan once he was released?
18 A. There wasn't really a plan.
19 Q. So what happened when he was released?
20 A. He went back out on the streets.
21 Q. Did any of the doctors say anything about the
22 risk of suicide from the point he was released?
23 A. No, sir; said he was good.
24 Q. And then to your knowledge, did he have any
25 treatment between September of 2012 and when he was

28 (Pages 109 to 112)

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

### 113

1  arrested sometime in early winter of 2012?
2  A. No, sir.
3  Q. Did he live with you during any periods of
4  time during the September, October, November time
5  frame?
6  A. He would stop in -- no, not living.
7  Q. So he would stop in for short visits and then
8  leave again?
9  A. Yes, sir.
10 Q. Didn't spend any nights there at your house?
11 A. Occasionally, if we could get away with it.
12 Q. So, when you say "get away with it," you mean
13 if he was behaving appropriately for a period of time?
14 A. No, if there was enough time for him to sleep
15 and then leave when I left to go to work, to try to
16 fit that in the schedule because he would -- we'd get
17 in trouble.
18 Q. From your managers?
19 A. Correct.
20 Q. Because he wasn't allowed to be there at that
21 time --
22 A. No.
23 Q. -- is that correct?
24 A. Just complaints.
25 Q. You were concerned that you would get kicked

### 114

1  out of your apartment if there was another complaint?
2  A. Yes, sir.
3  Q. Is that --
4  A. Yes, sir.
5  Q. And I know you know where I'm going with my
6  questions, and I think we're starting to talk over
7  each other a little bit.
8     So can you estimate for me approximately how
9  many times he spent the night at your apartment
10 between September and December of 2012?
11 A. Perhaps a handful; five times.
12 Q. And remind me. Was your mother living there
13 in the apartment as well during that time period?
14 A. She was -- she had her own apartment. I got
15 my own apartment I believe December 7th of that year.
16 Q. December 7th?
17 A. Somewhere in there; that first week in
18 December I got my own place at Parkside.
19 Q. So it was really just kind of a short period
20 of time before he was in jail for --
21 A. Uh-huh.
22 Q. -- later December?
23 A. Yes, sir.
24 Q. So, when you say about five times, some of
25 those days would have been at your mother's place

### 115

1  where you were living. Correct?
2  A. Correct.
3  Q. And then did he spend any days with you in
4  your separate apartment?
5  A. Yes.
6  Q. And that was less than five?
7  A. Yes.
8  Q. And then describe for me his condition after
9  he was released from the Johnson Unit in September.
10 A. He was doing -- he was behaving well. He was
11 not interacting with the family at all, but there was
12 no concerns with any of the medical people at the
13 facility about him being a danger to anybody or
14 himself; typical system.
15 Q. So what did you observe after they released
16 him?
17 A. Well, they didn't -- we didn't even know he
18 was being released until after the fact. Then he's
19 out on the street.
20 Q. So nobody called you to say that they were
21 releasing him?
22 A. No, sir.
23 Q. And how long after he was released did you
24 discover that he wasn't there anymore?
25 A. It was -- it was that day, I believe. I

### 116

1  think my mom called and checked in.
2  Q. And they told her --
3  A. The day or the day after.
4  Q. And they told her he'd been released?
5  A. Yes, sir.
6  Q. Did you or your mother or Sandy call the
7  hospital and ask why he had been released without
8  notifying you?
9  A. No, sir.
10 Q. And I assume that they had consent from Casey
11 to communicate his medical information to you. Is
12 that your understanding?
13 A. I'm unsure of that.
14 Q. Unsure, okay. At least while he was in the
15 Johnson Unit, they would communicate medical
16 information about Casey to you?
17 A. When we went there.
18 Q. Okay. So presumably they had consent to talk
19 to you about this stuff. Right?
20 A. Yes, sir.
21 Q. And since he was released, did you ever go
22 back to them and ask them why they had released him?
23 A. No, sir.
24 Q. Okay. And I'm gathering from what you've
25 said that you think that that was the wrong decision

29 (Pages 113 to 116)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 10 of 14
Dec'l of JTD

Kelly Green, 6/20/14                    Johnson vs. Corizon Health, Inc.

