UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

DEREK JOHNSON, personal representative of )
KELLY CONRAD GREEN II, deceased; KELLY )
CONRAD GREEN and SANDY PULVER )
)
Plaintiffs, )
)
vs. ) Case No.:
) 6:13-cv-01855-TC
CORIZON HEALTH, INC., a Tennessee )
Corporation; LANE COUNTY, an Oregon )
county; DR. CARL KELDIE, an individual; DR.)
JOE PASTOR, an individual; BECKY PINNEY, )
an individual; VICKI THOMAS, an individual;)
KIRSTIN WHITE, an individual; JACOB )
PLEICH, an individual; SHARON FAGAN, )
an individual; ROB DOTSON, an individual; )
GUY BALCOM, an individual; DONALD )
BURNETTE, an individual; JOHN DOES 1-10, )
)
Defendants. )

---

The videotaped deposition of
CARL KELDIE, M.D.

March 6, 2014

---

TAMI R. WEBB, RPR, LCR, CCR
ACCURATE COURT REPORTING
The Pilcher Building
144 Second Avenue North, Suite 230
Nashville, TN  37201
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

2

---

I N D E X

                                          PAGE

Examination by Mr. Rosenthal .................... 5

E X H I B I T S

NUMBER                                    PAGE

107 ............................................ 37
    Corizon Quality Improvement documents

108 ............................................ 92
    *Fields v Prison Health Services, Inc.*, Opinion
    and Order

2

---

1    The videotaped deposition of CARL KELDIE, M.D.,
2  taken pursuant to notice for all purposes, at the offices
3  of Manier & Herod, P.C., One Nashville Place, Suite 2200,
4  150 Fourth Avenue North, Nashville, Tennessee, on March 6,
5  2014, at 1:29 p.m., at the instance of the Plaintiffs,
6  pursuant to the Oregon Rules of Civil Procedure.
7        All formalities as to caption, notice, statement
8  of appearance, et cetera, are waived.  Reading and signing
9  of the deposition transcript by the deponent is not
10 waived.  All objections except as to the form of the
11 question are reserved for the hearing.
12 _____
13            A P P E A R A N C E S
14
15 For the Plaintiffs:
16        Elden M. Rosenthal, Esquire
          John T. Devlin, Esquire (via telephone)
17        Rosenthal Greene and Devlin, P.C.
          121 SW Salmon Street, Suite 1090
18        Portland, OR  97204
19
   For Corizon Health, Inc., Dr. Carl Keldie, Dr. Joe Pastor,
20 Becky Pinney, Dr. Justin Montoya, Vicki Thomas, Kirstin
   White, Jacob Pleich, and Sharon Fagan:
21
          James M. Daigle, Esquire
22        Stewart Sokol & Gray, LLC
          2300 SW First Avenue, Suite 200
23        Portland, OR  97201
24
25
   APPEARANCES CONTINUED ON NEXT PAGE:

3

---

1  APPEARANCES, CONTINUED:
2
3  For Lane County, Rob Dotson, Guy Balcom, and Donald
   Burnette:
4
5        Sebastian Newton-Tapia, Esquire (via telephone)
         125 E 8th Avenue
6        Eugene, OR  97401
7  The Videographer:
8        Stephen Prince
         Nashville's Media Services

