*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

---

*Justin Montoya, MD*
*April 18, 2014*



CC REPORTING & VIDEOCONFERENCING

172 East 8th Avenue
Eugene, OR 97401

*Original File MontoyaJustinMD.TXT*
*Min-U-Script® with Word Index*

Exhibit 23 - Page 1 of 32
Dec'l of JTD

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


KELLY CONRAD GREEN, II, an        )

individual, by and through his    )

guardian ad litem Derek           )

Johnson,                          )

        Plaintiff,        )

  v.                              )No. 6:13CV01855-TC

CORIZON HEALTH, INC., a           )

Tennessee Corporation; et al.,    )

        Defendants.       )


DEPOSITION OF JUSTIN MONTOYA, M.D.

April 18, 2014

Friday

9:18 A.M.


THE VIDEOTAPED DEPOSITION OF JUSTIN
MONTOYA, M.D., was taken at CC Reporting and
Videoconferencing, 172 East 8th Avenue, Eugene,
Oregon, before Sara Fahey Wilson, CSR, Certified
Shorthand Reporter in and for the State of Oregon.

---

APPEARANCES

(Continued)


For Defendant Lane County and employees:

LANE COUNTY OFFICE OF LEGAL COUNSEL

125 East Eighth Avenue

Eugene, Oregon 97401

541/682-3728

BY:  MR. SEBASTIAN NEWTON-TAPIA

sebastian.newton-tapia@co.lane.or.us


Also Present:

MR. MATT CORNELIUS - STAFFORD VIDEO


Reported by:

SARA FAHEY WILSON, CSR

CC REPORTING & VIDEOCONFERENCING

EUGENE        541/485-0111

TOLL FREE    800/344-0983

---

Page 2

APPEARANCES

For the Plaintiff:

ROSENTHAL GREENE & DEVLIN PC

121 SW Salmon Street, Suite 1090

Portland, Oregon 97204

503/228-3015

BY:  ELDEN M. ROSENTHAL

elden@rgdpdx.com

BY:  MR. JOHN THOMAS DEVLIN (Via Phone)

john@rgdpdx.com


For Defendant Corizon Health and employees:

STEWART SOKOL & GRAY LLC

2300 SW First Avenue, Suite 200

Portland, Oregon 97201

503/221-0699

BY:  MR. ROBERT COLEMAN

rcoleman@lawssg.com


(Continued)

---

Page 4

INDEX

WITNESS.......................................PAGE

JUSTIN MONTOYA, M.D.

    BY MR. ROSENTHAL                        5


EXHIBITS......................................PAGE

No. 119   Independent Contractor Physician      17
        Agreement

No. 120   General Description of Duties          31

No. 121   Time Sheets                           57


MARKED TEXT.............................PAGE/LINE

INSTRUCTION                                30/ 6

INSTRUCTION                                31/ 3

INSTRUCTION                                70/ 4

INSTRUCTION                                70/ 9

INSTRUCTION                                70/25

INSTRUCTION                                73/ 4

INSTRUCTION                                74/ 4

INSTRUCTION                                98/17

INSTRUCTION                                98/25

INSTRUCTION                               104/24

Exhibit 23 - Page 2 of 32
Dec'l of JTD

Page 9

1  Clinic in Junction City, Oregon, and worked there
2  until approximately 2010.
3     Q.   During those eight years or so was that
4  your only employment?
5     A.   I worked as a wound care and hyperbaric
6  medicine physician at McKenzie-Willamette Wound Care
7  Center.
8     Q.   When did you start there, approximately?
9     A.   2009-ish, approximately.  I also worked at
10 Eugene Urgent Care around 2009 as well on a per diem
11 basis, and I worked at Sacred Heart RiverBend
12 Hospital in the emergency room on a per diem basis.
13    Q.   Starting approximately when?
14    A.   Around the same time.
15    Q.   Your job at Junction City Medical Clinic,
16 was that a full-time position?
17    A.   Yeah.
18    Q.   Then did something happen in 2009 that you
19 started picking up these per diems?  What occurred?
20    A.   Trying to put money away for the kids'
21 college.
22    Q.   So nothing changed with the Junction City
23 Medical Clinic.  You just started working more jobs?
24    A.   A little extra.
25    Q.   Okay.  What is Soul Wrap Designs?

Page 10

1     A.   That was a tie company that I had started.
2     Q.   Like neck tie?
3     A.   Uh-huh.
4     Q.   And --
5     A.   Extreme sport-based neck ties:  rock
6  climbing, mountain biking.
7     Q.   And when did you start that,
8  approximately?
9     A.   I don't know.
10    Q.   Is that still operating?
11    A.   No.
12    Q.   When did it go out of business?
13    A.   Couple years ago.
14    Q.   Prior to the time you became the
15 medical --
16    A.   Did you want the rest of my medical or
17 employment history?
18    Q.   I'm sorry.  I thought you were done.
19    A.   After I left there, I worked
20 more regularly at the wound care clinic.
21    Q.   After you left --
22    A.   Junction City.
23    Q.   Okay.
24    A.   And I also worked at the University of
25 Oregon Student Health Center for a couple years, and

Page 11

1  then I started my own clinic two years ago,
2  ProHealth Family Medicine.
3     Q.   Okay.  Does that pretty much cover it?
4     A.   Yeah, except for volunteer work, pretty
5  much.
6     Q.   So when did you first do any work with
7  Corizon?
8     A.   I don't recall the specific date.
9     Q.   Do you remember the year?
10    A.   Sometime in the last few years.
11    Q.   Were you the first medical director at the
12 Lane County Jail for Corizon?
13    A.   I don't know for sure.  I believe I was,
14 but I don't know for sure.
15    Q.   Who is Sara Sheffield?
16    A.   I don't know.
17    Q.   Do you have an employment relationship
18 with her?
19    A.   No.
20    Q.   When I looked on the business directory
21 for Oregon, there's -- a Justin Montoya, M.D., LLC,
22 is listed and I noticed that's how you signed the
23 contract with Corizon.  When did you form the LLC?
24    A.   I don't know.  Somewhere around 2009,
25 probably.  2008.  2010.

Page 12

1     Q.   And is this the entity that you did all of
2  your medical practice through at -- from the time
3  after you formed it?
4     A.   That's where I work as an independent
5  contractor, so when I work at Corizon, when I worked
6  at the urgent care, it was through that.
7     Q.   So do you have -- are you still working
8  for Corizon?
9     A.   I still work at the jail.
10    Q.   Okay.
11    A.   I'm not an employee.
12    Q.   You're an independent contractor?
13    A.   I'm an independent contractor.
14    Q.   Right.  So currently how many hours a week
15 are you working at the jail?
16    A.   I work four hours a week.  I work
17 additional hours on call.  I work additional hours
18 attending meetings.
19    Q.   Is 3683 Walton your home address?
20    A.   Yes.
21    Q.   And that's the business address that you
22 list for your LLC?
23    A.   For which LLC?
24    Q.   Do you have more than one?
25    A.   My company -- my clinic is also a separate

Exhibit 23 - Page 3 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD
April 18, 2014

Page 17

1    A.   No.
2    Q.   When you were hired -- let's see.  I've
3    got the agreement here to help us out.
4         (Deposition Exhibit No. 119
5         marked for identification.)
6    **BY MR. ROSENTHAL:**
7    Q.   Marking as Exhibit 119, your independent
8    contractor agreement that you entered into with
9    Corizon.  I'm not quite sure why there's two copies
10   here.  They were produced to me this way.  They look
11   to me to be the same.  But if you look on page 7 of
12   the document, it looks like you signed this
13   agreement in October of 2012.
14        My first question is, do you remember who
15   first contacted you about the position with Corizon?
16   A.   No.
17   Q.   Do you remember how you found out about
18   the opportunity?
19   A.   Somebody contacted me.
20   Q.   So this is not something that you reached
21   out for?  Somebody reached out for you?
22   A.   Yes.
23   Q.   And do you recall how long a process it
24   was from the time that first call occurred until you
25   actually signed the contract?

Page 18

1    A.   No.
2    Q.   Do you have a ballpark on it?  I mean, was
3    it a week or two, or was it a few months?
4    A.   Somewhere between there, I suppose.
5    Q.   I can't -- the signature, if you look on
6    page 7, I can't read the signature of the person
7    from Corizon that signed it.  Do you recall who you
8    signed the contract with at Corizon?
9    A.   No.
10   Q.   Was there a Mr. Legg involved?
11   A.   Yes.
12   Q.   Was he the person who you kind of made
13   your verbal deal with prior to having the contract
14   prepared and signed?
15   A.   Yes.
16   Q.   Was there a Ms. Garcia involved in the
17   process?
18   A.   I don't recall.
19   Q.   Was there a Mr. Hyppolite involved in the
20   process?
21   A.   I'm familiar with that name.  I don't
22   believe he was involved in that process.
23   Q.   So your best recollection is, is that your
24   discussions were with Mr. Legg leading up to the
25   signing of the contract?

Page 19

1    A.   Yes.
2    Q.   Now, when you first entered into the
3    agreement, was it your understanding that your work
4    would be right around four hours a week?
5    A.   Yes.
6    Q.   And did it stay that way at four hours a
7    week, or did it -- did it get enlarged into more
8    hours as you started the job?
9    A.   As I mentioned previously, I worked there
10   four hours a week.  I also attend meetings
11   occasionally and I take call.
12   Q.   Were you on call 24/7 when you started?
13   A.   I don't recall.
14   Q.   Are you currently on call 24/7?
15   A.   Define "on call."
16   Q.   Does Corizon expect you to be available to
17   the telephone if you're needed at the jail?
18   A.   No.
19   Q.   Is there a particular schedule you have as
20   to when Corizon expects you to be available to take
21   phone calls?  Is that certain days of the week?  Is
22   there some system?
23   A.   Yes.
24   Q.   Could you explain that to me, please?
25   A.   Myself, Kris White, Dr. Calder, alternate

Page 20

1    on a varying basis who is the primary person who
2    takes phone calls.
3    Q.   Dr. Calder is a new name to me.  When did
4    he start with Corizon, approximately, at the Lane
5    County Jail?
6    A.   Sometime within the past year, I believe.
7    Q.   Was -- do you know whether he was involved
8    at the Lane County Jail in February of 2013?
9    A.   I don't know specifically when he came on,
10   but I don't believe so.
11   Q.   Is he a family practice doc also?
12   A.   I don't know what his credentials are.  He
13   practiced primarily diabetes care.  I don't know if
14   he's family practice or internal medicine other than
15   that.
16   Q.   Does he do -- have clinic hours at the
17   jail now?
18   A.   Yes.
19   Q.   How many hours a week does he go into the
20   jail?
21   A.   Four.
22   Q.   Did that -- did he get involved at the
23   Lane County Jail when the jail population jumped up?
24   I know that they were running 200, 220, and then
25   there was a time when it jumped up into the 300s.

Exhibit 23 - Page 4 of 32
Decl'of JTD

Page 49

1   **Q.**   I'm sorry.  I must have misinterpreted
2   what you told me.  Did -- when do you do the annual
3   reviews of -- when was the last time you
4   did an annual review of Ms. White?
5   **A.**   In the fall, I believe.
6   **Q.**   Fall of what?  2013?
7   **A.**   Yes.
8   **Q.**   And how did you evaluate her?  What was
9   your review?
10  **A.**   Could you clarify the question?
11  **Q.**   I'm not sure what terms Corizon asks you
12  to use, whether it's a grading system or just some
13  kind of a descriptive system, but I'd like to know
14  what you concluded in terms of her review.
15  **A.**   I concluded that she was competent to do
16  her job.
17  **Q.**   Did you have the opportunity to give her a
18  higher rating than competent?
19  **A.**   No.
20  **Q.**   So is that the highest rating you could
21  have given her?
22  **A.**   There was really no descriptor one way or
23  another.  I gave her a good review.  Satisfactory
24  review.  I did not give her a negative review.
25  **Q.**   When you go to the jail to meet with

Page 50

1   patients, does Ms. White accompany you on the rounds
2   in the jail?
3   **A.**   Occasionally.
4   **Q.**   But usually not?
5   **A.**   Occasionally.
6   **Q.**   All right.  So is it fair for me to say
7   that usually when you do rounds Ms. White is not
8   with you?
9   **A.**   It varies.  Sometimes we will spend more
10  of the portion of the time seeing people together.
11  Other times we will be seeing people more
12  independently.  That would vary depending on the
13  number of people that we're trying to see, the
14  acuity of the people that we're trying to see, the
15  location of the people that we're trying to see, and
16  specific questions or concerns about their care,
17  their plan of care, that type of thing.  So it
18  really would vary.
19  **Q.**   You usually worked Wednesday morning.  Is
20  that right?
21  **A.**   Correct.
22  **Q.**   Did -- was Ms. White usually there on
23  Wednesday morning when you were there?
24  **A.**   Yes.
25  **Q.**   Do you know what her schedule was other

Page 51

1   than Wednesday morning?
2   **A.**   32 hours a week total, I believe.
3   **Q.**   Was she usually there in the jail on
4   Tuesdays?
5   **A.**   Yes.
6   **Q.**   Did you have anything to do with approving
7   her overtime if she worked overtime?
8   **A.**   No.
9   **Q.**   Do you have any knowledge one way or the
10  other as to whether she was encouraged to work
11  overtime or discouraged from working overtime?
12  **A.**   No.
13  **Q.**   In an average week how often does she call
14  you for guidance?
15  **A.**   It's very variable.  I would say a few.
16  **Q.**   So let me put it in my words and you tell
17  me if this is fair.  In a normal week you would
18  expect that she would be calling you more than one
19  time for guidance?
20  **A.**   Yes.
21  **Q.**   Did you expect her to contact you if there
22  was a medical emergency in the jail?
23  **A.**   Not always.
24  **Q.**   Did you consider her, in February of 2013,
25  competent to diagnose whether a patient had suffered

Page 52

1   a closed head injury?
2   **A.**   Yes.
3   **Q.**   Did you consider her competent in 2013,
4   February of 2013, to diagnose whether a patient had
5   a subdural hematoma?
6   **A.**   I don't think that's probably a fair
7   question.  Subdural hematoma for definitive
8   diagnosis usually would require a CAT scan, which we
9   did not immediately have available in the jail.  So
10  that's usually something that gets confirmed in an
11  emergency room or imaging center that has those
12  capabilities.
13  **Q.**   What would your expectations have been in
14  February of 2013 as to what Ms. White should do if
15  she suspected the possibility of a subdural
16  hematoma?
17  **A.**   If she suspected the possibility of a
18  subdural hematoma, would be to get a CAT scan.
19  **Q.**   If Ms. White wanted to refer a patient out
20  for a CAT scan on an emergency basis, would you
21  expect that you would be involved in any way in that
22  process?
23  **A.**   It would depend on the clinical
24  circumstances.
25  **Q.**   Well, if a patient had run into a concrete

Exhibit 23 - Page 5 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD
April 18, 2014

Page 57

1    **MR. COLEMAN:** Let's go off the record
2  while Mr. Rosenthal is marking and then we'll go
3  back on.
4    **THE VIDEOGRAPHER:** We're off the
5  record.
6    (Recess:  10:36 to 10:41 a.m.)
7    **THE VIDEOGRAPHER:** Okay.  We're back
8  on the record.  The time is 10:41.
9    (Deposition Exhibit No. 121
10    marked for identification.)
11  **BY MR. ROSENTHAL:**
12    **Q.**  I'm handing you what I've marked as
13  Exhibit 121, and these, as I mentioned before the
14  break, were produced to me by defense counsel. So
15  looking at the first page here of Exhibit 121, is
16  this, in February, how you were submitting your time
17  to Corizon for pay?  Is this the kind of form you
18  were using?
19    **A.**  Page 3 and 4 would really be what I would
20  consider to be my time sheet for pay.  Page 1, 2,
21  and 5 would be more of a documentation of what
22  occurred throughout the day.
23    **Q.**  So why would you keep the document that is
24  page 1 of Exhibit 121?  What was your purpose in
25  keeping that information?

