# The Deposition Of:
# Tonya Mooningham

**Date:** October 16, 2014

Derek Johnson, personal representative of Kelly Conrad Green II, deceased; Kelly Conrad Green II and Sandy Pulver v. Corizon Health Inc, Lane County, Dr. Carl Keldie, Dr. Joe Pastor, Becky Pinney, Vicki Thomas, Kirstin White, et al

Taken On Behalf Of The Plaintiffs



SYNERGY LEGAL

LITIGATION SUPPORT SERVICES

Exhibit 24 - Page 1 of 13
Dec'l of JTD

**Tonya Mooningham**

1 (Pages 1 to 4)

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF OREGON
 3                   EUGENE DIVISION
 4
 5   DEREK JOHNSON, personal representative
 6   of KELLY CONRAD GREEN II, deceased;
 7   KELLY CONRAD GREEN and SANDY PULVER,
 8        Plaintiffs,
 9     vs.             No. 6:13-cv-01855-TC
10   CORIZON HEALTH, INC., a
11   Tennessee Corporation; LANE
12   COUNTY, an Oregon county; DR.
13   CARL KELDIE, an individual; DR.
14   JOE PASTOR, an individual; BECKY
15   PINNEY, an individual; VICKI
16   THOMAS, an individual; KIRSTIN WHITE,
17   an individual; JACOB PLEICH, an
18   individual; SHARON FAGAN, an
19   individual; ROB DOTSON, an individual;
20   GUY BALCOM, an individual; DONALD
21   BURNETTE, an individual; JOHN
22   DOES 1-10,
23        Defendants.
24
25   (caption continued next page)
```

## Page 2

```
 1        DEPOSITION OF TONYA MOONINGHAM
 2      TAKEN ON BEHALF OF THE PLAINTIFFS
 3          THURSDAY, OCTOBER 16, 2014
 ...
16      BE IT REMEMBERED that the deposition of TONYA
17   MOONINGHAM was taken in behalf of the Plaintiffs,
18   pursuant to the Federal Rules of Civil Procedure
19   before Karen Steinbock, Certified Shorthand
20   Reporter for Oregon and Washington, on Thursday,
21   the 16th day of October, 2014, in the law offices
22   of Synergy Legal, 1235 SE Morrison Street,
23   Portland, Oregon, commencing at the hour of 9:08
24   a.m.
25
```

## Page 3

```
 1                  APPEARANCES
 2
 3   ROSENTHAL GREENE & DEVLIN
 4   By Mr. Elden Rosenthal and Mr. John Devlin
 5   121 SW Salmon Street, Suite 1090
 6   Portland, OR 97204
 7   Appearing for the Plaintiffs;
 8
 9   STEWART SOKOL GRAY
10   By Mr. Robert Coleman
11   2300 SW First Avenue, Suite 200
12   Portland, OR 97201
13   Appearing via videoconference for the
14   Defendants;
15
16   LANE COUNTY COUNSEL
17   By Mr. Sebastian Tapia
18   125 East 8th Avenue
19   Eugene, OR 97401
20   Appearing via telephone for Lane County
21   Defendants.
```

## Page 4

```
 1              EXAMINATION INDEX
 2   EXAMINATION BY                    PAGE NO.
 3     Mr. Rosenthal                       6
```

**Tonya Mooningham**

Page 9

1      Q.   Okay.  And how long were you out of work
2   between the time you left Capella and the time you
3   joined Corizon?
4      A.   I believe it was about two months.
5          MR. ROSENTHAL:  Let's go off the record
6   for one second.
7          (Discussion is held off the record.)
8   BY MR. ROSENTHAL:
9      Q.   So, when did you -- so, how long did you
10  say you were between jobs?  You told me but I
11  didn't write it down.
12     A.   Two months.
13     Q.   And did you seek employment at Corizon or
14  did Corizon seek you out?
15     A.   I sought them out in a Career
16  Builder-type search, search engine.
17     Q.   Search engine?
18     A.   Yes.
19     Q.   And what was it that, what was the job
20  that you applied for at Corizon?
21     A.   Clinical risk management analyst.
22     Q.   And was that the job that they hired you
23  for?
24     A.   Yes.
25     Q.   Had there been someone in that job before

Page 10

1   you took the job, or were you the first person in
2   that position?
3      A.   The first person in this position.
4      Q.   Who did you talk to at Corizon about the
5   job before you took it?
6      A.   My supervisor, Dr. Haggard.
7      Q.   And did Dr. Haggard indicate to you why
8   they were creating this position?
9      A.   I don't really recall the specifics.  The
10  position, you know, has shifted a little bit since
11  I have taken it.
12     Q.   Well, did you get a general idea as to
13  why they wanted to bring you on board?
14     A.   Yes.  The role, yes.
15     Q.   I'm sorry, my question wasn't very good.
16         Did you get a general idea about why they
17  wanted a new person to fill this particular role
18  that they were hiring you for?
19     A.   I suppose they had a need for this
20  position.
21     Q.   That's what I'm wondering.  Did she
22  explain to you what had changed or what their
23  thought process was on creating this new position?
24     A.   I don't recall exactly.  Maybe it was
25  volume.

Page 11

1      Q.   What did you understand your job would be
2   when you started your job?
3      A.   Okay.  I would handle patient complaints
4   and participate on the Sentinel Event Committee.
5      Q.   What was the date you started?
6      A.   I believe it was March 26, 2013.
7      Q.   Was Dr. Haggard your immediate
8   supervisor?
9      A.   Yes.
10     Q.   So, let's talk about the first aspect of
11  the job as you explained it, handling patient
12  complaints.  Could you explain that to me a little
13  bit, please.
