*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

*Jacob Pleich*
*January 28, 2014*



*Orignal File PleichJacob.txt*
*Min-U-Script® with Word Index*

Exhibit 30 - Page 1 of 15
Dec'l of JTD

Case 6:13-cv-01855-TC   Document 91-30   Filed 02/17/15   Page 2 of 15

Kelly Conrad Green II v                                              Jacob Pleich
Corizon Health, Inc., et al.                                   January 28, 2014

Page 3

```
            UNITED STATES DISTRICT COURT
                  DISTRICT OF OREGON
                    EUGENE DIVISION

KELLY CONRAD GREEN II, an      )
individual, by and through his )
guardian ad litem Derek        )
Johnson,                       )
         Plaintiff,            )
    v.                         ) No.6:13CV01855-TC
CORIZON HEALTH, INC., a        )
Tennessee Corporation; et al., )
         Defendants.           )


            DEPOSITION OF JACOB PLEICH
                 January 28th, 2014
                      Tuesday
                     9:38 A.M.
      THE VIDEOTAPED DEPOSITION OF JACOB PLEICH
was taken at CC Reporting & Videoconferencing, 172
East 8th Avenue, Eugene, Oregon, before Deborah M.
Bonds, CSR-RPR, Certified Shorthand Reporter in and
for the State of Oregon.
```

(continued)

for Defendant Lane County and employees:

    LANE COUNTY OFFICE OF LEGAL COUNSEL

    125 East Eighth Avenue

    Eugene, Oregon 97401

    541/682-3728

    BY: SEBASTIAN NEWTON-TAPIA

    sebastian.newton-tapia2@co.lane.or.us


Also Present:

    BEN BOCHNER, VERBATIM VIDEO


Reported by:

    DEBORAH M. BONDS, CSR-RPR

    CC REPORTING & VIDEOCONFERENCING

    EUGENE         541/485-0111

Page 2

APPEARANCES

For the Plaintiff:

    ROSENTHAL GREENE & DEVLIN PC

    121 SW Salmon Street, Suite 1090

    Portland Oregon 97204

    503/228-3015

    BY:  ELDEN M. ROSENTHAL

    elden@rgdpdx.com

    BY:  JOHN THOMAS DEVLIN

    john@rgdpdx.com


For Defendant Corizon Health and employees:

    STEWART SOKOL & GRAY LLC

    2300 SW First Avenue, Suite 200

    Portland, Oregon 97201

    503/221-0699

    BY: JAMES M. DAIGLE

    Jmdaigle@lawssg.com

(continued)

Page 4

INDEX

| WITNESS | | PAGE |
|---|---|---|
| JACOB PLEICH | | |
|     BY MR. ROSENTHAL | | 6 |

| EXHIBITS | | | PAGE |
|---|---|---|---|
| No. 5  | LCAC initial assessment instrument | | 55 |
| No. 10 | Intake receiving and screening | | 114 |
| No. 11 | Mental health progress note | | 114 |
| No. 12 | Mental health progress note | | 114 |
| No. 13 | Corizon rejection criteria | | 53 |
| No. 17 | Photographs | | 108 |
| No. 18 | Burnette memo | | 96 |
| No. 53 | Corizon intake and receiving screening | | 61 |
| No. 58 | Corizon METS suicide watch status form | | 98 |
| No. 59 | Suicide precaution form | | 129 |
| No. 60 | Director's hold | | 122 |

| EXHIBITS | | | MARKED |
|---|---|---|---|
| No. 62 | Western State Hospital records | | 9 |
| No. 63 | Pleich Corizon application | | 20 |
| No. 64 | Mental health professional position description | | 31 |

(continued)

### Page 17

1  Q. What type of political things?
2  A. A lot of in-fighting and backstabbing and
3  things of that nature. I was just there to try to
4  take care of my patients, and there was a lot of
5  kind of jockeying for leadership positions, things
6  of that nature.
7  Q. You left there in 2011?
8  A. Correct. December 2011.
9  Q. So what was your next job?
10 A. I was actually unemployed for six months.
11 During that time I was actually pursuing and
12 training towards becoming a pharmaceutical sales
13 representative because I had lots of interactions
14 with drug reps that came into our facility to talk
15 about new medications for our patients. And at the
16 time I thought that that might be a way to provide
17 better for my family, so I was doing lots of job
18 interviewing, job shadowing, training with folks
19 that had done it for years and years.
20      And I also -- for three of those months I
21 was working with my father who was -- who is a
22 contractor building a new building in Tangent,
23 Oregon, which was a federal agriculture building.
24 Q. Did you voluntarily leave South Lane or
25 were you terminated?

### Page 18

1  A. I was terminated.
2  Q. And what was the reason given for your
3  termination?
4  A. The reason was that they didn't feel like
5  I was a good fit anymore.
6  Q. What does that mean, not a good fit?
7  A. They felt like I had certain personality
8  attributes that were not conducive to the position
9  anymore.
10 Q. What attributes are those?
11 A. They felt like I was too opinionated.
12 There were things that they said that were very
13 inflammatory that I never really agreed with.
14 Q. Like what?
15 A. They said that I was condescending. They
16 said that I was arrogant. And this was just coming
17 from two supervisors that really didn't interact
18 with me hardly ever but because of my supervisor not
19 really liking me, that was what was basically passed
20 along to them.
21 Q. Who were those supervisors, please?
22 A. My immediate supervisor, his name was
23 Andrew Buck, B-u-c-k.
24 Q. To your knowledge, is Mr. Buck still at
25 South Lane?

### Page 19

1  A. I have no idea.
2  Q. And who was the other supervisor who made
3  the inflammatory statements?
4  A. Oh, man. I'm trying to remember her name.
5  The executive director's name was Tom Wheeler. I
6  remember him, but I don't remember the other
7  supervisor's name.
8  Q. Tom Wheeler?
9  A. Uh-huh.
10 Q. And did he ask you to leave?
11 A. He did.
12 Q. And is he still there, to your knowledge?
13 A. I believe so.
14 Q. Did you discuss any of this with Corizon
15 before going to work for Corizon?
16 A. Yes.
17 Q. Who did you talk to about this?
18 A. The folks that interviewed me and offered
19 me the job.
20 Q. Do you remember who that was?
21 A. That would be Jeremy Legg, who is no
22 longer with Corizon.
23 Q. Where is he now?
24 A. I don't -- I don't know.
25 Q. Do you know why he's no longer with

