UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CONRAD GREEN II, an

individual, by and through his

guardian ad litem Derek

Johnson,

               Plaintiff,

       vs.            No. 6:13-cv-01855-TC

CORIZON HEALTH, INC., a

Tennessee Corporation, et al.,

               Defendants.


VIDEOTAPED DEPOSITION OF VICKI THOMAS

Taken on behalf of the Plaintiff

February 21, 2014


\*      \*      \*

Exhibit 36 - Page 1 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

2

1    BE IT REMEMBERED that the videotaped
2    deposition of VICKI THOMAS was taken on behalf
3    of the Plaintiff, pursuant to the Federal Rules
4    of Civil Procedure, before Pamela Beeson
5    Frazier, Certified Shorthand Reporter for
6    Oregon, California, and Washington, and a
7    Registered Professional Reporter, on Friday,
8    February 21, 2014, in the law offices of
9    Stewart Sokol & Gray, 2300 SW First Avenue,
10   Suite 200, Portland, Oregon, commencing at the
11   hour of 9:15 a.m.
12
13       APPEARANCES:
14   ROSENTHAL GREENE & DEVLIN
15   BY: MR. JOHN THOMAS DEVLIN
16       MR. ELDEN ROSENTHAL
17       121 SW Salmon Street, Suite 1090
18       Portland, Oregon  97204
19       Attorney for Plaintiff
20   STEWART SOKOL & GRAY
21   BY: MR. JAMES M. DAIGLE
22       MR. ROBERT COLEMAN
23       2300 SW 1st Avenue, Suite 200
24       Portland, Oregon  97201
25       Attorney for Corizon Health, Inc.

3

1    LANE COUNTY, OFFICE OF LEGAL COUNSEL
2    BY: MR. SEBASTIAN NEWTON-TAPIA
3       Lane County Courthouse
4       125 E. 8th Avenue
5       Eugene, Oregon  97401
6       Attorney for Lane County, Rob Dotson,
7       Donald Burnette, Guy Balcom
8
9           *   *   *

4

EXAMINATION INDEX

1                                           Page
3    Examination by Mr. Devlin              5
4
5           *   *   *
6
7
8       EXHIBIT INDEX
9                                           Page
10   No. 89 - Employee roster for 2/11/2013   145
11   No. 90 - Corizon Attestation of Approval   187
12   No. 91 - Nursing Encounter Tool, Abrasions  187
13       and Lacerations
14   No. 92 - Nursing Encounter Tool, Fracture   190
15   No. 93 - Nursing Encounter Tool, Musculo-   190
16       skeletal
17
18          *   *   *

5

1           VICKI THOMAS
2    was thereupon produced as a witness and,
3    after having been first duly sworn on oath,
4    was examined and testified as follows:
5
6           EXAMINATION
7    BY MR. DEVLIN:
8    Q.  Good morning.
9    A.  Good morning.
10   Q.  My name is John Devlin, and I'm an attorney
11      here in Portland representing the estate of a
12      man named Kelly Green, who brought a lawsuit
13      against Corizon and Lane County and various
14      individuals out of an incident that happened
15      back last February.
16       I asked you to come here this morning so I
17      can ask you some questions about what you saw
18      and heard that day and also some Corizon
19      policies and procedures.  That's kind of my
20      agenda.
21       Have you ever had your deposition taken
22      before?
23   A.  No.
24   Q.  From my perspective, I'm sure your able lawyers
25      have covered the ground rules with you really.

(Pages 2 to 5)                                          2

Exhibit 36 - Page 2 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

22

1  providers, holding monthly informational
2  sessions for new patients.  At one point I went
3  to Denver and helped out at a clinic there when
4  they were without a program manager.
5  Q.  What was the name of that clinic that you were
6  at?
7  A.  The initials are FFC, Fibro & Fatigue Centers.
8  They no longer exist.
9  Q.  And it was a national organization with a
10  Portland office?
11  A.  Yeah.
12  Q.  And how long did you do that job as a program
13  manager?
14  A.  About a year and a half.
15  Q.  How many people would you say, roughly, you
16  were supervising?
17  A.  It was a small clinic: Two physicians, a
18  medical assistant, two nurses, an
19  administrative assistant.  And then there was a
20  laboratory technician, but he worked for Quest
21  so I -- I oversaw what he did, but I was not
22  legally his boss.
23  Q.  And then the senior living centers that you
24  worked at, what kind of jobs were you doing at
25  those places?

23

1  A.  When I was in McMinnville, I was the only nurse
2  for the whole campus, so I delegated to the
3  caregivers.  I conducted care meetings with the
4  families and the residents.  I signed off on
5  all the physician orders that came to the
6  facility.
7  I monitored the narcotics usage.  I
8  visited and met with residents.  I monitored
9  the care plans and how they were being
10  instituted.  I helped with events.
11  Q.  So, in your mind, would you describe that as
12  more of an administrative job supervising
13  people, or providing direct care, or does
14  that -- is there a distinction --
15  A.  It was both, it was both.
16  Q.  What about at the other, at Calaroga?
17  A.  At Calaroga it was also both.
18  Q.  Similar idea?
19  A.  At Calaroga I wasn't the only nurse.  I had --
20  I oversaw the nurses and the caregivers and the
21  med-aides.  And then the executive director and
22  I started an in-home health care program in the
23  building.
24  Q.  And how long -- are you still teaching at
25  Mt. Hood?

24

1  A.  No.
2  Q.  How long did you do that teaching?
3  A.  I taught three classes, so not quite a year.
4  Q.  Not three individual classes but three group
5  sort of sessions?
6  A.  Three sessions, yes, like terms, three terms.
7  Q.  Terms, okay, great.  So now let's walk through
8  your employment at Corizon.  You started in
9  September 2012.  What did you -- what job did
10  you start in?
11  A.  Assistant HSA at Washington County jail.
12  Q.  And then just walk me through just first
13  positions you've held at Corizon from that
14  point to now?
15  A.  In late December I was asked to go to Lane as
16  the interim HSA there.  I was there as interim
17  HSA until mid-March when I returned to
18  Washington County jail and became the HSA
19  there.
20  And I was at that position until the 1st
21  of November when I assumed the regional
22  clinical services manager position for Western
23  Region.
24  Q.  So tell me again, what's your current title?
25  A.  Regional clinical service manager, Western

25

1  Region Jails.
2  Q.  So when you went back to Washington County in
3  March of 2013, did you go back as the HSA?
4  A.  Yes.
5  Q.  So when you started at Washington County, who
6  was the HSA?
7  A.  Stevens Hippolyte.
8  Q.  And do you know whether Mr. Hippolyte still
9  works for Corizon?
10  A.  He does not.
11  Q.  Have you kept in touch with him?
12  A.  A little bit.
13  Q.  Do you know how to contact him?
14  A.  I have a phone number for him, yes.
15  Q.  You do?  Okay.  Do you have a physical address
16  as well or an email address, anything like
17  that?
18  A.  No.
19  Q.  When is the last time you talked to him?
20  A.  About maybe a month ago.
21  Q.  And it was a working -- a good phone number for
22  him, the one you had?
23  A.  Actually, we didn't talk on the phone.  We were
24  driving down 217, side by side.
25  Q.  In different cars?

(Pages 22 to 25)                                        7

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 3 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

34

1    discussion about whether to move forward or
2    have more interviews, or not.
3    Q.  I see.  So tell me if I have it right, because
4    I'm trying to short-circuit some of this.  So
5    you were not receiving the applications and
6    doing the screening; that was all happening
7    somewhere else.  You were basically being told,
8    we've screened this candidate, interview him
9    and see what you think?
10   A.  Correct.
11   Q.  And do you remember at all what your criteria
12   were or what you were looking for in hiring an
13   HSA?
14   A.  Someone with previous management experience,
15   preferably correctional experience, had to have
16   been an RN, someone creative, flexible, quick
17   thinker, good nursing background.
18   Q.  Okay.  Overall, would you say that the -- I'm
19   trying to think of the right way to say this.
20   How would you compare just the overall process,
21   the way the Corizon office is run in the
22   Washington County jail versus the Lane County
23   jail?  Are they the same or are there
24   differences between the two?
25   A.  There's differences.

35

1    Q.  And can you describe what those differences
2    are?
3    A.  Well, the jails are different.  That's --
4    Q.  Tell me about that.
5    A.  They're physically different.  The way intake
6    and booking and housing are done is different.
7    The custody is different.  The counties are
8    different.  They're just different.
9    Q.  So do the same Corizon policies and procedures
10   apply to both places?
11   A.  Yes.
12   Q.  There's no separate sort of manual or handbook
13   for one county versus the other?
14   A.  No.
15   Q.  Okay.  So one of the things I wanted to see if
16   you could help me understand is, I want to
17   focus now on the Lane County time period.
18   While you were the interim HSA at Lane County,
19   were you the senior medical person in the
20   facility?
21   A.  No.
22   Q.  So who was?
23   A.  The site medical director, Dr. Montoya.
24   Q.  Dr. Montoya, okay.  And how did your --
25   describe for me the difference between what

36

1    your job was and what Dr. Montoya's job was.
2    A.  Dr. Montoya oversaw clinically how the unit was
3    run, and he also had direct supervision of the
4    PA.  I had more administrative duties.  I made
5    sure that the contract was followed, policy and
6    procedure were followed, staff was properly
7    trained, and I interfaced with the lieutenant.
8    Q.  And the whole time that you were at Lane County
9    jail, was Dr. Montoya the medical director?
10   A.  Yes.
11   Q.  And Chris White was the PA?
12   A.  Yes.
13   Q.  And so did you play any role as the HSA in
14   making sure that Dr. Montoya did his job?
15   A.  Yes.
16   Q.  Tell me about that.  How would you make sure he
17   was doing what he was supposed to do?
18   A.  Made sure he showed up, fulfilled his
19   contractual hours.
20   Q.  Was that one day a week?
21   A.  Yes.  Made sure that if there were new manuals
22   that came from Corizon that he reviewed them
23   and signed off on them; made sure that things
24   that needed his signature had his signature.
25   Q.  But in terms of the clinical content of his

