*Kelly Conrad Green II v*
*Corizon Health, Inc., et al.*

*Kirstin White*
*January 27, 2014*



*Original File HubbardEric_4PP.pdf*
*Min-U-Script® with Word Index*

Exhibit 39 - Page 1 of 29
Dec'l of JTD

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CONRAD GREEN II, an )

individual by and through his )

Guardian ad litem Derek Johnson,)

    Plaintiff, )

    v. )No. 6:13-cv-01855-T

CORIZON HEALTH, INC., a ) PORTIONS OF

Tennessee Corporation; et al., ) TRANSCRIPT ARE

    Defendants. ) CONFIDENTIAL

DEPOSITION OF KIRSTIN WHITE

January 27, 2014

Tuesday

1:00 P.M.

    THE VIDEOTAPED DEPOSITION OF KIRSTIN WHITE

was taken at 172 East 8th Avenue, Eugene, Oregon,

before Eleanor G. Knapp, CSR-RPR, Certified

Shorthand Reporter in and for the State of Oregon.

---

INDEX

WITNESS........................................PAGE

KIRSTIN WHITE

    BY MR. ROSENTHAL    5

EXHIBITS.......................................PAGE

No. 49  Temporary Affiliation Approval    42

No. 50  Temporary Affiliation Approval    43

No. 51  Corrective Action memo    56

No. 52  Application for Employment    56

No. 53  Intake and Receiving Screening    68

No. 54  Nursing Encounter Tool, Altered Mental  142

    State

No. 55  Nursing Encounter Tool, Head Injury  144

No. 56  New Employee Orientation, Part II  144

No. 57  Emergency Room Referral    147

No. 58  Mental Health Evaluation Tools:  154

    Suicide Watch Status

No. 59  Suicide Precaution Form    158

No. 60  Notice of Director's Hold    163

No. 61  WFC Adjustment Form    165

---

Page 2

APPEARANCES

For the Plaintiff:

    ROSENTHAL GREENE & DEVLIN
    121 SW Salmon Street, Suite 1090
    Portland, OR 97204
    503-228-3015
    BY:  MR. ELDEN ROSENTHAL
        MR. JOHN DEVLIN

For Corizon Defendants:

    STEWART SOKOL & GRAY, LLC
    2300 SW First Avenue, Suite 200
    Portland, OR 97201
    503-221-0699
    BY:  MR. JAMES DAIGLE
        MR. ROBERT COLEMAN

For Lane County Defendants:

    OFFICE OF LEGAL COUNSEL
    LANE COUNTY COURTHOUSE
    125 East 8th Avenue
    Eugene, OR 97401
    541-682-3728
    BY:  MR. SEBASTIAN NEWTON-TAPIA

Videotaped by:

    VERBATIM VIDEO, BEN BOCHNER

Reported by:

    ELEANOR G. KNAPP, CSR-RPR
    CC REPORTING & VIDEOCONFERENCING

---

Page 4

INDEX

(continued)

MARKED TEXT..............................PAGE/LINE

Information regarding textbooks    38/2

Training notebook    61/9

Time card    152/13

CONFIDENTIAL TESTIMONY

Page 20, line 15, through page 20, line 24

Page 38, line 9, through page 49, line 9

Exhibit 39 - Page 2 of 29
Dec'l of JTD

Page 5

1        KIRSTIN WHITE,
2  having been first duly sworn to testify the truth,
3  the whole truth, and nothing but the truth, was
4  examined and testified as follows:
5
6        **EXAMINATION**
7  BY MR. ROSENTHAL:
8     **Q.**   Good afternoon.
9     **A.**   Hi.
10    **Q.**   We briefly introduced ourselves before.
11  Again, my name is Elden Rosenthal.  I'm a lawyer
12  from Portland, Oregon.
13        You may be aware of this.  Mr. Green has
14  passed away.  He died in December.  So I represent
15  his estate, his family, and my goal here is to find
16  out things that you know about.  And I'm not going
17  to try to trick you or fool you or play any word
18  games with you.  Please, if you don't understand my
19  question, ask me to repeat it --
20    **A.**   Okay.
21    **Q.**   -- or rephrase it.  If I repeat a
22  question, again, it's not because I want you to
23  change your answer.  It's that sometimes when I'm
24  thinking about things and listening to you I miss
25  something, and I just ask it again to make sure I

Page 6

1  got it right.
2     **A.**   Okay.
3     **Q.**   It's real normal in regular conversation
4  to answer somebody's question before they finish
5  because you know exactly where they are going.  I do
6  the same thing all the time.  But in the deposition
7  process, for the court reporter's sake if you could
8  wait till I'm done before you answer it would be
9  better.
10    **A.**   Okay.
11    **Q.**   Thanks.  How are you currently employed?
12    **A.**   I am full-time with the Lane County jail
13  with Corizon.
14    **Q.**   So you are still here with Lane County.
15    **A.**   Yes.  Yes.
16    **Q.**   When did you start with Corizon?
17    **A.**   I was officially hired in June of 2012,
18  and I came on and started actually working in
19  October of 2012.
20    **Q.**   So when you were hired in June of 2012,
21  was that for a full-time position?
22    **A.**   No.  It was part-time.
23    **Q.**   When did you become full-time?
24    **A.**   Probably about six months ago.  I don't
25  have exact dates.  I apologize.

Page 7

1     **Q.**   When Mr. Green was injured in February of
2  2013, you were part-time?
3     **A.**   Yes.
4     **Q.**   And how many hours were you working?
5     **A.**   About 16 a week.
6     **Q.**   I just want to be sure I understand.  You
7  were hired in June of 2012.  That's when the job was
8  offered to you?
9     **A.**   Yes.
10    **Q.**   But you didn't do any work for Corizon
11  until October?
12    **A.**   Correct.
13    **Q.**   Why did you seek employment with Corizon?
14    **A.**   I was looking for something part-time.
15  Just thought it would be an interesting place to be.
16    **Q.**   When did you -- you are a physician's
17  assistant.  Right?
18    **A.**   Correct.
19    **Q.**   When did you become a physician's
20  assistant, what year?
21    **A.**   2003.
22    **Q.**   I've looked at a bunch of records.  Now
23  that I'm hearing you, I seem to remember it was in
24  Chicago?
25    **A.**   Correct.

Page 8

1     **Q.**   How long a program was that?
2     **A.**   Two years.
3     **Q.**   What was your formal education before
4  becoming a physician's assistant?
5     **A.**   Bachelor's degree in human sciences and
6  biology.
7     **Q.**   From where?
8     **A.**   Linfield.
9     **Q.**   What year did you get your bachelor's
10  degree?
11    **A.**   '97.
12    **Q.**   What did you do employment-wise between
13  '97 and the time you went back to Chicago to go to
14  PA school?
15    **A.**   I worked for Community Tissue Services.
16  We recovered skin and bones and heart valves and
17  veins for transplant.
18    **Q.**   What was your role?
19    **A.**   I was a coordinator.  I did the actual
20  recovery and coordinated care between hospitals and
21  families and the actual recovery of tissue.
22    **Q.**   Would you take the tissue out of the dead
23  person's body?
24    **A.**   Yes.
25    **Q.**   And what years did you do that?

Exhibit 39 - Page 3 of 29
Dec'l of JTD

Page 13

1   **Q.**   So the program is a two-year program?
2   **A.**   Correct.
3   **Q.**   Is it a full yearlong program as opposed
4   to having a summer off?
5   **A.**   It's full, yeah, full -- two full years,
6   yes.
7   **Q.**   And did you have a particular guidance
8   counselor or person at the -- in that program who
9   knows -- who knew how you were doing and kept track
10  -- if you had problems you would go to that person?
11  Was there anything like that?
12  **A.**   Not particularly.  It was a small program.
13  I think there were 40 of us, so it wasn't -- if
14  there were any issues, I mean, they probably would
15  have been taken care of by whoever you were having
16  the issue with.
17  **Q.**   You didn't have a particular academic
18  mentor?
19  **A.**   No.
20  **Q.**   Were the classes there pass/fail?
21  **A.**   No.
22  **Q.**   What was your grade point?
23  **A.**   3.96, if I'm not mistaken.
24  **Q.**   So I may have been confused about this,
25  but I was -- I thought I read somewhere that you

Page 14

1   left Lane County for some period of time.
2   **A.**   No.
3   **Q.**   Maybe I'm mixing your records up with
4   someone else's.  So you got your PA degree in 2003.
5   What did you do between then and when you went to
6   work at Lane County work-wise?
7   **A.**   We were still living north of Chicago, and
8   I worked for, first, Saint Therese.  It was a
9   hospital.  I worked in the ER as a PA.  And then
10  Saint Therese closed and we went to the sister
11  hospital across town in Waukegan, Victory Hospital.
12  And then I moved over to Condell Medical Center in
13  Libertyville.
14  **Q.**   Have you ever been disciplined or lost any
15  job as a PA?
16  **A.**   No.
17  **Q.**   Have you been awarded any awards or prizes
18  during your -- either your academic PA career or
19  working as a PA?
20  **A.**   No.
21  **Q.**   Tell me again when you left the Midwest,
22  when you left Illinois.  What year was that?
23  **A.**   2011.
24  **Q.**   Where did you go?
25  **A.**   To Eugene.

Page 15

1   **Q.**   So were you unemployed from the time you
2   left Illinois until you got the job with Corizon?
3   **A.**   No.  And I need to retract something I
4   just said.
5   **Q.**   Okay.
6   **A.**   I worked briefly for Oregon Neurosurgery
7   Specialists.
8   **Q.**   For who?
9   **A.**   Oregon Neurosurgery Specialists at
10  RiverBend.  And I worked for them for about six
11  weeks.  And it wasn't working out and they
12  terminated me.
13  **Q.**   Do you know why they terminated you?
14  **A.**   It wasn't -- personality issues, I'm
15  pretty sure.
16  **Q.**   Who was your supervisor?
17  **A.**   Drs. Daniel Hutton and Bob Hacker.
18  **Q.**   When were you terminated approximately?
19  **A.**   Spring of 2012.
20  **Q.**   And you had only worked there a couple of
21  months?
22  **A.**   Mm-hmm.
23  **Q.**   Does Corizon -- during your employment
24  with Corizon, do they communicate with the health
25  team from the national headquarters in any regular

Page 16

1   way with a blog or a newsletter or anything like
2   that?  I know a lot of companies have some kind of
3   internal communications.
4   **A.**   We do.  We have newsletters.  I can't say
5   I've ever sat down and truly read one.  But we have
6   a weekly or an every-other-week conference call with
7   all the providers and the medical director.  So any
8   issues that arise or any -- anything that needs to
9   be addressed is done at that time.
10  **Q.**   Does that call involve anybody back in
11  Tennessee?
12  **A.**   Yes.
13  **Q.**   Who back in Tennessee would be involved in
14  that call?
15  **A.**   We've just had a pretty big shakeup in our
16  administration, so I know George -- and I can't tell
17  you his last name.  I apologize.
18  **Q.**   George.  Is he the current person who is
19  involved in those calls?
20  **A.**   He is one of them.  There's -- every
21  western jail is involved, so all the providers, our
22  regional medical director.  George is sometimes
23  there.  This is mostly providers.
24  **Q.**   When you say providers --
25  **A.**   Doctors and PAs.  But occasionally there

Exhibit 39 - Page 4 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 17

1  is someone from Tennessee.
2      Q.   I'm sorry to belabor this, but I want to
3  be sure I understand it before we go on to another
4  topic. Either once a week or once every other week
5  these conference calls take place.
6      A.   Correct.
7      Q.   And during these conference calls, the
8  physicians and PAs that are Corizon employees in the
9  western states are on the phone?
10     A.   Yes.
11     Q.   Who would be on the phone from Lane County
12  on one of those calls?
13     A.   Myself and Dr. Montoya and Kevin Mishler,
14  our HSA or human services administrator.
15     Q.   And there are similar representation from
16  the various jails where Corizon --
17     A.   Correct.
18     Q.   -- has contracts?
19     A.   Correct.
20     Q.   Who from Tennessee is on the call? Is it
21  a vice president? Is it the president?
22     A.   You know, I'm not -- to be honest, I'm not
23  sure. I know there are people who -- a big thing
24  that we discuss is what inmates we have outside of
25  the facilities in hospitals. And some of the people

Page 18

1  who track that, they are from Tennessee, and I
2  couldn't tell you exactly who. I do not have a lot
3  of direct contact with them.
4      Q.   So these calls, how long do they usually
5  last?
6      A.   Anywhere from 20 minutes to an hour and a
7  half depending on how many people we've got out at
8  the hospital, if there's any issues that we need to
9  discuss.
10     Q.   During one of these calls would you say
11  that 10 percent of the time you are talking about
12  patients in the hospitals or about 50 percent of the
13  time or about 90 percent of the time? What percent
14  of the time in these calls are you talking about
15  patients that are out in hospitals?
16     A.   I would probably say 80 to 90 percent, the
17  big majority.
18     Q.   And what do you understand the purpose of
19  this conversation to be?
20     A.   So we -- we talk and -- you know, who is
21  sending who out? Are we having a lot of send-outs
22  that are coming right back? Are we having fewer
23  send-outs that are staying in the hospital? Just so
24  everyone is kind of on the same page.
25     Q.   Is it -- during these calls is there a

Page 19

1  discussion about the fact that these patients who
2  are in the hospitals are paid for by Corizon under
3  the various contracts they have?
4      A.   No, not -- I mean, not that I'm -- not
5  that I'm really aware of. I mean, I know -- I do
6  understand that Corizon does pay for that. However,
7  that's not ever a big topic of conversation.
8      Q.   Is there an effort in these calls to try
9  to minimize the amount of times that inmates are
10  sent out -- away from jails to hospitals?
11     A.   Yes. However, when there's any kind of
12  doubt, we have sort of a saying: When in doubt,
13  send them out.
14     Q.   When you say we have the saying, is that
15  everybody on the conference call or is that a local
16  thing?
17     A.   That pretty much Corizon. If there's any
18  concern at all, we try to get somebody out of the
19  building.
20     Q.   Have you ever served as an HSA?
21     A.   No.
22     Q.   And who was the HSA within the Lane County
23  jail in February 2013?
24     A.   Vicki Thomas.
25     Q.   And was she the first HSA you worked under

Page 20

1  in the Lane County jail?
2      A.   No.
3      Q.   Who was the first one?
4      A.   His name is David Dearling.
5      Q.   Do you know how to spell his last name?
6      A.   D-e-a-r-l-i-n-g.
7      Q.   So was he the person when you started in
8  October?
9      A.   Mm-hmm.
10     Q.   Then was Ms. Thomas the next person?
11     A.   Yes. She was interim while they found the
12  one that we currently have.
13          (The following portion of the
14           transcript is confidential.)
15     Q.   Why did Mr. Dearling leave? Do you know?
16     A.   Yes.
17     Q.   What was the reason?
18     A.   He was terminated.
19     Q.   Do you know why?
20     A.   For just not being able to do the job
21  appropriately and efficiently.
22          MR. DAIGLE: I'd like to mark that
23  portion of the transcript as confidential.
24          (End of confidential portion.)
25  BY MR. ROSENTHAL:

Exhibit 39 - Page 5 of 29
Dec'l of JTD

Page 25

1  **A.**  Correct.
2  **Q.**  That includes Oregon?
3  **A.**  Correct.
4  **Q.**  Does it include Washington?
5  **A.**  It would. I'm not sure if we have -- if
6  we have accounts up there.
7  **Q.**  Does it include northern California to
8  your knowledge?
9  **A.**  Yes.
10  **Q.**  Does it include any other states, Idaho or
11  Utah or Nevada?
12  **A.**  Yes. Arizona, Nevada.
13  **Q.**  Have you ever spoken with Dr. Orr?
14  **A.**  Yes.
15  **Q.**  Under what circumstances?
16  **A.**  Our weekly conference call or
17  every-other-weekly conference call.
18  **Q.**  So he would be on the phone also?
19  **A.**  Yes. And he's been out to visit our
20  facility twice.
21  **Q.**  When was the last time?
22  **A.**  I'd like to say early summer.
23  **Q.**  What was the first time?
24  **A.**  The first time was, I'd like to say, last
25  spring.

