Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

**Marc F. Stern, MD, MPH**



February 2, 2012

## I. Introduction

This report contains my medical opinions regarding the health-related care provided to inmates at the Idaho State Correctional Institution (ISCI), Boise, Idaho, in compliance with Order 806 (July 20, 2011) by Judge Windmill, U.S. District Court for the District of Idaho, in the case Walter Balla, et al. v. Idaho State Board of Correction (IDOC), et al. (Balla).

My report is based on information from a variety of sources. I reviewed numerous court, IDOC, ISCI and patient-generated documents (including video) provided by both parties. I conducted an informal status conference with current and previous counsel for the parties on September 9, 2011 at which time both parties presented summaries of Balla and the issues at hand from their vantage points. On July 7, 8, and 9, 2011 and January 2, 3, and 4, 2012 I visited ISCI. On the latter three days, I was accompanied by Dr. Amanda Ruiz, a forensic and correctional psychiatrist. At my request, the Court appointed Dr. Ruiz as Deputy Special Master; Dr. Ruiz concentrated her review on Balla issues related to mental health care. During those visits I (or Dr. Ruiz) met with over 60 patients (including the three Class Representatives) and reviewed over 45 patient medical records. We visited all key areas of the facility including the Health Services Unit in Unit 20 (HSU) which houses most outpatient and inpatient medical and dental activities, the dining hall (Pendyne), Unit 16 which houses the Behavior Health Unit (BHU), Unit 15 which houses the Receiving Unit (RDU), Unit 8 which houses the Segregated Housing Unit (SHU), Unit 20a which houses the Medical Annex for inmates who have health care needs requiring some level of sheltered housing, and living units 9, 10, 11, 13. Dr. Ruiz and/or I met with a variety of IDOC, ISCI, and Corizon (the contractor providing medical, dental, and psychiatric care) employees, including but not limited to:

      IDOC
      IDOC Health Services Director; IDOC Dietary Services Manager

      ISCI
      Warden; Deputy Warden of Programs; Deputy Warden of Security; internal investigator; numerous custody lieutenants, sergeants, corporals and front line officers; Acting Food Service Manager and food service staff; Grievance Coordinator; Clinical Supervisor of Mental Health Care; inmates who function as Companions in the Suicide Observation Program

Exhibit 69 - Page 1 of 96
Decl' of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Corizon
Regional Medical Director; Regional Vice President; Regional Director of Nursing; Facility Medical Director; former Facility Medical Director (by phone); facility Director of Psychiatry; facility Director of Dental Care; facility Health Services Administrator (former and current); facility Director of Nurses; Correctional Medical Specialists (CMS)[1], nurses, dental assistant, and support staff in all areas of the health care operation, including inpatient and outpatient (for medical, mental health, and dental), dialysis, medical records, pharmacy; Grievance Coordinator; off-site appointment scheduler.

With the permission of both parties, I conducted an exit briefing on January 4, 2011 attended by counsel for both parties, and representatives of IDOC, ISCI, Corizon, and the Class. At the briefing Dr. Ruiz and I presented our preliminary factual findings. I asked both parties to provide information to correct any factual errors they heard during the briefing and informed them I would take such information under advisement prior to issuing this report.

I felt Dr. Ruiz and I were afforded unfettered access to people, places, and documents during our review and note the full cooperation received from Defendants in order to obtain the information we required. At the conclusion of our review, Dr. Ruiz presented her findings to me. I have incorporated them into my report; however, I accept full responsibility for the contents and conclusions herein.

In its Memorandum of October 30, 1984 in Balla I, the Court identified several areas requiring remediation. Four orders pertained to health care specifically:

-Order 1 (Balla I): This order addressed the need for an adequate dietary program to serve the needs of the medically infirm.
-Order 3 (Balla I): This order addressed the need for (a) 24-hour emergency medical care and (b) unimpeded access to medical care (including, at the time, the addition of at least one full-time physician).
-Order 4 (Balla I): This order addressed the need for a properly staffed and organized health care system to allow for effective utilization of the HSU.
-Order 5 (Balla I): This order addressed the need for an effective psychiatric care program.

These four orders form the backbone of the health care issues in Balla. For simplicity, in the remainder of this report, I will refer to issues contained in Order 1 (Balla I) as "Special Diets," the issues contained jointly in Orders 3 and 4 (Balla I) as "Medical Care." and the issued contained in Order 5 (Balla I) as "Mental Health Care."

The Court asked me to address two items: 1. the status of conditions at ISCI relative to Compliance Plans (or "Plans") created as part of this case in or around 1984 (Order #5 within Order Appointing Special Master, Docket 806), and 2. the constitutionality of

---

[1] CMSs are staff who have received limited training (and state certification) in how to administer medications.

Exhibit 69 - Page 2 of 96
Dec'l of JTD

Notice: This report is only a recommendation to the Court. Unless there a Court Order or a decision by the Court, neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

health care currently (Order #6 within the same docket). I found it difficult to fully parse my findings into these two items as there is tremendous overlap between the two. Moreover, for reasons explained in Section III of my report, the Compliance Plans bear little relevance to the ISCI and the science of correctional health care delivery of today. As such, I believed it would be more useful to the Court and the parties to couch the bulk of my findings and conclusions within the second item. Nonetheless, Section IV of this report contains a brief analysis specifically responsive to the first item, i.e. the Court's Order #5.

## II. Executive Summary

In my capacity as Special Master in the case Balla, et al. v. Idaho State Board of Correction, and with the assistance of Deputy Special Master, Dr. Amanda Ruiz, I reviewed the state of health care at ISCI in three domains (medical diets; medical/dental care; mental health care) using the benchmark of three (presumptive, see below) Compliance Plans from Balla I and the U.S. Constitution's Eighth Amendment prohibition against cruel and unusual punishment.

I found the state of health care with respect to medical diets to be fraught with some problems, but, (a) to be compliant with the spirit of the Balla I Compliance Plan, and (b) to not result in violations of inmates' constitutional rights.

I found serious problems with the delivery of medical and mental health care. Many of these problems either have resulted or risk resulting in serious harm to inmates at ISCI. In multiple ways, these conditions violate the right of inmates at ISCI to be protected from cruel and unusual punishment. Since many of these problems are frequent, pervasive, long standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges.

That there are problems with the delivery of health services should not come as an unexpected conclusion. IDOC staff monitor care delivered by Corizon under IDOC's contract with Corizon via annual and follow up audits. During the annual audit of 2010, Corizon failed 23 of the 33 categories of the audit. Despite feedback and follow up (and assessment of liquidated damages), Corizon failed 26 of the 33 audit categories in the 2011 annual audit.

In response to my invitation to both parties to provide corrections to any errors in the factual findings Dr. Ruiz and I shared at our exit briefing, I only received a response from the Defendants. Their response did not lead to any factual corrections in my findings. According to their response, IDOC had made some changes to their ISCI operation prior to my first site visit, made some further changes after my first site visit, and are in the process of, or are planning other changes. None of the changes IDOC made prior to my first visit affect my conclusions, but I did note any changes that were significant in the relevant sections of my report. As to any changes IDOC reported making after my first visit, I did not audit to those changes, so I cannot comment on their effectiveness.

Exhibit 69 - Page 3 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Despite these comments, the willingness of IDOC to entertain change is very positive and commendable, and I include a copy of IDOC's response (without attachments) so the Court can appreciate their efforts (Appendix A).

In a similar vein, I think it is very important to note some of the uplifting bright lights at ISCI which bodes well for change and improvement. The Warden recognizes the critical importance of health care delivery, is progressive, and is willing to entertain change. The ISCI Mental Health Program Director is energetic and actively involved in the health care delivery system. Corizon has hired a new Health Services Administrator and a new Director of Nursing, both of whom come with a lot of experience, devotion to their work, and ideas for improvement. The chief psychiatrist is well trained, hard working, dedicated, and trying to do his best. The dental program is without problems. With few exceptions, the most important members of the health care team – the front line health care and custody professionals – are hard working, dedicated people who clearly want to do a good job. Finally, while this report describes examples of problematic health care, many instances of health care delivery at ISCI are good or excellent. But many is not enough.

### III. Analysis of Order #5 (Docket 806):  Compliance Plans

In Order #5 (Docket 806), the Court instructed:

> Dr. Stern shall investigate and attempt to reconstruct the injunctive relief issued by the Court in Balla I, 595 F.Supp. 1558 (D. Idaho 1984), pertaining to the delivery of medical care – including special medical diets – and mental health care at the Idaho State Correctional Institution (ISCI). To that end, Dr. Stern should determine, to the extent that he is able:
>
> (a) the terms of the compliance plans that were adopted by the Court to remedy the constitutional violations in these areas,
>
> (b) whether changes in circumstances have rendered these plans ineffective or unworkable as a practical matter, and, if still applicable,
>
> (c) whether Defendants are presently in compliance.

With regard to the terms of the Compliance Plans (part (a) above), as the Court is aware, neither the Court, nor the Plaintiffs, nor the Defendants have retained copies of the original Compliance Plans. Plaintiffs provided me with three documents from historical court filings in this case. Both parties believe that these likely represent the Compliance Plans for Special Diets, Medical Care, and Mental Health Care (Appendices B, C, D, respectively). My analysis is based on these documents, however, it is important to note that no one is certain that these documents are indeed the original Compliance Plans.

Exhibit 69 - Page 4 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Below I address parts (b) and (c) of the Order for each of the three disciplines.

**1. Special Diets**
The presumptive Compliance Plan for Special Diets is a Field Memorandum (similar to a Policy/Procedure). The Memorandum is largely still relevant.

> **Conclusion 1. Special Diets**
> In my opinion, ISCI is largely compliant with the provisions of the Plan dealing with Special Diets. I did not evaluate those portions of the Plan that were not relevant to Special Diets.

**2. Medical Care**
Unfortunately, this presumptive Compliance Plan is largely stated in terms of the expected structure of the health care delivery system (e.g. actual number of employees needed) rather than expected processes or outcomes (e.g. there will be a sufficient number of employees to conduct certain business within a specified period of time). In my opinion, the circumstances at ISCI have changed sufficiently in the past three decades to render much of this Plan irrelevant. The nature of these changes include such things as: increased number of inmates; changes in physical plant; changes in operations and mission of ISCI; increased complexity of medical science and health care delivery (such as the existence of MRI scanners); increased severity of illness among inmates (such as HIV/AIDS, Hepatitis C, and an aging population).

A few items within the Compliance Plan have or may have some relevance in 2012. Defendants are in compliance with the requirement for 24-hour physician phone availability for emergencies. Medical Request Form boxes were envisioned in the Plan to eliminate barriers to access to care. The boxes are no longer relevant because the system for accessing care has changed, but access to care remains a problem. The Plan described the organization of a typical patient medical record. The current medical record is compliant with the Plan. However, as noted later in the report, this state of compliance is relatively recent. The Plan prescribed the number and hours of a number of employee positions. As noted above, it is difficult to extrapolate the relevance of most of these prescriptions to 2012. Two positions, however, deserve separate mention: dietician and pharmacist. The Plan called for one full-time therapeutic dietician and one full-time pharmacist (adjusting for the change in population size since 1984, these would now be approximately two full-time positions each). ISCI is not in compliance with either position at either staffing level. In my opinion these positions are not absolutely necessary. On the other hand, ISCI continues to face challenges in delivery of special diets and pharmaceuticals in 2012, and lack of these positions may be a contributing factor. Both issues are discussed in more detail elsewhere. Finally, the Plan called for some measures with which ISCI is not -- in my opinion, appropriately -- compliant. For example, ISCI was to have purchased and operated blood testing equipment. In 2012, blood tests are more accurately and reliably tested at nationally certified commercial laboratories than on prison-owned and operated machines.

Exhibit 69 - Page 5 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

**Conclusion 2. Medical Care**
Most of the elements of the Medical Care Compliance Plan are no longer relevant. Of two elements which are or may be relevant, ISCI is compliant with one (medical records) and not compliant with the other (staffing for pharmacy and therapeutic diets).

### 3. Mental Health Care
The presumptive Compliance Plan is a two-page memorandum authored by the then Deputy Warden. It is largely a description of operations. Further analysis per the Court's instruction was impossible.

**Conclusion 3. Mental Health Care**
I was not able to analyze adherence with this compliance plan.

*        *        *

In Order #6 (Docket 806), the Court instructed:

Dr. Stern shall also assess the overall medical and mental health care delivery system ISCI at the present time and offer his opinion as to whether members of the inmate class are experiencing current and ongoing violations of their Eighth Amendment rights against cruel and unusual punishment in these areas…

The following three sections (IV, V, VI) address this order with regard to Special Diets, Medical Care, and Mental Health, respectively.

### IV. Analysis of Order #6 (Docket 806): Constitutionality, Special Diets
Special diets are those diets which differ from the usual prison diet ("main line diet") and are administered pursuant to a practitioner's[2] order for medical reasons. There are two components to successful delivery of special diets to patients: planning and execution.

IDOC and ISCI have developed an effective system for planning. There is a full-time Dietary Services Manager in headquarters who has been there for several years. There are several standard special diets which cover the most common medical dietary needs. There is a system in place to ensure that the contents for each of these special diets is established centrally and that local staff have the materials and skill to produce them. The nutritional content of the special diets appears appropriate to me. There are regular audits (which I reviewed) of the menu by a Registered Dietician to assure that the nutritional plan is translated into meals which actually contain what they should. There are also quarterly audits of the preparation and delivery of special diets (which I reviewed) by the Food Service Manager. These audits suggest a reasonable degree of compliance.

---

[2] I use the term practitioner or prescriber to connote an individual licensed to write medical orders. Generally this is a physician, but can also be a physician assistant or nurse practitioner.

Special Master's Report -- February 2, 2012                    Page 6

Exhibit 69 - Page 6 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Execution entails getting the right diet to the right patient. It appears that in some aspects, this has improved over the past few years. In the past, the system for ordering special diets was very complex and it is possible that practitioners did not have complete autonomy over the orders. Based on my evaluation, those flaws no longer exist. The order for special diets at ISCI is currently the sole province of a health care practitioner, as it should be. The form for such orders is quite simple and is only subject to review by a supervising physician, which is also reasonable.

It is difficult to audit the effectiveness of the execution phase. One tool is assessment of complaints. There have certainly been some patient complaints and I have reviewed those brought to my attention by Class members. Complaints can also come to light through the Grievance process. The Grievance process at ISCI has a gap in it which makes it easy for patterns of complaints to go unnoticed. The gap is that diet-related grievances may be channeled through any one of three different chains of command (Dietary Services Manager, Food Service Manager, Medical Service), each with a different final appeal authority. It appears, however, that most special diet-related grievances go through the Food Service Manager, and based on my review of grievances, there appear to be few. Another assessment tool is customer surveys. IDOC conducts annual satisfaction surveys (which is actually quite progressive for corrections). I reviewed a number of these. ISCI generally scores in the middle to just below the middle of all IDOC prisons. ISCI scores for individual scales are rarely at the very bottom. In 2008 ISCI scores were considerably lower than in other years; however, scores for all facilities appear to fluctuate significantly from year to year.

Based on audit results, interviews with patients, and interviews with staff, I found that at least two significant problems still exist with the execution phase of special diets. First, it is not uncommon to have a delay (days to weeks) in the ordering or communicating to the kitchen of special diets upon arrival of new patients to ISCI. On the other hand, though, (a) kitchen staff seem very sensitive to this and make an effort to accommodate the special need, even in the absence of an order, and (b) in the short-term, it is unlikely that getting the wrong diet would cause serious medical harm, especially for diabetes, which is the most common special diet.[3]  Second, communication and coordination between the HSU and kitchen with regard to unusual special diets is severely lacking. For example, food service recognizes two mechanically altered diets: a "fractured jaw" diet, consisting of liquids drinkable through a straw, and a "modified consistency" diet, consisting of main line foods that are either soft or processed in a blender. A practitioner recently ordered a "fractured jaw/modified consistency" diet for a patient. Kitchen staff have been understandably confused about the composition of such a diet and have been unable to receive clear direction from HSU staff. On the other hand, though, these types of problems seem to have arisen, not from deliberate indifference, but rather from just the opposite – a well-intentioned effort to fine tune or tailor dietary needs to specific patients when there is no appropriate "off-the-shelf" solution. Similar confusion has occurred with other patients requiring special diets such as diets with high or low residue (fiber).

---

[3]  Of course, this would not be true for food allergies. However, I saw no evidence that this has happened.

Exhibit 69 - Page 7 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

### Conclusion IV. Constitutionality, Special Diets

It is my opinion that problems exist with the successful delivery of special diets at ISCI. There is no question that these issues need to be addressed. However, I do not believe the problem is pervasive enough nor the consequences generally serious enough that these problems rise to the level of a violation of patients' constitutionally protected rights as defined by the Court; where there are problems, the conduct of ISCI is better characterized by "well-intentioned confusion" than "deliberate indifference."

## V. Analysis of Order #6 (Docket 806):  Constitutionality, Medical Care

### 1. Sick call (SC)

Sick call at ISCI is the process by which patients are evaluated for non-urgent health problems. The vast majority of care delivered at ISCI is through the SC process. Generally patients communicate their need in writing on a Health Service Request (HSR) form and are seen at a scheduled time. The initial evaluation is conducted by a nurse. In Units 8 and 15 the HSRs are collected by HSU staff. Patients in all other units personally deliver their HSRs to the SC nurse stationed at the SC window in Unit 20 at a scheduled time each day.

Based on my review of health care at ISCI I believe there are three serious problems with the SC system: (a) delays or no response to HSRs;  (b) poor quality of nursing care when it is delivered; (c) lack of confidentiality during care.

#### a. Delays or no response to HSRs

Delays or lack of response to HSRs was identified as a problem at ISCI as far back as Balla I (HSRs were referred to as "kites"). The problem persists. I found delays as long as five weeks between the time a patient submitted an HSR and when he was seen for the problem. One patient stated on an HSR that he thought his blood sugar might be too low and that he might have diabetes; he was not seen for 11 days. A patient who requested to be seen 15 days earlier had not yet been seen on the day of my chart review; there is no way of knowing if his care will occur late or not at all.

Timely response to HSRs is an essential component of adequate access to care. Generally, patients should be seen within two to three days (slightly longer on weekends or holidays) of submitting non-urgent requests for health care. This time frame is subject to some variation depending on other factors such as the ease with which patients can be seen during off-tour hours, the presence and quality of triaging of the HSR, etc. In any case, delays of the order of magnitude occurring at ISCI are too long. They pose a significant risk of serious medical harm. For example, if the patient above who thought he might have low blood sugar did indeed have that condition, he was at risk of becoming unconscious and either falling and injuring himself, or simply dying. In the RDU (Unit 15), where SC is conducted in the living unit, the delays in access to care seem to arise, in part, from insufficient staff and/or space. I did not determine the underlying reason(s) for delays elsewhere. Corizon has implemented a relatively novel approach to submission of HSRs in units other than 8 and 15: patients deliver their HSRs personally to a nurse in the

Exhibit 69 - Page 8 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

HSU.  It is likely that this innovation has reduced lost HSRs and delays to responses. However, as noted above, this innovation is insufficient.

b. Poor quality of nursing care when it is delivered

Once a patient is seen, the quality of care in SC is, at times, of poor quality.  The first (and usually only) patient evaluation in SC is usually conducted by a Licensed Practice Nurse (LPN).  These nurses often operate independently, i.e. taking the patient's history, conducting examinations, making conclusions about the patient's condition, and providing treatment, all without input from a Licensed Professional Nurse (RN)[4] or practitioner.  Most states' nurse practice acts, including that of Idaho, draw a clear distinction between the scopes of practice of LPNs and RNs.  Generally LPNs collect data which they provide to RNs or practitioners and execute care plans as developed by RNs and practitioners.  Making independent assessments (the nursing equivalent of a diagnosis) and prescribing nursing interventions is the sole domain of the RN and is beyond the scope of an LPN.[5]

---

[4] Licensed Professional Nurse and Licensed Practical Nurse are two different licensures.  The former receives significantly more training and can supervise the latter.  Unfortunately, in Idaho, the acronym for both nurses is the same.  To avoid confusion in this report, I abbreviate the Licensed Professional Nurse with "RN," which is the more common designation used outside Idaho.

