February 27, 2005

HARSH MEDICINE

## As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence

By PAUL von ZIELBAUER

**B**rian Tetrault was 44 when he was led into a dim county jail cell in upstate New York in 2001, charged with taking some skis and other items from his ex-wife's home. A former nuclear scientist who had struggled with Parkinson's disease, he began to die almost immediately, and state investigators would later discover why: The jail's medical director had cut off all but a few of the 32 pills he needed each day to quell his tremors.

Over the next 10 days, Mr. Tetrault slid into a stupor, soaked in his own sweat and urine. But he never saw the jail doctor again, and the nurses dismissed him as a faker. After his heart finally stopped, investigators said, correction officers at the Schenectady jail doctored records to make it appear he had been released before he died.

Two months later, Victoria Williams Smith, the mother of a teenage boy, was booked into another upstate jail, in Dutchess County, charged with smuggling drugs to her husband in prison. She, too, had only 10 days to live after she began complaining of chest pains. She phoned friends in desperation: The medical director would not prescribe anything more potent than Bengay or the arthritis medicine she had brought with her, investigators said. A nurse scorned her pleas to be hospitalized as a ploy to get drugs. When at last an ambulance was called, Ms. Smith was on the floor of her cell, shaking from a heart attack that would kill her within the hour. She was 35.

In these two harrowing deaths, state investigators concluded, the culprit was a for-profit corporation, Prison Health Services, that had moved aggressively into New York State in the last decade, winning jail contracts worth hundreds of millions of dollars with an enticing sales pitch: Take the messy and expensive job of providing medical care from overmatched government officials, and give it to an experienced nationwide outfit that could recruit doctors, battle lawsuits and keep costs down.

A yearlong examination of Prison Health by The New York Times reveals repeated instances of medical care that has been flawed and sometimes lethal. The company's performance around the nation has provoked criticism from judges and sheriffs, lawsuits from inmates' families and whistle-blowers, and condemnations by federal, state and local authorities. The company has paid millions of dollars in fines and settlements.

In the two deaths, and eight others across upstate New York, state investigators say they kept discovering the same failings: medical staffs trimmed to the bone, doctors underqualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished.

Exhibit 70 - Page 1 of 17
Dec'l of JTD

Not surprisingly, Prison Health, which is based outside Nashville, is no longer working in most of those upstate jails. But it is hardly out of work. Despite a tarnished record, Prison Health has sold its promise of lower costs and better care, and become the biggest for-profit company providing medical care in jails and prisons. It has amassed 86 contracts in 28 states, and now cares for 237,000 inmates, or about one in every 10 people behind bars.

Prison Health Services says that any lapses that have occurred are far outnumbered by its successes, and that many cities and states have been pleased with its work. Company executives dispute the state's findings in the upstate deaths, saying their policy is never to deny necessary medical care.

And they say that many complaints - from litigious inmates, disgruntled employees and overzealous investigators - simply come with the hugely challenging work they have taken on.

"What we do," said Michael Catalano, the company chairman, "is provide a public health service that many others are unable or unwilling to do."

The examination of Prison Health also reveals a company that is very much a creature of a growing phenomenon: the privatization of jail and prison health care. As governments try to shed the burden of soaring medical costs - driven by the exploding problems of AIDS and mental illness among inmates - this field has become a $2 billion-a-year industry.

It is an intensely competitive world populated by a handful of companies, each striving to find enough doctors and nurses for a demanding and sometimes dangerous job. The companies, overseen by local governments with limited choices and money, regularly move from jail to jail, and scandal to scandal - often disliked but always needed.

Perhaps the most striking example of Prison Health's ability to prosper amid its set of troubles unfolded in New York State. Despite disappointed customers and official investigations in Florida and Pennsylvania, the company still managed to win its largest contract ever in 2000, when New York City agreed to pay it $254 million over three years to provide care at the correctional labyrinth on Rikers Island.

The city, in fact, just renewed that deal in January for another three years - despite the deaths upstate, and a chorus of criticism over Prison Health's work at Rikers, where employees and government monitors have complained of staff shortages and delays in drugs and treatments for H.I.V. and mental illnesses. A rash of suicides in 2003 prompted a scramble by officials to fill serious gaps in care and oversight.

Along the way, though, Prison Health has acquired at least one tenacious adversary. The State Commission of Correction, appointed by the governor to investigate every death in jail, has moved over the last several years from polite recommendations to bitter denunciations, frustrated by what it says is the company's refusal to admit and address deadly mistakes.

Exhibit 70 - Page 2 of 17
Dec'l of JTD

The commission has faulted company policies, or mistakes and misconduct by its employees, in 23 deaths of inmates in the city and six upstate counties. Fifteen times in the last four years, it has recommended that the state discipline Prison Health doctors and nurses.

And since 2001, the commission, along with the State Education Department, which regulates the practice of medicine, has urged Attorney General Eliot Spitzer to halt the company's operations in New York, saying that Prison Health lacks any legal authority to practice medicine because business executives are in charge. New York, like many other states, requires that for-profit corporations providing medical services be owned and controlled by doctors, to keep business calculations from driving medical decisions.

