James M. Daigle, OSB #942843
jmdaigle@lawssl.com
STEWART SOKOL & LARKIN LLC
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
Telephone: (503) 221-0699
Facsimile: (503) 223-5706
*Attorneys for Defendants Corizon Health, Inc.,*
*Dr. Carl Keldie, Dr. Justin Montoya, Vicki Thomas,*
*Kirstin White, Jacob Pleich, and Sharon Epperson*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| DEREK JOHNSON, personal representative of KELLY CONRAD GREEN II, deceased; KELLY CONRAD GREEN and SANDY PULVER,<br><br>       Plaintiffs,<br><br>  v.<br><br>CORIZON HEALTH, INC., a Tennessee corporation; LANE COUNTY, an Oregon county; DR. CARL KELDIE, an individual; DR. JUSTIN MONTOYA, an individual; VICKI THOMAS, an individual; KIRSTIN WHITE, an individual; SHARON EPPERSON, (née FAGAN), an individual; and JACOB PLEICH, an individual,<br><br>       Defendants. | Case No. 6:13-cv-01855-TC<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS CORIZON HEALTH, INC., DR. CARL KELDIE, DR. JUSTIN MONTOYA, VICKI THOMAS, KIRSTIN WHITE, SHARON EPPERSON, AND JACOB PLEICH** |

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

# TABLE OF CONTENTS

I.    THE POST-INJURY CLAIMS: SUMMARY JUDGMENT IS APPROPRIATE ON THESE CLAIMS, BECAUSE PLAINTIFFS HAVE PROFFERED ONLY IRRELEVANT, MISSTATED, OR IMPLAUSIBLE FACTS IN THEIR ATTEMPT TO CREATE TRIABLE ISSUES ................................................................. 1

A.    In the absence of subjective bad faith, a claim for deliberate indifference becomes a claim for medical malpractice.  To overcome this, Plaintiffs claim to proffer evidence showing that the Corizon defendants delayed Mr. Green's hospitalization in order to save costs.  But what credible evidence of this claim have Plaintiffs actually identifed? ........... 2

B.    Plaintiffs have proferred no credible evidence in support of their claim that PA White deceptively covered up her "misdeeds." ............................................................... 11

C.    Plaintiffs have offered no credible evidence that any of the other Corizon defendants acted with deliberate indifference.... 14

D.    Nor is there any evidence that, as soon as PA White concluded there was a chance of cervical injury, any of the Corizon employees acted with deliberate indifference. ............ 18

E.    So what is the sum total of the evidence that Plaintiffs have proferred? ................................................................. 21

II.   THE PRE-INJURY CLAIMS:  PLAINTIFFS' CLAIMS FAIL BECAUSE PLAINTIFFS HAVE BEEN UNABLE TO SHOW THAT ANY CORIZON POLICY OR PRACTICE WAS IMPLICATED............ 21

III.  CONCLUSION ................................................................... 24

i

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W

2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

# TABLE OF AUTHORITIES

**Cases**

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................ 2

*Leon v. County of San Diego*,
   202 F.R.D. 631 (S.D. Cal. 2001) ....................................................... 5

*Estate of Tucker v. Interscope Records*,
   515 F.3d 1019 (9th Cir. 2008) ......................................................... 22

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ......................................................................... 1

*Gibson v. County of Washoe*,
   290 F.3d 1175 (9th Cir. 2002) ........................................................... 1

*Hicks v. Frey*, 992 F.2d 1450 (6th Cir. 1993) ...................................... 23

*Morrow v. Bard Access Sys.*,
   833 F. Supp. 2d 1246 (D. Or. 2011) .............................................. 11

*Toguchi v. Chung*,
   391 F.3d 1051 (9th Cir. 2004) ...................................................... 1, 2

*Tsao v. Desert Palace, Inc.*,
   698 F.3d 1128 (9th Cir. 2012) ....................................................... 14

*Wilhelm v. Rotman*,
   680 F.3d 1113 (9th Cir. 2012) ....................................................... 18

**Statutes**

Federal Rules of Evidence 407 ............................................................. 5

**Other Authorities**

Litigation: Claims and Defenses, § 6.04[E] (4th ed. 2014) ............................ 14

i

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

1238.038-01158577; 2

I.      **The Post-Injury Claims: Summary judgment is appropriate on these claims, because Plaintiffs have proferred only irrelevant, misstated, or implausible facts in their attempt to create triable issues.**

Proving "deliberate indifference" is a high hurdle.  It requires evidence, in the case of a county (or in this case, a corporation standing in the shoes of the county), that an entity knowingly pursued policies that posed substantial risk of constitutional harm to detainees, *Gibson v. County of Washoe*, 290 F.3d 1175, 1186-87 (9th Cir. 2002), or in the case of individuals, that those individuals were subjectively aware of an inmate's medical needs and disregarded those risks.  *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994).  And as was discussed in the Corizon defendants' opening brief, it is not enough for Plaintiffs to show mere negligence or medical malpractice; they have to show that Corizon and its employees had a quasi-criminal, reckless state of mind – i.e., that they "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."  *Id.; see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." (quotation marks and citation omitted)).

So how have Plaintiffs attempted to demonstrate evidence sufficient to create a triable issue of fact that Corizon Health, Inc. ("Corizon") and its employees acted with this reckless state of mind?  By constructing an elaborate house of cards premised on the villain *de rigeur*, corporate greed.   In short, Plaintiffs claim that Corizon, and its employees, have all conspired to put the profits of their operations over the safety and well-being of their patients.  This conspiracy, Plaintiffs claim, permeated all levels at Corizon, from national executives – who routinely emphasized "profits, profits, and more profits" – down to the physicians' assistants and nurses – who both doctored official reports to hide wrongdoing and made medical decisions based not on their actual diagnoses but on the desire to increase Corizon's profits.  But to be fair, such a "profits over patients" theory, if true, is the only way their allegations could make any sense,

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 1

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

because otherwise, their claims would necessarily amount to nothing more than bad, or at worst, grossly negligent, medical judgments.  And even gross negligence does not rise to the level of deliberate indifference.  *Toguchi*, 391 F.3d at 1061 (citation omitted).

Sadly for Plaintiffs, however, their theory doesn't work.  Because what Plaintiffs have failed to recognize is that, in order to defeat a motion for summary judgment, they must put forward affirmative evidence demonstrating *genuine* issues of fact, from which a *rational* jury can find in their favor.  Corizon's obligation in this motion, on the other hand, is to point out that Plaintiffs do not have enough genuine evidence with which to prove their case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  And here, as is true with any house of cards, Plaintiffs' theory only works if every supporting piece stays in place.  In other words, if there is no evidence for even one piece of the long chain of inferences the Plaintiffs ask the Court to make, then Plaintiffs' *house* of cards quickly becomes a *pile* of cards.