133
1    Q. Never would? Never would admit?
2    A. Admit, yes.
3         (Deposition Exhibit No. 505 was marked for
4    identification.)
5    Q. So let me direct your attention to the lower
6    half of this document. It's Kelly Green, or K.GREEN
7    2770. This is Western State Hospital progress record.
8    There in kind of the middle of that last paragraph
9    where it says, MSW received a call from Kelly's
10   father, will you read from there to the end of the
11   paragraph? You're welcome to read the whole thing.
12   That's the only part --
13   A. That's on the last half of the page, sir?
14   Q. Yes, right here.
15        MR. ROSENTHAL: This stuff here.
16        THE WITNESS: Oh, okay. Okay.
17   Q. (By Mr. Daigle) So the sentence that says, He
18   has told Kelly, and I believe they're referring to
19   you, that he cannot discharge to family, but he thinks
20   staff has been telling him that he can.
21       Do you remember this phone call with the
22   social worker at Western State Hospital?
23   A. I do.
24   Q. Okay. Is that factual, that you told the
25   social worker that Kelly could not discharge to

134
1    family?
2    A. Yes, at that point in time.
3    Q. Okay.
4    A. In agreeance with me and Sandra.
5    Q. I'm sorry?
6    A. In agreeance with me and Sandra.
7    Q. So you both agreed that it wasn't appropriate
8    for him to discharge to either you or Sandra?
9    A. That day.
10   Q. That day. Did it change the next day or --
11   A. Things changed all the time, sir.
12   Q. Okay.
13   A. Crazy way to live.
14   Q. So this was in April, and he didn't come down
15   to Eugene until August 7; is that correct?
16   A. Yes, sir.
17   Q. So, when he was eventually discharged from
18   Western State Hospital, was he discharged to either
19   you or to Sandy?
20   A. I believe that he was discharged to a halfway
21   house that he was supposed to report to.
22   Q. Okay. And did he not end up reporting to
23   that halfway house or group home?
24   A. He did.
25   Q. He did, but didn't stay there; is that --

135
1    A. No. He told the person in charge of that
2    particular facility that there were too many rules.
3    Q. So he just left?
4    A. Yes, sir.
5         (Deposition Exhibit No. 506 was marked for
6    identification.)
7         (A discussion was held off the record.)
8    Q. (By Mr. Daigle) This is K.GREEN SSA 713. Why
9    don't you read through the paragraph 1 there at the
10   top of the page.
11   A. Okay. Okay.
12   Q. Earlier this morning, we talked about kind of
13   the first, you know, realization that there were some
14   problems was the barbecue in 2004, so my question is
15   whether or not you were aware of the issues that are
16   discussed here in section 1 of the August 15, 2003,
17   Behavioral Health Evaluation.
18   A. I was not involved in any of that. I
19   remember talking about it with Sandra.
20   Q. Okay. So had she related most of this stuff
21   to you prior to this evaluation?
22   A. Yes.
23   Q. And remind me your marriage situation at the
24   time. The two of you were divorced but back living
25   together?

136
1    A. Yes.
2    Q. Okay. So you were in the same household --
3    A. Correct.
4    Q. -- Casey was living there, and the other two
5    kids were there?
6    A. Correct.
7    Q. And had Casey ever expressed to you some of
8    his fears about being called gay behind his back at
9    Willamette High School?
10   A. It's the first I've ever heard of it.
11   Q. Sandy hadn't related that to you?
12   A. No, sir.
13   Q. Are you aware that he had dropped out of
14   Willamette High School?
15   A. I remember that, but gay and all this other
16   stuff, I...
17   Q. This is the first time you've heard of that?
18   A. Yes, sir.
19   Q. There in the middle of the paragraph, it
20   says, Mother states Kelly's father smoked marijuana
21   and used other drugs with Kelly and his 17-year-old
22   brother.
23   A. Yes, sir.
24   Q. Is that a factual statement?
25   A. Yes, sir.