4

Exhibit 19 - Page 1 of 7
Dec'l of JTD

1 in a leadership position with -- was something that I was
2 interested in. And -- and frankly, once I met some of the
3 key physicians in corrections who I found to be very
4 passionate about what they were doing was really one of
5 the key deciding factors. While I was at a -- a -- a
6 flagship hospital in -- in Hollywood, Florida, level one
7 trauma hospital, I was responsible for four hospitals and
8 200,000 ER and primary care visits a year, it was just --
9 the physicians were not very happy or passionate about
10 what they did. And that was a big part of the reason.
11    Q.    What was the job that you came into PHS to do?
12 What was your -- what was your first job title?
13    A.    Chief medical officer.
14    Q.    And at that time how many physicians were you
15 supervising?
16    A.    It was a -- it was a transition to -- to, say,
17 supervision. I don't know how many regional medical
18 directors reported to me at that time. Somewhere in the
19 neighborhood of eight to ten that reported to me. How
20 many physicians we had in September of 2000, I don't know.
21 Maybe -- maybe 2' or 300 around the country.
22    Q.    And you stayed in the position of chief medical
23 officer at PHS until it merged with Correctional Medical
24 Services to form Corizon Health. Is that right?
25    A.    That's correct.

13

1    Q.    And that merger - I've got a date written down -
2 June of 2011. Does that sound right?
3    A.    That does sound right.
4    Q.    And when the merger occurred, what was your new
5 job title?
6    A.    My -- my new job title was transitional and then
7 I could find another career. We -- they had a chief
8 medical officer, we had a chief medical officer. They
9 made the decision that Jack Davidson would be the chief
10 medical officer.
11    Q.    So what did you do?
12    A.    I worked for a couple of months in the
13 transition and then I -- and then I -- we parted ways. I
14 took some time off, studied for my boards, recertified in
15 emergency medicine, and was looking at opportunities.
16 Really took some time off.
17    Q.    So when did you come back to Corizon?
18    A.    December of that same year, late 2011.
19    Q.    So what happened to cause that to occur?
20    A.    I think -- I think they made a decision that
21 maybe they had chosen the wrong chief medical officer, and
22 they asked me to -- asked me to come back and resume that
23 role.
24    Q.    And the other fellow's name was Davidson. Is
25 that what you said?

14

1    A.    Yes.
2    Q.    And he left the company at that time?
3    A.    He -- he stayed in a role for a few months in
4 utilization management. I'm not sure exactly when Jack
5 left.
6    Q.    Okay. But -- but -- but within six months he
7 was no longer --
8    A.    Ballpark.
9    Q.    -- with the company?
10    A.    Ballpark.
11    Q.    And so -- so then you're the chief medical
12 officer of Corizon?
13    A.    Correct.
14    Q.    Which is basically the same job you had with PHS
15 but there's just more --
16    A.    Correct.
17    Q.    -- beds and more people?
18    A.    Correct.
19    Q.    And you stayed in that job until when?
20    A.    April 1st of 2012. In April 1st of 2013.
21 Excuse me.
22    Q.    Okay. And what happened at that time?
23    A.    Rich Hallworth, the CEO, came into my office
24 April Fools Day, 0900 hours, and asked for my resignation.
25    Q.    Did this come out of the blue?

15

1    A.    It was -- it was pretty out of the blue.
2    Q.    Did you ever find out why he wanted you to
3 leave?
4    A.    I did not.
5    Q.    Did you ever ask?
6    A.    I did not.
7    Q.    Did you get a letter of recommendation from
8 Corizon when you left so that you could use it for future
9 employment?
10    A.    To the best of my knowledge, I did not get a
11 letter of recommendation.
12    Q.    So this is a little bit hard for me to get my
13 mind around - and then of course it didn't happen to me,
14 it happened to you - but somebody with 20 years with the
15 same company just gets asked to leave with no explanation.
16 I mean no -- nobody talked to you about what was going on
17 as to why you'd been asked to leave?
18    A.    I was asked for my resignation and they didn't
19 tell me why and I didn't ask why.
20    Q.    Had there been any investigation of you to your
21 knowledge?
22    A.    To my knowledge, there were no -- no
23 investigation of --
24    Q.    Was there ever any claim that you had done
25 anything unethical or illegal?

16

Exhibit 19 - Page 2 of 7
Dec'l of JTD

1    Q.   Well, maybe I swallowed the word.

2    A.   Yeah.

3    Q.   Let me try to say -- ask it again.

4         Isn't it true that outpatient treatment is the

5    single biggest variable expense that Corizon has in its

6    local jail contracts?