Page 58

1    **A.**  Because they requested it.
2    **Q.**  Who requested it?
3    **A.**  Corizon requested it.
4    **Q.**  All right.  So Corizon wanted you to
5  document how much time you spent doing -- seeing
6  each patient.  Is that the idea?
7    **A.**  Yes.
8    **Q.**  Okay.  So that -- so the first page of 121
9  you've listed the various patients that you see --
10  their names have been redacted -- and how much time
11  you spent with them and approximately or generally
12  what you were doing.  Is that a fair summary of
13  this?
14    **A.**  Yes.
15    **Q.**  Okay.  And is that your signature over on
16  the lower left?
17    **A.**  Above the line that says professional
18  signature, that's my signature.
19    **Q.**  Okay.  Then on the 13th, the second page,
20  and that -- both the 6th and the 13th were
21  Wednesdays.  So this is the same kind of
22  documentation.  And, again, is that your signature
23  down there where it says professional signature?
24    **A.**  That is my signature.
25    **Q.**  Now, would you turn these sheets in with

Page 59

1  the semimonthly time sheet?
2    **A.**  Yes.
3    **Q.**  All right.  So then on the next page, page
4  3, do you see where it indicates that on February
5  12th there was a MAC meeting?
6    **A.**  I see where it indicates that, yes.
7    **Q.**  All right.  And is that your signature
8  down there where it says provider?
9    **A.**  That is my signature, yes.
10    **Q.**  And did you turn this form in on February
11  13th?
12    **A.**  I don't know what day I turned it in.
13    **Q.**  Did you sign it on February 13th?
14    **A.**  I appeared to have.
15    **Q.**  All right.  So is it reasonable for us to
16  interpret this as meaning you were in the jail on
17  February 12th from 12:30 p.m. to 2:00 p.m. for a MAC
18  meeting?
19    **A.**  Yes.
20    **Q.**  And is it your recollection that Ms. White
21  was with you at that meeting?
22    **A.**  I don't recall.
23    **Q.**  Do you ever remember a MAC meeting where
24  she wasn't present?
25    **A.**  Yes.

Page 60

1    **Q.**  When was that?
2    **A.**  I don't recall.
3    **Q.**  Was it in the last six months?
4    **A.**  I don't recall.
5    **Q.**  Do you ever remember a MAC meeting where
6  the HSA was not present?
7    **A.**  Yes.
8    **Q.**  When was that?
9    **A.**  I don't recall.
10    **Q.**  Can you give me -- can you tell me what
11  year it was?  Whether it was 2012 or 2013?
12    **A.**  No.
13    **Q.**  But normally -- usually at a MAC meeting
14  you would be there along with the HSA and the -- and
15  Ms. White.  Is that correct?
16    **A.**  Usually, yes.
17    **Q.**  All right.  So I want to return to my
18  question about when you first heard about
19  Mr. Green's injury.  It appears that you were in the
20  jail, and if things went as normal, Ms. White and
21  Ms. Thomas were with you at a meeting from 12:30
22  until 2:00 p.m.
23    Do you have any recollection of whether
24  they mentioned to you what had happened that morning
25  with Mr. Green?

Exhibit 23 - Page 6 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD
April 18, 2014

Page 61

1   **A.**   No, I don't have any recollection.
2   **Q.**   Do you think if they had told you that
3   that morning a patient had run into a concrete wall
4   and collapsed in a pool of blood and there had been
5   an emergency and that he had been taken to the
6   infirmary in a wheelchair and had had multiple
7   stitches put into his head, do you think that you
8   would remember that?
9   **A.**   Repeat the question.
10        **MR. ROSENTHAL:** Could you read it
11  back, please.
12        (The record was read back as follows:)
13  **QUESTION:** Do you think if they had told you
14      that that morning a patient had run into
15      a concrete wall and collapsed in a pool of
16      blood and there had been an emergency and
17      that he had been taken to the infirmary in
18      a wheelchair and had had multiple stitches
19      put into his head, do you think that you
20      would remember that?
21  **A.**   Do I think I would remember over a year
22  later that I was told that on that particular day at
23  that particular time?
24  **BY MR. ROSENTHAL:**
25  **Q.**   Yeah, that's my question.

Page 62

1   **A.**   No, I don't believe I would be able to
2   tell you exactly when that was.
3   **Q.**   Okay.  Did you review the care and
4   treatment given Mr. Green at any time with
5   Ms. White?
6        **MR. COLEMAN:** I'm going to instruct
7   the witness not to answer unless there was sometime
8   other than preparing a sentinel event report or when
9   an attorney was present.
10  **BY MR. ROSENTHAL:**
11  **Q.**   Well, the sentinel event report wasn't
12  prepared for several weeks, so I want to know
13  whether, in the immediate aftermath of February
14  12th, in the week following February 12th, Ms. White
15  and you reviewed in any way the situation?
16  **A.**   I believe we did.
17  **Q.**   And where did that happen?
18  **A.**   I don't recall.  It was either by
19  telephone or at the Lane County Jail.
20  **Q.**   Well, these events happened on Tuesday,
21  and Ms. White has testified that on Tuesday night
22  she had some kind of communication with you, and
23  that the next day or the day after you talked about
24  it.  And since the next day is a Wednesday, when you
25  would normally come in, I'm wondering if that

Page 63

1   refreshes your recollection, did you talk to her
2   about it the next morning?
3   **A.**   If I knew exactly when it was, I would
4   have told you that the first time.  I do not recall
5   exactly when it was.  I know that we talked about
6   the case.
7   **Q.**   What did she tell you?
8   **A.**   I don't recall exactly specifically what
9   she told me.  I know that we talked about the events
10  that occurred and how things had resulted later.
11  Honestly, I cannot tell you exactly everything that
12  we talked about in any detail.
13  **Q.**   All right.  Well, this is important to me
14  so I'm going to try to go over it with you in some
15  detail and see what aspects, if any, you do remember
16  about this.
17  **A.**   I understand.
18  **Q.**   When you spoke with her, did you know that
19  Mr. Green had suffered a severe spinal cord injury
20  and had had a surgery -- an emergency surgery the
21  evening of February 12th?
22  **A.**   I believe so.
23  **Q.**   And did you know the neurosurgeon that did
24  the surgery, Dr. Halliday?
25  **A.**   Yes, I know Dr. Halliday.

Page 64

1   **Q.**   Have you ever spoken with her about the
2   case?
3   **A.**   No.
4   **Q.**   Have you ever spoken with Dr. Halliday
5   about Ms. White and why she left the neurosurgery
6   clinic?
7   **A.**   No.
8   **Q.**   Did Ms. White say anything to you about
9   whether or not she performed a neurologic
10  examination of Mr. Green in the courtroom when --
11  when she first got there?
12        To put it in into context, Mr. Green ran
13  into the wall.  Collapsed on the floor.  There was a
14  medical alert called.  And Ms. White and Ms. Fagan
15  and Joan Borgard (phonetic) have all testified that
16  they ran into the courtroom and that Ms. White was
17  in charge of the case in the courtroom.
18        So my question is, in -- within that
19  context, did Ms. White tell you whether or not she
20  performed a neurologic exam?
21  **A.**   Unfortunately over a year out I do not
22  recall the specifics of that discussion.
23  **Q.**   Did she say anything to you about whether
24  Mr. Green had indicated verbally that he was
25  paralyzed?

Exhibit 23 - Page 7 of 32
Dec'l of JTD

Page 65

1    **A.**   Unfortunately, since it's been over a
2  year, I don't recall the specifics of that
3  discussion.  I can tell you that we had talked about
4  the scenario and the fact that he had been in the
5  hospital.  And I believe she had mentioned to me
6  that he'd had surgery, although at this point I
7  cannot say that with a hundred percent accuracy, and
8  that's about the most I remember from our
9  conversation.
10    **Q.**   Do you recall one way or the other whether
11  it was your impression that this was a suicide
12  attempt by Mr. Green?
13    **A.**   Do I remember if that was my impression at
14  the time or do I think that --
15    **Q.**   Correct.
16    **A.**   -- that's my impression now?
17    **Q.**   I'd like to know back at the time was it
18  your impression that that was a suicide attempt by
19  Mr. Green?
20    **A.**   I remember hearing that he had run himself
21  into a wall.  I suppose I thought that was certainly
22  a possibility that he had been trying to commit
23  suicide.  That's probably the most accurate
24  statement I could give you would be that I certainly
25  considered that a possibility.

Page 66

1    **Q.**   And when you talked with Ms. White about
2  it in that first conversation, did she indicate to
3  you whether or not she suspected there was a closed
4  head injury as a result of running into the wall?
5    **A.**   I don't recall the specifics of that
6  conversation, sir.  I wish I could give you more
7  specifics from it, but I would be speculating and
8  being untruthful if I did.
9    **Q.**   Do you recall whether you yourself thought
10  there was the possibility of a closed head injury
11  from the description Ms. White gave you?
12    **A.**   I don't recall.
13    **Q.**   Did you ask Ms. White whether she had
14  considered the possibility of a subdural hematoma?
15    **A.**   I don't remember what I asked her or did
16  not ask her during that conversation.
17    **Q.**   Do you recall whether you discussed with
18  her whether she had considered sending Mr. Green to
19  the hospital right away?
20    **A.**   I do remember that we had a conversation
21  to discuss the case, what had happened, how things
22  ended up turning out to what we knew at that point.
23  As to the specifics, I just -- I can't tell you
24  exactly what we did or didn't talk about.  I mean, I
25  know that we talked about it.  We reviewed it.

Page 67

1  That's what, you know, we do, we talk about cases,
2  what has happened.
3    Certainly there are times that we'll
4  discuss differential diagnosis, what should we have
5  been thinking about, what are possibilities, and
6  sometimes we'll discuss what we could have done
7  differently.
8    As to the specifics of that conversation
9  on that day, I would been speculating if I told you
10  that I remembered exactly what we talked about.  As
11  a general rule, as I just mentioned, we'll talk
12  about the cases, what's going on, how they
13  presented, different things that we might want to
14  consider, different options that we have for a plan
15  of care.
16    If it's in retrospect, we might also
17  discuss what we might have done differently.  That
18  would be a pretty standard discussion that her and I
19  would have about cases, either bad outcomes or
20  difficult cases where we're not quite sure where to
21  go with somebody.
22    **Q.**   Did you know at the time you had the
23  discussion with her that Mr. Green was a
24  quadriplegic?
25    **A.**   I -- it's very fuzzy to me because

Page 68

1  obviously I've heard that news since then, so
2  exactly at what point I learned that information
3  would -- I would be speculating as to when exactly
4  that was.
5    **Q.**   Did you learn it within a week?
6    **A.**   I think so.
7    **Q.**   Did you ever make any effort to get the
8  hospital records?
9    **A.**   Not that I recall.
10    **Q.**   Did you have the ability to look at his
11  hospital records?
12    **A.**   Yes.
13    **Q.**   How would you have done it if you wanted
14  to do it?
15    **A.**   We could contact the hospital and get
16  records faxed over.  I also have access to the
17  electronic medical record at the hospital.
18    **Q.**   So I know you're saying that you don't
19  remember one way or the other.  Let me ask you the
20  question this way.  Is it your belief, based upon
21  the way you usually do your business, that you would
22  have looked at his hospital records at some time?
23    **A.**   Not necessarily.
24    **Q.**   Do you recall any other case while you've
25  been medical director at Corizon where an inmate

Exhibit 23 - Page 8 of 32
Dec'l of JTD

Page 81

1 either calling you or sending him to the hospital?
2 **A.** Not necessarily.
3 **Q.** Now, is it normally understood that
4 charting will be done the day of an event?
5 **A.** Ideally, yes.
6 **Q.** And if someone puts a chart note in on a
7 day other than the date of the chart note, are they
8 supposed to say "late entry" or something like that
9 to designate that the note was not made simultaneous
10 with the event?
11 **A.** I believe that would be the standard, yes.
12 **Q.** All right. So looking at -- on the
13 progress notes, there's a 2/12/13 note at 1730. Do
14 you see that?
15 **A.** Yes.
16 **Q.** All right. And then Ms. White's next note
17 is at 2/12/13 and it's not timed. Do you see that?
18 **A.** Yes.
19 **Q.** Is it your assumption, looking at the
20 chart, that Ms. White wrote her chart note on
21 February 12th?
22 **A.** Yes.
23 **Q.** Did you ask Ms. White whether she wrote it
24 on February 12th?
25 **A.** No.

Page 82

1 **Q.** Were you aware that Ms. White had checked
2 out of the jail and had left her -- had left her --
3 had left the jail and gone off duty at 4:00 p.m. on
4 February 12th?
5 **A.** I'm not aware of her time schedule, no.
6 **Q.** Did she tell you that she had stayed at
7 the jail until the ambulance came?
8 **A.** I don't believe we talked about that.
9 **Q.** You will notice on the February 12th note
10 by Nurse -- by the other nurse -- that there's a
11 blood pressure of 84 over 62 and a pulse -- and a
12 pulse of 42. Do you see that?
13 **A.** Yes.
14 **Q.** All right. That's -- and then did you
15 notice on Ms. White's chart note from earlier in the
16 day, on the first page, the blood pressure was 128
17 over 84 with a pulse of 72?
18 **A.** You're asking me did I notice that
19 previously or do I notice it right now?
20 **Q.** Right now.
21 **A.** Yes, I notice that.
22 **Q.** Okay. So would you agree with me that
23 this -- given the condition that he was in when this
24 1730 note was written that he was probably in some
25 kind of shock?

Page 83

1 **A.** That would be one of the things that would
2 be on the list of possibilities. Absolutely.
3 **Q.** All right. Well, at -- according to the
4 other nurse -- and I believe it's Nurse Smith --
5 this 1730 note, Mr. Green was saying, quote, I can't
6 move, that she noticed there was no gross movement,
7 no gross or fine movement visualized.
8      And Nurse White said the same thing in her
9 note, that he stated he couldn't move and that he
10 was hypotensive and bradycardic. So under all of
11 the circumstances, given that we know that he had
12 run into a wall head first earlier in the day, is
13 shock high on the differential at that point?
14 **A.** That or something related to his head
15 injury.
16 **Q.** All right. Is it an emergency situation
17 at that point?
18 **A.** Yes.
19 **Q.** Does he need to go to the hospital
20 immediately?
21 **A.** Yes.
22 **Q.** Is his life in danger?
23 **A.** Don't know.
24 **Q.** Might his life be in danger at that point?
25 **A.** It might be.