14     A.   It just involves when a patient calls our
15  compliance line to report any sort of complaint,
16  it could be about anything, medical, primarily --
17  well, they are all medical complaints.  I would
18  investigate that and come up with a resolution.
19     Q.   About how many complaints were you
20  handling a day or a week or a month, however it's
21  easy for you to reconstruct?
22     A.   Well, that is hard to determine because
23  it's going to depend on the type of contracts we
24  have.  You know, once we took on Arizona, we had
25  more.  The bigger the contract, the bigger the

Page 12

1   area you service, naturally, the more complaints
2   you are going to get.
3      Q.   Were you handling complaints from a
4   particular geographic region?
5      A.   All of Corizon.
6      Q.   So, approximately how many beds was
7   Corizon providing medical care for when you began?
8      A.   I don't know the answer to that.  It's
9   nationwide.
10     Q.   Was it more than 100,000?
11     A.   I don't know the answer to that.
12     Q.   And when you first started at Corizon,
13  approximately how many calls were you handling a
14  week or a month, patient complaints?
15     A.   You know, I honestly cannot answer that.
16  Basically the calls come in to a compliance line,
17  which is a vendor, and then they are processed by
18  someone else and they are given to me to
19  specifically investigate it.  So, it goes through
20  levels before it arrives to me and I wasn't
21  responsible for developing the reports and
22  reporting them, how many we had monthly and that
23  sort of thing.  So I can't answer that.
24     Q.   How many were you asked to investigate in
25  the first month or two that you were at Corizon?

Page 13

1  **In other words, did you have just a handful, three**
2  **or four, or did you have 100? I mean, give me a**
3  **ballpark as to the volume of complaints that got**
4  **through the vendor to you.**
5      A.  Initially, it was slower. And then we
6  got some new contracts that came on board, but you
7  know, up until July, I did that role, of this
8  year, and you know, it wasn't uncommon for me to
9  handle maybe 20 a week.
10     **Q.  And when you would get a patient**
11  **complaint, that would be some kind of written**
12  **report from the vendor?**
13     A.  It wasn't a written report. It came
14  through the vendor's system, a system.
15     **Q.  So --**
16     A.  Computer program.
17     **Q.  So, I'm just curious what depth of**
18  **information you would get with the complaint. In**
19  **other words, if somebody called up from Arizona**
20  **and said, I didn't get proper medical care for my**
21  **diabetes, would you get any other information than**
22  **that, or was that all that the vendor would send**
23  **you?**
24     A.  Well, it depends on the quality of the
25  complaint the patient alleged. If that's all they

Page 14

1  stated, it's a verbatim account of whatever the
2  patient states. So, sometimes yes, it would be as
3  vague as that. So, I would send it out to the
4  site for an investigation and try to find any gaps
5  in care.
6      **Q.  What was the name of the vendor?**
7      A.  Boy, it's, I know the site is like My
8  Compliance, M-Y Compliance.
9      **Q.  And you were the only person at Corizon**
10  **handling these complaints?**
11     A.  Yes, in terms of the investigation now,
12  you know, that is correct.
13     **Q.  Then, the second part of your job as you**
14  **explained it to me a few minutes ago was serving**
15  **on the Sentinel Event Committee, is that right?**
16     A.  Yes.
17     **Q.  And who was on the Sentinel Event**
18  **Committee with you?**
19     A.  There are several members. I didn't
20  bring a listing of the names, but there are
21  several members, probably, most -- on average the
22  committee involved ten members.
23     **Q.  So, was the chief medical officer of**
24  **Corizon on the committee?**
25     A.  Yes.

Page 15

1      **Q.  Was the chief mental health officer for**
2  **Corizon on the committee?**
3      A.  Yes.
4      **Q.  Was Dr. Haggard on the committee?**
5      A.  Yes.
6      **Q.  Was Diane Wood on the committee?**
7      A.  Yes.
8      **Q.  Can you remember anyone else that was on**
9  **the committee?**
10     A.  Not specifically in relevance to this
11  case.
12     **Q.  No, I'm just asking generally. When you**
13  **started work, who else was on the committee?**
14     A.  There is several physicians. Dr. Fulks,
15  Dr. Deghetto. I'm trying to think. And they,
16  there is more, some that may have left at this
17  point, too.
18     **Q.  I saw a news release that was issued, I**
19  **guess by Corizon, when you were hired, and it**
20  **indicated that in addition to doing**
21  **clinically-related telephone call issues, that you**
22  **would be assisting in the analysis of professional**
23  **liability records. Is that something that you**
24  **were doing from the beginning of your employment?**
25     A.  Very sporadically.

Page 16

1      **Q.  All right. And then has your job changed**
2  **since you were hired?**
3      A.  Yes.
4      **Q.  In what way?**
5      A.  Well, I no longer handle patient
6  complaints, that's not a part of my role any
7  longer.
8      **Q.  And have you been given any new**
9  **assignments?**
10     A.  Not new assignments. But I have been
11  given more volume, if that makes sense.
12     **Q.  Is 82?**
13     A.  My capacity is --
14     **Q.  I didn't mean to interrupt you. Please**
15  **finish.**
16     A.  Well, since I no longer handle patient
17  complaints, I am open to handling more Sentinel
18  events and PLIs.
19     **Q.  So, in the first few months when you were**
20  **working for Corizon, what was your role on the**
21  **Sentinel Event Committee?**
22     A.  It was basically very limited. I didn't
23  have many cases at first. Because, well, because
24  I didn't have the capacity to do them because the
25  compliance line required my ultimate attention.

**Tonya Mooningham**

6 (Pages 21 to 24)

Page 21

1   A.   The last ten days of care provided, the
2   whole chart, of the chart, sorry, of the chart, I
3   get ten pages -- not ten pages -- ten days of
4   clinical prior to the event.