### Page 20

1  Corizon?
2  A. He lives in Tennessee and was always on
3  the road. And from what I've heard, he chose to go
4  elsewhere to be closer to his family, his wife and
5  young children.
6  Q. Okay. So at some point in time you were
7  interviewed by Mr. Legg before you were offered the
8  job?
9  A. Absolutely.
10 Q. Is he -- is he the person who actually
11 offered you the job?
12 A. Yes.
13 Q. Okay. Do you remember, did anybody else
14 interview you?
15 A. Another gentleman named Stevens. Why
16 can't I remember his last name? Stevens Hyppolite.
17 There we go. Just popped in my head.
18 Q. And what was his position in the company,
19 do you know?
20 A. He was the regional manager, I believe,
21 and then Jeremy was his immediate supervisor. So
22 Stevens was filling in as the role of my supervisor
23 for several months until they could find an actual
24 supervisor at Corizon where I work currently.
25      (Deposition Exhibit No. 63

Page 25

1 judge actually that I interacted with in the jail
2 and asked me to be a part of this kind of team that
3 she was putting together. And Corizon paid me to be
4 a part of those meetings.
5  Q.  So that happened after you started work?
6  A.  Yes.
7  Q.  So let me see if I can put that in a
8 sentence that I'm comfortable with. If I'm wrong in
9 any implication, please tell me.
10  A.  Sure.
11  Q.  After you went to work for Corizon,
12 Corizon asked you to be a part of a task force that
13 was being organized by a Lane County judge to look
14 into the issue of mentally ill folks being housed in
15 the jail?
16  A.  The last part of that would be true. I
17 would say that Corizon didn't ask me to be a part of
18 the task force. Corizon encouraged my
19 participation. I asked -- the judge asked me to be
20 a part of the team.
21  Q.  Okay.
22  A.  And Corizon endorsed that. They paid for
23 me to be part of those meetings for one hour a
24 month.
25  Q.  And what was the name -- what's the

Page 26

1 judge's name?
2  A.  Judge Mary Mora.
3  Q.  M-o-r-a?
4  A.  I believe so.
5  Q.  And is she a circuit court judge?
6  A.  She's a municipal court -- Eugene
7 Municipal Court judge. She was --
8  Q.  What was the name of the task force?
9  A.  It just became the Mental Health Summit.
10 It was just a -- they called it a summit that would
11 meet once a month that involved different agencies,
12 Lane County Mental Health, local law enforcements,
13 community-based shelters, different mental health
14 agencies within the -- within the area.
15  Q.  When did it start, approximately?
16  A.  Oh, boy. I couldn't say with certainty.
17 It's been over a year though.
18  Q.  Did it start after Mr. Green was injured,
19 after February of 2013?
20  A.  I don't remember exactly.
21  Q.  Has any report or findings been issued by
22 your task force?
23  A.  Well, they did just receive a $500,000
24 grant to do a jail diversion program.
25  Q.  The task force did?

Page 27

1  A.  Uh-huh.
2  Q.  And are you involved in this diversion
3 program?
4  A.  Not at this point.
5  Q.  So but has a report of any sort been
6 issued or findings or any kind of public document?
7  A.  I'm not aware of it yet.
8  Q.  Okay. Does anybody take minutes at these
9 meetings?
10  A.  They do.
11  Q.  And do you know who it is that takes the
12 minutes?
13  A.  I don't.
14  Q.  And is the chairman of the -- of the task
15 force the judge?
16  A.  No.
17  Q.  Who is the chairman?
18  A.  Katharine Schneider, who is the director
19 of Lane County Mental Health.
20  Q.  All right. Going back now to the
21 beginning again --
22  A.  Sure.
23  Q.  -- when did you get offered the position
24 at Corizon?
25  A.  I believe it would have been around the

Page 28

1 22nd of June 2012 because I know my first day was
2 the 29th of June 2012 --
3  Q.  Okay.
4  A.  -- which was the first day.
5  Q.  And what was your starting pay?
6  A.  $25 an hour.
7  Q.  Were any promises made to you regarding
8 raises or bonuses or extra pay that you would be
9 able to earn?
10  A.  They did say that if Corizon became -- or
11 if overtime became necessary, that that would be
12 something that obviously had to be approved, but
13 that they would pay for, and that Corizon had step
14 -- certain step advancements that I could expect.
15  Q.  When you started work at Corizon, was it
16 full time or part time?
17  A.  Full time.
18  Q.  And did you consider yourself an employee
19 of Corizon?
20  A.  Absolutely.
21  Q.  Did you have any kind of employment
22 agreement with Corizon that was in writing?
23  A.  I believe so.
24      MR. ROSENTHAL: (To Mr. Devlin) Have
25 we seen anything like that?

Page 37

1  clinic, doing the initial interviews, gathering
2  medical records pertinent to diagnoses, medication
3  history, those types of things, and then reviewing
4  those patients with him before he saw them in the
5  clinic.
6    Q.  Has that changed, that relationship?
7    A.  It has changed. Andrea is now responsible
8  for the clinic.
9    Q.  Okay. Say his name again.
10   A.  Victor Richenstein.
11   Q.  Richenstein. So in February of 2013, how
12 many hours a week would Dr. Richenstein come into
13 the jail?
14   A.  I'm sorry. I answered that currently.
15 Currently Dr. Richenstein is our psychiatrist. In
16 February of 2013 Dr. Wendy, W-e-n-d-y, Saville,
17 S-a-v-i-l-l-e -- I believe -- she was our
18 psychiatrist. And she came in every Monday for four
19 hours.
20   Q.  In your opinion, was that an adequate
21 amount of psychiatric coverage in the jail?
22   A.  No.
23   Q.  What do you base that on?
24   A.  I base that on the high concentration of
25 mentally ill folks we have in our community and also

Page 38

1  the high concentration of mentally ill patients that
2  we serve that come into our jail.
3    Q.  Did you take that matter -- did you
4  discuss your opinion that there was insufficient
5  psychiatric coverage with anyone at Corizon prior to
6  February of 2013?
7    A.  Absolutely.
8    Q.  Who did you talk to?
9    A.  I spoke to the HSAs that we had at the
10 time. I say HSAs plural because we had an
11 additional one.
12   Q.  That was Mr. Dearling or Darling?
13   A.  Yes. David Dearling.
14   Q.  And then he left and Ms. Thomas did it for
15 a while.
16   A.  Correct.
17   Q.  And then Mr. Mishler did it.
18   A.  Correct.
19   Q.  So in February of 2013 Ms. Thomas was the
20 HSA?
21   A.  Correct.
22   Q.  Did you discuss this issue with
23 Ms. Thomas?
24   A.  Absolutely.
25   Q.  And what was her response?