37

1    work that he was doing or his supervision of
2    Chris White, did you see that as part of your
3    job, to make sure the substantive clinical
4    work -- to be checking on that in some way?
5    A.  I did that with monthly chart audits.
6    Q.  So tell me about that.  How would you do that?
7    A.  The corporate sent out continuous quality
8    improvement audit templates each month on
9    different topics.  And as the HSA, I would then
10   pull the designated number of charts or have
11   the medical records or the CMAs pull them for
12   me.
13       And then I would do an audit based on the
14   template and the questions asked.  And it
15   covered nurse things, PA things, physician
16   things, dentist things, psychiatrist things.
17   So it covered the whole gamut.
18   Q.  Okay.  And that job of doing that monthly
19   checking that I've seen some of the charts and
20   flow charts, that the job of doing that
21   continuous quality improvement checking, that
22   was the HSA's job?
23   A.  Correct.
24   Q.  And then would you have meetings with
25   Dr. Montoya to go over things at the jail?  I

(Pages 34 to 37)                                             10

Exhibit 36 - Page 4 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

38

1    just didn't know if you and he had a regular
2    standing meeting or anything like that.
3    **A.  We did not have a regular standing meeting.**
4    **But he attended the monthly staff meetings, and**
5    **any areas of concern or news or new forms would**
6    **be discussed at those meetings.**
7    Q.  Okay.  And I'll get to that in a minute.
8         And then what about Ms. White, how would
9    you describe sort of what your job was as
10   opposed to what her job was?
11   **A.  Her job was to see patients.  My job was**
12   **everything else.**
13   Q.  And did you feel like you played some role in
14   supervising her, as well?
15   **A.  Made sure she showed up, did her contractual**
16   **hours, that if she needed anything**
17   **equipment-wise or whatever, I would make sure**
18   **and procure that.**
19        **We'd talk about difficult cases together**
20   **when Dr. Montoya wasn't around, or the three of**
21   **us would.  She attended the staff meetings.**
22   **We'd go to man-down calls together.**
23   Q.  One of the things that came up in Ms. Fagan's
24   or Ms. Epperson's deposition that I hadn't
25   heard before is that, when you were in Lane

39

1    County was there a charge nurse --
2    **A.  No.**
3    Q.  -- who was different from just the regular RNs?
4    **A.  No.**
5    Q.  Is that something that exists, to your
6    knowledge -- does that exist in Washington
7    County?
8    **A.  No.**
9    Q.  So in terms of the nursing staffing on a
10   particular -- let's take day shift, because
11   that's when the most nurses are there.  On a
12   particular day shift when you were in Lane
13   County, did the -- what would the different
14   nurses be doing in terms of their jobs?
15   **A.  One of the nurses would handle seeing the**
16   **patients that were withdrawing in the**
17   **segregation area, plus handle intake.  Another**
18   **nurse would be in the clinic seeing patients,**
19   **either doing histories and physicals or**
20   **answering medical requests.**
21   Q.  But there was no -- and were you the supervisor
22   of the nurses?
23   **A.  Yes.**
24   Q.  But there was no -- other than you, there was
25   no nurse who was sort of designated as being

40

1    more senior than the other RNs on staff?
2    **A.  Correct.**
3    Q.  Okay.  If they had a problem, one of the nurses
4    had an issue, you would be the person they
5    would come to?
6    **A.  Correct.**
7    Q.  And when you were the HSA in Lane County, what
8    hours did you work?
9    **A.  I would get there in the morning, anywhere from**
10   **7:00 to 9:00, depending on the day of the week,**
11   **and would stay until 5:00, 6:00, 7:00,**
12   **depending on what needed to be done.**
13   Q.  Were you working Monday through Friday?
14   **A.  Yes.**
15   Q.  And then were you on call?
16   **A.  Yes.**
17   Q.  Tell me about that.  How would that work?
18   **A.  24/7.  If they needed something, they called**
19   **me.**
20   Q.  Were you paid by the hour or were you salaried?
21   **A.  Salaried.**
22   Q.  Did your salary change at all when you did the
23   Lane County job?
24   **A.  No.**
25   Q.  So what's your -- back in this time frame, what

41

1    was your salary?
2    **A.  I don't remember.**
3    Q.  Just ballpark it.  40, 80?
4    **A.  I don't remember.  I honestly don't remember.**
5    Q.  Okay.  But because it was a salaried job, you
6    considered yourself available if people needed
7    things 24/7, and people knew they could call
8    you?
9    **A.  Yes.**
10   Q.  So you mentioned -- I want to talk about sort
11   of what kind of meetings there were on any kind
12   of regular basis when you were the HSA in Lane
13   County.
14        So first let's start with meetings, just
15   Corizon meetings.  It sounds like, was there
16   some sort of staff meeting just for the Lane
17   County folks?
18   **A.  You mean the medical staff?**
19   Q.  Yeah.
20   **A.  Yes, monthly.**
21   Q.  And who would lead that meeting?
22   **A.  Me.**
23   Q.  Were all of the Corizon employees expected to
24   attend that meeting?
25   **A.  Yes.**

(Pages 38 to 41)                                              11

Exhibit 36 - Page 5 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

54

1  A.  I'm responsible for overseeing clinical aspects
2      of all the jails in the western region.
3  Q.  Tell me what that means.
4  A.  I do site visits where I audit pharmacy, sick
5      call, intake, nursing process, charts,
6      medication records, visit with staff.
7          I provide a monthly call to all the
8      directors of nurses of the jails. I sit on the
9      infection control committee, sentinel
10     committee, and attend region leadership
11     meetings.
12 Q.  And did you replace someone in that job?
13 A.  Yes.
14 Q.  Who was that?
15 A.  Jennifer Slencak.
16 Q.  Is that actually the person you referred to at
17     the beginning, your friend?
18 A.  Yes.
19 Q.  And so how does that job -- what's -- help me
20     understand the difference between that job and
21     the regional vice president of the western
22     region, Mr. Legg's job.
23 A.  The RVP position is operational. My job is
24     clinical.
25 Q.  So, in your mind, just tell me what those terms

55

1      mean.
2  A.  RVP position is responsible for the finances,
3      the budgets, the staffing, contractual
4      obligations. I'm strictly clinical.
5  Q.  And are they on a DEP chart? Are they
6      equivalent, or is one above --
7  A.  I couldn't tell you. I don't know.
8  Q.  Do you know, who or what position is your
9      supervisor now?
10 A.  George Vaughn.
11 Q.  And what's Mr. Vaughn's title?
12 A.  VPO of western region.
13 Q.  I think you referenced something about doing
14     monthly calls with directors of nursing. So
15     are there some jails around the country that
16     actually have a position called the director of
17     nursing?
18 A.  Yes.
19 Q.  But that position did not exist in the Lane
20     County jail?
21 A.  That's correct.
22 Q.  And is that because of the size of the jail?
23 A.  That's correct.
24 Q.  It's not a big enough jail to need that job?
25 A.  That's correct.

56

1  Q.  Does the Washington County jail have a director
2      of nursing?
3  A.  Yes, it does.
4  Q.  And that position, is that below the HSA on the
5      organizational chart?
6  A.  That's correct.
7  Q.  Let's -- I want to talk a little bit about the
8      conditions at the Lane County jail while you
9      were there. Do you recall any staff members,
10     any Corizon folks, raising concerns about the
11     level of staffing at the Lane County jail while
12     you were there?
13 A.  Yes.
14 Q.  Tell me what you remember about that.
15 A.  Nurses will always complain that there's not
16     enough nurses to do the job. Whether you're in
17     a hospital, a nursing home, a jail, a clinic,
18     it's a common complaint. So I heard that they
19     would appreciate more nurses.
20 Q.  So, again -- and tell me if I've got it wrong
21     because I want to make sure I get it. Were
22     there nurses -- while you were the Lane County
23     HSA, were there nurses telling you that, in
24     their opinion, there was not enough nursing
25     staff to do the job?

57

1  A.  Yes.
2  Q.  And do you remember who raised those concerns?
3  A.  No, no.
4  Q.  Was it more than one nurse?
5  A.  Yes.
6  Q.  Was it all the nurses?
7  A.  I can't answer that.
8  Q.  What did you do in response to those concerns?
9  A.  I pulled out the staffing matrix of the
10     contract and showed them our contractual
11     obligations. I helped revamp staffing times
12     for overlap. I taught them how to multitask
13     and showed them areas where they were wasting
14     time or not utilizing their time to the best of
15     their ability.
16 Q.  Did you ever talk to anyone above you at
17     Corizon about the concerns raised by the nurses
18     at the Lane County jail?
19 A.  No.
20 Q.  Why not?
21 A.  I didn't see the need.
22 Q.  Because you didn't agree with their concerns?
23 A.  Correct.
24 Q.  You thought they were just complaining?
25 A.  Correct.