Page 26

1  **Q.**  So April or May of 2013?
2  **A.**  I think it was May. I could be wrong, but
3  I think it was May.
4  **Q.**  Was that a planned visit?
5  **A.**  Yes.
6  **Q.**  Did you know he was coming?
7  **A.**  Yes.
8  **Q.**  Did you understand what the purpose of him
9  coming was?
10  **A.**  Yes.
11  **Q.**  What was his purpose?
12  **A.**  To meet everybody. He was new. To meet
13  everybody, to say hi, look at our facility, check
14  out our -- make sure all the policies and procedures
15  were in place.
16  **Q.**  Who was Dr. Orr's predecessor?
17  **A.**  Dr. Ivor Garlick.
18         (Reporter inquiry.)
19  **BY MR. ROSENTHAL:**
20  **Q.**  Has Garlick got a K on the end?
21  **A.**  Yes.
22  **Q.**  Was he the western medical director when
23  you started at Corizon?
24  **A.**  Yes.
25  **Q.**  And do you know why he left?

Page 27

1  **A.**  Corizon had acquired several more
2  accounts, and so he -- he took over a different
3  region. And then Dr. Orr took in -- took over some
4  of the accounts that Dr. Garlick had.
5  **Q.**  And I know you are not in corporate
6  management, so I understand that you are just
7  telling me as best you know. But as best you know,
8  is Dr. Orr the highest ranking Corizon person as far
9  as Oregon is concerned? On the west coast, situated
10  on the west coast.
11  **A.**  As far as -- as far as I know, yes.
12  **Q.**  And who is the -- is there a regional vice
13  president?
14  **A.**  There is.
15  **Q.**  Who is that?
16  **A.**  I'm unsure, actually.
17  **Q.**  Do you know a Dr. Carl Keldie?
18  **A.**  I do not.
19  **Q.**  Do you know a Dr. Joe Pastor?
20  **A.**  I do not.
21  **Q.**  Do you know a person named Becky Pinney?
22  **A.**  I do not.
23  **Q.**  Now I'm focusing on October through -- '12
24  through February '13 now in these questions. When
25  you were working at the jail, was there an MD

Page 28

1  working the same shifts that you were working?
2  **A.**  No.
3  **Q.**  Was there ever an MD working the same
4  shifts you were working during that time period?
5  **A.**  Yes. Wednesday mornings from 8 to 12.
6  **Q.**  That would be Dr. Montoya?
7  **A.**  Yes.
8  **Q.**  So the other times that you would work,
9  other than Wednesday morning, were you the primary
10  medical person for Corizon in the jail?
11  **A.**  Yes.
12  **Q.**  Is there a title that you had? I want to
13  use the right words. Were you the lead person or
14  primary? What was the title?
15  **A.**  Physician assistant, medical provider.
16  **Q.**  Other than the time when Dr. Montoya was
17  there, approximately how many other Corizon staff
18  would be in the jail other than yourself?
19  **A.**  Let me see. Anywhere from 6 to 12
20  depending on the shift.
21  **Q.**  You always worked day shifts?
22  **A.**  For the most part.
23  **Q.**  When did day shift start?
24  **A.**  For certain people it starts at 6 a.m.
25  For some people it starts at 7. I don't necessarily

Exhibit 39 - Page 6 of 29
Dec'l of JTD

Page 53

1  **A.**  No.
2  **Q.**  So from the time you started at Lane
3  County jail through today, the only PA for Corizon
4  has been you?
5  **A.**  Correct.  And Sherlynn was there as well
6  off and on.  She was more a PRN.  When I couldn't be
7  there, needed to be out of town, or when our patient
8  load became very heavy, we could call her in on an
9  as-needed basis.
10  **Q.**  PRN means as needed?
11  **A.**  Correct.
12  **Q.**  And the only supervising physician you've
13  had at Corizon has been Dr. Montoya?
14  **A.**  Yes.
15  **Q.**  Have there been any other physicians, to
16  your knowledge, that have worked at the Lane County
17  jail on behalf of Corizon other than Dr. Montoya?
18  **A.**  Yes.
19  **Q.**  Who is that?
20  **A.**  Right now, Dr. David Calder.
21  **Q.**  Is that with a C, Calder?
22  **A.**  Yes.
23  **Q.**  What is his role?
24  **A.**  He is a physician.  He works 4 hours a
25  week.  Sometimes he fills in for me when I need to

Page 54

1  be here or out of town or, like again, the patient
2  load gets really heavy, I can call him in.
3  **Q.**  So in February of 2013 you were working 16
4  or 20 hours a week.  Was Dr. Montoya working 4 hours
5  a week?
6  **A.**  Correct.
7  **Q.**  And that was the total, sum total of
8  physician or PA coverage?
9  **A.**  Correct.
10  **Q.**  Did you have an opinion at the time as to
11  whether that coverage was adequate?
12  **A.**  No.  Some days it felt like it would be
13  nice to have another provider, just like with any
14  job I've ever worked.  But for the most part it was
15  pretty appropriate.
16  **Q.**  When you started with Corizon, were you on
17  any kind of probation?
18  **A.**  Not that I'm aware of.
19  **Q.**  I didn't mean that in a negative context.
20  **A.**  Yeah.
21  **Q.**  Many times new employees have a
22  probationary period.
23  **A.**  I'm sure I was.  I don't recall -- I mean,
24  I don't recall right now how long that time was.
25  I'm sure I was.  I've never had a job where I

Page 55

1  wasn't.
2  **Q.**  But it wasn't such that you could say to
3  me, "I was on probation for three months and then
4  they told me I was done with probation."  It wasn't
5  anything like that?
6  **A.**  No.  No.
7  **Q.**  How often do you have a formal review with
8  Corizon?  Is there an annual performance review or
9  something like that?
10  **A.**  Yes.
11  **Q.**  So your first review was when?  Was it
12  late in 2013?
13  **A.**  Actually, my first review was just very
14  recently.
15  **Q.**  How recently?
16  **A.**  Probably two months.  Three months.
17  **Q.**  So in November or December?
18  **A.**  Mm-hmm.
19  **Q.**  Who reviewed you?
20  **A.**  Dr. Montoya.
21  **Q.**  Was that -- did you get a good review?
22  **A.**  Yes.
23  **Q.**  Did you get an excellent review?
24  **A.**  Yep.
25  **Q.**  Did he recommend any kind of pay increase

Page 56

1  for you?
2  **A.**  He can't -- he doesn't have that, but he's
3  pushed for that.  But he doesn't have that --
4  because he is not an employee of Corizon, he doesn't
5  have that ability.  But he does advocate for me.
6  **Q.**  Has anyone else formally reviewed you as
7  an employee of Corizon other than Dr. Montoya?
8  **A.**  Kevin Mishler, my HSA.
9  **Q.**  And when did he do a performance review?
10  **A.**  I don't recall a formal.  But I know that
11  he was doing it and there was some paperwork filled
12  out and some chart reviews and he and Dr. Montoya
13  sat down.  But I don't recall a formal sit-down
14  review.
15  **Q.**  Again, did you get a good review,
16  excellent review?  Do you know?
17  **A.**  I assume so.  I haven't -- like I said,
18  this is not -- this was not a formal so I can't -- I
19  can't really give you an answer to that.
20  **THE VIDEOGRAPHER:** Excuse me, Counsel.
21  I need to change tapes.
22  **MR. ROSENTHAL:** Okay.
23  (Recess:  2:02 to 2:07 p.m.)
24  (Deposition Exhibit Nos. 51 and 52
25  marked for identification.)

Exhibit 39 - Page 7 of 29
Dec'l of JTD

Page 57

1    **THE VIDEOGRAPHER:** We are back on the
2    record.
3    **BY MR. ROSENTHAL:**
4    **Q.**   I've marked this Exhibit 51, the paperwork
5    that was previously provided to me regarding the
6    discipline issue we talked about already.  I just
7    want to -- did they give you a copy of that at some
8    point?
9    **A.**   Yes.
10   **Q.**   Okay.  And then I've marked as Exhibit 52
11   an application for employment.  Now, can you -- is
12   this the original application that you filed?  It's
13   dated, I see, June 29 of '12 on the last page.
14   **A.**   Yes.  I would -- I would assume so.  I
15   don't have -- I don't remember this document
16   specifically but --
17   **Q.**   All right.  So it says prior employment
18   history on page 2.  Did you intentionally leave off
19   the employment with the neurosurgeons here in
20   Eugene?  Or were you not working there yet?
21   **A.**   I'm not sure why I didn't have that on
22   there.  There's a big oversight because I would have
23   definitely disclosed that information.  I can't tell
24   you why, but obviously that was an error on my part.
25   **Q.**   We talked before the break about your

Page 58

1    wages a little bit.  Was there unhappiness generally
2    among the staff with the Corizon pay scale?
3    **A.**   I can't speak for anybody else.
4    **Q.**   Has anyone else at the Lane County jail
5    had a conversation with you about the pay scale?
6    **A.**   Yes.
7    **Q.**   Who?
8    **A.**   Some of the nurses.
9    **Q.**   Have they been unhappy with the pay scale?
10   **A.**   Yes.
11   **Q.**   Have there been other nurses -- is anyone
12   else on call other than you?
13   **A.**   No.  And Dr. Montoya and Dr. Calder.  We
14   share the call.  But no.
15   **Q.**   Has Dr. Montoya ever talked with you about
16   on call pay?
17   **A.**   Yes.  He is paid for call as is
18   Dr. Calder.
19   **Q.**   But you're not.
20   **A.**   Correct.
21   **Q.**   While we're talking about Dr. Montoya,
22   have you ever discussed the situation with Kevin
23   Green -- Kelly Green with Dr. Montoya?
24   **A.**   Yes.
25   **Q.**   When did that conversation occur

Page 59

1    approximately?
2    **A.**   Probably a day after, as soon as we found
3    out, you know, the final outcome.  And then
4    obviously once all of this -- we got wind of all
5    this we discussed it.
6    **Q.**   So that original conversation that you had
7    with him, did he prompt it or did you prompt it?
8    **A.**   I did.
9    **Q.**   And why did you do that?
10   **A.**   He is my medical director and I wanted to,
11   you know, give him everything and see if he had any
12   other -- you know, any input, you know, any
13   criticisms.  He is my medical director.  When we
14   have something significant like this happen, of
15   course I'm going to involve him.
16   **MR. ROSENTHAL:** I'm looking for the
17   notes that we marked during the EMT's deposition.
18   There we go.
19   **BY MR. ROSENTHAL:**
20   **Q.**   When you talked to Dr. Montoya, did you
21   give him the notes that I've marked as Exhibit 48 to
22   review?
23   **A.**   Yes.
24   **Q.**   All right.  Did he find any fault with
25   anything that you had done?

Page 60

1    **A.**   Yes.
2    **Q.**   Tell me about that, please.
3    **A.**   I didn't time the note.
4    **Q.**   Did he have anything else that he thought
5    was something that could be improved?
6    **A.**   No.
7    **Q.**   And have you had any other conversation,
8    other than with lawyers, about the service that you
9    provided Mr. Green on February 12th?
10   **A.**   I have not.
11   **Q.**   Did anybody from the jail ever debrief you
12   on the events of February 12?
13   **A.**   No.
14   **Q.**   We were talking, when we took the break,
15   about your orientation when you began working at the
16   jail.  And you told us that you shadowed the nurse
17   practitioner for a few weeks.
18   Was there any formal training that Corizon
19   required you to take?  I know when I went through
20   the notes there was some things that you had to sign
21   that you studied their ethical rules and things like
22   that.  What do you recall about that?
23   **A.**   You know, signing the ethical rules,
24   policies, procedures, standard operating procedures,
25   that kind of stuff.