[5] Nurse Practice Act, Idaho Statues TITLE 54, CHAPTER 14, 54-1402. (Emphasis added)

"(3) "Licensed practical nurse" [LPN] means a person who practices nursing by:
 (a) Functioning at the direction of a licensed professional nurse, licensed physician, or licensed dentist;
 (b) Contributing to the assessment of the health status of individuals and groups of individuals;
 (c) Participating in the development and modification of the strategy of care;
 (d) Implementing the appropriate aspects of the strategy of care as defined by the board, including administering medications and treatments as prescribed by those health care providers authorized to prescribe medication;
 (e) Maintaining safe and effective nursing care rendered directly or indirectly;
 (f) Participating in the evaluation of responses to interventions; and
 (g) Delegating nursing interventions that may be performed by others and that do not conflict with this act.

(4) "Licensed professional nurse" [RN] means a person who practices nursing by:
 (a) Assessing the health status of individuals and groups of individuals;
 (b) Identifying health care problems that are amenable to nursing intervention;
 (c) Establishing goals to meet identified health care needs;
 (d) Planning a strategy of care;
 (e) Prescribing nursing interventions to implement the strategy of care;
 (f) Implementing the strategy of care, including administering medications and treatments as prescribed by those health care providers authorized to prescribe medication;
 (g) Authorizing nursing interventions that may be performed by others and that do not conflict with this act;
 (h) Maintaining safe and effective nursing care rendered directly or indirectly;
 (i) Evaluating responses to interventions;
 (j) Teaching the theory and practice of nursing;
 (k) Managing the practice of nursing; and
 (l) Collaborating with other health professionals in the management of health care."

Special Master's Report – February 2, 2012                                    Page 9

Exhibit 69 - Page 9 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

It is the expectation of Corizon administrators that LPNs at ISCI use condition-specific nursing protocols[6] when evaluating patients; they believe that these protocols represent the input of an RN or practitioner and that, as such, LPNs are not operating independently. This reasoning is flawed for two reasons. First, LPNs do not always use the protocols. Second, protocols cannot substitute for clinical judgment. Nursing and medicine are professions which cannot be practiced by recipe, which essentially is what a protocol is in the hands of an LPN. At the outset of the patient encounter, the mere selection of the correct protocol to use for that encounter requires the LPN to have made a diagnosis. For example, if a patient complains of pain in the area of the chest wall, should the LPN select the "chest pain" protocol, which is heavily geared towards managing a patient with life-threatening heart problems, or the "strains, sprains, pains" protocol, which does not? Selecting the correct protocol at the beginning of an encounter is tremendously challenging, even for a physician, and once the incorrect protocol is selected, the likelihood of arriving at a correct diagnosis and treatment is markedly decreased. Another challenge in choosing the correct protocol is when a patient has two symptoms. For example, if a patient complains of vomiting and diarrhea, should the LPN select the "nausea and vomiting" protocol or the "diarrhea" protocol? In this case it would not be correct to select either or both – a very different approach is needed. In summary, making a correct nursing assessment or diagnosis (leading to a correct treatment plan) is a very complex task requiring training and skills beyond the level of an LPN, even one aided by a single page set of instructions. Thus the use of protocols by LPNs without the assistance of an RN or practitioner poses an ongoing threat to the safety of patients at ISCI.

Protocol use or not, care delivered at SC is poor at times. This is most true when patients are triaged or treated and then released by the first nurse they see (as opposed to being shunted immediately to a higher level professional as does happen in certain cases). I found instances when those evaluations were cursory, leading to great risk of patient harm. It is not uncommon for the nurse to omit any examination of the patient (including measurement of vital signs) prior to arriving at a conclusion. I personally observed this, such as a patient presenting with foot pain prescribed a corn pad and a patient presenting with a tooth ache prescribed no pain medication and told his request would be forwarded to the dental clinic. Neither patient was afforded further history taking or examination. While patients with symptoms like these usually turn out to have benign problems which resolve on their own, these same symptoms can occasionally accompany much more serious conditions; only a more thorough evaluation can tell the difference. Even more serious presenting symptoms, such as bleeding from the rectum (which can be a sign of life-threatening disease such as intestinal hemorrhage or colon cancer), resulted in release from SC by the LPN without further diagnosis, treatment, or plan for follow up. When nurses do appreciate that significant disease is present, care is not necessarily better or provided at all. Patients with dental infections may be treated with regimens that are not aggressive enough, with the patients later developing more serious infections. One such patient presented to an LPN. The LPN's only documentation was two words: "abscess

---

[6] The nursing protocol is a sheet of paper that guides the nurse through specific steps to take during a clinical encounter. The same sheet of paper also provides blank spaces for the nurse to document the results of each step.

Special Master's Report – February 2, 2012                                        Page 10

Exhibit 69 - Page 10 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

[sic] tooth" followed by a verbal order from a practitioner for oral antibiotics. The following day the patient's abscess had gotten much worse, requiring admission to the infirmary for intravenous antibiotics.[7]

c. Lack of confidentiality during care
Upon submission of an HSR, for most patients in the facility, first contact with a nurse occurs at the SC window in the lobby of the HSU (indicated by the arrow in photograph, Appendix E). During SC, the lobby can be extremely crowded. Patients waiting to be seen in SC line up in front of the window through which the nurse conducts his/her evaluation. Due to the proximity of patients in the lobby and the need to speak loudly due to the din, it is impossible for other patients not to overhear the nurse-patient encounter. These conditions constitute a blatant violation of a patient's right to privacy during a medical encounter. Not only does our society consider confidentiality of health care encounters a basic social right (which does not evaporate behind bars), but when patients cannot share health care information freely without fear of breach of their privacy, they tend to withhold information. And when clinicians do not get the whole story from a patient, patient safety is at risk.[8]

> Conclusion 1. Sick call
> Patient requests for routine care through the sick call process result in no care, delayed care, or care which is dangerous, all of which deprive patients of their constitutional right to access to care and the opinion of a qualified health care professional.

**2. Urgencies/emergencies**
An urgency or emergency is when a patient has a health care need which cannot -- or the patient believes cannot – wait until the next regularly scheduled SC. There are medical staff present on site and a physician[9] on-call 24/7 to respond to these needs. There is always an RN on duty. However, the first responder (Emergency Responder) to urgencies and emergencies is not always an RN; the Emergency Responder currently can be an RN or an LPN. Further, according to information I received, this is a recent change; previously a less highly trained person than even an LPN could fulfill the Emergency Responder role. It is the expectation of Corizon administrators that nurses use nursing protocols for every encounter and that each encounter conducted by an LPN is immediately reviewed with an RN.

Based on my observations, the system in place for response to urgencies and emergencies at ISCI is seriously flawed, both in planning or design as well as execution of the plan. In parallel to my assessment of care for Sick Call above, two flaws are: (a) delays or no response to urgencies or emergencies; and (b) poor quality of medical care when it is

---

[7] There was no documentation of any examination of the patient on the day of infirmary admission either; the first time the patient appears to have been adequately examined was on the third day of his illness.
[8] I have been informed that following my first visit, the HSU lobby window is no longer used for sick call evaluations. I did not personally verify this during my second visit.
[9] The first level practitioner may be a nurse practitioner or physician assistant, but a physician is still available. Such an arrangement is acceptable.

Exhibit 69 - Page 11 of 96
Dec'l of JTD

Case 1:81-cv-01165-BLW    Document 822    Filed 03/19/12    Page 12 of 24

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

delivered. In addition, urgent/emergent care suffers from: (c) poor continuity of care upon return from the hospital emergency room (ER); and (d) emergency response equipment which is either not kept in order or not carefully tracked.

a. Delays or no response to urgencies or emergencies

Patients report, and many correctional officers confirmed, that when correctional officers contact HSU for an urgency, it is not uncommon for the nurse to either take a long time to respond, sometimes requiring repeat calls to the HSU, or for the nurse to obtain some second hand clinical information from the officer, and based on this, to instruct the officer to have the patient submit an HSR on the next regular business day.[10] This state of operation places patients at an unacceptable risk of harm. While many urgencies which sound benign over the phone are benign, some are not. The only way to determine the difference is through basic -- and timely – nursing triage which usually requires taking a patient history and conducting an examination.

b. Poor quality of nursing care when it is delivered

Nursing care given during urgent and emergent situations suffers from all the same defects described above for care during Sick Call (see Section 1.b.); by reference that section is included here. The following example illustrates many of these defects as they apply specifically to an emergency response. An LPN responded to a living unit for a patient suffering from an extremely low blood sugar (too low to register on a meter). The patient had an altered mental status. This is a life threatening situation. The LPN prescribed and administered an injection of a medication, without use of a protocol or an order from a physician. Without further determination of the cause of the episode (which is important for predicting and preventing a recurrence) and without arranging further follow up, the LPN discharged the patient back to his living unit. The LPN acted independently without any oversight or input from an RN or practitioner.

In addition to problems which are common to both SC and urgencies/emergencies, I found a number of troubling cases of poor care demonstrating problems specific to urgency/emergency care. The following two examples are illustrative. In the first, the Emergency Responder was emergently summoned by staff for an unconscious person in a living unit. This nurse found the patient to have agonal respirations (respirations which are very weak, very intermittent, and are insufficient to sustain life). The nurse failed to measure any other vital signs such as blood pressure, pulse, or amount of oxygen in the blood. Such evaluation was critically important at this point because it was highly likely the patient was not getting enough blood to his brain and required resuscitation. Instead, the nurse moved the patient to the HSU. During the move, the patient's vital signs were not monitored and he received no supplemental oxygen. Upon arrival at the HSU (a few minutes later) the nurse finally assessed the patient (including application of an automatic external defibrillator [AED] for the first time), found him to be in cardiac arrest, and began CPR. The patient died. It is impossible to know if immediate application of life saving measures in the living unit would have saved this patient. However, failure to provide these measures greatly reduced any chance for survival.

---

[10] It should be noted that I was told of, but could not confirm any cases of, a delayed or deferred HSU response when the situation was clearly life threatening.

Special Master's Report – February 2, 2012                                   Page 12

Exhibit 69 - Page 12 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

In the second example, an Emergency Responder was emergently summoned by staff for another unconscious patient. This nurse only brought part of the emergency equipment with her to the scene (she failed to bring oxygen, a bag-mask resuscitator to provide rescue breathing, or an AED, all of which are available in the emergency response vehicle). It is not clear from the video footage I reviewed whether or not she checked the patient's pulse, but it is clear that in the 19 seconds she was at the patient's side she did not check any other vital signs such as blood pressure, respirations, or blood oxygen level. The nurse then left the patient unattended (i.e. unattended by any other health care professionals) for approximately 2.5 minutes[11] after which she had the patient loaded on a gurney and transported to HSU. The confused and apparently ineffectual behavior of the nurse so concerned one of the correctional officers that he described it in his incident report. This case also highlights problems ensuring staff competency, discussed in Section V. 7.

Finally, an additional problem with urgent/emergent care relates to interpretation of electrocardiograms (heart tracing or EKG). Interpretation of an EKG requires considerable training and expertise. Therefore Corizon administrators expect that nurses will fax urgently obtained EKGs to on-call practitioners to interpret. However, I found that nurses sometimes interpret EKGs themselves. Since these nurses do not have the requisite skill, this puts patients at risk because serious heart conditions may be missed.

c. Poor continuity of care upon return from the hospital ER
To ensure that patients are safe when they return from an ER trip, the following should occur: the patient should be evaluated by a nurse (including condition-specific evaluations and often including measurement of vital signs); the nurse's findings as well as those of the ER (found on the ER medical records) should be communicated immediately to the on-call practitioner; the practitioner should then issue appropriate orders (which usually includes implementation of the ER physician's recommendations or some explanation why not); on the next business day the practitioner should personally review the ER medical record provided. During my review, I found examples of violation of each of these steps.

d. Emergency response equipment which is either not kept in order or not carefully tracked
I found a number of problems with the condition or use of emergency response medical equipment or maintenance of logs. There are no oropharyngeal or nasopharyngeal airways in the Emergency Response kit taken to the scene of emergencies. These are basic tools used to maintain an open airway in an unconscious patient during rescue breathing. There is a set[12] of oropharyngeal airways in the HSU emergency room.

---

[11] As the most qualified health care professional at the scene, there is rarely a reason for a nurse to leave the patient's side. My review of the documentation of this case failed to indicate any justifiable reason. Leaving a patient unattended for such a long period of time puts the patient at risk for serious harm such as their breathing or heart stopping unnoticed, or vomiting and having the vomit enter their lungs.
[12] Since the proper sized airway must be used based on the size of the patient, an emergency kit should contain a set with various size airways.

Exhibit 69 - Page 13 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

However, of the set of five or six, the two sizes most commonly used on adults were missing. Based on the inoperable condition of the bag-mask ventilator in the Emergency Response vehicle and the caked dust on its protective container, it is apparent that this essential piece of equipment is rarely if ever taken to the scene of emergencies and is never checked for operability.

There is a log book in the HSU emergency room which is supposed to be used by staff to document periodic checks of essential equipment. The book was in disarray. Pages for different devices and different (past and current) months were intermingled. Some were filed in the rings of the binders, others were stuck in the binder's pockets. Many spaces corresponding to checks which were supposed to have been completed and initialed were blank. Where the facility owns multiples of the same piece of equipment (e.g. machines for checking blood sugars), the titles on the log sheets were very unclear as to which units were to be checked. Given the condition of the log book, it is impossible to imagine how staff can effectively assure that all emergency equipment is in working order. The following observations supports this impression.

During my first visit I found that the main oxygen tank in the HSU emergency room was significantly depleted.[13]  I brought this immediately to the attention of HSU administrators who were accompanying me. They said they would address it. Apparently, some time between my first and second trip, there was a need for oxygen, and the tank opened by staff during the emergency was empty. During my second trip (and unaware of the second incident), I checked the same oxygen tank I had checked during my first trip. This time it was completely empty.

> **Conclusion 2. Urgencies/emergencies**
> Patient requests for urgent or emergency care result in no care on the day of request, delayed care on the day of request, or care which is of substandard quality. Much of this care is delivered by LPNs, practicing well beyond the scope of their training and abilities, without protocols, and without direct supervision. Some equipment required for emergency responses is missing or non-functional. When returning from ER trips, steps important for safe continuity of care fall through the cracks. These conditions are dangerous and deprive patients of their constitutional right to access to care and the opinion of a qualified health care professional.

**3. Outpatient medical care by practitioners**
Most outpatient medical care provided by practitioners occurs in the following settings: referrals from nurses conducting SC; Chronic Care Clinics; over the phone for unexpected events such as urgencies or ER trips. I found instances where the quality of care delivered was poor. Some examples follow. One patient was found to have a lesion

---

[13] It should be noted that there are several extra full tanks of oxygen in the HSU emergency. Thus ISCI will not run out of oxygen. However, the tank I checked was the tank which has the regulator and oxygen tubing already set up on it. It is the tank to which staff turn first in an emergency. If that tank is empty, it will add time delay (and anxiety) to an emergency situation while staff obtain and prepare another tank for use.

Special Master's Report – February 2, 2012                          Page 14

Exhibit 69 - Page 14 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

on a chest x-ray which was suspicious for cancer. Practitioners were aware of the finding and followed it with several tests but never discussed the possible cancer with the patient until a full seven months later. Though the patient may have chosen the route followed by the practitioners (i.e. periodic repeat x-rays), that route was not the only acceptable route. Indeed the patient may have opted for more aggressive diagnostic tests at an early stage, such as bronchoscopy or biopsy, or consultation with a lung or cancer specialist. Or he may have decided not to undergo the tests that he was given.[14] Recent tests showed that cancer was highly likely and he is currently receiving treatment. I was unable to determine his current prognosis or whether or not a more aggressive approach would have affected it. However, failure to tell the patient what was going on for seven critically important months denied him of his basic human right to participate in his care and to provide informed consent for the care delivered.

In a second case, a patient who had an ER evaluation for a possible heart attack felt dizzy and fell four days after returning from the ER. A nurse responded, measured a blood pressure of 170/109, obtained an EKG, and informed the on-call practitioner. This blood pressure was quite high, and given the recent evaluation for a possible heart condition, was particularly dangerous. The practitioner should have either sent the patient back to the ER or have done a complete assessment to determine that the patient was stable, including reviewing the patient's EKG. The practitioner did none of this. The practitioner did order some treatment for the blood pressure and requested repeat checks. However, despite these measures, the blood pressure went higher (183/111; 200/115; 188/110). Even if the patient did not have a heart condition, these blood pressures are so high as to place him at risk of a heart attack or stroke. The practitioner's failure to treat this patient's high blood pressures swiftly and aggressively – especially in light of the patient's recent history of a possible heart condition – put the patient at grave risk of injury or death.[15]

In a third case, a patient with a history of heart disease was inexplicably dropped from the rolls of the heart disease Chronic Care Clinic. Thus practitioners ceased to conduct regular check ups focusing on the patient's heart disease. A couple of years later, during a routine visit to a practitioner for other problems, the practitioner noted that the patient was having occasional angina (heart-related chest pain). The practitioner did no further evaluation and provided no change in treatment. Four days later the patient died suddenly of a heart attack. Practitioners failed to manage the patient's heart disease on a chronic basis, and failed to manage it on an acute basis. This death may have been preventable.

### Conclusion 3. Outpatient medical care by practitioners

---

[14] These tests were not without risk. Without knowing what was going on, it was impossible for the patient to have given informed consent for the tests to be conducted.

[15] Additionally, despite knowing of the extremely high last blood pressure (188/110), shortly after this blood pressure was measured, the practitioner allowed the patient to return to his living unit. Three hours later the patient fell and hit his head. I was unable to determine if the fall was due to high blood pressure, the treatment for high blood pressure, or another process exacerbated by the high blood pressure, such as a heart problem. In any case, this patient was clearly not stable and should not have been allowed to return to his living unit.

Exhibit 69 - Page 15 of 96
Dec'l of JTD

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Care delivered by medical practitioners in routine and urgent settings is at times substandard and as a result, dangerous.  A prisoner's Eighth Amendment protection includes the right to a qualified medical opinion.  The quality of medical opinions at ISCI is at time so poor as to render them unqualified.  In those situations patients are deprived of their constitutional right.

**4. Long term care**

Patients bemoan changes to a previous program for dying or physically incapacitated patients.  Part of that program included training and provision of inmate companions.  In and of itself, the existence of a hospice program, Life Transitions Program, or use of inmate companions are not requisite for constitutionally adequate care.  However, in whatever manner they are provided, certain components of care must be present.  Patients who cannot feed themselves must be fed.  Patients who cannot get to the sink must be provided hydration.  Patients who cannot write for themselves must be provided a mechanism of submitting medical grievances or HSRs.  Patients who cannot move independently must have their bedding cleaned when it is soiled.  Patients in significant pain must be provided comfort.

Based on my evaluation of long term (and terminal) care at ISCI, it is my opinion that none of these essential elements of health care are provided consistently.  For example, one terminally ill patient was ordered to receive pain medication up to three times a day as needed.  During the several days prior to his death, nurses only assessed the patient twice a day.  Thus it was *de facto* impossible for nurses to execute the practitioner's order for pain relief.  Another patient who cannot feed himself has not had food provided for some meals.

On balance, it should be noted that Corizon has increased the amount of staffing in the Long Term Care unit to try to address some of these deficiencies.  The staffing change is fairly recent and, unfortunately, helpful but insufficient.  The remaining deficiencies result in inhumane conditions.

**Conclusion 4. Long term care**
Care delivered to patients who cannot fend for themselves, such as providing food and water, cleaning soiled linen, and treating pain, is at times inadequate at ISCI, resulting in conditions which are inhumane and thus violative of patients' constitutional right to care which is not cruel and unusual.