Prison Health says its work in New York is legal because it has set up two corporations headed by doctors to run medical care. But state investigators have called those corporations shams.

Elsewhere, Prison Health did not go that far, until questioned by The Times. Now it says it is creating doctor-run corporations in 11 other states with similar laws, including New Jersey and California.

"Had we realized this would be a question, we would have addressed it earlier," said Mr. Catalano, the company's chairman. "We have nothing to hide here."

But in one report after another, the state commission has exposed what it says is the dangerous way Prison Health has operated.

One investigation found that the doctor overseeing care in several upstate jails in 2001 - continually overruling the doctors there, and refusing drugs and treatments - was not even licensed to practice in New York State. He did the job, the commission found, by telephone - from Washington.

The commission's gravest findings have involved deaths on the company's watch, mostly of people who had not been convicted of anything.

Candy Brown, a 46-year-old Rochester woman jailed in 2000 on a parole violation, died when her withdrawal from heroin went untreated for two days as she lay in her own vomit and excrement in the Monroe County Jail, moaning and crying for help. But nurses did not call a doctor or even clean her off, investigators said. Her fellow inmates took pity and washed her face; some guards took it on themselves to ease her into a shower and a final change of clothes.

Scott Mayo Jr. was only a few minutes old in 2001 when guards fished him out of a toilet in the maternity unit of Albany County Jail. It was the guards, investigators said, who found a faint pulse in the premature baby and worked fiercely to keep his heart beating as a nurse stood by, offering little help.

"We're a jail," the nurse told state officials after the infant died. "There's no equipment for a fetus. Or a newborn."

Exhibit 70 - Page 3 of 17
Dec'l of JTD

In at least one death report, the commission took the opportunity to voice a broad indictment of the company. Frederick C. Lamy, chairman of the commission's medical review board, denounced Prison Health, or P.H.S. as it widely known, as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."

"The lack of credentials, lack of training, shocking incompetence and outright misconduct" of the doctors and nurses in the case was "emblematic of P.H.S. Inc.'s conduct as a business corporation, holding itself out as a medical care provider while seemingly bereft of any quality control."

In its review of Prison Health's work, The Times interviewed government regulators, law enforcement officials and legal and medical specialists, including current and former company employees. The review included thousands of pages of public and internal company documents, state and city records, and every New York State report on deaths under the company's care.

The examination shows that in many parts of the country, including counties in New Jersey and Florida, Prison Health has become a mainstay, satisfying officials by paring expenses and marshaling medical staffs without the rules and union issues that constrain government efforts.

But elsewhere, it has hopscotched from place to place, largely unscathed by accusations that in cutting costs, it has cut corners.

Georgia, which hired Prison Health in 1995, replaced the company two years later, complaining that it had understaffed prison clinics. Similar complaints led Maine to end its contract in 2003. In Alabama, one prison has only two doctors for more than 2,200 prisoners; one AIDS specialist, before she left this month, called staffing "skeletal" and said she sometimes lacked even soap to wash her hands between treating patients.

In Philadelphia's jails, state and federal court monitors in the late 1990's told of potentially dangerous delays and gaps in treatment and medication for inmates under Prison Health, which nonetheless went on in 2000 to win a contract not far away in the Baltimore City Detention Center. There, two years later, the federal Department of Justice reported that better care might have prevented four inmate deaths. One guard, it said, complained that she had to fight nurses to get sick inmates examined.

Such stories can be heard around the country. In Las Vegas, after an H.I.V.-positive inmate died in 2002, nurses and public defenders said the county jail's medical director had refused medications for AIDS and mental illness, calling inmates junkies.

In Indiana, Barbara Logan, a former Prison Health administrator who filed a whistleblower suit last year, said in an interview that the pharmacy at her state prison was so poorly stocked that nurses often had to run out to CVS to refill routine prescriptions for diabetes and high blood pressure.

Before Prison Health even started in Georgia, there had been several inmate deaths in neighboring Florida that cost the company three county contracts, millions of dollars in

Exhibit 70 - Page 4 of 17
Dec'l of JTD

settlements - and an apology for its part in the 1994 death of 46-year-old Diane Nelson. Jailed in Pinellas County on charges that she had slapped her teenage daughter, Ms. Nelson suffered a heart attack after nurses failed for two days to order the heart medication her private doctor had prescribed. As she collapsed, a nurse told her, "Stop the theatrics."

The same nurse, in a deposition, also admitted that she had joked to the jail staff, "We save money because we skip the ambulance and bring them right to the morgue."

**A Tough Business: Taking On Headaches, and Creating Some, Too**

Few jobs are harder to get right than tending to the health of inmates, who are sicker and more dependent on alcohol and drugs than people outside. AIDS and hepatitis have torn through cellblocks, and mental illness is a mushrooming problem. In the last decade, state and local government spending for inmate health care has tripled nationwide, to roughly $5 billion a year.