The Corizon defendants therefore invite the Court to consider what evidence Plaintiffs have actually proffered in support of their claims.  And whether that evidence is genuine or plausible.

**A.**  **In the absence of subjective bad faith, a claim for deliberate indifference becomes a claim for medical malpractice.  To overcome this, Plaintiffs claim to proffer evidence showing that the Corizon defendants delayed Mr. Green's hospitalization in order to save costs.  But what credible evidence of this claim have Plaintiffs actually identifed?**

First, Plaintiffs must provide genuine, credible evidence that Corizon and its employees subjectively knew of the risk of cervical injury to Mr. Green and disregarded it.  It is not enough to show that Corizon adopted policies or its employees acted in a way that resulted in mere medical malpractice.  In order to do this, Plaintiffs have argued there is evidence that "Corizon has a policy of delaying necessary medical treatment until a Lane County inmate can be discharged from the jail, thereby saving

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Corizon from its contractual obligation to pay for necessary medical care." (Opp. Br. at 7.) Demonstrating both that such a nefarious policy exists and that such policy was the moving force behind Mr. Green's injuries, is critical to Plaintiffs' case. Because in the absence of such a motive, the Corizon defendants' treatment of Mr. Green results in nothing more than negligence or gross negligence, and not deliberate indifference. And Corizon defendants have not moved for summary judgment on the negligence or gross negligence, but rather, on the section 1983 claims of deliberate indifference.

The focus of Plaintiffs' allegations is that Mr. Green's cervical injury was ignored and his transportation to the hospital was unjustifiably delayed. Plaintiffs concede that Physician's Assistant Kirstin White ("PA White") and Health Services Administrator Vicki Thomas ("Ms. Thomas") were the senior ranking Corizon officials at the jail on February 12, 2013. And thus the primary focus of this inquiry must, at least initially, necessarily center on those two, and their respective motivations and subjective belief. Against this backdrop, therefore, the Court is faced with two threshold questions:

(1) What credible evidence is there that such a "delay-hospitalization-in-order-to-save costs" policy even existed?

(2) And assuming such a policy did exist, what credible evidence is there that it could have been the cause of, or moving force behind, Mr. Green's injuries?

Each question is addressed in turn.

      **1.   <u>There is no credible evidence that a "delay-hospitalization-in-order-to-save costs" policy existed.</u>**

Consider the following:

- First, Corizon does not control the timing or make the decision as to when to release an inmate. That is all in the hands of the county.[1] Plaintiffs do

---

[1] (Supplemental Sealed Declaration of James M. Daigle in Support of Reply Brief ("Supp. Daigle Decl.") ¶ 4, Ex. 2 (G. Balcom Tr. at 49: 10-12 ("Q. So it is up to the discretion of the sheriff's office as to whether or not to release the inmate? A. Yes."));

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 3

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

not dispute this.

- Second, when a prisoner of the City of Eugene (as Mr. Green was) is taken to a hospital, the *City*, not Corizon, covers the hospital costs.[2] Plaintiffs also concede this.

This is all to say that the policy or practice upon which Plaintiffs' argument rests – i.e., that Corizon would have been responsible for Mr. Green's hospital bill if he hadn't been released and that Corizon was in a position to manipulate his release in any event – is false.

Not so, claim the Plaintiffs. Even if the "delay-hospitalization-in-order-to-save costs" policy was not implicated in this instance, there is sufficient evidence for a jury to conclude that Corizon, as a company, fostered a pervasive culture of "profits over patients" and constantly pressured its employees to cut costs whenever and wherever possible. Such a culture, Plaintiffs claim, was a moving force behind the delay in Mr. Green's treatment. But again, Corizon defendants invite the Court to consider the evidence put forward to support this claim.

First, Plaintiffs point to Corizon's frequent meetings in which a given unit's financial performance was analyzed as proof of Corizon's "profits over patients" policies. (Opp. Br. at 32-34.) Corizon concedes that, as a for-profit-corporation, it was, is, and will always be interested in the financial health of its component parts. A business

---

*see also* discussion on p. 10 regarding Mr. Pleich's being summoned to fill out a director's hold, which further demonstrates that the County, not Corizon, was in control of releasing Mr. Green from the jail.

[2] (Daigle Decl., Dkt. No. 76 ¶ 7, Ex. 15 (L. Brown Tr. 89:23 – 92:19 ); ¶ 28, Ex. 36 (at LC003388 (city contract noting that the City authorizes the County to release a detainee prior to incurring medical expenses but, "[i]f despite the procedures above, a claim is made against Lane County for medical treatment and any other associated expenses by a City of Eugene prisoner, the City agrees to indemnify and hold harmless the County from any such claims.")))

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 4

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

model that attempts to make a profit is not unconstitutional.  To do otherwise would not only be a pathetic business model, but would also be a violation of the corporation's fiduciary duties to its shareholders.  Plaintiffs' "undisputed fact" on this front is nothing more than a neutral description of how every single business in the United States conducts business.

Second, Plaintiffs claim that Corizon "d[id] nothing" following Mr. Green's suicide attempt, pointing to a delay in the initiation of the Sentinel Event Report, a lack of punishment of either PA White or Ms. Thomas following the Sentinel Event Report, and a lack of corrective action taken in response to that Report.  This is false.  But as an initial point, the Corizon defendants dispute both the relevance and admissibility of any discussion of the either the Sentinel Event Report or Corizon's internal process of implementing it and request that the Court, pursuant to LR 56 – 1(b), strike all mention of either of these two facts from Plaintiffs' opposition brief.  The Sentinel Event Report (as described more below) is a remedial measure, designed to be a tool to continuously assess and improve the quality of Corizon's medical services.  (*See* Declaration of Rebekah M. Haggard, M.D. in Support of Reply Brief ¶ 3, Ex. 1, at CORIZON000723.)  Thus, under Federal Rules of Evidence 407, "evidence of [the measure] is not admissible to prove:  culpable conduct."  Fed. R. Evid. 407.  *Cf. Leon v. County of San Diego*, 202 F.R.D. 631, 637 (S.D. Cal. 2001) (suggesting, in the discovery context, that the policy interests behind FRE 407 are implicated in the context of a medical peer review designed specifically to investigate an inmate's death).  Moreover, evidence of the Sentinel Event Report is irrelevant, as it has nothing to do with any policies or actions that could have been the cause of Mr. Green's injuries.  Nor would the Report be relevant for Plaintiffs' "ratification" theory, because, as is discussed below, the Sentinel Event Report is not meant to be punitive.  The Sentinel Event Report is directed at improving the quality of Corizon's medical services, and thus it, necessarily,

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 5

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S  A T  L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

could not serve as the corporate ratification that Plaintiffs claim.