                                    34 (Pages 133 to 136)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 11 of 14
Dec'l of JTD

Kelly Green, 6/20/14                                      Johnson vs. Corizon Health, Inc.

### 137

1  Q. So, earlier when we talked about when you and
2  Kelly had shared marijuana, it was 2010.
3  A. Uh-huh.
4  Q. So now we know that it occurred sometime
5  before August of 2003 as well.
6  A. Yes, sir.
7  Q. Were there other periods of time where you
8  and Kelly used marijuana or other drugs?
9  A. No, sir.
10 Q. So how long of a time period was it back in
11 2003 or earlier that you and Casey were using
12 marijuana or other drugs?
13 A. Well, when I caught him and his brother
14 smoking.
15 Q. You caught them or --
16 A. Yes.
17 Q. Did you then start smoking with them?
18 A. Yes.
19 Q. Okay. And it says "other drugs." Were there
20 other drugs that were being used?
21 A. Alcohol.
22 Q. There's some instances in the record where
23 Casey is either reported to or alleged to have used
24 cocaine and methamphetamine.
25 A. No, sir.

### 138

1  Q. Were you aware of that?
2  A. No, sir.
3  Q. It's in the medical record. My question is
4  whether or not you were aware of or heard that he had
5  ever used methamphetamine.
6  A. Yes, sir.
7  Q. And during what time period?
8  A. When he was using?
9  Q. Let me back up --
10 A. Yes, sir.
11 Q. -- just so we're understanding each other.
12 I'm not suggesting that you used methamphetamine with
13 Casey. I'm just saying that the medical records say
14 that Casey had used methamphetamine. The question is
15 whether or not you were aware of that and during what
16 time periods you had heard that he was using
17 methamphetamine.
18 A. Yes, I did hear that.
19 Q. Okay. And during what time period?
20 A. That was around 2005.
21 Q. Okay. And did he continue to use
22 methamphetamine after that time period, or had you
23 heard that he was using it after that time period?
24 A. When he would -- when he would be out looking
25 to find his high, if he couldn't find certain stuff,

### 139

1  that's what he would resort to; so unsure of how it
2  all played out all the time.
3  Q. And then refresh my memory. What was the
4  living situation with the family during that time
5  period?
6  A. In 2005 I was at -- I had my apartment at the
7  Village Apartments and Thomas and Casey were staying
8  at my house and living with me.
9  Q. Okay. And then McKenzie and Sandy were in
10 Washington?
11 A. Yes, sir.
12 Q. Had you heard of Casey using methamphetamine
13 at any time after 2005?
14 A. Not that I can recall, sir.
15 Q. Okay. Are you aware of any family members
16 using or having been alleged to have used
17 methamphetamine with Casey?
18 A. Family members?
19 Q. Family members.
20 A. I think he and his brother has.
21 Q. And how about other drugs, like cocaine?
22 A. Not that I know of.
23 Q. To your knowledge, had he ever used heroin?
24 A. No, sir.
25 Q. And so was Tom -- was it two or three years

### 140

1  behind Casey in high school?
2  A. They're 14 months apart.
3  Q. Fourteen months?
4  A. Same grade.
5  Q. They were in the same grade?
6  A. Yes, sir.
7  Q. Was Casey held back?
8  A. Yes, sir.
9  Q. And what grade was he held back?
10 A. Second grade.
11 Q. Okay. And what was the reason for holding
12 him back?
13 A. Just -- he just wasn't up to everybody else's
14 level at his age.
15 Q. Okay. Was that a recommendation from his
16 teachers at school?
17 A. Yes, sir.
18 Q. Did he ever have an individualized teaching
19 plan or lesson plan?
20 A. We did have him in -- gosh, what's that?
21 There's another name for it, sir. I want to say
22 special ed. I hate that name, but it was something
23 like that. He was involved.
24 Q. Was that grade school --
25 A. Yes, sir.