7    A.   And I'm not meaning to be anything other than

8    trying to answer your question appropriately.  What --

9    what do you mean by variable expense?

10    Q.   Something that can't be controlled for.  In

11    other words, staff Corizon controls for.

12    A.   To some degree.  So -- and you said outpatient.

13    Q.   Outpatient treatment.  That would be, you know,

14    being sent to a hospital or going to a practitioner

15    outside of a jail.

16    A.   Okay.  The -- the terminology is "off site" --

17    Q.   Okay.

18    A.   -- because in -- virtually everything we do is

19    outpatient --

20    Q.   Okay.

21    A.   -- if it's in our setting.  So off site is one

22    of if not the largest variable expense.

23    Q.   And is it -- and is the control of off-site

24    treatment one of the primary duties of the HSA?

25    A.   The -- I would say no.

81

1    Q.   Is jail staff around the country reminded of the

2    fact that off-site treatment is a significant expense that

3    Corizon is trying to limit?

4    A.   I -- I -- the message that I as the chief

5    medical officer consistently gave was appropriate off-site

6    utilization; that we encourage the use of off site for

7    appropriate care, but that we try to optimize care on

8    site.

9    Q.   And isn't it true that there are monthly

10    meetings that occur throughout the country with -- I have

11    to stop my question in mid sentence because I'm forgetting

12    a phrase.  What do you call the person who's the primary

13    medical person working on site?  There's the HSA and then

14    there's a name for the -- the person who's the primary

15    medical doctor or physician assistant on -- at the jail.

16    A.   You mean medical director?

17    Q.   Okay.  Isn't it true that there are monthly

18    meetings for medical directors around the country?

19    A.   Not that I know of.

20    Q.   We were told by Physician's Assistant White that

21    she attended monthly regional meetings of var -- of all

22    the medical directors.  It was a telephone conference

23    call.

24    A.   Okay.  I -- now having a -- having a conference

25    call was not what I -- because we -- we did have not

82

1    infrequent meetings around the country where there -- they

2    would -- we would have a regional meeting with the

3    physicians coming in.  And that didn't happen monthly.  We

4    had -- we had -- we had sometimes daily calls, sometimes

5    weekly calls, and sometimes monthly calls.

6    Q.   And we were told by this physician's assistant

7    from Lane County that the -- that 80 to 90 percent of the

8    time on those monthly conference calls were concerned with

9    patients that were in the hospital.  Does that sound

10    correct?

11    A.   I -- I've not been on a monthly call where 80,

12    90 percent had -- were consumed by patients in the

13    hospitals.

14    Q.   Was it during your watch that the Idaho special

15    master, I think his name was Stern, Dr. Stern, wrote a --

16    wrote a report that was quite critical of CMS and Corizon?

17    A.   Yes.

18    Q.   How, if at all, did Corizon respond to that

19    report?

20         MR. DAIGLE:  Okay.  I'm going -- just so we have

21    the -- the boundaries of the questions, I'm going to allow

22    him to answer questions about whether he was asked by

23    anybody to -- to do an internal response.  But my

24    understanding is the report was prepared at the direction

25    of counsel for Corizon, so the contents of the report, we

83

1    are claiming, are privileged.

2         MR. ROSENTHAL:  The contents of which report?

3         MR. DAIGLE:  Well, earlier today, you talked to

4    Dr. Pastor and he said that he had prepared a -- a

5    response and provided it to Dr. Keldie.  You recall that?

6         MR. ROSENTHAL:  Okay.  I do remember that now.

7    All right.

8         MR. DAIGLE:  Okay.  So it's my position that the

9    contents of whatever internal review of the Idaho special

10    master's report is privileged.

11    Q.   (By Mr. Rosenthal)  Was there any public

12    response to the Idaho special master's report?