Page 84

1 **Q.** He could be in spinal shock. Is that
2 correct?
3 **A.** That's a possibility.
4 **Q.** He could stop breathing. Is that correct?
5 **A.** I don't -- I wouldn't jump -- think he
6 would stop breathing.
7 **Q.** His blood pressure was so low and his
8 pulse was so high, was there a risk that he could go
9 into cardiac arrest?
10 **A.** His pulse was low.
11 **Q.** Excuse me. His pulse was low. His -- his
12 -- his --
13 **A.** Blood pressure was low.
14 **Q.** His blood pressure was low. So was he in
15 -- at risk of going into cardiac arrest?
16 **A.** It would be possible.
17 **Q.** Was he at risk of suffering an anoxic
18 brain injury?
19 **A.** He could be.
20 **Q.** Would you have expected Ms. White to call
21 you immediately?
22 **A.** I probably would expect her to arrange for
23 transport before she called me, so not immediately.
24 **Q.** Would the transport be an emergency
25 transport?

Exhibit 23 - Page 9 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD
April 18, 2014

Page 85

1    **A.**   Probably.
2    **Q.**   Lights and sirens?
3    **A.**   If that's what you mean by emergency
4    transport --
5    **Q.**   Yes.
6    **A.**   -- then the answer is also yes.
7    **Q.**   Would you expect Ms. White to stay with
8    her patient until the ambulance arrived?
9    **A.**   I would expect -- I would hope somebody
10   would stay with the patient, one of our staff.
11   **Q.**   Would you expect Ms. White to go home
12   before the ambulance arrived?
13   **A.**   Would I expect her to?  I would not expect
14   her to.
15   **Q.**   Yes.  Would you expect her to stay in the
16   jail with her patient until the ambulance arrived?
17   **A.**   Probably.
18   **Q.**   If she had called you, was there any
19   medical care that she -- that you could have
20   recommended for her to give to support his blood
21   pressure or his pulse?
22   **A.**   Yes.
23   **Q.**   What would that have been?
24   **A.**   Start an IV.  That would probably be the
25   first thing.  Get some fluids going.

Page 86

1    **Q.**   So if she had called you, that's one of
2    the things you probably would have recommended?
3    **A.**   I would think so.  I mean, I'm
4    speculating, but that's something that comes to
5    mind, yes, sir.
6    **Q.**   Then were there any medications available
7    in the pharmacy that could have been administered to
8    assist his blood pressure and pulse?
9    **A.**   You know, I would -- Epinephrine, but I
10   wouldn't probably give it -- if somebody was still,
11   you know, having a pulse and a heart rate and
12   breathing, I probably wouldn't give them Epinephrine
13   right away.  If it deteriorated further to where he
14   was in true cardiac arrest then I would give
15   Epinephrine.
16   **Q.**   Did you learn at any time that the
17   ambulance was not called until 4:30 even though
18   Ms. White examined the patient sometime shortly
19   before 4:00 p.m.?
20        **MR. COLEMAN:** You know, I'm going to
21   give the same instruction.  If he learned it other
22   than in the process related to a sentinel event
23   report, you can answer the question, and other than,
24   obviously, a discussion with your attorneys.
25        **MR. ROSENTHAL:** Let me --

Page 87

1    **A.**   My attorney has instructed me not to
2    answer that question.
3    **BY MR. ROSENTHAL:**
4    **Q.**   Yeah.  Let me help you here a little bit.
5    I'm going to hand you what is marked as Exhibit 102.
6    It's the sentinel event form that was sent to
7    Corizon.  Have you ever seen that document before?
8    **A.**   I don't recall.
9    **Q.**   You will notice that it was sent on or
10   about April 12th.  Do you see that?
11   **A.**   Yes.
12   **Q.**   Did you have anything to do with causing
13   that document to be sent?
14   **A.**   Did I have anything to do with causing it
15   to be sent?  Please clarify the question.
16   **Q.**   Well, what is your understanding as to how
17   soon after an event the sentinel event form should
18   be sent to corporate headquarters?
19        **MR. COLEMAN:** Generally?
20        **MR. ROSENTHAL:** Yeah, generally.
21   **BY MR. ROSENTHAL:**
22   **Q.**   Is it supposed to be sent within a day or
23   two, or can it wait a month or two months?
24   **A.**   Generally it should be sooner than later.
25   **Q.**   All right.  So within a few days.

Page 88

1    Correct?
2    **A.**   I think once the appropriate information
3    is available.
4    **Q.**   And who usually is responsible to send the
5    form?  You, as the medical director, or the HSA?
6    **A.**   Either one.
7    **Q.**   All right.  So did you make any effort to
8    send a sentinel event form in in February of 2013?
9    **A.**   I don't recall the specific date.
10   **Q.**   Can you tell me why it took two months
11   before a sentinel event form went in?
12   **A.**   I don't know.
13   **Q.**   Did the investigation that you did --
14   which I'm not allowed to ask you about what you did,
15   but I'm just asking you a timing question now -- did
16   the investigation that you did related to the
17   sentinel event occur before or after that form went
18   in?
19   **A.**   I don't recall the specific date.
20   Certainly I talked with somebody the day after or
21   that night.  I don't recall when it was.
22   **Q.**   Somebody in Tennessee you mean?
23   **A.**   No.  The provider, Kris White.
24   **Q.**   Right.  But the form didn't go in for two
25   months.  At least that's the only form we found.

Exhibit 23 - Page 10 of 32
Dec'l of JTD

Page 89

1 Okay?
2   A.   Okay.
3   Q.   So assuming that that's the only sentinel
4 even form that went in, I'm wondering if you can
5 tell me whether you did your investigation before or
6 after that form went in?
7   A.   I would say my investigation started with
8 the discussion with Kris White after I was made
9 aware of the case and proceeded from there.
10   Q.   Did you ever look at the videotapes that
11 were taken in the jail cell?
12   A.   No, sir.
13   Q.   And just so that -- so that we're clear
14 about this, you do not remember one way or the other
15 whether you learned that the ambulance was called at
16 4:30 prior to responding to a sentinel event
17 investigation request.  Am I understanding you
18 correctly?
19   A.   I knew prior to looking at the specific
20 details that there had been a delay.  I didn't have
21 any specifics as to the exact times.
22   Q.   Did you make any effort to find out the
23 exact times?
24   A.   Subsequently.
25   Q.   When?

Page 90

1        MR. COLEMAN: Again, if it's -- you
2 can answer if it's other than in the process of the
3 sentinel event report.
4   A.   My attorney has recommended I don't answer
5 that.
6 BY MR. ROSENTHAL:
7   Q.   I want to be sure that I understand your
8 role as supervising Ms. White.  In your role of
9 supervising Ms. White, did you feel it was your
10 responsibility to determine what had happened on
11 February 12th?
12   A.   Yes.
13   Q.   Aside and apart from any corporate
14 sentinel event investigation.  Correct?
15   A.   Yeah.
16   Q.   All right.  So in supervising Ms. White
17 and in doing an investigation to determine what had
18 happened, when did you learn that the ambulance
19 wasn't called until 4:30?
20   A.   As part of supervising Ms. White, my
21 primary concern was discussed with her, the
22 situation, the clinical situation, the course of
23 events.  Other than in a specific issue, which my
24 attorney has recommended that I not answer, time --
25 you know, a delay is an issue.  Looking at specific

Page 91

1 time stamps, exact times came up during a later
2 process which my attorney has recommended I don't
3 discuss.
4        But in the entirety of the situation,
5 certainly it was noted to be part of the
6 circumstances.
7   Q.   Did you believe Ms. White had violated the
8 physician assistant's standard of care by not
9 getting an ambulance there sooner on February 12th?
10   A.   No.
11   Q.   Did you ever interview -- did you -- let
12 me start that again.
13        We've taken the deposition of a Nurse
14 Fagan.  She told us that she wrote a chart note and
15 it's not in the chart.  Were you aware of that?
16   A.   What's Nurse Fagan's first name?
17   Q.   Sharon.
18   A.   Sharon?  I'm not aware of that.
19   Q.   Were you aware prior to today that
20 Ms. White had left the jail before 4:00 p.m.?
21   A.   No.
22   Q.   Does any paperwork go with a prisoner to
23 the hospital when there's an emergency transport?
24   A.   There's a form that I believe gets sent
25 with them, yes.

Page 92

1   Q.   I'm going to hand you what we previously
2 marked as Exhibit 57.  That's a form that we
3 received from Corizon in discovery prepared by
4 Ms. White.  Have you seen that form before?
5        MR. COLEMAN: The document or the
6 form?
7        MR. ROSENTHAL: The document.  Excuse
8 me.
9   A.   I believe so, but I don't recall
10 specifically.
11 BY MR. ROSENTHAL:
12   Q.   Did you talk about it with Ms. White, that
13 -- when she had filled that form out, did you talk
14 to her about it?
15   A.   About the form?
16   Q.   About filling out the form, the document
17 that we're looking at.
18   A.   I did not specifically talk to her about
19 form filling out.
20   Q.   Well, were you of the impression that she
21 filled that document out and it went with Mr. Green
22 to the hospital?
23   A.   I don't recall.
24   Q.   Are you familiar with the form, that it's
25 two different pieces of paper, I think, with

Exhibit 23 - Page 11 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD
April 18, 2014

Page 97

1     **MR. ROSENTHAL:** Sheriff's Officer
2  Burnett.
3     **MR. COLEMAN:** Sheriff's Officer
4  Burnett.  I apologize.  Does that make sense to you?
5     **A.**   I don't understand the question because as
6  part of my review of this, it was for the sentinel
7  event report.  So I guess it goes back to what my
8  first question and response to your question is, did
9  I do an investigation and a separate investigation
10  completely separate from that?
11  **BY MR. ROSENTHAL:**
12     **Q.**   Hang on.  Let me try to separate this out
13  and make this simpler.
14     **A.**   Thank you.
15     **Q.**   You agree with me that you have the duty
16  to supervise Ms. White?
17     **A.**   Yes.
18     **Q.**   As part of that duty to supervise
19  Ms. White, did you investigate the circumstances of
20  February 12th?
21     **MR. COLEMAN:** That's not going to
22  help.
23     **MR. ROSENTHAL:** It is going to help.
24  **BY MR. ROSENTHAL:**
25     **Q.**   I want to know whether supervising

Page 98

1  Ms. White, prior to this sentinel event going out
2  two months later, did you make an effort to
3  investigate the circumstances?
4     **A.**   The sentinel event form subsequently led
5  to the sentinel event report, which is something
6  I've been advised by my attorney not to discuss.
7     **Q.**   All right.  And I want to know whether
8  prior -- this sentinel event form went out on April
9  12th.
10     **A.**   Yes, sir.
11     **Q.**   Do you agree with me that the sentinel
12  event form that you did in response to this sentinel
13  event report occurred after April 12th?
14     **MR. COLEMAN:** I'm going to object to
15  the form of the question.  I'm going to just
16  instruct you not to answer that.  I think it's too
17  vague.
18     **MR. ROSENTHAL:** It's not too vague.
19  **BY MR. ROSENTHAL:**
20     **Q.**   I want to know whether the investigation
21  you did occurred after the sentinel event form went
22  in.
23     **MR. COLEMAN:** My objection is asked
24  and answered and I'm going to instruct you not to
25  answer it again.

Page 99

1     **MR. ROSENTHAL:** Well, I apologize,
2  Mr. Coleman, if I can't remember his answer to that
3  question.  Perhaps you would remind me of his
4  answer.
5     **MR. COLEMAN:** His answer was that he
6  didn't know.  He didn't know when in respect to the
7  form going out on April 12th the sentinel event
8  report was -- or investigation occurred.  He's
9  testified, I think, for an extensive period of time
10  that he had a discussion with Ms. White in the
11  evening and/or the day after -- in the evening of
12  the events or -- and/or the day after -- and he's
13  not sure which -- and so I think that that's what's
14  happening here, Mr. Rosenthal, is that you're --
15  when you say investigation, you're confusing the
16  witness and asking him to answer questions that he's
17  answered many times.
18  **BY MR. ROSENTHAL:**
19     **Q.**   Did you at any point in time prior to
20  today from an opinion as to when Mr. Green suffered
21  his spinal cord injury?
22     **A.**   Yes.
23     **Q.**   And what is your opinion?
24     **A.**   When he ran his head into the wall.
25     **Q.**   Did you at any point in time prior to

Page 100

1  today form an opinion as to whether Ms. White
2  performed a proper neurologic exam in the courtroom?
3     **A.**   Yes.
4     **Q.**   What is your opinion?
5     **MR. COLEMAN:** You know, I'm going to
6  instruct you not to answer if you formed the opinion
7  based on your sentinel event report process.
8     If you formed the opinion in some
9  other fashion, based on either review of the chart
10  or discussion with Kris White, you can answer the
11  question if you have the ability based on that
12  information.
13     **A.**   Based on what I see in the chart, I think
14  she did a complete neurologic exam as would be
15  expected under those circumstances.
16  **BY MR. ROSENTHAL:**
17     **Q.**   Did you at any point in time prior to
18  today form an opinion as to whether you should have
19  been called by Ms. White before he was moved from
20  the courtroom?
21     **MR. COLEMAN:** Asked and answered.
22  I'll let you answer that one again.
23     **A.**   Did I form an opinion prior to today?
24  **BY MR. ROSENTHAL:**
25     **Q.**   Yes.

Exhibit 23 - Page 12 of 32
Dec'l of JTD

Page 101

1    **A.**    Yes, I did.

2    **Q.**    And what is your opinion?

3    **A.**    No, I don't believe she needed to have
4    called me.

5    **Q.**    Did you at any point in time prior to
6    today form an opinion as to whether the use of a
7    cervical collar and a backboard would have minimized
8    the injuries suffered by Mr. Green?

9    **A.**    I would be speculating.

10    **Q.**    Well, did you form an opinion on that
11    matter?

12    **A.**    I would say I've considered it. I don't
13    know that I've formed an opinion on it.

14    **Q.**    And in your consideration, what conclusion
15    have you reached, if any?

16    **A.**    It's hard to, again, differentiate
17    because, of course, hindsight is 20/20. At the
18    time, based on the information I see here and what
19    I've looked at, there's no sign of neurologic injury
20    at this time so it would be hard to know, based on
21    the information I have, why somebody would put a
22    cervical collar on him.

23        Of course, hindsight is 20/20. I mean, we
24    know what happened down the road. This person is,
25    you know, moving their arms and legs, palpated the

Page 102

1    spine. Apparently no pain with that. No sign of a
2    neurologic problem other than, you know, some
3    subjective complaints, but the same person is saying
4    they are paralyzed and yet moving and also
5    complaining that their ears are paralyzed, which is
6    an extremely strange thing to say.