5       Q.   So look at page 3382. So those are
6   Corizon progress notes from Mr. Green's chart.
7   And the day of the event was February 12, so would
8   you have expected to receive those chart notes
9   that are 3382 through 3385?
10      A.   One second. What was the date of the
11  event?
12      Q.   February 12.
13      A.   Yes, I would have expected to.
14      Q.   Would you have expected to receive
15  anything else that was in the patient's chart for
16  that time period, like 3386, which is a mental
17  health progress note?
18      A.   It depends on the pertinence. I don't
19  know exactly what the policy says as far as what
20  all -- I know that ten days of charting prior to
21  the event, sometimes it's present, the mental
22  health, I think it depends on whether it's
23  pertinent to the case.
24      Q.   Is there any way for you to determine
25  whether you received these pages that we have just

Page 22

1   looked at together?
2       A.   If I feel as though I don't have enough
3   information, I have the option of requesting more
4   information from the site.
5       Q.   Right. But I want to know, is there
6   anyway for us to figure out now whether in fact
7   you got the chart notes?
8       A.   No. I mean, they are not, when the chart
9   comes to us, it's not stamped according to how
10  many pages we are supposed to receive, if that's
11  what you mean.
12      Q.   Is there a stamp that indicates the date
13  that the chart came to you?
14      A.   No.
15      Q.   Now, take a look at page 3390, the last
16  page in the packet. Now, in this particular case,
17  Ms. Mooningham, Mr. Green was taken from the Lane
18  County Jail to an emergency room. And my question
19  is, is it usual for you to receive an emergency
20  room referral form similar to this when you review
21  a case where the patient was taken to the
22  emergency room?
23      A.   No, not necessarily.
24      Q.   Do you recall whether you had an
25  emergency room referral form in this case to look

Page 23

1   at?
2       A.   I do not recall.
3       Q.   We are having a problem on our end. The
4   picture is frozen up so let's go off the record a
5   second.
6       (Discussion is held off the record.)
7   BY MR. ROSENTHAL:
8       Q.   Back on the record. So, can you hear me?
9       A.   Yes, I can hear you.
10      Q.   So, still looking at Exhibit 132, take a
11  look at page 3370, please.
12      A.   Okay.
13      Q.   Is that type of document usually in the
14  packet that you get when you are asked to review
15  one?
16      A.   Yes, it is.
17      Q.   And then working forward to 3367 and
18  3368?
19      A.   Yes, it is.
20      Q.   So, that's a two-page report from
21  Dr. Montoya. Is that something that you would
22  have had at your, that you would have had when you
23  did your review?
24      A.   Yes.
25      Q.   And then going forward again, page 3366,

Page 24

1   there is a memo from Dr. Orr, is that a document
2   that you would have had?
3       A.   Yes, it is.
4       Q.   I notice the 3366 has a lot of yellow
5   markings on it. Is that something that you would
6   have done, or would somebody else have done that?
7       A.   I can't recall.
8       Q.   Is it your habit to underline and mark up
9   your copy of these documents to help you do your
10  job?
11      A.   No.
12      Q.   Then, moving, again, forward another
13  page, page 3365, would you expect that you would
14  have had that piece of paper?
15      A.   Yes.
16      Q.   And then the front page, 3364, would you
17  have had that piece of paper?
18      A.   Yes.
19      Q.   Now, looking at this front page, who
20  would have filled this out?
21      A.   Not me, so I don't really know.
22      Q.   When you get the documents to review, do
23  you get them electronically or do you get them in
24  paper form?
25      A.   Right now, both.

**Tonya Mooningham**

8 (Pages 29 to 32)

Page 29

1  Q. Did you interview anyone?
2  A. No.
3  Q. Is it your understanding that you have
4  the option to interview somebody if you wish to?
5  A. That is not my understanding.
6  Q. So you are supposed to do this from the
7  paper, you are not supposed to pick up the
8  telephone and call the HSA or call the doctor and
9  ask any further questions?
10  A. That option would be available.
11  Q. Have you ever done that?
12  A. No.
13  Q. So then, the caption describes event.
14  You wrote, "event analysis by the site Patient
15  Safety Committee. See report." Is that report
16  that you are referring to there Dr. Montoya's
17  report?
18  A. I'm not sure. I don't recall.
19  Q. Well, is there any other report that you
20  had?
21  A. No, I don't have another report.
22  Q. Now, the next sentence says, "most
23  concerning parts of the review." And you wrote,
24  "no documentation that the C spine was secured or
25  that the inmate was placed on a backboard during

Page 30

1  transport." So, am I correct in interpreting this
2  that that was what was the most worrisome to you
3  in this situation?
4  A. At the time of this review,
5  retrospectively, yes.
6  Q. So, that was more concerning to you at
7  the time than the items in the next paragraph?
8  A. Not necessarily.
9  Q. Well, I'm trying to understand what you
10  meant there. What was the most concerning part of
11  the review to you when you prepared this report?
12  A. The fact that the C collar and spine
13  weren't available.
14  Q. And is this something that you discussed
15  with Dr. Haggard before putting it in your report?
16  A. Yes, I did.
17  Q. And did Dr. Haggard agree with you?
18  A. Yes, she did.
19  Q. And that was more concerning to you than
20  the failure of PA White to diagnose a spinal cord
21  injury?
22  A. No, I wouldn't say it was more concerning
23  than that.
24  Q. Well, you didn't even put that in here.
25  You didn't put in here that a concerning part of

Page 31

1  the review was the failure of PA White to diagnose
2  the spinal cord injury.
3  A. Yes.
4  Q. Why?
5  A. I think it should have been put in there.
6  Q. So, what you are telling me is today if
7  you were writing the report, you would write it
8  differently?
9  A. Yes.
10  Q. But Dr. Haggard -- what was Dr. Haggard's
11  position at the time you did this review?