Page 39

1    A.  She was very much in favor of trying to
2  figure out how to increase those hours.
3  Unfortunately, at the time the contractual
4  obligation was only four hours. So she was kind of
5  handcuffed in that regard.
6    Q.  And -- but the previous HSA, Mr. Dearling,
7  did you have a similar conversation --
8    A.  Yes, I did.
9    Q.  -- or conversations?
10   A.  Uh-huh.
11   Q.  And what was his response?
12   A.  He agreed with me, but he was -- to be
13 honest, he was a bit overwhelmed in his position.
14   Q.  Well, why do you say that?
15   A.  Well, he -- he was a nurse, so he was
16 qualified in that sense, but I believe that he had a
17 lot on his plate trying to just understand his
18 position and navigate the staffing issues and things
19 like that. So unfortunately, the mental health
20 piece kind of didn't get as much attention.
21   Q.  Did you do any study or research on jail
22 mental health issues before going to work at
23 Corizon?
24   A.  Yes.
25   Q.  Tell me about that. What did you do to

Page 40

1  prepare yourself?
2    A.  Well, because the majority of my job was
3  going to center around crisis intervention, suicide
4  prevention, those types of things, I did a lot of
5  research around suicide rates, and suicide risk and
6  risk factors, in both prison and jail settings.
7    Q.  Did you take a look at any of the national
8  standards that have been issued regarding mental
9  health care in correctional facilities?
10   A.  I did. And we also have received quite a
11 bit of testing and training around those issues.
12 Corizon does very consistent periodic trainings
13 where all staff have to be trained in suicide
14 prevention and suicide risk factors and such.
15   Q.  Did you -- in your research and in your
16 training, leading up to beginning your work at
17 Corizon in the first few months of your work at
18 Corizon, did you come upon any statistics regarding
19 what the national average is for the number of
20 people -- for the percentage of folks in jail that
21 have serious mental illness, what the ratio is? In
22 other words, is it one out of ten or is it two out
23 of ten?
24   A.  I did. I couldn't say with a hundred
25 percent accuracy what those numbers were, but I do

Page 45

 1  lawyer asked you to do, you could pull out from your
 2  email collection?
 3     A.   If they're still there, yeah.
 4          MR. ROSENTHAL: Could you mark that
 5  spot, please.
 6  BY MR. ROSENTHAL:
 7     Q.   So our conversation about your concerns, I
 8  kind of began it by asking whether you thought there
 9  was sufficient psychiatric coverage. Let me kind of
10  back up. Did you also have concerns that there was
11  insufficient mental health counselor resources? In
12  other words, did you think you had too much to do?
13     A.   I did.
14     Q.   And did you ever try to quantify that in
15  any way? In other words, did you ever say to
16  anybody, you know, "I've got 20 percent too many
17  patients" or "50 percent too many patients,"
18  anything like that?
19     A.   I don't know if I ever quantified it. I
20  do keep statistics. And I do know from having
21  talked to the folks that worked with the County
22  previously in the same position as I, that I was
23  seeing far more patients than them. And I believe
24  that I made that fairly clear to supervisory folks
25  within Corizon. And that's why they started moving

Page 46

 1  finally to help me bring in more mental health
 2  staff.
 3     Q.   Was this a problem that was apparent to
 4  you within a few weeks of starting at Corizon?
 5     A.   Well, the first few weeks of starting at
 6  Corizon, I was just trying to figure out how to do
 7  my job correctly --
 8     Q.   Okay.
 9     A.   -- and what the parameters were.
10     Q.   So let me ask you this: By the end of
11  2012, was it your opinion that you had too many
12  folks to take care of?
13     A.   I believe so.
14     Q.   And when you had these conversation that
15  you've been generally discussing with your HSAs or
16  with Mr. Hyppolite or Mr. Legg, were you talking
17  about your workload as well as the psychiatric piece
18  of it?
19     A.   Yes.
20     Q.   Okay. So if I was going to try to
21  summarize this part of our discussion, from at least
22  the end of 2012, you were having conversations with
23  your supervisors about the amount of resources
24  available for mental health issues in the Lane
25  County Jail.

Page 47

 1     A.   Correct.
 2     Q.   Did you speak with anybody about this
 3  problem who was a Lane County employee as opposed to
 4  a Corizon employee?
 5     A.   I don't believe so. I tried to -- I tried
 6  to honor the relationship that I had with
 7  supervisory staff and not draw them into politics.
 8     Q.   And you said you had talked with people
 9  that had your position prior to Corizon --
10     A.   Uh-huh.
11     Q.   -- having the contract. Who was that that
12  you talked to?
13     A.   I had a couple conversations with Richard
14  Klotz.
15     Q.   K or C? How do you spell it?
16     A.   Klotz K-l-o-t-z, I believe.
17     Q.   And is he a master's mental health
18  professional like yourself?
19     A.   Correct.
20     Q.   And he had a similar job when --
21     A.   He had the same exact job.
22     Q.   And had he -- to your knowledge, did he
23  want to stay on when Corizon --
24     A.   They offered him the position and he
25  respectfully turned it down.

Page 48

 1     Q.   Did he tell you why he turned it down?
 2     A.   Because he wanted to continue with his
 3  county benefits and so he went over to Lane County
 4  Mental Health.
 5     Q.   Let me ask you this: Are there any fringe
 6  benefits with Corizon? Do they -- what fringe
 7  benefits do you get as a Corizon employee?
 8     A.   I get health and dental and vision. I am
 9  a pretty healthy guy so I don't utilize those a lot,
10  but it's nice to know that I only have copayments
11  instead of having them come out of pocket for basic
12  things or if there's an emergency. Other than that,
13  it's the paid time off and honestly just job
14  security, knowing that I have a -- I have a job.
15     Q.   And is there a retirement plan?
16     A.   There is. I don't participate in it
17  because I, frankly, can't afford to.
18     Q.   In other words, would it come out of your
19  salary?
20     A.   Correct.
21     Q.   Okay. So Mr. Klotz felt that he -- it was
22  better financially for him to stay with the County?
23     A.   Correct.
24     Q.   So but you talked with Mr. Klotz about
25  staffing issues?

Page 49

1  A.  I -- I asked him generic questions about
2  how many people he would see when he was doing his
3  job.
4  Q.  And how many people was he seeing?
5  A.  He said he would see about five or six a
6  day.
7  Q.  And how many were you expected to see?
8  A.  There wasn't an expectation other than
9  what I placed on myself, but I was seeing, on
10 average, 10 to 12 people a day.
11 Q.  Did you work overtime?
12 A.  Sometimes, yes.
13 Q.  Did Corizon -- did you have to get
14 preapproval to work overtime?
15 A.  At the time, no.
16 Q.  So how often -- in early 2013, January,
17 February 2013, how much overtime were you working?
18 A.  During the regular week, I would maybe
19 work only an hour or two.  If I received a phone
20 call, and I was on call and had to come into the
21 jail, then it would be an extra hour or two to come
22 in and deal with a situation.
23 Q.  I want to switch topics with you now and
24 talk generally about intake mental health screening.
25 A.  Sure.