(Pages 54 to 57)                                                    15

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 6 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

74

1  Q.  And then do you know who would be
2      responsible -- what was your understanding back
3      when you were a Lane County HSA about who would
4      be responsible for paying?  If somebody had
5      already been booked into the jail, been
6      accepted into the jail but they weren't yet
7      housed in a particular wing, did you know who
8      would pay in that situation?
9  A.  No.
10 Q.  Do you know the difference from your work in
11     the jail about when someone is booked into the
12     jail as opposed to when they're housed?  Do
13     those terms have different meanings to you?
14 A.  No.  As soon as they are booked in, they become
15     the responsibility of Corizon.
16 Q.  Okay, okay.  Does Corizon -- as the HSA, are
17     you expected to monitor those types of
18     expenses?
19 A.  Yes.
20 Q.  Tell me how you're expected to do that.
21 A.  We get a monthly report.  There's a utilization
22     management department that we are in contact
23     with regarding outside service providers.  We
24     speak with the regional medical directors as
25     well as the site medical director when someone

75

1      is sent to the hospital.
2          We have certain vendors, service providers
3      that we contract with, and those are the folks
4      that we're supposed to utilize.  And if we --
5      if there is something needed that we don't have
6      a vendor contracted for, then we contact
7      corporate, and then the department that handles
8      that, then they get us somebody.
9          Or the utilization management or regional
10     medical director would okay for somebody to go
11     to someplace special if there wasn't a contract
12     provided for that.
13 Q.  So the name of the department in Corizon that
14     you would be in contact with at the HSA is the
15     utilization --
16 A.  Management department.
17 Q.  And do you know whether any people with medical
18     training are in that department?
19 A.  I have no idea what their credentials are.
20 Q.  And as an HSA, are you judged in your
21     performance on whether those utilization rates
22     are too high?
23 A.  Yes.
24 Q.  Tell me about that.  How is that evaluated?
25 A.  As I said, there's a report that comes out each

76

1      month that shows how many ER visits, et cetera,
2      that we have.  And all of that is looked at to
3      make sure that we're utilizing the services
4      properly and that patients that are sent out,
5      it's a need.
6          So that it's not -- for instance, you
7      know, somebody can't go and get a nose job
8      while they're in the jail.  That's how it's
9      looked at.
10 Q.  So how would -- if a provider in a jail
11     somewhere decided that an inmate needed to go
12     to the emergency room, how would someone at
13     utilization management review that decision to
14     decide if it was appropriate or not?
15         MR. DAIGLE:  Object to form.
16         THE WITNESS:  They review it afterwards.
17 BY MR. DEVLIN:
18 Q.  Do you know what they would look at to try to
19     figure out whether it was appropriate or not?
20         MR. DAIGLE:  Object to form.
21         THE WITNESS:  They get the ER referral
22     sheet, and then they're in contact with the
23     hospital.
24 BY MR. DEVLIN:
25 Q.  So your understanding is that someone from

77

1      utilization management might actually speak
2      directly with someone from the hospital where
3      the inmate was sent?
4  A.  Yes.
5  Q.  And then while somebody was in the hospital
6      that was going to be a prolonged
7      hospitalization, not just an ER visit, were
8      there efforts made to monitor what was
9      happening in the hospital by Corizon?
10 A.  Yes.
11 Q.  Tell me how that would be done.
12 A.  Either the PA or the site MD would be in
13     contact with the local hospital.  And if they
14     weren't getting any information, the
15     utilization department would step in.  And if
16     they weren't getting any information, then the
17     regional medical director would step in.
18 Q.  And do you know why Corizon folks would do that
19     while someone was in the hospital?
20 A.  To make sure that the care that was needed was
21     received and to make sure that discharge wasn't
22     held up based on erroneous information from the
23     hospital.
24 Q.  And was there an effort to try to get the
25     person discharged as soon as could be done?

(Pages 74 to 77)                                          20

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 7 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

78

1   A.   Yes.
2   Q.   Because it was costing Corizon money to have a
3        person in the hospital?
4   A.   Correct.  And it was also costing the County,
5        because the deputy has to be there with the
6        patient.
7   Q.   Do you know whether there's a system -- when
8        you were the Lane County HSA, was there a
9        system in place to keep track of the monthly
10       payroll expenses to all the Corizon staff
11       folks?
12  A.   Yes.
13  Q.   Did you play a role in monitoring that?
14  A.   Yes.
15  Q.   So tell me about that.  How would you keep
16       track of that?
17  A.   There is a software system called Kronos that
18       captures all the data of clock-ins and
19       clock-outs.  And I was responsible for
20       approving payroll every pay period by going
21       onto Kronos and looking over everything and
22       making sure it was accurate, and then giving my
23       electronic approval and sending it to payroll.
24  Q.   And what was your -- in addition to making sure
25       all the paperwork was right and it was all done

79

1        properly, were you instructed -- substantially
2        what were you checking it for?  To make sure it
3        matched the matrix or to make sure it was low
4        as could be?  What were you looking for when
5        you were reviewing it?
6   A.   To make sure that there was a clock-in and a
7        clock-out and a lunch-in and a lunch-out for
8        every day that an employee worked in that pay
9        period; and to make the sure that if they were
10       off sick or had PTO time that it was so marked;
11       and that if they clocked in early, late, out
12       early, late, or missed a punch, that that was
13       accurately documented.
14  Q.   But you were as the HSA also reviewing it to
15       see if it fit in within the larger budget of
16       the jail or something like that?
17  A.   Not at that point, no.
18  Q.   Did that change at a certain time?
19  A.   No.  What I mean is, when you make a schedule
20       for staff for the month, you follow the matrix,
21       and if you're following the matrix, you're
22       following the budget.
23  Q.   Because the matrix matches the budget?
24  A.   The matrix matches the contract, which matches
25       the budget, yes.

80

1   Q.   So you were -- and again, tell me if I'm wrong.
2        One of the things you were doing when looking
3        at the payroll was making sure that the number
4        of hours worked for different positions matched
5        what the matrix said?
6   A.   Not.  When I'm approving payroll for Kronos,
7        no.
8   Q.   Oh, you said when you're making the schedule?
9   A.   When I'm making the schedule, yes.
10  Q.   And so as the HSA, would you actually be the
11       one to sit down and say what days everybody was
12       going to work and what shifts?
13  A.   It started out as the job of one of the other
14       nurses, and when she was no longer employed
15       there, I took it over.
16  Q.   Do you know whether -- while you were the HSA,
17       did you also play a role in monitoring the
18       pharmaceutical expenses of the jail?
19  A.   Yes.
20  Q.   Tell me about how you did that.
21  A.   It was a monthly report that came out that
22       showed our pharmaceutical utilization and the
23       costs, and I just made sure that we weren't
24       ordering medications that would then just sit
25       on a shelf.

81

1        We made sure that we were maintaining par
2        levels and that if there were any expensive
3        medications that there was justification for
4        it.
5   Q.   And on that last example, how would you do that
6        to make sure there was justification?
7   A.   That there was a patient actually receiving the
8        medication and, again, it wasn't sitting on the
9        shelf.
10  Q.   And were there any budgetary goals or marks
11       that the facility needed to be within in terms
12       of pharmaceutical expenses?
13  A.   There was a projected monthly budget of
14       pharmaceuticals.
15  Q.   And do you know who prepared that projected
16       monthly budget?
17  A.   Corporate.
18  Q.   It wasn't something that the HSA, that you did?
19  A.   No.
20  Q.   But you would be monitoring the expenses at the
21       jail to make sure it fit within the confines of
22       that protected budget?
23  A.   Correct.
24  Q.   And do you know what office or department at
25       corporate that budget would come from?

(Pages 78 to 81)                                          21

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 8 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

82

1   A.  Finance.
2   Q.  And if you had an issue while you were at Lane
3       County, if something came up related to the
4       budget, is there a person at finance that you
5       would -- that you considered basically your
6       contact person?
7   A.  Yes.
8   Q.  So who was that?
9   A.  Jacob Dyce.
10  Q.  How do you spell Jacob's last name?
11  A.  D-Y-C-E.
12  Q.  And do you know what his job was?
13  A.  No.
14  Q.  And was he also your contact person when you
15      were working in Washington County?
16  A.  Yes.
17  Q.  And do you know whether he's still in the same
18      job?
19  A.  He's not.
20  Q.  Do you know if he's still at Corizon?
21  A.  He is not.
22  Q.  Do you know who took over his job?
23  A.  I do not.
24  Q.  And since you've moved to your new job in
25      November, do you still have budget-type issues

83

1       that you deal with?
2   A.  No, sir.
3   Q.  Okay.  So you don't have a point person now
4       because you don't deal with these issues.
5       Correct?
6   A.  Correct.
7   Q.  Was there also a system in place to monitor
8       expenses of outside visits to outside doctors?
9       Not ER visits, but specialist consultations.
10  A.  There probably was, but not at my level.
11  Q.  So unlike the payroll and the pharmaceutical
12      which we've talked about, that looking at going
13      to outside specialists is not something as the
14      HSA you would have looked at?
15  A.  Not for pricing.
16  Q.  What would you have looked at it for?
17  A.  Just how many visits there were, how long the
18      visits were.
19  Q.  Okay.  It wasn't talked -- at least from what
20      you reviewed, it wasn't talked about in terms
21      of a budget number; it was just talked about in
22      terms of number of visits and reasons for
23      visits?
24  A.  Correct.
25  Q.  And was there a number of visits projected

84

1       for -- any benchmark that you were supposed to
2       check it against?
3   A.  Yes.
4   Q.  So what was that called?
5   A.  It was just part of the monthly report, and it
6       showed the -- I don't even know what it's
7       called now, but basically the projected number
8       of visits per month.
9   Q.  And do you know who or what entity within
10      Corizon would have prepared that protection?
11  A.  (Witness shakes head.)
12  Q.  You have to answer out loud for her.
13  A.  Sorry.  No.
14  Q.  And you would just -- you would look at it, at
15      the report, to just compare it to the benchmark
16      and also check it in the way you've already
17      described, but you don't know where the
18      benchmark number came from?
19  A.  Correct.
20  Q.  And was the same true for people going to the
21      ER being hospitalized?
22  A.  Correct.
23  Q.  And in terms of the hospitalizations, was that
24      talked about in terms of a dollar figure or a
25      number of days or -- what was the sort of unit