Exhibit 39 - Page 8 of 29
Dec'l of JTD

Page 61

1    **Q.**   Did they ask you to read through their
2   policy manuals?
3    **A.**   Or read the parts that were more pertinent
4   to my position, yes.
5    **Q.**   And did you do that online or did you do
6   that through some kind of a notebook?
7    **A.**   Through a notebook.
8    **Q.**   Where was the notebook kept?
9    **A.**   There is one in the clinic.  And if I'm
10  not mistaken I have one at home.
11   **Q.**   And the one that you have at home, was
12  that given to you at about the time you came to
13  work?
14   **A.**   I believe so, yes.
15          **MR. ROSENTHAL:** Could you mark that
16  spot, please.
17  **BY MR. ROSENTHAL:**
18   **Q.**   Then I read something somewhere -- we've
19  gotten a lot of paperwork in a short period of time,
20  so I'm a little bit vague about some of this.  But I
21  do remember reading that Corizon has some kind of
22  online education program.  Is that correct?
23   **A.**   Yes.
24   **Q.**   Tell me about that, please.
25   **A.**   Every year we are required to do like

Page 62

1   suicide prevention -- suicide, you know, prevention
2   as well as medical ethics and code of conduct, that
3   kind of stuff.
4    **Q.**   Are these -- is this online Corizon?  Is
5   it like a question-and-answer kind of a thing or is
6   it like reading a textbook?  What is it that's
7   online?
8    **A.**   It's almost an interactive.  It's a
9   presentation.  You know, you sign on and then
10  there's this introduction and sort of a, if you
11  will, a -- here's what's going to happen.  So in
12  Section 1 we are going to do this.
13          It's audio, so it's talking to you.  You
14  interact with it.  It gives you certain scenarios.
15  It gives you definitions.  It gives you -- it gives
16  you just about all the information you need to know.
17  So you kind of go through all these sections, and
18  then at the very end is a test.
19          **MR. ROSENTHAL:** I'd like to go off the
20  record for a second.
21          **THE VIDEOGRAPHER:** We are off the
22  record.
23          (Recess:  2:15 to 2:17 p.m.)
24          **THE VIDEOGRAPHER:** We're back on the
25  record.

Page 63

1          **MR. ROSENTHAL:** Thank you.
2   **BY MR. ROSENTHAL:**
3    **Q.**   This training, do you do it in the office?
4    **A.**   Yes.
5    **Q.**   And you do it on the computer terminal?
6    **A.**   Yes.
7    **Q.**   Is it a requirement that you do it once a
8   year?
9    **A.**   Yes.
10   **Q.**   And I take it you answer questions and
11  interact with it and then you somehow sign off that
12  you completed the course and Corizon has a digital
13  record of it.  Is that the way it works?
14   **A.**   Yes.
15   **Q.**   Changing topics with you now, have you
16  ever seen the contract that Corizon entered into
17  with Lane County?
18   **A.**   Yes.
19   **Q.**   Under what circumstances have you seen the
20  contract?
21   **A.**   Some of the parts that pertain, you know,
22  it's been brought out in MAC meetings.  I'm aware of
23  some of it.  Have I sat down and read it word for
24  word?  No, I have not.
25   **Q.**   What's a MAC meeting?

Page 64

1    **A.**   It's a monthly meeting that -- that we
2   have with Lieutenant Brown, Kevin Mishler,
3   Dr. Montoya, and myself.
4    **Q.**   We interviewed Lieutenant Brown last week,
5   and we marked as Exhibit 37 some notes that he keeps
6   at the MAC meetings.  Do you keep notes at the MAC
7   meetings?
8    **A.**   I do not.  But Kevin Mishler's
9   administrative assistant keeps notes.
10   **Q.**   Has someone from Corizon been keeping
11  notes from the time you started work at the Lane
12  County jail?  Has there always been somebody taking
13  notes?
14   **A.**   Yes.  And I actually did not begin
15  participating in MAC meetings until several months
16  ago.
17   **Q.**   Okay.  All right.  Okay.  Were you aware
18  when you started work for Corizon that if a jail
19  inmate is sent to a hospital that Corizon had to pay
20  the hospital bills?
21          **MR. DAIGLE:** Object to form.
22   **A.**   I think I knew that, yeah.
23  **BY MR. ROSENTHAL:**
24   **Q.**   And to your knowledge was it -- did it
25  matter at all whether the inmate was -- what agency

Exhibit 39 - Page 9 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 65

1   had arrested the inmate or was it the same for
2   anybody who was in the jail?
3       A.   It was the same for anybody in the jail --
4   as far as I know.
5       Q.   I'm just wondering about your knowledge.
6       A.   No.  I'm not aware of any differences.
7       Q.   Were you aware as to whether or not
8   Corizon had agreed to do any kind of training of the
9   Lane County sheriff's staff on the subject of
10  suicide assessment?
11      A.   I'm not aware of -- of that.
12      Q.   To your knowledge does Corizon do any
13  training of the Lane County sheriff's staff on
14  suicide assessment?
15      A.   Not to my knowledge.
16      Q.   Were you aware as to whether or not
17  Corizon had agreed in the contract to provide
18  medical and mental health screening to inmates at
19  the time of booking?
20      A.   Yes.
21      Q.   What was your understanding about that?
22      A.   That when an inmate comes in and they have
23  been processed and they are going to be housed,
24  that's when medical comes in and does an intake
25  screen.

Page 66

1       Q.   So what about an inmate who is brought in
2   during the evening and no housing decision is made
3   until the next day, is it your understanding that
4   the intake screening would be accomplished the next
5   day when the housing decision is made?
6       A.   When the housing decision is made unless
7   -- when they come in, they are asked a triage of
8   questions -- if they have any significant medical
9   complaints, concerns, injuries -- and then someone
10  -- I'll either be called out or one of our nurses
11  will be called to the wall to do an assessment.
12      Q.   What is the wall?
13      A.   They come in and they are in handcuffs and
14  they have to face -- we call it on the wall.  They
15  are lined up against a wall.
16      Q.   In your experience if a patient comes into
17  the jail, day or night, and is having a psychotic
18  episode, is that type of person -- does that type of
19  inmate get a screening right away at the time of
20  booking?
21          MR. DAIGLE: Object to form.
22      A.   Probably not like an actual intake
23  screening.  We would do -- depending on how bad it
24  was, because we have someone -- obviously we have
25  medical staff in-house 24 hours a day, 7 days a

Page 67

1   week.  If they are having an acute psychotic episode
2   and they are a danger to themselves or other people,
3   they will get put back -- taken straight back to
4   seg/med.  And that's when our psych team gets called
5   to come in and assess and/or a provider gets called.
6          Like they might call me and I would say,
7   you know, "Do we have any history on this guy?"  A
8   lot of times I will send these people to the
9   hospital to be evaluated so I mean -- especially if
10  we don't know those people.  And we don't know most
11  of them.  Are they overdosing on something?  Is this
12  a brand-new psychotic break?  Do they have a brain
13  tumor?
14          So a lot of times if it's something that
15  serious they will be sent out.  The intake screening
16  is a more formal sit-down, three- or four-page
17  document, vital signs, all kinds of nosy questions
18  and medical history and physical exam and whatnot.
19          MR. ROSENTHAL: Do you have that
20  document, the screening document?  Is it one of
21  these here?
22          MR. DEVLIN: I'll find it.
23  BY MR. ROSENTHAL:
24      Q.   Is that -- is that different than the
25  nursing encounter tool kind of document?

Page 68

1       A.   Very.
2       Q.   I think I've -- before I mark it, is this
3   the right one?
4       A.   Yes.  I just want to make sure it's --
5   yeah, this is our new one.  Yes, this is the intake
6   exam.
7       Q.   So you say this is a new one.  As of when?
8       A.   Several months ago.  Just a new form.
9       Q.   Was it a similar form before?
10      A.   Yes.  Yeah.  Same questions, just a
11  different layout.
12          (Deposition Exhibit No. 53
13          marked for identification.)
14  BY MR. ROSENTHAL:
15      Q.   So I'm marking what you've just identified
16  as Exhibit 53.  So I want to be sure I understand
17  what you are saying.  If someone is arrested during
18  the evening and the booking officer thinks they are
19  a danger to themselves or others, would they be seen
20  by a Corizon person that evening?
21      A.   Yes.  If they are brought in and they are
22  on the wall and there's a question as to whether or
23  not this is a medical problem, yes.
24          But Corizon also staffs -- we also have
25  our psychiatric team as well.  So the psych team

Exhibit 39 - Page 10 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 73

1   A.   No, there is not.  There is now, but there
2  was not at the time, no.
3   Q.   When did that change get made, to put a
4  neck collar in there?
5   A.   I couldn't -- I couldn't give you an
6  exact.
7   Q.   Was it as a result of what happened with
8  Kelly Green?
9   A.   Yes.
10   Q.   It was?
11   A.   Yes.
12   Q.   Do you know the mechanism of how it
13  happened?
14   A.   The mechanism of --
15   Q.   Of getting something else put into the
16  bag.  What do you call it, the first aid bag?
17   A.   We call it the E bag or the emergency bag.
18   Q.   Okay.
19   A.   It should have been in there, but I hadn't
20  -- we hadn't had any need for it prior to it that.
21  And so when you -- I didn't even realize that it
22  wasn't there.  But it should have been.
23       So, yes, after that we now have them.
24   Q.   Prior to February 12 was there no system
25  in place to check that emergency bag on a regular

Page 74

1  basis to make sure it was properly equipped?
2   A.   There was.  I hadn't -- I hadn't been
3  involved in that, and they may not have thought that
4  -- because when we respond to a code everybody goes,
5  and we can't possibly have everything we need with
6  us at that time.  So there's a lot of, you know,
7  "Run back to the clinic and get me this."
8       So whether it's in the bag or not -- we
9  simply didn't have them in the building, which I was
10  not aware of.  But I hadn't had a need for one
11  before, so I didn't notice that there was one in the
12  bag or even in the supply room.
13   Q.   Whose responsibility on the Corizon side
14  -- as opposed to the sheriff's side -- whose
15  responsibility on the Corizon side was it to make
16  sure that proper equipment was available?
17   A.   You know, I don't know that there is an
18  actual person.  Typically whoever uses it last
19  replaces what they've used.  Sometimes when I need
20  it I will go back through and kind of weed things
21  out and put things back where they need to be and
22  make sure -- you know, our pharmacy or our CMAs will
23  go through and make sure that the medications that
24  are in there are not expired, that kind of stuff.
25   Q.   But there's no regular protocol as to

Page 75

1  checking that E bag once a week or once a month?
2   A.   No, there's not.
3   Q.   So you were in the medical clinic.  You
4  got the call, and you dropped everything and ran
5  into the courtroom.  When you got to the courtroom,
6  what did you observe?
7   A.   Mr. Green was on the ground, sort of on
8  his side, part of his chest and hips.  One of the
9  arresting officers or EPD had him on the ground.  I
10  don't remember if he had his knees on his body or he
11  was straddling him, but he had his hand pushed down
12  on his head and his head was kind of just pushed
13  into the ground.
14   Q.   Was he bleeding?
15   A.   Yes.
16   Q.   Was he conscious?
17   A.   Yes.
18   Q.   And how many law enforcement people were
19  in the courtroom?  Do you recall?
20   A.   A lot.  I don't have -- when I go in, I
21  see my patient.  I don't necessarily know who is
22  there.  I had actually never been in the courtroom
23  prior to that.  So I'm not even aware.  I mean,
24  there were other people in there for other things
25  other than this code, so I couldn't tell you.  I

Page 76

1  mean, there were probably -- there were ten to 15.
2  Maybe more than that.
3   Q.   People or law enforcement people?
4   A.   Law enforcement -- I mean, are you --
5  corrections staff as well, yes.
6   Q.   That's what I meant.
7   A.   Arresting officers and corrections staff.
8   Q.   Okay.  So when you -- did you immediately
9  go over to Mr. Green?
10   A.   Yes.
11   Q.   Were you in charge?
12   A.   Yes.
13   Q.   So what's the first thing you did?
14   A.   Well, I went to him.  And as I'm getting
15  down, I'm starting to talk to him.  I'm asking what
16  happened.  You know, "Mr. Green, are you okay?  Are
17  you in any pain?"
18       The first thing I did was ask the officer
19  to let go of his head so we could get kind of get
20  him in a better position.  I did check his neck.
21   Q.   How did you check his neck?
22   A.   The position he was in, all I could do at
23  that point was to feel it, you know, to make sure I
24  didn't feel any major deformities.  He didn't have
25  any pain when I pushed on his neck.  He was moving.

Exhibit 39 - Page 11 of 29
Dec'l of JTD

Page 77

1    And then we rolled him over so he was on
2  his back.  And at that point I did a more thorough
3  cervical spine exam.  At the same time I looking at
4  the lacerations.  I also did a neuro exam, listened
5  to heart, lungs, tried to engage him, find out a
6  little bit more from him what had happened as well
7  as hearing from the people standing around who know,
8  have known him from previous book ins and
9  interactions as well as people who could tell me
10 what happened just prior to the incident.
11    Q.   At any point during the first few minutes
12 you were with Mr. Green, did he indicate to you he
13 couldn't move?
14    A.   No.
15    Q.   Did he indicate that to you at any time in
16 the courtroom?
17    A.   He did make one statement.  He said, "My
18 ears are paralyzed. I can't hear you."
19    And I said, you know, "I'm sorry?  What
20 was that?"
21    And he repeated, "My ears are paralyzed.
22 I can't hear you."
23    Q.   You said you did a cervical exam.  Explain
24 to me exactly what you did, please.
25    A.   He was lying on his back.  I reach under

Page 78

1  and I feel all the way from the top of his -- I'm at
2  the head.  I'm on my knees.  And I reach down and I
3  feel all the way from the thoracic spine all the way
4  up.  You know, "Does this hurt?  Does this hurt?  At
5  any time, you know, tell me, does this hurt?"
6    There were no midline deformities.  He was
7  moving on his own.  So I was able to take his head
8  -- you know, "Does this hurt?  Does this hurt?
9  Kelly, can you put your chin to your chest?  Kelly,
10 can you look back at me?"
11    And he was able to follow all of those
12 commands.
13    Q.   Let me ask you this.  When you came into
14 the courtroom, how soon did you learn he had run
15 into the wall?
16    A.   About the same time.  As we are going in,
17 you know, I'm asking what happened.
18    Q.   So as you began to talk and interact with
19 Mr. Green, you knew that he had lowered his head and
20 run into the wall?
21    A.   Yes.
22    Q.   And you knew he had run into the wall with
23 enough force to break the skin?
24    A.   Yes.
25    Q.   And he was bleeding?