Exhibit 69 - Page 16 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

### 5. Pharmacy

The two most serious and pervasive problems with provision of medications at ISCI are a failure to ensure seamless provision of medication as ordered, and poor documentation of medication delivery or administration.[16] It is not possible to totally disentangle these issues from one another. A third problem is use of expired medications.

There are gaps in delivery of medications to patients who will keep the medication on their person (KOP). When patients see that they are running low on a KOP medication, they are to notify staff who then order the medication from an off-site pharmacy. At times (hopefully rarely) these medications arrive late, i.e. after the patient has run out of medications. When this happens, there are back-up systems in place which are supposed to provide an interim supply of medication. However, medications arrive late more often than is expected and the back-up systems are not always successful in providing medications to cover the hiatus. Thus patients at ISCI may go several days to – reportedly – weeks without essential medications. Similar things happen with medications which are directly administered by nurses. An additional complication in the system is that the decision of whether or not to invoke one of the back up systems is a subjective one made by the medication nurse based on the nurse's perception of the necessity of the medication. Unfortunately, the medication nurse making that decision may be an LPN (or even a less-trained non-licensed person such as a CMS, a person who is not licensed or trained to make such decisions. This entire area was a very difficult one for me to evaluate due to extremely poor record keeping. However, I feel confident of my findings based on triangulation among patient complaints, officer reports, the few records I was able to find (and their poor condition), and a Corizon administrator's statement.

One particularly troubling area of medication provision is how ISCI deals with patients who refuse nurse-administered medications. It is presumed that patients are only prescribed medications they need and if they don't take them, their health is endangered. On that basis, a safe health care system takes remedial steps when a patient refuses their medications. The nature of the remediation is a function, among other things, of the particular medication and the number of doses missed. For example a long acting medication for pain can be missed more safely than a single dose of an antiretroviral for HIV/AIDS. Thus it was troubling to find that not all staff I interviewed who regularly administer medications were sure what to do in the event of a missed medications. There were staff who were vaguely aware of a "critical medication list" but didn't know what medications were on that list or the exact rules to be followed.

Whether as a result of this confusion of other factors, the outcome is that patients are able to miss even one of the "critical medications" without staff taking any remedial action. A

---

[16] Delivery of medication means the provision of a package of medication to a patient that he will administer to himself. Administration of medication is the provision of a single dose of medication to a patient by a nurse. Anyone can deliver medications (e.g. US Postal Service). Administration is a much more complex task requiring a more highly trained person – usually a licensed professional such as a nurse – who makes assurances such as the right patient is getting the right medication at the right dose by the right route at the right time.

Exhibit 69 - Page 17 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

staff member was able to provide me the "critical medication list." It contains three items (isoniazide, used for treatment of tuberculosis; all HIV/AIDS medications; and a blood thinner). I was easily able to find instances of patients missing these medications with no action taken. For example, Appendix F shows the medication administration record for a patient on the tuberculosis medication. He missed a dose on December 2, 2011 and five doses in a row starting on December 5, 2011. There was no record of any remedial action taken.

Medication-related documentation at ISCI is extremely sloppy. The log on which nurses are supposed to record missing medications was replete with missing or incorrect information, making it impossible to trace whether some patients actually received bridge medications during a hiatus of their regular supply. The other record in shambles was the individual patient medication administration record (MAR). These pages are the contemporaneous record on which nurses are to document every dose of medication they administer. If a dose is not administered, the reason must also be documented. In other words, it is unacceptable and unsafe to have blank spaces on an MAR (except for medications prescribed "as needed"). During my inspection of MARs (at various locations throughout ISCI) I found an alarmingly high number of MARs with blank spaces, often with several blanks on a single MAR.

While it is difficult if not impossible to determine with certainty whether all these doses were actually missed, the lack of complete and accurate documentation in and of itself creates a danger for patient care. Indeed, if a patient becomes ill, it might be difficult to determine whether that illness were due to the medication (or despite the medication) or due to its absence.

Finally, HSU staff continue to administer medications which have expired. Without much effort, I found three packages of actively used medications which had expired five months earlier, and another which had expired a year earlier.

> **Conclusion 5. Pharmacy**
> Medication management practices at ISCI are dangerous. Medications are not seamlessly provided as ordered. Record keeping of medication delivery and administration is markedly deficient. Expired medications are used. These contribute to and/or constitute deprivation of patients' constitutional right to the care which is ordered.

## 6. Segregation

I identified two areas of concern related to health care delivery to persons housed in Segregation (Unit 8): deficient welfare checks and lack of seamless provision of medications.

Inmates in Segregation are at particularly high risk of physical and mental health problems, either due to the segregation itself or due to limited access to services or both. As such, it is imperative that health care staff – independent of custody staff – conduct regular welfare checks. A welfare check must involve a face to face visualization and

Special Master's Report – February 2, 2012                                      Page 18

Exhibit 69 - Page 18 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

interaction with each and every inmate. At ISCI these checks are assigned to a nurse and are planned for three times a week (which is reasonable). Unfortunately, the checks do not always occur. In the recent past, it was a common practice for a nurse to fail to make cell-to-cell rounds, instead standing at the entrance to the unit and yelling that he/she was present if anyone wanted him/her. There is evidence that just recently this has improved, though at times, the individual nurse-inmate interaction may too often be limited to visualization.

As noted elsewhere, there is a problem with seamless provision of medications to patients throughout ISCI. This problem seems particularly common in the Segregation unit, especially when inmates are first assigned there. It falls on unit officers to notify -- and re-notify -- HSU staff that inmates have not received their previous medications for days, and sometimes weeks. Such discontinuity of prescribed medications is clearly dangerous.

> ### Conclusion 6. Segregation
> The general welfare of inmates in segregation has not consistently been monitored by health care staff (although there have been some recent improvements). There are gaps in the provision of medications. While failure to conduct welfare checks may not, in and of itself, be unconstitutional, it is a safety mechanism to assure that problems – such as gaps in provision of medications – do not go unchecked. Thus, overall, I found that conditions of confinement in Segregation resulted in deprivation of patients' right to access to health care. Additional problems specific to access to mental health care is discussed in Section VI.

### 7. Ensuring staff competency
A safe health care system has systems in place to prevent or detect and respond to health care professionals who are not performing in a minimally acceptable way. I learned of two specific circumstances demonstrating that these safety mechanisms are not functioning properly at ISCI.

With regard to prevention, in Section V.2.b I described an example of a problem with the competency of a staff member responding to an emergency. That problem arose from flaws in the system for selecting and training Emergency Responders. It should be noted that as a result of this incident (which occurred very recently), Corizon has made significant positive changes such as improvements to its method for selecting and training Emergency Responders.

Since staff competency cannot be guaranteed – even with proper systems for selecting and training qualified staff -- a health care organization must also be able to detect and respond to evidence of lack of competency. The following case reveals that this did not happen at ISCI. ISCI received troubling allegations regarding a nurse (Corizon employee) in the dialysis suite in the HSU. Allegations included suspicion that she overtly did not like inmates, was failing to provide food and water during dialysis, prematurely aborted dialysis sessions or simply did not provide them at all, and failed to provide ordered medications resulting in patients becoming anemic (low red blood

Exhibit 69 - Page 19 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

count). Based on my discussion with staff members and review of available documents,[17] it is more likely than not that authorities were aware of the potential danger to the safety of patients for several months but unduly delayed taking action to protect them. Further, IDOC's internal investigation strongly suggests that the delay was based on financial rather than patient safety or labor relations considerations. This fact set is very troubling and indicates a conscious disregard for patient safety.

### Conclusion 7. Ensuring staff competency
Systems to prevent, or detect and respond to incompetent staff are deficient, resulting in dangerous conditions for patients at ISCI. In one very troubling case, authorities were aware of ongoing employee poor performance and/or misconduct which presented a significant risk of serious harm to patients, yet deliberately took no action. Such conditions violate patients' rights under the Eighth Amendment.

## 8. Medical Records
A well organized and complete medical record is a necessary element of a constitutionally adequate health care delivery system. In my opinion, medical records are currently well organized and complete, and all loose papers have been filed. However, this state of affairs is a recent development. According to staff, until May 2011, most medical records did not have clearly marked sections, were disorganized, and were missing many essential documents, such as lab and x-ray reports which were in loose stacks waiting to be filed. If this is true, the medical record at that time would likely not have been able to support constitutionally adequate care.

It is a basic patient right to be able to review one's medical record. Aside from other purposes, a patient's review of his medical record is one mechanism to help ensure that information in the record is accurate. Patients at ISCI do not have this right. It is important to note that this deficiency is not under the control of ISCI; it is dictated by Idaho Code 9-342, 3, e. Unfortunately, this Code lumps medical records together with all other state records from which prisoners are barred access.

### Conclusion 8. Medical records
Prior to the middle of last year, the medical record was likely insufficient to support constitutionally adequate care; that is no longer the case. Patients should, but do not, have the right to access their medical record; this is not under the

---

[17] I requested the employee's personnel file (a document maintained by Corizon) and any IDOC/ISCI documents related to any investigations and actions taken. The employee had been dismissed about 18 months prior to my request. I was originally informed that Corizon had already "purged" all of this employee's personnel records (with the exception of payroll data). After a repeat request, I was informed that the records had not been purged but had been sent to an off-site storage facility and would be forwarded to me prior to issuing my report. They were not received as of the date of this report. IDOC conducted an investigation about one month after the employee's dismissal. I was provided IDOC's 22-page investigation report. The report is an accounting of the facts in the case. My subsequent request for any other IDOC documents containing conclusions and action plans based on the investigation also remains outstanding as of the date of this report.

Exhibit 69 - Page 20 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

control of ISCI or IDOC. Problems with inadequate entries into the medical record for mental health care are discussed in Section VI.

**9. Systems to support a constitutionally adequate health care delivery system**
This subsection addresses three ancillary systems which support health care delivery: policies and procedures, inmate grievances, and death reviews. Absence or dysfunction of these systems does not in and of itself mean a system of care is constitutionally inadequate. However, these systems are so important that when they are absent or dysfunctional, it is hard for a correctional health care system to provide constitutionally adequate care. These three ancillary systems are dysfunctional at ISCI. Given the problems with the health care delivery system at ISCI described in this report, the dysfunction of these three systems should be considered as one of the contributing causes. I will discuss them briefly.

I did not review many individual policies or procedures and do not offer an opinion about their specific content. However, I did find that the overall structure of policies and procedures at ISCI it very cumbersome. IDOC has policies. IDOC also has Standard Operating Procedures. For each IDOC policy ISCI may have its own Field Memoranda, which essentially expand on policy and procedures. Corizon, a national health care vendor, has corporate level policies. In addition, state or facility operations within Corizon may have local instructions. Not only does the mere existence of these various (and overlapping) sets of documents make for confusion, but the platforms on which they reside (i.e. internet, Corizon intranet, IDOC intranet, paper) are disparate and not coordinated, making it very difficult for an individual staff member to use them. This difficulty of use was apparent to me during a number of interactions with staff on issues about relevant policy and procedure. From floor nurses to secretaries to medical records staff to HSU supervisors and even Corizon regional supervisors, everyone had difficulty finding relevant policies and procedures.

In the IDOC Grievance system, inmates may submit Concerns and then Complaints; under PRLA they must exhaust these remedies prior to seeking judicial relief. Dr. Ruiz and I reviewed over 100 Concerns and over 75 Complaints. I found a number of problems with the Grievance system which erode its value. First, when addressing a Concern or Complaint, with rare exception, staff never talk directly with the inmate to better understand (and attempt to resolve) the issue. Second, at least half the Concerns I reviewed are essentially HSRs. Staff allow inmates to use Concerns in that way. However, policy for handling Concerns does not have the same clinical rigor as policy for handling HSRs. Thus, Concerns about clinical issues are not necessarily triaged according to clinical protocol, are not responded to within a short time period, etc. For example, a patient submitted a Concern stating he was on lithium pills and was experiencing extreme tremors. This might have been a symptom of a toxic, life-threatening lithium blood level. Staff responded to the Concern several days later, indicating simply that the Concern was satisfied because the patient had already been seen in a clinic six days after submitting the Concern. Instead, the Concern should have prompted an immediate (i.e. within hours) face-to-face clinical evaluation. The way the Concern was handled placed the patient's life at risk during the six days after submitting

Exhibit 69 - Page 21 of 96
Dec'l of JTD

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

the Concern.  Third, appeals of Complaint responses are not always reviewed by Corizon's Regional Manager, as required by policy.  Additionally, they are often responded to by an LPN – who is sometimes the same staff member who was the subject of the Concern leading to the Complaint.  Such responses are inconsistent with the facility's high level of response to Complaint appeals for non-health care related issues (which require the Warden's concurrence), and can present a conflict of interest.  Fourth, and most importantly, facility responses are often non-responsive to the issue, flippant, and/or fail to address any underlying system problem leading to the Complaint.

According to IDOC Policy[18] and good medical practice, deaths are "sentinel events" which should be reviewed to evaluate the quality of health care delivered and make remedial changes based on lessons learned.  At ISCI no such review occurs.  Corizon conducts an internal peer review which is protected from review by anyone outside Corizon, including IDOC.  Corizon does not prepare a report for IDOC, it does not forward any recommendations for improvement to IDOC, and IDOC does not request or require this from Corizon, despite policy to the contrary.  As an example of the importance of the death review process, in Section V.3. I described a death.  My own review suggested that there were errors which may have contributed to the death.  However, no review was conducted by IDOC nor was any report created by Corizon and provided to IDOC.  Thus if there were indeed preventable errors, to my knowledge ISCI has not taken any remedial measures to prevent the errors from causing future deaths.

### Conclusion 9. Systems to support a constitutionally adequate health care delivery system
The state of guiding documents, the inmate grievance system, and death reviews at ISCI is poor.  While not in and of themselves unconstitutional, it is important for the Court to be aware of this and its possible contribution to other unconstitutional conditions.

## VI. Analysis of Order #6 (Docket 806):  Constitutionality, Mental Health Care
In Balla I, the Court described a constitutionally adequate mental health care program as one which contained six elements[19]:

---

[18] "Within 30 days of the offender's death, the facility health authority and facility medical director (or designees), shall jointly conduct a clinical mortality review, and submit a written report to the health authority. ..[The report shall contain]… Events leading to the terminal event; Diagnosis as established at the time of the clinical mortality review; The primary cause of death…For the period prior to the terminal event- the timeliness and appropriateness of diagnoses, treatments, preventive measures taken, and staff responses; For the period of the terminal event- the timeliness and appropriateness of diagnoses, treatments, preventive measures taken, and staff responses; The reviewer's opinion of whether the level of housing and available healthcare was appropriate; And a narrative – prepared and signed by the facility medical director and other participant in the clinical mortality review process, to include conclusions, findings, and the reviewer's recommendations for improvement….The [IDOC] health authority (or designee) shall review the completed and signed Clinical Mortality Review Report (and other relevant documentation) to determine whether the death may be part of an emerging pattern or indicative of opportunities for improvement in the overall healthcare delivery system." IDOC SOP 401.05.03.11
[19] The Court's source was Ruiz v. Estelle, 503 F. Supp. 1265 (S.D.Tex. 1980).

Exhibit 69 - Page 22 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

1. A systematic program for screening and evaluating inmates to identify those in need of mental health care;

2. A treatment program that involves more than segregation and close supervision of mentally ill inmates;

3. Employment of a sufficient number of trained mental health professionals;

4. Maintenance of accurate, complete, and confidential mental health treatment records;

5. Administration of psychotropic medication only with appropriate supervision and periodic evaluation; and

6. A basic program to identify, treat, and supervise inmates at risk for suicide.

These elements remain viable in 2012.[20] Along with an additional element,

7. Systems to support a constitutionally adequate mental health care delivery system,

they form the framework for my analysis of current conditions at ISCI.

### 1. A systematic program for screening and evaluating inmates to identify those in need of mental health care

Screening is the process by which all arriving inmates are tested for mental illness, whether or not there is any overt indication or history. The screening does not have to be conducted by a mental health professional. If the screening suggests possible mental illness, an inmate should be referred to a qualified mental health professional for an evaluation to determine if mental illness truly exists, and if so, implement (or continue) therapy. If the screening score crosses a certain threshold, the inmate is considered at imminent risk of danger to self or others and merits immediate referral to a mental health professional, prior to a bed assignment.

ISCI recognizes the need to screen newly arriving inmates for serious mental illness (SMI) and has nurses screen for SMI on a regular basis using preprinted screening forms. However, when the screening clearly flags an inmate as requiring professional mental health care, appropriate referrals do not consistently take place. Dr. Ruiz found several cases in which the inmate scored well more than seven points (the cutoff over which the screener should immediately contact a mental health professional) but no such referral was generated, putting the inmate (and/or others with whom he might come in contact) at significant risk of harm. One such inmate was described as angry, rambling, hostile, and unable to sit still, yet was assigned a bed in general population without prior mental health consultation. Another had a documented history of psychiatric illness and a recent episode of self-injury. Not only did he not receive immediate referral to a mental health professional as dictated by his screening results, his routine referral did not materialize until three weeks later, a week beyond the facility's own 14-day limit dictated by policy. A more tragic example is a patient whose intake screening revealed five risk factors for suicidality. Contrary to protocol, he was not immediately referred to a mental health

---

[20] see NCCHC Guidelines for Mental Health Care in Correctional Facilities 2008; Coleman v. Wilson, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995), appeal dismissed, 101 F.3d 705 (9th Cir. 1996)

Exhibit 69 - Page 23 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

professional. Eleven days later fellow inmates found him hanging and he died shortly afterwards.

> **Conclusion 1. A systematic program for screening and evaluating inmates to identify those in need of mental health care**
> ISCI does not have an adequate program for screening and evaluating inmates to identify those in need of mental health care. The program's design is adequate, however, it suffers from poor implementation and lack of appropriate referral after screening. Failure to identify and treat mental disease can lead to patient harm or death or harm to others, and violates patients' constitutional right to access to care for serious health conditions.

**2. A treatment program that involves more than segregation and close supervision of mentally ill inmates**
Dr. Ruiz found four fundamental deficiencies in the mental health treatment program at ISCI: (a) inadequate work up of and treatment plan for patients enrolled in the program; (b) underuse of group and individual therapy; (c) inadequate care during acute illness; and (d) misuse of segregation for mental health problems.

a. Inadequate work up of and treatment plan for patients enrolled in the program
ISCI staff informed Dr. Ruiz that of the several hundred inmates enrolled and being treated in the mental health program, 144 do not have adequate psychological intake assessments or treatment plans. This poses a fundamental challenge to providing adequate mental health care.

b. Underuse of group and individual therapy
Group and individual therapy are important tools for treatment of mental illness. They are markedly underutilized at ISCI both in terms of the number of groups being run and individual sessions being offered as well as the amount of time an individual patient spends in group therapy. Because of their non-invasive and effective nature as treatment modalities, group and individual therapy should be the first line options for many patients (before use of medications). Thus the number of patients in group therapy at ISCI should be much higher than the number of patients on medication. Instead, approximately 474 patients are on psychotropic medications and 464 are in group therapy.[21] These data demonstrate the underuse of group therapy as well as suggest the overuse of medications. The proportion of the ISCI population on psychotropic medication (about 28%) is unexpectedly high compared to national norms for a non-specialized, male, medium custody facility. For those patients who are placed in group treatment, they average one to four hours per week in treatment sessions. This "dosage" is too low.[22]

Use of group therapy is largely limited to patients in the BHU (Unit 16). However, only a fraction of patients with SMI – those who are most unstable – are housed in the BHU; the rest reside in general population. Dr. Ruiz was informed that in general population select

---

[21] These are not mutually exclusive groups, i.e. some patients are on medications and in group therapy.
[22] For example see Coleman v. Schwarzenegger which mandates 10 hours per week of out-of-cell structured time for mentally ill inmates.