Qualified doctors and nurses are difficult to find, as jails are hardly the most prestigious or best-paying places to work. The potential costs of failure, though, are high - because most inmates will eventually be let out, along with any disease or mental illness that went untreated.

For decades the task fell to state and local governments that typically lacked resources or expertise, acting in sometimes conflicting roles as punisher and medical protector. Often, the results were tragic.

Three skeletons dug up at an Arkansas penal farm in 1968 led to the uncovering of a monstrous system in which a prison hospital served as torture chamber and a doctor as chief tormentor. The 1971 uprising at Attica state prison in upstate New York, which was sparked in part by complaints about health care, left 43 inmates and guards dead. The debacle unleashed a flood of prisoner lawsuits that culminated in a 1976 United States Supreme Court decision declaring that governments must provide adequate medical care in jails and prisons.

But where governments saw a burden, others spotted an opportunity. Two years after the ruling, a Delaware nurse named Doyle Moore founded Prison Health, pioneering a for-profit medical-care industry that offered local officials a grand solution: hand off the headache.

About 40 percent of all inmate medical care in America is now contracted to for-profit companies, led by Prison Health, its closest rival, Correctional Medical Services, and four or five others. Though the remaining 60 percent of inmate care is still supplied by governments, most often by their Health Departments, that number has been shrinking as medical expenses soar.

A few big-city hospitals and other nonprofit enterprises have stepped into the fray, and while not perfect themselves, have performed the best by many accounts, bringing a sense of mission to the work. But that care usually costs more than governments want to spend, and most hospitals are neither equipped nor motivated to enter a jail or prison, where profit margins linger in the single digits.

Exhibit 70 - Page 5 of 17
Dec'l of JTD

In this world, where governments are limited in their choices, a half-dozen for-profit companies jockey to underbid each other and promise the biggest savings.

"It's almost like a game of attrition, where the companies will take bids for amounts that you just can't do it," said Dr. Michael Puisis, a national expert and editor of "Clinical Practice in Correctional Medicine," an anthology of articles by doctors. "They figure out how to make money after they get the contract."

Businesses with the most dubious track records can survive, and thrive. When cost-trimming cuts into the quality of care, harming inmates and prompting lawsuits and investigations, governments often see no alternatives but to keep the company, or hire another, then another when that one fails - a revolving-door process that sometimes ends with governments rehiring the company they fired years earlier.

Prison Health has mastered the game. When its mistakes have become public, the company has quietly settled lawsuits and nimbly brokered its exits by quickly resigning, thus preserving its marketable claim that it has never been let go for cause.

Even dissatisfied government clients can be reluctant to discuss their complaints openly, or share them with other counties or states. Some fear being exposed to lawsuits and criticism; others worry that the company dropped this year may return next year as the only bidder for the job. Or, as some former Prison Health customers discovered to their dismay, the new company they hire may be bought by the company they fired.

"You've got the professionals dealing with amateurs," said Dr. Ronald Shansky, a former medical director for the Illinois prison system. He said most sheriffs and jailers were not sophisticated enough about medicine to know what to demand for their money until things go wrong. Local laws requiring that contracts be regularly put out for bid - and go to the lowest bidder - can force officials to switch providers constantly, disrupting care and demoralizing staffs.

Yet once they turn jail medicine over to an outside enterprise, governments rarely go back to providing it themselves. "It's like an article of faith that private is better," Dr. Shansky said, even though a 1997 study comparing government and for-profit prison care, commissioned by the Michigan Department of Corrections, found little difference in cost or quality.

On this playing field, Prison Health has prevailed by thinking big, buying up competitors and creating a nationwide pharmacy to supply its operations. Its revenues have risen in the last decade to an estimated $690 million last year from $110 million in 1994, and its stock has leapt to $27.46 a share - its closing price on Friday - from a split-adjusted price of $3.33.

But day by day, Prison Health - like all of its competitors - faces the most basic challenge: finding people to do the job. For openings in Philadelphia last year, it advertised on a Web page called the Job Resource. "Psychiatrists - Feel shackled to an unsatisfying job? Discover correctional medicine!" said one ad. A Las Vegas posting urged, "Come do some time with us!"

Exhibit 70 - Page 6 of 17
Dec'l of JTD

Those who Prison Health hires wind up responsible for the legion of people locked up every day. When the doors shut behind them, the care those prisoners get is shuttered from public view. Deaths behind bars provoke scant outcry.

But if the public has little information about inmates, and not much inclination to care, it may have even less sympathy for the notion that they should die for want of medical attention.

**Cutting a Lifeline: For Parkinson's Patient, a Countdown to Death**

Four days into his stay at the Schenectady County Jail, it all began to come apart for Brian Richard Tetrault. He could no longer walk the four steps from his bunk to the door of Cell 22, in A-block, where a nurse was waiting with his small ration of pills.

Since his arrest, the state commission said, he had been denied most of the medication he had used for a decade to control his Parkinson's disease and psychological problems. The medical staff knew about his ailments from the day he arrived, soft-spoken and clutching a plastic pill organizer; they even phoned his doctor for his charts.