But even if evidence of the Sentinel Event Report is admissible, how have Plaintiffs proved that Corizon did "d[id] nothing" to take corrective action following Mr. Green's injuries?  They assert that *Corizon* has been unable to produce evidence to the contrary, by noting, for instance, that Corizon "has not been able to produce any documents regarding follow-up or implementation of the Corrective Action Plan" and that "[t]here is nothing in White's deposition that suggests any such [remedial] training occurred."  (Opp. Br. at 31.)  In other words, they seem to claim it is Corizon's responsibility to provide affirmative evidence of Plaintiffs' claims.  Plaintiffs seem to have forgotten that they, not Corizon, have the burden of putting forward affirmative evidence of their claims.  But more importantly, corrective actions in fact have been taken.  For instance, Dr. Montoya counseled PA White regarding the incident, and c-collars and a backboard have been purchased.  (Supp. Daigle Decl. ¶ 3, Ex. 1 (J. Montoya Tr. at 62:3 – 67:21) and ¶ 4, Ex. 2 (G. Balcom Tr. at 84: 15-22.))  Plaintiffs have put forward no evidence to draw an opposite inference, other than to simply ask the Court to speculate.  And finally, Plaintiffs' contention that the Sentinel Event Report resulted in no punishment or reprimand of PA White or Vicki Thomas is irrelevant, because the Sentinel Event Report is not meant to be punitive.  (Declaration of Rebekah M. Haggard, M.D. in Support of Reply Brief ¶ 3, Ex. 1 (Sentinel Event Review, Introduction and Rationale at CORIZON000723 ("The goal of the sentinel event process is ***NOT*** to assign blame or take punitive measures against human error.  This is not to be construed as a lack of accountability.  Disciplinary measures may be taken in cases of willful, conscious disregard for policies and procedures and reckless behavioral choices."))

And finally, Plaintiffs point to a number of lawsuits brought against Corizon in other jurisdictions as proof of some underlying corporate culture at Corizon favoring

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 6

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

1238.038-01158577; 2

profits over patients.  (Opp. Br. at 34-39.)  This entire section of Plaintiffs' brief is
irrelevant, because the issue is not what was happening at *other facilities*, but what
happened at *Lane County*.  Plaintiffs have not, and cannot, point to any evidence that
PA White, nurse Sharon Epperson ("RN Epperson"), mental health specialist
Jacob Pleich ("Mr. Pleich"), or Ms. Thomas had any knowledge or any involvement in
any of the incidents mentioned in those other lawsuits.  In other words, for these other
lawsuits to be relevant, Plaintiffs would have to demonstrate that the decision makers in
this instance, i.e., PA White, RN Epperson, Ms. Thomas, or Jacob Pleich, were
somehow influenced or otherwise connected with those other lawsuits.  But Plaintiffs
have not even attempted that.  More importantly, Corizon's policies, particularly its
billing practices in relation to hospital visits, varies based on the policies and needs of a
given jail.  (*See, e.g.,* Supp. Daigle Decl. ¶ 5, Ex. 3 (V. Thomas Tr. at 94-96 (describing
the timing of the screening that occurs at Washington County Jail and how it differs from
the practice at Lane County Jail.))  And Plaintiffs have not drawn any connection
between the practices implicated in those other lawsuits and the practices allegedly
implicated in this one.  Thus, these other lawsuits are necessarily irrelevant to what may
or may not have happened at Lane County Jail in connection with Mr. Green.

### 2. <u>Even if a "delay-hospitalization-in-order-to-save-costs" policy existed, there is no credible evidence that such a policy was the moving force behind Mr. Green's treatment.</u>

Plaintiffs claim it is irrelevant whether such a "delay-hospitalization-in-order-to-
save costs" policy actually existed, because PA White and Ms. Thomas – the two
Corizon employees who supposedly made the decision to delay Mr. Green's transport
to the hospital – subjectively believed that Corizon would cover the costs of Mr. Green's
hospital visit.  (Opp. Br. at 52-53.)  But again, even making all inferences in favor of
Plaintiffs, the evidence is that such a policy could not have been the moving force here,
as a matter of fact.

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 7

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Consider the following:

As an initial point, undercutting Plaintiffs' entire premise is the fact that PA White *did* request Mr. Green's transportation to the hospital.  The video recording of Mr. Green's jail cell in the segregation unit of Lane County Jail records a visit from PA White at approximately 3:41 PM (after being alerted that Mr. Green was still in the jail and not at the hospital), in which she states that Mr. Green "needs to go" to the hospital, and that she was "under the impression he was going to be released within an hour or two."  (*See* Sealed Declaration of James M. Daigle in support of the Motion for Summary Judgment by Corizon Defendants ("Daigle Sealed Decl."), Dkt. No. 74 ¶ 6. Ex. 39 (at time entry 3:42:50 – 3:43:05.))  Try as they might, Plaintiffs cannot refute this evidence.  PA White is recorded, pre-dispute, as confirming exactly what she has testified to now – i.e., that she had the understanding that Mr. Green was going to be taken to the hospital shortly after his injuries.  Thus, we are left with undisputed evidence that PA White ordered (or at least subjectively believed she had) a hospital visit as an extra precaution – despite her subjective diagnosis that there was no cervical injury.  This is not deliberate indifference.

But more to the point, Plaintiffs attempt to create a dispute of fact on this point by claiming that PA White testified that she was of the opinion that if she sent Mr. Green to the hospital before he was discharged from jail, Corizon would have to pay the bill. (Opp. Br. at 52-53 ("[PA White] testified that she thought Corizon would have to pay the bill, because Mr. Green had been admitted to the jail."))  Thus, regardless whether Corizon would have actually had to pay the bill for Mr. Green (as Corizon has pointed out that the City, not Corizon, would have been responsible for Mr. Green's bill in any event), it doesn't matter because the primary decision makers – PA White and Ms. Thomas – *believed* it existed.  But this contention both misstates the record and ignores the bigger picture.  As an initial point, Plaintiffs offer no evidence that