Kelly Green, 6/20/14                Johnson vs. Corizon Health, Inc.

### 141

1   Q. -- or high school?
2      Grade school?
3   A. Yes, sir.
4   Q. And did Tom and Casey go to grade school and
5   high school together starting in second grade?
6   A. Yes, sir.
7   Q. And then I see that Tom dropped out of high
8   school at some point in time. Do you remember what
9   grade that was?
10  A. I do not.
11  Q. Did he ever finish high school?
12  A. He did.
13  Q. And did Casey ultimately finish high school?
14  A. Yes.
15  Q. Did he get his diploma from Willamette?
16  A. Sandra said that he did.
17      (Deposition Exhibit No. 507 was marked for
18  identification.)
19  Q. We're looking at Exhibit 507.
20      MR. DAIGLE: Sorry. I have another copy for
21  you, Elden.
22  Q. (By Mr. Daigle) These are K.GREEN texts, page
23  1 through 14. Is the 971-533-9278 phone number, whose
24  is that?
25  A. Mine, sir.

### 142

1   Q. Your number. And these are text messages
2   that have been retrieved from your phone?
3   A. Yes, sir.
4   Q. And are these text messages with the phone
5   that was in Casey's room?
6   A. It was my telephone.
7   Q. I know it's all off of your telephone, but
8   text messages usually there's a sender and receiver.
9   A. Yes, sir.
10  Q. And I assume this has both the message you
11  sent and the ones that you received.
12  A. Yes, sir.
13  Q. So I'm just curious about the ones you
14  received. Did they come from a phone or a tablet or
15  something like that in Casey's room?
16  A. To the best of my ability, it was a phone.
17  Q. Okay. And the thing I'm having a problem
18  with is these are all dated May 6th, 2014, which I
19  assume is probably the date that they were printed.
20  A. Uh-huh.
21  Q. Not the date that they were sent and
22  received, obviously.
23  A. Correct.
24  Q. Do you know if -- let me ask you this. Do
25  you still have that conversation on your phone or has

### 143

1   it been deleted?
2   A. I still have those conversations on my phone.
3   Q. So, when you look at your phone, are you able
4   to identify the specific dates --
5   A. Yes, sir.
6   Q. -- that they were sent and received?
7   A. Uh-huh.
8   Q. And we're not going to go through that
9   exercise today. I'd just ask you to give
10  Mr. Rosenthal the information so that we can have the
11  dates rather than all being May 6, 2014.
12      MR. ROSENTHAL: How about I give you a copy
13  of this and you sit down and put down the dates and
14  then send it back to me?
15      THE WITNESS: Agreed.
16      MR. ROSENTHAL: Okay.
17      MR. DAIGLE: Okay.
18  Q. (By Mr. Daigle) And then, you know, it would
19  also be helpful to identify which ones are sent and
20  which ones are received so you can do like an S and an
21  R.
22  A. Understood, sir.
23  Q. Okay. Thank you. So let's move to February
24  of 2013, and if you want to take a break at all, let
25  me know.

### 144

1   A. I'm okay.
2   Q. Okay. So tell me, what was your first
3   knowledge that, you know, Casey had been in jail in
4   February 2013?
5   A. My knowledge of it?
6   Q. Yes.
7   A. I did not know he was in jail in February
8   2013 until I got the call from the deputy.
9   Q. Okay. So was the deputy calling from the
10  hospital?
11  A. Yes, sir.
12  Q. And so then you arrived at the hospital in
13  response to that call. Right?
14  A. Uh-huh.
15  Q. Did you come with anybody else?
16  A. My mother.
17  Q. Do you remember about what time you arrived
18  at the hospital?
19  A. It was -- it was sometime in the dinner
20  hours.
21  Q. So which means what, six, seven?
22  A. Sometime after six, I believe. Exact time I
23  can't remember.
24  Q. And who was the first person you saw when you
25  got there?

Kelly Green, 6/20/14					Johnson vs. Corizon Health, Inc.