13    A.   I am pretty sure there was.

14    Q.   And can you tell me what the nature of that

15    public response was?

16    A.   I think there was a response by our CEO, Rich

17    Hallworth.

18    Q.   And --

19    A.   I don't --

20    Q.   -- was it a press release or was it a report or

21    did he file something with the Court?  Do you know?

22    A.   I don't know.

23    Q.   Was it the position of Mr. Hallworth that the

24    Idaho special master report was accurate or was it his

25    report -- was it his conclusion that the report was

84

Exhibit 19 - Page 3 of 7
Dec'l of JTD

1  inaccurate, the public statements that he made?

2      A.  I think his -- I think his report reflected that

3  it was inaccurate.

4      Q.  And as a result of the report by Dr. Stern in

5  Idaho, were there any steps taken to change the way CMS or

6  Corizon provided services in Idaho?

7      A.  Yes.

8      Q.  What type of changes were made?

9      A.  There were -- there were some changes made to

10  patient flow where we actually saw the patient.  There was

11  de minimis change to staffing; but I think in concert with

12  the staffing, there was -- in concert with the client,

13  there were some staffing changes.

14      Q.  Were you aware of a case in Michigan in 2006

15  where a federal judge wrote in an opinion:  The days of

16  deadwood in the Department of Corrections are over, as are

17  the days of CMS intentionally delaying referrals and care

18  for craven profit motives, close quote?

19      A.  That -- to my knowledge, that's the first time

20  I'm hearing that quote.

21      Q.  Were you aware of any litigation in Michigan

22  over quality of care provided by CMS?

23      A.  I am sure I was aware of -- of some -- of -- of

24  the issues that CMS had.  I don't remember the specificity

25  of the issues.

                                                        85

1      Q.  Were you aware of issues with care provided in

2  Arizona in 2007, 2008?

3      A.  In Arizona?

4      Q.  In Arizona, Pima County.

5      A.  Okay.  That's -- I -- I -- when you say Arizona,

6  I think of the Arizona Department of Cor -- the prisons.

7      Q.  I'm talking about Pima County.

8      A.  Okay.  So in a jail contract at Pima County,

9  I -- I don't know any specificities around that.

10      Q.  Were you aware of a published quote by Judge

11  Warner in Pima County, quote, I have issues with the

12  quality of the staff, the quality of the care.  It has

13  been a frustration for the Court that their whole goal is

14  how not to do any work, close quote?

15      A.  I am not.

16      Q.  Were you aware of a report written by a Mr.

17  Martin in Delaware who was appointed to monitor inmate

18  care at the Delaware Department of Corrections?

19      A.  I am -- I am aware of reports regarding the

20  Delaware Department of Corrections.  I have no idea if

21  it -- what I was aware of was written by Mr. Martin.

22      Q.  Are you aware of a 2008 report written by a

23  court-appointed monitor in Delaware in which the report

24  found poor supervision, inadequate staffing, and

25  inappropriate care provided by CMS?

                                                        86

1      A.  We, being PHS, bid on the Delaware contract, and

2  it was -- and I don't know the -- the year that we bid on

3  it -- but we were made aware of a number of issues that

4  CMS had had in the Delaware DOC.  So I actually read a lot

5  of information when we were -- when we were evaluating

6  whether we even wanted to bid on the Delaware DOC.

7      Q.  Were you aware that the state of Maine found

8  fault with Corizon's care in a report issued in January of

9  2012?

10      A.  I was aware that -- that there were findings in

11  Maine DOC.  The specificity I don't remember.

12      Q.  Do you recall that Maine DOC terminated the

13  contract with Corizon as a result of the problems I --

14  identified in the report?

15      A.  I did not know that.

16      Q.  Were you aware of a report by Immigration and

17  Customs Enforcement Office of Professional Responsibility

18  regarding the death of a Mr. Alvarez in the Suffolk County

19  Jail in Massachusetts?

20      A.  Yes, sir.

21      Q.  Did -- did -- was that a PHS contract?

22      A.  Yes, sir.

23      Q.  Did PHS have any public response to that report?

24      A.  I don't remember whether we had a public

25  response or not.