7        So, you know, hindsight is 20/20. It's
8    hard for me to separate out what I know to be the
9    final result of this situation, and so for that
10    reason, yeah, when we know what eventually happened,
11    it's clear.

12        When I look back at what the apparent
13    presentation was at the time, I think I would be
14    hard justified to say absolutely you needed to put a
15    cervical collar on that person.

16    **Q.**    Would it have been good medical practice
17    to do that?

18    **A.**    I'm not seeing anything based on how
19    things presented at that time that tells me so. Of
20    course, hindsight tells me so. I would have been
21    concerned about, you know, a closed head injury so I
22    would want the person monitored. Clearly you have
23    to take care of the bleeding.

24    **Q.**    Let me --

25    **A.**    But if somebody is moving and saying, "I'm

Page 103

1    paralyzed," that makes no sense to me. And if they
2    are not having any neck problems and their
3    neurologic exam is normal, there's no reason for me
4    to think that that would have been the right thing
5    to do, of course.

6    **Q.**    Let me interrupt you.

7    **A.**    Hindsight is 20/20.

8    **Q.**    Right. Let me interrupt you. Were you
9    aware that when Mr. Green was in the clinic having
10    his head sutured that he defecated on himself?

11        **MR. COLEMAN:** At what time?

12    **A.**    I know there was some defecation. I don't
13    know the specifics of that.

14    **BY MR. ROSENTHAL:**

15    **Q.**    Would you agree with me that a spinal cord
16    injury -- a severe spinal cord injury can cause a
17    person to lose bowel control?

18    **A.**    That would be one of the things, although,
19    we see extensive defecation without spinal cord
20    injuries at that facility so . . .

21    **Q.**    Would you have expected, Ms. White, when
22    she was suturing up Mr. Green's head, to have become
23    concerned about a spinal cord injury when he
24    defecated during that process?

25    **A.**    I would need to know what the rest of his

Page 104

1    neurologic exam was at that time or his neurologic
2    findings were. Unfortunately, sir, feces -- the
3    presence of feces is not uncommon in that facility.
4    So, certainly, if the other things were pointing in
5    a certain direction neurologically, that would be a
6    consideration.

7        If other things were pointing into a
8    psychiatric direction, that can be a consideration
9    as well.

10        If something was pointing toward a
11    gastrointestinal problem, that would be a
12    consideration.

13    **Q.**    Did you, at any point in time prior to
14    today, form an opinion as to whether Mr. Green
15    should have had his vital signs checked on a regular
16    basis during the afternoon when he was in his jail
17    cell?

18        **MR. COLEMAN:** You know, I'm going to
19    instruct the witness not to answer that question.
20    I've given you a lot of latitude to ask opinion
21    questions. He's here as a fact witness. He's not
22    going to provide opinion testimony generally, so I'm
23    just going to instruct him not to answer that
24    question.

25        **MR. ROSENTHAL:** I'm going to take all

Exhibit 23 - Page 13 of 32
Dec'l of JTD

*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

---

*Justin Montoya, MD*
*Vol. 2*
*October 07, 2014*



172 East 8th Avenue
Eugene, OR 97401

*Original File Montoyajustin.txt*
*Min-U-Script® with Word Index*

Exhibit 23 - Page 14 of 32
Dec'l of JTD

**Kelly Conrad Green II v**
**Corizon Health, Inc., et al.**

**Justin Montoya, MD - Vol. 2**
**October 07, 2014**

Page 110

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

KELLY CONRAD GREEN II, an      )
individual, by and through his)
guardian ad litem Derek        )
Johnson,                       )
            Plaintiff,         )
     v.                        ) No.6:13CV01855-TC
CORIZON HEALTH, INC., a        ) Volume 2
Tennessee Corporation; et al.,) Pages 108-225
            Defendants.        )

DEPOSITION OF JUSTIN MONTOYA, MD
October 7th, 2014
Tuesday
1:11 P.M.
THE VIDEOTAPED DEPOSITION OF JUSTIN
MONTOYA, MD, was resumed at CC Reporting &
Videoconferencing, 172 East 8th Avenue, Eugene,
Oregon, before Deborah M. Bonds, CSR-RPR, Certified
Shorthand Reporter in and for the State of Oregon.

(continued)

for Defendant Lane County and employees:

LANE COUNTY OFFICE OF LEGAL COUNSEL

125 East Eighth Avenue

Eugene, Oregon 97401

541/682-3728

BY: SEBASTIAN NEWTON-TAPIA

sebastian.newton-tapia2@co.lane.or.us

Also Present:

ROBIN CASSIDY-DURAN, VIDEOGRAPHER

Reported by:

DEBORAH M. BONDS, CSR-RPR

CC REPORTING & VIDEOCONFERENCING

EUGENE      541/485-0111

Page 109

APPEARANCES

For the Plaintiff:
   ROSENTHAL GREENE & DEVLIN PC
   121 SW Salmon Street, Suite 1090
   Portland Oregon 97204
   503/228-3015
   BY:  ELDEN M. ROSENTHAL
   elden@rgdpdx.com
   BY:  JOHN THOMAS DEVLIN (via teleconference)
   john@rgdpdx.com

For Defendant Corizon Health and employees:
   STEWART SOKOL & LARKIN LLC
   2300 SW First Avenue, Suite 200
   Portland, Oregon 97201
   503/221-0699
   BY:  ROBERT COLEMAN
   rcoleman@lawssl.com
   BY:  JAMES M. DAIGLE (via telephone)
   jmdaigle@lawssl.com

(continued)

Page 111

INDEX

WITNESS.........................................PAGE

JUSTIN MONTOYA, MD.

   BY MR. ROSENTHAL                          112

EXHIBITS...................................REFERRED

No. 4    Log notes                          159

No. 20   Emergency Log notes                159

No. 26   Log notes                          152

No. 47   EMS report                         176


EXHIBITS.....................................MARKED

No. 131  Montoya various notes              113

No. 132  Sentinel event review form        144

Exhibit 23 - Page 15 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD - Vol. 2
October 07, 2014

Page 128

1 **Q.** -- that -- is that what you believe these
2 to be also?
3 **A.** Yes.
4 **Q.** Okay.
5 **A.** Well, when it has the date and that on the
6 top of it, I would assume that's what that is.
7 **Q.** And do you keep these various meeting
8 notes in a notebook or in a pad of -- on a pad of
9 some sort?
10 **A.** They were kept in a pad.
11 **Q.** Okay. And is the actual pad still in
12 existence?
13 **A.** No. I gave him the papers.
14 **Q.** Okay. Did you give the pad to him or did
15 you give him photocopies like he gave me?
16 **A.** Well, there was things that were not
17 relevant to this on that pad so I just gave him the
18 relevant stuff that you asked for.
19 **Q.** So you tore piece -- you tore off your pad
20 these pages and gave them to the lawyer?
21 **A.** Well, I had things on there that were not
22 relevant to this at all.
23 **Q.** That's fine. I understand. I just want
24 to understand what you gave to Mr. Coleman. Was it
25 sheets of paper?

Page 129

1 **THE WITNESS:** Did I give you sheets of
2 paper or a pad?
3 **MR. COLEMAN:** Let's go off the
4 record --
5 **A.** I think I gave him sheets of paper.
6 **MR. COLEMAN:** Let's go off the record
7 for a second.
8 **THE VIDEOGRAPHER:** Off the record.
9 Hold on one moment.
10 (Brief discussion off the record.)
11 **THE VIDEOGRAPHER:** We're back on the
12 record.
13 **BY MR. ROSENTHAL:**
14 **Q.** Okay. So we had a discussion off the
15 record. And am I correct, Dr. Montoya, that your
16 best recollection is that these were piece -- these
17 notes were taken on some kind of a pad. And when I
18 requested certain records, that one way or the other
19 these sheets were separated from that pad?
20 **A.** I swear under oath I gave you every piece
21 of paper --
22 **Q.** I'm not --
23 **A.** -- that was relevant to it, and I
24 maintained things that were not relevant to it.
25 **Q.** Okay. Here's my question. The pad, did

Page 130

1 you use it for various aspects of your life and not
2 just Corizon stuff?
3 **A.** For business, yes.
4 **Q.** For business that had nothing to do with
5 Corizon?
6 **A.** Yes.
7 **Q.** Okay. All right. So going back to this
8 page we were looking at, 3282, it says 7/9/13 MAC,
9 and then it lists who was present, Kris and Kevin
10 and Linda. Who is Linda?
11 **A.** Linda -- I can't remember her last name.
12 She's the administrative person.
13 **MR. COLEMAN:** You're thinking of
14 Panzer, Linda Panzer (phonetic)?
15 **A.** Linda Panzer.
16 **BY MR. ROSENTHAL:**
17 **Q.** Administrative person for whom?
18 **A.** For Corizon.
19 **Q.** Okay.
20 **A.** Secretary.
21 **Q.** Okay. And then it says Lieutenant Brown.
22 All right. So then Item No. 1, what is that word?
23 **A.** Movement.
24 **Q.** So what does that refer to, do you know?
25 **A.** Shall I speculate?

Page 131

1 **Q.** Please.
2 **MR. COLEMAN:** Not if it's -- if you're
3 just guessing, no; if you have some reason to
4 believe you know what it is, go ahead.
5 **A.** I believe it means movement of people
6 throughout the jail.
7 **BY MR. ROSENTHAL:**
8 **Q.** This is the physical movement of nurses
9 and corrections officers and patients?
10 **A.** I don't recall if it meant corrections
11 people or nurses or inmates, slash, patients.
12 **Q.** Well, I'm wondering, why was movement of
13 persons in the jail an issue? Can you recall?
14 **A.** I believe -- going back to the third page,
15 was it -- it had to do with when they were able to
16 move people around the jail for patients -- for me
17 to see.
18 **Q.** Okay. And the second item, what does that
19 say?
20 **A.** "Book-in."
21 **Q.** Could you read the rest of it, please?
22 **A.** (Reading) Something states it can
23 take hours for medical to clear.
24 **Q.** All right. Can you tell me what that --
25 what those words are referring to?

Exhibit 23 - Page 16 of 32
Dec'l of JTD

Page 132

1    **A.**   That it can take the medical a while to
2  get up there to book-in.
3    **Q.**   So what does that mean, get up there to
4  book-in?
5    **A.**   To go from the medical area to the book-in
6  area.
7    **Q.**   So why would medical people go to the
8  book-in area?
9    **A.**   Why would they?
10    **Q.**   Yeah.  Why is this an issue?
11    **A.**   To check people who are coming in.
12    **Q.**   What was the -- what was the standard
13  procedure at that time as to when somebody on the
14  Corizon nursing staff would go up to book-in to
15  check people who were being brought into the jail?
16    **A.**   I'd have to look at the procedure book to
17  give you an exact standard, but they would go see
18  people who were being booked in to do a medical
19  evaluation.
20    **Q.**   At the time they were brought into the
21  jail?
22    **A.**   I think we went over this before, but it
23  is when they are being -- not when they come into
24  the jail, but when they are being housed, I think,
25  is when the first main evaluation goes through.  Is

Page 133

1  that the correct terminology?  I think so.
2    **Q.**   So the comment here that "it can take
3  hours for medical" -- does it say "to clear"?  Is
4  that what it says?
5    **A.**   I believe so, yeah.
6    **Q.**   So does that mean that there was an issue
7  with how long it was taking to get a medical
8  evaluation so that somebody could be put in housing?
9    **A.**   According to somebody.  I can't read that
10  -- oh, email.  Email states that.
11    **Q.**   So the first word there, you think, is
12  email?
13    **A.**   I believe it is, yes, sir.
14    **Q.**   So what's that -- who sent the email?
15    **A.**   I don't have the email.
16    **Q.**   So do you know why this matter was being
17  discussed?
18    **A.**   Yes.
19    **Q.**   Could you explain that to me, please?
20    **A.**   Because there was an email sent stating
21  that it took hours for medical people to clear them.
22    **Q.**   Well, was the email -- did it come from
23  somebody at Lane County?
24    **A.**   I don't know who sent it.
25    **Q.**   Did -- was it true that -- did you feel

Page 134

1  this was a valid complaint that was being made?
2    **A.**   I don't recall how I felt about it.
3    **Q.**   Was anything done to change the system so
4  that it wouldn't take hours?
5    **A.**   Well, I don't think it actually took
6  hours.  I think that was the term that somebody put
7  in there, which is why I put it in quotes, because
8  that was their word, I believe, that they had
9  mentioned, which I think was the -- was their word
10  that they used.  I don't think it takes hours.
11    **Q.**   Well, was there a staffing shortage?
12  Was -- was that the question that was being
13  discussed, whether or not Corizon had sufficient
14  staff to get the book-in medicals done?
15    **A.**   I don't recall the staff being an issue,
16  if I recall correctly, as far as, you know, staffing
17  numbers and that type of thing.  Again, this has
18  been, you know, 15 months ago.  I have a lot of
19  discussions.  I have a lot of meetings.  You know,
20  asking me to recall exactly what, you know,
21  inferences is a little difficult for me.  I
22  apologize.
23    **Q.**   Well, all I'm trying to understand is why
24  it was of significant enough importance that it was
25  discussed at this monthly meeting and that you made

Page 135

1  a note about it?
2    **A.**   If you'd asked me in August 2013, I'm sure
3  I could have told you.
4    **Q.**   All right.  So then it says underneath
5  Plan of Action (reading):  May break -- no.  Excuse
6  me -- May be able to move -- is that the next word?
7    **A.**   Yes, I believe so.
8    **Q.**   -- (reading):  15 minutes early or later
9  -- well, that doesn't sound right.
10          Can you read that line to me?  I'm having
11  trouble reading --
12    **A.**   (Reading):  May be able to move 15
13    minutes early or later, or earlier.
14    **Q.**   So what does that refer to?
15    **A.**   That refers to what I think I mentioned on
16  page 3 about them moving the inmates around when I'm
17  there for lunches --
18    **Q.**   Okay.
19    **A.**   -- that they may be able to either move
20  them 15 minutes earlier or 15 minutes later or maybe
21  that I would try to come in earlier so that I didn't
22  overlap with as much as a nonmovement time.
23    **Q.**   All right.  Then the next page, 3283,
24  August 13 MAC meeting.  The first question I have --
25  where it says (reading):  RN, Paula Sawyer,

Exhibit 23 - Page 17 of 32
Dec'l of JTD

Page 136

1  terminated.
2      Do you see that?
3  A.  I think it says Paula Savage.
4  Q.  Okay.  Excuse me.
5  A.  If I -- I think that's her name.
6  Q.  All right.  And do you recall why this
7  nurse was terminated?
8  A.  I think when I have a P with a circle
9  around it, that means pending.
10  Q.  Okay.  Do you know -- was she terminated?
11  A.  You know, I get their names mixed up so
12  bad, it's embarrassing.  I don't think she works
13  there anymore.
14  Q.  And do you know why her termination was
15  pending at this time?  By this time, I mean, in
16  August of 2013.
17  A.  I don't recall.
18  Q.  And then two lines --
19  A.  I get them all mixed up.
20  Q.  And then two lines from the bottom it says
21  (reading):  Kris, use of time, not
22    organizing charts.
23      Could you explain that to me, please?
24  A.  I think she -- well, I don't know.  I
25  could --

Page 137

1  Q.  Can you tell me --
2  A.  I could guess.
3  Q.  Well, I'd like you to tell me your best
4  recollection of what it means.
5  A.  I don't actually have a recollection.  I
6  mean, I might be able to make an inference off of
7  what my notes are, but that would be --
8  Q.  Please, would you --
9  A.  -- a stab in the dark, at best.
10  Q.  Well, would you make the inference,
11  please?
12  A.  That she was spending some time doing
13  nonmedical things, trying to, you know, help out,
14  and clean up the charts so that they were more
15  organized, but I think we wanted her to make sure
16  and focus on spending more times with direct patient
17  care and allow the other staff to do the -- you
18  know, the things that -- so she could do only the
19  things that she could do and then let the less
20  qualified staff, I think, do the more office
21  administrative stuff.
22  Q.  Okay.
23  A.  Pretty sure, but I'm not sure.
24  Q.  Okay.  You skipped three pages now to the
25  one on the bottom that says Corizon 3286.