12  A. Her position, particularly her title, is
13  that what you mean?
14  Q. Yes.
15  A. Patient safety officer.
16  Q. So, was she the chairman of the Patient
17  Safety Committee?
18  A. Yes.
19  Q. And did she approve this report?
20  A. Yes.
21  Q. How long had Dr. Haggard been with
22  Corizon, to your knowledge?
23  A. I'm not sure. I don't know.
24  Q. Well, was it more than six months?
25  A. Yes.

Page 32

1  Q. Was it more than five years?
2  A. Yes.
3  Q. Well, did Dr. Haggard tell you what to
4  put in this section and you put in what she told
5  you to put in, or did you independently decide
6  what to put in here?
7  A. I independently decided what to put in
8  the form and she scanned over it.
9  Q. So, why has your opinion changed since
10  you wrote this report?
11  A. Well, there is -- for one, I have more
12  experience with these cases now. This was one of
13  my first cases. So, I review them -- in this
14  case, I would have reviewed it differently because
15  the practitioner, I don't believe her behavior was
16  intentional or reckless, as I marked on the form.
17  Q. We will get to that in a minute.
18      Do you have any more information now than
19  you did then, or is it just a matter of looking at
20  it for the first -- now, let me start my sentence
21  again. My sentence wasn't going to work.
22      Have you been given any additional
23  information about this situation since you wrote
24  your review form?
25  A. Yes, I have.

**Tonya Mooningham**

Page 33

1    Q.  And who gave it to you?
2    A.  Well, in talking about the case --
3        MR. COLEMAN:  I'm going to object to the
4    extent it calls for attorney-client privileged
5    communications, and instruct you not to answer
6    that part.  But if you received information from
7    somebody else that has something to do with why
8    you might review it differently, you can tell
9    Mr. Rosenthal what that is.
10   BY MR. ROSENTHAL:
11       Q.  So, here's my question.  Have you talked
12   with anybody about this case other than lawyers
13   since, in the last year?
14       A.  No, I have not.
15       Q.  And have you seen any pictures or videos
16   in the last year relating to this case?
17       A.  No.
18       Q.  You have never seen the videos from the
19   jail?
20       A.  I have not, no.
21       Q.  And have you seen any reports written by
22   the Lane County Sheriff's Office in the last year?
23       A.  No, I have not.
24       Q.  And has anybody read depositions to you
25   in the last year?

Page 34

1    A.  No.
2    Q.  Have you read any depositions in the last
3    year?
4    A.  No.
5    Q.  So, on this section that we are looking
6    at, if you were to write this section today, tell
7    me how it would be different.
8        MR. COLEMAN:  Which page are you on?
9        MR. ROSENTHAL:  I'm talking about the
10   event analysis.  Well, I'm talking about the last
11   two paragraphs in this block that we have been
12   looking at, which is the "what happened" block.
13       THE WITNESS:  I think it would have been
14   pertinent to place in here that the practitioner
15   assessment, her assessment when she found the
16   patient.
17   BY MR. ROSENTHAL:
18       Q.  It would have been pertinent to put in
19   here her findings when she assessed the patient?
20       A.  Correct.
21       Q.  In the courtroom?
22       A.  Correct.
23       Q.  But would you have changed any parts of
24   the, quote, most concerning parts of the review,
25   close quote?

Page 35

1    A.  Let me find it.
2    Q.  It's the last six lines.
3    A.  I think that is concerning, but I think
4    the most relevant and pertinent thing is that the
5    practitioner, when she assessed the patient, her
6    neuro exam was negative and she proceeded
7    according to her findings.
8    Q.  So my question is, in terms of the most
9    concerning parts of the review, would you change
10   it if you were writing it today?
11       A.  No.
12       Q.  So, let's go to the next page.  So, this
13   is the block that is "best judgment of why" and
14   you have checked, "human error, reckless behavior
15   choice."  Now, whose reckless behavior choice does
16   that refer to?
17       A.  Well, the nurse -- well, not the nurse,
18   but the provider practitioner assessing the
19   patient, and that is who it was applying to at the
20   time.
21       Q.  So that's physician assistant White?
22       A.  Yes.
23       Q.  Okay.  And this was something that you
24   filled out back in May of 2013, is that correct?
25       A.  Correct.

Page 36

1    Q.  And this was approved by Dr. Haggard?
2    A.  I don't know that she specifically saw
3    that.  I know she scanned the document, but
4    ultimately she signed off on it, yes.
5    Q.  All right.  Now, then in the second
6    column there is a checkmark next to the word
7    "documentation".  What does that checkmark
8    indicate?  I just don't understand how to
9    interpret it.
10       A.  It refers to the neuro checks that were
11   written in the physician's orders and then not
12   written in the progress notes.
13       Q.  I think you said that backwards,
14   actually.  Did you mean that the PA had said there
15   were supposed to be neuro checks and there was no
16   order written?
17       A.  Right, correct.  You are correct.
18       Q.  So, when you checked the box
19   "documentation" there, you are indicating that one
20   of the reasons there was an unfortunate tragic
21   event for Mr. Green was because this documentation
22   wasn't handled according to Corizon standards, is
23   that correct?
24       A.  No.  When we review these cases, it can
25   be documentation anywhere as a part of

**Tonya Mooningham**

Page 37

1  opportunities for improvement.  It may not be
2  directly related to the event.
3       Q.  In this case --
4       A.  But in this case --
5       Q.  Go ahead.
6       A.  -- it is.  In this case, the neuro checks
7  should have been followed.
8       Q.  Well, to put this in kind of everyday
9  English, and correct me if I misstate this, if my
10 statement isn't right, I want you to tell me.