Page 50

1  Q.  What was your general -- well, I guess
2  "general" isn't the right word.
3       What was your understanding in January,
4  February of 2013 as to whether or not there would be
5  any intake mental health screening?
6  A.  I think the answer to it as concisely as
7  possible, the intake screening on a mental health
8  basis was after the medical screened the patient.
9  So if I could just take you briefly through the
10 process, folks come into prebook, which is usually
11 where the arresting officer brings them in and talks
12 about their charges.
13      If there's a medical emergency or if
14 there's some kind of outstanding medical issue,
15 before they're actually brought into booking, which
16 then they became the County's inmate at that point,
17 medical staff is notified and they come out to
18 prebook to either clear them medically or to send
19 them to the hospital to get cleared and then come
20 back to our facility.
21 Q.  All right.  Let me stop you for a
22 second --
23 A.  Yeah.
24 Q.  Because I want to -- I'm going to lose my
25 train of thought here.  Just give me a second.  I'm

Page 51

1  writing a note to myself.
2       So is what you've just described the
3  process whereby somebody might be refused entry into
4  the jail --
5  A.  Correct.
6  Q.  -- or are you talking about something
7  different from that?
8  A.  Correct.  Yes.  They could be refused
9  entry into the jail.
10 Q.  And how was that -- who was making that
11 determination?  Was that the sheriff's office, the
12 booking folks, or was that Corizon folks?
13 A.  Sometimes it's -- I'm not -- I'm not -- I
14 can't speak knowledgeably about the County or law
15 enforcement's part of it, but I do know that medical
16 has a huge part in the responsibility of saying,
17 "This person cannot be medically cleared to come
18 into our facility right now."
19 Q.  Have you ever been asked to do a mental
20 health examination of someone as part of the
21 decision about whether or not to even admit them
22 into the jail?
23 A.  No.
24 Q.  You've never been asked to do that?
25 A.  Never.  Never.

Page 52

1  Q.  To your knowledge, is the psychiatrist who
2  works with Corizon asked to do something like that?
3  A.  Never.
4  Q.  Okay.  So if the person coming into the
5  jail has a -- I'm saying that wrong.
6       If a person who's arrested who the police
7  want to bring to jail has a serious mental health
8  problem, who is the -- who does the screening to
9  decide whether or not to let them into the jail?
10 A.  No one does.
11 Q.  Okay.  So I could interpret that two ways.
12 I want to know what you mean.
13 A.  Sure.
14 Q.  Does that mean that they are lodged anyway
15 or does it mean that some --
16 A.  That means unless there's a medical reason
17 why they cannot be lodged, folks with mental illness
18 of all kinds will still be coming into our doors.
19 Q.  Okay.  And have you talked about this
20 issue with your supervisors?
21 A.  Not that particular issue, no.
22      (Discussion out of the hearing of the
23 reporter.)
24      MR. DEVLIN: 13.
25      MR. ROSENTHAL: 13?

Page 65

1  Q.  No.
2  A.  So I'm not familiar with that.
3  Q.  Okay.
4  A.  But I wanted to clarify something about
5  medical staff being called to prebook.  They're not
6  in prebook.  They're not always out there in the
7  booking area.
8  Q.  I don't understand what you mean by that.
9  I just don't understand your terminology.
10  A.  Okay.  So when I was referring to medical
11  being a big part of the screening process to whether
12  or not people came into the jail, I wanted to
13  clarify that medical has to be called to the prebook
14  and book-in area.  They're not established in that
15  area.  They're back in the clinic.  So I just wanted
16  to make sure that was -- that was clear.
17  Q.  Okay.  To your knowledge -- well, have you
18  ever been asked to provide any training to the
19  booking people about suicide assessment?
20  A.  No.
21  Q.  Is that a matter that has been discussed
22  at all with you and the Corizon staff?
23  A.  I have asked that over time they would be
24  open to the idea of me trying to provide more
25  training for staff, both medical and security staff.

Page 66

1  I do know that the --
2  Q.  Who did you -- who did you ask that -- who
3  did you have that discussion with?
4  A.  I don't remember specifically.  It would
5  have been a supervisor.
6  Q.  It would have been a Corizon person?
7  A.  Correct.
8  Q.  Okay.  So and I interrupted you.  I'm
9  sorry.
10  A.  That's fine.  I do know that both Corizon
11  and Lane County Sheriff's Office offer those kinds
12  of trainings over the computer for their employees
13  on an annual basis that everyone is required to
14  take.
15  Q.  Have you felt that that was really not
16  adequate, that they needed some -- some one on --
17  some training directly from a mental health
18  professional?
19        MR. DAIGLE:  Object to the form.
20  A.  I -- I always think that more training is
21  beneficial.  I also know that there's exceptional
22  amount of experience that the deputies have -- you
23  know, the folks that are working in the jail have
24  been there for years and years and years, and so I
25  don't not trust their judgment with a lot of things,

Page 67

1  but I always think that training is -- you can never
2  have enough training.
3  BY MR. ROSENTHAL:
4  Q.  In your understanding and experience of
5  jail populations, is the first 24 or 48 hours the
6  time period where there's the highest risk of an
7  inmate committing -- attempting to commit suicide?
8  A.  Absolutely.
9  Q.  What's your understanding of that time
10  frame where the highest risk is placed?
11  A.  The first 48 hours.
12  Q.  And what is your understanding of what the
13  other great -- you know, what are the other big risk
14  factors for new inmate committing -- attempting to
15  commit suicide?
16  A.  Some of them are -- and I'm not
17  necessarily saying them in order of importance, but
18  the ones that I remember are definitely depression,
19  depressed mood, history of major mental illness,
20  previous suicide attempts is one of the very few,
21  you know, statistics that we have to even begin to
22  project whether or not someone is going to attempt
23  to suicide again, and also first time in custody.
24  Folks that have been in custody for the first time
25  have a higher percentage of attempting suicide in

Page 68

1  those first 48 hours than folks that have maybe come
2  and gone from jail a lot.
3  Q.  What about if someone is having a
4  psychotic episode?
5  A.  That I'm not as familiar with.  You know,
6  we have people that come in that are psychotic all
7  the time that never try to kill themselves.
8  Q.  What about if the person has made comments
9  within a short time period before being admitted to
10  jail that they were thinking of committing suicide?
11  Does that increase their risk?
12  A.  I couldn't say with certainty.
13  Q.  Tell me about what your relationship was
14  in 2013 with the psychiatrist -- you told us the
15  name and I forgot.
16  A.  Dr. Wendy Saville.
17  Q.  Saville.
18  A.  Correct.
19  Q.  Did you and Dr. Saville have a regular
20  meeting time where you would discuss cases?
21  A.  She came in, like I said before, on
22  Mondays generally in the morning if I remember
23  correctly.  And I would have her clinic prepared for
24  her, all the files pulled that she was going to --
25  people she was going to see, and then I would sit

Page 85

1  Q. Was that Mr. Burnette?
2  A. I believe so. I don't remember exactly.
3  Q. So what do you remember about that
4  encounter with -- with Sheriff Burnette?
5  A. I remember him asking me to kind of see --
6  to kind of check in with Mr. Green, to see how he
7  was doing. And I think he might have mentioned
8  something about the fact that he was refusing to put
9  his blanket over him and to cover up. That's --
10 that's kind of about all I remember from that
11 interaction.
12 Q. Is that one of the ways that was normal
13 for you to be given heads up to see somebody?
14 A. It was a little bit different situation in
15 the sense that Mr. Green had a pretty major
16 incident, obviously, prior to that. And I believe
17 they were concerned about his -- not only his mental
18 state, but whether or not -- I believe at the time
19 they were trying to determine what they were going
20 to do with him medically.
21      I'm not a medical professional. They
22 didn't call me for a medical observation, but they
23 were trying to figure out if this was Mr. Green
24 feigning paralysis or if they really needed to get
25 him out.