85

1       of measure for --
2   A.  There's number of days and then there was cost
3       per day.
4   Q.  So both?
5   A.  (Witness nods head.)
6   Q.  And would you get a monthly report that had a
7       projection for both the number of days in a
8       given month and also the cost per day?
9   A.  Yes.
10  Q.  And again, you don't know -- do you know where
11      those projections came from?
12  A.  Probably the same place the other ones came
13      from.
14  Q.  Okay.  And in your experience, both at Lane
15      County and at Washington County as the HSA,
16      were there times when there would be overruns
17      in some of these categories that we've been
18      talking about?
19  A.  Yes.
20  Q.  And how would those be dealt with?  What would
21      you do as the HSA when there were overruns?
22  A.  They would be discussed with the site medical
23      director, the regional medical director, and
24      utilization management department.
25  Q.  And did you have a contact in utilization

(Pages 82 to 85)                                                22

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 9 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

86

1  management that you went to?
2  **A. Yes.**
3  Q.  Who was that?
4  **A. Christina Panico.**
5  Q.  Spell her last name?
6  **A. P-A-N-I-C-O.**
7  Q.  And was she your contact both when you were at
8  Lane County and when you were at Washington
9  County?
10  **A. I do believe so, yes.**
11  Q.  And where was she located?
12  **A. East Coast somewhere.**
13  Q.  Do you know whether she was in Tennessee?
14  **A. No, she wasn't. She was on the East Coast.**
15  Q.  Okay. So you know she was not in Tennessee?
16  **A. Correct.**
17  Q.  Do you know if Ms. Panico is still with
18  Corizon?
19  **A. She is.**
20  Q.  Do you know if she's in that same job?
21  **A. She is.**
22  Q.  I think I forgot to ask this. Do you recall
23  when you were the Lane County HSA who the
24  regional medical director was?
25  **A. It was Dr. Garlick for a while and then it was**

87

1  **Dr. Orr.**
2  Q.  And does the same medical director oversee the
3  Lane County jail and the Washington County
4  jail?
5  **A. Yes.**
6  Q.  So for the time you've been at Corizon as a
7  whole, was it Dr. Garlick for a while and then
8  Dr. Orr?
9  **A. Correct.**
10  Q.  Is it still Dr. Orr?
11  **A. For right now, yes.**
12  Q.  Is there some -- is there a change in the
13  works?
14  **A. Possibly.**
15  Q.  Tell me what you know about that.
16  **A. It's going to probably go back to Dr. Garlick,**
17  **because there's a lot of contracts being looked**
18  **at in California, which would make Dr. Orr**
19  **extremely busy.**
20  Q.  I can't remember. Does Dr. Garlick still work
21  for Corizon?
22  **A. Yes.**
23  Q.  All right. Take a look back at Exhibit 36, if
24  you would again. So let me ask it this way
25  with Exhibit 36. As you look at this big

88

1  document now, is there some part of this that
2  you would consider to be the contract? Is
3  there some subset of this that was in your
4  binder?
5  **A. As I said before --**
6  MR. DAIGLE:  Object to the form.
7  Go ahead.
8  THE WITNESS:  -- the RFP wasn't in my
9  binder.
10  BY MR. DEVLIN:
11  Q.  So what page number is there at the bottom?
12  **A. 110.**
13  Q.  So taking 110 to the back, just looking at the
14  chunk that's 56 to 109, does that excerpt of it
15  look like the contract that was in your binder?
16  And take a minute if you feel you need it.
17  **A. Yes.**
18  Q.  I got lost because of the question. Yes, the
19  excerpt from 56 to 109 looks like the document
20  that would have been in the binder you've been
21  referring to?
22  **A. Yes.**
23  Q.  If look back at 107 to 108 for a second, those
24  two matrixes, my colleague just raised a
25  question. He noticed that service level A did

89

1  not have a mental health person on Saturday and
2  Sunday and service level B did.
3  **A. Correct.**
4  Q.  And I think you said that your memory was that
5  service level B is the one that was in effect
6  when you were at Lane County, but our memory
7  from talking to Mr. Pleich is that he wasn't
8  working weekends at the time. So I just didn't
9  know if --
10  **A. I'm not sure of what the ADP is when I was**
11  **there, and the service levels are attached to**
12  **the ADP. So if the ADP fell below 221, then it**
13  **was service level A. So it might have been**
14  **service level A that I was working under**
15  **instead of service level B.**
16  Q.  And how often did it change? I mean, the jail
17  population obviously changes every day. Was
18  this reassessed, A versus B, every week or
19  every month? How was that done?
20  **A. No, it wasn't, because there's only one inmate**
21  **number different between A and B. I'm not sure**
22  **which one -- it could have been that we were**
23  **under A, and B came after I left. I can't be**
24  **certain.**
25  Q.  If you were going to try and figure out the

(Pages 86 to 89)                                                23

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 10 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

94

1  A.  No.
2  Q.  Is the same procedure followed at the
3      Washington County jail?
4  A.  No.
5  Q.  Tell me what happens at Washington County.
6  A.  At Washington County jail, once an inmate is
7      received in from the sally port, they are an
8      inmate in the jail and they get an intake
9      screening.
10         They may then go to court and be cited and
11      released.  But once at Washington County you
12      enter the sally port, you become property of
13      Washington County jail.
14  Q.  Okay.  So let me break this down a little bit.
15      So at the Washington County jail, when someone
16      comes in the sally port and they're first dealt
17      with by people at the jail, is that when a
18      Corizon person does the screening with
19      Exhibit 53?
20  A.  They have to be brought in from the sally port
21      into the intake area.  Custody needs to deal
22      with them there first before we start the
23      intake.  When that procedure is done, then
24      they're set in chairs to wait.
25         And they come up on a screen at Washington

95

1      County, and that's what the intake nurse goes
2      by, is who's on the screen.  Because then the
3      first procedure has been done.  They are booked
4      in, and they're ready for intake.
5         And it has a whole screen, and it tells
6      the nurse what's been done, what hasn't been
7      done.  And when she does her piece, then that
8      piece is checked off.
9  Q.  So tell me if I have it wrong.  You know, I'm
10      just trying to understand.  In Washington
11      County as opposed to Lane County there is no
12      several-hour gap in that process happening?
13      That process happens when a person is first
14      received into the jail?
15  A.  There might be a several-hour gap if there's 17
16      people waiting to be screened for intake.  One
17      nurse is not going to be able to do everybody
18      right away.
19  Q.  Right.  But the reason there would be a delay
20      or a gap, whatever words you want to use, in
21      Washington County, is just literally because
22      there are more people to be seen than a person
23      available?
24  A.  Correct.
25  Q.  But the standard and procedure in Washington

96

1      County is that the person is seen by a Corizon
2      nurse as soon as they're brought into the jail?
3  A.  Yes.  And as soon as they're brought into the
4      jail and custody does their first piece and
5      their name pops up on the screen as ready for
6      intake.
7  Q.  And that was not the procedure that was
8      followed in Lane County while you were the HSA?
9  A.  Correct.
10  Q.  When you -- and in Lane County while you were
11      the HSA, the Corizon screening did not take
12      place until a decision had been made that a
13      particular inmate was going to be housed at the
14      jail?
15  A.  Correct.
16  Q.  Was not going to be released for any reason?
17  A.  Correct.
18  Q.  A lot of times might have already had their
19      initial court appearance?
20         MR. DAIGLE:  Object to form.
21         THE WITNESS:  I don't know.  That's
22      possible.
23      BY MR. DEVLIN:
24  Q.  When you first got to the Lane County jail, did
25      you ask anybody about why the procedure in Lane

97

1      County was different than the procedure at
2      Washington County?
3  A.  Yes.
4  Q.  Who did you ask?
5  A.  I don't remember.
6  Q.  Was it a Corizon person or a Lane County
7      person?
8  A.  I probably asked both.
9  Q.  Do you recall what those people told you?
10  A.  In essence, this is how we do it here.
11  Q.  Okay.  Do you know whether that procedure at
12      Lane County was actually following the contract
13      between Lane County and Corizon?
14  A.  As a Corizon employee in a jail, I am beholden
15      to how the jail runs their procedures.  If
16      that's how they run their procedure, then my
17      intake starts when they tell me that the inmate
18      is ready for me.  I don't jump the gun.
19         I do it the way custody has asked me to do
20      it.  That's how it's run and that's how it's
21      run in any jail.  We are guests in the jail.
22      We don't own the jail.  We don't make the
23      rules.  The only time we can supersede that is
24      if there's a medical emergency.
25  Q.  I appreciate that, but it's a different

(Pages 94 to 97)

25

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 11 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

98

1    question.  Do you know whether the procedure
2    that you described that was taking place in
3    Lane County complies with the contract that
4    Lane County and Corizon sign?
5  A.  I don't understand your question.
6  Q.  Do you know what the contract between Lane
7    County and Corizon provided for in terms of
8    when the Corizon screening should take place?
9  A.  No.
10 Q.  During your time as the HSA, did you ever look
11    at it to try to figure out when that screening
12    was supposed to take place?
13 A.  That particular piece, no.
14 Q.  So I just want to make sure I have this right.
15    You said it's pretty vivid about someone
16    basically saying, this is how we do things.  Do
17    you have any memory, as you sit here, about who
18    from the Lane County Sheriff's Office said
19    that?
20 A.  Mr. Devlin, do you know how many conversations
21    I had with people down there in the time I was
22    there?  Hundreds.  Do I remember exactly what
23    one person said to me regarding one question at
24    one time?  No, I do not.
25      Maybe they explained the whole custody