Page 79

1    A.   Yes.
2    Q.   Did you take blood precautions right away?
3    A.   Yes.
4    Q.   Put on gloves?
5    A.   Yes.
6    Q.   Did you put any kind of a mask on?
7    A.   No.
8    Q.   So is the first thing that you did -- I
9  understand that you were talking to him
10 simultaneously so I'm not trying to be deceptive
11 here.  I understand that.  But is the first thing
12 that you did physically the cervical check?
13    A.   Yes.
14    Q.   After you completed the cervical check --
15 you are about to knock that thing --
16    A.   Oh, thank you.  It's wrapped around my
17 ankle.  That's why.
18    Q.   After you completed the cervical check,
19 what was the next thing that you did?
20    A.   Started a neuro -- neuro exam.  I had
21 someone put pressure on the lacerations, did a scalp
22 check making sure I didn't feel any major, you know,
23 skull fractures.  Checked his face.  Did a neuro
24 exam.
25    Q.   You've got to go real slow.  How did you

Page 80

1  check his face?
2    A.   Pushed around all the bony -- you know,
3  make sure he didn't have any injuries.  There was
4  blood everywhere, and I just needed to make sure
5  that it was coming from here.  Looked in his ears to
6  make sure there was no blood coming from his ears.
7    Q.   How did you look into his ears?
8    A.   With an otoscope.
9    Q.   Did you turn his head or did you get on
10 either side?
11    A.   I got on either side of him.
12    Q.   And you said a neuro exam.  Explain that
13 to me, please.
14    A.   I went down from head to toe.  You know,
15 "Kelly, can you squeeze --" you know, I gave him two
16 of my fingers "-- can you squeeze my fingers?"  He
17 could do it.
18    "Kelly, can you feel this," as I'm kind of
19 -- not pinching but -- you know, "Does this feel the
20 same as this?  Can you feel this?  Kelly, can you
21 put your hand?  Pretend like you are going to give
22 me five.  Can you push against me?"
23    He could follow all the directions.  He
24 had full strength pushing, pulling.  There were no
25 obvious -- there was no obvious trauma to any of his

Exhibit 39 - Page 12 of 29
Dec'l of JTD

Page 81

1  limbs.
2      I went down -- down his legs.  He could
3  push against resistance with his feet.  He could
4  pull his toes towards his nose.  I kind of tickled
5  the back of his legs and his ankles.  He could feel
6  that.
7      At one point I had to ask him to hold
8  still.  He wanted to put his leg up and cross it.
9  And I said, "Mr. Green, I need you to -- you know, I
10  need you to follow directions.  I need you to put
11  your feet down so I can examine you."
12      He was able to move all his toes.
13  Q.   Did you do any reflex tests?
14  A.   Yes.
15  Q.   Tell me what reflex tests you did.
16  A.   I just did the deep tendon reflex on the
17  patellar.
18  Q.   How did you do that?
19  A.   With my stethoscope.
20  Q.   Explain to me exactly what you did,
21  please.
22  A.   Usually you have someone sitting up and
23  having their legs dangle, but you can't always get
24  them in that position.  So I was able to lift his
25  leg up enough, and he actually followed the

Page 82

1  direction and relaxed and I was able to get a reflex
2  by using the bell of my stethoscope.
3  Q.   Did you do a Babinski?
4  A.   Yes.
5  Q.   Why didn't you chart any of that stuff?
6  A.   When I chart -- and I do.  Usually I do,
7  especially now.
8      I would still be charting.  You cannot
9  possibly put down every single thing that you do.
10  You are doing a lot of it simultaneously.  There is
11  just -- you cannot chart every single thing that you
12  do.
13      But yes, I did the basic exams.  I do a
14  basic.
15  Q.   On your note -- unfortunately I stapled
16  these together in the wrong order.  If you look at
17  page 46 on that Exhibit 48, that's your note from
18  2/12, the first note?
19  A.   Yes.
20  Q.   You said that [reading]:  He follows
21  simple commands, but is difficult to follow.
22  States he is paralyzed but is moving all
23  extremities.  Also states he can't hear me
24  because his ears are paralyzed.
25      So did he make two statements to you, one

Page 83

1  that he was paralyzed and another that his ears are
2  paralyzed?
3  A.   Yes.
4  Q.   When you say in this note a few lines
5  down, "C spine held supported during exam.  Cleared
6  by myself," what does that mean?
7  A.   When you clear C spine, it's I've done the
8  exam and I was pretty sure that there was no -- I
9  was -- there was no -- he exhibited no symptoms at
10  that time of a C spine injury.
11  Q.   What does "pupils slightly reactive to
12  light" mean?
13  A.   When you shine a light in somebody's eyes,
14  they open or close depending on whether the light is
15  on or off them.  His were a little bit slower than
16  usual.
17  Q.   Did you measure the opening of his pupil?
18  A.   Did I measure it?  No.
19  Q.   In millimeters?
20  A.   No, I did not.
21  Q.   Did you estimate it?
22  A.   No.
23  Q.   What does it mean, if anything, to you
24  that his pupils were slightly reactive to light?
25  A.   They were just sluggish, just slower.

Page 84

1  Some people have that.
2  Q.   In cases I've worked on as a lawyer, I've
3  seen the phrase, "Pupils being briskly reactive to
4  light."  Are you familiar with that phrase?
5  A.   Mm-hmm.
6  Q.   What does that mean?
7  A.   It just means that they go real fast.
8  Q.   Is that normal?
9  A.   For the most part.
10  Q.   So when someone's pupils are slightly
11  reactive to light, is that an abnormal finding?
12  A.   Yes.
13  Q.   What is it potentially indicative of?
14  A.   A head injury.  Or some people that's just
15  their norm.  And also the light in the courtroom
16  wasn't fantastic.  It's fairly dark.  He was on the
17  ground.  And it's very hard to get a perfect eye
18  exam unless you are sitting in, you know, an office
19  like this, turn off the light, and use your specific
20  light.
21  Q.   Did you have a flashlight with you?
22  A.   I had a penlight, yes.
23  Q.   Did you use that --
24  A.   Yes.
25  Q.   -- to check his pupils?

Exhibit 39 - Page 13 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 85

1    **A.**    I did.
2    **Q.**    Did any other Corizon employee participate
3    with you in the examination while Mr. Green was on
4    the floor?
5    **A.**    I had a nurse holding pressure on the
6    scalp wounds.
7    **Q.**    Who was that?
8    **A.**    I couldn't tell you.
9    **Q.**    Was it Ms. Fagan?
10    **A.**    It may have been.  I don't recall.
11    **Q.**    Was Ms. Thomas there?
12    **A.**    She was.
13    **Q.**    Was she in the courtroom?
14    **A.**    Yes.
15    **Q.**    Was she participating in any way in the
16    examination?
17    **A.**    Not that I recall.
18    **Q.**    Hang on a second.  We are looking for
19    something.  Did you take his vital signs in the
20    courtroom?
21    **A.**    I did not.  A nurse did.
22    **Q.**    Do you know what nurse took the vital
23    signs?
24    **A.**    I don't.  I would have to look at her
25    notes.

Page 86

1    **Q.**    Well, it's right on your note, page
2    Corizon 42.
3    **A.**    Okay.  I mean, someone else would have
4    taken them and then told me what they were.
5    **Q.**    How was the blood pressure taken?  Was it
6    with a cuff?
7    **A.**    Yes.
8    **Q.**    Did you do a Glasgow Coma Scale analysis?
9    **A.**    No.
10    **Q.**    You know what that is?
11    **A.**    I do.
12    **Q.**    Why didn't you do that?
13    **A.**    He was alert and talking and moving.  I
14    had no reason to think that he had an altered
15    Glasgow Coma Scale.  And that's when you would
16    typically do that.
17    **Q.**    And you say he could move all of his
18    limbs?
19    **A.**    Mm-hmm.
20    **Q.**    Did you ask for anyone to get a cervical
21    collar?
22    **A.**    No.
23    **Q.**    Did you ask for anyone to get a backboard?
24    **A.**    No.
25    **MR. ROSENTHAL:** We need to go off the

Page 87

1    record for a minute.  I need to find a document.
2    **THE VIDEOGRAPHER:** We are off the
3    record.
4    (Recess:  2:45 to 2:47 p.m.)
5    **THE VIDEOGRAPHER:** We're back on the
6    record.
7    **MR. ROSENTHAL:** Thank you.
8    BY MR. ROSENTHAL:
9    **Q.**    Did anyone ask for a neck brace or a neck
10    collar?
11    **A.**    Not that I recall.
12    **Q.**    Did anyone ask for a backboard?
13    **A.**    Not that I recall.
14    **Q.**    When you asked Mr. -- how long did it take
15    you to complete this examination that you've
16    described to us?
17    **A.**    I'm guessing.  Probably about 15, 20
18    minutes.
19    **Q.**    Did you do anything else in the courtroom
20    examination-wise other than what you've described to
21    us?
22    **A.**    No.  I did a head-to-toe examination.
23    **Q.**    Did you check his heart?
24    **A.**    Yes.
25    **Q.**    Did you use a stethoscope to do that?

Page 88

1    **A.**    Yes.
2    **Q.**    Do you do anything else?
3    **A.**    I listened to his lungs with a
4    stethoscope.  I pushed on his belly, listened to his
5    belly.  Checked his pelvis.
6    **Q.**    How did you check his pelvis?
7    **A.**    He was laying on his back.  You just find
8    the hip bones and you kind of rock it back and forth
9    and just -- you know, there wasn't any major
10    problems.  He didn't have any pain.
11    I did -- was able to check his back when
12    he -- before he was rolled over, just palpated the
13    spine all the way down.  Didn't have any pain.
14    **Q.**    So when you completed all of those steps,
15    what did you decide to do?
16    **A.**    Took him down to the clinic.  I wanted to
17    stop the bleeding.
18    **Q.**    So --
19    **A.**    He needed stitches.
20    **Q.**    -- what was your plan on how to get him to
21    the clinic?
22    **A.**    Wheelchair.
23    **Q.**    Why not walking?
24    **A.**    He wasn't being entirely cooperative.  And
25    when someone is bleeding like that, I think I just

Exhibit 39 - Page 14 of 29
Dec'l of JTD

Page 89

1  thought that the best thing to do would be to have
2  them in a wheelchair so someone could keep pressure
3  on his head.
4      Q.   What was he doing that wasn't entirely
5  cooperative?
6      A.   He was a little bit -- I don't want to say
7  combative, but kind of pushing us away during the
8  exam.  I would say, "Mr. Green, I need you to
9  straighten your legs for me.  I need you to uncross
10  your legs."
11      And I -- typically when we'll have
12  something that like that, a Code 3, and we need to
13  transport them to the clinic, we usually will do a
14  wheelchair.
15      Q.   Was he actually trying to push you?
16      A.   Yes.
17      Q.   With one hand or two hands?
18      A.   I don't recall.
19      Q.   Did he put his hand on your body?
20      A.   Well, he -- I would go to touch him and he
21  would push.  Yeah, he would push my hand or my arm.
22  And when we were holding pressure on his head, he
23  didn't like that.  I'm sure it hurt.  He didn't like
24  that, but he would kind of push and try to move his
25  head out of the way.

Page 90

1      Q.   But you are saying with one or both hands
2  he pushed your arms or hands away?
3      A.   Yes.
4      Q.   Did you ask him to get into the
5  wheelchair?
6      A.   I -- did not.  Security staff did that.
7      Q.   Did what, asked him to get in the
8  wheelchair?
9      A.   Yes.
10      Q.   Do you remember who it was that said that?
11      A.   I don't.
12      Q.   How did Mr. Green respond?
13      A.   He didn't.
14      Q.   He just didn't say anything?
15      A.   He didn't.  Not that I recall.  I don't
16  recall anything specific that he said, but he didn't
17  -- he didn't want to cooperate.
18      Q.   Did you at any time say anything about
19  Mr. Green perhaps having a spinal injury?
20      A.   No.
21      Q.   Did any of the other Corizon staff say
22  anything about Mr. Green perhaps having a spine
23  issue?
24      A.   No.
25      Q.   Was Mr. Green totally conscious the whole

Page 91

1  time you were with him in the courtroom?
2      A.   Yes.
3      Q.   Did anybody, any law enforcement or
4  sheriff's officers say to you he had been
5  unconscious for any period of time?
6      A.   No.
7      Q.   Did you or any Corizon staff ever ask
8  whether there was a cervical spine collar in the
9  emergency bag?
10      A.   Not that I recall.
11      Q.   Did anyone ask whether he should be taken
12  to the hospital, whether Mr. Green should be taken
13  to the hospital?
14      A.   I said that I wanted him to go to the
15  hospital.  I said that -- I was more concerned about
16  a head injury at that time, and I said that I wanted
17  him to go to the hospital.
18      Q.   Who did you say that to?
19      A.   Just kind of over my shoulder to Vicki,
20  our HSA.  And she was standing with -- I think it
21  was Sergeant Balcom.
22      Q.   How did she respond?
23      A.   I wasn't part of that conversation, but I
24  remember hearing them saying, "Well, he is going to
25  be released."

Page 92

1      And I -- you know, our response was, "He
2  still needs to go, you know, so we are going to do
3  the paperwork."  And I said, "We just need to get
4  him to the hospital.  It doesn't have to be Code 3,
5  lights and sirens right this minute, but it needs to
6  be within the hour."
7      They said the paperwork would take less
8  than an hour and they would -- that's why we decided
9  to take him down to the clinic, suture him up, and
10  then I wanted him to be seen at the hospital.
11      Q.   Why did you want him to be seen at the
12  hospital?
13      A.   I was more concerned about a head injury
14  at that time.
15      Q.   And HSA White --
16      A.   I'm sorry.  HSA Thomas.
17      Q.   Excuse me.  Probably my mistake.  HSA
18  Thomas was the person you said this to?
19      A.   Yes.
20      Q.   Was it her call?
21      A.   No.  This was my call.
22      Q.   So did she contradict your request?
23      A.   No.  No.
24      Q.   Well, then why wasn't he taken to the
25  hospital?

Exhibit 39 - Page 15 of 29
Dec'l of JTD

Page 93

1   A.   You would have to ask security staff that.
2   It was my understanding that they would be taking
3   him to the hospital when they completed his
4   paperwork.
5   Q.   So while you were in the courtroom it was
6   your understanding that he would get to the hospital
7   within an hour?
8   A.   Yes.
9   Q.   And you mentioned Sergeant Balcom, I
10  think.  Are you saying that he said that to you?
11  A.   He said they had to do some paperwork.
12  And I don't remember if it was myself or whether it
13  was Vicki Thomas asked, "How long will that take?"
14       It shouldn't take any -- I'm -- in my mind
15  I'm hearing, you know, 30 minutes to an hour.  I
16  know it wasn't any more than an hour because I said,
17  "Then, you know, he's got to go."
18  Q.   Why didn't you think it should be right
19  away rather than 30 minutes to an hour?  You were
20  worried about a spinal cord injury.  Right?
21  A.   Not a spinal cord injury, no.
22  Q.   What were you worried about?
23  A.   A head injury.
24  Q.   So you were worried about a potential head
25  injury such as a subdural hematoma?