Special Master's Report – February 2, 2012                    Page 24

Exhibit 69 - Page 24 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

group therapy was being offered, but this was the exception, not the rule.[23]  For example, she was told that groups were occasionally offered to patients with SMI who were 12-24 months from parole.  No group therapy (or one-on-one therapy) is offered to patients with SMI if they are convicted of life sentences.

c. Inadequate care during acute illness

SMI patients with the most acutely severe illnesses (other than suicidality) are placed in the infirmary.  They require the highest level of mental health care, which includes close involvement by the psychiatrist.  The following case reviewed by Dr. Ruiz illustrates how that does not invariably occur at ISCI.  A patient with Schizoaffective Disorder, bipolar type, became nearly catatonic.  He had previously been receiving a long acting antipsychotic medication by injection every two weeks.  Upon presenting with catatonia, he was given intramuscular injections of two other medications (Cogentin and Ativan).  He has some improvement with the medications.  However, the medications wore off, his psychotic symptoms returned, and two days after receiving the two medications he was admitted to the infirmary with a provisional diagnosis of toxic reaction to antipsychotic medication.  During our visit – 14 days after his admission to the infirmary – the patient was still in the infirmary, had still not been seen by the psychiatrist, and had still not received any specific treatment.  In Dr. Ruiz's opinion, his presentation was most consistent with catatonia due to psychosis/mania (not due to a toxic medication reaction) and would respond rapidly to higher doses of the type of drug which he received two weeks earlier (i.e. the drug which provided a mild transient improvement until it wore off).  Whether or not this would happen, it is clear that this patient has a serious mental illness which required the expertise of a psychiatrist.  For 14 days (at least, as of the time of our visit) the patient was not evaluated by a psychiatrist and thus was deprived access to appropriate mental health care.  He may have been suffering in a catatonic state unnecessarily.

d. Misuse of segregation for mental health problems

There is insufficient treatment for patients in segregation with *bona fide* mental illness, and misuse of segregation for behavior which is driven by mental illness.  By design, inmates in segregation with SMI (including those taking anti-psychotic medications and sedatives) or inmates being closely observed due to suicide risk receive no group therapy and no one-on-one therapy.  This situation not only constitutes a denial of necessary health care, but also violates IDOC's own policy.[24]  Inmates interviewed by Dr. Ruiz said they are put in a segregated cell for such reasons as not taking their medications.  Dr. Ruiz was unable to confirm many of these allegations due to the poor state of documentation (discussed elsewhere).  However, at least one medical record indicated a patient was placed in a segregated cell for 15 days for disruptive behavior during class.  The patient had a diagnosis of Asperger's Syndrome, a mental illness that is closely related to autism, and was on an antidepressant medication.  Patients with this disease have trouble relating to others, thus it is very possible that his "misbehavior" was really a manifestation of his disease.  If this

---

[23] Dr. Ruiz was unable to confirm the provision of even these limited group therapy offerings because group therapists do not document any treatment provided in the patient's medical record.

[24] Offenders placed in restrictive housing for greater than 30 days "shall be offered an opportunity to participate in therapeutic groups" (IDOC Correctional Mental Health Services System, page 68).

Exhibit 69 - Page 25 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

was what happened, he was essentially punished for being ill. Unfortunately, his medical record does not reflect that mental health staff explored this possibility. Further, even if it had been established that his misbehavior were not the result of his illness, patients with Asperger's Syndrome also suffer from anxiety and depression (as this patient did). Thus placement in the severe environment of a segregated cell for a protracted period of time was especially risky because it can exacerbate the anxiety and depression.

The preceding paragraph addressed the issue of using segregated housing as *de facto* punishment for behaviors related to mental illness. A related, but distinct issue is attempting to provide mental health care, but doing so via the inappropriate use of segregated housing. Frequently, when inmates are considered to be at risk of self-harm, they should be placed in special cells where they can be closely watched. At ISCI, inmates at risk of self-harm are placed in segregated cells and either placed on "suicide watch" (for inmates at high risk) or "close observation" (for inmates at medium risk). ISCI provided Dr. Ruiz with a list of 137 individuals who were identified as having been placed in segregated cells on "suicide watch" or "close observation" in the last quarter of calendar year 2011. Based on Dr. Ruiz's review of these lists, 45 of the 137 individuals were placed in specialized segregated cells called "dry cells." A dry cell is a cell that is not plumbed with a faucet or toilet. At ISCI, the dry cells in the BHU (Unit 16) are equipped with a hole in the middle of the cell covered by a grate which functions as a toilet. Aside from that hole, the room has four bare walls, a door, and nothing else.

There are five problems with the way individuals at risk of self-harm are handled during these acute periods. First, there is a dearth of documentation of events in the patient's medical record. The mere fact that the patient was suicidal and placed in a protective cell was missing from the medical records Dr. Ruiz reviewed, as well as other information such as the reason the individual was placed there, when the individual was placed there, when and why the patient "promoted" from suicide watch to close observation, when and why they were discharged, etc. Some or all of this information is apparently contained in other prison (custody) records but is not readily available to all mental and medical treatment staff. Thus key staff who should know about a patient's history of suicidal behavior do not have that information.[25] For example, a psychiatrist coming on duty a few weeks after an individual was fully discharged from one of these events might find no indication at all in the medical record that his/her patient had recently been acutely suicidal. Under those circumstances, it would be impossible for the psychiatrist to safely care for the patient. Second, the dearth of documentation in the medical record also means that patients are experiencing changes in their clinical treatment in the absence of medical orders. Indeed, anyone – including an custody officer – should be able to, and is able to, place an individual in one of these protective environments emergently. However, after that point, all decisions about protective living conditions should be made by a licensed mental health clinician (and documented in the medical record). Dr. Ruiz was unable to determine if this is what happens due to the lack of documentation. Third, by practice or policy, patients intentionally are not provided group or one-on-one therapy

---

[25] Other than the fact that individuals were on the list of suicide watches or close observations, it was even difficult for Dr. Ruiz to determine if, in fact, these individuals had been placed in segregated cells due to an actual suicide risk.

Exhibit 69 - Page 26 of 96
Dec'l of JTD

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

when they are in segregated cells on suicide watch, a time when such therapy is of paramount importance.   Fourth, the number of individuals at ISCI on suicide watch or close observation, and especially the number placed in dry cells, is in excess of the number that would be expected for an institution of the size and composition of ISCI. Due to the poor documentation we encountered, it was impossible for Dr. Ruiz to determine if these high numbers are clinically justifiable, if they represent clinically unnecessary overuse of these specialized cells, or if they are a reflection of gaps elsewhere in the mental health system resulting in higher incidence of suicidality.

The fifth problem is one of the most distressing: patients with SMI spend far too much time in dry cells.  In a three month period, eight individuals spent five or more days in a dry cell (six of these stays lasted 10 days or more, the longest of which was 16 days). According to Dr. Ruiz, the use of these dry cells on a long-term basis can only be described as degrading and inhumane.

The following capstone case illustrates the problem with the use of dry cells (as well as other problems with the mental health treatment system described elsewhere).  A 20 year old male was admitted to ISCI.  His intake mental health screening revealed seven positive findings, including prior sex offense and prior history of victimization, which should have triggered an immediate referral to a mental health professional.  Instead the screener checked the box for 'no referral' to mental health.  Ten days later the patient was placed in segregation and was (in this case) seen by a psychiatrist.  The patient reported symptoms of depression and 'voices.'  The psychiatrist's diagnosis was polysubstance abuse.  No medications were prescribed and follow-up with a mental health professional was only recommended as needed.  About six weeks later the patient was placed on close observation in a dry cell, presumably due to some risk to the patient due to his psychotic and/or depressive condition.  His only contact during this depressed and/or psychotic state was another mentally ill inmate-companion who was marginally trained for the task. There was no documentation in the medical record of this placement in a dry cell on close observation (including lack of a medical order placing him in that status).  He remained there on close observation status for 10 days during which time he had no initial mental health assessment, no follow-up by mental health staff, and no treatment plan.  At each of his three encounters with the mental health system (at screening, in segregation, and in close observation), the care he received was inadequate.  Lapses in care at the first two encounters likely led to his subsequent two deteriorations.  All three encounters, especially the third, reflect diminished or absent access to mental health care.

### Conclusion 2. A treatment program that involves more than segregation and close supervision of mentally ill inmates

There are significant deficiencies in the treatment program at ISCI such as inadequate work up of and treatment plans for patients enrolled in the program, underuse of group and individual therapy, and misuse of segregation.  These deficiencies result in denial of medically necessary care to patients with serious mental illness and are therefore violative of patients' constitutional right to health care.

Exhibit 69 - Page 27 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

**3. Employment of a sufficient number of trained mental health professionals**
Professionals from a number of disciplines provide health care to inmates. In mental health, these disciplines include psychiatry, psychology, mental health counseling, and nursing, among others. With one exception (psychiatry), it is difficult to establish a formula for calculating the proper staffing level of different correctional health care disciplines. The best proxy measure – albeit imperfect – of the adequacy of staffing is the effectiveness of operations that are staff-dependent. Using this proxy, based on information I provide elsewhere in Section VI showing deficiencies in staff-dependent activities (such as sparse provision of group therapy), there may be insufficient staffing of non-psychiatric mental health personnel. For a variety of reasons, it is easier to directly assess the adequacy of psychiatric staffing at ISCI. Based on this assessment, it is my opinion that there is insufficient staffing of psychiatry services. The data supporting this conclusion come from local and national metrics.

The local metric is the Balla record itself. When Balla I was adjudicated in 1985, the average daily population was 923. Nine percent of the population, or about 83 inmates, were on psychotropic medication. As a result of a finding of deliberate indifference, psychiatric staffing was increased to 0.65 FTE. Currently the institutional count is about 1664; 28% of the population, or about 474 inmates, are on psychotropic medication, and psychiatric staffing is 1.25 FTE. Thus the number of patients on psychotropic medications has increased over five-fold (from 83 to 474) while psychiatric staffing has increased less than two-fold (from 0.65 FTE to 1.25 FTE).[26] To keep pace with the population increase, ISCI should currently have 3.7 FTE psychiatric staffing.

A useful national metric is provided by the American Psychiatric Association (APA). APA states that for every 75-150 inmate-patients with SMI who are receiving psychotropic medication, there should be 1.0 FTE psychiatrist or equivalent. Using this metric, and assuming there are 474 medicated SMI patients, ISCI should have between 3.2 and 6.3[27] FTE psychiatric staffing.

Another way of looking at the adequacy of psychiatric staffing is at the level of individual patient encounters with the psychiatrist. The ISCI psychiatrist spends an average of ten minutes per encounter with enrolled patients and 20 to 30 minutes per encounter with new patients. There is no time allotted for administrative duties, comprehensive assessments, or discussions with other staff about difficult cases. Nationally, the correctional norm for encounters with enrolled patients is about 30 minutes and for new patients is about 60 minutes. Based on these numbers, the psychiatrist cannot be expected to have enough time to safely evaluate and treat patients. Based on Dr. Ruiz's review of medical records, the psychiatrist does not have enough time to safely evaluate and treat patients.

---

[26] The reason for tying psychiatric staffing time to psychotropic medications is that medications are prescribed and followed by a psychiatrist, psychiatric physician assistant, or psychiatric nurse practitioner. Other mental health professionals cannot prescribe medications.
[27] The estimate of the number of medicated SMI patients (474) is likely conservative. Thus the resulting calculation of FTE based on the APA formula (3.2 to 6.3 FTE) is also likely conservative.

Exhibit 69 - Page 28 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

In summary, based on Balla I guidelines, ISCI should currently have 3.7 FTE psychiatrist; based on the APA benchmark, ISCI should currently have (at least) between 3.2 and 6.3 FTE psychiatrist. ISCI currently has 1.25 FTE. Thus whether using Balla I metrics or APA metrics, psychiatric staffing is clearly inadequate. Empiric review of the amount of time psychiatric practitioners have to spend with their patients and evaluation of the actual care delivered during these brief encounters confirms the staffing inadequacy.

### Conclusion 3. Employment of a sufficient number of trained mental health professionals

There are deficiencies in the delivery of psychiatric and non-psychiatric mental health services at ISCI. The deficiencies in non-psychiatric mental health services may be the result of insufficient staffing, however, I cannot state this with certainty. I can state with greater certainty that there is an insufficient number of psychiatric practitioners at ISCI to provide the care needed for mentally ill patients. As such, inmates at ISCI do not have sufficient access to mental health care to satisfy constitutional requirements.

### 4. Maintenance of accurate, complete and confidential mental health treatment records

Dr. Ruiz found significant problems with documentation of care provided to suicidal patients placed in segregated/protective cells during crises, documentation of mental health treatment plans, and documentation of care delivered in group therapy. Problems with documentation of care provided to suicidal patients placed in segregated/protective cells during crises was described in Section VI.2.

Generally, mental health treatment plans were inadequate. Charts contained generic boiler-plate plans. For example, each of the cases Dr. Ruiz reviewed contained the same first two treatment goals, "Will voice an understanding of how he can kite a clinician for support" and "If prescribed medication, will take any medication prescribed by his psychiatrist as indicated reporting any changes, concerns, or side effects." In several cases the psychiatrist had clearly decided not to prescribe the patient medication, yet the treatment plan goal remained to discuss medication with the psychiatrist. For example, Dr. Ruiz reviewed the record of a patient who had previously been on an anti-depressant, but was currently off the medication. He was described as having a labile (abnormally fluctuating) mood, being anxious, and doing sexual favors for others so that they will be his friends. He also had a history of self-injurious behavior. Thus he had complex mental illness and was not stable. Proper care demanded that he have a specific treatment plan to address these needs. Instead, his treatment plan contained the same generic plans cited above without any additional plans specific to this patient's individual needs. His other problems were simply not addressed. While it is not wrong for a patient's treatment plan to contain some generic elements, the entire plan cannot be generic; treatment plans must be individualized. Lack of individualized planning and coordination contributes to poor outcomes.

Exhibit 69 - Page 29 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Group therapy treatment is not documented in patients' medical records. Thus any pertinent mental health information the group therapist generates is not available to the rest of the patient's health care team.

### Conclusion 4. Maintenance of accurate, complete and confidential mental health treatment records

ISCI does not maintain complete – and therefore accurate – mental health treatment records of care delivered during acute suicidal events, of treatment plans for SMI patients, and of treatment provided during group therapy. It is impossible to deliver constitutionally adequate care if pertinent patient information is not recorded so that it can be shared among the care team.

## 5. Administration of psychotropic medication only with appropriate supervision and periodic evaluation

I have described elsewhere the challenge faced by psychiatric prescribers due to significant understaffing. The following example illustrates how this challenge impacts ISCI's ability to administer psychotropic medications with appropriate supervision and periodic evaluation.

Dr. Ruiz learned that due to time constraints, psychiatric practitioners sometimes write orders for psychotropic medications without face-to-face visits and without stating definite time limits, e.g. "Risperidone 4 mg orally nightly until next visit." Since some patients do not get a "next visit" (i.e. a face-to-face encounter) scheduled with the psychiatrist, a patient can continue for a long time on psychotropic medications without examination by the psychiatric prescriber. Psychiatry cannot be safely practiced without occasionally "laying hands" on the patient for whom medications are prescribed. The practitioner must assure that medications are working, that their dosages are appropriate, and that patients are not developing serious medication-related side effects. Thus psychotropic medications are not always provided at ISCI with appropriate supervision by a psychiatric prescriber.

### Conclusion 5. Administration of psychotropic medication only with appropriate supervision and periodic evaluation

Psychiatric prescribers cannot routinely provide adequate supervision of medication administration without the time to conduct initial and periodic patient evaluations. In the absence of such evaluations, patients are deprived of a qualified medical opinion, rendering care unconstitutional.

## 6. A basic program to identify, treat, and supervise inmates at risk for suicide

Dr. Ruiz identified five areas of deficiency in the basic program for self-injurious behavior and/or suicidality management. I have discussed three of these deficiencies in depth elsewhere: (a) inadequate medical records such that relevant information about suicidal behavior and suicide observation periods is missing from the medical record and not routinely available to key people who need to know, e.g. the patient's psychiatrist; (b) lack of treatment for the most acutely ill patients at risk of suicide: those on suicide watch; (c) placement of patients in suicide watch or close observation, sometimes in dry

Exhibit 69 - Page 30 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

cells, for extended periods of time, amounting to inhumane conditions without access to adequate mental health care.

Two additional areas of deficiency, described below, are: (d) inadequate suicide prevention training for staff, and (e) unsafe use of Companion Offenders during suicide watch.

d. Inadequate suicide prevention training for staff
The suicide prevention training program addresses three constituencies: Corizon health care staff (medical and mental health), ISCI (IDOC) mental health care staff, and custody staff. There are deficiencies in training provided to all three.

IDOC provided documentation that Corizon conducted suicide training for its staff during a staff meeting in December, 2011. The length of the training could not be verified. When questioned about the training, two key front line staff could "not recall" having been trained in suicide prevention during 2011. Assuming that some training did occur, the intensity/quality was therefore of questionable effectiveness.

Training for ISCI mental health care staff was provided in 2011. It was provided as "self-study" training in the form of pamphlets and take-home test; there was no video, CD or interactive component. In Dr. Ruiz's estimation, this training would require an investment of less than 15-30 minutes annually of an employee's time, which is insufficient.

For the entire two-year period ending in December, 2011, ISCI provided a single training session on Suicide Risk Management in April 2010 to 110 of 283 of their custody officers. This training is inadequate both in the amount of training per officer and the number of officers trained. In terms of the amount of training, when training was provided, it was a one hour long presentation. In Dr. Ruiz's estimation, this is insufficient. By comparison, many law enforcement agencies (an environment where suicide prevention and treatment are less germane than prison) provide one to two hours of training per year. Mr. Lindsay Hayes, one of the nation's foremost experts in suicide prevention in prisons and jails, recommends eight hours of training for general duty custody staff.

In terms of the number of officers trained, this too is problematic. Every officer should receive the training, at a minimum, annually. Thus less than half of the custody staff received mandated training in 2010 and none of the custody staff received mandated training in 2011. Further, certain custody officers require more frequent training. IDOC policy states, "Because of the high risk for suicide attempts in restrictive housing, staff working in these units will receive supplemental training once each quarter. If a staff member has not attended restrictive house supplemental training within the previous quarter, they must complete it before working on the unit." Thus, at least some officers should have received eight training sessions (quarterly over two years) during this same time period; none of them did.

Exhibit 69 - Page 31 of 96
Decl' of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

e. Unsafe use of Companion Offenders during suicide watch

ISCI utilizes a Companion Offender Program whereby trained inmate volunteers help monitor patients during suicide watch or close observation. The program, as operated, has three serious flaws. First, the program operates without adequate screening of the participants. In contrast to the current policy and principles of safe patient care, some applicants chosen have significant mental illness themselves. This puts the inmates they work with at risk. The second serious flaw concerns the way in which the volunteers are utilized. According to ISCI policy and standards of correctional care nationally, volunteers are used "to supplement" monitoring. During a suicide watch, a patient should be under constant, direct, in-person, visual observation by a staff member. Instead, inmates provide this observation and officers only come by periodically to check. In other words, inmates are used in place of professional staff rather than to supplement them. To compound this, the officers' periodic check is not conducted according to policy. Officers are instructed to check on the inmate at random intervals[28] not to exceed 15 minutes. Instead, based on officer logs I reviewed, many checks are done at exactly 15 minute intervals; some checks are done at intervals longer than 15 minutes, some as long as 25 minutes. Finally, in violation of IDOC policy[29] and minimally acceptable medical practice, there is no medical record documentation of clinical observation during suicide watches and close observation.

> **Conclusion 6. A basic program to identify, treat, and supervise inmates at risk for suicide**
> There are serious flaws in the basic program to identify, treat, and supervise inmates at risk for suicide, including: insufficient staff training, incomplete medical record documentation, inhumane conditions of confinement, lack of adequate mental health treatment, and use of inmates in place of staff to monitor patients. These system flaws either harm suicidal patients or place them at significant ongoing risk of harm and therefore violate their constitutional right of access to health care.