But the jail's medical director took him off all but two of his seven medications, and nurses concluded that the new inmate was more uncooperative than ill, state investigators said. Mr. Tetrault, a former nuclear scientist at the nearby Knolls Atomic Power Laboratory, had only seven days left before an agonizing death that investigators would label "physician induced."

He had grown up in the Albany suburbs, a hunter and amateur mechanic with a gift for mathematics. He joined the Navy, and spent a year on classified missions in a nuclear submarine. By 1990, he had a wife and two sons, a house on a lake and his pick of good-paying jobs in nuclear engineering.

But try as he did to ignore its slow trespass, Parkinson's ruined everything. His sister Barbara first noticed how his hand shook during a game of pinochle. By 1995, Mr. Tetrault was popping prescription Sinemet tablets every two hours to counter the loss of dopamine, a brain chemical vital to muscle function. Every day became a battle with dyskinesia, the drug-induced tremors common to Parkinson's patients.

"He'd call it 'disky,' " said Larry Broderick, a high school friend. "He'd say, 'I'm getting disky.' "

By 2001, the disease had destroyed Mr. Tetrault's marriage and estranged his two teenage sons. His ex-wife, Eileen, had obtained an order of protection as he grew increasingly depressed and angry. That Nov. 10, he stormed into her home while she was away and snatched some items - skis and a push broom - before the police arrived and charged him with burglary and harassment.

His mistreatment began that day, according to the state commission. Without seeing Mr. Tetrault, the jail's medical director, Dr. W. J. Duke Dufresne, prescribed Sinemet and an anti-ulcer drug, but none of the other five medications for his Parkinson's, pain and psychiatric troubles.

Exhibit 70 - Page 7 of 17
Dec'l of JTD

On his second day in jail, Mr. Tetrault saw Dr. Dufresne, the only physician for the jail's 300 or so inmates. In a brief visit, the commission said, the doctor reduced even the Sinemet. As for the mental health drugs, Dr. Dufresne later told investigators that only a psychiatrist should prescribe them.

But no one ever arranged for Mr. Tetrault to see the jail psychiatrist, the commission said. And never again did he see Dr. Dufresne, who told investigators he had believed that Mr. Tetrault was merely feeling the typical ups and downs of Parkinson's; he had planned to check on him in three months.

Mr. Tetrault had only days. On his fourth day in jail, medical records show, he grew increasingly "disky" and belligerent, as his body withdrew from the medications that had sustained him for years. On the sixth day, he lay in his bunk, steeped in his own urine and unable to move. "Continues to be manipulative," a nurse wrote.

On the seventh day, the commission said, nurses continued to look in on him, chronicle his deterioration and do little about it. "Inmate remains very stiff," one wrote. "Head arched back, sweating profusely," another noted. A third nurse forced him to walk to the jail clinic, though he could barely move.

On the eighth day, alerted by a nurse's phone call, Dr. Dufresne ordered Mr. Tetrault hospitalized. At Ellis Hospital in Schenectady, emergency-room doctors diagnosed the ravages of his untreated Parkinson's. "I suspect, in the prison setting, he was not getting his full dose of medication as needed," wrote Dr. Richard B. Brooks.

There was not much the hospital could do. On the 10th day, Mr. Tetrault went into septic shock. On the 11th, he died.

The state commission ultimately referred Dr. Dufresne to the State Board for Professional Medical Conduct for what it alleged was "grossly inadequate" care, urged Prison Health to fire him and asked the county to fire Prison Health.

The commission found that Dr. Dufresne had never given Mr. Tetrault a physical examination; and nurses had transcribed the doctor's orders incorrectly, reducing even the Sinemet.

The medical conduct board has taken no action against Dr. Dufresne. The company, in its lawyer's response to the commission, disputed virtually all of the commission's findings, saying that Mr. Tetrault sometimes resisted taking his medication, and that he was well able to move when he wanted. The company's internal one-page review of Mr. Tetrault's care passed no judgment on the doctor or the nurses. But it did recommend six minor changes, like keeping medical records in chronological order. Dr. Dufresne, who is now the company's regional medical director for upstate jails, did not return calls seeking comment.

Richard D. Wright, the president and chief executive of Prison Health, would not discuss details of the case, citing a lawsuit by Mr. Tetrault's son Zachary. He said that over all, Schenectady County "was extremely pleased with the work of the company."

Exhibit 70 - Page 8 of 17
Dec'l of JTD

But the county moved to fire Prison Health the day after the commission's report was made public last June. "We were going to terminate them for cause," said Chris Gardner, the county attorney. "But they approached us and we mutually agreed to terminate the relationship."

The humiliation of Mr. Tetrault did not end with his passing, or with Prison Health, the commission said. On the day he died, Nov. 20, 2001, sheriff's officials altered records to change the time of his release from custody, in the early evening, to 2:45 p.m. - 10 minutes before he was pronounced dead, the commission said. The Sheriff's Department denied the charge, and said it had done nothing untoward in trying to formally release Mr. Tetrault.