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 8

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Ms. Thomas believed this was the case, other than to rely on their evidence of a generally corrupt culture within Corizon (discussed above).[3] As for PA White, she testified, in response to questions from Plaintiffs' counsel, that she did not know whether Mr. Green's release would shift costs away from Corizon.  (Declaration of James M. Daigle filed in support of Motion for Summary Judgment, Dkt. No. 76 ("Daigle Decl.") ¶ 12, Ex. 20 (K. White Tr. 95:11 – 96:19 ("Q. So then you wrote "Patient to be released." Why was he going to be released? . . . . Q.  Is that so Corizon wouldn't – or the jail wouldn't have to pay for [Mr. Green's] medical care?  A. I don't have any knowledge as to why he was being released.  I don't know if it was his charges.  I don't have any – I don't have any – I don't know if it was determined before the incident.  I don't have any knowledge of that as to why."))  And as to PA White's supposed "admission" that she thought Corizon would be paying for Mr. Green's hospital visit, the record merits a closer look.  Plaintiffs' counsel asked PA White:  "Were you aware when you started work for Corizon that if a jail inmate is sent to hospital that Corizon had to pay the hospital bill?"  To which PA White responded:  "I think I knew that, yeah."  (Supp. Daigle Decl. ¶ 6, Ex. 4 (K. White Tr. 64 – 65.))  Corizon's counsel objected to this question on the record, because the question: (1) assumes facts not in evidence, and (2) assumes incorrect facts (because in fact Corizon does not always cover the bill when a jail inmate is sent to the hospital, such as was the case here).  On this basis, Corizon re-states its objection to the admissibility of this evidence and, pursuant to Local Rule 56 – 1(b), requests the Court strike it.  But even if the statement is deemed admissible, PA White's statement is hardly the unequivocal admission Plaintiffs would have the Court believe it is.  PA White says she "think[s] [she] knew that," in response to a question that was

---

[3] Nor could they.  As Ms. Thomas testified that she wasn't "sure" whether it mattered whether Mr. Green was released or not.  (Supp. Daigle Decl. ¶ 5, Ex. 3 (V. Thomas Tr. at 115:7-16.))

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 9

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

factually inaccurate.

Furthermore, Plaintiffs have not disputed that when the County summoned Mr. Pleich to examine Mr. Pleich, the County requested he fill out a "director's hold." (*See* Opening Br. at 18.)  A "director's hold" is the process whereby the County requests a mental health worker authorize the County to release a detainee, but because the detainee is suicidal or mentally unstable and thus a threat to him/herself or the community, that detainee is required to first be released to a mental hospital for further evaluation.  (*Id.*)  In Mr. Pleich's own words:  "I was told [by the County], 'We need to do a director's hold to get this guy out of here.'"  (Supp. Daigle Decl. ¶ 7, Ex. 5 (J. Pleich Tr. at 129:25 – 130:3.))  But whether the County had decided to delay Mr. Green's hospital transport in order to first obtain a director's hold proves two things:  (1) Corizon in fact requested transportation to the hospital (otherwise, why would the County be working on a medical release?) and (2) the timing of that release was in the hands of the County, not Corizon.  (*See also* Supp. Daigle Decl. ¶ 4, Ex. 2 (G. Balcom Tr. at 49: 9-12 ("Q. So it is up to the discretion of the sheriff's office as to whether or not to release the inmate?  A. Yes."))

But here is the best part:  Even if none of the foregoing was true, PA White ultimately ordered Mr. Green's transport to the hospital *before his release from the jail* – as confirmed by the video recording of PA White in Mr. Green's cell at approximately 3:40 PM!  And yet, Mr. Green was not released from custody until *after* he had arrived at the hospital.  (Supp. Daigle Decl. ¶ 8, Ex. 6 (K. Green Tr. at 146.), and ¶ 9, Ex. 7 (R. Ralph Tr. at 52-57, and Depo. Ex. 74.))  Thus, even if the financial responsibility alleged by Plaintiffs existed, and even if PA White and Ms. Thomas were aware of it, they ultimately ignored it.  Which is to say, that the alleged "profit motive" was, as a matter of

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 10

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

fact, *not* the moving force behind Mr. Green's injuries.[4]

Nor is Plaintiffs' theory – i.e., that PA White and/or Ms. Thomas delayed Mr. Green's hospital visit in order to save Corizon costs – at all plausible. Plaintiffs have alleged that Ms. Thomas (a nurse) and PA White have both compromised their professional integrity in order to possibly save some hospital costs. This despite the fact that such hospital costs pale in comparison to the litigation costs associated with improperly denying necessary medical care. This despite the fact that neither PA White nor Ms. Thomas participate in any profit-sharing plan at Corizon or are otherwise financially compensated based on the number of individuals they do or do not send to the hospital. And this despite the fact that, in the end, PA White ultimately sent Mr. Green to the hospital before he was released. Plaintiffs have an obligation to not only put forth "disputed" facts, but to also put forth plausible facts – something they cannot do on this point. *See, e.g., Morrow v. Bard Access Sys*., 833 F. Supp. 2d 1246, 1249-50 (D. Or. 2011).

**B.    Plaintiffs have proffered no credible evidence in support of their claim that PA White deceptively covered up her "misdeeds."**

Likely in recognition of the foregoing, and perhaps in recognition that there is at least some objective evidence supporting PA White's diagnosis and recommendation (which would destroy a claim of deliberate indifference), Plaintiffs have sought to demonstrate PA White's deliberate indifference by showing that she has both falsified

---

[4] Indeed, it is worth pointing out yet another inconsistency with Plaintiffs' theory. Plaintiffs concede that Dr. Montoya was never contacted by either PA White or Ms. Thomas prior to Mr. Green's transportation to the hospital. But requiring the approval of a physician before hospitalizing an inmate is the exact type of barrier that Plaintiffs claim Corizon artificially constructed in order to save costs. (Opp. Br. at 32-39.) And yet, here, Corizon evidently ignored that policy in order to expedite Mr. Green's transportation to the hospital. So where is the deliberate indifference?

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 11

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

important medical documents post-injury and has now been committing perjury all throughout this action.  This is perhaps the most far-fetched and implausible layer in Plaintiffs' house of cards.

In support of their theory, Plaintiffs identify three things:  (1) the absence of Nurse Smith's Emergency Room Referral Form in the Corizon medical chart; (2) the absence of a note prepared by RN Epperson in Mr. Green's chart; and (3) the presence of an allegedly backdated entry in Mr. Green's chart.  (Opp. Br. at 25-26.)  Even a cursory review of each of these three items demonstrates the complete absurdity of Plaintiffs' theory.

First, the absence of a note prepared by RN Epperson in Mr. Green's chart is meaningless and actually undercuts Plaintiffs' theory.  Plaintiffs suggest that there is evidence that PA White removed RN Epperson's note from the medical chart in order to hide evidence about her misdeeds.  (Opp. Br. at 25-26.)  But Plaintiffs have also alleged that RN Epperson was in on the scheme – i.e., that she, along with PA White, Ms. Thomas, and Mr. Pleich, were deliberately indifferent to the medical needs of Mr. Green.  So in one breath, Plaintiffs would have the trier of fact believe that RN Epperson wrote something potentially damning of PA White, while in the next breath, Plaintiffs would have the trier of fact believe that RN Epperson was deliberately indifferent to Mr. Green in the same manner as PA White.  This is particularly incredible where, as here, RN Epperson prepared the note the day *after* Mr. Green's attempted suicide.  (Supp. Daigle Decl. ¶ 11, Ex. 9 (S. Epperson Tr. at 85:1 – 86:13.))  If RN Epperson was deliberately indifferent to Mr. Green on February 12, 2013, why then would she prepare a chart note indicting PA White the day after the incident, which would in turn also indict her?  Plaintiffs' theory on this point is logically inconsistent.  The more likely explanation is that the note simply fell off the chart, or she is mistaken that she even wrote one.