**145**

1	A.	It was the deputy.
2	Q.	And do you remember your conversation with
3	the deputy?
4	A.	Yes, I do.
5	Q.	And then if you don't remember the exact
6	words, just tell us the substance of the conversation
7	and how it went.
8	A.	Just basically said that my son was admitted
9	into ICU with severe injuries and to follow him.
10	Q.	Okay. And did he give you any paperwork that
11	you recall?
12	A.	He did when we got -- uh-huh.
13	Q.	Was that during that first visit with him?
14	A.	No.
15	Q.	Was that later in the evening?
16	A.	When we went to the room with the rest of the
17	people.
18	Q.	So the deputy went to the room with you?
19	A.	(Witness nodding head.)
20	Q.	So, when you said follow him, he was talking
21	about, Follow me, I'm going to take you to where he's
22	at?
23	A.	Back to a room where the chaplain and the
24	neurosurgeon was.
25	Q.	And was Casey in the room or was this a

**146**

1	separate meeting room?
2	A.	Separate room.
3	Q.	Okay. And so it's you, the deputy, the
4	chaplain, and the surgeon?
5	A.	And Mom.
6	Q.	And your mother?
7	A.	Yes, sir.
8	Q.	Anybody else in the room?
9	A.	No, sir.
10	Q.	Tell me about the substance of that
11	conversation.
12	A.	The doctor interjected, introduced herself at
13	that point and said that Casey was in a really bad
14	accident, and she put x-rays up and we could quickly
15	see what happened.
16	Q.	Okay.
17	A.	And then she said that he had a neck
18	fracture. It was broke in four places.
19	Q.	In four places?
20	A.	Uh-huh. And then the chaplain wanted to pray
21	and then had to -- I had to sign a form with the
22	deputy.
23	Q.	Okay. And was that the release of custody to
24	you?
25	A.	Yes, sir.

**147**

1	Q.	Did the deputy say anything to you about what
2	had happened at the jail?
3	A.	He did not know what happened. He clearly
4	stated, Your case is with the Lane County Sheriff's
5	Department.
6	Q.	What do you mean, "your case"?
7	A.	That's what he said, sir.
8	Q.	Okay. And what did you understand him to
9	mean?
10	A.	Just basically check in. I'm trying to put
11	all of this together at the time. We did not know
12	that he was arrested, we did not know anything until
13	we got to the hospital.
14	Q.	Okay.
15	A.	Me and Mother did say that something bad
16	happened. We figured that if we were going to the
17	hospital. We didn't know what.
18	Q.	So, when he's saying "case," is he referring
19	to your son's criminal charges or did you know what he
20	was referring to?
21	A.	I have no idea what he meant by that, sir.
22	Q.	Okay. And --
23	A.	After the fact, I did.
24	Q.	Which is what?
25	A.	The negligence.

**148**

1	Q.	You believed he meant that there was a
2	negligence case against the Lane County Sheriff's
3	Office, and that's what he was referring to?
4	A.	After the fact that's what I like to believe.
5	Q.	So you're trying to put two and two together,
6	essentially --
7	A.	Yes, sir.
8	Q.	-- and that's your belief as to what he
9	meant?
10	A.	Yes, sir.
11	Q.	Okay. Do you remember any other substantive
12	information that this deputy gave to you while you
13	were there at the hospital?
14	A.	No. He was a nice young man.
15	Q.	And then there was a conversation, I take it,
16	with the surgeon?
17	A.	Said that he was -- that they were preparing
18	him for surgery and that we could go back and talk to
19	him for a minute.
20	Q.	Did you go back and talk to Casey before
21	surgery?
22	A.	Uh-huh.
23	Q.	And can you tell me what was said between the
24	two of you and -- did your mother go back as well?
25	A.	Yes.

37 (Pages 145 to 148)

Lehmann Court Reporting, Inc.
(503) 223-4040 *** (360) 553-2131

Exhibit 15 - Page 14 of 14
Dec'l of JTD