                                                        87

1      Q.  Were you the CMO at the time that report came

2  out?

3      A.  Which report?

4      Q.  The one by Immigration and Customs Enforcement

5  Office of Professional Responsibility.

6      A.  Can you tell me when that report came out?

7      Q.  2010.  Either 2010 or 2011, but I think it was

8  2010.

9      A.  In -- and I'm pretty sure that I -- I was the

10  chief medical officer when -- when that report came out.

11  I don't remember that it specifically came from

12  immigration and naturalization.

13      Q.  Do you remember that it was a federal report?

14      A.  I do not.

15      Q.  All right.  Was there any public response to

16  that report?

17      A.  I don't remember.

18      Q.  Did you, as chief medical officer, read the

19  report, whoever wrote it?

20      A.  I don't remember, but it would have been unusual

21  for me not to read such a report.

22      Q.  Do you remember whether you agreed with the

23  report or not, that there was substandard care that led to

24  the death of Mr. Alvarez?

25      A.  I don't remember.

                                                        88

Exhibit 19 - Page 4 of 7

Dec'l of JTD

1    Q.    In New York -- let's see.  When -- when did you
2  start at PHS, what year?
3    A.    2000.
4    Q.    2000.  I saw that in 2005 PHS was fined $71,000
5  for failing to meet medical or mental health standards in
6  the New York City jails.  Was that on your watch?
7    A.    Yes, sir.
8    Q.    And did you agree with those fines?
9    A.    I didn't -- I didn't go into the specifics.
10  We -- we had a tremendous number of performance indicators
11  and a tremendous number of monitors, and $71,000 was a
12  de minimis number of the potential fine.
13    Q.    Were there problems in Upstate New York with
14  patient death?
15    A.    Were there problems in Upstate New York?  Can
16  you be a little more specific?
17    Q.    Okay.  Well, let me -- let me start with --
18  with -- with Manhattan.  Does -- does the name Oswald
19  Livermore mean anything to you?
20    A.    No, sir.
21    Q.    He died from acute alcohol withdrawal and DTs in
22  May of 2009 while in the -- The Tombs, T-O-M-B-S, which is
23  a jail in New York.
24    A.    Uh-huh.
25    Q.    Does that ring a bell?

89

1  Jail, in July of 2004, do you -- do you recall New York
2  State investigators accusing Prison Health Services of
3  causing the death of an inmate suffering from Parkinson's
4  disease?
5    A.    Yes, sir.
6    Q.    Did you -- did -- did Corizon have any public
7  response to those accusations?
8    A.    I don't know.
9    Q.    There was a report written by the New York
10  Commission of Corrections arising out of an event in Palm
11  Beach County, New York.  Does that ring a bell?
12    A.    Palm Beach County, New York?
13    Q.    Probably Palm Beach County is Florida.
14    A.    Right.
15    Q.    Excuse me, I'll withdraw the question.
16        Are you familiar with the *Fields* case in
17  Florida - there's a jury verdict for over a million
18  dollars - a couple years ago?
19    A.    What facility?
20    Q.    Well, I'll show you the trial court's opinion.
21  I wonder if you've ever seen that.  Lee County, L-E-E.
22    A.    The -- the name does not jump out at me.  I
23  don't -- I don't remember the specificity.  If I read the
24  whole report, I might remember something about it.
25        MR. ROSENTHAL:  I'm going to mark this opinion