Page 138

1  A.  Let me just look at this one other one
2  here so I can get the context here.
3  Q.  So I'm interested -- there's some boxes in
4  the bottom half of the page, and I'm interested in
5  this lower right-hand box.  Could you read what's in
6  that box, please?
7  A.  It says -- I think it says -- I think it's
8  supposed to say (reading):  Haldol, 5, slash, 2, and
9  then something document.  I'm not sure what that
10  other word is at this point.
11  Q.  Do you have any recollection as to what
12  that note's about?
13  A.  5 milligrams of Haldol and 2 milligrams of
14  Ativan.
15  Q.  Okay.  Do you have any recollection --
16  A.  That doesn't look like Ativan, but I think
17  that's what that references.
18  Q.  So can you tell me what this is all about,
19  this note?
20  A.  This note in particular, no.  I can tell
21  you that sometimes when people are psychotic they
22  receive a combination of Haldol, 5 milligrams, and
23  2 milligrams of Ativan, often prescribed by the
24  psychiatrist to help get their psychosis under
25  control.

Page 139

1  Q.  Okay.  And then the next page, Corizon
2  3287, that's the 11/12/13 MAC meeting.  And I'm
3  interested in the line that's the third kind of
4  entry.  It says (reading):  Need 24/7 book-in nurse.
5      See that?
6  A.  Uh-huh.
7  Q.  What does that refer to?
8  A.  That a book-in nurse is needed 24 hours a
9  day, 7 days a week.
10  Q.  Is this the first time this issue came up,
11  to your recollection?
12  A.  I don't recall.
13  Q.  Was someone complaining about the lack of
14  having a 24/7 book-in nurse?
15  A.  I could just tell you what's on the page,
16  sir.  I don't recall.
17  Q.  You don't have any recollection?
18  A.  We must have been talking about it because
19  I put it in the notes.
20  Q.  But you don't have any recollection what
21  the conversation was?
22  A.  That we needed to have a 24-hour-a-day --
23  24-hours-a-day, 7-days-a-week book-in nurse.
24  Q.  But you don't know whether this is an
25  issue that had been hanging around for a while or

Exhibit 23 - Page 18 of 32
Dec'l of JTD

Page 140

1  whether this was a brand-new issue?
2  A.    Well, we did talk about the nurse in
3  book-in regarding the email previously, so it was
4  mentioned there.
5  Q.    Right.
6  A.    Or some reference to it, in general.  I
7  don't know if it was exactly 24/7, but there was
8  some reference on the previous page that was --
9  Q.    Right.  I remember.
10  A.    -- whatever it was.
11  Q.    But you told me that wasn't a staffing
12  issue, so I'm wondering is it a staffing issue on
13  this note?
14  A.    I don't recall telling you whether it was
15  or was not a staffing issue.
16  Q.    Okay.  Let me just ask you.  Was it a
17  staffing issue -- on November 12, 2013, was somebody
18  complaining that Corizon didn't have enough staff to
19  do 24/7 coverage of book-in?
20  A.    I don't know if somebody was complaining
21  or if it was a change in the policy that we were
22  going toward.
23  Q.    Well --
24  A.    Certainly it got brought up at that
25  meeting.

Page 141

1  Q.    Well, was a 24/7 book-in nurse provided
2  after this meeting?
3  A.    I don't know.
4  Q.    Is there a 24/7 book-in nurse now?
5  A.    I'd have to check the staffing algorithm.
6  Q.    All right.  Then the next page, Corizon
7  3288, it says "Corizon email."  And I was just
8  wondering, was there some new email system put into
9  place at that time or is it --
10  A.    No.
11  Q.    What does that refer to?
12  A.    I think I was having problems with the
13  password or something on my Corizon email or my log
14  in or something like that.
15  Q.    All right.  Then the next page, Corizon
16  3289, the third item here, could you read that to
17  me, please?
18  A.    Boy, this is embarrassing.
19  Q.    When I looked at it, I thought it said CNA
20  Daniels released.  Does that make -- would that make
21  sense?
22  A.    I don't know of any CNA Daniels.
23  Q.    Okay.  Do you remember any employee with
24  the name of Daniels?
25  A.    Something -- what's that next part say?

Page 142

1  "Contract not renewed."  Oh, Sherlin.  The second
2  line says -- I think it says "Sherlin contract not
3  renewed."
4  Q.    What -- what or who is Sherlin?
5  A.    Sherlin was the nurse practitioner
6  previously.
7  Q.    Do you know why her contract was not
8  renewed?
9  A.    I don't think she was needed anymore.  And
10  then the other one, Daniels -- that just doesn't
11  look like an N -- or my N, but it -- that's
12  embarrassing.  I know I have bad handwriting, but I
13  can usually read it.
14  Q.    All right.  Then on the next page, right
15  at the bottom, is that your Corizon email address,
16  Justin.montoya@Corizon?
17  A.    Yes.
18  Q.    And then what goes after Corizon on the
19  email address line?  Is it com or org or --
20  A.    I think it's com.  I think it's a -- it
21  might be CorizonHealth.com.
22  Q.    All right.  Do you still have that same
23  email address with Corizon?
24  A.    Yes.
25  Q.    And do you use that for Corizon business?

Page 143

1  A.    Sometimes.
2  Q.    Then the last page, right here it says
3  "New" -- I think it says "contract" about a third of
4  the way up.  Do you see that?
5  A.    Uh-huh.
6  Q.    What does it say right below there?
7  A.    (Reading):  CCC immediate response only.
8  BOP physicals.
9  Q.    Can you explain those two lines to me?
10  A.    The CCC stands for -- what does that stand
11  for?  It's like the -- I think it's the adjacent --
12  I think it's the people that kind of come in and
13  out.  The --
14  Q.    I was wondering --
15  A.    It's like not in the jail, but it's like
16  right next to it.  It's Community something or
17  other.  I think those are people that come in at
18  night and they go out and work during the day or
19  come in -- on the weekend or something like that, I
20  think.  I don't know if it's the weekend people or
21  not.  So we were -- we were to do emergency
22  responses over there only.
23  Q.    And what does BOP physicals refer to?
24  A.    BOP.  There's so many of these little
25  letter things.  I think it's -- I think it's for

Exhibit 23 - Page 19 of 32
Dec'l of JTD

Page 148

1  And let me tell you what I know, Dr. Montoya.  I
2  know that my office gave notice to Corizon that we
3  were involved in this matter, and that there might
4  be a lawsuit.  And I know from some other documents
5  that I've seen that that got the sentinel event
6  process going, and that -- and I'm -- and I'm trying
7  to reconstruct it.
8      I think Mr. Mishler sent this form in in
9  response to a request from the headquarters in
10  Nashville to get the process going.  My question is:
11  Do you have -- does that sound correct to you from
12  what you've learned about this whole process?
13     A.   I don't know if it was -- I don't know if
14  it was in response to a lawsuit or not.
15     Q.   Okay.  Is it your understanding that the
16  sentinel event process begins when the HSA sends a
17  notification form to Nashville?
18     A.   I think -- I think that's one of the
19  things that can trigger it.
20     Q.   Okay.  Well --
21     A.   I mean I --
22     Q.   I don't see a document -- there's been no
23  document provided to me that is a communication to
24  you in writing that says:  Please do this
25  investigation.  I'm wondering, did you receive a

Page 149

1  document that told -- that instructed you to do an
2  investigation or did it happen some other way?
3      A.   I don't recall a document, sir.
4      Q.   Had you ever done a investi- -- a sentinel
5  event investigation prior to this case?
6      A.   For Corizon?
7      Q.   For Corizon, yeah.
8      A.   I don't recall.
9      Q.   Were you given any instructions on how to
10  do a sentinel event investigation?
11     A.   I think so.
12     Q.   And who gave you the instructions?
13     A.   I don't recall if it was Dr. Orr or Kevin,
14  Kevin Mishler.
15     Q.   Okay.  It wasn't Mr. Legg?
16     A.   I don't recall.
17     Q.   Okay.  And what instructions were you
18  given?  What were you told -- what were you told
19  that Corizon wanted you to do?
20     A.   I don't know.  Like file a -- do like a
21  summary.
22     Q.   Okay.  Were you instructed in any way in
23  how to collect the information other than looking at
24  the chart?
25     A.   I don't recall.

Page 150

1      Q.   What was your understanding that the
2  purpose of doing this investigation was?
3      A.   Quality improvement, I guess, would be the
4  biggest summary.
5      Q.   Okay.  So what did you do before writing
6  your report?
7      A.   I looked at the chart, read the chart.  I
8  talked to Kris and I looked at log notes from
9  deputies.
10     Q.   How many hours do you think you put into
11  your investigation before you sat down to write the
12  report?
13     A.   Probably between one and two.
14     Q.   Did you -- did you interview Ms. White
15  again about what had happened?
16     A.   You know, I don't recall if it was
17  information that I had from our earlier discussion
18  or if I asked -- talked to her again specifically
19  about it.
20     Q.   All right.  So I need to back up kind of
21  to what we were talking about when I took your
22  deposition back in April.  And you told me back in
23  April that within a day or two of the event you had
24  a conversation with Ms. White about the event.  Do
25  you recall that?

Page 151

1      A.   Yeah, I think so.
2      Q.   All right.  Did you have another
3  substantive conversation with Ms. White about what
4  happened?
5          MR. COLEMAN:  Asked and answered.
6      A.   You know, like a year and a half later, I
7  can't really tell you when I had the conversation,
8  and if it was -- we have a lot of conversations.  I
9  mean, we talked while I'm there.  We talk on the
10  telephone so -- you know, multiple times a week,
11  sometimes multiple times a day.  Going back a year
12  and a half and trying to figure out what day it
13  was -- you know, I know I talked to her about it.  I
14  got her side of the scenario after the gentleman
15  tried to kill himself.
16         And I'm sure we talked about it initially
17  within, you know, the first bit of time.  And did we
18  talk about it later?  Maybe.  It's likely come up
19  at -- somewhere along our discussions.
20     Q.   All right.  So --
21     A.   Did I talk to her specifically prior to
22  doing that?  I don't recall what my thought process
23  was at the time.  I don't remember if I felt like it
24  was better to just take what I already had and write
25  the report or if I was going to go through it again.

Exhibit 23 - Page 20 of 32
Dec'l of JTD

Page 152

1  It's been so long ago, I just can't recall.
2      Q.   All right.  Did you take any handwritten
3  notes during any conversation that you had with
4  Ms. White regarding that conversation with
5  Ms. White?
6      A.   I don't know.
7      Q.   Do you still have any notes from any
8  conversations with Ms. White?
9      A.   The only notes I have are the ones that
10 you have there.
11     Q.   All right.  Now, I'm handing you what was
12 previously marked as Exhibit 26.  And is -- are
13 those the log notes that you looked at before you
14 wrote your report?
15     A.   Well, let's see.  Green was lodged,
16 assaulting unknown female, smashed in a store
17 window, checked out by medics for meth, housed, was
18 asleep, being disruptive.
19          I don't recall seeing -- I don't recall
20 seeing page 1 about him being disruptive and why he
21 was in jail and -- I don't recall seeing that first
22 bit of them.
23          Let's see.  I don't recall seeing that
24 first page.  I don't recall seeing that page.  I do
25 think I saw some of these notes.  I'm not sure if

Page 153

1  they're the exact ones or not, but I don't -- I
2  think they have one log, so I don't think it's -- I
3  can't tell you verbatim if this is them but I think
4  they are.
5      Q.   How did you look at the log notes?  Did
6  you look at them on paper or on a computer?
7      A.   I don't recall.  I got them from
8  somewhere.
9          MR. COLEMAN:  Just for the record,
10 could you tell us the Bates label, the page number
11 down at the bottom of the ones that has notes that
12 you think you saw.
13         THE WITNESS:  I think -- I think it
14 started with the bottom one on page No. 26, I think.
15 2/12/13 at 12:05.
16 BY MR. ROSENTHAL:
17     Q.   How did you get the log notes?
18     A.   Or maybe it was the one above it.  It
19 might have been the one before that at 11:02.
20     Q.   So how did you get the log notes to look
21 at them?  What process did you use to see those log
22 notes?
23     A.   I think I asked somebody to get me log
24 notes.
25     Q.   Somebody that worked for Lane County?