11      What I'm interpreting you telling me is
12 that when you checked the box "documentation", it
13 was your opinion back at the time that the failure
14 to put the neurological check order into the order
15 pages of the chart was a contributing factor to
16 the tragic outcome?
17      A.  I know it should have been done.  I don't
18 know that it, what level of contribution it
19 played.
20      Q.  All right.  Then the third column you put
21 a check for system defects and supplies and
22 equipment.  I take it that refers to the failure
23 to have a backboard?
24      A.  Yes.
25      Q.  So, did you determine at the time that

Page 38

1  you did this work as to whose responsibility it
2  was to see that there was a backboard available
3  for the medical staff at the jail?
4       A.  No.  The CAP includes that action, which
5  is the site's responsibility.
6       Q.  Now, when you filled out this area of the
7  review form, this best judgment of why, did you
8  have an opinion as to the point in time that
9  Mr. Green suffered his spinal cord injury?
10      A.  I don't understand the question.
11      Q.  Sure.  So, when you were filling this
12 form out, what was your understanding as to when
13 Mr. Green injured his spinal cord?
14      A.  In the courtroom.
15      Q.  And did you have an opinion as to whether
16 he had suffered a serious injury to his spinal
17 cord in the courtroom?
18      A.  Retrospectively, he obviously did, which
19 is the time of this review.  But the provider
20 assessing the patient, she, I wouldn't have chosen
21 a reckless behavior choice for her.  I now would
22 choose a mistake because it wasn't intentional and
23 her exam findings didn't warrant the C collar.
24      Q.  Well, at the time when you checked
25 "reckless behavior" for PA White, what was the

Page 39

1  reckless behavior that was in your head when you
2  checked that box back in May of 2013?
3       A.  Well, I made a mistake and it was an
4  error, and I was mainly looking at the outcome
5  rather than the assessment.  And I wasn't familiar
6  at that time with the just culture tool that we
7  have in place that defines these categories.  I
8  didn't know what these categories even meant.
9       Q.  So you filled this without really even
10 understanding how the form was to be interpreted?
11      A.  Right.
12      Q.  So, I want to ask this question again
13 because I'm not sure that we are communicating on
14 this.  I want to know back at the time -- I
15 understand you have got a different viewpoint
16 now -- but back at the time when you checked the
17 box "reckless behavior", what reckless behavior
18 were you thinking about?  What was it that you
19 thought PA White did that was reckless?
20      A.  You know, at the time I thought that he
21 should have been sent to the ER immediately and I
22 thought that the facility should have had a C
23 collar.
24      Q.  Okay.
25      A.  But I didn't know the exam findings.

Page 40

1       Q.  Why didn't you know the exam findings?
2       A.  Because I was looking at it
3  retrospectively rather than in the practitioner, I
4  wasn't considering her role.  I was looking at the
5  outcome more than the findings.
6       Q.  So, take a look at page 3382 -- no,
7  excuse me.  Thirty-three -- I'm sorry, that's the
8  wrong page.  No, that's the right page, 3382.  So,
9  you will see the lower half of that page is the
10 chart note that PA White prepared, allegedly
11 immediately after the events in the courtroom.
12 And her note begins on page 3382 and continues on
13 to page 3383.  Now, you had these two pages
14 available to you in May of 2013, when you filled
15 this review form out, is that correct?
16      A.  Yes.  Yes, I did.
17      Q.  And in this form, she claims that she
18 cleared him neurologically, so I don't understand
19 what you told me a minute ago that you didn't
20 understand what she had done or what she claimed
21 to have done back when you filled this form out.
22      A.  Well, I didn't understand the definition
23 of the term I checked, this reckless behavior
24 choice, I didn't realize that legally it means
25 intentional behavior, and I don't believe it was

**Tonya Mooningham**

12 (Pages 45 to 48)

Page 45

1  Q. And were you aware that she suspected
2  that there was a possible closed-head injury?
3  A. Yes.
4  Q. And so she intentionally didn't send
5  Mr. White to the emergency room at the hospital
6  and she intentionally didn't order any imaging,
7  isn't that what you meant when you checked the box
8  "reckless behavior"?
9  A. No.
10  Q. That's not what you meant. What did you
11  mean when you checked that box?
12  A. Well, I don't remember exactly, but it
13  can mean, it could mean her, that her conclusion
14  of her diagnosis was inappropriate, it was not the
15  right conclusion as we know now. It can mean
16  another human behavior, could be the fact that the
17  site didn't have the proper equipment ready and
18  available for situations like this.
19  Q. Let's go down to the next box on your
20  form on page 3372, the risk management analysis
21  box. So, you checked "delay failure in
22  treatment." What did you mean by that?
23  A. The appropriate treatment, meaning in
24  relationship to the outcome, the patient obviously
25  didn't get, retrospectively didn't get the right

Page 46

1  treatment according to the correct diagnosis, he
2  was misdiagnosed.
3  Q. And did you think at the time that that
4  misdiagnosis was a violation of the applicable
5  standard of care for a physician assistant who is
6  treating a person who has just run headfirst into
7  a concrete wall?
8     MR. COLEMAN: I'm going to object to the
9  question. Instruct you not to answer. There is
10  no foundation for the concept that she would have
11  any idea what the standard of care is for a
12  physician's assistant in Oregon.
13     MR. ROSENTHAL: All right. I would
14  request, Mr. Coleman, that you not make speaking
15  objections. If you are going to object and
16  instruct your witness not to answer, that's fine.
17  But I don't think it's appropriate for you to make
18  a speaking objection like that.
19  BY MR. ROSENTHAL:
20  Q. Now, Ms. Mooningham, in your prior
21  employment, were you asked to determine whether or
22  not medical providers had acted negligently?
23  A. Yes.
24  Q. And was that one of the things that you
25  were asked to do at Corizon?