Page 86

1  Q. So you had a convers- -- I want to be sure
2  I understand you.
3       Before you saw Mr. Green, you had a
4  conversation with Sheriff Burnette in which, among
5  other things, he told you about what had happened in
6  the courtroom?
7  A. I had heard about it prior to that, yes.
8  Q. Who did you hear about it from?
9  A. Well, when the tones went off with the
10 Code 3 --
11 Q. And you -- were you already at work?
12 A. I was at work -- I believe I was in my
13 office. And normally when the codes go off, there's
14 a cease movement so I would have made sure that I
15 stayed in my office and not go anywhere.
16      At some point I was contacted to come over
17 to the clinic because of the nature of what
18 happened. And the insinuation that there was
19 obviously mentally -- a mentally ill individual that
20 was involved in this situation.
21 Q. So you went to the medical clinic office?
22 A. I went to the medical clinic.
23 Q. And when you got there -- well, who told
24 you to go there or who asked you to go there?
25 A. I don't remember.

Page 87

1  Q. Was it a Corizon person?
2  A. It would have either been probably a
3  security sergeant with the jail or it would have
4  been a medical person.
5  Q. All right. And in that initial phone call
6  were you told that Mr. Green had put his head down
7  and run into a wall?
8  A. Correct.
9  Q. And that he had been taken by wheelchair
10 from the courtroom?
11 A. I don't remember the mention of
12 wheelchair, but I knew that he was in the medical
13 clinic.
14 Q. All right. So do you know what time it
15 was that you got to the medical clinic?
16 A. I don't recall.
17 Q. Does it make sense that it was sometime
18 between 11:00 and 11:30 in the morning. Does
19 that --
20 A. If that's --
21 Q. -- sound right?
22 A. -- prior -- if that's right after it
23 happened, then yes.
24 Q. I think it happened around quarter to
25 11:00 in the courtroom. That was when the event

Page 88

1  occurred.
2  A. Okay.
3  Q. That's when the Code 3 was called.
4  A. Okay.
5  Q. So when you got into the clinic, was
6  Mr. Green already there?
7  A. Yes.
8  Q. And was he in a wheelchair?
9  A. I don't recall because there was so many
10 people in the examination room and in the hallway of
11 the medical clinic that I couldn't see below about
12 his chest.
13 Q. Well, if he wasn't in a wheelchair, given
14 what you saw, what -- where might -- I'm trying to
15 understand what the possibilities were other than a
16 wheelchair.
17 A. There's a couple of just four-legged
18 chairs with a padded seat that are in each exam room
19 that patients often are required to sit in while
20 they're being checked on medically, and I had
21 assumed that that's probably what he was sitting in.
22 Q. Okay.
23 A. But I couldn't tell.
24 Q. How long did you stay in the medic --
25 clinic area while Mr. Green was there?

Page 89

1  A.  My approximation was probably 10 to 20
2  minutes perhaps.
3  Q.  Okay.  And did you assist in any way with
4  -- I know Ms. White sutured his head.
5  A.  Uh-huh.
6  Q.  So did you assist in any way with that
7  process?
8  A.  No.
9  Q.  Okay.  Did you ever approach Mr. Green?
10 A.  No.
11 Q.  Did you ever get close enough to recognize
12 he was in a wheelchair?
13 A.  No.
14 Q.  What were you doing in the room?
15 A.  They had asked me to come because of the
16 fact that it was a mentally ill individual.  And I
17 perhaps assumed that they wanted me to talk to him,
18 but by the time I got to the clinic, there were so
19 many individuals, both security and medical, that it
20 wasn't appropriate for me to try to get in the mix.
21 So I asked some questions of the security sergeants
22 that were there, what had happened, and got some
23 information, and then kind of bowed out from the
24 situation to give them room to try to take care of
25 Mr. Green.

Page 90

1  Q.  Do you remember which sheriff's officers
2  you spoke with?
3  A.  I remember Guy Balcom was there.  I
4  remember Don Burnette was there.  I thought Darreyl
5  Davis, Sergeant Darreyl Davis at the time, was
6  there.  I don't remember everybody else.
7  Q.  Did any of the sheriff's officers you
8  talked to say anything to you about how Mr. Green
9  had said that he couldn't move?
10 A.  Not at that point, no.
11 Q.  Okay.  So at that point all you knew was
12 that he had a head wound?
13 A.  Yes.
14 Q.  When you did look at Mr. Green --
15 A.  Uh-huh.
16 Q.  -- was he moving any part of his body?
17 A.  I remember him moving his head.
18 Q.  Tell me what you remember.
19 A.  I remember Kris White telling him to sit
20 still because she was trying to suture him up.  And
21 I remember him moaning.  I don't remember him
22 forming any words at the time.
23 Q.  Do you remember anybody holding his head?
24 A.  I remember Kris having a hold of his head
25 and maybe one of the deputies because she was

Page 91

1  obviously trying to suture him and probably needed
2  the assistance of someone to hold his head still so
3  that she could not create further damage.  I don't
4  remember who it was holding the head, though, if
5  there was that.
6  Q.  Do you remember any discussion with any of
7  the sheriff's officers about whether or not
8  Mr. Green would be released?
9  A.  Not at that time.
10 Q.  Do you remember, was there -- did you have
11 any discussion before seeing Mr. Green at 2:30 about
12 whether or not he would be released?
13 A.  No.
14 Q.  Now, I saw a Corizon form here that
15 suggested that you went home because your wife
16 wasn't feeling well that afternoon.  Is it -- am I
17 right about that?  Here.  Well, let me grab it for
18 you.
19 A.  Okay.
20      (Deposition Exhibit No. 67
21       marked for identification)
22 BY MR. ROSENTHAL:
23 Q.  I've marked it as Exhibit 67.
24 A.  Okay.
25 Q.  So what is this form?