99

1    piece to me and I don't understand it because
2    it's different at every jail.  What I do
3    understand is that they're in charge and I do
4    as they ask me to.  Does that answer your
5    question?
6  Q.  Fair enough.  Do you know whether -- what role
7    the Lane County Sheriff's Office -- what job
8    the Lane County Sheriff's Office did in terms
9    of dealing with an inmate when they first came
10    in?
11 A.  I have no idea.
12 Q.  Do you know if a Lane County sheriff's deputy
13    asked any medical or mental health screening
14    questions when an inmate was first brought in?
15 A.  Yes, they did.
16 Q.  Do you know what they asked about?
17 A.  No, I don't.
18 Q.  Could you or the HSA ever talk with anyone at
19    Lane County about what kind of questions the
20    sheriff's deputy should be asking at the intake
21    stage?
22 A.  No.
23 Q.  Do you know whether Corizon ever provided any
24    training to the Lane County sheriff's deputies
25    about what kind of questions they should be

100

1    asking inmates when they were brought into the
2    jail?
3  A.  You already asked me a question about training,
4    and I told you I did not know.
5  Q.  Let me show you what's been marked as
6    Exhibit 13.  Can you tell me what Exhibit 13
7    is?
8  A.  Fit for confinement guideline.
9  Q.  How is that used at the Lane County jail with
10    HSA?
11 A.  If we were called to the wall because there was
12    a concern about an inmate who had been arrested
13    and brought in, we would go and assess that
14    individual to see if they were indeed fit for
15    confinement.
16 Q.  And is Exhibit 13, this first page here, is
17    that the criteria that Corizon used to decide
18    if someone is fit for confinement?
19 A.  Yes, at Lane County.
20 Q.  Do you know who prepared Exhibit 13?
21 A.  I do not.
22 Q.  Is there a similar fit for confinement
23    guideline in effect at Washington County?
24 A.  There is.
25 Q.  Take a minute and look at first page of

101

1    Exhibit 13 and tell me if, as best you can
2    tell, if the guidelines are the same or
3    different.
4  A.  Some of them are a bit different.
5  Q.  Can you identify which ones are different?
6  A.  Not really, because I don't have the Washington
7    County one in front of me.
8  Q.  Is there something, as you're looking at
9    Exhibit 13, that is standing out to you as
10    being different than between Lane and
11    Washington County?
12 A.  Not at this moment, I cannot.
13 Q.  Let me show you what's been marked as
14    Exhibit 71.  Do you recognize Exhibit 71?
15 A.  Yes.
16 Q.  What is Exhibit 71?
17 A.  Policy and procedure on receiving screening.
18 Q.  Is that a Corizon policy?
19 A.  Yes.
20 Q.  Can you read the first line there under
21    "policy"?  What does that say?  Out loud,
22    sorry.
23 A.  Receiving screening as performed on inmates
24    upon arrival at the intake facility to ensure
25    that emergent and urgent medical and mental

(Pages 98 to 101)                                                    26

Exhibit 36 - Page 12 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

106

1    confused.  What was the first thing that day
2    that you heard related to Mr. Green?
3  A.  Man-down call.
4  Q.  So were you actually in the courtroom?
5  A.  No.  I don't even know where the courtroom is.
6  Q.  But you heard the call related to it?
7  A.  Yes.
8  Q.  Okay, great.  So tell me if you remember where
9    you were and what you were doing when you heard
10    the call.
11  A.  I was in the clinic starting an IV and drawing
12    blood on a patient.
13  Q.  And I guess I should have asked that.  So as
14    the HSA, did you both do administrative work
15    and also do clinical work?
16  A.  Yes.
17  Q.  And so you were starting an IV, and were
18    Ms. White and Ms. Fagan -- I'll call her
19    Ms. Fagan just because it's easier.  Were
20    Ms. White and Ms. Fagan in the medical clinic
21    at the same time?
22  A.  I think so, but I'm not positive.
23  Q.  Because you were working on the patient?
24  A.  Right.
25  Q.  So what did you do in response to the man-down

107

1    call, if anything?
2  A.  Nothing except verify that somebody else was
3    going to go on it.
4  Q.  You just made sure that someone was responding?
5  A.  Right.
6  Q.  Okay.  From your perspective, what was the next
7    thing that happened in connection with Kelly
8    Green?
9  A.  Me walking into the room where he was being
10    treated.
11  Q.  In the medical clinic?
12  A.  Correct.
13  Q.  So you didn't have any -- until Mr. Green was
14    brought to the medical clinic -- from the time
15    of the man-down call until he was brought to
16    the medical clinic, you didn't hear anything
17    about what was going on or anything?  That was
18    the next event?
19  A.  Correct.
20  Q.  There were no calls back to your office or
21    anything like that?
22  A.  Not that I remember.
23  Q.  Okay.  And so then tell me sort of -- I'll have
24    some specific questions, but sometimes it
25    helps.  Walk me through, from your perspective,

108

1    what was the first thing you heard and what did
2    you do in response?
3      MR. DAIGLE:  Does that say 2/12?
4      MR. COLEMAN:  9/12.
5      MR. DEVLIN:  9/12.  No, 2/12.
6      MR. DAIGLE:  2/12, 2/12, not 9/12.  Sorry.
7      MR. DEVLIN:  It's so hard to find good
8    help these days.
9      MR. DAIGLE:  2/12 was a Tuesday.
10      MR. DEVLIN:  So that helps, it was a
11    Tuesday.
12      MR. DAIGLE:  We were both wrong.
13      THE WITNESS:  I could have been there
14    anywhere from 6:30 to 8:30.  It just depended
15    on things.
16  BY MR. DEVLIN:
17  Q.  So after the man-down call when you're just
18    were doing your work in the clinic, walk me
19    through sort of from your perspective what
20    happened.
21  A.  I finished with my patient, went back over to
22    the administrative side.  And then I think I
23    got called over to the clinic, because I went
24    into the clinic to the room where Mr. Green was
25    being treated.

109

1  Q.  And so then do you recall who called you over
2    or why?
3  A.  I think it was Jona, but I didn't -- I think
4    she might have just said, I think you need to
5    go over there, they need you over there, have
6    you been over there.  I'm not sure.
7  Q.  Okay.  So then what happened next from your
8    perspective when you got to the room?
9  A.  I looked in and saw Mr. Green and everybody
10    that was in the room.  And I looked at the
11    wound on his head and spoke to the deputies
12    about him going to the hospital.
13  Q.  And so when you first went into the room, what
14    was happening with Mr. Green?  Was he still
15    being stitched up?
16  A.  Yes.
17  Q.  And could you just describe, if you remember,
18    kind of the -- where everybody was
19    position-wise around him.
20  A.  There was a male deputy sitting in a chair in
21    the corner, and the exam table had been pushed
22    over to the side.  Chris was behind Mr. Green.
23    He had a sterile drape over his head.  She was
24    stitching the wound.
25      Sharon had her hands under the sterile

(Pages 106 to 109)                                          28

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 13 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

110

1    drape holding his head and neck.  There was a
2    female deputy on either side holding his arms.
3    Then there was Sergeant Davis on the left of
4    the door and Sergeant Balcom on the right of
5    the door, and I was standing next to Sergeant
6    Davis.
7  Q.  So let's break that down a little bit.  So
8    there was a male deputy in the room who you
9    didn't know by name?
10  A.  I don't remember his name, yes.
11  Q.  But you knew by sight Sergeant Balcom and
12    Sergeant Davis?
13  A.  Yes.
14  Q.  And they were both in the area?
15  A.  They were standing at the door.
16  Q.  And could you tell -- and Mr. Green obviously
17    was in the wheelchair?
18  A.  Yes.
19  Q.  Could you tell whether Ms. Fagan, just from
20    what you were observing, was she holding his
21    head and neck so that it wouldn't move for the
22    stitching or as a way to provide, you know,
23    stabilization because worrying about a neck
24    injury?
25         MR. DAIGLE:  Object to the form.

111

1  BY MR. DEVLIN:
2  Q.  Or is there any way to tell?
3  A.  There would be no way to tell.
4  Q.  And did you say -- did you actually go and look
5    at the wound yourself?
6  A.  Yes.
7  Q.  When you first got to the room, did you have
8    any discussion with Ms. White or Ms. Fagan
9    about what was going on with Mr. Green?
10  A.  No, because they were in the midst of treating
11    him.
12  Q.  Okay.  Tell me what you remember about looking
13    at the wound.  What did it look like?  How bad
14    was it?
15  A.  Pretty significant.  It stretched across the
16    top of his head.  I don't know how deep or how
17    wide it was.  I don't remember.  But obviously
18    it was deep and wide enough to need stitches.
19  Q.  And so then -- and again, if I'm skipping
20    something, tell me.  I want to make sure I've
21    got it.  So you go and you see everybody, you
22    check the wound.  What's the next thing that
23    you do?
24  A.  I step back out of the way.  I stand in the
25    doorway with the two sergeants, and I told

112

1    Sergeant Davis that I felt that Mr. Green
2    needed to go to the hospital right away.
3  Q.  It sounds like you have a specific memory of it
4    being Sergeant Davis that you talked to?
5  A.  Yes, yes.
6  Q.  And what -- why did you say that to him?  What
7    was it about the situation?
8  A.  I believe that during the time we were standing
9    at the door to the exam room I was aware of the
10    circumstances of the injury.  And because
11    there's a head injury, I always feel it's
12    prudent to send someone to the hospital to be
13    checked out.
14  Q.  At that point, when you've made that statement
15    to Sergeant Davis, what you knew -- as best you
16    remember, tell me what you had heard about what
17    had happened in the courtroom.
18  A.  If he told me at that time, it was that he had
19    run himself into the wall in the courtroom.
20  Q.  Did you have any information at that point
21    about whether or not Mr. Green had lost
22    consciousness in the courtroom?
23  A.  I don't know that I ascertained that.
24  Q.  Or how far from the wall he was when he ran his
25    head in?