Page 94

1   A.   Mm-hmm.
2   Q.   Why isn't that an emergency?  Why wouldn't
3   it be important to get him to the hospital right
4   away in case there was a subdural hematoma?
5   A.   My clinical suspicion was very low.  All
6   around me, you know, I mentioned in my notes his eye
7   -- you know, his eye tracking.  He had a lazy eye.
8   And everyone said, "That's just him.  He's always
9   had it."
10       His mental capacity wasn't quite up to
11  normal.  Everyone around me said, "Kris, that's
12  normal for him.  We know Mr. Green."  I'd never seen
13  him before, and I wasn't real comfortable with just
14  taking everybody else's assessment.
15  Q.   Did you put anywhere in writing that you
16  wanted him to go to the hospital within an hour?
17  A.   It is -- "Patient to be" -- it says
18  "Patient to be released.  Will recommend courtesy
19  drop at ER" --
20  Q.   Excuse me.  I need to track that with you.
21  A.   I'm sorry.
22  Q.   No, it's okay.  I should have pulled mine.
23  So what page number are you on?
24  A.   Well, it's the last in that unless yours
25  is stapled --

Page 95

1   Q.   Is the last page 46?
2   A.   Yes.
3   Q.   So where are you reading?
4   A.   The very bottom.
5   Q.   "Scalp lacerations with surgical repair."
6   Right?
7   A.   Mm-hmm.
8   Q.   "Will continue neuro checks every one to
9   two hours."
10  A.   Mm-hmm.  And --
11  Q.   "Patient to be released.  Will recommend
12  courtesy drop at ER for further continued
13  evaluation."
14  A.   Mm-hmm.
15  Q.   So I'm having trouble.  This seems
16  inconsistent to me.  Why would there be neurological
17  checks every one to two hours if he was going to go
18  to the hospital within an hour?
19  A.   That's something I would standard put in.
20  You're right.  He should have been gone by the time
21  -- and I never even wrote that order actually.  That
22  was my -- you're right.  It is inconsistent, and
23  that is my -- my error.
24       Normally when we have someone with an
25  injury we would do neuro checks every one to two

Page 96

1   hours.  That's just a standard procedure.
2   Q.   So then you wrote "Patient to be
3   released."  Why was he going to be released?
4   A.   I don't know.  That was a custody.  He was
5   going to be released from custody.
6   Q.   Is that so Corizon wouldn't -- or the jail
7   wouldn't have to pay for his medical care?
8   A.   I don't have any knowledge as to why he
9   was being released.  I don't know if it was his
10  charges.  I don't have any -- I don't have any -- I
11  don't know if that was determined before the
12  incident.  I don't have any knowledge of that as to
13  why.
14  Q.   The reason you wrote "Patient to be
15  released" is because it's something Sergeant Balcom
16  told you?
17  A.   Yes.  Yes.  We were told he was going to
18  be released.  They would do the paperwork and then
19  they would take him to the ER.
20  Q.   All right.  So you knew it wasn't going to
21  happen right away, so you decided you were going to
22  stitch his head up.  Did a sheriff's officer ask him
23  to get into the wheelchair?
24  A.   I don't recall.
25  Q.   Did he get into the wheelchair himself?

Exhibit 39 - Page 16 of 29
Dec'l of JTD

Page 97

1   **A.**   No.
2   **Q.**   How did he get into the wheelchair?  How
3   did that happen?
4   **A.**   I -- I had my back turned and was cleaning
5   up.  I was covered with blood and I was cleaning up
6   and helping get some of that stuff put together.  I
7   know that several officers helped pick him up and
8   put him in the wheelchair.
9   **Q.**   Can you describe how they picked him up?
10  **A.**   I can't.  I did not see it.
11  **Q.**   Did you see him in the wheelchair?
12  **A.**   I did.
13  **Q.**   How was he in the wheelchair?  Was he
14  sitting up straight?  Was he slumped over?
15  **A.**   He was -- he was dragging his feet.  He
16  was almost absolutely flaccid.
17  **Q.**   Was he absolutely flaccid?
18  **A.**   No.
19  **Q.**   What part of him wasn't flaccid?
20  **A.**   Well, at times -- especially when we got
21  down to the clinic -- he was using his feet to try
22  and push the chair.  I was kind of backed into a
23  corner.  We kept him in the wheelchair as I was
24  suturing up -- suturing him up.  He was moving his
25  head.  He was kind of doing this.  So it took

Page 98

1   several officers to just kind of hold him in place
2   so I could suture him.
3   **Q.**   Why didn't you put him on an examination
4   table in the infirmary?
5   **A.**   Our exam rooms aren't set up so -- to do a
6   suturing at the top of the head.  The end of the
7   table end is at -- ends at a wall.  So a lot of
8   times if I have to do something like that on the
9   back of a neck or a head, depending on the size of
10  the patient and the situation, I will do it as they
11  are sitting up in a wheelchair.
12  **Q.**   Who was holding him in the wheelchair
13  while you were doing your stitching?
14  **A.**   Several deputies.
15  **Q.**   No Corizon folks?
16  **A.**   I think -- I want to say -- typically I
17  will have an assistant in there to help me with
18  stuff.  I want to say Sharon Fagan was in there, but
19  I -- I can't swear to that.
20  **Q.**   Did Mr. Green hold his head up for you so
21  you could do the stitching?
22  **A.**   He did.  He would hold his head up, but
23  then -- you know, so we actually had someone kind of
24  holding him, because I have a sterile drape over
25  him, over his --  not over his face but over his

Page 99

1   head so I can work.  And someone was actually
2   holding it in place and holding his head because he
3   -- he was fighting.
4   **Q.**   I want to be sure I understand something.
5   I'm asking you a question that I asked you before in
6   a slightly different form, but the difference is
7   important to me so bear with me, please.
8        Why didn't you ask for EMTs to be called
9   while he was in the courtroom?
10  **A.**   My clinical suspicion for a severe injury
11  was low.
12  **Q.**   But there was some suspicion in your mind
13  that he had a head injury that was serious.
14  **A.**   Very small.
15  **Q.**   I thought that the motto was, "When in
16  doubt, send them out"?
17  **A.**   Yes.
18  **Q.**   Why -- there was some doubt in your mind,
19  wasn't there?
20  **A.**   He was going out.
21  **Q.**   If -- what was it that you had a small
22  clinical suspicion for?  What was it that was in
23  your mind that maybe he had?  Was it a subdural
24  hematoma or was it something else?
25  **A.**   Just a generalized head -- I didn't have a

Page 100

1   specific differential diagnosis.  Again, my clinical
2   suspicion was low.  But I did not know this
3   patient's mental baseline.  I was concerned because,
4   you know, the -- what sticks out in my mind is, "My
5   ears are paralyzed.  I can't hear you," and some of
6   his responses, which I can't give you specifics,
7   just weren't quite normal.
8   **Q.**   So you knew you had intentionally rammed
9   his head into a wall.
10  **A.**   Yes.
11  **Q.**   And you knew his pupils are not briskly
12  reactive to light.  Correct?
13  **A.**   Mm-hmm.
14  **Q.**   And you knew he was acting somewhat
15  inappropriate verbally with you.  What was -- in
16  your unofficial differential diagnosis in your mind,
17  what's the worst thing it could have been that was
18  going on with him at that time?
19  **A.**   Like a subdural hematoma or an
20  intracerebral bleed.
21  **Q.**   And if it was subdural hematoma or an
22  intracerebral bleed, that is potentially fatal,
23  isn't it?
24  **A.**   Correct.
25  **Q.**   And time is of the essence, isn't it?

Exhibit 39 - Page 17 of 29
Dec'l of JTD

Page 101

1    **A.**  Correct.
2    **Q.**  The sooner the treatment occurs the
3  better.  Correct?
4    **A.**  Mm-hmm.
5    **Q.**  So why not call the EMTs if you are doubt?
6  Get him out.  Why not?
7    **A.**  My clinical suspicion was low.
8    **Q.**  So does Corizon ask you, as a physician's
9  assistant, to not send someone emergently to the
10  hospital if your clinical suspicion is low?
11    **A.**  Mm-hmm.
12    **Q.**  You wrote in your chart note -- and I'm
13  looking on page 46 again -- UE, and then that's the
14  symbol for with -- F-R-O-M.  Am I credit reading
15  that correctly?
16    **A.**  Yes.
17    **Q.**  Does that mean upper extremities with full
18  range of motion?
19    **A.**  Correct.
20    **Q.**  Did you mean by that he had passive full
21  range of motion or active full range of motion?
22    **A.**  Both.
23    **Q.**  What about his lower extremities?
24    **A.**  Same thing.
25    **Q.**  Why didn't you write that down?

Page 102

1    **A.**  An oversight.
2    **Q.**  When did you make this entry we've been
3  reading from?
4    **A.**  Probably -- I mean, obviously he had -- I
5  went up, saw him, brought him down, sewed him up.
6  And it probably would have been right after that.
7    **Q.**  I'm going to give you the original chart
8  here that Mr. Daigle brought with us today.  So the
9  page I've turned to has black ink on the top and
10  then your note, 2/12/13, that we've just been
11  referring to is in blue ink.
12    **A.**  Correct.
13    **Q.**  So by looking at this chart is there any
14  better way to pinpoint in time when you wrote that
15  note?
16    **A.**  No.  No, there really isn't.
17        **MR. DAIGLE:** Can we correlate that --
18  I'm sorry, Elden, to interrupt you -- with the Bates
19  page just for clarity?
20        **MR. ROSENTHAL:** Yeah.  I can do it
21  here.
22  **BY MR. ROSENTHAL:**
23    **Q.**  So the blue ink begins, as I understand
24  it, around page 43.  Is that correct?
25    **A.**  No.

Page 103

1    **Q.**  I think it does.  Take a look at 43.
2    **A.**  But these are out of order.  This was the
3  second -- when I got called to seg/med to see him.
4    **Q.**  You're right.  You're right.  All right.
5  So what we ought to do is put Exhibit 48 in the
6  correct order.
7        **MR. ROSENTHAL:** So does anybody mind
8  if I unstaple it and put it in the correct order?
9        **MR. DAIGLE:** I think each page has at
10  least one time entry on it.
11        **MR. ROSENTHAL:** Does anybody mind if I
12  reorder these pages?
13        **THE VIDEOGRAPHER:** We've got a tape
14  change coming up.  Would now be a good time?
15        **MR. ROSENTHAL:** Perfect.  Perfect
16  time.
17        **THE VIDEOGRAPHER:** We're off the
18  record.
19        (Recess:  3:06 to 3:15 p.m.)
20        **THE VIDEOGRAPHER:** We are back on the
21  record.
22  **BY MR. ROSENTHAL:**
23    **Q.**  I thought I asked you this question, but
24  my partner thought that I didn't ask it so I'm going
25  to ask it again in case he's right.  Did anybody ask

Page 104

1  for a backboard in the courtroom?
2    **A.**  Not that I recall.
3    **Q.**  If a backboard had been provided, would
4  you have used it to transport Mr. Green back to the
5  medical clinic?
6    **A.**  Probably not.
7    **Q.**  While Mr. Green was in the clinic being
8  sutured, did he have a bowel movement?
9    **A.**  Yes.
10    **Q.**  Did he also have a bowel movement in the
11  courtroom?
12    **A.**  Not that I'm aware of, no.
13    **Q.**  Did he urinate on himself in the
14  courtroom?
15    **A.**  Not that I'm aware of.
16    **Q.**  So when, when he was in the medical
17  clinic, did he have the bowel movement?
18    **A.**  As I was suturing him.
19    **Q.**  So it was during the process of suturing?
20    **A.**  Yes.
21    **Q.**  Were you aware that he was having a bowel
22  movement as it was occurring?
23    **A.**  Yes.
24    **Q.**  How did you become aware?
25    **A.**  Sound.  Smell.

Exhibit 39 - Page 18 of 29
Dec'l of JTD

Page 105

1   **Q.**   What sound?  What sound did you hear?
2   **A.**   The sound of him having a bowel movement.
3   **Q.**   So did he -- did he have gas?
4   **A.**   Yes.
5   **Q.**   Did he -- did any part of his body move as
6   -- either right before or during the bowel movement?
7   Did his chest move?  Did his stomach move?  Did he
8   try to get out of the chair?  Anything at all?
9   **A.**   I can't tell you right specifically at
10  that time, but then I do remember him -- you know,
11  because we kept having to say, "Mr. Green, please
12  hold still," because he would put his feet on the
13  ground and push up and try to shift his hips and try
14  to -- he was in a wheelchair that had the locks on,
15  but he was really trying to push.  He was using his
16  legs to try to maneuver himself in the chair.
17  **Q.**   Were there places for his feet to go?
18  What do you call those little things on a wheelchair
19  where you put your feet?  What do they call them?
20  Foot rests?
21  **A.**   Foot rests.  Exactly.
22  **Q.**   Were there foot rests?
23  **A.**   I don't think so, no.  I mean, he was a
24  pretty tall guy, so, I mean, his feet were on the
25  ground.