**7. Systems to support a constitutionally adequate mental health care delivery system**

In Section V.9. of this report I addressed three ancillary systems which support health care delivery (policies and procedures, inmate grievances, death reviews), and which are dysfunctional at ISCI. The deficits in these three systems extend to mental health care and thus the contents of Section V.9. are included here by reference.

A fourth support system that Dr. Ruiz found dysfunctional in the mental health arena at ISCI is quality control (or Continuous Quality Improvement, CQI). To assure that key elements of any health care operation are functioning as planned, there must be a system (or systems) in place to continuously collect key pieces of data, monitor that data, recognize deviations from acceptable levels, and make course corrections when needed. Unfortunately, at ISCI there is no integrated CQI system monitoring the effectiveness of the mental health treatment program overall. As with the first three support systems,

---

[28] Random intervals make it more difficult for a patient contemplating suicide to plan how much time he has until the next check.
[29] Directive 315.02.01.001, Page 9

Exhibit 69 - Page 32 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

absence or dysfunction of the CQI system does not in and of itself mean a system of care is constitutionally inadequate. However, CQI is so important that when it is absent or dysfunctional, it is hard for a correctional health care system to provide constitutionally adequate care.

The backbone of a CQI system is data collection. Prior to our visit, Dr. Ruiz identified a number of key pieces of data she required to conduct her evaluation of mental health services (Appendix G). Most of these pieces of data are the same basic data that would be used in a mental health CQI program. ISCI staff do not collect and monitor any of these important metrics (and, as shown in Table 2 of Appendix G, staff were not equipped to generate some of these metrics, even upon our request). Appendix G is not meant to imply lack of helpfulness on the part of ICSI staff; indeed ICSI staff members were very cooperative and willing to try to accommodate our requests. Rather, it demonstrates that the ISCI mental health program (including both the IDOC psychological and the Corizon psychiatric components) does not routinely collect key data, data that is necessary for the safe and effective management of a constitutionally adequate mental health system.

CQI activities can and should be brought to bear on each of the six major domains of the mental health treatment program addressed in this report. For example, in Section VI.1., I described the failure of intake screeners to refer newly arrived patients with SMI to mental health professionals and the serious effect this has had on patient safety. A simple CQI activity, commonly conducted at other prisons, is to periodically review a random sample of intake forms to assure that nurses are filling them out completely and correctly. ISCI does not do this. If they did, they would discover the problem and be able to correct it.

In addition to collecting this kind of statistical information, an adequate CQI program also examines serious or "sentinel events," most notably deaths, in more detail. ISCI does not do this consistently. As previously discussed in Section V.9., IDOC does not request or receive policy-mandated death reviews from Corizon (including deaths due to suicide or other mental illness). Mental health staff do conduct a psychological autopsy after mental illness-related deaths. However, based on the two such autopsies reviewed by Dr. Ruiz, these reports do not address key CQI topics such as potential errors in patient management and areas for improvement. Mental health staff also have begun having regular meetings over dinner at which time they discuss a variety of cases. However, these meetings have no structure and generate no documented record or formal outcome and action plan.

One of the two psychological autopsies Dr. Ruiz reviewed involved a patient who recently experienced a successful suicide (also described in Section VI.1). This death may have been preventable had there been appropriate referral to mental health staff upon the patient's arrival at ISCI and adequate response times to the acute event.[30] However,

---

[30] This patient was found hanging at 19:20. He was cut down. However, there was miscommunication and the automatic external defibrillator was not applied until approximately 19:45, more than 25 minutes after his hanging.

Exhibit 69 - Page 33 of 96
Dec'l of JTD

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

in the absence of any review, there was no mechanism to indentify and remedy these possible errors.  In other words, ISCI is challenged to learn from and remember the mistakes of yesterday; system errors thus have a high likelihood of remaining and, when they do, they are destined to be repeated.

> **Conclusion 9. Systems to support a constitutionally adequate mental health care delivery system**
> The state of guiding documents, the inmate grievance system, death reviews, and a mental health CQI system at ISCI is poor.  While not in and of themselves unconstitutional, it is important for the Court to be aware of this and its possible contribution to other unconstitutional conditions.

Marc F. Stern, MD
Special Master


Appendix A: IDOC Response to Exit Brief
Appendix B: Compliance Plan, Presumptive, Special Diets
Appendix C: Compliance Plan, Presumptive, Medical Care
Appendix D: Compliance Plan, Presumptive, Mental Health Care
Appendix E: Photograph of sick call window
Appendix F: Isoniazide MAR
Appendix G: Mental Health Program operational data

Exhibit 69 - Page 34 of 96
Dec'l of JTD

Case 1:81-cv-01165-BLW    Do[Appendix A]    Filed 03/19/12   Page 11 of 23

**Response to the Special Master's Preliminary Findings**

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Sick Call<br>1. Quality<br>2. Follow up<br>3. Confidentiality | 1-3. Quality:<br>There is daily oversight of the sick call nurse and the sick call nurse functions by the nurse supervisor.<br><br>The sick call nurse is trained in the use of the protocols. Nursing assessment skills are reviewed on a routine basis by the DON.<br><br>The sick call nurse will use nursing protocols for every sick call visit. | 1-3. There is daily supervision and oversight by the nursing supervisor. The nursing supervisor conducts regular audits to ensure that protocols are in use for every sick call and that performance of the sick call nurse meets the standards. | 1-3. Complete. |
|  | Follow up:<br>Follow up appointments are made for offenders at the time of the sick call visit. There is a plan to audit referrals on a routine basis to ensure the appropriateness of the referral. | Follow up appointments are initiated at the time of the sick call visit and before the patient leaves. There is a review of cases to determine appropriateness of referral. | To be completed by January 13, 2012. |
|  | Confidentiality:<br>The sick call assessments occur within the confines of the sick call office. | Completed. | Completed. See Attachment A for detail. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

1

Exhibit 69 - Page 35 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Urgent and Emergent Response<br>1. Staffing<br>2. Staff development<br>3. Equipment and supplies<br>4. Review and follow up | 1-4. Health Service Administrator (HSA) has assumed oversight of the emergency room staff development, competency, assessment, and operations. | 1-4. The Health Services Administrator (HSA) now has oversight of the Emergency room process and staff. She is a Certified Emergency Room Nurse and a Certified Public Health Nurse.  She has years of emergency room management experience that will add to the value of the emergency response service functions at ISCI. | 1-4. Complete. |
| | The Emergency Room facility is scheduled to be updated with appropriate equipment and supplies. It will then be organized to facilitate emergency management. Additionally there are plans in place to investigate the feasibility of connecting an EKG to phone line for interpretation. | Currently in process. | February 27, 2012 will be the completion date. |
| | Specific team will be appointed as the emergency response staff and assigned on a consistent basis.  Each staff person will complete an emergency care curriculum and complete monthly training. | Currently in process.  The team has been identified and the curriculum is attached (Attachment B). | March 5, 2012 the team will be appointed and have the training completed. This will be an ongoing process. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 36 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Urgent and Emergent Response (Con't) | The RN/HSA or designee reviews all emergency responses to evaluate care and identify opportunities for improvement. As reported above, the RN/HSA is a Certified Emergency Nurse and a Certified Public Health Nurse.<br><br>An Emergency Assessment and Report is completed for every emergent call. Emergency Responders complete and maintain an ongoing Emergency Log containing the case demographics, description of the event, the outcome, and the follow up for each emergency response. | Initiated.<br><br>Emergency response sheets are reviewed by the RN/HSA or designee for appropriateness.<br><br>The ER form is faxed to the Regional Medical Director (RMD) daily for all ER offender patients. | Current practice and this will be ongoing with feedback to staff as appropriate. |
| | An emergency cart with storage space for emergency supplies and safe transport has been purchased for the exclusive use by the emergency response staff. | The cart has been purchased. The cart is due to be delivered the week of January 16, 2012. Once the cart arrives it will be stocked with appropriate emergency supplies and equipment. The cart and its supplies will be maintained by the designated emergency staff. | Awaiting arrival. The cart is for ER response only. Should arrive the week of January 16, 2012. |
| | Full oxygen tanks have been separated from used tanks. Tanks will be marked appropriately. | Initiated. | Completed. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

3

Exhibit 69 - Page 37 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Urgent and Emergent Response (Con't) | The RMD will continue to review clinical pathways with each provider to ensure that there is continuity and consistency of care. The RMD reviews cases as needed to ensure that appropriate pathway was followed. | The RMD will continue to work with each provider to assure that clinical pathways and guidelines are followed and formal training is provided quarterly to the provider group. Each ER report is faxed to the RMD daily for review and follow-up. | The RMD documents education, training, and outcomes, and evaluates provider care on an ongoing basis. The RMD reviews all emergency cases daily. This is current and ongoing. |
| | All patients returning from the ER outside the facility return to the infirmary for evaluation and disposition decisions. A white board is maintained in the infirmary listing all offender patients going off site so that they can be tracked and receive follow up. | Security staff will continue to return all offender patients with off site visits to the infirmary for assessment prior to returning them to their designated housing. Continue to use the white board for tracking outgoing and returns. | There were white boards placed in the infirmary on December 27, 2011 to track offender patients going off site as well as their return and follow up status. Ongoing. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 38 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| LTC( Long Term Care)<br>1.  Activities of daily living<br>2.  Hospice management | 1-2. A dietary log for each meal and each offender patient is maintained every day. | 1-4. Staff document dietary intake for each meal. Trends are reviewed and any trends that would indicate a compromise in nutrition are reviewed by the RN for care management. | 1-2. Initiated on January 4, 2012.<br><br>The documented meal intake is maintained and reviewed daily by the DON or RN nursing supervisor on an ongoing basis.<br><br>Conduct care planning as needed based on the outcomes of the dietary monitoring to assure proper nutrition needs are met. Ongoing. |
| | The current policy and practice is for offender patients in the terminal phase to be moved to designated area in the infirmary for hospice care and pain management. | Offender patients are moved to designated area in the infirmary for hospice and pain care. | Nursing management staff currently oversees hospice care with contracted hospice organization and site Medical Director. Ongoing. |
| | The nursing staff and IDOC clinical staff meets weekly to staff each offender patient who is receiving hospice care to ensure appropriate management. | The infirmary RN staff will work in concert with the hospice management organization to assure there is a current and complete plan of care in place. | Within 1 week of the next offender patient assigned to hospice care, a Hospice Care Staffing will be scheduled and there will be a care management plan developed. |
| Medical Records<br>Filing current | Staff is currently in place to ensure that filing is maintained. | Since June 2011 staff has been in place and will continue to be maintained. | Ongoing. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 39 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Pharmacy | The DON/nursing supervisor on days and nursing supervisor on eves will review Medical Administration Records (MARs) daily to ensure documentation completion and accuracy. The DON/nursing supervisor on days and nursing supervisor on eves will assure that missed meds are managed appropriately and that the referral log is current and complete. | Medical Administration Records (MARs) are audited on a daily basis per unit. One audit rotation takes one week. These audits are conducted by RN nursing management. RN nursing management provides one-on-one staff education and counseling as needed to assure documentation is complete and current. | Daily oversight and feedback to staff and other follow up as needed.

See Attachments A, B, C and D for more detail.

Process is ongoing. |
| Segregation<br>1.  Staffing<br>2.  Welfare checks<br>3.  Intake assessment<br>4.  Medication management | 1-4. An experienced segregation staff nurse has been hired to replace the previous segregation nurse. This nurse continues to have responsibility for management of the care of the offender patients in the segregation unit.

The segregation staff nurse provides sick call, medication management, intake assessments, regular welfare checks, and patient education. The nurse is located in Unit 8 and is accessible to conduct daily rounds as indicated. The welfare checks are done routinely three times per week per NCCHC standard P-E-09. The offenders in the segregation unit are out of their cells for one hour each day for exercise and socialization. | 1-4. A medical room is set up in the segregation unit for medication management, sick call as needed, and chart and documentation management.

The medical staff is assigned exclusively to the segregation unit to assure that sick call is offered daily, that medications are in place, and that emergent care is accessed as needed. Additionally, the segregation staff nurse administers daily medications, conducts welfare checks, assessment, and provides patient and security staff education as needed. | 1-4. Continue daily rounds of segregation by the DON/ HSA/nursing supervisor to assure that expectations are met and provide feedback to the nurse as needed.

Ongoing. |

6

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 40 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Grievance System<br>1. Monitoring<br>2. Tracking<br>3. Follow up | 1-3. An ombudsman is currently employed and working to enhance the previous practice of the IDOC contract monitor in the review, follow up, and response to all concerns and grievances for medical. This includes offender patient involvement as needed. The concerns and grievances are tracked, monitored, and evaluated for trends and patterns.<br><br>In addition to reviewing each grievance the Health Service Director will now be responsible for the Level III reviews instead of Corizon management staff. | 1-3. The ombudsman staff is in place and the process is evolving. All concerns and grievances are logged and reviewed regularly by the contract monitor and the ombudsman to identify any emerging trends and patterns. In the event there is opportunity for improvement, this staff would involve the key staff that would facilitate the improvement.<br><br>The Health Service Director will be the primary reviewer for Level III beginning January 9, 2012. | 1-3. In place and ongoing.<br><br><br><br><br><br><br><br><br><br>Change made January 9, 2012 and ongoing. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

7

Exhibit 69 - Page 41 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Receiving and Diagnostic Unit<br>Sick Call<br>a.  Nurse<br>b.  Provider | Sick call is provided daily in the RDU by the nursing staff.  The nursing staff utilizes established nursing protocols that are reviewed and approved annually by the site Medical Director, the Director of Nursing, and the Administrator.  The assigned Provider reviews the completed assessments and protocols for each offender patient seen by the nurse.<br><br>Sick call is offered daily to the offenders housed in unit 15, the RDU.<br><br>The nurse refers the offender patient to the provider assigned to the RDU if necessary.  The provider is available in the RDU 5 days a week for sick call. | Open sick call in place in the RDU 7 days per week with the nurse.<br><br>Standard and current nursing protocols are in use by the nursing staff.<br><br>A Provider is available for sick call and follow up 5 days per week.<br><br>The provider reviews the protocol for each offender patient seen by the nurse.<br><br>There is a Provider on call 24 hours a day 7 days a week for emergent cases. | In process and ongoing. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

8

Exhibit 69 - Page 42 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| <u>Mental Health</u><br>Screening & Evaluation | There is an initial Mental Health and Evaluation process in place and defined in the Correctional Mental Health Service Manual. The Initial Screening Form is reviewed by the primary clinician within 24 hours. To augment the existing process and formalize documentation, a Clinical Case Note will be attached to the Initial Mental Health Screening Form documenting in a SOAP format the findings of the clinician. | An email was sent by Clinical Supervisor, Shell Wamble-Fisher to all clinicians at ISCI instructing the clinicians to include a Clinical Case Note to document in SOAP format any findings by the clinician. The documentation will include any follow up needed. | An email was sent January 11, 2012 and the practice is now in place. |
| | The Initial Mental Health Screening Form is a propriety form of Corizon. Corizon and IDOC will work together to update the form over the next 90 days to include a comment section so clinicians can use the section to document their SOAP note in lieu of a separate Clinical Case Note. Once the form is updated, the clinicians will use the comment section for documentation. | A meeting is scheduled for January 12, 2012 to review and amend the Initial Mental Health Screening Form. Training on the use of the form is provided to all new employees and bi-annually as refresher training. Corizon Dr. Eliason provides the training. | A meeting is scheduled and the Initial Mental Health Screening Form will be available by March 1, 2012. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 43 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| <u>Mental Health</u><br>Groups and Non-Medical Modalities | The need for non medical Clinical Groups in Restrictive Housing (Unit 8) was identified in December 2011. The outline for the group was developed and approval was given to start the groups in Restrictive Housing. (see email attachment MH-A)<br><br>The Restrictive Housing groups will start the week of January 15, 2012. Dr. Eliason has been making referrals to the group during the past few weeks. These offenders will be included in the group. (See Group Outline MH-B) | Groups are scheduled to begin the week of January 15, 2012 in the Restrictive Housing Unit (Unit 8). | Start date week of January 15, 2012 and ongoing. |
| | Currently there are five clinical groups provided in general population at ISCI. There are two clinicians assigned to general population. The number of groups will be increased from five groups to eight groups during the next 90 days. | Clinicians will start a Mood Management/Coping Skills Group in Restrictive Housing (Unit 8) the week of January 15, 2012. There are currently groups in general population (Mood Management and PTSD) More groups(Depression, Living with Bipolar, and Co-Occurring Disorders) will be started during the next 90 days. | By April 15, 2012 groups will be increased. Ongoing. |
| | Group therapy is the preferred treatment modality for individuals who are incarcerated. One-on-one therapy is offered by exception (See attached list of those offenders receiving individual therapy, MH-C). | Continue current practice with focus on ensuring the needs of the offenders are met. | Ongoing |

10

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 44 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| <u>Mental Health</u><br>Tracking Information about Suicide Watches | The ISCI Clinical Supervisor tracks the Daily Suicide Watches for daily review by the ISCI clinician and Dr. Eliason and PA Barrett. | Beginning January 11, 2012 the Daily Suicide Watch Log is used to communicate with Dr. Eliason and PA Barrett information about suicide watches. This information supplements the Suicide Risk Assessment (SRA) located in the medical file. | January 11, 2012 and ongoing. |
| | The Daily Suicide Watch Log (see attached MH-D) is used to review suicide watches for the week prior. On Wednesday, during the regularly scheduled Mental Health Staffing, the Daily Suicide Watch Log is reviewed for the week prior to identify trends, placement concerns, and intervention ideas. This information is documented in the meeting notes. | Starting January 11, 2012 the Daily Suicide Watch Log will be reviewed during the already existing Wednesday MH Staffing. Notes will be taken at the meeting. | January 11, 2012 and ongoing. |
| | Once a calendar quarter beginning in January, Dr. Eliason and ISCI Clinical Supervisor will review the Suicide Watch Log to determine trends, concerns, outcomes, length of stay in holding cells, and interventions. | Beginning January 18, 2012 the past quarter Suicide Watch Log will be reviewed for trends. Findings will be available for the next MAC meeting. | January 18, 2012 and ongoing. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 45 of 96<br>Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Mental Health<br>Holding Cell #1 and #2 Unit 15 & 16 – "Dry Cells" | Unit 15 & 16 #1 and #2 Secure Holding Cells do have an area for elimination.  There are provisions for hand washing. Sanitary Hand Towel dispensers have been installed to simplify access.  Unit Post Orders have been updated.<br><br>While offenders have had an opportunity to wash their hands before meals and after toileting; however, the Sanitary Hand Towels will make the practice more practical. | Sanitary Hand Towel dispensers have been ordered and installed.<br><br>The Unit Post Orders have been updated and submitted for approval. The update provides the staff directions to offer the sanitary towels after toileting, before meals, and at request. The Security Log will reflect the action taken. | Completed January 11, 2012 and Ongoing. |
|  | Unit 15 & 16 #1 and #2 Secure Holding Cells are used for behavioral situations that pose a risk to the safety of the staff and/or offenders. These cells are used only in extreme situations for a short duration (see attached Placement Guide MH-E). If an offender needs to be placed in a secure holding cell, security staff will contact the IDOC Clinical Supervisor or Chief Psychologist for the initial Mental Health Assessment and conduct a telephonic follow-up every two hours until the offender can be moved to a less restrictive environment. | The Placement Guide was updated and effective January 9, 2012. The Correctional Mental Health Manual will be revised by April 1, 2012 to reflect the changes. | On January 12, 2012, the Placement Guide was emailed. The Correctional Mental Health Manual will be updated by April 1, 2012.<br><br>Ongoing. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 46 of 96

Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Holding Cell #1 and #2 Unit 15 & 16 – "Dry Cells" (Con't) | Three additional Close Observation Cells were identified (Unit 16 A 26, 27, and 28). There are five Suicide Watch Cells and three Close Observation Cells, providing more cells available for mental health situations. | These Close Observation Cells were identified and usage started on January 6, 2012. A formal email was sent January 9, 2012 (see Attached). | January 6, 2012 and ongoing. |