But the commission said the time change allowed the department to avoid an investigation, at least for a while. Commissioners learned of Mr. Tetrault's death by reading a newspaper article about Zachary's lawsuit, 20 months later.

**The Revolving Door: After Trouble in Florida, Moving On, and Up**

If Schenectady County was learning hard lessons about Prison Health, it was old news in South Florida, where several counties had tangled, and re-tangled, with the company years earlier.

By the time Pinellas County hired Prison Health in 1992, the company was hitting its stride. Fourteen years after its founding, it had established a wide beachhead in the state, and had just begun a nationwide push that by the end of the decade would put it in the three biggest cities of the Northeast and the prison systems of entire states. A year earlier, the company began selling stock under the name of a holding company, America Service Group.

But for Pinellas, halfway down Florida's Gulf Coast, things were headed downhill.

Everett S. Rice, who was sheriff then, said that Prison Health understaffed the county jail in Clearwater. The company seemed reluctant, he said, to send seriously ill inmates to hospitals, which could cost it thousands of dollars a day. Inmates were regularly showing up in court incompetent to stand trial, said Bob Dillinger, the county public defender, because they were not getting their psychiatric medicines.

The sheriff's office learned that even the most basic care had to be spelled out in the contract. When one inmate died after a delay in calling for help, Mr. Rice said, the agreement was rewritten to require that Prison Health call 911 at a specific time after the start of a medical emergency.

Then, in March 1994, came the death of Diane Nelson, who collapsed of a heart attack in front of the nurse whose words would echo in news reports: "We save money because we skip the ambulance."

Saving money was the reason the county had hired Prison Health. Pinellas was actually on its second round with the company, having first enlisted it in 1986 because of worries about the ballooning costs of the county's own jail health care. When the contract went back out for bid

Exhibit 70 - Page 9 of 17
Dec'l of JTD

three years later, Pinellas switched to a cheaper competitor; three years after that, Prison Health bid the lowest and retook the job.

But Mr. Rice said the bidding process never turned up a whisper of criticism about Prison Health, or any of its competitors. "Every time we'd be up for renewal, we'd talk to the other counties and institutions, and surprisingly, most of them had glowing reports," he said.

In the end, the deal with Prison Health "probably saved a little money," Mr. Rice said, but the human and political costs were too high. "I thought if I'm going to get the blame for this, I'm going to bring it back inside," he said.

The county did that in April 1995, going back into the business of jail medical care. Three months later, an hour's drive to the east, rural Polk County - which had hired Prison Health the same year as Pinellas - broke off with the company after three inmate deaths that cost Polk taxpayers thousands of dollars in settlements.

"There were instances where we would actually send somebody to the hospital by ambulance because P.H.S. wouldn't do so," said David Bergdoll, counsel to the Polk County Sheriff's office.

Since 1992, at least 15 inmates have died in 11 Florida jails in cases where Prison Health appears to have provided inadequate care, according to documents and interviews with state and county officials.

As it grew, Prison Health proved adept at ingratiating itself with local politicians, hiring lobbyists and contributing to campaigns for sheriff. Under a promise of immunity from prosecution, the nurse who founded the company, Mr. Moore, testified at a 1993 Florida corruption trial that he had paid the Broward County Republican chairman $5,000 a month - "basically extortion," he said - to keep the contract there and in neighboring Palm Beach County.

Some counties say Prison Health has done good work and saved taxpayers money. In Tampa, the medical bill at the Hillsborough County Jail fell to $1.2 million, from $1.8 million in 1982, the year Prison Health replaced the county's medical operation, said Col. David M. Parrish, who runs the jail.

There have been other costs. Last year, the company dismissed a nurse and reprimanded two others after an inmate's baby died; the mother, Kimberly Grey, said in a federal lawsuit that although she had been leaking amniotic fluid for five days, nurses refused to examine her until she gave birth over a cell toilet.

But Colonel Parrish said that mistakes, and second-guessing, were part of the job, no matter who does it. "Anybody who is in the health care business for inmates is going to get blasted because inmates have nothing better to do than complain and sue and find somebody who is going to make a big stink about nothing," he said.

Certainly, a litany of complaints followed as Prison Health expanded across the nation. In Philadelphia, a 1999 federal court monitor's report warned that the company's failure to segregate

Exhibit 70 - Page 10 of 17
Dec'l of JTD

inmates who were suffering from tuberculosis posed "a public health emergency." Pregnant inmates, it said, were not routinely tested or counseled for H.I.V., endangering their babies.

Dr. Robert Cohen, a state court monitor, said in an interview that Philadelphia doctors "actually encouraged women to refuse pelvic examinations."

Prison Health still works in Philadelphia, where officials have persistently prodded it to improve care. Like many governments, the city has moved from a fixed-cost contract in which the company's profit comes out of whatever it does not spend to one that covers most medical costs and pays Prison Health a management fee.