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 12

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Second, PA White's late entry of her chart note is a near verbatim description of the real time, pre-dispute video recording of her contact with Mr. Green in his cell. Plaintiffs claim there is evidence that PA White backdated one of her chart notes to cover up her "misdeeds."  But even if that were true, what did PA White's "backdated" entry state?  "Head Trauma – suture repairs.  No evidence of cerebral hemorrhage. Diminishing sensation and strength is concerning for possible cervical injury.  Will send to ER for further eval."  (Supp. Daigle Decl. ¶ 6, Ex. 4 (K. White Tr. at 82, Depo. Ex. 48 at 4.)  Corizon invites the Court to watch minutes of 3:42:50 – 3:43:05 of the video tape of Mr. Green's cell, (Daigle Sealed Decl., Dkt. No. 74, ¶ 6 Ex. 39 (at time entry 3:42:50 – 3:43:05)), and compare that with the allegedly "backdated" chart (Supp. Daigle Decl. ¶ 6, Ex. 4, (K. White Tr. at 82, Depo. Ex. 48 at CORIZON000044) – as the recording of PA White's visit confirms everything written in the medical chart – backdated or not.  So if PA White was really intending to doctor the documents to cover up her "misdeeds," she did a shoddy job, as the real time video recording corroborates her "backdated" entry nearly verbatim.

And finally, the suggestion that PA White switched out the Emergency Room Referral forms is nonsensical, as Nurse Smiths' form does not incriminate or contradict PA White's form.  Again, Corizon invites the Court to compare the allegedly doctored form filled out by PA White[5] and Nurse Smith's "more accurate" form[6], to see for itself the meaningless differences between the two.  The latter is very short, describing a loss of bowel control, a "self-inflicted head injury" and self-reported paralysis.  The former provides more detail and notes that the patient (in the afternoon) was reporting loss of sensation and movement and thus he was sent to the ER – again, all facts confirmed by

---

[5] *See* Supp. Daigle Decl. ¶ 6, Ex. 4 (K. White Tr. at 147, Depo. Ex. 57.)

[6] *See* Supp. Daigle Decl. ¶ 12, Ex. 10 (L. Smith Tr. at 29-30, Depo. Ex. 125.)

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 13

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

the video recording of PA White's visit to Mr. Green.  So again, PA White was either telling the truth in the medical chart or is simply incredibly incompetent at lying.

Plaintiffs' cover-up theory is not a genuine fact – it is a genuine red-herring.

### C.    Plaintiffs have offered no credible evidence that any of the other Corizon defendants acted with deliberate indifference.

As the Court well knows, Plaintiffs' claims do not stop with PA White and Ms. Thomas.  Indeed, Plaintiffs claim that almost every Corizon employee on duty that day (and others not on duty, Drs. Carl Keldie and Justin Montoya) acted with deliberate indifference.[7]  But all of those individuals either (1) had less medical training than PA White (i.e., Mr. Pleich and RN Epperson) or (2) were not involved in the events of the day and thus had to rely on PA White's medical diagnosis (i.e., Drs. Keldie and Montoya).  And therefore, Plaintiffs have to show that these individuals exhibited deliberate indifference, despite a lack of medical expertise or knowledge greater than PA White (whose diagnosis could not, for the reasons above, been deliberately indifferent or the cause of Mr. Green's injuries).  This is a burden Plaintiffs cannot meet.

It is first important to note the corner that Plaintiffs have painted themselves into. In their opposition brief, Plaintiffs devote tremendous real estate to describing the actions of the Corizon defendants "failing" to treat Mr. Green's injuries as a neck injury, noting, for instance, decisions to not use c-collars or immobilize Mr. Green's neck. (*See, e.g.,* Opp. Br. at 14 ("Lane County deputies Davis, Dodds and Rahm all recall that

---

[7] And yes, the Corizon defendants readily acknowledge that they relegated their argument that Corizon has no vicarious liability for the acts of its employees under section 1983 to a footnote (*see* Opp. Br. at 63), because not only was the Ninth Circuit clear on that point (*see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, (9th Cir. 2012), but so too has virtually every other lower federal court to address the issue.  *See* 1A Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses, § 6.04[E] (4th ed. 2014) (a nearly three page string cite outlining all the authority for the proposition that "[l]ower federal courts have consistently ruled that private parties who act under color of state law may not be held liable on the basis of respondeat superior.").

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 14

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

White was asked whether Mr. Green should be taken to the hospital, and that White said it was not necessary"); *id.* at 14-15 ("No Corizon medical person told the Lane County deputies to take any precautions with Mr. Green's neck."); *id.* at 17-18 ("Epperson testified that she did not believe that Mr. Green needed to go to the hospital, because she believed that he was faking his injuries and his head laceration had been repaired.")  Yet, every undisputed fact outlined by Plaintiffs in this regard simply confirms that PA White and all the other subordinate Corizon employees were acting consistent with a diagnosis that there was no cervical injury (only a head wound).  So how is declining to treat Mr. Green's injuries as a cervical injury (by, for instance, not immobilizing Mr. Green's neck or using a c-collar), when the senior medical official's diagnosis was that there was no cervical injury, proof of deliberate indifference?[8] According to Plaintiffs, therefore, either:  (1) every Corizon employee was simply acting consistent with the diagnosis and decisions made by their superior (in which case Plaintiffs seem to suggest that the only way for these employees to avoid liability would have been to contravene PA White's orders); or (2) every Corizon employee interacting with Mr. Green each independently came to the subjective belief that there was a substantial risk of cervical injury but nonetheless disregarded that risk.

As to the first option, acting consistent with a superior's diagnosis is not deliberate indifference.  Otherwise, how is an individual with less medical training ever supposed to escape liability?  In Plaintiffs' view of the world, any Corizon employee accepting PA White's diagnosis was literally in a "no win" situation.

And as for the second option, consider the following:

---

[8] This question is particularly informative considering Plaintiffs' voluntary dismissal of the individual County deputies, who, Plaintiffs have claimed, were simply relying on Corizon's medical assessments when they treated him as they did.  (*See, e.g.,* Opp. Br. at 19.)  In other words, why, according to Plaintiffs, do the County deputies get a "pass" for relying on PA White's diagnosis when the other Corizon employees do not?