91

1    A.    No, sir.
2    Q.    There was a report issued by one of the -- by an
3  agency of the state of New York that concluded that
4  Mr. Livermore's death may have been prevented if medical
5  officials in the jail had simply diagnosed the condition
6  and treated it.  Do you recall that?
7    A.    Was that an SCOC report?
8    Q.    I can't answer that on the information I have in
9  front of me.  I know it was a -- it was a state of New
10  York agency report.
11    A.    And I do not remember the specifics of -- of
12  that report.
13    Q.    In December of 2005 in York County, New York, a
14  gentleman named Michael Herman committed suicide while in
15  solitary confinement in York County Prison.  Do you have a
16  recollection of that event?
17    A.    Are we talking nine years ago, 2005?
18    Q.    December 2005.
19    A.    Say the name again.
20    Q.    Michael Herman, age 19.
21    A.    I don't remember that name.
22    Q.    It was a suit filed against Prison Health
23  Services.  Does that ring a bell?
24    A.    Still doesn't ring a bell.
25    Q.    In Schenectady, New York, in the Dutchess County

90

1  as Exhibit 108.
2        (*Fields v Prison Health Services,*
3  *Inc.*, Opinion and Order marked Exhibit 108 to this
4  deposition.)
5        THE WITNESS:  May I look at my phone?
6        MR. ROSENTHAL:  Sure.  Do you want to take a
7  break?
8        THE WITNESS:  Yeah, let's take just a couple
9  minutes.
10        THE VIDEOGRAPHER:  Going off the record at
11  3:59 p.m.
12        (Recess taken, 3:59 p.m. to 4:04 p.m.)
13        THE VIDEOGRAPHER:  We're back on the record.
14  The time is 4:04 p.m.
15    Q.    (By Mr. Rosenthal)  I want to read you a
16  sentence out of this *Fields* decision, Exhibit 108:  Quote,
17  the Court finds that plaintiff presented sufficient
18  evidence that PHS's policy, slash, custom of trying to
19  contain costs for emergency medical care was the moving
20  force behind the violation of plaintiff's constitutional
21  rights, close quote.
22        Was that ever brought to your attention, that a
23  judge had -- had reached that conclusion?
24    A.    And what was the date of that?
25    Q.    September 2, 2011.

92

Exhibit 19 - Page 5 of 7
Dec'l of JTD

1    A.    That's when it was actually written?

2    Q.    Yes.

3    A.    I was -- I was not with the company at that time

4    and I can't remember if -- I think that's -- yeah, it was

5    June 2011 when the merger took place.  So I -- I don't

6    remember that -- that particular ruling.

7    Q.    So that -- so is it your testimony that this was

8    probably not brought to your attention when you came back

9    to the company?

10    A.    Probably not.

11    Q.    And I'm sorry that I keep asking you these date

12    questions, but I confess that I can't keep them in my head

13    very well.

14          Were you with the company in September of 2012?

15    A.    And I have to think as well.  But September of

16    '12, yes.

17    Q.    Well, that's when the 11th Circuit, Federal

18    Court of Appeals, issued an opinion in the same case

19    affirming the judgment, and concluded:  "Prison Health

20    enforced its restrictive policy against sending inmates to

21    the hospital."

22          Was that ever brought to your attention?

23    A.    You're asking me if I remember a sentence out of

24    a four- or five-page ruling?

25    Q.    You know, I don't know that the sentence is so

93

important.  The gist of it is, is that the Court concluded

2    that Prison Health enforced a policy, a restrictive

3    policy, against sending inmates to a hospital.  Was that

4    ever brought to your attention, that a federal three-judge

5    panel had concluded that?

6    A.    I -- I don't remember the specificity around --

7    I'll be glad to read both reports and discern to see if it

8    jogs my memory.

9    Q.    Do you know who Randall Berg, Jr., is, the

10    executive director of the Florida Justice Institute in

11    Miami?

12    A.    Randall Berg?  No, sir.

13    Q.    I've got a report that I'm looking at, that in

14    November of 2006 or sometime shortly before that, the

15    Florida Department of Corrections announced that it was

16    fining Prison Health Services $696,000 for failing to meet

17    a series of benchmarks including keeping legible medical

18    records, missing deadlines to assign case workers, and

19    performing medical evaluations.  Do you recall that event?