Page 154

1      A.   I don't know.
2      Q.   Well, those notes are not made by Corizon
3  employees.  Correct?
4      A.   No.
5      Q.   All right.  So these are notes made by
6  Lane County Sheriff's Officers that work in the
7  jail.  Is that your understanding?
8      A.   That is my understanding.
9      Q.   So can you tell me how you happened to get
10 them?
11     A.   I asked somebody to get them for me.
12     Q.   So who would you have asked?
13     A.   I don't know.  I don't remember.
14     Q.   Did you ask a Corizon person or did you
15 just ask somebody over at Lane County if you could
16 look at them?
17     A.   I don't remember.  Okay.  I'm under oath.
18 I'm telling you the truth.  You can ask me the same
19 question four times.  I don't remember.
20     Q.   Have there been any other occasions when
21 you've looked at log notes written by county
22 employees?
23     A.   I think so.
24     Q.   Under what circumstances?
25     A.   I don't know if they're the exact same

Page 155

1  thing or if they're some other -- I think it had to
2  do with trying to look at like accommodations, like
3  extra meals for people that have low blood sugars or
4  low body weight.  And I think there's a place that
5  they put in their -- in their system, where you put
6  stuff like that in there.  I'm not sure it's the
7  exact same thing as here, but I think that's in
8  their system where we looked stuff like that up.
9  Not very -- not very often.
10     Q.   All right.  Now, I know you've told me
11 that you don't know how you got the notes, but this
12 question is a little bit different.  Do you know
13 whether there was any trouble getting the notes?  In
14 other words, did you have to go through any process?
15 Sign any paperwork?
16     A.   I don't recall any specific trouble.
17     Q.   All right.
18     A.   I don't recall if there was a process or
19 not, but I don't recall there being trouble.
20     Q.   Could I have that back, please?
21     A.   (Witness complies.)
22     Q.   Thank you.  Now, on PRR 27, which is the
23 third page of the exhibit, there's a log note by
24 LC -- Lane County Sheriff's Officer Burnette, in
25 which he talks about two phone calls he made to the

Exhibit 23 - Page 21 of 32
Dec'l of JTD

Page 156

1  Corizon office reporting that Mr. Green wasn't
2  moving.
3          And in this log note he relates that
4  whoever answered the phone in the Corizon office
5  asked if Mr. Green was breathing and then after
6  Mr. Burnette said he was breathing that the medical
7  people, whoever it was he was talking to, quote
8  (reading):  Stated they would be back to
9   evaluate him later in the day, but as long
10   as he was breathing, there was no immediate
11   concern, closed quote.
12          Do you recall -- did you read that log
13  note before --
14   A.   I believe so.
15   Q.   -- you wrote your report?
16   A.   It looks like I did.
17   Q.   All right.  And did you make any effort to
18  talk directly to Sheriff Burnette to see if he knew
19  any more about what -- about those conversations or
20  if he knew who he had talked to?
21   A.   No.
22   Q.   Why not?
23   A.   I just read the log note and did my
24  report.
25   Q.   Did you make any effort to determine who

Page 157

1  he spoke with in the Corizon office, in the medical
2  office?
3   A.   Yes.
4   Q.   What did you do to try to figure that out?
5   A.   Asked people.
6   Q.   Who did you ask?
7   A.   I don't know.  Kevin maybe, Kris, other
8  people, nurses.
9   Q.   Did you -- did you take a look and see who
10  was working that day and deter- -- and then go
11  through the roster and check everybody that was
12  working that day and talk to them?
13   A.   No.
14   Q.   Why not?
15   A.   Not my job.
16   Q.   As part of your investigation you didn't
17  feel that was part of your job?
18   A.   I thought the HSA was trying to figure
19  that out.
20   Q.   Did the HSA ever tell you whether she had
21  figured it out?
22   A.   No.
23   Q.   Now, when I took your deposition back in
24  April, we talked a bit about when PA White,
25  Ms. White, left the jail.  Do you recall that

Page 158

1  conversation?
2   A.   No.
3   Q.   Okay.  Well, I'll try to refresh your
4  recollection.  We talked about the fact that
5  according to her time records, she left the jail
6  about a half hour before the ambulance was called.
7  Does that -- do you remember that now?
8   A.   Vaguely.
9   Q.   All right.  Is that something that you
10  knew before I brought it up in the deposition with
11  you in April?
12   A.   I don't recall.
13   Q.   All right.  That's not something that got
14  into your report and that's why I'm asking you.
15   A.   Okay.
16   Q.   Do you have any recollection at all as to
17  whether you knew that?
18   A.   I don't recall.
19   Q.   Have you made any effort to follow up on
20  that information since your deposition?
21   A.   You know, I've been busy taking care of
22  other patients and trying to do the best we can over
23  there so I haven't been going back a year and a
24  half, looking at stuff like that, no, sir.
25   Q.   There's another log book that the jail

Page 159

1  has.  It's been previously marked as Exhibit 20.  I
2  just want to know whether you ever looked at that.
3   A.   Was that included in --
4   Q.   No, it wasn't.  Thank you.
5          (Pause.)
6   A.   I don't recall.  I don't know what this
7  other stuff is about.  I don't know if I saw this
8  other part regarding Green or not.
9   Q.   Okay.  Now, this is another form of the
10  log notes.  It's Exhibit 4, and it starts on the
11  third page.  And I'm wondering if maybe this is what
12  you looked at.
13          (Pause.)
14   A.   I don't recall reading -- ever reading
15  about him assaulting a female or smashing a store
16  window or using meth, so I don't think I saw that.
17  I don't think I saw this part about his failing to
18  complete the laundry exchange or changing his
19  clothes.  It's not the same stuff we looked at
20  already?
21   Q.   It appears similar to me.  It's in a
22  different format.  It was given to me in that
23  format.
24   A.   I don't recall the part about him being
25  disruptive in P Pod, kicking the door.  I don't

Exhibit 23 - Page 22 of 32
Dec'l of JTD

Page 160

1   recall the part about him pacing and sitting on the
2   bunk.  I think -- this looks like the same stuff I
3   looked at, that you showed me before.
4      Q.   Well, it appears similar to me also.  Like
5   I said, I'm showing it to you because it's in a
6   different format, and I'm wondering if that's the
7   format you saw it in?
8      A.   I can't even tell a difference in the
9   formats.
10     Q.   Okay.
11     A.   Hang on.  I'm not finished.  Okay.  Page
12  -- it says page 7 of 9 looks similar to what I've
13  looked -- seen before.  I can't tell you if that's
14  different or the same than the other piece of paper
15  you showed me.  One or the other looks familiar.  I
16  think I reviewed those.  It looks to me like the
17  exact same thing you showed me before, so I can't
18  tell you the difference.
19     Q.   So you were aware from reading these notes
20  that during the time that his head was being
21  stitched that he had defecated?
22     A.   Let me see.
23     Q.   It's the 12:05 entry.
24     A.   Oh, I remember now.  I remember reading a
25  part about him flexing his stomach and grunting.

Page 161

1   And then somebody asked him if he was pooping, and
2   he did not reply.  And then -- I remember that part.
3   **I don't actually remember reading (reading):** A
4   few minutes later the odor confirmed that he
5   had soiled his pants.
6      Q.   But were you aware that -- from any source
7   that he had defecated on himself while in the
8   medical clinic and his head was being sutured?
9      A.   I can't recall exactly when I -- I do
10  remember him having pooped his pants, defecated.  I
11  don't recall remembering exactly when that was.
12     Q.   Was it your understanding that that
13  happened before he was taken to his jail cell?
14          MR. COLEMAN: Eldon, just to clarify,
15  you're asking him if he -- that was his
16  understanding at the time he was writing the report?
17          MR. ROSENTHAL: Correct.
18     A.   At the time I was writing the report?
19  BY MR. ROSENTHAL:
20     Q.   Right.  Were you aware at the time you
21  were writing your report that Mr. Green had
22  defecated on himself while in the wheelchair in the
23  medical clinic having his head sutured and before he
24  was taken to his jail cell?
25     A.   I think so.

Page 162

1      Q.   All right.  Did you consider that to be
2   any indication that there was a spinal cord injury?
3      A.   I wasn't there.
4      Q.   Well, when you were writing your report,
5   did it -- did you think to yourself, That goes along
6   with a spinal cord injury?
7      A.   Not necessarily.  We have people at the
8   jail who will poop themselves, poop the floor, poop
9   the wall, poop in their mouth.  I mean, it's
10  disgusting.  So we see a lot of poop, unfortunately.
11     Q.   At the time you wrote this report, to your
12  understanding, when a person suffers a spinal cord
13  injury, is one of the symptoms that they lose bowel
14  control?
15     A.   It can be, yes.
16     Q.   And you knew that when you wrote this
17  report.
18     A.   Yes.
19     Q.   But you didn't put anything about that
20  topic in this report.  Why is that?
21     A.   Because it sounded like he was grunting
22  and trying to poop --
23     Q.   So --
24     A.   -- based on that report.
25     Q.   So it was your opinion at the time you

Page 163

1   wrote the report, that that was a voluntary action
2   on his part.
3      A.   It was a possibility.  I don't know that I
4   would say it was my opinion.  It was a possibility.
5      Q.   Was it also a possibility that he had a
6   spinal cord injury?
7      A.   After he rammed his head into the wall?
8      Q.   Yeah.
9      A.   Yes.
10     Q.   All right.  So why didn't you put in the
11  report that the defecation was further -- was
12  consistent with having suffered a spinal cord injury
13  when he hit his head on the wall?
14     A.   Because this was all after the fact.  What
15  does that matter?
16     Q.   Well, I thought that you were trying to do
17  something to improve the quality of care at the Lane
18  County Jail.
19     A.   Absolutely.
20     Q.   So did you think that that was something
21  that you should perhaps discuss --
22     A.   When he pooped?  No, I did not.
23     Q.   All right.  Were you aware before you
24  wrote your report that no one had cleaned Mr. Green
25  from the time he defecated until after 4:00 p.m.?

Exhibit 23 - Page 23 of 32
Dec'l of JTD

Page 164

1    **A.**   At what point are you asking?
2    **Q.**   Before you wrote your report.
3    **A.**   Before I read that log?  After I read the
4    log and before I wrote the report?
5    **Q.**   Yes.
6    **A.**   Whatever the -- I don't recall the times.
7    Whatever the report said, I read the log notes that
8    we've already discussed.  I don't recall the time
9    difference.
10   **Q.**   Were you at all concerned about the fact
11   that Mr. Green had lain in his own feces for four or
12   five hours?
13   **A.**   From a medical standpoint or from a
14   humanistic standpoint?
15   **Q.**   Well, let's go medical first, if they're
16   different, and then we'll discuss that.
17   **A.**   Yeah.  That's unsanitary.
18   **Q.**   All right.  Why didn't you put something
19   about that in your report?
20   **A.**   The purpose of the report, as I saw it,
21   was kind of the events immediately after he tried to
22   kill himself, after he rammed his head into the
23   wall, and they were bleeding, and the transportation
24   issues, you know.  I wasn't focusing on the stool so
25   much.

Page 165

1    **Q.**   You told me in your deposition back in
2    April that you thought Mr. Green had suffered a
3    spinal cord injury when he hit his head against the
4    wall.  Is that -- do you recall telling me that?
5    **A.**   I think it's highly probable.
6    **Q.**   All right.  Was it your opinion when you
7    wrote the report that he was able to move his limbs
8    for some period of time after hitting his head
9    against the wall?
10   **A.**   Repeat that question.
11   **Q.**   Was it your opinion at the time you wrote
12   the report that Mr. Green was able to voluntarily
13   move his limbs after he rammed his head into the
14   wall?
15   **A.**   The only thing that I saw was a log note
16   that says that he crossed his legs.
17   **Q.**   All right.  So was it your opinion that he
18   was not a quadriplegic at that time?
19   **A.**   You could say that, yes.
20   **Q.**   All right.  So did you form an opinion as
21   to when he became quadriplegic?
22   **A.**   No.
23   **Q.**   Did -- did you believe that he -- his
24   quadriplegia was a result of the spinal cord injury
25   plus delay in treatment?

Page 166

1    **A.**   It's possible.  Certainly if he didn't ram
2    his own head into the wall, there would be no
3    paralysis.  So I think that is part of it.
4    **Q.**   Sure.
5    **A.**   Exactly what happened after that, when --
6    you know, the -- he became completely quadriplegic
7    was probably -- let's see.  When was that?  When was
8    the log note that he crossed his legs?  How far
9    after that was the --
10   **Q.**   That was in the courtroom.
11   **A.**   So that was within a minute?
12   **Q.**   Well, I don't know about a minute, but it
13   was within five or ten minutes for sure.
14   **A.**   So it would be anytime -- I think the
15   major injury occurred -- self-inflicted,
16   unfortunately -- after he rammed his head into the
17   wall -- dove into the wall, from what I understand.
18   **Q.**   So --
19   **A.**   And then, you know, whether there was some
20   further injury, I don't know.
21   **Q.**   So did you ever ask Ms. White why she
22   didn't immediately call for an ambulance if this man
23   had a spinal cord injury and was laying on the floor
24   in the courtroom?
25   **A.**   I did not ask her that specific question,

Page 167

1    no.
2    **Q.**   Did you conclude that she should have
3    called an ambulance?
4    **A.**   Immediately while he was laying in the
5    courtroom?
6    **Q.**   Yeah.
7    **A.**   I don't know about that.
8    **Q.**   What should she have done?
9    **A.**   In -- in hindsight being 20/20, probably
10   put a C collar on him and put him on a backboard.
11   **Q.**   And done what with him?  Done what after
12   she put him on a backboard?
13   **A.**   Probably stitched his head up and stopped
14   the bleeding or done something to stop the
15   bleeding -- staple it or something like that -- and
16   then done some further evaluation to determine if he
17   needed further treatment or not.
18   **Q.**   Well, you wrote in your report (reading):
19   Problem No. 2:  Patient with concern for
20        possible spinal injury cleared without
21        imaging.  Recommendation:  All patients with
22        possible spinal injury receive imaging
23        before being cleared.  Implementation:
24        Immediate.
25   **A.**   That's what I just told you.  She -- after

Exhibit 23 - Page 24 of 32
Dec'l of JTD

Page 168

1 stabilize, do further evaluation.
2    Q.   And does Lane County Jail have the ability
3 to do imaging of spinal cord?
4    A.   Yes.
5    Q.   In the jail?
6    A.   Yes.
7    Q.   What type of machinery is available in the
8 jail?
9    A.   X-ray.
10    Q.   Is there any MRI or CAT scan ability in
11 the jail?
12    A.   No.
13    Q.   And was the X-ray equipment available at
14 the time in the jail?
15    A.   I don't know.
16    Q.   Is X-ray equipment now?
17    A.   Sometimes.
18    Q.   I don't know what you mean by sometimes.
19    A.   It comes in, it's there, and then they
20 take it out.
21    Q.   Where does it come from?
22    A.   Mobile imaging people.
23    Q.   So did Ms. White in February of 2013 have
24 the ability to call for a mobile X-ray unit to be
25 brought into the jail?

Page 169

1    A.   Yeah.  I don't know how long it would take
2 to get there or not.
3    Q.   All right.  So when you wrote "Problem
4 No. 2:  Patient with concern for possible spinal
5 injury cleared without imaging," what you meant was
6 that he should have been imaged in the jail?
7    A.   I didn't say that.  He should be imaged.
8    Q.   Well, did you have an opinion as to
9 whether he should have been imaged in the jail or
10 whether he should have been immediately sent to a
11 hospital?
12    A.   Not necessarily.
13    Q.   Not necessarily?  I don't understand "not
14 necessarily."  What do you mean?
15    A.   Do I -- did I have an opinion?
16    Q.   Yes.
17    A.   Not means no.  Necessarily means not
18 necessarily.
19    Q.   So do you -- are you telling me that you
20 did not have an opinion at the time or that your
21 opinion was that it was not necessary to send him to
22 the hospital?
23    A.   When are you talking about, when I wrote
24 the report?
25    Q.   When you wrote the report.