Page 47

1  A. Yes.
2  Q. So, did you, back in 2013, conclude that
3  PA White had acted negligently?
4  A. I think the patient was misdiagnosed. It
5  wasn't negligence.
6  Q. What is the difference between
7  misdiagnosis as you are using the phrase and
8  negligence as you are using the phrase?
9  A. Well, misdiagnosis happens in healthcare.
10  You know, it is unfortunate, but we go through the
11  course of right assessments that we were supposed
12  to do and we don't catch some things sometimes.
13  Q. So, when you checked the box "delay
14  failure in treatment", what you are telling me is
15  at the time what you were thinking was there was a
16  mistake made but it was not negligent, is that
17  correct?
18  A. Correct.
19  Q. So, the next box that you checked was
20  "failure to follow up". What does that refer to?
21  A. I don't remember specifically. I would
22  think just with maybe the neuro checks -- I don't
23  remember specifically why I checked that box.
24  Q. Well, in this case, PA White had written
25  in the chart that there was supposed to be

Page 48

1  neurological checks every one or two hours, but
2  there were no follow-up neurological checks
3  performed. So, is that what you were referring to
4  by failure to follow up?
5  A. Yes.
6  Q. Now, take a look at page 3367. Now, if
7  you will look at the entry at, it says,
8  "approximately 11:47", do you see that?
9  A. Yes.
10  Q. I'm going to read it. It says, "deputy
11  log indicates patient had not moved. Reported to
12  medical. Medical, paren, nurse, question mark,
13  not documented, close paren, asked if Green was
14  breathing. When told he was breathing, nursing
15  informed they would check on Green later in the
16  day, close quote.
17     Then there is an entry right below that
18  at 13:45, that says, quote, deputy log indicated
19  deputy again informed medical, patient had not
20  moved positions close quote. Did you find -- did
21  you believe when you did your review that those
22  two notes by Dr. Montoya were accurate?
23  A. I don't know --
24  Q. Well --
25  A. -- if they are accurate.

**Page 53**

1    A.  I don't know that this page was referred
2  to in the, the Sentinel Event Committee CAP is a,
3  can be different than the site's CAPs.  Doesn't
4  mean that they are not following them.
5    Q.  Where do I find the Sentinel committee's
6  CAPs?
7    A.  You are looking at it.  The case analysis
8  on the Sentinel Event Committee form, it says,
9  "see list for entire CAP."  So, I would take that
10 to mean that it's all-inclusive.
11   Q.  So, let me ask you a procedure question.
12      After you filled out this form, what
13 happened to it?  After you filled out your
14 two-page form, after Dr. Haggard approved it, what
15 happened to it?
16      MR. COLEMAN:  Objection, compound.  You
17 can answer.
18      THE WITNESS:  Okay.  Well, I take the
19 form with -- after I fill it out, I take it to the
20 Sentinel Event Committee and I present the case
21 and we review it and we decide on the category.
22 And after that, well, it's done after that.
23 BY MR. ROSENTHAL:
24   Q.  Well, does the Sentinel Event Committee
25 approve your form, or is your form simply

**Page 54**

1  information for discussion?
2    A.  It's just information for discussion.
3  They receive a copy of it to approve.
4    Q.  So did the Sentinel Event Review
5  Committee approve your form?
6    A.  No.  It's just used for presentation
7  purposes.
8    Q.  So, does the Sentinel Event Review
9  Committee then prepare any kind of a document
10 regarding what its conclusions are?
11   A.  No.
12   Q.  So, I want to understand what happens at
13 the Sentinel Event Review Committee after you make
14 your presentation.  Is there a discussion?
15   A.  Yes, there is discussion.
16   Q.  And is there a vote on anything?
17   A.  I don't know that it's a vote.  We just
18 discuss the category level, that is it.
19   Q.  What do you mean by "category level"?
20   A.  I guess you could say vote.  On the form
21 it says "cat".  This was rated a category four.
22   Q.  What form are you looking at, what page?
23   A.  3372.
24   Q.  Okay.
25   A.  So, I present the case, we discuss the

**Page 55**

1  case, and then we give it a rate, we agree.
2    Q.  And so, your committee concluded it was a
3  four?
4    A.  Correct.
5    Q.  What does four mean?
6    A.  It just means that the care that was
7  rendered contributed to the event.
8    Q.  What do you mean by "contributed to the
9  event"?  Do you mean contributed to the injury?
10   A.  It can.
11   Q.  Well, is that --
12   A.  Yes.
13   Q.  Was that the conclusion of the committee
14 in this case?
15   A.  It was just rated as a severity level
16 four because the patient suffered injuries that
17 led to his outcome, and there was a delay in
18 transferring him.
19   Q.  So, the committee concluded it was a
20 category four after hearing your presentation.
21 Did the committee make any other decisions after
22 hearing your presentation?
23   A.  No.
24   Q.  Did all the committee members actually
25 see your form or at least have the opportunity to

**Page 56**

1  see it?
2    A.  No.  No.
3    Q.  Who sees the --
4    A.  That's not part of the process.
5    Q.  Who sees your form other than
6  Dr. Haggard?
7       MR. COLEMAN:  Asked and answered.  You
8  can answer again.
9       THE WITNESS:  No one.  At this point in
10 time, you know, no one.  I review it.  That's it.
11 BY MR. ROSENTHAL:
12   Q.  So, what you do is you make an oral
13 presentation but you don't give the committee the
14 form to look at, is that what you are telling me?
15   A.  That's correct.
16   Q.  And do the committee members have an
17 opportunity to ask you questions if they want to?
18   A.  Yes.
19   Q.  Now, do you -- did you make a
20 recommendation to the committee about whether
21 corrective action should be taken?