Page 92

1  A.  This is called a Workforce Central
2  Adjustment form.
3  Q.  Whoa, whoa.  You said that fast.
4  A.  I know.  Sorry.  Workforce Central
5  Adjustment form so --
6  Q.  What does that mean, Workforce Central?
7  A.  It's a fancy acronym for the time
8  management Corizon uses, which is a fingerprint
9  recognition software, which we have to use to check
10 in and out from work and for lunches.
11 Q.  All right.  Well, that kind of interests
12 me.  Let me just stop you for a second.  So I'm so
13 old fashioned, I remember punch cards and a time
14 clock.
15 A.  Exactly.  Sure.
16 Q.  Does this take the place of the punch
17 cards and the time clock?
18 A.  Yes.
19 Q.  And so there's -- you use your actual
20 fingerprint to check in and check out?
21 A.  Sure.  You have to use an employee ID
22 number and then your fingerprint and it checks in
23 the time.
24 Q.  So your employee ID number is up in the
25 upper right hand corner of 67?

| Kelly Conrad Green II v | Jacob Pleich |
| --- | --- |
| Corizon Health, Inc., et al. | January 28, 2014 |

**Page 105**

 1  Q.  So had Mr. Green in your -- in his prior
 2  times in the jail or in the medical records that you
 3  had, had he ever feigned an ability to move or acted
 4  catatonic, to your knowledge?
 5  A.  Not to my knowledge.
 6  Q.  So this was something new, as far as you
 7  could tell?
 8  A.  Correct.
 9  Q.  And did you know that he had rammed his
10  head into the wall?
11  A.  I did.
12  Q.  All right.  So did it -- did you wonder
13  whether perhaps he actually had a spinal injury?
14  A.  I did.
15  Q.  Did you talk to anybody about it after you
16  were done talking to Mr. Green?
17  A.  I believe I went over to the medical
18  clinic.  I don't remember who I spoke to.
19  Q.  But tell me what happened when you went to
20  the medical clinic.
21  A.  I -- I did hear that the conversation was
22  already in progress about getting him out to the
23  hospital, but I don't remember who that was coming
24  from.  I don't remember if it was combination of the
25  HSA, Vicki Thomas, at the time, or if it was other

**Page 106**

 1  medical staff, but I know he was the talk of the
 2  clinic because of the severity of what had happened.
 3  Q.  Do you recall that Ms. White was in the
 4  clinic when you went -- when you went to the clinic
 5  after seeing Kelly Green or whether -- my question
 6  is terrible here.
 7  A.  It's okay.
 8  Q.  It may be -- you told me you don't
 9  remember who you spoke with.
10  A.  Right.
11  Q.  But I'm just wondering do you remember,
12  was Ms. White present when you had the conversation?
13  A.  I don't remember if she was present.
14      MR. ROSENTHAL:  Okay.  You want to
15  change tape now?
16      (Recess:  11:37 to 11:45 a.m.)
17  BY MR. ROSENTHAL:
18  Q.  I want to back up a second.  When you got
19  called to the medical clinic, when they were doing
20  the stitches for Mr. Green, it was your
21  understanding that they wanted you there because he
22  had -- was it your understanding at that time that
23  he tried to injure himself?
24  A.  Correct.
25  Q.  And they wanted you there to do some kind

**Page 107**

 1  of evaluation?
 2  A.  I think they wanted me to stand by to kind
 3  of find out what was going on that led to him
 4  running his head into the wall.
 5  Q.  Okay.  But apparently you didn't get the
 6  opportunity to do that?
 7  A.  No.
 8  Q.  Did you ask -- was Ms. White in charge?
 9  A.  That was my understanding.  I mean, she is
10  the prescriber, and the prescriber generally kind of
11  runs the clinic.
12  Q.  So did you say anything to her before you
13  left like, you know, "When am I supposed to do
14  this?"
15  A.  I decided that was not a good idea based
16  on the emergent nature of the medical care they were
17  trying to provide.
18  Q.  So what was your plan when you left the
19  medical clinic area -- and it must have been
20  sometime between 11:00 and 11:30 because he got to
21  his cell at 11:37.
22  A.  Uh-huh.
23  Q.  So what was the plan as to when you were
24  going to see him?
25  A.  Well, I do remember -- I do remember

**Page 108**

 1  staying there until after they took him over to his
 2  cell.
 3  Q.  All right.  So you were there when they
 4  took him out of the medical clinic?
 5  A.  Uh-huh.
 6  Q.  Did you see him being taken out in the
 7  wheelchair?
 8  A.  I don't remember if he was in a wheelchair
 9  or if two deputies had him one under each arm.
10  Q.  I assure you he was in a wheelchair.
11  A.  Okay.
12  Q.  We've got a video and we've got pictures
13  of it.
14  A.  Okay.  Sure.  Like I said, my memory is
15  foggy from that far back, but, yes, I was there.
16  Q.  So I'm handing you Exhibit 17, and we're
17  identifying the pages because there's a compression
18  number --
19  A.  Okay.
20  Q.  -- there.  So on Compression 85, that's
21  when they were taking him out of the medical clinic.
22  A.  Right.
23  Q.  And then that's when they were taking him
24  into the jail cell.
25  A.  Okay.

Page 109

1  Q. So does that refresh your recollection
2  about him being in a wheelchair?
3  A. Yes.
4  Q. Okay. And I'm going to show you a few
5  photos here. So this is -- Compression 121 is when
6  they were taking him into the medical clinic.
7  A. Okay.
8  Q. And then 94 is another angle taking him
9  into the medical clinic.
10 A. Okay.
11 Q. Then 85 is them taking him out of the
12 medical clinic.
13 A. Correct.
14 Q. So is that consistent with your memory,
15 now that I've refreshed your recollection, as to how
16 he appeared, that he was slumped over and dragging
17 his feet?
18 A. Yes.
19 Q. At the time when you saw this, did you
20 have any thought about, I wonder what's going on
21 with him?
22 A. Absolutely.
23 Q. So did you ask anybody about it?
24 A. As a mental health professional, I try to
25 stay out of the way when they're doing something

Page 110

1  that's very medically necessary. I felt like the
2  medical part trumped any mental health piece at the
3  time. And so I tried to be there in whatever
4  capacity I could be, if there was a need, without
5  getting in the way.
6  Q. So were you concerned when you saw the way
7  he appeared in the wheelchair, that he might have
8  some neurological or spinal injury?
9  A. I did -- I was.
10 Q. And -- but you didn't talk about it with
11 anybody at the time -- at that time. Is that
12 correct?
13 A. Not at that time.
14 Q. All right. So then after Kelly was
15 wheeled out of the medical clinic, PA White was
16 still there.
17 A. Okay.
18 Q. And one or more of the other medical staff
19 was still there. Do you -- did you go in and talk
20 to them at that time?
21 A. I remember following the deputies, and I
22 thought there was at least one medical staff that
23 went over with Mr. Green and the deputies to the
24 segregation cell.
25 Q. I think that's right. I mean, there was a