113

1  A.  I don't know that I ascertained that, either.
2  Q.  But you do have a memory of knowing at least
3    that he didn't come from -- that the mechanism
4    of injury was running his head into a wall?
5  A.  Correct.
6  Q.  And then you saw the wound?
7  A.  Correct.
8  Q.  Seriousness of the wound?
9  A.  Correct.
10  Q.  So what was the -- I understand that's the --
11    mechanically that's the reason.  Medically,
12    what was the reason why you thought Mr. Green
13    should go to the hospital?
14  A.  Because he had a head injury.
15  Q.  Was it just for the laceration?
16  A.  No, because he had a head injury.
17  Q.  So why would someone need to go to the hospital
18    in that situation?
19  A.  To make sure that there isn't anything further
20    going to and that there isn't further injury.
21  Q.  Further injury to what?
22  A.  Head, neck, spine, shoulders.  I don't know how
23    hard he hit.  I don't know what hit.  I don't
24    know how much hit.
25  Q.  When you said to Sergeant Davis that Mr. Green

(Pages 110 to 113)

29

Exhibit 36 - Page 14 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

114

1  needed to go to the hospital right away, did
2  you have concerns that he might have suffered a
3  neck or a spinal cord injury?
4  A.  It could have crossed my mind.  I was more
5  concerned with the head injury and -- not just
6  that his scalp was split open, but further head
7  injury in his skull.
8  Q.  That couldn't be seen?
9  A.  Correct.
10  Q.  Okay.  But it's possible that envisioning
11  obviously just an underlying head injury, it
12  may have crossed your mind that a neck or a
13  spinal cord injury is a possibility?
14  A.  It may have, yes.
15  Q.  Because certainly you agree that with that
16  mechanism of injury and that kind of wound, it
17  was a possibility?
18  A.  Correct.
19  Q.  What did Sergeant Davis say in response when
20  you said that?
21  A.  He said, we'll get him released within the
22  hour, and we'll make sure he gets to the
23  hospital.
24  Q.  And what did you understand that to mean?
25  A.  They were working on releasing him, and he

115

1  would make sure that he got to the hospital,
2  and that it would be within the hour.
3  MR. DEVLIN:  Off the record for a second.
4  (Interruption in the proceedings.)
5  THE VIDEOGRAPHER:  Back on.
6  BY MR. DEVLIN:
7  Q.  So what was your understanding of what that
8  meant, to work on getting him released?
9  A.  That he would be talking with somebody -- I
10  don't know who that would be, whether it would
11  be court, DA, lieutenant -- and that they were
12  working on releasing him from the jail.
13  Q.  And did you -- why was that important?  Why did
14  it matter whether he was released or not if he
15  needed to go to the hospital?
16  A.  I'm not sure.
17  Q.  So what did you say in response when Sergeant
18  Davis told you that?
19  A.  I verified that he said within the hour, and I
20  also said, and it needs to be by ambulance.
21  Q.  As opposed to?  What were the other options?
22  A.  Back of a squad car.
23  Q.  Why did that matter to you that it be by
24  ambulance?
25  A.  Because he had a head injury.  The back of a

116

1  squad car is for less serious injuries, like,
2  say, a broken arm.  The arm is broken, but you
3  don't need an ambulance to go to the hospital
4  for a broken arm.
5  Q.  And just -- the part -- just help me
6  understand.  Say he's going to be transported
7  to the hospital.  An ambulance -- why would an
8  ambulance be different than a squad car?
9  A.  An ambulance has paramedics who are trained in
10  all levels of trauma.
11  Q.  So did you think Mr. Green needed not only to
12  go to the hospital but he needed to see a
13  paramedic?
14  A.  He needed to be accompanied by a paramedic
15  between the jail and the hospital.
16  Q.  And, in your mind, why was -- why?
17  A.  That's prudent medical care for a head injury.
18  Q.  And was one of the things you were worried
19  about a subdural hematoma?
20  A.  Possibly.
21  Q.  Can you tell me what other things, if you think
22  about it -- you know what a differential
23  diagnosis is?
24  A.  Yes.
25  Q.  What would be the other things you're thinking

117

1  about in terms of a differential diagnosis with
2  the facts as you knew them?
3  MR. DAIGLE:  Object to the form.
4  THE WITNESS:  At any point he could lose
5  consciousness.  Sometimes with head injuries
6  you can get nausea and vomiting.  I didn't have
7  his latest blood pressure, and blood pressure
8  can skyrocket or plummet, depending on the
9  body's response to trauma.
10  He needed to have somebody with him who
11  could attend to whatever came between the jail
12  and the hospital.
13  BY MR. DEVLIN:
14  Q.  And so, in your mind, was this an emergency?
15  A.  In my mind it needed to happen as soon as it
16  could happen.
17  Q.  Could it have happened immediately?
18  A.  I can't answer that now, but -- I don't know.
19  I suppose it could have.
20  Q.  Well, as the HSA at the jail, could you have
21  told the deputies, I want a code 3 ambulance to
22  come for this man right now, order it right
23  now?
24  A.  At that time I'm not sure that I felt
25  comfortable in coming up against custody like

(Pages 114 to 117)                                    30

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 15 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

122

1      stitched up?
2   A.  Not that I remember.
3   Q.  You don't remember seeing him?
4   A.  (Witness shakes head.)
5   Q.  While Mr. Green was in the medical office, do
6       you -- were you there when he defecated?
7   A.  No.
8   Q.  While you were there, do you know, had he -- I
9       can't think of a good way to ask this.  When
10      you got to the medical office, had he already
11      defecated?
12  A.  Not that I'm aware of.
13  Q.  Okay.  Do you know, as you sit here today, at
14      some point in the medical office Mr. Green did
15      defecate?
16  A.  Not that I'm aware of.  Two deputies talked
17      about it, but I don't know that it happened.
18  Q.  When you say two deputies talked about it, what
19      are you referring to?
20  A.  The two female deputies.  When Mr. Green was
21      fidgeting in his chair, one of them said, I
22      think he's trying to poop his pants right now.
23  Q.  Okay.  So while you were there, there was some
24      discussion of it, but you're saying you don't
25      know that it happened --

123

1   A.  Right.
2   Q.  -- because you couldn't verify it?
3   A.  Correct.
4   Q.  Did you ever hear later at any point before
5       this morning that, in fact, he did defecate in
6       the medical office?
7   A.  I have no knowledge of that whatsoever.
8   Q.  So tell me what happened next, from your
9       perspective, after your discussion with
10      Sergeant Davis.
11  A.  I believe I went back to my office, and I don't
12      remember what happened after that until later
13      on in the afternoon.
14  Q.  Well, when you left the medical office, was
15      Mr. Green still being worked on?
16  A.  Yes.
17  Q.  So you were not there when he was taken from
18      the office?
19  A.  No, I wasn't.
20  Q.  And when you went back to your office, were you
21      doing work related to Mr. Green or other work?
22  A.  I don't remember.  I would imagine other work.
23  Q.  I mean, in your mind, when you finished talking
24      to Sergeant Davis, the issue was taken care of?
25  A.  Correct.

124

1   Q.  So as the HSA at the facility, did you have the
2       ability to call the ambulance yourself?
3   A.  I'm not sure.  I don't remember how that went.
4       At Washington we can call ourselves and we do.
5       We just inform the sergeant on duty and master
6       control.  But I don't remember the chain of
7       command of command events at Lane.
8   Q.  And I'm glad you brought that up, because
9       that's a good point to clarify.  So at
10      Washington County as the HSA, you can directly
11      contact EMS if you think they're necessary?
12  A.  Yes.
13  Q.  And obviously you'd let your staff know?
14  A.  Yes.
15  Q.  So did you feel -- when you first said that
16      Mr. Green needed to go to the hospital right
17      away, did you feel like Sergeant Davis was
18      overruling you?
19  A.  I'm not sure.  I don't think that was his
20      intent but, you know, I can't speak for him.
21  Q.  Well, in your mind, I guess, because I know it
22      takes a little time for the ambulance to come
23      and for them to get him out of jail.
24  A.  Right.
25  Q.  So, I mean, did you feel like he was doing what

125

1       you asked him to do, or what he said was
2       different than what you asked him to do?
3   A.  No.  I felt that, you know, in the time it
4       would take Chris to finish stitching him up and
5       for them to call the ambulance and for him to
6       get whatever he had to do on the release part
7       of it, that it would probably all happen at
8       around the same time.
9   Q.  Okay, okay.  That's helpful.
10          So then what was the next thing that
11      you -- the next time during that day you heard
12      anything about Mr. Green?
13  A.  When Sharon contacted me -- and I can't
14      remember if she called me or she came to my
15      office or had somebody come get me.  But she
16      told me I needed to go to medical segregation
17      with her because Mr. Green was laying in the
18      cell.
19  Q.  And what did you think when you heard that?
20  A.  It couldn't possibly be true, because I had
21      been told he was going to be sent to the
22      hospital.
23  Q.  So what did you do in response?
24  A.  I went.
25  Q.  And how was -- can you describe what

(Pages 122 to 125)                                          32

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 16 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

126

1    Ms. Fagan's demeanor was when she came to tell
2    you? Was she calm? Was she upset?
3    A.  Upset.
4    Q.  So walk me through what happened next.
5    A.  We entered the cell and found Mr. Green lying
6    in his cell with his clothes on.  He had soiled
7    himself, so she and I removed his pants and
8    cleaned him up as best we could, taking very
9    strict care not to move him except in what's
10   called a log-roll style where the whole body
11   moves as one.
12        And I turned to -- there was a deputy
13   standing there, and I turned to him and I said,
14   you need to call an ambulance right now.  And
15   why isn't he -- why is he still here?
16   Q.  Were you upset?
17   A.  Yes.
18   Q.  Did you raise your voice?
19   A.  Probably.
20   Q.  Did that happen inside the cell?
21   A.  Yes.
22   Q.  What did the deputy do when you said that?
23   A.  Well, he had to wait for us to be finished
24   before he could leave, because we can't be left
25   in the cell alone with an inmate.