Page 106

1   **Q.**   Why were there no foot rests on the
2   wheelchair?
3   **A.**   I can't answer that.  I don't know.
4   **Q.**   Are there now?
5   **A.**   I don't know.
6   **Q.**   So was he pushing on the ground with his
7   feet while he had the bowel movement?
8   **A.**   I don't recall if it was specifically
9   during the bowel movement, but I know before and
10  after he was.
11  **Q.**   Do you remember any particular movement or
12  noise that came out of his mouth associated with the
13  bowel movement?
14  **A.**   No.  And he had been sort of chatting with
15  the deputies.  They were talking to him a little
16  bit, and I wasn't paying attention to what was being
17  said.  I was focused on what I was doing.  So I
18  mean, he may have said something about needing to
19  go, but I didn't -- I didn't hear it.  I didn't -- I
20  didn't pick that up.
21  **Q.**   When you became aware that he had had a
22  bowel movement, did you say anything to him about
23  it?
24  **A.**   I really didn't.  The deputies that were
25  in the room with me were, you know, saying, you

Page 107

1   know, "Not again, Kelly."  Like I said, I had never
2   seen this guy, but apparently he had a history of
3   doing this.  I didn't -- all I remember is, "Really,
4   Kelly, again?"  But that's, you know --
5       And I do, you know, sort of remember
6   saying, "Listen, we are going to get this done real
7   quick and we'll get you cleaned up."  But like I
8   said, at the time I was suturing his head, trying to
9   maintain a sterile field on a moving target so my
10  focus was up here.
11  **Q.**   According to your education and training,
12  when someone has a neurological injury can that
13  cause an involuntary bowel movement to occur?
14  **A.**   Mm-hmm.
15  **Q.**   Was that a yes?
16  **A.**   Yes.
17  **Q.**   Did that thought cross your mind when he
18  had the bowel movement?
19  **A.**   Yes.
20  **Q.**   So what did you do at that point to
21  satisfy yourself that he was okay?
22  **A.**   Well, he was still moving his legs.  I
23  mean, he was still, you know, kind of kicking
24  around.  He was moving.  Typically if you see
25  something like that it's -- you know, there's been a

Page 108

1   pretty severe injury.
2       And again, I have not seen this
3   personally, but he had done it -- I was told he had
4   done it before.  And we also have inmates that do
5   that on a fairly frequent basis.
6   **Q.**   Did you take his blood pressure again
7   while he was in the medical clinic?
8   **A.**   I didn't personally.
9   **Q.**   Did anyone?
10  **A.**   I'm not sure that they did.
11  **Q.**   There's nothing charted anywhere.
12  **A.**   Then there probably wasn't.
13  **Q.**   Why do you say if it wasn't charted it
14  probably wasn't done?
15  **A.**   Well, I can't assume that it was.  If it's
16  not charted, I can't say that it was done.  I would
17  like to say that it was done, but I can't if it's
18  not in the chart.
19  **Q.**   And that's because there's a general rule
20  for nurses and physician's assistants:  If it's not
21  in the chart, it wasn't done.  Correct?
22  **A.**   Correct.
23  **Q.**   Were any vital signs taken while he was in
24  the medical clinic?
25  **A.**   Not that -- not according to the chart,

Exhibit 39 - Page 19 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 121

1    later in the day, but as long as he was
2    breathing there was no immediate concern,
3    close quote.
4         Had anybody read that to you or had you
5    read that before this very moment?
6    **A.**   Not verbatim, no.
7    **Q.**   Did it ever come to your attention as the
8    PA for Corizon on February 12th that there had been
9    any calls from Deputy Sheriff Burnette or anyone
10   else back to the medical clinic reporting that
11   Mr. Green was not moving?
12   **A.**   No.
13   **Q.**   When did you learn that Burnette had
14   called the -- had allegedly called the medical
15   clinic a couple of times on February 12th?
16        **MR. DAIGLE:** Before you answer, to the
17   extent that you have knowledge outside of
18   conversations with counsel, you can answer the
19   question.
20   **BY MR. ROSENTHAL:**
21   **Q.**   Did you know other than from talking to a
22   lawyer?
23   **A.**   Yes.  And I -- I'm trying to recall,
24   because like I said, we've not talked about this so
25   I'm trying to recall if this is something that I

Page 122

1    heard -- I'm sorry.  I don't have an immediate
2    answer for you.  But I had heard that there were --
3    that Don had called.
4         But like I said, I did not -- I was not
5    aware of any of the phone calls and I did not speak
6    to him nor did anybody come talk to me.
7    **Q.**   In your opinion as a physician's
8    assistant, was it appropriate for a nurse to tell
9    Deputy Sheriff Burnette that if Mr. Green was
10   breathing that everything was okay?
11        **MR. DAIGLE:** Object to the form.
12   **A.**   No.
13   **BY MR. ROSENTHAL:**
14   **Q.**   What should have happened?
15   **A.**   The nurse should have gone back and
16   assessed him or said to me, "Mr. Green is still
17   here.  This is what Burnette is saying," and we
18   would have gone back and assessed him immediately.
19   **Q.**   We've already talked about this a little
20   bit, but your chart note, Exhibit 48, says neuro
21   checks every one to two hours.
22        Did you make any effort to see that there
23   were neuro checks done every one to two hours?
24   **A.**   No, I did not.
25   **Q.**   Was there a system in place for you to be

Page 123

1    able to be reminded to do neuro checks on a patient?
2    **A.**   Had he still been in the building, they
3    would have -- I would have done them or I would have
4    verbally told the nurses this is what we need done
5    every hour.
6    **Q.**   But he was still in the building.
7    **A.**   But I wasn't aware of it.  He was -- when
8    he rolled out of the clinic and was cleaned up in
9    seg, I was under the impression that he was on his
10   way out the door.
11   **Q.**   You thought he was leaving the clinic and
12   going right to the hospital?
13   **A.**   I thought he was going to go get cleaned
14   up in seg, they would finish the paperwork, and get
15   him out.  That's the impression that I was given.
16   **Q.**   And is the standard operating procedure
17   that when an inmate leaves that -- for medical
18   reasons that the medical clinic is advised of that
19   fact?
20   **A.**   Not always, no.
21   **Q.**   But is that the standard practice?
22   **A.**   It is now.
23   **Q.**   How is that achieved?
24   **A.**   I call and call and call.  "Is he gone?"
25   "Are they still here?"  "Why are they still here?"

Page 124

1    **Q.**   When an inmate leaves, is there a standard
2    procedure for the sheriff's staff to tell the
3    medical staff that the patient is gone -- that the
4    inmate is gone?
5    **A.**   No.
6    **Q.**   What did you mean by "will recommend
7    courtesy drop"?
8    **A.**   Well, that's just semantics.  I told them,
9    you know, "He either needs to be taken to the ER or
10   if you guys can't do that, then I would like an
11   ambulance to come pick him up."
12        I mean, I recommended that they courtesy
13   drop him, not just release him to a family member or
14   whatever.
15   **Q.**   What is a courtesy drop?
16   **A.**   When they are no longer in custody, but
17   they take them as a courtesy.
18   **Q.**   What did you do the rest of that
19   afternoon?
20   **A.**   Saw patients in the clinic.
21   **Q.**   Did you stay in the clinic the rest of the
22   afternoon?
23   **A.**   I don't recall.
24   **Q.**   Did you see patients in their cells that
25   afternoon?

Exhibit 39 - Page 20 of 29
Dec'l of JTD

Page 125

1    **A.** I can't recall. More than likely.
2    **Q.** Were there other patients in seg/med?
3    **A.** I can't recall if there were any at that
4    time.
5    **Q.** Is seg/med on the same floor as the
6    medical clinic?
7    **A.** Yes.
8    **Q.** How far a walk is it from the medical
9    clinic to seg/med?
10   **A.** Just around a corner.
11   **Q.** Ten seconds?
12   **A.** Mm-hmm.
13   **Q.** You never walked over to see if Mr. Green
14   was still in the cell?
15   **A.** No.
16   **Q.** How did you learn -- I think you already
17   told me that somebody -- that some nurse told you
18   that Mr. Green needed to be reevaluated. Is that
19   correct?
20   **A.** Yes.
21   **Q.** You don't remember which nurse?
22   **A.** No, I don't.
23   **Q.** And when did you write the note that
24   appears -- that begins on page 43 of Exhibit 48?
25   When did you write the note about what you did when

Page 126

1    you went back to see Mr. Green in the late
2    afternoon?
3    **A.** Right after I saw him. This says here
4    that they called me at 1730.
5    **Q.** No, no. That's -- you are not reading
6    that right. That note was written at 1730.
7    **A.** Oh, okay. I don't have -- but it was
8    right after. Right after I saw him, evaluated, said
9    he has to go, now. Then I went right back in and
10   charted.
11   **Q.** Was it after 5:30 p.m. that you charted?
12   **A.** I can't tell you that. I don't -- I'm not
13   sure what the time frames are.
14   **Q.** I'm doing a little Sherlock Holmes here.
15   Bear with me. On the top of 43 there's a note
16   written by someone else. Correct?
17   **A.** Mm-hmm.
18   **Q.** Who wrote that note?
19   **A.** Looks like Leah, Leah Smith. She's an RN.
20   **Q.** She has timed her note 2/12/13, 1730.
21   Correct?
22   **A.** Correct.
23   **Q.** And she says, "At approximately 1545 we
24   got called to see Mr. Green."
25   **A.** Correct.

Page 127

1    **Q.** How long were you with Mr. Green?
2    **A.** Probably 15 or 20 minutes. So you're
3    right. I mean, obviously it was -- it was a little
4    -- I mean, I must have gotten called off to do
5    something else. But I sat down, probably as soon as
6    I had the chance, to do the chart note. I did it
7    that afternoon.
8    **Q.** So you didn't do it right after you saw
9    Mr. Green?
10   **A.** No. No. I mean, obviously I didn't. I
11   thought that I did. But obviously, per this, I did
12   not.
13   **Q.** Did you go back at 3:45 with Nurse Smith?
14   Did you two go in together?
15   **A.** Yes.
16   **Q.** Who took his vital signs?
17   **A.** Probably she did.
18   **Q.** When in the course of events were his
19   vital signs taken?
20   **A.** Well, she would -- or they -- I'm sure it
21   was Leah because she charted it. She would have
22   taken them before I got in there. And that's when
23   -- either that or -- I'm not sure. I don't remember
24   if she came or if she sent Sharon or somebody else.
25   It was one of the nurses that came and told me. But

Page 128

1    I came in there, was told the vital signs. I did a
2    very quick assessment.
3    **Q.** Let me stop you for a second. You've said
4    two contradictory things to me. I want to sort it
5    out. You first told me you walked into Mr. Green's
6    cell with Nurse Smith. And now, if I understood
7    what you just said, you said you came in later. So
8    I want to know which it is.
9    **A.** Leah had gone in -- she charted it, so I'm
10   assuming it was Leah that went in. She did the
11   vital signs, and then someone came to get me. I
12   don't remember if it was Leah that came to get me or
13   if it was Sharon. But then I walked back with them
14   and did my assessment, because she came to me and
15   said, "He is not moving." And to be honest, I can't
16   remember if she told me the vital signs then or if
17   she did them as soon as I got back in there with
18   her. It all happened about the same time.
19   **Q.** All right. So let's walk through this
20   really carefully. Is it your testimony that you
21   knew Mr. Green's vital signs before you went in the
22   room to see him?
23   **A.** I don't recall.
24   **Q.** You don't remember one way or the other?
25   **A.** Right.

Exhibit 39 - Page 21 of 29
Dec'l of JTD

Page 129

1    Q.   Do you remember at what point in time you
2  determined that he needed to go to the hospital?
3    A.   Probably within about 15 seconds of
4  walking in and doing a quick neuro exam and then
5  being -- either being told -- either I knew right
6  before, but it all happened within a two-minute
7  period.  Them coming to get me, these are the vital
8  signs, here's my neuro exam, he's got to go.
9    Q.   All right.  So you made the decision after
10  you saw him?
11    A.   Yes.
12    Q.   How did he appear to you?
13    A.   He was lying very still.  He was mentally
14  alert.  He was actually moving his head.  And he
15  stated very clearly, "I can't move."
16         I did a neuro check and, you know, a
17  pretty brief neuro exam.
18    Q.   Tell me exactly what you did as best you
19  recall it.
20    A.   I asked him again to squeeze my fingers .
21  He couldn't do it.  He couldn't move very much
22  against -- he was moving a little bit on his own,
23  but when I asked him to push against my hand, like
24  with his feet, for example -- "Push against me" --
25  whereas before he was able to push down with equal

Page 130

1  strength against resistance on both sides, he
2  couldn't do that.  He had very, very little
3  strength.
4         His sensation was diminished.  I use a
5  sharp object and kind of go up the bottom of their
6  foot.  He didn't react.  And at that point I said,
7  "He has to go."
8    Q.   Who did you say that to?
9    A.   The nurses and the -- the security,
10  whoever -- I don't know if it was Deputy Correll at
11  that time, but there was multiple people in the
12  cell.
13    Q.   What was -- what were you trying -- what
14  was going on with Mr. Green?
15    A.   At that time I was worried about a spinal
16  cord injury.
17    Q.   Did you think he was faking?
18    A.   No.
19    Q.   If it was a spinal cord injury, did you
20  have an opinion as to whether it was a low back
21  spinal cord injury or a cervical spinal cord injury?
22  Did you have an opinion on that?
23    A.   Well, I'm -- likely it would have been a
24  cervical spine because his upper extremities were
25  involved.

Page 131

1    Q.   In your nursing experience, does a blood
2  pressure of 84 over 62 correlate with a spinal cord
3  injury?
4    A.   Not necessarily.
5    Q.   What do you mean?
6    A.   Sometimes it can be -- it can be really
7  high depending on where the injury is within the
8  spinal cord.  You know, sometimes patients are
9  realizing, Oh, my god, I'm paralyzed, and their
10  blood pressure is through the roof because they are
11  panicking.  It could have been very low because he
12  was lying there very, very still.  He wasn't
13  panicking.  He wasn't upset.
14    Q.   Does the phrase neurogenic shock mean
15  anything to you?
16    A.   Yes.  It means when the body starts
17  shutting down, when the body -- you know, a blood
18  pressure can drop, respirations can drop, O2
19  saturation can drop where the body essentially goes
20  into shock because of a neuro injury.
21    Q.   Is that, in your opinion, what was going
22  on?
23    A.   Of course.
24    Q.   How urgent was the need to get him to the
25  hospital?

Page 132

1    A.   Very urgent.  And I said, "He needs to go
2  now, Code 3."
3    Q.   What did you do after you said -- who did
4  you say Code 3 to?
5    A.   One of -- the deputy.  Again, I don't
6  remember if it was Correll.  I don't remember.  I
7  mean, I don't have to say it to a specific person.
8  I can say he has to go out Code 3, and everybody
9  knows that that's what they do.
10    Q.   Did you write that down anywhere?
11    A.   No, I did not.  I just wrote, "Will send
12  to ER for further eval."
13    Q.   You didn't write down either that you
14  suspected he had a spinal cord injury, did you?
15    A.   I said, "Diminishing sensation of strength
16  is concerning for possible cervical injury."
17    Q.   Is that your way of saying this is
18  probably what's happening?
19    A.   Mm-hmm.
20    Q.   Why didn't you say probable rather than
21  possible?
22    A.   I can't -- I can't answer that.
23    Q.   Do you know the difference between those
24  two words?
25    A.   I do.