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

13

Exhibit 69 - Page 47 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Mental Health<br>1.  Approximately 144 Offenders in General Population do not have Treatment Plans<br><br>2.  Treatment Plans are Generic | 1-2. There are two clinicians currently available to offenders living in general population. In November 2011 the ISCI Clinical Supervisor did a review of the records finding approximately 144 offenders who have Levels of Care needing treatment plans. The clinicians have been trained and have already begun a roster to track the offenders and treatment plans (see attached MH-F). They are currently meeting with offenders and developing treatment plans. | 1-2. A roster will contain the names and IDOC numbers of offenders with a current Level of Care. The clinician assigned will develop a treatment plan according to the Mental Health System Manual. All Treatment Plans will be completed by April 15, 2012. | 1-2. Due April 15, 2012 and ongoing. |
| | Initial Treatment Plans will be developed in RDU upon arrival. | The ISCI Clinical Supervisor met with the RDU Clinician on January 11, 2012 to ensure Treatment Plans are initiated in RDU. This is currently being done. | Ongoing. |
| | Treatment Plans will be individualized and a quarterly audit on a random sample will provide feedback to clinicians about the quality of the Treatment Plans. This feedback will be provided during monthly Clinician Meetings and documented in the meeting notes. | The IDOC Clinical Supervisors will conduct a quarterly audit of 8-10 percent of Treatment Plans to gather information about the quality of the plans, providing feedback to the clinicians. | Due Quarterly starting January 2012. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 48 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Mental Health<br>Suicide Risk Training and Refresher Training | Suicide prevention training is completed for all new employees and refresher training is conducted annually thereafter for medical, treatment, program, education, and security staff. | All new hires will receive Suicide Risk Prevention Training and this is documented. The Elevate - Learning Tool is available to provide an avenue for annual refresher training for all IDOC Staff.<br><br>ISCI Security Staff will participate in Suicide Risk Refresher Training (Policy 315) starting February 1, 2012. | Medical, treatment, program, security and education currently provide and track training. All written tests will be stored for future reference and tracked on an Excel Spreadsheet updated monthly and submitted to the Warden by the ISCI Training Sergeant. |
| Mental Health<br>Monitoring of Pill Call Lines | Pill call lines in the mental health unit are tracked (see attached MH-G) and this information is assessed and the outcomes reported at the monthly Medical Management Committee (MAC) meeting. | Pill call times are tracked and these reports will be discussed during the monthly Medical Management Committee (MAC) meetings. | Currently the tracking is in place and the results will be reviewed during the monthly Medical Management Committee (MAC) meeting starting January 2012. |
| Mental Health<br>Companion Program | Security officers monitor offenders on suicide watch per policy 315 with irregular checks with a frequency of no more than 15 minutes between checks. These checks are documented on the Holding Cell Contact Sheet (see attached MH-H for examples for Oct, Nov and Dec). Offender companions supplement but never substitute the monitoring. Companion checks are documented on the Companion Log located in the medical file. Companions are screened and used as support for the offender on watch. | Current practice.<br><br>There is now a check list to ensure that the medical record is reviewed prior to hiring a companion and the process is overseen by the Deputy Warden of Operations or Designee (attached MH-E). | Current practice. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 49 of 96
Dec'l of JTD

| AREA OF CONCERN | PLAN | STATUS | COMPLETION DATE |
|---|---|---|---|
| Mental Health<br>Offender originated Mental Health Request | Continue to track and monitor all requests to be seen by the Mental Health Provider. | Continue to adjust daily schedule to accommodate any urgent or emergent cases. | Current practice.<br><br>Currently patients are seen within 10 days in general population and within 7 days in BHU unless urgent or emergent and those are seen within 24 hours. |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 50 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 1 of 15 |
|---|---|---|---|
| | | SUBJECT:  Food Service ISCI Nutritional Adequacy | ADOPTED: REVISED: |

References

Idaho Department of Corrections Administrative Policy and Procedure Manual, Sections 403, 404.

Standards for Adult Correctional Institutions, Second Edition, Standards 2-4238, 2-4239, 2-4243, 2-4253, 2-4254.

Procedures

1.  General Statement

All inmates will be served a nutritionally adequate diet. The Food Service Bureau Chief shall ensure this nutritional adequacy by providing general direction for foods served to meet or exceed dietary allowances as stated in the recommended dietary allowances, National Academy of Sciences. This general direction from the Food Service Bureau Chief shall fulfill the following requirements:

A.  Documentation of an annual review by a dietitian registered eligible for registration with the American Dietetic Association or who has the documented equivalent education, training and experience, of all menus served to inmates to ensure compliance with nutritional standards.

B.  Management by at least one qualified, full-time staff member of the Food Service operation.

C.  Accurate records of all menus served.

D.  Budgeting, purchasing, and accounting systems used by the Food Service Program to include the following:

1.  A food expenditure cost accounting system which will identify the cost per meal per inmate;

2.  An estimate of advance Food Service requirements;

3.  Purchase of supplies at wholesale prices;

4.  Regular surveys of the eating habits of the institutional population;

5.  Adequate refrigeration and storage procedures for all food items.

2.  Daily standard food ration allowances for each inmate are the cornerstones of an adequate food program. Each inmate shall be provided foods from a fifteen (15) category grouping with daily allowances for each grouping. Establishment of these

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 51 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 2 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Nutritional Adequacy | ADOPTED: REVISED: |

allowances in terms of pounds per person per day considered waste incidents in normal preparation. All ration allowances are based on standard retail cuts for meats and fresh produce while all canned foods are included as net weights. The daily standard allowances for foods for inmates in the agency are:

| 1. | Food Allowance Detail | | Lbs. Per Person Per Day | | Food Allowance Detail | Lbs. Per Person Per Day |
|---|---|---|---|---|---|---|
| 01 | Meat, Poultry, Fish | | | 08 | Potatoes | .75 |
| | Beef | .20 | | 09 | Other Roots | .10 |
| | Pork | .30 | | 10 | Leafy Green & | |
| | Others | .10 | .60 | | Yellow Fresh Veg | .65 |
| 02 | Fats | | .18 | 11 | Tomatoes | .20 |
| 03 | Starches | | .70 | 12 | Dried Beans, | |
| 04 | a. Milk | | .84 | | Peas & Nuts | .08 |
| | b. Cheese | | .02 | 13 | Fruits | .30 |
| 05 | Eggs | | .12 | 14 | Citrus Fruits | .10 |
| 06 | Sweets | | .30 | 15 | Adjuncts, Spices | .10 |
| 07 | Beverages | | .05 | | | |
| | | | | | TOTAL: | 5.09 lbs. |

3.  Food Service Management

The Food Service area will be operated with at least one (1) regular staff Food Service Manager to supervise food preparation during all operational hours. IN NO CASE will it be operated with only inmate staff in attendance.

4.  Food Service Records for the Standard Ration

Records will be maintained to document information related to the service of the minimum dietary requirements.

A.  The Food Service office will maintain an annual budget plan by quarters for the procurement of foods, supplies, and equipment needed to provide the daily food allowance;

B.  An up-to-date daily record of foods served which includes allowance detail and a comparison of the actual poundage served with the standard ration allowance.

5.  Food Service office records shall be maintained to document the following food operations, at a minimum:

A.  Food expenditure costs which identify per capita costs per meal;

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 52 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS **FIELD MEMORANDUM** | SECTION NUMBER: 404-02 | PAGE NUMBER 3 of 15 |
|---|---|---|
| | SUBJECT: Food Service ISCI Nutritional Adequacy | ADOPTED: REVISED: |

    B. Records indicating proof of effective procurement procedures which result in the purchase of supplies at competitive wholesale prices.

6. <u>Meal Service Records</u>

    Records shall include, at a minimum, the following information:

    A. Number of meals served daily to inmates and staff;

    B. Menus for last year;

    C. Food cost per plate, monthly basis;

    D. Records of food consumption.

7. <u>Food Service Survey</u>

    The Food Service Bureau Chief shall bi-annually conduct a survey of inmate response to the Food Service. It shall include items regarding:

    A. Menu

    B. Meal service;

    C. Sanitation

    D. Special diets

8. <u>Program Review</u>

    The dietitian shall review the menus of each institution. These reviews shall:

    A. Be held at least annually;

    B. Compare the nutritional values of the menus with agency standards and ration allowances. A written report to follow from dietitian;

    C. Include quarterly reports by the Food Service Bureau Chief evaluating:

        1. Standard ration compliance;

        2. Menu plans;

        3. Survey results regarding Food Service;

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 53 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 4 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Nutritional Adequacy | ADOPTED: REVISED: |

4.  Costs;

5.  Staffing patterns (inmate and civilian);

6.  Equipment needs;

7.  Special problems.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 54 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 5 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Menu Planning & Meals | ADOPTED: REVISED: |

Definitions

The following definitions shall apply:

1.  Therapeutic Diets - Special meals or foods prescribed by a physician or dentist as part of the patient's treatment;

2.  Religious Diets - Meal(s) and/or dietary restrictions required by a religious de- weekends and holiday variations;

References

Idaho Department of Corrections Administrative Policy and Procedure Manual, Sections 403, 404.

Standards for Adult Correctional Institutions, Second Edition, Standards 2-4240, 2-4241, 2-4242, 2-4249, 2-4250, 2-4251, 2-4252

Procedures

1.  General Statement

All inmates are provided meals which are nutritionally adequate, properly prepared and served in pleasant surroundings in the least regimented manner possible. To accomplish these goals, this policy outlines basic menu requirements and dining room services mandated for the institution. These mandates require:

A.  Food Service staff prepare advance menus;

B.  Menu plans are followed substantially without major or frequent changes.

C.  All meal planning and preparation strives to the highest possible standard relative to flavor, texture, temperature, appearance and palatability.

D.  Therapeutic diets as prescribed by physician or dentist are served;

E.  Religious diets as ordered by the Chaplain and approved by the Deputy Warden, Security;

F.  Group dining rooms are available to all physically able inmates, except for those housed in the close custody and segregation units;

G.  All inmates are provided three meals daily, including two hot meals, except for weekends and holiday variations, or when security conditions dictate other- wise.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 55 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 6 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Menu Planning & Meals | ADOPTED: REVISED: |

H.  Food will never be withheld as a form of punishment.

2.  Menu Plan - Menus shall be developed which consider available personnel, equipment, and the layout of the physical plant. Effective menu planning recognizes needs of the general inmate population and specific needs of the inmate group attributable to age, physical activity, sex, medical status, etc. The Food Service Bureau Chief will develop an institutional menu within the following framework:

A.  Menus shall be based upon budget allocations;

B.  Menus shall ensure that each inmate is provided access to the minimum poundage allowance as per ration standards;

C.  Menus shall be designed to provide meals which are not only nutritionally adequate, but also a balance of color, flavor and texture which will add to meal enjoyment.

3.  Therapeutic Diets - Diet menus shall be provided to inmates:

A.  When prescribed by competent medical authority and approved by the Chief of Medical Services;

B.  Never as a reward;

C.  As directed by the dietitian or medical staff member;

D.  For a specific number of days (not to exceed thirty). Diet orders may be reviewed or continued upon approval of the Chief Medical Officer;

E.  As a complete meal service and not in supplement to or as a choice between dietary meals and regular meals;

F.  Diet trays will be prepared under the supervision of a Food Service Supervisor in accordance with appropriate guidelines supplied by a dietitian and/or competent medical authority;

G.  Each inmate placed on a special therapeutic diet will sign for his/her meal tray at the time of receipt;

H.  A staff member will sign the appropriate form attesting to the inmate's receipt of the tray and the inmate will receive a copy of the form with the original copy being retained in the Food Service office;

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 56 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 7 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Menu Planning & Meals | ADOPTED: REVISED: |

I. All therapeutic diet meals will be eaten in the area in Pendyne set aside for individuals requiring special diets unless the inmate is classified and/or housed in a manner requiring that he receive his meals in his housing unit.

4. <u>Religious Diets</u> - Religious diets are served:

A. For special occasions as specifically approved in writing by the Chaplain and Deputy Warden, Security;

B. To utilize regular menu items unless specifically approved by the Chaplain and Deputy Warden, Security. These menu items shall not exceed the quantity and/or quality provided to the general population;

C. Special religious diet trays will be prepared under the supervision of a Food Service Supervisor in accordance with appropriate guidelines supplied by the ISCI Chaplain;

D. Each inmate requiring a religious diet will present his/her memo and sign for his/her meal tray at the time of receipt;

E. A staff member will sign the appropriate form attesting to the inmate's receipt of the tray.

F. All religious diet meals will be eaten in the area in Pendyne set aside for individuals requiring special diets unless the inmate is classified and/or housed in a manner requiring that he receive his meals in his housing unit.

5. <u>Staff Dining</u> - Staff meals shall always be prepared and served in the same manner and of the same quality and quantity as those served to inmates.

6. <u>Food Preparation</u> - All meals shall be designed to provide inmates with the best possible meals, consistent with the budget plan and daily ration allowances. Food preparation shall:

A. Utilize a standard recipe system available to all Food Service staff and inmates responsible for the preparation of meals using a standard recipe system to:

1. Standardize costs;

2. Enhance and reserve food flavors;

3. Improve appearance;

4. Provide optimum palatability.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 57 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS<br>FIELD MEMORANDUM | SECTION NUMBER:<br>404-02 | PAGE NUMBER<br>8 of 15 |
|---|---|---|
| | SUBJECT:<br>Menu Planning & Meals | ADOPTED:<br>REVISED: |

B. Provide maximum utilization of the equipment available to enable service of high quality products.

C. Be in compliance with the safety and sanitary conditions of the State.

7. Meal Service - The manner in which meals are presented influences the entire atmosphere of the institution since meals assume a magnified importance in the daily routine of the inmate. The following criteria shall establish minimum standards for the institution:

A. All inmates shall be provided with three meals Monday through Friday except for holiday variations or when security conditions dictate other arrangements;

B. At least two meals, Monday through Friday, shall be served hot, except when security conditions dictate other arrangements.

C. Holiday and weekend schedules may be developed to provide for a more variable meal schedule to coincide with visiting activities, recreational programming or similar functions. Only two meals will be served on holidays and weekends.

D. Dining rooms shall be operated to reduce regimentation as much as possible;

E. No restrictions regarding normal conversation shall be imposed;

F. All inmates in the general population will be provided appropriate eating utensils.

G. Food or Meals shall never be withheld as a punishment;

H. Meals served to inmates in segregation shall be representative of the same meal served to the general population;

I. All foods should be served at the appropriate temperature to maintain quality, taste appeal and texture.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 58 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 9 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Safety & Sanitation | ADOPTED: REVISED: |

## Definitions

__Outside Source Inspection__ - Inspections by a person or persons not regularly employed by the institution. State employees from other agencies, representatives of federal agencies or independent qualified contractors shall be considered outside sources.

## References

__Idaho Department of Corrections Administrative Policy and Procedure Manual__, Sections 306, 404, 506.

__Standards for Adult Correctional Institutions__, Second Edition; Standards 2-4244, 2-4245, 2-4246, 2-4247, 2-4248.

## Procedures

1.  __General Statement__

    The facility shall operate a food service program which will ensure the highest possible level of safety and sanitary practices. Federal and State occupational safety and health codes shall serve as standard requirements for all food service programs. At a minimum, this policy requires the institution to provide the following:

    A.  A physical examination by qualified medical staff members to ensure that all employees and inmate workers in the food service area are free from transmissible disease. This examination shall be completed prior to job entry.

    B.  Food handlers shall be required to comply with standard personal hygiene requirements. These requirements shall include:

        1.  Use of clean clothing, hairnets, caps;

        2.  Maintenance of clean hands and fingernails by washing hands after using toilet facilities;

        3.  Freedom from open or infected wounds.

    C.  The institution shall maintain sanitary, temperature controlled storage facilities. These controls shall provide regulation to comply with the following temperature ranges:

        1.  Dry shelf storage..........45 to 85 degrees Fahrenheit;

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 59 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 10 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Safety & Sanitation | ADOPTED: REVISED: |

      2.  Refrigerated areas.........35 to 40 degrees Fahrenheit;

      3.  Frozen food areas..........  0 degrees Fahrenheit or below.

D.  Toilet shall be located in close proximity to all food preparation and serving areas and maintained in good working order.

E.  The institution will regularly inspect the food preparation and service areas to ensure compliance with appropriate health and safety rules.

F.  Efficient safety and sanitary operations of a food service department are extremely complex.  Therefore, this section sets forth basic requirements which are mandatory.

2.  Physical examinations - Food Service inmate and staff employees shall:

A.  Receive pre-entry on duty physical examinations by a member of the medical staff to:

      1.  Provide protection to the employee by locating restrictions of duty assignments;

      2.  Prevent spread of communicable disease to diners.

B.  Be examined regularly (at least biannually) by an appropriate health authority to ensure continued compliance with worker health safety standards.

C.  Comply with all health related regulations required by an appropriate authority.  These rules include:

      1.  Adequate personal hygiene;

      2.  Compliance with grooming rules regarding uniforms, hair care, use of caps or hairnets and aprons;

D.  Be provided with clean clothing.

3.  Physical Plant

A.  Food service facilities are important ingredients of a safe and sanitary program.  Facilities shall minimally be designed to comply with National and State safety codes.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 60 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 11 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Safety & Sanitation | ADOPTED: REVISED: |

B.  Equipment Sanitation – Food Service equipment and areas shall:

   1.  Be designed to enable efficient cleaning;

   2.  Be operated and maintained in accordance with the manufacturer's instructions;

   3.  Be thoroughly cleaned after each use and/or on a regular schedule.

C.  Minimum Facility Requirements

   1.  Provide toilet and wash basins available to all Food Service workers;

   2.  Provide fire safety protection and avenues for exit in case of emergencies;

   3.  Provide for adequate storage areas with appropriate temperature controls.

4.  Safety and Sanitation Inspections – Inspections of the food service area are vital to ensure regular compliance with appropriate health and safety rules. The facility shall make the following inspections at a minimum:

A.  Weekly safety and sanitation inspections conducted by the Food Service Bureau Chief including:

   1.  Inspection of all areas of the department including the storage areas and toilet facilities;

   2.  Examine the daily inspection forms for the previous week;

   3.  Visit the department on a regular, pre-announced schedule;

   4.  Prepare a written report of sanitary conditions and safety practices observed.

B.  Outside source inspections shall be conducted at least quarterly.

5.  Training Related to Safety and Sanitation – Training for Food Service employees in the areas of safety and sanitation shall be conducted on a regular basis and records kept regarding course content and participation. At a minimum, both inmates and civilian employees shall be trained regularly in the following areas:

A.  Department fire plan;

B.  First Aid procedures;

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 61 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS  FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 12 of 15 |
|---|---|---|
| | SUBJECT: Food Service ISCI Safety & Sanitation | ADOPTED: REVISED: |

C. Use of safety devices for equipment in the department;

D. Use and storage of hazardous tools;

E. Use of fire extinguishers;

F. Accident prevention techniques regarding scalds, falls, burns, and related injuries.

G. Proper storage techniques for food service areas;

H. Proper report procedures for accident and/or hazardous conditions.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 62 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 13 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Control of Tools, Equipment and Hazardous Materials | ADOPTED: REVISED; |

### References

Idaho Department of Corrections Administrative Policy and Procedure Manual, Sections 404, 509.

Standards for Adult Correctional Institutions, Second Edition; Standard 2-4197.

### Procedures

1. General Statement

   The Food Service Bureau Chief, under the general direction of the Deputy Warden, Security, shall be responsible for enforcing the tool control policies for the Food Service Department. This responsibility shall include: Auditing of tool inventories, marking of tools, location of tool storage, the security of tools and overall tool accountability and use. The Food Service Bureau Chief may delegate this responsibility as he/she deems appropriate.