When other governments have shown less patience, Prison Health has survived, and even grown, by buying rivals like Correctional Health Services, of Verona, N.J. In 1999, its biggest purchase, EMSA Government Services, brought with it contracts with dozens of prisons and jails.

Back in Florida, the purchase brought some unwelcome déjà vu to Polk County, which thought it was through with Prison Health when it hired EMSA. When Prison Health bought EMSA, Polk officials soon replaced it yet again.

"P.H.S. was the lowest bidder, but we didn't accept their bid," said Mr. Bergdoll, the sheriff's counsel. "That should tell you something." Since then, he said, the number of lawsuits has fallen so sharply that the county's insurer lowered its premiums.

The EMSA purchase also brought Prison Health back to Broward County, Fla., which had dropped it years earlier because it had been unhappy with the medical care. Two years after its return, three state judges noticed the phenomenon that had played out in Pinellas - a parade of inmates showing up in court incoherent - and ordered the company to stop withholding psychiatric drugs.

"My impression was that it was money," Judge Susan Lebow said in an interview. "The doctors were under corporate direction to not continue the medications."

Prison Health denies it gave any such order. The Broward sheriff would not comment on the company, which the county replaced again in 2001.

But the revolving door of for-profit health care spins on. Last December, Broward hired Armor Correctional Health Services, a company formed just a few weeks earlier by a familiar figure: Doyle Moore, the nurse who founded Prison Health.

**A Jailhouse Birth: Chaos on a Cell Floor as a Baby Is Discovered**

It could not have been much worse. A newborn baby lay in a pool of blood on the floor of the Albany County Jail. At least four adults were there: the mother, a registered nurse and two correction officers who struggled to save the tiny boy. But the nurse looked on passively, tending to the dazed mother, convinced that little could be done, state records show.

Exhibit 70 - Page 11 of 17
Dec'l of JTD

The baby, who was named Scott Mayo Jr., died two days later.

The mistreatment and missed chances to help the young mother, Aja Venny, began soon after her arrival 11 days earlier, investigators said. A 22-year-old secretary and community-college student from the Bronx, she knew she had done something stupid: taken a ride with a drug dealer she knew from her neighborhood. When a state trooper pulled them over, she stuffed his small bags of drugs into her bra.

She was booked into jail on Aug. 30, 2001, nearly six months pregnant.

The medical staff made an appointment with an obstetrician it paid to visit every two weeks, but Ms. Venny never saw him, state investigators said; nurses ordered her files from a Bronx women's clinic, but never received them. The one concession to her condition, it seems, was her assignment to the maternity unit, a six-bunk cell with a toilet cordoned off by a white curtain.

On Sept. 9, Ms. Venny awoke before dawn with excruciating cramps. Another inmate told the guard that Ms. Venny was about to give birth. After two calls to the nursing supervisor, Donna Hunt, a jail sergeant sent an officer to fetch her immediately.

When she arrived at 7:15 a.m., Ms. Hunt found Ms. Venny sitting on the toilet crying and "blood everywhere," she told investigators. She cleaned off and consoled the inmate, and told the officers to call an ambulance. She said later that she assumed that Ms. Venny had miscarried and saw no reason to check the toilet.

But ambulance technicians, on the phone with the sergeant, asked if there was a baby. Guards looked in the toilet and discovered the infant, still in his placental sac. Officer Dave Verrelli scooped him out using a red biohazard waste bag and laid him on a towel on the cell floor as Nurse Hunt watched.

"I knew that there was probably nothing we could do for this fetus," she told investigators.

Officer Verrelli detected a slight pulse. "What should I do now?" he frantically asked the nurse, who told him to cut open the sac. Officer Verrelli cut it, removed the baby and uncoiled the umbilical cord from its neck. Ms. Hunt confirmed that there was a faint heartbeat, investigators said, but did nothing to get the baby breathing in the quarter-hour before ambulance workers arrived and administered oxygen.

At the hospital, the boy was placed on a ventilator, his heart pumping but his temperature too low to be measured. On his third day of life, he died.

The State Board of Regents found that three Prison Health nurses, including Ms. Hunt, had failed to care properly for Ms. Venny or her baby. Each nurse was placed on a year's probation and fined $500. The State Commission of Correction did not say whether anyone might have saved the child, but it emphasized that Ms. Hunt did not take basic steps to help. She did not return calls seeking comment.

Exhibit 70 - Page 12 of 17
Dec'l of JTD

The commission also found more deep-seated failures: a disorganized staff and prenatal training for nurses that consisted of e-mail messages with instructions copied from a university Web site.

Prison Health's lawyers defended Nurse Hunt - saying she found the child in the toilet, but was pushed aside by guards - and accused the commission of ignoring "inconvenient facts."

Ms. Venny, who completed a six-month boot-camp prison program after her son's death, now lives in the Bronx with her husband, Scott, and their 20-month-old daughter, Skye. The ashes of Scott Jr. are kept in a golden urn in the bedroom.

"I know what I was doing was wrong," she said. But still, "I can't find a reason why a baby had to die."