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 15

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

### 1.    Regarding Mr. Pleich:

As to Mr. Pleich, Plaintiffs' "undisputed" facts are all over the place.  Plaintiffs do not dispute that Mr. Pleich is not medically trained, yet they nonetheless suggest that his allegedly improper diagnoses of Mr. Green were deliberately indifferent.  But how could a trier of fact find Mr. Pleich deliberately indifferent as a result of his "diagnoses" of Mr. Green when Plaintiffs also concede that Mr. Pleich was not medically trained and therefore could offer no medical diagnoses of Mr. Green?

In another example, Plaintiffs claim, in one breath, that Mr. Pleich was deliberately indifferent to the medical needs of Mr. Green.  Yet, in the next breath, Plaintiffs note that Mr. Pleich believed that mental health staffing was inadequate and that he requested more staffing and resources at the jail.  (Opp. Br. at 8-9.)

Finally, the video recording of Mr. Green's jail cell – contrary to Plaintiffs' claim that this "could be shown to a law school class to demonstrate the principle of deliberate indifference" (Opp. Br. at 63) – shows Mr. Pleich laying a blanket on Mr. Green, after nobody from the County (who was actually monitoring Mr. Green) had done so for several hours.  (Daigle Sealed Decl., Dkt. No. 74, ¶ 6, Ex. 39 (at time entry 2:28 – 2:33:45.))  Yet, Mr. Pleich was deliberately indifferent?

### 2.    Regarding RN Epperson:

Plaintiff's "undisputed" facts concerning RN Epperson are similarly all over the place.  Plaintiffs concede that PA White, and not RN Epperson, performed the assessment of Mr. Green in the courtroom.  (Opp. Br. at 12-14.)  And the first time RN Epperson did independently assess Mr. Green was at approximately 3:55 PM, at which point RN Epperson and Leah Smith almost immediately elevated the issue to somebody with more training them themselves – PA White.  (Opp. Br. at 21-22.)  So what more, according to Plaintiffs, was RN Epperson to do?  If we are to believe Plaintiffs' theory, there was literally no way for RN Epperson to avoid liability.  And

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Plaintiffs have proffered no evidence that RN Epperson had a subjective belief that a more significant problem existed.

Plaintiffs also claim there is evidence that PA White lied about conducting a neurological exam of Mr. Green in the courtroom (Opp. Br. at 13-14), yet Plaintiffs then rely on testimony from RN Epperson to reach that conclusion. (*Id.* at 13.) Again, why would RN Epperson indict PA White's conduct in the courtroom, when to do so would also indict RN Epperson? Wouldn't she have more motive to corroborate PA White's version of events? Of course, the only plausible explanation is that, whatever communication errors or mistakes in judgments that may or may not have been made, RN Epperson was never consciously disregarding any risks to Mr. Green's life.

Plaintiffs' claim that RN Epperson was the individual who took two calls from Deputy Burnette on February 12, 2013, is similarly without support. (Opp. Br. at 20.) Plaintiffs seem to think that the absence of any direct evidence on this point should somehow default to judgment in their favor. Not so. It is Plaintiffs' burden to prove that such calls in fact took place and to whom such calls were made. But there is no reliable evidence that RN Epperson had anything to do with those calls, and she has unequivocally denied receiving them. (Daigle Decl., Dkt. No. 75, ¶ 17, Ex. 25 (S. Epperson Tr. 132:6 – 16.)) Deputy Burnette testified only that he "thought" he was talking to a nurse, based "just" on the number that he called, and that the nurse was female. (Supp. Daigle Decl. ¶ 10, Ex. 8 (D. Burnette Tr. at 91:8 - 92:9.)) But again, Plaintiffs claim that RN Epperson was more than willing to post incriminating notes on Mr. Green's medical chart and contradict PA White's testimony that she performed a neurological exam. So there is no reason, according to Plaintiffs' view of the world, for RN Epperson to deny receiving those phone calls now. And as to Plaintiffs' claim that it was improper for the unnamed Corizon employee to limit her questions to confirming that Mr. Green was still breathing, the unnamed individual would not have been aware

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 17

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

1238.038-01158577; 2

of Mr. Green's injuries, and thus, the query whether Mr. Green was still breathing, is not the callous response Plaintiffs claim it to be.[9]

### D. **Nor is there any evidence that, as soon as PA White concluded there was a chance of cervical injury, any of the Corizon employees acted with deliberate indifference.**

Again, Plaintiffs concede that the Corizon employees all acted consistent with a diagnosis that Mr. Green had not suffered a cervical injury.  They may now claim that such a diagnosis was incorrect, but acting in accordance with a medical superior's diagnosis is hardly a basis for deliberate indifference.  *See Wilhelm v. Rotman*, 680 F.3d 1113 (9th Cir. 2012) (finding that even acting in accordance with a subjective, albeit unreasonably incorrect, diagnosis does not make a doctor deliberately indifferent).

But what about how the Corizon defendants acted *after* learning that there was a risk of cervical injury?  According to Plaintiffs' theory, the Corizon defendants would have, even after learning of such a risk, disregarded it nonetheless.  Otherwise, their behavior would necessarily not have risen to the level of deliberate indifference.

Again, there is irrefutable video evidence of PA White first coming to the conclusion that there was a possibility of cervical injury at roughly 3:40 PM on February 12, 2013 when she was alerted that Mr. Green was still in the MOU unit.  So it is worth examining how the Corizon defendants responded to Mr. Green's injuries at that point.

First, PA White stated "he needs to go [to the hospital]," which she said in the

---

[9] In truth, Plaintiffs' allegations on these points reveal something about their motives. Plaintiffs have dismissed Guy Balcom, Rob Dotson, and Donald Burnette (the primary three County employees that interacted with Mr. Green) from their complaint.  Yet, if it was so callous for RN Epperson or some other unnamed Corizon employee to ask whether Mr. Green is breathing, why wasn't it similarly callous for Deputy Burnette to not do more to help Mr. Green?  If RN Epperson did receive those calls and was deliberately indifferent, why does she go to his cell later that afternoon (as recorded on the videotape of Mr. Green's cell)?

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 18

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

presence of the County deputies in charge of arranging Mr. Green's transportation. (Daigle Sealed Decl., Dkt No. 74 ¶ 6 Ex. 39 (at time entry 3:42:50 – 3:43:05.))  Whether the County deputies subsequently failed to timely act on those orders has no bearing on whether PA White was deliberately indifferent.

Second, Mr. Green had not yet been released by the time PA White confirmed that he was to go to the hospital, thus contradicting Plaintiffs' theory that PA White was delaying his transportation to the hospital in order to avoid Corizon having to pay his hospital bill.