20    A.    No, sir.

21    Q.    Are you aware in 2006 of lawsuits in Georgia out

22    of Gwinnett County, Lawrenceville, where two inmates in

23    separate lawsuits claimed they -- they died after a

24    struggle with prison guards and then claiming that they

25    didn't receive adequate medical care?

94

1    A.    Two inmates, Gwinnett County, 2006?

2    Q.    Yeah.

3    A.    I don't know -- I -- I don't remember any

4    specificity around that.

5    Q.    Do you have a recollection of a case out of that

6    same county in late 2005 about a cancer patient who died,

7    and there was a claim of botched medications, patient

8    neglect, and staff indifference by Prison Health Services?

9    Harriet Washington was the plaintiff, was -- was the

10    cancer patient's name.

11    A.    No, sir.

12    Q.    Do you recall the firing in Gwinnett County of

13    Diane Y-O-C-I-S-S - I'm not sure how to say that name -

14    Yociss, who claimed that she was fired for being vocal

15    about lapses in healthcare at the jail in Gwinnett County?

16    A.    No, sir.

17    Q.    Do you recall a case in Idaho in November of

18    2008, Pocatello County, a $3.6 million award to a woman

19    and her son who claims that she wasn't properly cared for

20    and that her -- she had a premature son who was seriously

21    injured due to failure by Prison Health Services to

22    provide appropriate care?

23    A.    Yes, sir.

24    Q.    What do you remember about that case?

25    A.    I remember a pregnant female that was in labor

95

and was taken by a wheelchair to the ambulance and she

2    precipitously delivered on the way to the ambulance.  And

3    I remember that being a -- a large case that we had expert

4    witness that testified that -- on our behalf, that the --

5    very much so, that this -- the -- the -- the outcome to

6    the infant was much less likely to be from the trauma than

7    from the antecedent history of the mother.

8    Q.    And did you agree with your expert testimony

9    that you just --

10    A.    With my --

11    Q.    -- described?

12    A.    -- expert testimony?

13    Q.    No.  Did you agree with the expert testimony

14    that you've just described?

15    A.    I remember reviewing the case and -- and -- and

16    feeling like this was -- this was a -- this was not due to

17    whatever that, what'd they say, botched care on our part

18    or -- I'm not sure that I'm quoting exactly what it said.

19    Q.    Do you recall a case out of Louisville,

20    Kentucky, in the summer of 2007, where a man who committed

21    suicide in the summer of 2006 claimed that he was not

22    properly -- the family claimed that he was not properly

23    evaluated, that he had a history of attempted suicide and

24    depression, but he was put in a regular jail cell and not

25    monitored?

96

Exhibit 19 - Page 6 of 7
Dec'l of JTD

1    Q.   Do you think it is likely that this history of
2  litigation is indicative of the fact that Corizon has a
3  business model which leads to inadequate staffing?
4         MR. DAIGLE:  Object to form.
5    A.   No, sir.
6    Q.   (By Mr. Rosenthal)  Are you of the view that
7  this litigation history is indicative of a business model
8  that suggests that for-profit medical care in prisons
9  leads to inappropriate medical care?
10   A.   No, sir.
11        MR. DAIGLE:  Object to form.
12   Q.   (By Mr. Rosenthal)  So I want to circle back now
13 and talk about the Kelly Green case a little bit further.
14        You know, I'm a broken record here, and I should
15 have written this down and I didn't.  And I apologize.
16 The -- the date that you were asked to discontinue your
17 service as chief medical officer was what?
18   A.   April Fools Day, April 1st, 2013.
19   Q.   I'm about done.  What I'd like to do -- and I
20 know we just took a break -- but now that we've gone
21 through this last half hour, I'd like to take another
22 short break so I can wrap this up in an efficient way.
23   A.   Sounds good.
24        MR. ROSENTHAL:  Okay.  Thank you.
25        THE VIDEOGRAPHER:  Going off the record at