Page 170

1    A.   I didn't specify one way or the other.  I
2 think it would depend on other factors in addition
3 to, you know, does the person have spinal cord
4 injury, you know, what does their physical exam
5 show, what does their other findings show, that type
6 of thing.  And then, you know, you put the whole
7 picture together, and then you make a clinical
8 assessment.
9         It's very difficult for me to give you an
10 opinion after we know what happened, after -- you
11 know, hindsight is 20/20.  What exactly -- because I
12 wasn't there.  Yes, people who -- you have --
13 concerned about spinal cord injury should have
14 imaging done, absolutely.
15    Q.   And should the imaging be a simple X-ray
16 or should it be something more sophisticated?
17    A.   It depends on your clinical suspicion.  I
18 have seen too many times to count that people were
19 cleared with X-rays.
20    Q.   I don't know what you mean by "cleared
21 with X-rays."
22    A.   They get an X-ray done and they're fine
23 and they -- you're done worrying about their spinal
24 cord injury.
25    Q.   So --

Page 171

1    A.   I've also seen people get MRIs.  I've also
2 seen people get CAT scans.
3    Q.   All right.  Did you think Mr. Green was at
4 risk for subdural hematoma after having hit his head
5 against the wall hard enough to cause a spinal
6 injury?
7    A.   Did I think that when?
8    Q.   When you wrote the report.
9    A.   I wasn't specifically concerned about that
10 because I knew the whole scenario, the way the
11 things had panned out.
12    Q.   Was -- is -- can subdural hematoma be a
13 fatal injury?
14    A.   Potentially.
15    Q.   And is it something that needs to be
16 properly attended to if it in fact is present?
17    A.   Depends.
18    Q.   Can someone suffer significant brain
19 injury if a subdural hematoma is not treated for
20 several hours?
21    A.   Depends on the size of it.
22    Q.   So is the answer yes?
23    A.   It depends on the size of it.  The answer
24 is yes, if it's large, and no, if it's small.
25    Q.   All right.  If someone rams their head

Exhibit 23 - Page 25 of 32
Dec'l of JTD

Page 172

1  into a wall hard enough to cause spinal injury,
2  should the patient -- should the person taking care
3  of that patient also be concerned about subdural
4  hematoma?
5     **A.**   Depends on their clinical findings.
6     **Q.**   And can subdural hematoma be evaluated
7  with an in-jail X-ray?
8     **A.**   No.
9     **Q.**   Why didn't you put in your report anything
10 about Ms. White ignoring the possibility of subdural
11 hematoma?
12    **A.**   Well, I didn't put the possibility of
13 subdural hematoma, I didn't put the possibility of a
14 nasal fracture or an orbital fracture or a tear on
15 his ear because we know what the scenario was. I
16 didn't go through and list the potential of 200
17 things that could have been tested for. We know
18 what happened. We look -- we're looking at the
19 facts. We're looking at the scenario, so that's
20 why.
21    **Q.**   So the facts are that Ms. White had a
22 patient lying on the floor in the jail --
23    **A.**   That's a fact.
24    **Q.**   -- who had rammed his head into the wall,
25 who had a somewhat altered state of awareness, at

Page 173

1  least according to her notes --
2     **A.**   That I don't know.
3     **Q.**   -- who had her -- had pupils that were not
4  normally reactive to light --
5     **A.**   I'd have to look at the chart again on
6  that.
7     **Q.**   Well, that's what it says. -- and that he
8  was claiming that he was paralyzed, and he was
9  claiming that his ears were paralyzed.
10        What did you think he meant by his ears
11 were paralyzed? Did you draw any medical --
12    **A.**   That's --
13    **Q.**   -- inference?
14    **A.**   That is a hard one to put a finger on. I
15 don't recall ever learning in my medical training --
16 that's not to say it's never happened, but I don't
17 recall in my medical training people talking about
18 their ears getting paralyzed. Just that they can't
19 hear.
20    **Q.**   If someone has a concussion, do they have
21 auditory symptoms?
22    **A.**   They can. I don't -- never heard -- say
23 that their ears were paralyzed.
24    **Q.**   So --
25    **A.**   Ringing in their ears, that type of thing.

Page 174

1     **Q.**   So if a patient is lying on the floor
2  saying that he's paralyzed and saying that he's --
3  his ears are paralyzed and he's bleeding from the
4  head, is it your opinion that it is not necessary to
5  send that patient immediately away from the jail to
6  the hospital? Is that your opinion?
7     **A.**   You said a patient's laying on the
8  floor --
9     **Q.**   Claims that he's paralyzed --
10    **A.**   -- claims that he's paralyzed, claims that
11 his ears are paralyzed.
12    **Q.**   -- claims that his ears are paralyzed.
13 He's bleeding. And he's got --
14    **A.**   So what is his --
15        **THE REPORTER:** I'm sorry --
16 **BY MR. ROSENTHAL:**
17    **Q.**   -- pupils that are slightly reactive to
18 light rather than normally reactive to light.
19 Should that patient be immediately sent to the
20 hospital?
21    **A.**   It depends. It depends on what your
22 physical exam findings show.
23    **Q.**   Did you --
24    **A.**   I -- you know, is he paralyzed? What does
25 the physical exam show? You know, try to clarify

Page 175

1  what he means if his ears are paralyzed. So there
2  would be potential scenarios for any number of
3  different ways of treating that.
4     **Q.**   Were you aware that --
5     **A.**   I've seen people who were laying there,
6  telling me they're paralyzed, and then they get up a
7  minute later and they walk around, so you just don't
8  know.
9     **Q.**   Were you aware before you wrote your
10 report that Lieutenant Brown had done an
11 investigation and had collected written statements
12 from all the deputies that were involved either in
13 the courtroom or in the jail with Mr. Green on
14 February 12th?
15    **A.**   Before I wrote my report?
16    **Q.**   Yes.
17    **A.**   I don't recall.
18    **Q.**   Did you -- you knew that Lieutenant Brown
19 was in charge of the jail?
20    **A.**   I knew he was in charge of part of the
21 jail. I don't know if he's in charge of the whole
22 jail or --
23    **Q.**   Did you ask him whether he did an
24 investigation or collected reports from the various
25 officers involved?

Exhibit 23 - Page 26 of 32
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Justin Montoya, MD - Vol. 2
October 07, 2014

Page 176

1    **A.**   I don't recall.
2    **Q.**   Did you look at the ambulance report, the
3    report from the emergency medical people that showed
4    up at the jail?
5    **A.**   Do you have a copy of it --
6    **Q.**   I do.
7    **A.**   -- to stimulate my memory?
8    **Q.**   Sure.
9    **A.**   I don't recall specifically or not.
10   **Q.**   It's Exhibit 47.
11          (Pause.)
12   **A.**   I don't recall seeing this, that I can
13   recall.
14   **Q.**   Did you interview Jacob Pleich before
15   writing your report?
16   **A.**   I don't -- I would not say I interviewed
17   him.
18   **Q.**   You simply looked at his report that he
19   wrote from the time?
20   **A.**   I don't think so.
21   **Q.**   You don't think you looked at his report?
22   **A.**   I'd have to see it.
23   **Q.**   It's in the chart there.  It's in the back
24   of that exhibit.  It's page 3388, way at the back.
25   I believe it's only that one page, 3388.

Page 177

1    **A.**   Oh, sorry.  I was on the wrong page here.
2    This looks like something -- I don't know what that
3    is.  Yeah.  If these were in the chart, I think I
4    looked at them.
5    **Q.**   So why didn't you interview him about what
6    had happened?  He was in the jail cell about 2:30.
7    Why didn't you interview him?
8    **A.**   In the jail cell at 2:30?
9    **Q.**   He was in Mr. Green's jail cell at 2:30?
10   **A.**   Oh.  You know, my -- the gist of my sort
11   of evaluation and report was the spinal cord injury,
12   is what I was kind of focusing on.
13   **Q.**   Why don't we take a short break.  This
14   would be a good place to take a break.
15          **THE VIDEOGRAPHER:** We're off the
16   record at 2:47 p.m.
17          (Recess:  2:47 p.m. to 2:59 p.m.)
18          **THE VIDEOGRAPHER:** We're back on the
19   record at 2:59 p.m.
20   **BY MR. ROSENTHAL:**
21   **Q.**   Dr. Montoya, when you wrote your report,
22   were you aware that there were video cameras that
23   captured things that occurred in the jail hallways
24   and in the jail cells?
25   **A.**   Yes.

Page 178

1    **Q.**   Did you -- did you ask to look at the
2    video -- I don't know whether it's videotape.  I
3    guess it was actually an electronic disk, but did
4    you ask to look at the video before you wrote your
5    report?
6    **A.**   No.
7    **Q.**   Were -- did you have any knowledge as to
8    whether or not there was video from the jail cell
9    that Mr. Green was in from approximately 11:30 in
10   the morning until he was picked up by the emergency
11   people between 4:30 and 5:00?
12   **A.**   You know, my main focus when writing the
13   report was really -- I'm kind of the initial triage
14   and evaluation and some of the communication stuff,
15   so I guess I didn't think that looking at the video
16   was, you know, going to change a lot of that.
17   **Q.**   Well, if on the video you would have seen
18   that he appeared to be paralyzed, would that have
19   gotten into your report?
20   **A.**   Well, I know --
21   **Q.**   If you'd look at the video --
22   **A.**   I know in retrospect from -- you know,
23   down the road, the patient was paralyzed, so I'm not
24   sure that I would change my report by looking at a
25   video of a paralyzed person.

Page 179

1    **Q.**   Well --
2    **A.**   I've seen paralyzed people before.  I
3    don't know that that's going to change the way that
4    I would recommend, you know, improving care for
5    potential spinal injuries.
6    **Q.**   I'm having trouble understanding that,
7    Dr. Montoya, because if you would have looked at the
8    video and if it was obvious from a video at noon
9    that the man was paralyzed and yet he stayed in the
10   jail for another five hours, wouldn't that have been
11   something you would have wanted to call to PA
12   White's attention and perhaps discipline her for not
13   properly responding to a paralyzed patient?
14   **A.**   Let's see.  How can I answer that?  Repeat
15   the question.
16   **Q.**   If you had looked at the video and seen
17   that at approximately noon Mr. Green was visual --
18   to the visual eye paralyzed, isn't that something
19   that you would have wanted to take up with PA White
20   and perhaps discipline her for it, for not treating
21   a patient properly?
22   **A.**   The -- I think the purpose of what we're
23   trying to do with the report here is improve the
24   quality, not necessarily discipline people, firstly.
25   Secondly, we know that the gentleman was paralyzed.

Exhibit 23 - Page 27 of 32
Dec'l of JTD

Page 180

1  I know what paralysis is, sir.  I know what it looks
2  like.
3  **Q.**  Do you --
4  **A.**  So looking at a video of it, when it's
5  documented other places that the patient wasn't
6  moving, I don't think changes really my
7  recommendation.  It might look good for a jury, but
8  it doesn't change how I feel about taking care of
9  people.
10  **Q.**  Do you feel that -- that PA -- did you
11  feel when you wrote the report that PA White had
12  done anything wrong in taking care of Mr. Green?
13  **A.**  I draw your attention to the report, and I
14  did make some recommendations and some problems.
15  **Q.**  All right.  But --
16  **A.**  We want to take care of people the best
17  that we can.  Okay.  That's what we do.  That's why
18  I spent years of my life studying medicine.  And
19  this is what we're trying to do with this report is
20  improve the quality of care that we provide to
21  people.
22  **(Reading):** No. 2.  Patient with
23  concern for possible spinal injury cleared
24  without imaging.  Recommendation: Patients
25  with spinal -- possible spinal injury

Page 181

1  receive imaging before being cleared.
2  Okay.  So the fact that that wasn't done,
3  if you want to change the wording and say:  Do I
4  think that she made a mistake?  Well, I think she
5  should have done this, yeah.
6  **Q.**  Well, did you think that she did the
7  neurologic exam that she wrote in her chart?
8  **A.**  Yes.
9  **Q.**  You believe that?
10  **A.**  Why wouldn't I?
11  **Q.**  I'm asking you if you believed it.
12  **A.**  I think I just said yes.
13  **Q.**  All right.  So you believed that his arms
14  and legs could move when he was in the courtroom?
15  **A.**  I need to look at the chart to refresh my
16  memory.  Let's see.  What page is that on here?
17  **Q.**  It's on page 3382 it starts.
18  **A.**  (Reading): Patient's mental baseline
19  according to witnesses is appropriate.
20  **Q.**  You don't need to read it out loud.  Just
21  read it to yourself and then answer my question: Do
22  you think that Ms. White -- according to Ms. White
23  that he could move his limbs?  Right at the top of
24  page 3383 it says (reading):  States he is
25  paralyzed but is moving all extremities.

Page 182

1  **A.**  Your question is?
2  **Q.**  Did you -- do you believe that that is
3  true -- that that is in fact true?
4  **A.**  Yes.
5  **Q.**  All right.  And you don't think it would
6  have helped you evaluate whether or not that is in
7  fact true or whether in fact Ms. White wrote
8  something down that is not correct if you had looked
9  at the video?
10  **A.**  Of him in the courtroom?
11  **Q.**  There's no video in the courtroom.
12  There's video of him being transported to the
13  clinic --
14  **A.**  Well, this is in the courtroom?
15  **Q.**  That's right.  So --
16  **A.**  After he left --
17  **Q.**  -- there's no video of that, correct.
18  **A.**  Well, I don't see how that would help me
19  on this scenario right here.  I guess I don't
20  understand your question.
21  **Q.**  Has anyone told you that the judge's clerk
22  has testified in deposition in this case that there
23  was no neurologic exam done?  She watched everything
24  that happened and there was no neurologic exam done.
25  Are you aware of that?

Page 183

1  **A.**  No, sir.
2  **Q.**  Nobody told you that?
3  **A.**  I think I just answered that --
4  **Q.**  Nobody --
5  **A.**  -- when I said, "No, sir."
6  Is that a different question?
7  **Q.**  And has anyone told you that the
8  registered nurse that was in the courtroom with
9  Mr. White [sic] testified that Ms. White was always
10  up at the head of the patient, that she never moved
11  around to other parts of the body?
12  **A.**  I haven't been told of anybody else's
13  testimony.
14  **Q.**  All right.  And you haven't interviewed
15  any of the nurses -- is that correct? -- about what
16  happened in the courtroom.
17  **A.**  I don't think I did.  I've read the
18  reports.
19  **Q.**  Did you interview the HSA -- the acting
20  HSA, Ms. Thomas -- regarding any aspect of what
21  happened before you wrote your report?
22  **A.**  I think it came up.  I don't know if you
23  would call it an interview.  I think the -- some
24  aspects of the case had come up in various
25  conversations or meetings or that type of thing.

Exhibit 23 - Page 28 of 32
Dec'l of JTD

Page 184

1    Q.   Did you ask her why there was no cervical
2  collar or backboard available in the jail?
3    A.   No.  I didn't ask her that, no.
4    Q.   Did you ask anybody about that?
5    A.   It was determined that there wasn't one
6  immediately available.
7    Q.   Well, was it determined that there wasn't
8  even one available, period?
9    A.   I'm not sure where the nearest one was.  I
10  don't think there was one that was readily
11  available.
12    Q.   Was any additional equipment purchased
13  after you wrote your report?
14    A.   I believe we have the C collar and the
15  spine board.
16    Q.   Who took care of that?
17    A.   HSA, I believe.
18    Q.   But you're not sure?
19    A.   I'm not sure.  Some of the equipment is
20  purchased by Corizon and some of the equipment, I
21  believe, is purchased by the county.  And I'm not
22  sure which organization actually obtained the
23  equipment.
24    Q.   After you wrote your report, what did you
25  do with your report?  Who did you send it to?