22   A.  Yes.
23   Q.  What did you recommend to the committee?
24   A.  The CAP as you see it on this form.
25   Q.  So, you recommended that a cervical

**Tonya Mooningham**

15 (Pages 57 to 60)

Page 57

1    collar and spine board be obtained by the Lane
2    County Jail, correct?
3       A.   Yes.
4       Q.   And did you, so the next sentence is you
5    wrote, quote, order for neuro checks not written
6    in the physician orders, only written in the
7    progress notes, close quote.  What is your
8    corrective action that you recommended?
9       A.   I didn't really specify what they had to
10   do about it but it's just pointing it out, these
11   are the errors and these are the corrective
12   actions you need to come up with.
13      Q.   So, what corrective action did the
14   committee come up with for this problem of
15   neurological checks not written in the physician
16   orders?
17      A.   I'm not sure.  Typically it involves
18   training and education for something like that.
19      Q.   So does the --
20      A.   And audit.
21      Q.   So, does the committee anywhere write
22   down that they want a corrective action of
23   additional training on this issue?
24      A.   Here it is on, it's covered under "doctor
25   orders summary".

Page 58

1       Q.   What page are you looking at, ma'am?
2       A.   3366.
3       Q.   So this is Dr. Orr's recommendation.  So,
4    did the committee adopt Dr. Orr's recommendation?
5       A.   Yes.
6       Q.   How do you know that?
7       A.   Well, because it says, "see list for
8    entire CAP."  I'm taking that is what that means.
9       Q.   So, are the three CAPs that were
10   recommended by the Patient Safety Committee the
11   three CAPs listed by Dr. Orr?
12      A.   It appears that they are.
13      Q.   Now, there is nothing in those
14   recommendations about imaging someone before they
15   are released by medical.  In these three CAP
16   recommendations, there is nothing about imaging,
17   is there?
18      A.   No, there isn't.
19      Q.   So, did the committee have a corrective
20   action plan relating to the failure of PA White to
21   have any imaging done before releasing him?
22      A.   No.
23      Q.   Now, after -- here's a question.  Did you
24   know when you did your work as to whether or not
25   there was x-ray equipment available at the Lane

Page 59

1    County Jail?
2       A.   No, I didn't know.
3       Q.   Going back to your form, 3372, the last
4    thing on there is a checkmark by the box of A.
5    What does that mean?
6       A.   I can't, it's just a severity level but I
7    can't give you specifics about it without having
8    it in front of me to tell you what it is.
9       Q.   Is A more severe than B or C?
10      A.   Yes.
11      Q.   So, you checked the most severe severity
12   rating?
13      A.   Yes.
14      Q.   Now, after the Patient Safety Committee
15   has a discussion about your report -- well,
16   actually, let me rephrase that.  Take a look at
17   page 3369.
18      A.   Okay.
19      Q.   So, when is this form filled out?
20      A.   This is a feedback form after the
21   Sentinel Event Committee renders a decision with
22   the category, this is sent to the site to give
23   them feedback about the outcome of the committee.
24      Q.   So, did you fill this out?
25      A.   I don't think -- I don't know.  At that

Page 60

1    time I wasn't completing these, this part.
2       Q.   So, who would have done this,
3    Dr. Haggard?
4       A.   Yes.
5       Q.   So, I just want to be sure I understand
6    the process.  The file came to you, you did the
7    review, you went to the committee, you gave an
8    oral report to the committee, the committee
9    accepted your oral report, and then did this form
10   get sent to the site?
11      A.   Yes.
12      Q.   Is there any other follow-up that your
13   committee performed in this case?
14      A.   No.
15      Q.   So, how does your committee know whether
16   the corrective action plan was followed?
17      A.   We do not.
18      Q.   I want to go back to your form now for a
19   minute.  And again, I want to look at page 33 --
20   it's the second page, 3372.  Now, I know that you
21   disagree with what you wrote now, I understand
22   that.  I'm not forgetting that, but I'm trying to
23   go back in time to May of 2013.  Did you make an
24   effort to determine why PA White made the mistakes
25   that she made?

**Tonya Mooningham**

16 (Pages 61 to 64)

Page 61

1  A. No.
2  Q. Isn't that part of the Corizon policies
3  and procedures, that you are supposed to determine
4  why a mistake was made so that you can fix it in
5  the future?
6  A. Yes, it is. This is one of my first
7  cases.
8  Q. Well, did the committee try to determine
9  why the mistakes were made?
10 A. Not that I recall.
11 Q. Now, the committee, it wasn't one of the
12 first cases for the committee, was it?
13 A. No.
14 Q. The committee had been in existence for
15 years, am I correct?
16 A. Yes.
17 Q. So, the committee members knew that part
18 of their responsibility was to determine why a
19 mistake was made, isn't that correct?
20 A. Yes.
21 Q. But there was no discussion of that at
22 all, is that correct?
23 A. There was discussion about it. It's not
24 represented in this form.
25 Q. Well, tell me what you remember about the

Page 62

1  discussion.
2  A. The biggest thing was the lack of the C
3  collar. That's what I remember.
4  Q. So, was there any discussion about PA
5  White's decision to not send Mr. Green immediately
6  to the emergency room?
7  A. I don't know.
8  Q. Prior to the time I asked for your, to be
9  able to interview like this, to take your
10 deposition, did you know that Mr. Green died from
11 the complications of his spinal cord injury?
12 A. No.
13 Q. Other than conversations you have had
14 with lawyers, and I don't want you to tell me
15 about those, but other than conversations that you
16 had with lawyers, did you know, was there any
17 conversation you had about this case after the
18 Sentinel Event Committee met and before this
19 deposition occurred?
20    MR. COLEMAN: I'm just going to instruct
21 you that that would include somebody in the PLI
22 internally, for example, Mr. Aaron.
23    THE WITNESS: Right. I don't recall
24 anyone telling me that he died, no.