Page 111

1  picture of the group. Well, these are all sheriff's
2  officers, aren't they?
3  A. Yeah.
4  Q. Maybe when we look at the video again we
5  can see.
6  A. Okay.
7  Q. But -- but I took Ms. White's deposition
8  yesterday, and my recollection is she said she
9  didn't go to the jail cell.
10 A. Okay.
11 Q. So she would have still been in the clinic
12 office.
13 A. Uh-huh.
14 Q. Did you go in at that point and talk to
15 her?
16 A. I don't remember. I remember going
17 towards the segregation cell kind of behind all the
18 deputies. And my anticipation was to try to talk to
19 Mr. Green once they had gotten him housed in the
20 segregation cell, but due to the fact that he had
21 defecated at some point along that process and they
22 had to remove his clothing and things, I decided to
23 remove myself from the situation.
24     And at that point I don't remember if I
25 went back to my office with the anticipation of

Page 112

1  going to talk to Kris or if I went into the clinic
2  at that point to talk.
3  Q. At some point before you went home to take
4  care of the family issue, did you talk to Ms. White?
5  A. I don't recall.
6  Q. All right. Do you recall whether
7  Mr. Green had a bowel movement while he was in the
8  clinic being stitched up?
9  A. I don't recall that.
10 Q. Do you recall any conversation in the
11 clinic area about him having had a bowel movement?
12 A. I thought that I remembered the discussion
13 about the bowel movement being as they were either
14 moving him from the clinic to the segregation cell
15 or after he got into the segregation cell.
16 Q. And what do you recall about that
17 conversation?
18 A. I just remember somebody saying that he
19 had either crapped or -- excuse my language -- shit
20 his pants.
21 Q. All right. Is that something that you'd
22 ever known him to do intentionally?
23 A. Not him in particular. We have had lots
24 of people that have gone to prison and intentionally
25 defecated themselves.

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Jacob Pleich
January 28, 2014

Page 113

1  Q.  Right. But you don't recall him ever
2  doing this before.
3  A.  No.
4  Q.  All right. So in your own mind --
5  A.  Uh-huh.
6  Q.  -- you knew he had run into a wall, you
7  knew he was rather limp looking on the wheelchair,
8  and then you heard that he'd had a bowel movement.
9  Were you thinking spinal cord injury?
10  A.  Like I said, I'm not a medical
11  professional, but it did seem like it was high
12  potential for there to be that kind of injury.
13  Q.  But if I understand you right, given your
14  workload and your work responsibilities, that's
15  something that was just in your mind. You didn't
16  talk to the medical people about that at that time.
17  A.  Because everyone was so focused on it,
18  that I had assumed that, based on their training and
19  them being medical professionals, that they were
20  going to handle it.
21  Q.  All right. So if 11:37 is the accurate
22  time that he got into his jail cell, then you were
23  probably back doing your other work by noon?
24  A.  Probably, yes.
25  Q.  Okay. And then sometime around 1:15 you

Page 114

1  had to go home.
2  A.  Correct.
3  Q.  And you came back at two o'clock.
4  A.  Uh-huh.
5  Q.  Do you remember, did you do anything else
6  other than look at Mr. Green medical records before
7  going and talking to Sheriff Burnette?
8  A.  I don't think so. Because I think I
9  remember that being kind of a primary focus of mine
10  to kind of follow up with Mr. Green.
11  Q.  Okay. So we've already marked some of
12  these prior screens.
13  A.  Sure.
14  Q.  I've just got to find them here.
15  A.  I know there's a copy in the chart.
16  Q.  Yeah. No. But I wanted to use the ones
17  we've marked as exhibits.
18  A.  Gotcha.
19  Q.  So I'm going to hand you Exhibits 10, 11,
20  and 12.
21  A.  Okay.
22  Q.  And I'll give you the chart. And I want
23  to know, were 10, 11, and 12 available to you before
24  you went in to see Mr. Green on the 12th of
25  February. I think they're under the Mental Health

Page 115

1  tab, is my recollection.
2  A.  The intake screening -- receiving
3  screening is a medical document so it would have
4  been -- it's right here under H&P.
5  Q.  Okay. So is that something that you would
6  have looked at that day?
7  A.  Normally I don't look at that because the
8  only part of that that I get a copy of is the mental
9  health page, which as you can see is page No. 3.
10  This is the old version that we used to use.
11  Q.  Right. So would you have looked at that
12  page 3?
13  A.  I would have.
14  Q.  Okay. So that's Exhibit 10. Is that
15  12/20/12, the one you're looking at it?
16  A.  Yes.
17  Q.  Okay. So then Exhibit 11 is dated
18  12/31/12 and it's a mental health progress note.
19  A.  Correct.
20  Q.  Is that in there?
21  A.  Yes.
22  Q.  And that's your exam. Right?
23  A.  Yes.
24  Q.  So -- and then Exhibit 12 is dated
25  January 3, 2013.

Page 116

1  A.  Uh-huh.
2  Q.  And is that mental health progress note in
3  the chart?
4  A.  Yes, it is.
5  Q.  Down near the bottom of that assessment it
6  says (reading): Rule out psychotic disorder
7     comma, NOS.
8  A.  Right.
9  Q.  What does the NOS mean?
10  A.  "Not otherwise specified."
11  Q.  All right. So that's all information that
12  you had available to you and that you had actually
13  taken a glance at before you went to talk to
14  Burnette.
15  A.  Correct.
16  Q.  All right. So you go to talk to Burnette
17  and -- because I've skipped around a little bit --
18  A.  That's fine.
19  Q.  I want to get this back in context. You
20  go to talk to Burnette, and Burnette tells you that
21  he hasn't moved?
22  A.  I would assume that he had told me that.
23  I don't remember exactly.
24  Q.  And did he tell you that there was some
25  concern on his part about his not moving?

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Jacob Pleich
January 28, 2014

Page 117

1  **A.**  Uh-huh.
2  **Q.**  All right. So looking again at 58, which
3  is your --
4  **A.**  Yes.
5  **Q.**  Now, this is a suicide watch status
6  report. Why did you use that form?
7  **A.**  Because I believe after they had took him
8  to the segregation cell, they wrote a red sheet,
9  which is jargon that is specific to what the jail
10 uses when someone is placed on a suicide watch and
11 then, therefore, this is a Corizon form that I use
12 when I go and assess people that are on a red sheet
13 or a suicide watch within the jail.
14 **Q.**  And we had been working our way through
15 this form. And I hadn't got yet to this box you
16 checked "dysphoric mood"?
17 **A.**  Uh-huh.
18 **Q.**  What does that mean?
19 **A.**  Dysphoric is kind of another way of saying
20 very depressed versus euphoric, something that is
21 downtrodden, morose. I mean, I can figure out
22 another way of saying that.
23 **Q.**  Okay. And then you -- in handwriting you
24 wrote where it says Other Findings, and I can't read
25 it.