127

1        So when we were finished, I went probably
2    back to medical, I don't remember for certain,
3    and I would assume he went and made the phone
4    call.
5    Q.  When you saw Mr. Green, was he able to move?
6    A.  I don't remember what he could move.  I -- he
7    couldn't move his arms.  He could move his legs
8    a little bit, I think.  He could still talk to
9    us.
10   Q.  Tell me what, if anything, specifically you
11   remember about his legs being able to move.
12   A.  I think I asked him if he could lift his leg up
13   for me so I could pull the pants down, and he
14   was able to do it a little tiny bit.
15   Q.  So lift his leg a little bit off the bed?
16   A.  Yes.
17   Q.  Do you know if that was one or both?
18   A.  I don't remember.
19   Q.  I assume you know what a neurological exam is?
20   A.  Yes.
21   Q.  Did you do any kind of a neurological exam on
22   him?
23   A.  No, I did not.
24   Q.  Did Ms. Fagan do it while you were there?
25   A.  No.  We were busy cleaning him up, and she was

128

1    going to get paperwork ready I think for the
2    ambulance.
3    Q.  By the time you got into Mr. Green's cell that
4    afternoon, do you know whether anyone had
5    seen -- anyone from Corizon had seen him, you
6    know, in the last little bit of time?
7    A.  I did not know.
8    Q.  Did you -- did you see Ms. White around while
9    you were taking care of Mr. Green in the
10   afternoon there?
11   A.  No.
12   Q.  Do you know whether she had left for the day
13   already?
14   A.  I don't remember.
15   Q.  When you walked in and you saw Mr. Green in the
16   condition he was in, what did you think?
17   A.  I couldn't believe he was still there.
18   Q.  Because of what you'd been told earlier in the
19   day?
20   A.  Right, right.
21   Q.  I'm assuming after, based on what you said
22   already, that after you had the conversation
23   with Sergeant Davis and went back to your
24   office, you didn't independently do anything to
25   make sure he had been sent to the hospital?

129

1    A.  No.
2    Q.  You just figured that they said they would do
3    it and they'd take care of it?
4    A.  And Chris and Sharon were still there, so I
5    knew that they were capable of tying up what
6    needed to be tied up.
7    Q.  Right.  Between the time you left the medical
8    office and when you saw Mr. Green later in the
9    day, do you recall whether you talked with
10   Ms. White at all about Mr. Green?
11   A.  I don't recall.
12   Q.  Or do you recall whether you talked to
13   Mr. Fagan about Mr. Green?
14   A.  I don't recall.
15   Q.  Do you remember how you spent -- and I know you
16   don't remember exactly who you saw.  But do you
17   remember how you spent that time, the bulk of
18   that day, whether you were in the clinic or the
19   administrative office or . . .
20   A.  I remember the patient that I drew the labs on,
21   there was a nurse with me that was job
22   shadowing me, and so I was showing her things
23   that, you know, the HSA did at Lane County.  I
24   don't remember anything else.
25   Q.  I appreciate that your initial thought when I

(Pages 126 to 129)                                    33

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 17 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

130

1   asked you this question is going to be that
2   there's no such thing as a typical day at the
3   jail.  I get that.
4       Is there any way to give me a sense of, on
5   an average day, what percent of time you would
6   spend in the clinic versus in the
7   administrative office.  And I know it will be
8   rough.  I'm just trying to get a handle on it.
9   A.  Like you say, you know, it varies.  I would be
10  in and out of the clinic many, many times a day
11  just using the fax machine or the copier or
12  pulling charts or talking with somebody about
13  something.
14      Or they would call me over to do
15  something, draw a lab or help them with
16  somebody.  I would say a typical day was maybe
17  50/50 or 60/40.
18  Q.  And I understand it's rough.
19  A.  Yeah.
20  Q.  Was there some kind of procedure if someone
21  from -- were there ever times where someone
22  from the jail, or the deputy -- not an inmate,
23  but a jail deputy would call the medical office
24  for some reason?
25  A.  Yes.

131

1   Q.  Was there any kind of procedure in place for
2   who was supposed to answer the question?
3   A.  Whoever is sitting by it.
4   Q.  There wasn't a receptionist?
5   A.  Sometimes there was.  If we were seeing
6   patients in the clinic, there would be sitting
7   signature at the desk coordinating patient
8   traffic, but not all the time.
9   Q.  And if that was happening, if there was a
10  person doing that, who would typically have
11  done that?
12  A.  Who would typically have answered the phone?
13  Q.  Right.
14  A.  The person sitting at that desk.
15  Q.  And was there like a job position or a person
16  who would do that?  If the clinic was busy like
17  you described it, was there one person whose
18  job it was to do that?
19  A.  Not at that time there wasn't, no.  It was
20  whoever was available.
21  Q.  And was there any kind of documentation kept
22  when that type of phone call would come in from
23  a deputy, like a log by the phone or --
24  A.  No, no.
25  Q.  When you saw Mr. Green in the afternoon, at

132

1   that point did you think it was an emergency?
2   A.  Yes.
3   Q.  And what about it at that point made you think
4   it was an emergency?
5   A.  There was too much time between the incident
6   and when I found him in the cell.
7   Q.  What were the potential problems, or why was
8   that a bad thing?
9   A.  No one had looked at him.  There had been no
10  x-rays, no scans, no neurology consult, no
11  orthopedic consult, nothing.
12  Q.  At that point when you saw him in the
13  afternoon, did it cross your mind at all that
14  he was faking?
15  A.  No.
16  Q.  You thought he -- when he said he couldn't
17  move, you thought he couldn't move?
18  A.  Yes.
19  Q.  Could you describe a little bit what you
20  remember the condition he was in.  I know he
21  soiled himself and you had to clean him up.
22  Just as best you remember, how extensive was
23  it?  Where was it?
24  A.  You me to describe the poop, is that what
25  you're asking me?

133

1   Q.  I do.
2   A.  It was caked over all of his genital area and
3   on his buttocks.  And because he couldn't move
4   very well, it was difficult to do it and also
5   to maintain his spinal integrity.  It was
6   difficult, so we did the best we could.
7   Q.  Could you tell whether some of the feces had
8   been there for a while as opposed to being
9   recent?
10  A.  That I don't -- I don't recall.
11  Q.  When you went into the cell, how bad was the
12  smell?  Was it a little bit or pretty
13  overpowering?
14  A.  I don't recall that, either.
15  Q.  Did you have any idea at that point what his
16  vital signs were or whether they had been taken
17  recently?
18  A.  I don't.  But Sharon was going to go back and
19  get the equipment and take a set of vitals when
20  we were done.
21  Q.  Did you have any concerns when you first went
22  into the room that -- you've described some of
23  the problems, some of the reasons why the delay
24  was not good.  Did you have concerns that his
25  neck -- he had had no immobilization of his

(Pages 130 to 133)                                          34

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 18 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

142

1   A. I don't.
2   Q. Are you aware -- were you aware back then as
3       the HSA that there were video cameras all over
4       the jail?
5   A. Yes.
6   Q. And is it fair to say most everything that
7       happens in the jail is on video somewhere?
8   A. Yes.
9   Q. Did you ever make any effort as the HSA to go
10      back close in time and review available video
11      to figure out -- get more information about
12      what had happened with Mr. Green?
13  A. No.
14  Q. Why not?
15  A. I don't know. Never crossed my mind.
16      MR. DAIGLE: Hold on for a minute.
17      (A lunch recess is taken.)
18      THE VIDEOGRAPHER: Back on.
19  BY MR. DEVLIN:
20  Q. Okay. Ms. Thomas, I have a few random kind of
21      cleanup questions. You said the date this
22      happened to Mr. Green there was someone who was
23      job shadowing you.
24  A. Um-hum.
25  Q. Do you remember who that was?

143

1   A. Leslie O'Neill.
2   Q. And did she subsequently go to work at Corizon?
3   A. She was also a Corizon employee.
4   Q. Oh, okay. And is she still at Corizon?
5   A. Yes.
6   Q. Do you know where she's working now?
7   A. Washington County.
8   Q. Was what was the reason she was following you
9       that day?
10  A. Jeremy was considering placing her as HSA at
11      Clackamas.
12  Q. I see. So to give her a sense of that what
13      that entailed?
14  A. Um-hum.
15  Q. And then Stevens Hippolyte, do you know whether
16      he's an RN?
17  A. He is not.
18  Q. Or a physician's assistant?
19  A. He is not.
20  Q. Does he have any kind of medical license?
21  A. No.
22  Q. Or medical background?
23  A. He had some medical background. I don't
24      remember what it was.
25  Q. But not a professional license?