Exhibit 39 - Page 22 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 133

1   **Q.**   So you told somebody Code 3.
2   **A.**   Mm-hmm.
3   **Q.**   What did you do then?
4   **A.**   I can't recall.
5   **Q.**   Did you stay in the cell with your
6   patient?
7   **A.**   No. A nurse would have done that.
8   **Q.**   Did you instruct the nurse to stay in the
9   cell with the patient?
10  **A.**   I don't recall if I specifically
11  instructed, but that's -- that's standard procedure.
12  If we have somebody who is going out, whether it's
13  Code 3, Code 1, we typically keep someone -- if an
14  ambulance is coming, we typically keep someone with
15  them.
16  **Q.**   Did you give any special instructions to
17  the nurse about what she should or shouldn't do with
18  Mr. Green while she was waiting for the ambulance?
19  **A.**   I don't specifically recall other than
20  keep him still.
21  **Q.**   Did you give her any instructions about
22  immobilizing his head?
23  **A.**   No.
24  **Q.**   Why not?
25  **A.**   He was moving. And I -- I -- I should

Page 134

1   have. I absolutely should have. But I didn't.
2   **Q.**   When you went into the room was he naked?
3   **A.**   Yes. I think.
4   **Q.**   Had he --
5   **A.**   He was under a blanket.
6   **Q.**   Did you lift the blanket?
7   **A.**   For -- I lifted it up just far enough so I
8   could examine his legs.
9   **Q.**   Well, did you -- could you determine
10  whether or not he had been cleaned up from when he'd
11  had his bowel movement?
12  **A.**   No.
13  **Q.**   Did you smell the bowel movement in the
14  room?
15  **A.**   I did not, no.
16  **Q.**   Did you know whether he was lying in feces
17  and urine?
18  **A.**   I did not, no.
19  **Q.**   Did you instruct anyone to clean him up
20  before the ambulance came?
21  **A.**   No.
22  **Q.**   So your testimony today is that when you
23  went into the room at approximately 3:45 p.m. you
24  have no recollection as to whether or not the room
25  smelled of bowel movement?

Page 135

1   **A.**   I don't -- I don't recall.
2   **Q.**   And your testimony today is you left him
3   with the nurse without telling the nurse to
4   immobilize his spine?
5   **A.**   Correct.
6   **Q.**   Were you present when the ambulance came?
7   **A.**   I don't recall -- I don't think I was.
8   **Q.**   Did you talk to the ambulance people?
9   **A.**   I don't recall. I usually do, but I don't
10  recall on that specific incident.
11  **Q.**   Is this the worst injury you had had
12  during your stay at the Lane County jail at that
13  point in time?
14  **A.**   Probably. But again, I can't --
15  **Q.**   I don't understand why you didn't stay
16  with him in the room and wait for the ambulance. I
17  just don't understand.
18          **MR. DAIGLE:** Object to the form.
19  **BY MR. ROSENTHAL:**
20  **Q.**   Can you explain that to me?
21  **A.**   I can't.
22  **Q.**   Were you crying when you left the room?
23  **A.**   No. I was upset. And I know that I was
24  talking to people in the deputies' office: "Why is
25  he still here?"

Page 136

1   **Q.**   Who did you talk to in the deputies'
2   office?
3   **A.**   I was new enough at the time that I didn't
4   know -- I didn't know really a lot of people's
5   names. So I can't recall specifically who it was.
6   **Q.**   Was it the deputies' office that's right
7   there by his cell?
8   **A.**   Yeah, down the hall just a little bit and
9   then over -- you know, being in the clinic -- and
10  then I remember going to the clinic and saying, "I
11  don't understand why. Why was he still here? He
12  should have been gone hours ago. Why wasn't I
13  notified?"
14  **Q.**   Who did you say that to?
15  **A.**   Just about everybody that was there.
16  **Q.**   The Corizon people?
17  **A.**   Corizon as well as -- as well as deputy
18  staff.
19  **Q.**   One of the witnesses made this drawing. I
20  believe it was Officer Correll. Exhibit 39. And he
21  indicated that Mr. Green was in Seg 6 and that the
22  office was basically right across the little
23  hallway.
24  **A.**   Right. Right in here.
25  **Q.**   Did you go into that office?

Exhibit 39 - Page 23 of 29
Dec'l of JTD

Kelly Conrad Green II v
Corizon Health, Inc., et al.

Kirstin White
January 27, 2014

Page 141

1  A.  He was no longer in custody.  Therefore we
2  don't have -- we aren't allowed to have that
3  information if they are no longer in police custody
4  or sheriff's custody.
5  Q.  Did you ever ask Dr. Montoya if there was
6  a way that you could get those records so that you
7  and the other Corizon staff could have a better
8  understanding of what happened?
9       MR. DAIGLE: Object to the form.
10  A.  I am pretty sure that I did.  But, you
11  know, I don't recall ever seeing them.  But again,
12  we don't have -- if they are not in custody, they
13  will not give us information unless they book --
14  obviously, if they book back in and we get a release
15  of information for previous medical records, but
16  they are not allowed by HIPAA without a consent from
17  the patient or patient representative.  They did not
18  give us that information.
19  BY MR. ROSENTHAL:
20  Q.  Have you done any research in either books
21  or journals or on the internet regarding spinal cord
22  injuries since February 12, 2014?
23  A.  I went to a seminar.
24  Q.  Who put the seminar on?
25  A.  A surgeon in Sisters -- or Bend, Oregon.

Page 142

1  Q.  Where was the seminar?
2  A.  It was at Eagle Crest Resort.
3  Q.  When was it approximately?
4  A.  It was in the summer. I want to say it in
5  -- it was actually this October.
6  Q.  Just a few months ago.
7  A.  Correct.
8  Q.  Who put the seminar on?
9  A.  Central Oregon -- it was a Central Oregon
10  medical conference, and there were half a dozen
11  different speakers, presenters from different --
12  different areas of the region.
13  Q.  Did you ask any questions of the presenter
14  regarding spinal cord injuries?
15  A.  Not any that I specifically remember.
16  Q.  Did Lieutenant Brown ever interview you
17  about what had happened?
18  A.  No.
19  Q.  Did anyone from the sheriff's office ever
20  interview you about what had happened?
21  A.  No.
22       MR. DEVLIN: Do you want to take a
23  break?
24       MR. ROSENTHAL (to Mr. Devlin): I want
25  to look at the policies here. Can we do that right

Page 143

1  now?
2       (Deposition Exhibit No. 54
3       marked for identification.)
4  BY MR. ROSENTHAL:
5  Q.  I'm going to hand you Exhibit 54 and ask
6  you what that is.
7  A.  A Nursing Encounter Tool, what we call a
8  NET.
9  Q.  What is it?
10  A.  It's when a nurse gets called to see a
11  patient.  At that point --
12       MR. NEWTON-TAPIA: Is there a copy for
13  me as well?
14       MR. ROSENTHAL: Oh, I gave --
15       MR. DAIGLE: He gave them both to me.
16       MR. ROSENTHAL: Sorry.
17  BY MR. ROSENTHAL:
18  Q.  Go ahead.
19  A.  We have them for all kinds of -- for rash,
20  for eye injury, for chest pain, for nausea/vomiting,
21  for all different kinds of medical complaints.  But
22  this is what the nurses fill out when they get
23  called out to see somebody who has this complaint.
24  It kind of takes place of a progress note.
25  Q.  As a physician's assistant, do you use

Page 144

1  these tools, these NETs?
2  A.  I do not, no.
3  Q.  Were these -- was this tool available in
4  February of 2013, to your knowledge?
5  A.  Not to the extent that they are now.
6  Q.  So this document says it was issued
7  1/15/2013.  Do you see that?
8  A.  Mm-hmm.
9  Q.  Do you have any idea when the document got
10  into your medical clinic?
11  A.  I don't.
12       (Deposition Exhibit No. 55
13       marked for identification.)
14  BY MR. ROSENTHAL:
15  Q.  Exhibit 55 is another one of these NET
16  tools.  This is specifically for head injuries.  Is
17  that the one for head injuries I just gave you?
18  A.  Yes.  Yes.
19  Q.  And again, this is something that you are
20  saying that the nurses would use, but you as a
21  physician's assistant would not need to use it?
22  A.  Correct.
23  Q.  When Corizon uses the phrase "health care
24  staff," does that include nurses or is that just
25  physicians and physician's assistants?

Exhibit 39 - Page 24 of 29
Dec'l of JTD

Page 145

1    **A.**    That includes nurses.
2            (Deposition Exhibit No. 56
3            marked for identification.)
4  **BY MR. ROSENTHAL:**
5    **Q.**    What is Exhibit 56?
6            **MR. DAIGLE:** Did he give you two
7  copies?
8            **THE WITNESS:** Yes.
9    **A.**    It looks like a Corizon document regarding
10  emergency care.
11  **BY MR. ROSENTHAL:**
12    **Q.**    I'm wondering what it is.  I agree, it
13  looks look a Corizon document.  But it says New
14  Employee Orientation, Part II, Clinical, on the
15  bottom.  Does that give you any help in explaining
16  to me what it is?
17    **A.**    It really doesn't, no.
18    **Q.**    Is this a document -- have you ever seen
19  this document?
20    **A.**    I'm sure that I have.  I don't remember it
21  specifically, but I'm sure that I've seen it.
22    **Q.**    Are these kind of documents required
23  reading for employees to your knowledge?
24    **A.**    Yes.
25    **Q.**    Are you tested on these documents?

Page 146

1    **A.**    No.
2    **Q.**    Are you expected to learn these documents?
3    **A.**    Yes.
4            **MR. ROSENTHAL:** I think this would be
5  a good place for a break.  We are getting close to
6  being done.  I want to take a break and kind of
7  organize how to wrap this up.  So can we go off the
8  record for a few minutes, please?
9            **THE VIDEOGRAPHER:** We are off the
10  record.
11            (Recess:  4:10 to 4:22 p.m.)
12            **THE VIDEOGRAPHER:** We're back on the
13  record.
14            **MR. ROSENTHAL:** Thank you.
15  **BY MR. ROSENTHAL:**
16    **Q.**    When Mr. Green was taken from the medical
17  clinic to his jail cell by the sheriff's office, did
18  you ask them to protect his spine in any way?
19    **A.**    No.
20    **Q.**    I understand what you've said about the
21  neuro checks on the chart note being a mistake.  But
22  if in fact neuro checks were going to be done, who
23  was going to do them?
24    **A.**    Either an RN or myself.
25    **Q.**    So if an RN going to do them, how would

Page 147

1  the RN have learned about the need to do them?
2    **A.**    I would have told them.
3    **Q.**    So I take it you didn't ask anybody to do
4  neuro checks?
5    **A.**    I didn't.  Again, I didn't expect him to
6  be in the building long enough to even get the first
7  check.
8            (Deposition Exhibit No. 57
9            marked for identification.)
10  **BY MR. ROSENTHAL:**
11    **Q.**    What is Exhibit 57?
12    **A.**    This is our emergency room referral.  This
13  is the paperwork that gets filled out and sent to
14  the emergency room.  It's a quick -- a quick report,
15  if you will, that goes -- so when they get to the
16  emergency room they can give this to the physician.
17  It's just a report.
18    **Q.**    When do you fill these out?
19    **A.**    As soon as you know they are going to go,
20  the ambulance is on the way.
21    **Q.**    Did you fill one out for him after he was
22  taken from the court -- after he left the medical
23  clinic when you thought he was going to be leaving
24  within the next 45 minutes or so?
25    **A.**    No.

Page 148

1    **Q.**    Why not?
2    **A.**    Because he was going to be released from
3  custody and they were just going to courtesy drop
4  him.  This is typically if someone's in custody and
5  being taken by ambulance.  Like I said, it's an
6  in-custody thing.  We are referring them to the
7  emergency room and here's what happened beforehand.
8            At this point I didn't know if Mr. Green
9  was still in custody or not.  And it's -- it's a
10  courtesy to the providers on the receiving end.
11    **Q.**    How does this get to the provider on the
12  receiving end?
13    **A.**    You give it to the paramedics.
14    **Q.**    So did you give this form to the Eugene
15  EMTs that came to transport him?
16    **A.**    Yes.
17    **Q.**    How -- so you went back to your office,
18  filled this form out?
19    **A.**    Mm-hmm.
20    **Q.**    Then did you physically give it to them?
21    **A.**    No.  I would have given it to our office
22  assistant or a nurse because we make several copies
23  of it.  And the original paperwork goes with the
24  inmate.
25    **Q.**    Let me see what you've got, make sure I've

Exhibit 39 - Page 25 of 29
Dec'l of JTD

Page 149

1  got the same thing here.  All right.  Well, I really
2  don't understand this.  So you went back to the
3  medical clinic office and prepared this document.
4  Right?
5      A.   Mm-hmm.
6      Q.   And then you gave it to an administrative
7  person probably?
8      A.   Or a nurse, somebody -- a lot of time --
9  let me correct myself.  At that time we did not have
10 an official administrative -- or office assistant.
11 It would have been a nurse in the clinic.  I would
12 have given it to them to make the appropriate copies
13 and then to go -- keep whoever was with the patient
14 from medical, hang onto it until the EMTs got there.
15 And then they give it to them.
16     Q.   And the purpose of this is to give a good
17 history to the -- in this case to Sacred Heart
18 Hospital so they have some idea what they were
19 dealing with?
20     A.   Mm-hmm.
21     Q.   So this isn't accurate, is it?
22     A.   Now that I'm looking at it, you're right.
23     Q.   What is it that you now believe is
24 inaccurate?
25          MR. DAIGLE:  Object to form.

Page 150

1      A.   Oh, no, it is -- it is accurate.  It is
2  accurate.
3  BY MR. ROSENTHAL:
4      Q.   Well, it says moved by -- moved to clinic
5  by wheelchair for sutures.
6      A.   Mm-hmm.
7      Q.   So that was sometime between 11 and 11:30
8  in the morning.  Correct?
9      A.   Yes.
10     Q.   Three hours later he complained of
11 decreased sensation.  Is that accurate?
12     A.   What time -- yes.  If it was 11:30 or so
13 that he got this --
14     Q.   And then it was at 3:45 that you were
15 called to his room.
16     A.   So I -- yeah, so I was off by an hour --
17 or I was off an hour or so.  Hours later he
18 complains of decreased sensation and movement in his
19 extremities.
20          And then -- and here I write "as well as
21 neck pain," and I don't know why I wrote that,
22 because at no time did he tell me -- and I asked him
23 ad nauseam, "Does your neck hurt?"
24     Q.   So this is just a mistake that you made?
25     A.   Unless I was going off -- because I was

Page 151

1  reading -- if you read Vicki Thomas's note
2  underneath mine, the very last one where she's
3  cleaning him up awaiting for EMS, she says he
4  complains of neck pain.
5          At no time did he tell me that he had neck
6  pain.  And again, I asked him repeatedly, "Does your
7  neck hurt?"  His answer was always a very clear no.
8      Q.   Did you know at 3:45 or 4:00 p.m. when you
9  went into his jail cell that he had not moved during
10 the whole time he was on his bunk?
11     A.   I was informed of that as I was on my way
12 in.
13     Q.   Why didn't you put that in this note?
14     A.   This is a very quick -- I mean, I'm not --
15 you cannot have all the details in it.
16     Q.   But isn't the purpose of this note to tell
17 the emergency room at Sacred Heart as much as
18 possible so they can properly treat this man?  Isn't
19 that the purpose of it?
20     A.   Yes, but I also --
21     Q.   So don't you think that it was important
22 that he laid without moving for four hours?
23     A.   But I also call and speak -- I also call
24 and give a verbal report.
25     Q.   Who did you call?