2. Supervision of Tools

   Unless under direct and constant supervision, inmates shall not use Class K Tools. All tools and supplies stored in a Food Service area shall be kept in a secure, locked location when not in use.

3. Quota of Tools

   The Food Service Bureau Chief shall establish a tool quota for the Food Service. Food Service Managers shall maintain and account for all tools in their areas. Employees shall maintain only required tools. If any tool is determined to be in excess of the daily needs, it will be transferred to the Food Service Bureau Chief for his disposition.

4. Receipt of Tools

   All tools received from any source by the Food Service Bureau Chief will be marked for inventory prior to issue. No tool shall be procured or delivered to a Food Service area without the approval of the Food Service Bureau Chief who will assure that it has been properly logged in, marked and assigned to an appropriate inventory.

5. Tool Inventory Lists

   A. The Food Service Bureau Chief shall maintain a master inventory list of all tools and their assignment location.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 63 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 14 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Control of Tools, Equipment and Hazardous Materials | ADOPTED: REVISED; |

B.  An inventory list of tools will be prepared for each work location as to which tools are stored where and/or used. These inventories shall be current and readily available for daily inventory and accountability.

6.  Tool Inventory Control

A.  A daily check of tools will be made by the area supervisor of his/her tool inventory.

B.  All Class K tools, i.e., knives (except table knives), cleavers, icepicks, knife sharpeners, meat saws, etc., shall be stored in a steel knife and tool box equiped with a secure locking device. This box will be located in the food supervisor's office when in use, in the Food Service area, and stored at ISCI control when not in use.

C.  Only ISCI employees shall have access to this box. At time of issue, employees shall record the number of the knife or other item, time of issue, the name and number of the inmate it is issued to (by use of inmate ID card) and the name of the issuing employee. Any item issued will be returned to the box as soon as the work is completed, with time of return recorded and initialed by the receiving employee.

D.  Extra meat saw blades, knives, etc., shall be stored in secured storage elsewhere within the institution and issued as required.

E.  Any tool noted as lost shall be reported immediately to the Food Service Bureau Chief and the security shift supervisor and then by written report, as soon as possible, to the Food Service Bureau Chief and the Deputy Warden, Security. This report shall identify the missing tool(s) and the circumstances surrounding the absence. This report shall be maintained until the tool is found or, after three months, removed from the inventory.

F.  When a Class K tool(s) is lost or misplaced, any inmate(s) who had access to the tool(s) will be held at that location until a thorough search has been completed.

7.  Control of Flammable, Hazardous, and Poisonous Materials and Chemicals

A.  The propane powered steam cleaner will be stored in a secured area unless in use in a Food Service area. When, to facilitate its use, it must be left in a Food Service area during non-operational periods, the tank shall be removed and stored at ISCI control.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 64 of 96
Dec'l of JTD

| DEPARTMENT OF CORRECTIONS | FIELD MEMORANDUM | SECTION NUMBER: 404-02 | PAGE NUMBER 15 of 15 |
|---|---|---|---|
| | | SUBJECT: Food Service ISCI Control of Tools, Equipment and Hazardous Materials | ADOPTED: REVISED: |

B.  Toxic or caustic chemicals used in cleaning will be brought to a Food Service area only in such quantities as needed to complete a particular project. If any such material remains after completion of a project, it shall be removed from the Food Service area and not stored on the main compound.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 65 of 96
Dec'l of JTD

Response to the Ryan Decision #3                                    Page 1

1.   In accordance with American Correctional Association Standards
2-4276, 2-4279, and American Medical Association Standards 134,
151, 154, the Idaho Department of Corrections shall provide on-
site 24-hour health and emergency care for the inmate population.
See Idaho Department of Corrections Policy and Procedure Manual,
Section III, page 20. (see attached)

An on-site Correctional Medical Specialist shall be present 24
hours a day, seven (7) days a week.  In addition to this, he/she
shall be available for the Psychological Unit 1 facility 24 hours
a day, seven (7) days a week for their medical coverage.  (See
Correctional Medical Specialist job description, attached.)

On-call coverage by a physician shall be 24-hour and shall in-
clude a full time medical doctor or equivalent and/or his designate.
The Department of Corrections shall have in its employ two (2)
additional part-time medical doctors, who will also be included in
an Emergency Call-Out Roster.  (See attached Form R-1)   This roster
shall be published monthly and shall be made available to the medi-
cal staff and security chief and lieutenants for reference.

At present the medical staff publishes a 24-Hour On-Call Roster
which includes off-duty Correctional Clinical Specialists.  (The
Physician's Assistants and Nurse Practitioners fall under the head-
ing of Correctional Clinical Specialist.)  The present On-Call
Roster also includes a rotation of Correctional Medical Specialists,
(CMS's) to be notified in medical emergencies at the Institution.

(See Form R-2, attached, and CMS Job Description, attached.)

Form R-3 exemplifies a revised 24-Hour On-Call Roster For Cor-
rectional Clinical Specialists and Correctional Medical Specialists.
(See attached)  This shall be issued to all Program Managers and
Shift Lieutenants.

Form R-4 exemplifies a 24-Hour On-Call Roster for dental coverage.
The full time dentist or his/her designate shall be available for
any "dental emergency".

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 66 of 96
Dec'l of JTD

Response to the Ryan Decision #3                                    Page 2

II.    In accordance with the recent decision by Federal Judge Ryan, the
       following proposal for installation of first aid boxes in the hous-
       ing units and other locations in the Institution and Community Work
       Centers is submitted.

       Boxes to be located in:

              Unit 7                        Gymnasium
              Unit 8                        Administration Building
              Unit 9                        Unit 2
              Unit 10                       Unit 3 RDU
              Unit 11                       Unit 4
              A Block                       Ryder's Hall
              Pendyne Hall                  MCF Control
              Correctional Industries       Building 25
              Motor Pool                    Slaughterhouse
              Warehouse                     Dairy
              Auto Body Shop                CWC-Nampa and Boise

       The first aid boxes shall be permanently mounted to the wall in
       the control office in each of the housing units.  The other boxes
       shall also be mounted to walls located in a supervisor's office or
       in an area that is readily accessible and visable.  The boxes shall
       be locked with a padlock, and the keys shall be on a key ring kept
       by the officer or supervisor on duty.  There shall be also a seal
       affixed to the box to insure that the boxes are not pilfered.  An
       inventory sheet shall be maintained in each box, and inventories
       shall be conducted weekly.  Boxes shall be restocked the same day
       that the supplies are used accordingly.

       The responsibility for conducting inventories and restocking the
       first aid boxes shall be part of the duties of the CMS on the grave-
       yard shift.

       The cost of the first aid boxes will be $29.24 each for a total
       of $731.00.

       Attached are floor plans of the specific buildings and areas where
       the boxes will be mounted and available.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 67 of 96
Dec'l of JTD

Response to the Ryan Decision #3                                    Page 3

III. A series of changes will be instituted in the Medical Request
     system.  This shall be done to eliminate the suggested impeded
     access.  (See attached policy)

     Medical Request Form boxes are being constructed at the Correc-
     tional Industries.  A specific number will be fastened to a wall or
     support beam in each cell house unit.  The boxes shall be placed
     as to allow easy access of any inmate within that housing unit or
     tier.

     A. As described later in this report, those individuals who do
        not have access to movement shall be offered the opportunity
        for one-on-one contact with a designated member of the medi-
        cal staff daily.

     Also attached is a schematic of the Medical Request Form boxes
     to be used for the Medical Request system, and a floor plan of each
     housing unit which depicts the placement of each box.  These boxes
     will cost $20.88 each, with the total being $417.60 for the entire
     number of boxes ordered.  The locks cost $8.95 each, which would
     add $179.00 to the total amount.  (see Capital Outlay Proposal)

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 68 of 96
Dec'l of JTD

Response to Ryan Decision #3                                    Page 4

IV.    It is the responsibility of the Medical Services Manager or his
       designee to supply the Infirmary and the Medical Services Program
       with a procedure manual for health care regimens.

       The following is a standardized format of care instruction which
       will be made available for our staff to review and follow concerning
       in-house infirmary care.  Also attached is a copy of the Protocols
       Manual available for medical staff review concerning specific com-
       plaints an inmate might have or present clinically.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 69 of 96
Dec'l of JTD

Response to Ryan Decision #3                                      Page 5

V.      Listed on the attached pages of Policy and Procedure are the
Security procedures for patients being transferred to a community
hospital.  Included in this Policy and Procedure are the security
procedures to be used while inmates are under the care of the
community institutions.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 70 of 96
Dec'l of JTD

Response to Ryan Decision #3                                    Page  6

VI. The following is the staffing pattern that presently exists for the Idaho Department of Corrections main-site infirmary. (See the attached staffing flow chart and seven-day staffing pattern.)

A.  Physicians

1. We have medical doctor coverage a total of 16 hours per week. A contract physician is on-site Monday morning for four (4) hours and Thursday morning for four (4) hours. One of these physicians is assigned the responsibility of medical director every two (2) years. The physician's four (4) hour coverage consists of:

   a. Inpatient (infirmary) care and evaluation
   b. Medical Records review of all medical charts with new entries
   c. Pharmacy list and order review
   d. Outpatient consultations
   e. Coordinate with the Medical Services Manager old and new business
   f. Review of surgical procedures ordered by the contract special consultant physicians
   g. Assist in surgical procedures as requested by the Correctional Clinical Specialists on-site or the consultant physicians in the community

2. Included in the 16 hours a week is psychiatric coverage of four (4) hours on Monday and four (4) hours on Thursday; four hours of service provided by each of the two contract psychiatrists. This is discussed further in the psychiatric care program with Order #5.

B.  Dentists

1. Dental coverage is presently four (4) days a week. The dentist implements and conducts all forms of the dental health program.

   a. Presently the dentist has a part-time dental assistant working with him. (See Job Description) He/she is presently under contract services and is not a full-time state employee.
   b. Two days a week there is an on-site hygienist for oral hygiene programs. (See Job Description) Again, he/she is not a full-time employee but follows our code guidelines.

C.  Physician Extenders

1. The main portion of the present medical coverage is by the physician extenders. These members of the staff are graduates of accredited Physician's Assistant or Nurse Practitioner

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 71 of 96
Dec'l of JTD

Response to Ryan Decision #3                                              Page 7

programs, certified by the Idaho Board of Medicine and the
Idaho Board of Nursing to practice under the guideline set
up by these organizations. These staff members have passed
a national certification examination and are obligated to
be recertified every six (6) years. To maintain this certi-
fication, a minimum of 100 credit hours in continuing
medical education every two (2) years is required.

D.  Support Staff

1.  Medical records in the infirmary are kept by the full-time
    secretary/records manager and a part-time clerk. At present,
    the part-time records clerk is working almost full-time to
    try to maintain the records.

2.  The remaining members of the staff are the Medical Services
    Manager, two (2) Correctional Medical Supervisors, one (1)
    Registered Medical Technologist, and seven (7) Correctional
    Medical Specialists. Following are the employees' descrip-
    tions of their personal job duties as well as the State
    Personnel Coded Job Descriptions.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 72 of 96
Dec'l of JTD

Response to Ryan Decision #3                                   Page 8

VII. Addition staff needed to comply with standards and the Federal
     Court Order are as follows.

   A. One full time medical doctor or the equivalent
      (See attached job description)

      1. In addition to this, the Department will continue to employ
         two contract physicians for coverage during leave and sick
         time that might occur with the full time medical doctor.

   B. One full time dentist or the equivalent.  This will increase
      our capabilities and expand the dental program to provide com-
      mitment examinations and followup for all inmates.

   C. The Medical Service shall increase its dental assistant coverage
      to full time.  The plan is to employ a full time person for the
      fundamental assistant and clerical duties.  (See attached job
      description)

   D. Although a hygienist has not been recommended, it is the feeling
      of the Medical Services Manager that such a position is greatly
      needed.  The hygienist could identify and evaluate the dental
      needs of inmates that would normally require the time of a den-
      tist.  It is the belief of the Manager and the Administration
      that all new commitments need a full dental examination.  With
      the addition of a hygienist to the dental program, these necess-
      ary examinations could be provided.

   E. The Department of Corrections shall have a full time pharmacist
      or the equivalent.  This will greatly improve our credibility
      with the Idaho Board of Pharmacy.  In addition, accountability
      with the use of a computer system is being proposed; not to
      mention the savings that we will realize by the practice of
      stocking our own medications.  Note:  stock medications will not
      be stored on the mainsite ground within the fences.

      1. A secure pharmacy will have to be constructed in an area
         designated in the Infirmary Building.  (See description in
         Order #4)

   F. The Department of Corrections is going to hire an additional
      1.5 Medical Records Clerk.  This will greatly speed up the addi-
      tion of documents to the medical charts.

   G. There will be a full time therapeutic dietician added to the
      medical staff for improvement in meeting the special dietary
      needs of concerned inmates.  (See Dietary Order #1)  This
      individual will be assigned to the Infirmary and will work un-
      der the auspices of the medical doctor and the Medical Services
      Manager.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 73 of 96
Dec'l of JTD

Response to Ryan Decision #3                                                    Page 9

H. There will be an additional three (3) Correctional Medical Spec-
cialists added to the mainsite staff to fulfil the needed 24 hour
coverage recommendation.  Additionally, there will 5.2 Medical
Specialists hired to give the Unit 1, Idaho Security Medical Fa-
cility and the Minimum Custody Facility 24-hour coverage.  This
will result in a minimum of one and possibly two medical staff
members on duty for the evening and graveyard shifts.

VIII. The following list is additional monies by position that the Depart-
ment of Corrections has requested to fulfil the order for more on-
site licensed staff and 24-hour coverage.  This is proposed as a
medical package.

| | |
|---|---|
| A. Medical Doctor...................................$ | 62,600.00 |
| B. Dentist........................................" | 62,600.00 |
| C. PhD Psychologist..............................." | 39,500.00 |
| D. Social Worker.................................." | 28,600.00 |
| E. Three Psychologists @ $29,900 each.........." | 89,700.00 |
| F. Correctional Medical Specialists @ $19,300.." | 19,300.00 |
| G. Pharmacist....................................." | 30,000.00 |
| H. Dental Assistant..............................." | 18,300.00 |
| I. Dietician......................................" | 26,200.00 |
| J. One Records Clerk @ $10,171................" | 10,171.00 |
| Total........................................$ | 359,929.00 |

All of the above requested salaries are comparable to the surround-
ing area except one, and that is the proposed salary for a medical
doctor.  I believe this salary is somewhat low and should be approx-
imately $70,000.00.

Additionally, Operating Expenses of $46,100.00 have been requested to
cover Travel, Training, Wearing Apparel, Office Supplies, Dental Sup-
plies, and Repairs and Maintenance.  Not requested but greatly needed
is an allocation for Capital Outlay.  This would include equipment
and furnishings for a medical doctor's office, additional filing cab-
inets for a filing system which is already very full, and added
equipment to enable the laboratory to become more self-sufficient.
An estimated figure would be $50,000.  This would breakdown as follows:

| | | |
|---|---|---|
| 1. Out-of-State Travel | Additional $ | 7,000.00 |
| 2. In-State Travel | " | 2,000.00 |
| 3. Printing | " | 500.00 |
| 4. Subscriptions | " | 100.00 |
| 5. Employee Training | " | 1,100.00 |
| 6. Medical Expenses Needed | " | 250,000.00 |
| (But not included in request) | | |
| 7. Professional Services | " | 4,500.00 |
| 8. Housekeeping | " | 1,000.00 |
| 9. Medical Supplies | " | 1,000.00 |
| 10. Office Supplies | " | 2,000.00 |
| 11. Repairs & Maintenance Equipmt. | " | 2,000.00 |
| | | $ 46,200.00 |

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 74 of 96
Dec'l of JTD

Response to Ryan Decision #3                                    Page 10

The preceding total of $46,200.00 excludes the needed $250,000.00
for Major Medical costs.  The hospital section continually ends up
in the red in this Major Medical category.  The specifics of this
category is unforseen medical emergencies and necessary surgeries
which are very costly.

Following is a breakdown of needed Capital Outlay:

   1. SMAC Blood Analyzer..............................$ 15,000.00

   2. AMES Flurostat for Dilantin levels, Theo
      levels, and Phenobarbitol levels.................    5,000.00

   3. Glucometer to analyze blood glucose.............    1,000.00

   4. First Aid boxes for emergencies in units........      750.00

   5. Medical Request boxes...........................      417.60
      (locks for boxes)                                     179.00

   6. Office furnishings for M.D.'s office including:
      cabinets (nurses), exam table, desk, chairs,
      office medical equipment, head lamp, instruments.  20,000.00

   7. Office furnishings for dietician................    2,000.00

   8. Medical Equipment to properly supply the medical
      staff for examinations...........................    2,500.00

   9. Needed furnishings for physical examination
      room in Unit 4...................................    2,000.00

  10. Needed furnishings for Med Room in Satellite
      Facility.........................................    2,000.00

  11. Added medical filing system....................    1,500.00
                                             $52,346.00

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 75 of 96
Dec'l of JTD

Response to Ryan Decision #3                                    Page 11

IX.  The attached information is submitted as assigned regarding Goals
     #3 and #5 of the mission answering Order #3 of Judge Ryan's decision.
     The hourly requirements listed are mandated by the appropriate li-
     censure boards for each position and by the Department of Corrections
     training policies.

     The ratio of career-oriented training and Departmental training is
     75%/25% respectively, as suggested by the Medical Services Manager.
     Training for Continuing Medical Education was budgeted as being held
     locally as much as possible, thereby keeping travel at a minimum.

     Training Schedules from the Department of Corrections Training Aca-
     demy are attached.  They exemplify New Employee and Current Staff
     Medical Training Regimens that we will follow to keep our employees
     up-to-date on Emergency Treatment.  Following that is our own sched-
     ule of Inservice Training.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 76 of 96
Dec'l of JTD

X. It will be the responsibility of the Medical Services Manager to im-
plement hiring medical staff to fill the needed positions. This can
be accomplished by an immediate temporary hire basis, as soon as the
budgetary allowances are made available, and a directive from the pre-
sent Administration is presented. If enough personnel cannot be found,
to fulfill this program, an advertising circumstance occurs, and the
routine recruitment plan will have to be followed.

Recruitment of the required additional staff for the Medical Ser-
vices will be as follows:

1. Request and review applications of any individuals on the
hiring register maintained by the Personnel Department

2. Requisition of announcements for the Personnel Commission on
applicable positions

3. Formulate and run public service announcements on radio and
television

4. Contact nursing schools on available new job positions in Idaho

5. Announce and advertise in at least two local and international
medical journals

6. Write and run advertisements in local and out-of-town newspapers

7. Notify the Idaho Board of Medicine and the Idaho Board of Nurs-
ing announcing new positions available

XI. The medical staff, Medical Services Manager, and contract physicians
for the Department of Corrections are presently working on a plan to
use the Family Practice Residency Program through the University of
Washington Medical School for M.D. coverage at the Institution.
There is a total of 18 medical doctors rotating through this residency
program. At present, Dr. John Mohr is formulating a coverage program
that would enable the on-site infirmary to have the equivalent of a
full-time physician. With the help of our two (2) part-time contract
physicians, I believe fulltime coverage is within our grasp.

Note: These residents are licensed M.D.'s and are active in a three-
year Family Practice Residency. This results in a turn-over of six
(6) new M.D.'s to the program each year. The other 12 physicians in-
volved will have one or two years of experience with our clientele,
so that we would have to orient only six individuals in one year's
time.

Additionally, arrangements are being made to employ a Dr. Guarino, who
is presently on the staff at the Veterans Hospital. We would use him
on a part-time (20 hours a week) basis, if only a part-time coverage
situation is achieved through the Resident Program above.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 77 of 96
Dec'l of JTD

Response to Ryan Decision #3

Utilization of the additional proposed support staff (CMS) will be as follows:

1. One additional CMS (Correctional Medical Specialist) will be assigned to the yard during the a.m. shift. This will result in an increased coverage of the units, allowing the medical staff to spend more time with each inmate's medical complaint. (more contact time per inmate). The CMS who is assigned Units 7, 8, and 9 will do daily review and one-on-one contact with those individuals in a restricted custody classification. The other CMS will cover Units 10, 11, and A Block for their medical needs.