**Connecting the Deaths: A Pattern Emerges, and a Battle Begins**

It was late 2000 when state investigators began to notice something strange. Reviewing deaths that had occurred in jails in upstate New York, they were not struck by the number or even the grim details of the cases, which they routinely examined as employees of the State Commission of Correction. Something else was wrong.

Working out of a cluttered office in Albany, the three commissioners and a six-member medical review board noticed that low-level employees were doing work normally done by better-credentialed people. Nurses without the proper qualifications, they said, were making medical decisions and pronouncing patients dead.

In Rochester, where Candy Brown had died that September, pleading for help as she withdrew from heroin, investigators found that one of the nurses responsible for her had been suspended by the state three times for negligent care.

In that case and others, commission members said, the people offering the most help and compassion were guards and inmates. And the company, it turned out, was always the same: Prison Health.

"Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the commission's director of operations.

It was the start of a long fight to get the company to change its ways, and when that failed, to get other officials in Albany to step in. Four years later, the commission has been stymied on both fronts.

Mr. Lawrence said Prison Health seemed unfamiliar with New York's tradition of regulated health care, "and dismissive of it." When the agency sought out those in charge, it would often be routed to lawyers or executives at the company's headquarters in Brentwood, Tenn., who bristled at the suggestion that they were answerable to New York State regulators. "The rules were not of any consequence," Mr. Lawrence said.

Exhibit 70 - Page 13 of 17
Dec'l of JTD

Prison Health entered New York in 1985 as medical provider for the Dutchess County Jail. Orange and Broome Counties hired the company for a few years, but ended those contracts in the 1990's.

By late 2000, when the company began to attract the state commission's notice, it had signed contracts with Schenectady, Ulster, Monroe and Albany Counties. The Albany jail superintendent at the time called the company "a godsend."

The commission called it a disaster. "Grossly and flagrantly inadequate," for instance, was its verdict on the care given Candy Brown.

Prison Health, in turn, challenged the commission's authority, and even sued over its report on one inmate's treatment, saying the panel had acted maliciously. The suit was dismissed on its merits.

Dr. Carl J. Keldie, the corporation's medical director, said the commission seemed to make up its mind before an investigation and then overstate its case in reports. "The tone, the timbre, the language is egregious," he said. Company executives said the commission has refused to meet and try to reconcile their differences.

The commission in 2001 moved beyond the specific criticisms in its reports to sound a general alarm. Asking state education officials to investigate, it said Prison Health was allowing "dangerously substandard medicine" by hiring doctors and nurses with questionable credentials.

A month later, spurred by the commission, the Department of Education alerted the state attorney general that the company was operating illegally in New York by not having doctors in charge of medical care. "Nobody really noticed that they weren't licensed," one commission doctor said of Prison Health's presence in New York.

In the three years since, nothing has come of either complaint. The only agency with the power to enforce the state law - the attorney general's office - finally replied last October, telling the commission to resolve the matter on its own. In a heated exchange of letters, an assistant attorney general, Ronda C. Lustman, scolded the commission for refusing to meet with executives.

The company says that it is acting legally because it has set up local corporations with doctors in charge. But there is abundant evidence, state investigators say, that those corporations are shams.

For example, Dr. Trevor Parks is listed as the sole shareholder of P.H.S. Medical Services P.C., which the company says provides all medical care at Rikers Island, free of any influence from Prison Health executives. But investigators say that when they interviewed him, he had little idea of his role, or his corporation's.

Moreover, records show that Dr. Parks's corporation went out of business in July, for nonpayment of taxes and fees. After The Times pointed that out to company executives in December, Prison Health paid the money. Dr. Parks did not respond to phone calls and e-mail messages.

Exhibit 70 - Page 14 of 17
Dec'l of JTD

If frustration mounted at the commission, a sense of impending trouble was growing at the jail in Albany County, where the commission said doctors' decisions on inmate treatment were being overruled by a regional medical director in Washington who was not licensed to practice in New York.

The doctor, Akin Ayeni, said in an interview that he never overruled any doctor there. But a former medical director at the jail said she quit in April 2001 because she felt the company's policies, and Dr. Ayeni's decisions, were dangerous.

"I told my staff, 'I know it's only a matter of time before they kill someone,' " she said, asking that her name not be used because she feared retribution. "I knew there was going to be a death. I could feel it."

In the six months after she left, two people died and a third was seriously injured after poor treatment by Prison Health, the state commission found; the dead included Aja Venny's newborn son.

The county and the company parted ways six months later, said Thomas J. Wigger, the jail superintendent, because he was unsatisfied with the quality of care.

One by one, other counties have followed suit. Ulster County, for example, caught Prison Health overbilling it for thousands of dollars of nurse hours and switched to another company in 2001. The company, for its part, said it lost most of the upstate contracts to competitors who had underbid them. Strangely, it said it had no record of working in Orange County, even though the state commission faulted the company in two inmate deaths, in 1989 and 1990.