Third, in Plaintiffs' words, "Epperson and Thomas spent fifteen minutes cleaning up Mr. Green."  (Opp. Br. at 23.)  It is not at all clear how spending fifteen minutes cleaning up a patient is proof of deliberate indifference.  But of course, in any event, this was after the County deputies had spent over four hours with knowledge that Mr. Green had soiled himself while making no effort to clean it up themselves.  Yet, it was somehow RN Epperson and Ms. Thomas that were deliberately indifferent, according to Plaintiffs.

Fourth, Plaintiffs state that "Thomas testified that Mr. Green's medical situation was an emergency because 'there was too much time between the incident and when I found him in the cell.  No one had looked at him.  There had been no x-rays, no scans, no neurology consult, no orthopedic consult.  Nothing.'"  (Opp. Br. at 23.)  In other words, Plaintiffs concede that Ms. Thomas was both concerned and upset about the situation and that he had not been taken the hospital as she had thought.  Yet, how could one with such concerns have also simultaneously been acting with deliberate indifference?

And finally, it bears mentioning that Mr. Pleich and Drs. Keldie and Montoya were not even present or aware of these developments, and thus could not have been implicated in them in any event.

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 19

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

1238.038-01158577; 2

So what have Plaintiffs identified as evidence of the Corizon defendants' deliberate indifference after PA White's diagnosis?

First, Plaintiffs state that four minutes after PA White ordered Mr. Green to be taken to the hospital, she "clocked out of the jail." (Opp. Br. at 23.) So what? PA White gave her orders in the presence of nurses and county deputies, any of whom could have fulfilled the execution of her order. And PA White is, obviously, not an ambulance driver. So it is not clear how PA White's continued presence at the jail would have facilitated a faster transport to the hospital, when it was the County, not PA White, who was making those transportation arrangements.[10] Furthermore, there is no evidence that there was anything Corizon staff could do at that point.

Second, Plaintiffs contend that when RN Epperson and Ms. Thomas cleaned Mr. Green, "[n]o head or neck precautions were taken." (Opp. Br. at 23.) This is misleading. The two placed a soft collar (the best tool they had available for immobilizing his neck) on Mr. Green and remove it only when necessary to turn Mr. Green over to clean his backside, at which point they are heard informing Mr. Green of the need to immobilize his neck. Corizon invites the Court to watch the clip for itself. (Declaration of John Devlin in support of Opposition to Motion for Summary Judgment, Dkt. No. 91, Ex. 71 (video clip #19))

And finally, Plaintiffs point to the actual timing of Mr. Green's eventual transport to the hospital as evidence of Corizon's deliberate indifference. (Opp. Br. at 23-24.) But making and expediting those arrangements was the County's responsibility. Plaintiffs do not dispute that point. Nor do Plaintiffs proffer any evidence that any Corizon employee knew what the deputies said to the emergency response team (i.e.,

---

[10] For the record, Corizon disputes that PA White clocked out at that time, but for purposes of the summary judgment motion, it will assume Plaintiffs' evidence is correct on that point.

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 20

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

whether they ordered a Code 1 or Code 3).  And so it unclear how Plaintiffs' argument on this point is proof at all of Corizon deliberate indifference.

E.    **So what is the sum total of the evidence that Plaintiffs have proferred?**

Plaintiffs' laundry list of "disputed" facts amounts to very little.  At most, Plaintiffs have put forth evidence that PA White and possibly others missed the call in their judgment in the courtroom on February 12, 2013.  But what evidence is there that any of the Corizon defendants ever subjectively thought Mr. Green had a cervical injury but knowingly failed to act on that subjective opinion?  There is none.  There is no credible evidence linking Corizon's financial policies to Mr. Green's treatment.  Nor is there any credible evidence that Corizon has willfully declined to take the situation seriously.  To the contrary, Plaintiffs' own version of the "undisputed" facts demonstrates that on February 12, 2013 every Corizon employee coming in contact with Mr. Green treated him consistent with their subjective belief during each phase of his stay in the County jail, and they acted compassionately.  This does not add up to deliberate indifference.

II.    **The Pre-Injury Claims:  Plaintiffs' claims fail because Plaintiffs have been unable to show that any Corizon policy or practice was implicated.**

For the reasons provided in its opening brief, the Corizon defendants again urge the Court to dismiss all of the Pre-Injury Claims, for two simple reasons:  (1) The County did not request any screening of Mr. Green at his booking, *per the County's own policy or practice*; and (2) Even if it had, the lack of mental health screening was not the "moving force" behind Mr. Green's injuries.

In their opposition, however, Plaintiffs argue the Pre-Trial Claims are improper for dismissal on summary judgment because:  (1) Corizon is a "co-owner" of the County's policy of not providing a screening until the time a detainee is housed (Opp. Br. at 40-41); (2) Corizon had a responsibility to train the County employees on how to conduct mental health screenings (*id.* at 42-46); and (3) on the basis of a lone conclusory

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 21

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

1238.038-01158577; 2

declaration, "[Mr. Green] would not have attempted to injure himself," had he received "appropriate care." (*id.* at 48.)  It is worth addressing each point, to clarify the record and law.

First, Plaintiffs do not dispute that the County, not Corizon, requested an arrangement, wherein Corizon would provide health screenings either at the request of the booking County deputy or prior to a detainee's housing, and that Mr. Green had not been housed prior to his arraignment on February 12, 2013 (thereby not triggering Corizon's duty under the contract with the County).[11]  Instead, Plaintiffs sidestep the argument by claiming that Corizon "co-owned" this policy with the County and cannot escape liability from it now.  (Opp. Br. at 41.)  Lieutenant Larry Brown was the County official in charge of administering the contract with Corizon – a fact conceded by Plaintiffs (Opp. Br. at 26) – and he repeatedly made clear that the County preferred and requested the arrangement Corizon provided for the County.  (Daigle Decl. Dkt. No. 76, ¶ 7, Ex. 15 (L. Brown Tr. 97:17-98:1 ("Q. Was it your expectation under the contract that Corizon would screen all inmates at the time of booking?  A. No. Q. Was it your

---

[11] Plaintiffs make a half-hearted attempt to introduce a factual dispute on this point by pointing to Lane County's bald assertion in its proposed, unverified Amended Answer (which Corizon has opposed in any event) that Corizon co-owned the policy with the County (while entirely ignoring all the undisputed evidence put forward in Corizon's motion for summary judgment on the point).  This is not genuine evidence.  *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1029-30 (9th Cir. 2008) ("[A] non-moving plaintiff cannot 'rest upon the mere allegations or denials of the adverse party's pleading' but must instead produce evidence that 'set[s] forth specific facts showing that there is a genuine issue for trial.'" (citation omitted)).  And Plaintiffs' citation to a portion of Keri Nelson's (the booking deputy) deposition transcript that a record of each incoming inmate was immediately sent to Corizon is incredible and irrelevant.  (Opp. Br. at 40-41.)  As an initial matter, no foundation was laid for how or whether Deputy Nelson knew that somebody from Corizon was actually receiving such intake forms or what the process of reviewing those intake forms was.  But more importantly, Deputy Nelson testified, as every other witness to testify on the matter did, that Corizon was not to perform a mental health screening unless specifically requested by a booking deputy (which Deputy Nelson admits she did not do) or prior to housing.  (Supp. Daigle Decl. ¶ 13, Ex. 11 (K. Nelson Tr. at 58:18 – 59:24.))