101

1  4:23 p.m.
2         (Recess taken, 4:23 p.m. to 4:32 p.m.)
3         THE VIDEOGRAPHER:  We're back on the record.
4  The time is 4:32 p.m.
5    Q.   (By Mr. Rosenthal)  There was a pretty long list
6  of litigation that I went through with you, and I'm not
7  representing to you that that's anywhere near a complete
8  list.  But my question is this:  Other than the one
9  occasion where you mentioned - and I think it was in
10 regard to Minnesota - where there was some changes made as
11 a result of litigation, can you think of any other cases
12 in which there were changes made as a result of
13 litigation?
14   A.   I -- changes made specifically to one litigation
15 is pretty unusual.  The compilation of quality improvement
16 data, litigation information, has been inculcated in --
17 in -- in how we practice and how we monitor, and has
18 continuously improved over time.  I'm begging the question
19 slightly while I'm trying to remember it.  There is a
20 specific malpractice suit that resulted in -- in change.
21 And I -- I do know of -- of two cases in Florida where
22 cases brought to our attention resulted in a change in our
23 site medical director, because we felt that the errors
24 were -- were egregious and a significant -- significant
25 enough that we made changes to two medical directors.  And

102

1  I know that I personally reported them to the Florida
2  Board of Medicine.
3    Q.   Any other litigation that you recall led to any
4  changes in policies or procedures or in the business model
5  of Corizon?
6    A.   I think the -- I think the compilation of -- of
7  cases that were represented by Paul von Zielbauer in the
8  New York Times article in late winter, early spring of
9  2005, I think that led to a pretty significant paradigm
10 shift within Prison Health Services.
11   Q.   How so?
12   A.   Prior to -- prior to meeting on multiple
13 occasions with Paul von Zielbauer and -- and trying to --
14 and -- and trying to be transparent with him, we -- we
15 realized that we were not keeping good enough metrics.
16 Prior to his investigation and then subsequently his
17 publication, the majority of my time was actually spent in
18 utilization management; I would guess 60 or 70 percent.
19 After that, probably more like 75 percent of my time was
20 spent in quality improvement and patient safety.  We -- we
21 made our QI system more robust.  We deployed our sentinel
22 event system.  We trained staff.  We created the NETs out
23 of my department at that point in time.  We did continuing
24 education where -- where we -- we've learned from mistakes
25 and opportunity for improvement.  It was a -- it was a

103

1  seminal event and -- and I think transformative in our
2  shift from -- in the culture of the company, to one that
3  we really endorsed patient safety.  And it -- it continued
4  to -- we're the only correctional healthcare company that
5  I know of that are members of the National Patient Safety
6  Foundation, that are members of the Society to Improve
7  Diagnosis in Medicine, that have as -- as robust of an
8  intention to sentinel events and quality improvement and
9  educational and forums and -- and initiatives to really
10 try to improve the safety and the quality of the
11 healthcare for the inmate patients that -- that we serve.
12   Q.   Well, I don't have exact numbers because we've
13 been arguing about discovery matters and we just recently
14 got a court ruling, so my -- my next question's going to
15 be based on -- on approximate numbers.  Okay.
16        But it is my understanding from what your chief
17 legal officer told to -- to the Broward County folks when
18 they were negotiating that contract down there that in the
19 years 2008 to 2013, that there were 660 lawsuits filed and
20 there were approximately 90 confidential settlements
21 entered into.  How do you reconcile what you've just said
22 to me about changes in the company's policy with that
23 number of lawsuits and -- and confidential settlements.
24        MR. DAIGLE:  Object to the form.
25   A.   I've practiced medicine in rural America where

104

Exhibit 19 - Page 7 of 7
Dec'l of JTD