Page 185

1    A.   It made its way to Dr. Orr.  I don't know
2  if I gave it to the HSA and they forwarded it or if
3  I sent it directly to him.
4    Q.   So I'm trying to determine when your
5  report was written.  It says April 23rd, if you look
6  at page 3367 in the exhibit there.  So it says
7  Report Date:  April 23rd.  And then up on the top
8  there, it looks like there's a -- there's some fax
9  information.  So did you write the report on April
10  23rd?  Is that when it was completed?
11    A.   According to what I wrote there, I believe
12  that's the case.
13    Q.   All right.  And do you know who you gave
14  the report to after you wrote it?
15        MR. COLEMAN:  Asked and answered.
16  BY MR. ROSENTHAL:
17    Q.   Well, I want to be sure.  Do you know who
18  you gave the report to or did you mail it to
19  somebody?
20        MR. COLEMAN:  Go ahead and answer it
21  again.
22    A.   As I stated previously, I believe it made
23  its way to Dr. Orr.  Whether or not I sent it
24  directly to him or I asked the HSA to send it to him
25  or I asked the office assistant to send it to his

Page 186

1  fax number, I do not recall.
2  BY MR. ROSENTHAL:
3    Q.   Now, you listed seven problems on the
4  second page of your report.  So those seven
5  problems, are those items that you thought needed
6  correction?
7    A.   Yes.
8    Q.   Were there any other items that you
9  thought needed correction that you didn't put in
10  your report?
11    A.   At the time?
12    Q.   Yes.
13    A.   No.
14    Q.   Now, after you sent your report to
15  Dr. Orr, what is your understanding of what happened
16  with your report?
17        No.  Excuse me.  That's not a good
18  question.  Let me start that again.
19        After you sent your report to Dr. Orr, did
20  you have any further contact with Dr. Orr about your
21  report?
22    A.   I don't recall.
23    Q.   Take a look at --
24    A.   I think we -- I think he probably
25  mentioned it to me at some point in time afterwards.

Page 187

1    Q.   Did he ask you to change anything?
2    A.   No.
3    Q.   Is this the only version of the report
4  that you ever submitted to anybody, the one that
5  we're looking at together?
6    A.   Yeah.  I only did one.
7    Q.   All right.  So take a look, please, at
8  Dr. Orr's report, page 3366 -- if you go forward one
9  page.  Did you see this report back in 2013?
10    A.   I don't think so.  Let me read it here.
11        (Pause.).
12        Yeah.  I don't think I saw this back in
13  2013.
14    Q.   Take a look at the page in front of that,
15  page 3365.  Is that your signature on the lower
16  left-hand corner?
17    A.   Yes, it is.  Well, it's my initial.
18    Q.   So it's -- you didn't write Montoya, John
19  [sic], MD?  You just initialed it?
20    A.   Well, that's not my signature.  That's my
21  name, and then my initial.
22    Q.   All right.  Did you print your name before
23  you put your initials down?
24    A.   Yes.
25    Q.   All right.  And this document -- your

Exhibit 23 - Page 29 of 32
Dec'l of JTD

Page 200

1  page 3369, the Sentinel Event Review Committee
2  Feedback.  Did you see that document in 2013?
3      A.   I don't recall.
4      Q.   And then if you'd look at the first page
5  of the packet, 3364, did you see that piece of paper
6  in 2013 or on a computer?
7      A.   It doesn't look familiar.
8      Q.   All right.  I'm interested -- it says in
9  the lower left-hand corner, "Site medical director
10  review," and then it says "Category 4," and then it
11  has your name.  Do you know what that refers to,
12  that Category 4?
13      A.   Um, yeah.
14      Q.   What does that refer to?
15      A.   Well, I'd have to -- I'd have to look at
16  the exact definition of -- I know there's
17  categorizations.  There's different categories for
18  different types of events.
19      Q.   There's different types of sentinel
20  events?
21      A.   Yeah.
22      Q.   All right.  Is Category 4 the most
23  serious?
24      A.   I'd have to look at the --
25      Q.   I'm looking at 3365.  I see it's checked

Page 201

1  there, the box 4 is checked right above your
2  initial.
3      A.   Well, I'd have to look at the descriptors
4  to give you an exact answer.
5      Q.   Okay.  You don't recall offhand.
6      A.   I don't have them on the top of my head,
7  no.
8      Q.   Okay.  All right.  Did you ever talk to
9  anybody from Nashville on the Patient Safety
10  Committee or on the Sentinel Event Review Committee
11  about this event?
12      A.   No.
13      Q.   And do you know who this person is, Tonya
14  Mooningham?  Do you know who that person is?
15      A.   I don't know her, huh-uh.  I kind of heard
16  the name somewhere, I think, but --
17      Q.   But you never spoke with her.
18      A.   I don't think so.
19      Q.   All right.  Did anyone -- Dr. Orr or
20  anyone -- well, actually, let me ask you -- let me
21  back up.
22          I know Dr. Kelde (phonetic) was the chief
23  medical officer for Corizon when the event happened.
24  I don't recall the name of the person that took his
25  place.  He left before you did your report, if I

Page 202

1  recall correctly.
2          But here's my question:  Did the chief
3  medical officer of Corizon ever talk to you about
4  this event?
5      A.   Dr. Kelde?
6      Q.   Well, Kelde was the chief medical officer
7  when the event occurred and then somebody --
8      A.   I think I just talked to Dr. Orr, if I
9  recall.
10      Q.   Okay.  So did anyone ever tell you what
11  the patient safety committee was recommending based
12  upon your report and Dr. Orr's report?
13      A.   No.
14      Q.   You had various recommendations in your
15  report so I'd like you to look at it again, 3368.
16  So regarding documentation, you had a recommendation
17  (reading):  All chart notes and orders need
18  to be signed, timed, and dated.
19          Who were you making that recommendation
20  to?
21      A.   I don't know.  In general.
22      Q.   And did --
23      A.   Everybody.  Nobody in particular.
24      Q.   Did your report go to the nursing staff or
25  to the HSA at Lane County Jail or did it just go to

Page 203

1  Dr. Orr?
2      A.   It might have gone to the HSA.  I don't
3  know.  I don't recall exactly if I gave it to the
4  HSA and then they forwarded it on or --
5      Q.   I guess my --
6      A.   -- if I gave to Dr. Orr directly.
7      Q.   Yeah.  My question was poor.  Let me
8  restate my question.
9          Was this something that you expected the
10  HSA to read?
11      A.   I -- I expected the HSA to be involved in
12  the process, yeah.
13      Q.   Okay.  Now, were any steps taken to follow
14  your recommendation regarding Problem No. 1?
15      A.   Yeah.
16      Q.   What steps were taken?
17      A.   Everybody was told to make sure you put
18  date and time on all -- on everything.
19      Q.   And who told them?
20      A.   I don't recall.
21      Q.   Did you?
22      A.   Maybe.
23      Q.   All right.  Problem No. 2 --
24      A.   It was either me -- at maybe a staff
25  meeting -- either myself or somebody.  I know it got

Exhibit 23 - Page 30 of 32
Dec'l of JTD

Page 204

1  talked about, sure.
2  **Q.**   Recommendation under Problem No. 2 is
3  (reading):  All patients with possible
4  spinal injury receive imaging before being
5  cleared.
6       Was that recommendation acted upon?
7  **A.**   Yeah.
8  **Q.**   And how was it acted upon?
9  **A.**   Patients with suspected spinal injuries
10  are -- get imaging done.
11  **Q.**   How did that get communicated to the
12  staff?
13  **A.**   To the providers.
14  **Q.**   Who told them?
15  **A.**   Me.
16  **Q.**   When?
17  **A.**   And Kris.
18  **Q.**   Did Ms. White acknowledge that she had
19  made a mistake in not having Mr. Green imaged?
20  **A.**   I don't recall her -- specifically whether
21  or not she said that.  You know, we talked about the
22  case and different types of things that probably
23  should be done different next time, and I think this
24  was one of them.
25  **Q.**   Then Problem No. 3, you recommended

Page 205

1  (reading):  All patients with possible
2  spinal injury not placed in C-collar or on
3  spine board until cleared.
4       Was that recommendation acted upon?
5  **A.**   Yeah.
6  **Q.**   And how was that acted upon?  Did you hold
7  a class or did you send out a memo or did you just
8  talk to everybody?
9  **A.**   Well, I talked to the providers, Kris.
10  **Q.**   Did you talk to the nurses about it?
11  **A.**   I didn't.
12  **Q.**   (Reading):  Problem No. 4.  No C-collar
13  or spine board.  Recommendation:  Obtain
14  C-collar and spine board for clinic.
15       How that was recommendation acted upon?
16  **A.**   It was obtained.
17  **Q.**   And -- but you already told me you weren't
18  sure exactly who did it.
19  **A.**   Uh-huh.
20  **Q.**   Okay.  Problem No. 5 regarding the
21  neurological check, you wrote (reading):  All
22  nursing orders to be written in order sheet.
23       How was that -- was that recommendation
24  acted upon?
25  **A.**   I believe so.

Page 206

1  **Q.**   And how was it acted upon?
2  **A.**   Talked to Kris about making sure orders
3  get put in there.
4  **Q.**   Then Problem No. 5 [sic], the neurological
5  checks weren't done -- oh, that's the same thing.
6  Your recommendation was (reading):  All nursing
7  orders to be written in order sheet.
8       And then Problem No. 7, you wrote the
9  problem is (reading):  Medical follow-up not
10  done because staff believed the patient was
11  being released.
12       And your recommendation was
13  (reading):  Institute process to ensure
14  all medical follow-up is done until
15  confirmed release.  HSA should be involved
16  in this planning.
17       Was that recommendation followed up on?
18  **A.**   I'd have to check with the HSA to see
19  exactly how that was implemented.
20  **Q.**   Did you have anything to do with however
21  it was implemented?
22  **A.**   Not specifically, no.
23  **Q.**   Now, were you aware that Dr. Orr was
24  recommending mandatory in-service for all clinicians
25  and clinical staff regarding the approach to

Page 207

1  handling head and neck injuries?
2  **A.**   Aware when?
3  **Q.**   In May of 2013.
4  **A.**   May of 2013.  I know it came up that we
5  had to get some education on that.
6  **Q.**   So who arranged for the education to take
7  place?
8  **A.**   A year later, I don't recall exactly.
9  **Q.**   Did you attend some type of education
10  session?
11  **A.**   I don't think I was there at the staff
12  meeting.
13  **Q.**   Are you considered to be a clinician or
14  clinical staff by Corizon?
15  **A.**   I would assume so.
16  **Q.**   Do you have any knowledge as to what
17  training occurred when -- on this topic?  Do you
18  have any --
19  **A.**   I believe there was an in-service and a
20  staff meeting.
21  **Q.**   And do you know who led this -- the
22  training?
23  **A.**   No.
24  **Q.**   Do you know what materials were used?
25  **A.**   I wasn't there, no.

Exhibit 23 - Page 31 of 32
Dec'l of JTD

Page 208

1    Q.    Do you know whether there's any record of
2  that in-service training?
3    A.    No.  I don't know.  There may be.
4    Q.    Are you still supervising Ms. White?
5    A.    Yes.
6    Q.    And is she still working at the Lane
7  County Jail?
8    A.    Yes.
9    Q.    Was she disciplined in any way for her
10  actions in regard to Mr. Green?
11    A.    I wouldn't say she was disciplined, no.
12  We talked about improving -- quality of improvement.
13  I don't know that disciplining was going to do
14  anything but --
15    Q.    Were you aware that Ms. Mooningham back at
16  corporate headquarters had determined that Ms. White
17  had acted recklessly?
18        MR. COLEMAN: Object to the form of
19  the question.
20    A.    Not at the time.
21  BY MR. ROSENTHAL:
22    Q.    So no one's told you -- no one told you
23  that in 2011?
24    A.    Huh-uh.
25    Q.    Has anyone told you that since then?

Page 209

1    A.    Yeah.
2    Q.    And do you agree with that?
3    A.    I wouldn't use the term "reckless."  I
4  think there were certainly areas that could have
5  been improved.
6    Q.    Would you say that she acted negligently?
7        MR. COLEMAN: Objection.
8    A.    I wouldn't use the word "negligent."
9  BY MR. ROSENTHAL:
10    Q.    Would you say that she acted carelessly?
11    A.    No.  Careless means without care, so, no,
12  I think she cares about the people she's taking care
13  of.
14    Q.    So what word would you use to describe her
15  actions?
16    A.    I think there were some errors in
17  judgment.
18    Q.    And what errors in judgment?
19    A.    I think that the patient probably should
20  have been stabilized in a C-collar until further
21  evaluation was done, whether that was done in the
22  emergency room -- you know, of course, we know all
23  this now, hindsight being 20/20 -- but whether it
24  was done in the emergency room or whether it was
25  done in the clinic, yeah, probably just been

Page 210

1  stabilized better until a more thorough evaluation
2  could have been done.
3    Q.    Did you think she also made a mistake by
4  not doing neurological checks of Mr. Green after he
5  was sent to the jail cell?
6    A.    Her?  No.  I mean, we rely on nursing
7  staff to do some evaluations for us.
8    Q.    Do you think she also made a mistake in
9  leaving the Lane County Jail premises before
10  Mr. Green was picked up by emergency medical
11  service?
12    A.    You know, I would have to go back and look
13  at the exact time frame to do that.  We can
14  certainly go over it, if you'd like.
15    Q.    Well, she clocked out at 4 o'clock and the
16  ambulance didn't show up until ten to 5:00?
17    A.    And she was aware that he was still there?
18    Q.    Well, when she left, he was still there.
19    A.    What -- I wasn't implying whether or not
20  he was still there because, of course, the ambulance
21  came to get him there at a time after she left, but
22  I recall, you know, looking at some of the stuff
23  that -- I thought she was under the impression that
24  he had been sent out, so I don't remember if she was
25  told he was still there or not.

Page 211

1    Q.    Well, according to the video, which you
2  haven't looked at, she was in his jail cell at about
3  five to 4:00 or ten to 4:00.
4    A.    Okay.
5    Q.    And she left at 4:00.  And according to
6  the records, the ambulance was not called until
7  4:30.  So my question is:  Do you think that that
8  was a mistake in judgment on her part?
9    A.    If she thought he was stable, no.  If she
10  felt he was unstable, then, yes.
11    Q.    And were you aware that -- what his blood
12  pressure was?  I think we talked about it briefly in
13  your first deposition, that it was 84/62 at -- when
14  Nurse Smith took his blood pressure.  That's what --
15  she told that to Nurse White before she left,
16  according to Nurse Smith.  And his blood pressure in
17  the courtroom was 128/84.  So would you agree that
18  that's an unstable patient?
19    A.    I'd have to see what it was prior to that.
20  We do have people come in with very low blood
21  pressures.  And I would expect it to go up, if
22  somebody had some sort of endorphin release from
23  pain or an injury.
24        If it had been running consistently high
25  and dropped down, then I would say that that's not a

Exhibit 23 - Page 32 of 32
Dec'l of JTD