25 BY MR. ROSENTHAL:

Page 63

1  Q. But my question is, is broader than that.
2  Other than any conversations you have had
3  with lawyers or legal staff, have you talked with
4  anybody, any medical people, any nursing people,
5  any administrative people at Corizon since the
6  Sentinel Event Committee Meeting?
7  A. No, I have not.
8     MR. ROSENTHAL: Well, I'm just about
9  done. What I would like to do, even though we
10 don't have a technical problem, now I'm going to
11 ask to take a short break and consult with my
12 partner and then we can wrap this up. We are just
13 about done. We will go off the record for a few
14 minutes now. Okay?
15    THE WITNESS: Okay.
16    (A short recess is taken.)
17 BY MR. ROSENTHAL:
18 Q. I want to ask some questions to wrap this
19 up now. Okay? Can you hear me all right?
20 A. Okay.
21    MR. ROSENTHAL: Are you there, Mr. Tapia?
22    MR. TAPIA: Yes.
23 BY MR. ROSENTHAL:
24 Q. So, I'm going to ask you some questions.
25 It's a bit of going back a little bit, but I want

Page 64

1  to summarize where we are and make sure I
2  understand it.
3     So, after the site medical director and
4  the regional director prepare their reports, they
5  send that in to the Patient Safety Committee along
6  with the medical chart and it's given to you to
7  review, is that correct?
8  A. Yes, that's correct.
9  Q. And when you did your review, it was your
10 first review, so Dr. Haggard was supervising you,
11 correct?
12 A. Yes, correct.
13 Q. And at the time Dr. Haggard was the chief
14 patient safety officer at Corizon, is that
15 correct?
16 A. Correct.
17 Q. And --
18 A. I don't know if that's her title.
19 Q. But in terms of --
20 A. Patient safety officer, that's her title.
21 Q. Okay. And then after you did your
22 review, you went over it with Dr. Haggard and she
23 okayed it, correct?
24 A. Correct.
25 Q. Then you went to the full Patient Safety

**Tonya Mooningham**

17 (Pages 65 to 68)

Page 65

1   Committee, but you didn't give them your report in
2   writing, you gave it orally, correct?
3       A.  Correct.
4       Q.  Did you give them any other documents to
5   look at?  In other words, did they have the
6   medical chart?
7       A.  No, they did not.
8       Q.  So, when the patient safety --
9       A.  It's not a practice.
10      Q.  So, when the Patient Safety Committee
11  met, the entire process was an oral process?
12      A.  Yes.
13      Q.  Okay.  And when you made your report to
14  the Patient Safety Committee, did you go through
15  everything that is in your two-page review form?
16      A.  Yes.
17      Q.  And did you tell the Patient Safety
18  Committee that you had concluded that PA White had
19  acted recklessly?
20      A.  No, I did not.
21      Q.  Well, did you -- this box that we talked
22  about, reckless behavior, did you tell the
23  committee that, that PA White had, her actions
24  were reckless behavior?
25      A.  No, I did not.

Page 66

1       Q.  Why didn't you?
2       A.  Because I don't go over everything on the
3   form.  I just go through my narratives and the
4   corrective action.
5       Q.  So, who, other than Dr. Haggard, knew
6   that you had concluded that there was reckless
7   behavior?
8       A.  No one.
9       Q.  So, what is the purpose of filling this
10  out?
11      A.  I don't know.
12      Q.  And there was no effort made at the
13  committee to determine why PA White made the
14  mistakes that she made, correct?
15      A.  I don't remember in-depth analysis of
16  that, no.
17      Q.  Do you know why the Patient Safety
18  Committee isn't given a copy of your review form
19  to look at while you are giving your verbal
20  report?
21      A.  It's not a part of our practice, I don't
22  know why.
23      Q.  Don't you think it would be a good idea?
24      A.  I don't know.
25      Q.  And why wasn't the Patient Safety

Page 67

1   Committee given a chance to look at the patient
2   charts?
3       A.  It's not a practice.  I don't know why
4   they don't.  Each reviewer is tasked with doing
5   it.
6       Q.  All right.  Then, after the Patient
7   Safety Committee listens to your report and
8   approves it, then the only documentation is that,
9   that one page that we looked at together, page
10  3369, correct, the Sentinel Event Review Committee
11  feedback form?
12      A.  Yes.  What about it?
13      Q.  That's the only piece of paper that is
14  generated -- we froze up again, but I'm going to
15  keep going verbally.
16          Oh, it came back.
17          My question is, this piece of paper,
18  3369, this is the only piece of paper that is
19  generated by the Patient Safety Committee after
20  they approve your oral report, is that correct?
21      A.  That's correct.
22      Q.  And to your knowledge, somebody sends
23  this document, 3369, to the site, correct?
24      A.  Correct.
25      Q.  Who does it go to at the site?  Does it

Page 68

1   go to the site medical director or the HSA?  Who
2   does it go to?
3       A.  I'm not sure.
4       Q.  And the committee does not do any
5   follow-up to see whether the corrective actions
6   are taken, is that correct?
7       A.  That's correct.  It's the site's
8   responsibility.
9       Q.  Is the Sentinel Event Committee the same
10  thing as the Patient Safety Committee?
11      A.  I don't know if it technically is or not,
12  but it's a part of it.
13      Q.  Which committee is it that you give your
14  report to?
15      A.  The Sentinel Event Committee.
16      Q.  Is there a separate committee called the
17  Patient Safety Committee?
18      A.  There is not.
19      Q.  So, when I have --
20      A.  Not to my knowledge.
21      Q.  So, in our discussion today, whenever I
22  said Patient Safety Committee, you just assumed I
23  meant the Sentinel Event Committee?
24      A.  That's correct.
25      Q.  All right.  Has there been any change in