Page 118

1  **A.**  "Unknown other symptoms." And this X is
2  just --
3  **Q.**  Underneath that?
4  **A.**  "Impaired."
5  **Q.**  Impaired. When you left the room --
6  **A.**  Uh-huh.
7  **Q.**  How long did you talk to Mr. Green?
8  **A.**  I would -- I would say it was only maybe
9  two or three minutes at most because there were --
10 there was not a lot of content that he had to give
11 me at the time. And I tried not to take up too much
12 time of the deputies, especially when the door is
13 open like that, which is not normal.
14 **Q.**  Did you go all the way up to his bedside
15 and just sit down or -- I guess there's no chair.
16 **A.**  I stood. I stood next to his bed.
17 **Q.**  Went right up to his bed and chatted with
18 him?
19 **A.**  Uh-huh. I may have knelt down to try to
20 hear what he was saying because his voice was very
21 low.
22 **Q.**  Could you -- could you -- was there an
23 aroma of bowel movement in the room?
24 **A.**  Absolutely.
25 **Q.**  Noticed it the moment you walked in?

Page 119

1  **A.**  Absolutely.
2  **Q.**  But it wasn't so overpowering that you
3  couldn't do your job.
4  **A.**  I unfortunately have to do that every day.
5  There's lots of folks that do those types of things.
6  **Q.**  All right. Did you ask him about that,
7  about the bowel movement?
8  **A.**  He wasn't very forthcoming in information.
9  It seemed like it was all he could do just to tell
10 me the couple of things that I wrote down in the
11 progress note there.
12 **Q.**  Do you recall that Mr. Green was naked?
13 **A.**  I do recall that.
14 **Q.**  Do you recall that that he was actually
15 lying in his own feces?
16 **A.**  I don't recall that.
17 **Q.**  Do you recall putting a blanket on him?
18 **A.**  I do.
19 **Q.**  Did you -- was there -- did you have any
20 conversation with him about the blanket, like, "Are
21 you cold? Do you want me to put the blanket on
22 you?"
23 **A.**  I asked him. I said, "Can you cover up
24 please, Mr. Green?" And he said he couldn't move.
25 And so I covered him so he wouldn't be cold.

Page 120

1  **Q.**  All right. So when you -- when you left
2  the jail cell --
3  **A.**  Uh-huh.
4  **Q.**  -- were you concerned that he had a spinal
5  cord injury?
6  **A.**  I was concerned that he had some
7  significant medical damage. I didn't know to what
8  extent.
9  **Q.**  So what's the next thing that you did in
10 relationship to Mr. Green?
11 **A.**  Like I said, I don't remember. I think I
12 maybe went into the clinic and talked to somebody
13 about it, but I don't remember who I talked to.
14 **Q.**  Okay. I don't want to mislead you, so I'm
15 going to tell you something that you probably don't
16 remember.
17 **A.**  That's fine.
18 **Q.**  When we listened to the tape, we made
19 notes about what people said. And if we heard you
20 correctly, we heard you say to Mr. Green, when he
21 said he couldn't move -- we got this in quotes. I'm
22 not promising you that we got it exactly right --
23 **A.**  That's fine.
24 **Q.**  -- but it was our best effort -- "I don't
25 believe that you are completely paralyzed."

Page 141

1  Q.  So does -- so would you agree with me that
2  that doesn't have anything to do with housing, has
3  to do with initial arrival?
4  A.  It would appears so.
5  Q.  Okay.  And that's something, as you've
6  testified, was not occurring in February 2013 on a
7  mental health basis in the Lane County Jail?
8  A.  Yeah.  That's not a part of the process,
9  no.  The Lane County sheriff's deputies do ask
10 initial assessment questions as soon as they are
11 brought in.
12 Q.  Correct.  But Corizon people don't.
13 A.  No.
14     (Deposition Exhibit No. 73
15     marked for identification)
16 BY MR. ROSENTHAL:
17 Q.  Okay.  And have you seen Exhibit 73
18 before?
19 A.  I'm sure I've seen it, yeah.
20 Q.  And when we've talked about you seeing
21 this, how would -- what context would you see it in?
22 A.  It would -- it would have been in the
23 context of probably going through a large stack of
24 these packets and trying to get as much of the
25 material out of it in the time that I had and doing

Page 142

1  whatever follow-up assessment questions were
2  required to get the credit for the training, I would
3  imagine.
4  Q.  Okay.  So -- because you had earlier
5  mentioned that perhaps it was a PowerPoint.  Is it
6  more accurate to say this was probably given to you
7  in paper form?
8  A.  Yes, probably.
9  Q.  And the expectation would have been from
10 the Corizon organization that you would read this
11 section and understand it?
12 A.  Uh-huh.  And then at the very end, you can
13 see there's a multiple choice, true or false section
14 of answers to the questions based on the readings
15 that everyone is required to sign.
16 Q.  Okay.  Prior to this lawsuit being filed,
17 did you have any knowledge of other litigation
18 against Corizon for providing inadequate medical
19 care?
20 A.  I had heard lots of cases thrown around
21 insofar as those types of lawsuits, but I wasn't
22 aware of the differentiation between ones that were
23 prior to Corizon coming on that were against the
24 County and ones that maybe had to do with Corizon.
25 It wasn't a topic of conversation in the clinic or

Page 143

1  anything.
2  Q.  Is there any kind of regular meeting that
3  you as a mental health professional have with other
4  mental health professionals at Corizon in other
5  facilities?
6  A.  We have a once-a-month behavioral health
7  conference call that's on the -- I believe it's the
8  fourth Thursday of every month at 9:00 a.m.  During
9  that call, it's a western region check-in where
10 everybody from the different facilities that Corizon
11 is contracted within those jails or prisons --
12 somebody -- a representative from those facilities
13 will kind of check in about what's going on in their
14 site.  And whoever is facilitating that conference
15 call will maybe bring up a theme that everyone can
16 kind of chime in around that's related to
17 corrections mental health.
18 Q.  Does somebody from Tennessee run the
19 meeting?
20 A.  Yes.
21 Q.  And is there a particular person?
22 A.  At the time it would have been Diane Wood.
23 Q.  And are -- is there any record kept of
24 those monthly meetings, any minutes or anything?
25 A.  Uh-huh.  Yeah.  I have -- I have all those

Page 144

1  in my email.
2     MR. ROSENTHAL: Would you please mark
3  that spot.
4  BY MR. ROSENTHAL:
5  Q.  Is there a discussion at those meetings at
6  all about patients that are -- that have been
7  hospitalized that are Corizon -- that are patients
8  that were in the jail and who've been hospitalized?
9  A.  Unfortunately, no one can use specific
10 names or examples in those meetings because they
11 have had nonCorizon colleagues that have been a part
12 of those conference calls.  I did not know that
13 until I attempted to make some reference to a
14 Corizon policy or something in a meeting questioning
15 something, and I was told that there were people
16 that were nonCorizon employees that were the part of
17 those conversations.  So it's never been something
18 that we've talked about specifics.
19 Q.  Who that is a nonCorizon employee would be
20 a part of one of these calls?
21 A.  I'm not exactly sure.  I've been told that
22 they have invited psychiatrists perhaps from other
23 places in the region that may have some connection
24 with the jail system.  I never really had that
25 defined clearly to me.