144

1   A. Correct.
2   Q. Okay. And then when you were cleaning up
3       Mr. Green and you noticed the feces, like we
4       talked about, did you notice whether or not he
5       had also urinated on himself?
6   A. I don't remember.
7   Q. I want to go back to the discussion you had
8       with Ms. White after the incident with
9       Mr. Green. Do you recall Ms. White telling you
10      that Mr. Green had been struggling or fighting
11      or pushed her away in any way in the courtroom?
12  A. I don't remember that, no.
13  Q. If she told you that, do you think you'd
14      remember that?
15  A. Yes.
16  Q. I know you weren't in the courtroom, but let me
17      tell that -- my understanding is the Corizon
18      medical people that were in the courtroom were
19      -- actually, I should ask you that point.
20      Do you know who was in courtroom for
21      Corizon?
22  A. I know Chris was there. I'm assuming Sharon
23      was there. And after that, I don't -- I don't
24      know.
25  Q. But if Chris was there, Ms. White, is it your

145

1       expectation that she would be the one in charge
2       medically of the situation?
3   A. Absolutely.
4   Q. After this conversation you had with Ms. White,
5       did you ever talk with her again about what
6       happened with Mr. Green, as best you can
7       remember?
8   A. Yes.
9   Q. Tell me when the next time was.
10  A. I don't remember when the next time was, but we
11      talked about it a few times after that.
12  Q. Can you tell me what you remember about any of
13      those other discussions?
14  A. They were basically the same, just the chain of
15      events. That's all I remember.
16  Q. As best you can recall, did any of the details
17      of what Ms. White told you happened, did they
18      change in any of the different times she told
19      you?
20  A. No.
21  Q. Is that a consistent story that she told you?
22  A. Yes.
23  Q. Let me mark this as Exhibit 89.
24      (Deposition Exhibit No. 89 is
25      marked for identification.)

(Pages 142 to 145)

37

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 19 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

146

1    BY MR. DEVLIN:
2    Q.   This is a one-page document that we received
3         from Corizon in discovery.  It's got a number
4         CORIZON1281 at the bottom.  The format of this
5         document, do you recognize this?
6    A.   No.
7    Q.   My understanding is it's a printout of the
8         Corizon folks who were working in the jail on
9         February 11th to February 12th.  I assume you
10        recognize the name shown there?
11   A.   Yes.
12   Q.   Okay.  I just want to focus on the
13        February 12th day.  We've talked about you and
14        Ms. Fagan.  Martin McCarthy, can you tell me
15        what job duties Mr. McCarthy had?
16   A.   Well, as an RN he could have been doing intake
17        in the detoxers.  He could have been in the
18        clinic.  I don't remember what he was doing
19        that day.
20   Q.   But were he and Ms. Fagan basically
21        equivalent-level folks?
22   A.   Oh, yes.
23   Q.   And then how do you say her name?  Is it Jona?
24   A.   Yes.
25   Q.   How do you say her last name?

147

1    A.   Bourgard.
2    Q.   So the initial CMA, what does that stand for?
3    A.   Certified medication assistant.
4    Q.   And then next to it there's Gail --
5    A.   Fore.
6    Q.   Fore?
7    A.   Yes.
8    Q.   Also a certified medication assistant?
9    A.   Right.
10   Q.   And what was the job that Ms. Bourgard and
11        Ms. Fore did at the jail?
12   A.   They passed the medications to the inmates in
13        the housing units.
14   Q.   And then there's Mr. Pleich, Ms. White, and
15        Ms. Panzer.  And then looking at the swing
16        shift, there's Tanya Elliott and Leah Smith.
17        And again, did Ms. Elliott and Ms. Smith
18        basically have a job equivalent to Ms. Fagan's?
19   A.   Yes.
20   Q.   RNs?
21   A.   Yes.
22   Q.   And the name Karen Clark here, her name was
23        equivalent to Ms. Bourgard's?
24   A.   Yes.
25   Q.   Just a different time of day?

148

1    A.   Correct.
2    Q.   And then overnight, the graveyard shift, there
3         were two RNs on duty, Ms. Looney and
4         Ms. Killingbeck.  And did they have the same
5         basic job duties as Ms. Fagan?
6    A.   They did, but Ms. Rene Killingbeck is not an
7         RN.
8    Q.   What's her --
9    A.   She's an LPN.
10   Q.   What's the difference between the two?
11   A.   The level of training.  LPNs cannot give
12        intravenous medications.  They're limited in
13        their scope of practice.  They cannot delegate.
14        They cannot do assessments.  They can do
15        observations.  That's about it, I think.
16   Q.   So but in the hierarchy, an RN is higher than
17        an LPN?
18   A.   Yes.
19   Q.   Other than Ms. White, what you've already
20        described, did you ever, you know, close in
21        time to what happened with Mr. Green, did you
22        ever talk to anybody else about what happened
23        with Mr. Green?
24   A.   Possibly Sharon.
25   Q.   Ms. Fagan?

149

1    A.   Yes.
2    Q.   But you don't -- as opposed to Ms. White, it
3         sounds like -- do you have a memory of talking
4         to her at all?
5    A.   Not really.
6    Q.   Okay.  Anybody else in Corizon, did you talk to
7         them about what had happened close in time to
8         what had happened?
9    A.   Not that I can recall.
10   Q.   Did you talk to anybody at the sheriff's office
11        about Mr. Green and what happened to him close
12        in time --
13   A.   Lieutenant Brown.
14   Q.   And tell me about when.  How soon after did you
15        talk to Lieutenant Brown?
16   A.   I want -- I want to say the next day.  I'm not
17        positive on that.
18   Q.   And do you recall why you talked to him?
19   A.   To go over what had happened.
20   Q.   And was that discussion -- did you initiate
21        that or did he?
22   A.   I can't remember.
23   Q.   When you talked to him, was it just you and
24        him?
25   A.   Yes.

(Pages 146 to 149)                                          38

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 20 of 21
Dec'l of JTD

Vicki Thomas . 2/21/2014

170

1   Q.  Can you tell me anything else that you two
2      discussed?
3   A.  That's all I remember discussing, was this.
4   Q.  Did Mr. Mischler indicate that he was going to
5      do anything else to try to get to the bottom of
6      what had happened here?
7   A.  Not that I'm aware of.
8   Q.  After you got off the phone with Mr. Mischler,
9      did you do anything else to try to figure out
10     whether what the deputy said in this memo was
11     true?
12   A.  Not that I recall.
13   Q.  Why not?
14   A.  I'm in Washington County. How am I going to
15     talk to deputies at Lane County and how do I
16     approach deputies at Lane County asking them if
17     this is true?
18   Q.  Did you contact whoever was above you on the
19     chain at Corizon to let them know about this
20     information?
21   A.  No.
22   Q.  Why not?
23   A.  I assumed if Kevin had a copy of it, they
24     would, too.
25   Q.  So having left Lane County, you figured if

171

1     there was something to look into, it was
2     Kevin's role to look into it?
3   A.  Or actually it would be corporate's role to
4     look into it, since Kevin was not there when it
5     occurred.
6   Q.  Other than this discussion with Mr. Mischler,
7     do you recall anything else, any other time
8     hearing about what the deputy said in his memo?
9   A.  No.
10   Q.  If the supervisor of medical people both at
11     Lane County and Washington County -- if what
12     the deputy says in this memo is true, and I'm
13     not saying it is or it isn't.
14     But if it's true, did the Corizon people
15     referenced in here follow proper policies and
16     procedures?
17   A.  No.
18   Q.  What should have happened? Again, if it's
19     true, what should have happened after the first
20     call from the deputy?
21     MR. DAIGLE: Object to form.
22     THE WITNESS: Do I answer?
23     BY MR. DEVLIN:
24   Q.  Yeah.
25   A.  You're asking me to speculate, thinking about

172

1     all the medical staff at Lane County at the
2     time, which could be anyone from the
3     administrative assistant up to and including
4     myself and Chris. I can't speculate what they
5     would have done.
6   Q.  What should they have done?
7     MR. DAIGLE: Object to form.
8     THE WITNESS: They should have gone to the
9     cell and done an assessment of Mr. Green, and
10     then come to me or to custody to find out why
11     he was still in the jail.
12     BY MR. DEVLIN:
13   Q.  And presumably if it was a lower-level person
14     that wouldn't themselves do an assessment, they
15     should have notified someone like yourself or
16     Ms. White or Ms. Fagan, who could do an
17     assessment?
18   A.  Correct.
19   Q.  Oh, have you ever -- in the time after this
20     happened with Mr. Green, did you ever talk to
21     Mr. Pleich about what he may or may not have
22     done that day?
23   A.  No.
24   Q.  I want to show you what's been marked as
25     Exhibit 58. Tell me if you've seen Exhibit 58.

173

1   A.  Yes.
2   Q.  Do you recall when you first saw Exhibit 58?
3   A.  No.
4   Q.  Do you know what Exhibit 58 is?
5   A.  Yes.
6   Q.  What is it?
7   A.  It's the form that Jacob uses when he has
8     encounters with mental health patients.
9   Q.  And do you know what time on February 12th,
10     2013 Mr. Pleich saw Mr. Green?
11   A.  No.
12   Q.  And is there a place on the form to indicate
13     that?
14   A.  Yes.
15   Q.  Is that under "time seen"?
16   A.  Yes.
17   Q.  And there's no time indicated?
18   A.  Correct.
19   Q.  I assume you've seen these forms in your job as
20     an HSA for lots of people?
21   A.  Yes, yes.
22   Q.  Based on the way Mr. Pleich filled out this
23     form, what was the next thing that was going to
24     happen with Mr. Green if, you know, all the
25     policies and procedures were being followed?

(Pages 170 to 173)                                     44

Steinbock Court Reporting . 971.409.0709

Exhibit 36 - Page 21 of 21
Dec'l of JTD