Page 152

1      A.   I called the charge nurse at RiverBend.
2      Q.   When did you do this?
3      A.   Probably right as I was doing this or
4  right after I did this.
5      Q.   When did your shift end?
6      A.   I don't work a shift.
7      Q.   When did you normally leave the jail?
8      A.   When my work was done.
9      Q.   When was that normally the case?
10     A.   It would be anywhere from 4 p.m. to 8:30
11 p.m.
12     Q.   Do you have to punch out somehow?
13     A.   I do.
14     Q.   So you have a time card kind of a thing?
15     A.   Yeah.
16          Whenever we send anybody out, send them to
17 the ER, especially if it's something significant, I
18 will call and give a report.
19          MR. ROSENTHAL:  Will you mark that
20 spot where I asked about the punch card, please.
21 BY MR. ROSENTHAL:
22     Q.   You know who Jacob Pleich is.  Correct?
23     A.   Correct.
24     Q.   Did you see him that afternoon?
25     A.   Yes.

Exhibit 39 - Page 26 of 29
Dec'l of JTD

Page 153

1    Q.    Where did you see him?
2    A.    He was in the exam room when I was
3    suturing Mr. Green.
4    Q.    He was?
5    A.    For a very brief minute.
6    Q.    Did he assist in any way?
7    A.    No.
8    Q.    Did you -- did you explain to him that
9    Mr. Green was going to be discharged within the
10   hour?
11   A.    I don't recall if we had that conversation
12   or not.
13   Q.    Did you recommend that they put Mr. Green
14   in a seg/med room?
15   A.    No, I did not.
16   Q.    Who made the decision that he had -- that
17   he should go to a seg/med room?
18   A.    I don't know.
19   Q.    Who usually gets to make that decision?
20   Is that a Corizon Health decision or is that a
21   sheriff's office decision?
22   A.    That, more than likely, would have been a
23   security -- a corrections decision.
24   Q.    Did you know that they were taking him to
25   a seg/med room?

Page 154

1    A.    Yes.
2    Q.    Did that trigger the need for Mr. Pleich
3    to do a mental health exam?
4    A.    I was under the impression they were
5    taking him to seg/med.  There was an open cell.
6    There's room in there.  They had the wheelchair.
7    They were going to help him get cleaned up.
8          I didn't know anything about a suicidal
9    ideation until all of this was said and done.
10   Q.    Did you know Mr. Pleich did a mental
11   health status exam on Kelly at about -- well,
12   there's no time on here, but I'm thinking it was
13   approximately 2:30 p.m.?
14   A.    I didn't, no.
15   Q.    How long have you known Mr. Pleich?
16   A.    Since we were hired together so --
17   Q.    Do you and he get along just fine?
18   A.    Yes.
19   Q.    Is he a responsible mental health provider
20   to your knowledge?
21   A.    Yes.
22         (Deposition Exhibit No. 58
23         marked for identification.)
24   BY MR. ROSENTHAL:
25   Q.    So I'm going to hand you Exhibit 58.  And

Page 155

1    have you ever seen this document?
2    A.    No, I have not.
3    Q.    As the PA during your shift, if there's a
4    mental health evaluation performed, are you -- do
5    you routinely know about it?
6    A.    Not always, no.
7    Q.    But do you usually know about it?
8    A.    If the patient has medical issues as well
9    as mental health -- and a lot of our inmates don't
10   have -- you know, they either have one or the other.
11   If I'm not involved with them in a medical aspect, I
12   typically do not know.
13   Q.    So is it your testimony today that you did
14   not know that Mr. Pleich did an examination of
15   Mr. Green on the afternoon of February 12th and
16   concluded that -- I'm looking down here at
17   assessment -- that he had a psychotic disorder, rule
18   out schizophrenia, paranoid type, and further
19   evaluation was required?
20   A.    I did not.
21   Q.    Should you have known that this was going
22   on?
23   A.    It may have been nice to know, but it
24   didn't have any bearing on our medical.  I mean, he
25   would have been kept down in seg.  The psychiatric

Page 156

1    team would have monitored him.  Had he stayed
2    in-house for any longer, it would have been
3    something that I would have become aware of.
4    Q.    How long would he have to have stayed
5    in-house for you to become aware of it?
6    A.    It would depend on if he had any injuries,
7    if he required any medications.  We do have a weekly
8    psych/med meeting so someone can be there for
9    several days before I know about it if they don't
10   require medical intervention.  I don't -- I don't
11   need -- I don't know -- I don't need to know all of
12   that.  I like to, but I don't always.
13   Q.    I'm going to represent to you that I've
14   watched the videotape of when Mr. Pleich talked to
15   Mr. Green and that Mr. Green said to Mr. Pleich that
16   he couldn't move, and Mr. Pleich responded words to
17   the effect, "You've been cleared by medical."
18         Did Mr. Pleich ever tell you that
19   Mr. Green said he couldn't move when he went to see
20   him?
21   A.    No, he did not.
22   Q.    What happens to this piece of paper that
23   we've marked as Exhibit 58?  Where does it go after
24   Mr. Pleich fills it out?
25   A.    It would go in the patient's chart under

Exhibit 39 - Page 27 of 29
Decl'l of JTD

Page 157

1 the mental health tab.
2 **Q.** When would it get there?
3 **A.** Maybe immediately. I'm not sure.
4 **Q.** How would it get there?
5 **A.** Jacob would put it there.
6 **Q.** So when Mr. Pleich completes his exam he
7 would go back -- where is the chart kept?
8 **A.** In the clinic.
9 **Q.** Is it alphabetical?
10 **A.** Mm-hmm.
11 **Q.** So he would go back, find the chart, put
12 it in there.
13 **A.** Mm-hmm.
14 **Q.** So then when you went to write your
15 progress notes, you wouldn't have looked and noticed
16 it?
17 **A.** I wouldn't have had any reason to look
18 through all of the pages in his chart.
19 **Q.** Even though this was the most serious
20 injury situation that had come across your desk in
21 the whole time you had been working at Corizon, you
22 wouldn't have looked at the rest of the chart?
23 **MR. DAIGLE:** Object to form.
24 **A.** He should have come to me -- and that may
25 not have been in the chart at the time. But when I

Page 158

1 pick up a chart, I don't routinely look through
2 every piece of paper that's in there. I do what I
3 need to do.
4 I mean, that should have come directly to
5 me, but it did not. And I had no reason to think --
6 with this acuity I had no reason to think that there
7 was something arbitrarily filed for me to find.
8 (Deposition Exhibit No. 59
9 marked for identification.)
10 **BY MR. ROSENTHAL:**
11 **Q.** What is Exhibit 59?
12 **A.** I think this is what they call a red -- a
13 red sheet. I think normally this is a red, but this
14 is what looks like the suicide precaution form. I
15 typically don't have anything to do with these.
16 **Q.** Do you know Sergeant Peters?
17 **A.** I don't. I do know -- I mean, there's a
18 Deputy Peters.
19 **Q.** Deputy Peters. Excuse me.
20 **A.** I don't know him very well. I think I
21 know of him. And the reason I make that correlation
22 is because he is usually up in visiting.
23 **Q.** I'm going to hand you some -- what we've
24 marked as Exhibit 17. And you'll notice -- see in
25 the lower right-hand corner there's compression

Page 159

1 numbers?
2 **A.** Mm-hmm.
3 **Q.** So what I'd like you to look at is
4 compression number 94. It's kind of in the middle
5 so you just have to kind of thumb through to find
6 it. Here's the picture.
7 **A.** Got it.
8 **MR. ROSENTHAL:** Ben, could I just --
9 could you focus on this for a second?
10 **BY MR. ROSENTHAL:**
11 **Q.** So is that the way Mr. Green was slumped
12 over in the chair when he came into the clinic to
13 have his head sutured?
14 **A.** When the wheelchair was moving, yes.
15 **Q.** Do you know the name of the officer that
16 was moving him?
17 **A.** I think it is Rob Dotson --
18 **Q.** Right.
19 **A.** -- but I can't tell.
20 **Q.** That's correct. And Mr. Dotson, when we
21 interviewed him a couple of days ago, said he had to
22 grab Mr. Green's shirt to keep him from falling out
23 of the wheelchair. Were you aware of that?
24 **A.** No.
25 **Q.** I've got another little video clip I'd

Page 160

1 like you to look at.
2 **MR. ROSENTHAL:** Got that, Ben? Tell
3 me if you want me to tilt it or something.
4 **THE VIDEOGRAPHER:** That looks fine.
5 (Video played.)
6 **BY MR. ROSENTHAL:**
7 **Q.** Is that the way Mr. Green looked when he
8 was being wheeled in the wheelchair?
9 **A.** Yes.
10 **Q.** That's it. That's all I have for that.
11 I'm not done yet, but that's all I have for this.
12 You can go back to the witness stand -- witness
13 chair, please.
14 If Mr. Green was left alone in his jail
15 cell for any period of time after 3:50 p.m., was
16 that against your orders?
17 **A.** Like I said, I didn't give any specific
18 orders, but that would have absolutely been against
19 what a standard protocol would have been. And if
20 someone had to leave post, they should have notified
21 me or someone else to come stand in.
22 **Q.** Did you call Dr. Montoya at any time on
23 February 12?
24 **A.** No.
25 **Q.** Why not? I mean, didn't you think that

Exhibit 39 - Page 28 of 29
Dec'l of JTD

Page 161

1  some catastrophe had happened that day with
2  Mr. Green?
3     **A.** I did, yes.
4     **Q.** Why didn't you call Dr. Montoya?
5     **A.** Because I would have either spoken to him
6  that night or the next morning. There would have
7  been nothing that was going to change. I definitely
8  would have -- would have spoken to him, and I wanted
9  to find out what happened.
10    **Q.** Well, did you call him that night?
11    **A.** No, I did not. I didn't find out about
12 this until about 11:30 at night.
13    **Q.** When you talked --
14    **A.** In fact -- I'm sorry to interrupt. I
15 texted him that night and said, "We've had a pretty
16 bad situation. I will talk to you about it in the
17 morning."
18    **Q.** Did you often communicate with him via
19 texts?
20    **A.** No. No. We -- we, 99 percent of the
21 time, talk on the phone.
22    **Q.** So when you talked to Dr. Montoya the next
23 day, did you know yet that Deputy Sheriff Burnette
24 had twice reported to the medical office that
25 Mr. Green was not moving?

Page 162

1     **A.** I don't think that I knew that it was
2  specifically two times. I had heard in passing that
3  he had -- he said that he had called a couple of
4  times and then there was the response about "Is he
5  breathing? Then he's fine."
6        I hadn't gotten all that -- I hadn't
7  figured out all that transpired in that period of
8  time.
9     **Q.** Did you ever tell Dr. Montoya about that?
10    **A.** Yes.
11    **Q.** What was his reaction to that?
12    **A.** He was upset as -- you know, as I was.
13    **Q.** So was there any effort made to determine
14 what nurse in the medical office had given that
15 advice to Mr. Burnette?
16    **A.** I don't -- I don't recall any. I don't.
17    **Q.** Shouldn't -- wouldn't -- isn't it your
18 view that whatever nurse said something like that
19 should be disciplined or even terminated?
20    **A.** Absolutely.
21    **Q.** So why was no effort made by you or
22 Dr. Montoya to find out what nurse did it?
23        **MR. DAIGLE:** Form.
24    **A.** When I, you know, talked to Sharon, when I
25 talked to Leah, they both said, "Oh, my God, you

Page 163

1  know, who said that?"
2        I don't know if somebody's lying. I don't
3  know if it was a misinterpretation. I simply don't
4  know. I wasn't there. I didn't hear it. I heard
5  hearsay. No one is saying that, "Yes, I did that."
6  I really -- I can't tell you what happened.
7  **BY MR. ROSENTHAL:**
8     **Q.** All right. I apologize. I know I just
9  asked you this a few minutes ago, but it's kind of
10 the end of the day and my memory sometimes skips a
11 beat.
12        What time do you -- did you usually go
13 home at the end of your shift?
14    **A.** 5:30 or 6. And that's a guesstimate. I
15 don't -- like I said, I have a very, very fluid
16 schedule.
17    **Q.** Is it possible that you were already out
18 of the jail when the ambulance people came?
19    **A.** I don't know. I'm pretty sure I would not
20 have left unless he was gone. I can't say for sure.
21 I would have to look at my time card and find out
22 exactly, but I would be very shocked if that's what
23 happened.
24        (Deposition Exhibit No. 60
25         marked for identification.)

Page 164

1  **BY MR. ROSENTHAL:**
2     **Q.** Have you ever seen Exhibit 60 before?
3     **A.** No. I have not.
4     **Q.** Do you know what Exhibit 60 is?
5     **A.** I see that it's a director's hold.
6     **Q.** What's that?
7     **A.** To be honest, I don't understand a lot of
8  it. But it's my understanding of it is that when
9  somebody is mentally ill enough, that they are put
10 on a hold, that regardless of what the custody
11 situation is that they remain in custody.
12        But again, I don't have -- I don't have a
13 clear understanding of what this is, of what the
14 actual director's hold entails.
15    **Q.** So you're -- as the physician's assistant,
16 the primary health care provider at the jail, you're
17 not told if Mr. Pleich puts an inmate on a
18 director's hold?
19    **A.** Not unless I'm involved medically.
20    **Q.** Well, you were involved medically with
21 Mr. Green.
22    **A.** Yeah. I didn't know -- I didn't know
23 anything about this.
24    **Q.** Should you have?
25    **A.** Yes. I mean, it wouldn't have changed --

Exhibit 39 - Page 29 of 29
Decl'of JTD