2. Ideally, one of the present CMS positions can be upgraded to Unit Charge Nurse during the day shift and provide the Unit 1 facility with licensed coverage. Presently, we have a CMS who is an LPN and has a great deal of experience in the mental health field. I plan to offer her the proposed position and add a CMS position to that unit on the day shift. This added position will provide improved medical coverage and upgrade the number of medical contacts in Units 2, 3, and 4 on the Mental Health Facility compound. This would also correct our deficiencies in physical examination time we now experience. Occasionally the medical staff has some difficulty in "keeping up" with the physical exams. There are instances when a new commitment is overlooked in the medical screening process, and he/she is transferred to the yard or satellite facility without proper review.

3. The swing shift will also have CMS coverage in the Mental Health Facility. Presently there is no Assessment and Receiving Center medical staff in Unit 1 (mental health), Unit 2, Unit 3, or Unit 4 in the p.m. hours. With our geriatric and chronic care patients and new commitments, the added CMS coverage is well warranted.

4. Another CMS will be assigned to a swing shift position with his days off during the week. This will provide a double coverage situation during Saturday and Sunday and early afternoon and evening hours when sports, visiting, and all other extracurricular activities are at a peak.

5. Two positions will be staffed on graveyard shift. These individuals will have staggered days off. The staffing pattern will be arranged so as to give double coverage on Friday, Saturday, and Sunday night. This will provide the required coverage for those evenings when the greatest number of assaults or incidents occur.

6. The eighth and last CMS position will be assigned the duties of "relief CMS" to cover annual leave, sick leave and comp time off.

The remainder of the requested staff positions will be part of the on-site infirmary support team. These will be as follows:

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 78 of 96
Dec'l of JTD

Response to Ryan Decision #3                                                    Page 14

a. Full time or equivalent M.D.
b. Full time or equivalent dentist
c. Full time dental assistant
d. Full time records clerk
e. Full time pharmacist

See the attached graph.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 79 of 96
Dec'l of JTD

Response to Ryan Decision #3                                    Page 15

XII. Orientation of new commitment inmates is of great importance.
     This can be accomplished rather easily by assigning to the
     medical staff members performing the physical examinations the
     responsibility for that orientation.  Listed below are the areas
     that will be discussed between the medical staff and the new
     commitment contact.

          1. Medical Request system (sick call)
          2. Services provided
             a. M.D.
             b. Correctional Clinical Specialists (P.A. & F.N.P.)
             c. Dentist
             d. Optometrist
             e. Psychologists

     Addendums, changes, or Medical Service adjustments in procedure can
     be published on the daily call-out sheet, the Warden's inmate news-
     letter, and through officers' briefings when applicable.

XIII. One of the biggest problems/obstacles confronting the Medical
      Services and the inmates regarding unimpeded access is the escort-
      ing process.  On any given day, due to circumstances beyond the
      control of both security and medical staffs, inmates have to be re-
      scheduled because of a shortage of escorting personnel.  Custody
      levels are such that many of our patients require a certain amount
      of protection or control during any movement on the yard.  When a
      shortage of security personnel arises, that escorted movement suf-
      fers for these particular inmates who are scheduled on the Medical
      Services call-out.

      As shown on a listing of desirable staff presented to the Governor
      and Legislature, additional yard escort officers have been request-
      ed.  (See attached)  When this request is fulfilled, then one of
      the problems of impeded access will be solved.  This will reduce
      greatly the number of re-schedules by the Medical Service for sick-
      call, increase the patient load, and increase the number of inmate
      medical contacts.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 80 of 96
Dec'l of JTD

In accordance with American Correctional Association Standards 2-4301, 2-4300, 2-4275, 2-4279 and American Medical Association Standards 146, 147, 134, 154, and 151, the Idaho Department of Corrections shall make requested changes and adjustments in its Medical Program. (See attached standards)

Note:  Also attached are the proposed Policy and Procedures the Department of Corrections medical staff shall adhere to.  Keep in mind that these policies are not finalized, and proper revisions in commit-tee along with operational addendums will be added or deleted.  After all revisions are made, the final draft is to be typed by Norma Clemens of Word Processing to comply with Department of Corrections format.

The order to provide a full time, or equivalent, medical doctor is being followed.  (See M.D. proposal in Order #3)  In addition to this, we are requesting the following:

1. Full time dentist
2. Full time dental assistant
3. One Records clerk (additional)
4. Full time registered pharmacist
5. One Correctional Medical Specialist
6. Full time registered dietician
7. Additional security escort staff

Items 1-6 are covered in Order #3.

Item 7 is covered in security staff policy of desired and needed additional staff.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 81 of 96
Dec'l of JTD

Ryan Decision Order #4                                          Page 2

    Budgetary needs are discussed in Response to Order #3.  The package of additional costs is as follows:

| | |
|---|---:|
| Medical personnel salaries........$ | 577,000.00 |
| (Not included, but needed) | |
| Hygienist........................ | 19,200.00 |
| Operating Expenses............... | 46,100.00 |
| (Not included, but needed as a | |
| minimum amount) | |
| Capital Outlay................... | 50,000.00 |
| Total.....................$ | 692,300.00 |

    The Business Office and Administration have proposed a total of $577,000.00, which is a lesser amount.  That amount would not supply the staff with equipment or offices to function.  If the medical staff is to better utilize its physical plant and increase its coverage ability, the above reccommended allocation is greatly needed.

    Staffing and organization again is discussed in Order #3. (See the attached organizational chart)

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 82 of 96
Dec'l of JTD

Ryan Decision Order #4                                                    Page 3

    Development of training is of utmost importance for the new em-
ployees and for current staff, including those in security and
administration.  Attached is a submitted example of a proposed train-
ing schedule to be instituted by the Department of Corrections Training
Academy.  (see Order #3)

    Also attached is a schedule of in-service programs which will be
conducted at the Infirmary fon the medical staff members for improve-
ment of patient care and emergency care.  (See Order #3)

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 83 of 96
Dec'l of JTD

Ryan Decision Order #4                                          Page 4

Some changes in the Infirmary physical plant are recommended and
will soon be started.  These recommendations will require some modifi-
cations and construction to the building and will decrease impeded
access while improving medical services.

As mentioned in Order #3, we are requesting a full time pharmacist.
This means a serviceable pharmacy unit will have to be constructed.
This will eliminate the time lag presently experienced by the patients
in receiving medications.  At present there is a one-day waiting period
for medications from the time they are recommended and ordered until the
patient picks them up.  This is true of most medication orders, except-
ing those of an emergency nature.  In emergencies, the patient is issued
one day's medication while those prescribed are being ordered and picked
up.  A functioning pharmacy with stocks on hand will eliminate this
problem.

There will be two dispensing windows available.

1.  Daily, controlled abusable medications will be dispensed
    from the window adjoining the waiting room, and weekly
    medications will also be distributed from this window.

2.  Other recommended prescriptions will be picked up by the
    patient immediately following his examination during sick
    call and the daily call-out at the north dispensing window
    adjoining the hall.  (See attached Floor Plan #1)

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 84 of 96
Dec'l of JTD

Ryan Decision Order #4                                          Page 5

Construction in the inmate waiting room will be necessary. A special security "cage" waiting area will be built. This is to allow an increased number of special custody patients to be escorted to the Infirmary for medical evaluation. It will require fewer security personnel to guard several Administrative Segregation inmates in this area while they are awaiting examinations or testing than the present one officer per inmate method that is presently used.

Note: The area specified is readily visable from the officer's desk. Also, there will be a second security officer to provide additional control of inmate movement and behavior during regular sick call hours. (day shift) Extra security staff are being assigned to the Infirmary during the day shift to increase safety for the special custody inmates, and to increase access and movement to receive medical attention. (See attached floor plan)

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 85 of 96
Dec'l of JTD

Ryan Decision Order #4                                          Page 6

    Modification of a wall in the inpatient ward is recommended by the Medical Services Manager. Presently there is a patient wardroom which has no immediate bathroom facility. If there is a need to micturate or deficate by a patient or patients in this room, medical and/or custodial supervision is required. To eliminate this custodial problem and improve the accessability for the inmate, a door will be made in one wall adjoining the bathroom and shower.

    See the attached documents:

        1. Request for patient room construction
        2. Floor plan
        3. Cost breakdown of all construction in this section
        4. Work request for construction

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 86 of 96
Dec'l of JTD

Ryan Decision Order #4                                                Page 7

    Accomodations for our additional professional staff will have to be created in the Infirmary Building.

    1. An office and examination room will have to be made available for one medical doctor. This can be accomplished by minor shifting of supplies and room modification. As previously mentioned in the response, the pharmacy supply room will be moved to the newly built pharmacy and dispensing room, leaving this area available to become a physician's office. The medical supply room next to this office will be changed to an examination room.

    2. The medical supply and dental supply will be combined into a central supply room in an area which is now a janitor's area with storage for cleaning supplies. The present dental supply room when it is vacated, can be converted into an office for the dietician. (See Order #1)

    3. With funding available, the Medical Services Manager will have a vacant room converted into a whirlpool bath area for our physical therapy and orthopedic patients.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 87 of 96
Dec'l of JTD

Ryan Decision Order #4                                               Page 8

Medical records at the Idaho State Correctional Institution are
unique compared to record keeping systems in the community. They con-
tain not only out-patient care records such as those kept in a private
physician's office, but also contain the in-house Infirmary care entries
and medical care documentation.

As the medical chart is opened, one finds on the left entries by
the Social and Psychological staff members. This is kept separate from
the medical side of the chart. The right side of the file is separated
in categories as follows:

1. Identification sheet from with a brief I.D. and social history
   and a picture of the inmate taken by the I.D. office
2. Listings (white copies) of all Medical Request Forms the medical
   staff has received from the patient
3. Physician's Orders-contained in this section are medication pre-
   scriptions, orders for treatment, recommendations for follow-up
   consultations, X-ray, and lab test requests, and special needs
   orders for the inmate. Also in this order section are the
   requests for memorandums covering special diets, clothing, or
   bedding required by the patient.
4. Outpatient Treatment Record-all medical contact entries are made
   here. Most patients are seen on an outpatient basis by the M.D.,
   P.A., or the F.N.P. When there is a medical contact, the entry
   follows the S.O.A.P. format as follows:

   S. Subject's complaint or presentation
   O. Objective finding by examination
   A. Assessment or impression of the problem, combining
      the findings of presentation, history and exam
   P. Plan of action to be started to take care of or
      remedy the medical problem

5. Consultation-Entries of specialist's examinations. These include
   orthopedic, dermatologic, neurologic, urologic, or any other
   special interest examination given by either contract or community-
   based physicians who are not in a general practice category.

6. Lab and X-ray-This category includes all forms of laboratory, ra-
   diological or electro studies, CBC's, ZSR's, UA's, 18 channel
   screens, computerized axial tomographies, electromyographics, all
   X-ray studies, etc, etc, etc.

7. Prior Medical Records-All past records that have been requested,
   including medical contacts and hospitalizations.

8. History and Physical Examination-This includes the physical exam,
   Medical Questionnaire, and Patient's Questionnaire.

The medical charts are confidential and are kept in the Medical
Records section of the Infirmary under lock and key. A copy of a medical
file is made available to the patient upon receipt of a Medical Release
when he/she is discharged or paroled, or when a Medical Release Form

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 88 of 96

Dec'l of JTD

Ryan Decision Order #4                                                    Page 9

signed by the patient is received from his/her attorney.  These medical
files are not made available to security or other institutional staff
unless the legality of such is established.

Attached is the audit procedure for the medical records and an
example of a medical record.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 89 of 96
Dec'l of JTD



# STATE OF IDAHO

## BOARD OF CORRECTION

### Idaho State Correctional Institution

BOX 14
Boise, Idaho 83707
(208) 336-0740

April 19, 1985

M E M O R A N D U M

FROM:    Ralph Pierce, Deputy Warden of Programs

TO:      Robert Gates, Deputy Attorney General

SUBJECT: Psychiatric Services at the Idaho State Correctional
         Institution

The following information is provided regarding the advisability of
obtaining a full-time psychiatrist to provide for the needs of inmates
with mental health problems at the Idaho State Correctional Institution.

1. Presently, Dr. Michael Estess and Dr. Cantrill Nielsen are each
providing four hours care each week for a total of eight hours.
Dr. Nielsen holds clinic on Monday mornings and Dr. Estess holds clinic
on Thursday mornings. Appointments are triaged by the psychologists
and psychiatric nurse assigned full time to the Mental Health Unit.

2. The Mental Health Unit is a separate facility which normally
houses approximately ten patients. Patients are admitted to the unit
only with approval of a psychiatrist and the Director of Corrections.
The criteria for admittance is that the patient is currently diagnosed
by a psychiatrist as being actively psychotic and, additionally, that
the patient is exhibiting behavior which is considered to be dangerous
to himself or others. Patients assigned to this unit are normally seen
at least once each week by a psychiatrist, and twice each week if
needed. Additionally, the psychologist and/or psychiatric nurse have
access to both psychiatrists by telephone for emergencies or conferences
concerning symptoms or problems.

3. In addition to the average of ten patients treated in the Mental
Health Unit, outpatients from the general inmate population are seen at
the Mental Health Unit as necessary to monitor outpatient treatment pro-
grams and medication levels of all patients under psychotropic medicat-
ions. Inmates receiving psychotropic medications are seen by a psychia-
trist at least once every two months, and more frequently if indicated
and called for by the psychiatrist. An average of 35 outpatients are
being monitored by the staff of the Mental Health Unit.

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho
Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

EQUAL OPPORTUNITY EMPLOYER

Exhibit 69 - Page 90 of 96
Dec'l of JTD

Robert Gates, Deputy Attorney General                                    Page 2

4. Inmates who exhibit mental health symptoms within the general inmate population are referred first of all to a psychologist for an evaluation if conditions permit. The psychologist refers the inmate to be seen by a psychiatrist if deemed necessary by confering with the Mental Health Unit psychologist. In emergency situations this evaluation and referral can take place in the same day, and the inmate admitted to either the Mental Health Unit or the Medical Clinic as conditions warrant.

5. The above system of mental health care has been functioning quite well for the past five years. With the increase in inmate population, it is proposed to add four more hours of psychiatrist coverage by scheduling another four hour block one morning of the week. This will provide for a psychiatrist in the Unit three days per week. With the number of inpatients and outpatients within the inmate population, this should provide sufficient psychiatric coverage.

6. It must be understood that the services of the psychiatrists are primarily to monitor psychotic patients and to prescribe appropriate treatment programs, including therapy modality as well as chemical modality. The actual treatment is administered by the psychological and medical full-time staff.

To improve the delivery of mental health services and follow-up counseling programs prescribed by the psychiatrists, the Department of Corrections has been funded for two more psychologists, one of whom will be an Idaho State licensed Ph.D. This amounts to a forty percent increase in psychological staff, from three to five members.

Attached are copies of a treatment plan prepared for every patient seen by the psychiatrists which designate treatment modalities to be followed; and a form presently used in the initial receiving unit for developing a program for every sexual offender. The Sex Offender Checklist is prepared by a staff psychologist after interviewing the inmate and reviewing past history information.

Ralph Pierce
Deputy Warden, Programs

RP:rb

Notice: This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 91 of 96
Dec'l of JTD



Exhibit 69 - Page 92 of 96
Dec'l of JTD

Form: H6/31    Case 1:81-cv-01165-BL [Appendix F] t 822-3  Filed 03/19/12  Page 22 of 23

## MEDICATION ADMINISTRATION RECORD

**Facility:** M          IDAHO STATE CORR INST (ISCI)          ID          **Month:** December 2011

| Init. | Drug - Dose - Mode - Interval | HR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **ISONIAZID 300 MG TABS ~INH~** TAKE 1 TAB BY MOUTH EVERY DAY FOR 110 DAYS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  MITCHELL,JANET,PA    Rx | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Order Date  10/26/11  Start Date    Stop Date  02/13/12 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | **PYRIDOXINE HCL 50 MG TABS ~VITAMIN B-6~** TAKE 1 TAB BY MOUTH EVERY DAY FOR 110 DAYS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  MITCHELL,JANET,PA    Rx | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Order Date  10/26/11  Start Date    Stop Date  02/13/12 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  Order Date    Start Date    Stop Date | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  Order Date    Start Date    Stop Date | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  Order Date    Start Date    Stop Date | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Prescriber  Order Date    Start Date    Stop Date | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**Diagnosis:**

**Allergies:** No Known Drug Allergy

DOB/Inmate #:          Location:  MAIN          Name:

#3150 REV 4/10

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

PharmaCo

Exhibit 69 - Page 93 of 96
Dec'l of JTD

Mental Health Program Operational Data

<u>Table 1: Mental health operational data that is not routinely collected but was ultimately assembled and available to us</u>
-average number of inmates on psychotropic medications
-average number of inmates in group therapy
-average number of hours of group therapy per patient housed in Unit 16 per week
-average length of time psychiatrist spends per patient encounter
-average length of time psychiatric physician assistant spends per patient encounter
-average number of inmates seen for suicidal ideation or placed on suicide watch per month
-list of deaths secondary to self-injury or impulsivity in last 2 years
-average number of inmates in Administrative Segregation who screen positive for mental illness
-list of patients receiving psychotropic medications on an involuntary basis in the previous two years
-analysis of inmate grievances related to mental health care, e.g. according to nature of complaints, type of service, identity of provider, etc.

<u>Table 2: Mental health operational data that is not routinely collected and was not available to us</u>
-average number of inmates screening positive for mental health issues at intake
-average number of patients who have submitted sick call slips
-list of inmates placed on suicide watch within 72 hours of admission to ISCI
-list of inmates placed on suicide watch in the previous month
-list of patients transferred out to a higher level of psychiatric care than available at ISCI
-average length of stay in such higher level psychiatric care bed
-list of inmates requiring urgent care due to self-injurious behavior or impulsivity[1]

---

[1] Although this information was not provided, two separate interviews with staff indicated that approximately five inmates had been transferred out during 2011 due to self-injurious behavior.

Notice:  This Report is only a recommendation to the Court. It is not a Court Order or a decision by the Court. Neither the Idaho Department of Correction, nor Corizon, Inc., is required to adopt any of the suggestions or opinions stated in the Report.

Exhibit 69 - Page 94 of 96
Dec'l of JTD

MARC F. STERN, MD, MPH
SPECIAL MASTER


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

WALTER BALLA, et al.,

                Plaintiffs,

     v.

IDAHO STATE BOARD OF
CORRECTIONS, et al.,

                Defendants,

Case No. 1:81-cv-1165-BLW

**AFFIDAVIT OF MARC F. STERN**

**IN RESPONSE TO ORDER 806**

STATE OF WASHINGTON

COUNTY OF THURSTON

ss.

MARC F. STERN, being first duly sworn, deposes and says as follows:

**AFFIDAVIT OF MARC F. STERN - 1**

Exhibit 69 - Page 95 of 96
Dec'l of JTD

1.       I am submitting a final report to the Court, pursuant to Order 806, containing my opinions regarding health care delivery at the Idaho State Correctional Institute.

2.       I hereby attest under penalty of perjury that to the best of my knowledge the facts therein contained are true.

3.       Further your affiant saith naught.

DATED this ___2nd___ day of February, 2012.

_____
MARC F. STERN

SUBSCRIBED and SWORN BEFORE ME THIS 2nd day of February, 2012.

_____
NOTARY PUBLIC OF WASHINGTON
My commission expires on: _9-20-14_

CORRY CAVIN
NOTARY PUBLIC
STATE OF WASHINGTON
My Comm. Expires Sep. 20, 2014

**AFFIDAVIT OF MARC F. STERN - 2**

Exhibit 69 - Page 96 of 96
Dec'l of JTD