Last October, Schenectady County dropped Prison Health after the death of Mr. Tetrault, the inmate with Parkinson's disease. The jail director, Maj. Robert Elwell, said in an interview that the medical director, Dr. Dufresne, had discouraged treatment for anything but the most urgent problems. "When you're dealing with a for-profit corporation, those are the types of decisions that get made," Major Elwell said.

The company's only remaining outpost in upstate New York is Dutchess County. "I believe they are a good company," said David W. Rugar, the county jail administrator. "It's just an intense thing to do, when you provide medical services."

Indeed, just days before it renewed its deal with Prison Health in 2002, the jail had an intense experience that would cost the company's medical director there his job.

**Cries From the Heart: Despite Days of Agony, 'Nobody Will Help Me'**

When they cleaned out Cell 6 in Unit 10 on Feb. 16, 2002, workers at the Dutchess County Jail found a letter that Victoria Williams Smith had written to her husband.

"My chest is tight & burns, my arms are numb," it said. "I been to the nurse about five times & no body will help me. I need to get out of this jail. It feels like I'm having a stroke, no bull."

Exhibit 70 - Page 15 of 17
Dec'l of JTD

Actually, it was a heart attack, and it had killed Ms. Smith a few hours earlier at the age of 35. The letter was just one in a skein of increasingly panicked pleas for help during her last 10 days in jail.

Ms. Smith was born in Brooklyn, but settled in North Carolina with her second husband, Justin Smith. They married in 1997, shortly after he was sent to a prison in Dutchess County for attempted robbery.

She shipped him canned food that he could sell for cash, and in January 2002 drove to the prison for what friends said was a visit allowed to married couples.

The reunion was called off by state troopers, who were waiting at the prison to search her. They found about seven ounces of heroin clearly intended for her husband to use or sell, state records show.

Thirteen days passed, state investigators said, before Ms. Smith was examined by a doctor: Vidyadhara A. Kagali, the part-time medical director at the jail in Poughkeepsie, who worked only on Wednesday and Friday evenings even though he was responsible for about 300 inmates.

She could have hoped for better. Dr. Kagali, who was board certified only as a pathologist, had never treated patients in a hospital and had "limited knowledge of his responsibilities as jail medical director," according to commission records.

On Feb. 6, when she began to complain of chest pains and numbness, Dr. Kagali told her she was suffering from inflamed cartilage in her chest, and had her continue taking the Vioxx arthritis medication that friends in North Carolina mailed to her.

The next day, after Ms. Smith was found crying in pain in her cell, an electrocardiogram revealed abnormalities in her heart. But Dr. Kagali, notified by a nurse, did not see her, according to the state commission. On her third day in jail, records show, a second EKG showed the same heart problem, but the doctor still did not see her.

On the seventh day, a nurse turned to the jail's part-time psychiatrist for help in easing Ms. Smith's chest pain and labored breathing. Without seeing her, he prescribed a drug for intestinal problems. On the eighth day, Dr. Kagali saw Ms. Smith; he ordered a spinal X-ray and recommended Bengay.

Two days later, in tears, she phoned her North Carolina friends, Chris and Marjorie Bowers, three times. "She said these people would not help her at all," Ms. Bowers said.

In the early morning of Feb. 16, Ms. Smith's untreated heart ailment became an emergency, according to jail records and sworn statements from nurses and guards. Around 4:30 a.m., a guard found her rocking on her bunk, clutching her chest, and called Barbara Light, the registered nurse on duty.

Exhibit 70 - Page 16 of 17
Dec'l of JTD

Ms. Light concluded that Ms. Smith was having an anxiety attack - even though, the commission said, the nurse had never seen the inmate's medical record.

A half-hour later, Ms. Smith, weeping, told the guard she wanted to go to a hospital - a plea Nurse Light dismissed as an attempt to get drugs. Minutes after that, the guard placed a frantic third call to the nurse, who arrived to find the inmate on the floor, shaking. An ambulance rushed Ms. Smith to Vassar Brothers Medical Center, where she died in less than an hour.

The state commission, in its report, seemed hardly to know where to begin to catalog the failures.

It urged that Dr. Kagali be fired for "gross incompetence," and referred Ms. Light to state regulators for discipline. State health authorities eventually suspended the doctor's license for six months, but have not taken action against Ms. Light. Neither she nor Dr. Kagali would comment.

The company's confidential review of Ms. Smith's death found no fault with her treatment, but recommended that its staff offer grief counseling to colleagues and inmates after future jail deaths.

In a letter to the commission, Prison Health defended Ms. Light and Dr. Kagali. It said that over Ms. Smith's five weeks in jail the doctor had seen her numerous times and provided medications, knee braces and even an extra mattress for her arthritis. Ms. Smith had no known history of heart disease, the company said, and any suggestion that her death could have been prevented was "20-20 hindsight."

The letter was signed by Dr. Dufresne, whom the commission would later blame for Brian Tetrault's death.

*Joseph Plambeck contributed reporting for this article.*

Exhibit 70 - Page 17 of 17
Dec'l of JTD