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 22

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

understanding under the contract that Corizon would screen medically all inmates prior to housing?  A. That's what we were going for, yes."); L. Brown Tr. 98:3-99:9; 106:22-112:10; ¶ 8, Ex. 16.)

Indeed, it is difficult to conclude that Plaintiffs' argument on this point is anything but disingenuous.  Prior to its contract with Corizon, the County was performing zero screenings prior to housing and relying entirely on the experience and skills of its own employees to assess the risks of the detainees.  (Daigle Decl., Dkt. No. 76, ¶ 7, Ex. 15 (L. Brown Tr. 96:9 – 12 ("Q. Before Corizon had the contract, was Lane County providing medical screening before housing an inmate?  A. No, we were not."))  Yet now that Corizon is providing screenings in *every* instance prior to an inmate's housing, while necessarily deferring to the County (as the ultimate governmental entity in charge of administering its jails) to provide timely notice that an individual is ready to be screened.  Plaintiffs claim that this is deliberate indifference.  *See Hicks v. Frey*, 992 F.2d 1450, 1458-59 (6th Cir. 1993) (private entity not liable when the private entity is acting under color of state law and when the state has not delegated final decision-making authority to the private entity).

Second, as to Plaintiffs' argument that Corizon should have trained the County officials on how to perform their screenings, the County has made clear that it provided its *own* training on suicide prevention and mental health screening.  Lieutenant Brown even clarified that the County purposefully did not "place[] the burden of [suicide prevention training] on Corizon … because we [the County] have an internal one at this particular time."  (Daigle Decl., Dkt. No. 76, ¶ 8, Ex. 16 (G. Balcom Tr. 12:18-25 ("Q. Who is responsible to see that a booking officer has training in mental health and suicide issues?  A. The training department.  Q. Is that part of the sheriff's office?  A. Yes.  Q. Does it have anything to do with Corizon?  A. No.")  In fact, the County affirmatively declined to have Corizon provide additional training on this point.  (Daigle

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 23

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

Decl., Dkt. No. 76, ¶ 7, Ex. 15 (Brown Tr. 85:8-86:2 ("Q.  So why if the contract required

Corizon to provide annual training on suicide prevention, why hasn't the County insisted

on that?  A. I think because at this particular time we have a training program that is

available to our staff on suicide prevention, and following our policies and how to do it

and how to use the restraint chair.  We do have training on that.  And the reason why

we haven't placed that burden on Corizon is because we have an internal one at this

particular time.")))

    And finally, Plaintiffs seem to all but ignore the "moving force" requirement of

their Pre-Injury Claims, offering only a conclusory declaration that "[w]ith appropriate

care, [Mr. Green] would not have attempted to injure himself."  (Opp. Br. at 48.)  But this

conclusion is completely meaningless in the vacuum Plaintiffs offer it.  How could the

screening have prevented Mr. Green's injuries?  As detailed in the opening brief,

Mr. Green's behavior did not justify restraints.  And Mr. Green had been in the jail

roughly one month prior to his February 11, 2013 arrest and *had* received a mental

health screening, which, despite Mr. Green suffering from the same mental illness at

that time, did not result in Mr. Green being taken to the hospital, being sedated, or being

treated in any way contrary to how he was subsequently treated on February 11.

(Daigle Sealed Decl., Dkt. No. 74, ¶ 5, Ex. 10 (Portion of Corizon's medical file for

Mr. Green)).  Thus, the bald assertion that Mr. Green's injuries could have been

prevented is devoid of any significance and presents no "genuine" facts.

## III.    Conclusion

    The Corizon defendants restate their request that the Court dismiss all of the

Pre-Injury claims (federal and state) and all of the section 1983 claims.  The Corizon

defendants are not seeking dismissal of Plaintiffs' other state law claims (of negligence

and gross negligence).  And so any suggestions by Plaintiffs that this case deserves its

"day in court" are both irrelevant and also incorrect.  But more importantly, as for the

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 24

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR 97201-5047
(503) 221-0699
FAX (503) 223-5706

section 1983 claims, these require much more than mere negligence.  They require knowing constitutional violations.  And Plaintiffs' evidence simply cannot pass muster.

DATED this 10th day of March, 2015.

STEWART SOKOL & LARKIN LLC

By: */s/ James M. Daigle*
      James M. Daigle, OSB #942843
      jmdaigle@lawssl.com
      *Attorneys for Defendants Corizon Health,*
      *Inc., Dr. Carl Keldie, Dr. Justin Montoya,*
      *Vicki Thomas, Kirstin White, Jacob*
      *Pleich, and Sharon Epperson*

CORIZON DEFENDANTS REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT - 25

1238.038-01158577; 2

STEWART SOKOL & LARKIN LLC
ATTORNEYS AT LAW
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **REPLY BRIEF IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT** on:

| | |
|---|---|
| Elden M. Rosenthal | Sebastian Tapia |
| Rosenthal Greene & Devlin, P.C. | Lane County Counsel |
| 121 SW Salmon Street, Suite 1090 | 125 East 8th Avenue |
| Portland, OR  97204 | Eugene, OR  97401 |
| Bar Number: OSB #722174 | Bar Number:  OSB #043761 |
| E-mail: elden@rgdpdx.com | Email:  sebastian.tapia@co.lane.or.us |

by the following indicated method or methods:

  ☑      by **E-filing** a full, true and correct copy thereof to the attorney, as shown above, at the electronic mail address reflected on the court's CM/ECF system, on the date set forth below.

DATED this 10th day of March, 2015.

STEWART SOKOL & LARKIN LLC

By: */s/ James M. Daigle*
    James M. Daigle, OSB #942843
    jmdaigle@lawssl.com
    *Attorneys for Defendants Corizon Health, Inc., Dr. Carl Keldie, Dr. Justin Montoya, Vicki Thomas, Kirstin White, Jacob Pleich, and Sharon Epperson*

CERTIFICATE OF SERVICE - 1

STEWART SOKOL & LARKIN LLC
A T T O R N E Y S   A T   L A W
2300 SW First Avenue, Suite 200
Portland, OR  97201-5047
(503) 221-0699
FAX (503) 223-5706