UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

DEREK JOHNSON, personal representative of                  6:13-cv-1855-TC
KELLY CONRAD GREEN II, deceased;
KELLY CONRAD GREEN and SANDY
PULVER,                                            ORDER

                             Plaintiffs,

          v.

CORIZON HEALTH, INC., a Tennessee
Corporation; LANE COUNTY, an Oregon
county; DR. CARL KELDIE, an individual;
DR. JUSTIN MONTOYA, an individual;
VICKI THOMAS, an individual; KIRSTIN
WHITE, an individual;; SHARON
EPPERSON (née FAGAN), an individual, and
JACOB PLEICH, an individual,

                           Defendants.

COFFIN, Magistrate Judge:

Lane County deputies booked Kelly Green into custody on February 11, 2013, when he

allegedly exhibited symptoms of sever mental illness.  Plaintiffs allege he was not examined or

medically screened.  On February 12, during a court appearance at about 10:42 a.m., Green ran

headfirst into a concrete wall fracturing his neck.  Green asserted he could not move.  Defendant

Page 1 - ORDER

Lane County and its contracted medical services provider, defendant Corizon Health, Inc. allegedly failed to perform a reasonably necessary medical examination or transport Green to a hospital. Defendants allegedly transported Green back to his cell, without taking measures to stabilize his neck or spine. Defendants left Green incontinent and unmoving in his cell until about 4:30 p.m., when he was finally transported to a hospital. Green's injuries left him a quadriplegic.

Green brought this action through a guardian ad litem alleging violation of his civil rights. After filing this action, Green passed away due to complications from his injuries and the case is now maintained by his personal representative.

Defendants Corizon, Dr. Carl Keldie, Dr. Justin Montoya, Vicki Thomas, Kirstin White, Sharon Epperson, and Jacob Pleich (the Corizon defendants) move for partial summary judgment.


BACKGROUND

The parties version of events substantially differ, but viewing the facts in a light most favorable to plaintiffs, the court, for the most part, declines to grant summary judgment.

Kelly Green suffered from paranoid schizophrenia long before his arrest. Several months prior to the arrest, Green was admitted to a mental health facility where he expressed plans to kill himself by breaking his neck. In addition, about two months prior to the arrest at issue, on December 19, 2012, Eugene police arrested Green and lodged him at Lane County Jail. Corizon conducted an "Intake Receiving and Screening" the following morning noting history of mental illness with schizophrenia, but that intake was "not complete due to [his] mental condition." Several days later, Green's grandmother called the jail and informed reception that Green is schizophrenic. During the next several days, Green was disruptive, violent, conversing out loud with himself, and engaged in

tirades.  Lane County released Green on January 10, 2013.

On February 11, 2013, after receiving calls of Green acting strangely and talking about suicide, Eugene police again arrested Green on a warrant related to the December arrest.  The arresting officer noted that Green talked about killing himself, but said he was too important to actually do it.  The officer brought Green to Lane County Jail.  The booking form indicates that Green may be suicidal and was paranoid schizophrenic.  The initial assessment form relates that Green may be bipolar/schizophrenic, that he was not making sense, was very agitated, and talks to himself.  The assessment, completed on a computer, indicates that medical was contacted.

The booking officer, Keri Nelson, noted that Green was barely able to make it through the booking process.  In addition, Nelson states that the above assessment form went immediately to medical staff (Corizon) for review.  According to Nelson, the Corizon staffed medical office is about 30 feet down the hall from booking.  According to Corizon, its policy is to have medical personnel available 24 hours a day to provide health screening including mental health screening.

Although there is deposition evidence from the Corizon defendants and County defendants that it was anticipated that County deputies would perform an initial assessment of an arrestee's physical and mental health at booking and that Corizon would screen inmates prior to "housing," the contract between Lane County and Corizon states that

> Contractor's licensed registered nurse or other appropriate personnel must perform a medical intake screening on incoming Inmates upon admission to the Jail In accordance with the established rejection criteria mutually approved by the Contractor and the County. Individuals brought into the Jail to be placed in custody who have a questionable or unstable medical condition must be medically cleared by Contractor's registered nurse, licensed mid-level professional or physician prior to booking. If the County rejects taking the individual into custody at the Jail based on Contractor's intake screening, the arresting agency will be responsible for transportation and medical clearance prior to being accepted. The Contractor will not be responsible for medical care or treatment of an incoming inmate after the County

has rejected taking the individual into custody at the Jail. The Contractor is responsible for medical care or treatment upon completion of the booking process and physical commitment of the inmate into custody of the Jail. <u>Contractor's screening must identify those individuals with medical conditions, mental disorders, inmates in need of segregation or close supervision, and those with suicidal tendencies. Contractor is responsible for screening incoming inmates into the Jail</u> and for medical care and treatment once the inmate is booked into the facility.

Personal Services Contract (attached as Exhibit 48 to the Declaration of John T. Devlin (#91-48)) at p. 2 (emphasis added). Moreover, as noted above, Nelson states that Corizon was notified that a bipolar/schizophrenic who was not making sense, was very agitated, and talking to himself was in intake.[1]

The court arraigned Green the following morning, February 13, 2013, at about 10:43 a.m. and informed Green that he would be held for a couple days. Green then ran about eight to 15 feet, lowered his head and rammed a cinder block wall. Corizon medical staff, including physician's assistant defendant Kirstin White, registered nurse defendant Sharon Epperson, and licensed practical nurse Jona Bougard, responded.

The Corizon responders were told that Green ran into the wall and cut his head. The laceration to his head was substantial and he was bleeding profusely. White asserts that she conducted a comprehensive neurological exam:

Q. .... But is the first thing that you did physically the cervical check?

A. Yes.

....

Q. After you completed the cervical check, what was the next thing that you did?

A. Started a neuro – neuro exam. I had someone put pressure on the lacerations, did a scalp check making sure I didn't feel any major, you know, skull fractures. Checked

---

[1]Corizon denies notice, but that does not negate an issue of fact as to notice.

Page 4 - ORDER

his face. Did a neuro exam.

Q. You've got to go real slow. How did you check his face?

A. Pushed around all the bony -- you know, make sure he didn't have any injuries. There was blood everywhere, and I just needed to make sure that it was coming from here. Looked in his ears to make sure there was no blood coming from his ears.
Q. How did you look into his ears?

A. With an otoscope.

Q. Did you turn his head or did you get on either side?

A. I got on either side of him.

Q. And you said a neuro exam. Explain that to me, please.

A. I went down from head to toe. You know, "Kelly, can you squeeze --" you know, I gave him two of my fingers "-- can you squeeze my fingers?" He could do it. "Kelly, can you feel this," as I'm kind of -- not pinching but -- you know, "Does this feel the same as this? Can you feel this? Kelly, can you put your hand? Pretend like you are going to give me five. Can you push against me?" He could follow all the directions. He had full strength pushing, pulling. There were no obvious -- there was no obvious trauma to any of his limbs.
    I went down -- down his legs. He could push against resistance with his feet. He could pull his toes towards his nose. I kind of tickled the back of his legs and his ankles. He could feel that. At one point I had to ask him to hold still. He wanted to put his leg up and cross it. And I said, "Mr. Green, I need you to -- you know, I need you to follow directions. I need you to put your feet down so I can examine you." He was able to move all his toes.

Q. Did you do any reflex tests?

A. Yes.

Q. Tell me what reflex tests you did.

A. I just did the deep tendon reflex on the patellar.

Q. How did you do that?

A. With my stethoscope.

Q. Explain to me exactly what you did, please.

A. Usually you have someone sitting up and having their legs dangle, but you can't always get them in that position. So I was able to lift his leg up enough, and he actually followed the direction and relaxed and I was able to get a reflex by using the bell of my stethoscope.

Q. Did you do a Babinski?

A. Yes.

....

Q. When you say in this note a few lines down, "C spine held supported during exam. Cleared by myself," what does that mean?

A. When you clear C spine, it's I've done the exam and I was pretty sure that there was no -- I was -- there was no -- he exhibited no symptoms at that time of a C spine injury.

Q. What does "pupils slightly reactive to light" mean?

A. When you shine a light in somebody's eyes, they open or close depending on whether the light is on or off them. His were a little bit slower than usual.

Q. Did you measure the opening of his pupil?

A. Did I measure it? No.

Q. In millimeters?

A. No, I did not.

Q. Did you estimate it?

A. No.

Q. What does it mean, if anything, to you that his pupils were slightly reactive to light?

A. They were just sluggish, just slower. Some people have that.

....

Q. So when someone's pupils are slightly reactive to light, is that an abnormal finding?

A. Yes.

Q. What is it potentially indicative of?

A. A head injury. Or some people that's just their norm. And also the light in the courtroom wasn't fantastic. It's fairly dark. He was on the ground. And it's very hard to get a perfect eye exam unless you are sitting in, you know, an office like this, turn off the light, and use your specific light.

Q. Did you have a flashlight with you?

A. I had a penlight, yes.

Q. Did you use that --

A. Yes.

Q. -- to check his pupils?

A. I did.

Q. Did any other Corizon employee participate with you in the examination while Mr. Green was on the floor?

A. I had a nurse holding pressure on the scalp wounds.

Q. Who was that?

A. I couldn't tell you.

Q. Was it Ms. [Epperson]?

A. It may have been. I don't recall.

Deposition of Kirstin White (attached as Exhibit 39 to the Declaration of John T. Devlin (#91-39)) at pp. 79-85.

According to White, the exam took about 15-20 minutes and at the conclusion White did not ask for a cervical collar and did not ask for a backboard. White did not call for an EMT because despite the purported Corizon motto of "when in doubt, send them out," her clinical suspicion that

Green had a serious head injury was very low. She did, however, believe that the head injury could be a subdural hematoma or intercranial bleed that is potentially fatal where time is of the essence in terms of treatment.

In contrast to White's deposition testimony, her chart note did not note a neurological exam and did not include the level of detail noted above from her deposition. Epperson did not recall White performing a neurological exam, but does remember her checking his neck. Bougard recalls White assessing Green's head, she does not remember White examining Green's legs or feet. The judicial assistant in the courtroom, Tracy Tomseth, states that no one immobilized Green's neck and that no one performed a neurological exam. Tomseth did not see anyone do anything with Green's legs, put hands to his feet, or grab his hand to squeeze.

Three Lane County deputies present, Darryl Davis, Kelly Rahm, and Angela Dodds recall that White was asked if Green should be transported to the hospital and White responded that he could be treated at the jail. Deputy Angela Dodds stated that White specifically answered no, that Green would be treated at the jail and that it was ultimately White's decision. Deputy Kelly Rahm stated that medical did their assessment and determined that Green did not need to go out in an ambulance and White stated she could stitch or staple the wound on his head and that it was okay for the deputies to move Green because "He's fine, he's fine."

Although White did not call for an ambulance, based on her very low suspicion of a serious head injury, she claims that in response to the deputies questions about going to the hospital, she stated that she wanted Green to go to the hospital because she was concerned about his head injury. White says she stated this to defendant Vicki Thomas, Corizon's on-site ranking administrator, who

was with Deputy Balcom.[2] Deposition of Kirstin White (attached as Exhibit 39 to the Declaration of John T. Devlin (#91-39)) at p. 91. She recalls Balcom and Thomas saying Green was going to be released and she stated he needs to go within the hour after they do the release paperwork. Id. at 91-93. White's chart note indicates Green was to be released and that she "will recommend courtesy drop @ ER for further/cont. eval." Ex. 52 to the Declaration of John T. Devlin (#91-52).[3] The note also says, however, that neuro checks need to be done every one to two hours.[4] White acknowledges that Green was to go to the hospital after the County released Green from custody. Deposition of Kirstin White (attached as Exhibit 39 to the Declaration of John T. Devlin (#91-39)) at pp. 96.

During oral argument on the instant motion, counsel for the Corizon defendants stated "we had an untrained lay person who had actually received training on responding to neck injuries, Ms. Tomseth, who was the courtroom deputy during that arraignment, and saw what was happening and did nothing. Had a phone next to her and could call 9-1-1 and didn't call." Defendants suggested that Tomseth's reaction supports White's decision to wait for release to send Green to the hospital. However, Tomseth's testimony suggests the exact opposite:

> Q. ... Do you have any experience from other aspects of life about how you deal with someone that has a --
>
> A. Yes.

---

[2]It appears that Thomas fist saw Green in the medical clinic and spoke with Balcom there.

[3]Deputy Balcom describes a courtesy drop as simply taking people who can't make it to the hospital on their own and walking them into the ER where officers leave them and walk away. Deposition of Guy Balcom (attached as Exhibit 1 to the Declaration of John T. Devlin (#91-1)) at p. 52.

[4]The checks were never done and White asserts that it was inconsistent to put that in the note, but that it is standard procedure to do the neuro checks. Deposition of Kirstin White (attached as Exhibit 39 to the Declaration of John T. Devlin (#91-39)) at pp. 95-96.

Page 9 - ORDER

Q. -- spinal cord injury?

A. Yes.

Q. Tell me about that.

A. Well, I worked in the medical field for 26 years before I came to the City of Eugene and have taken lots of CPR/first aid classes so --

Q. What did you do in the medical field?

A. Mostly billing sort of stuff, but we all had to take the classes and -- you know, worked at McKenzie-Willamette for a little bit so we saw lots of trauma videos and different things and --

Q. And so from your perspective, do you know what it means to immobilize somebody's neck?

A. Yes.

....

Q. Do you know what a neurological exam is?

A. Yes.

....

Q. Did you think they should have been doing [aspects of a neurological exam]?

A. Yes. I have an opinion.

Q. What's your opinion?

A. I think that they probably should have just called 9-1-1 and have him dealt with that way. They were mostly focusing on his bleeding head so --

Q. Do you recall anybody talking in the courtroom about the possibility that Mr. Green had suffered a spinal cord injury?

A. No.

Q. Do you recall in the courtroom anybody talking about the fact at that Mr. Green needed to be sent to the hospital?

Page 10 - ORDER

A. No.

Q. Or that EMTs should be called right away?

A. I had a conversation with a deputy around that, but not anybody working on him or any of that.

Q. Tell me what you remember about that. Who did you talk to?

A. Rob White is a deputy, and he was there that day. I actually know him personally. And so he was in the courtroom. He was a sergeant at that time. And he came in, and I just asked him, you know, "Why" -- "Why are they doing this? Why are they not just calling 9-1-1?" And he said that, "It's out of the County's hands," that that's Corizon's position to take care of people when they're injured or if they need medical attention.

....

Q. And then when you -- he was taken out of the courtroom in a wheelchair?

A. Correct.

Q. Could you describe the process as you remember of getting him off the ground into the wheelchair?

A. I believe two of them lifted him up, you know, like maybe under his arm, set him in the wheelchair, and they just -- I can't remember if it had footrests on it because his feet were out straight dragging behind.

Q. It didn't?

A. It must not have, so -- but that's my memory of him being wheeled out, was backwards.

Q. And was he slumped over in the chair?

A. Yes. Yes.

Q. And did it seem to you to be an appropriate way to be transporting him out of the courtroom?

A. No.

Deposition of Tracy Tomseth (attached as Exhibit 37 to the Declaration of John T. Devlin (#91-37))

Page 11 - ORDER

at pp. 27-32.

As noted by Tomseth, deputies removed Green from the courtroom by lifting him into a wheelchair without taking any precautions regarding his neck. Indeed, there was no C-collar or backboard available at the clinic. Green initially slid out of the wheelchair and was just limp. Deputies used Green's sweatshirt to hold him in the chair. The deputies transported Green to the jail clinic at about 10:55 a.m.

White sutured Green's wound and Epperson held up his head during the process. During the procedure, Green lost control of his bowels (which is symptomatic of a spinal injury). The chart note does not indicate the loss of control and no neurological check was done following this incident. After seeing Green in the clinic, Thomas states she told deputy Darryl Davis that Green needed to go to the hospital right away and that he told her Green would be released within the hour and then they would get him to the hospital. Thomas claims she told him it needs to be by ambulance. However, Deputy Balcom states that he asked Thomas about taking him to the hospital and that he could get Green released if necessary, but she told him he did not need to go to the hospital.

Epperson testified that she did not think Green needed to go to the hospital because she believed he was faking being paralyzed and his head laceration had been fixed. Deposition of Sharon Epperson (attached as Exhibit 12 to the Declaration of John T. Devlin (#91-12)) at p. 110.

The Corizon mental health specialist, defendant Jacob Pleich stated he was called to the clinic, but he did not get to see Green at the time he was having the sutures done.

At 11:29 a.m. Green was wheeled from the medical clinic to a segregation cell about 20 to 30 feet away.[5] Green was limp with his feet dragging and the deputies very roughly removed his

---

[5]The Corizon medical staff claim they were not aware he went to segregation, but the video from outside the cell shows that at some point during the first five minutes or so that Green

shirt, removed him from the wheel chair, dropped him on the floor, roughly placed him on the bed and removed the rest of his clothes. No attempt was made to clean Green despite his loss of bowel control. The Deputies left Green at 11:34 am and he remained motionless.

Deputy Donald Burnette was assigned to watch Green. At 12:17 p.m., because Green was motionless, Burnette states he called the medical office and spoke to a female to report the lack of any movement and received the response that as long as Green was breathing, he was okay. Burnette repeated this action again at 1:35 p.m. because there still had been no movement from Green and received the same response from the medical office. Corizon asserts that no one called their office, but Burnette's testimony and contemporaneous memorandum creates an issue of fact.[6]

At 2:28 p.m. Jacob Pleich interviewed Green and responded to him as if he was faking paralysis and initially refused to place a blanket on the still naked Green. Pleich completed a form indicating Green was motionless and should receive a psychiatric referral.

At 3:30 p.m. Deputy Carrel relieved Burnette and Burnette stopped by the Corizon medical office to speak with a nurse to inform her of Green's motionless condition. Burnette states that he was told they were trying to get around to Green. Carrell then went to the medical office and

---

is in the cell, Jacob Pleich and another woman in plain clothes drop by and appear to laugh about Green's predicament along with the deputies.

[6]The only female nurse working at the jail at that time was Epperson. At oral argument counsel for Corizon notes that there were other non-medical female Corizon employees working at the time. Burnette's February 13, 2103 memorandum notes that he initially "called medical ... and asked how long I should allow him to remain unmoving in this position until I again notified them. They asked If he was breathing. I informed them he was breathing and had spoken to me. Medical stated they would be back to evaluate him later in the day, but as long as he was breathing there was no immediate concern. .... At 1345 hours.I again called medical .... Medical again asked if he was breathing." Memorandum dated 02/13/2013 (attached as Exhibit 45 to the Declaration of John T. Devlin (#91-45)). A trier of fact could conclude that the conversation involved a medical professional and, therefore, could conclude that Epperson took the call.

Page 13 - ORDER

summoned two Corizon nurses and at 3:35 p.m., Epperson and Leah Smith (who had just started her shift) examined Green. Smith then summoned PA White.

White arrived at 3:41 p.m., examined Green and stated he needs to go to the hospital and also stated that she had been under the impression he was going to be released within an hour or two (after his injury) and be "dropped" at the hospital. White was now worried about a spinal injury, but provided no instruction on immobilizing Green's head.

Smith returned to the cell and noted Green's vital signs which were indicative of shock. Smith reported the vitals to White at 3:53 p.m. and White believed Green was in neurogenic shock (a potentially fatal condition). However, White then apparently clocked out of work at 3:57 p.m notwithstanding that she was the most highly trained medical professional on the premises at the time.

Thomas and Epperson were in Green's cell at 4:15 p.m. to 4:30 p.m. to clean Green. Thomas believed the situation was an emergency because there was too much time between the incident and then. During the cleaning it is unclear if any neck precautions were taken, but at best, a soft collar was placed on Green and removed to clean his backside.

At 4:33 p.m. an ambulance was called, but the jail logbook indicates it was a code 1 (drive normal) and the ambulance arrived at 4:49 p.m. The EMTs immediately immobilized Green's neck. Smith is the only Corizon employee to speak with the EMTs and she does not appear to provide much information telling them the report is kind of poor.

Green left the Jail at 5:20 p.m. via ambulance and arrived at RiverBend Hospital at 5:31 p.m. He underwent spinal surgery at 7:46 p.m. because he suffered a burst fracture of the C-4 vertebra that compromised but did not sever his spinal cord. Plaintiffs' expert states that had Green been treated

Page 14 - ORDER

immediately, his outcome would have been significantly improved and he would not have been rendered a ventilator dependent high quadriplegic and would not have died as a result of ventilator dependence complications.

It should be noted that there is evidence in the case from which a jury could conclude that medical records were removed and added after the fact by one or more of the defendants. The Corizon medical chart does not contain a copy of the emergency room referral (with minimal information) filled out by Smith before Green's transportation. The RiverBend chart has a copy of this referral, however, but the Corizon chart has a much more detailed one (containing inaccuracies that could be viewed as supporting White's actions) prepared by White that she claims she prepared before the EMT's arrived. A note prepared by Epperson also has disappeared from Corizon's chart. In addition, an untimed progress note authored by White purportedly on February 12, 2013, appears in the chart, but it appears in the entry after Smith's 5:30 entry. Smith states that White was not at the jail at that time and indeed time records indicate she left at 3:57 p.m.[7]

Corizon's policy require a review process in situations like this, but it did not initiate the process (sentinel review) until after plaintiffs gave it notice of the lawsuit. The review did not include interviews with any Lane County staff and only included an interview of White. No effort appears to have been made to determine who Burnette called. Although, the review did find White to be "reckless," a Corizon official rescinded that assessment in depositions.[8] It appears that Corizon

_____

[7]White testified she usually leaves at 5:30 or 6:00, but she has a very "fluid schedule." She is not sure if she was already out of the jail when the ambulance arrived.

[8]Tonya Mooningham, a RN working as a clinical risk management analyst at Corizon corporate in Tennessee, completed the assessment. She felt that Green should have been sent to the ER immediately and that the facility should have had a C Collar, but testified that she made a mistake checking the behavior as "reckless" and now believes that it was simply a mistake. She does not even now consider White's conduct to be negligent. Deposition of Tonya Mooningham

officials found the standard of care mostly adequate.  Although Corizon claims it took corrective action via "counseling" for White and now has a backboard and C collar on site, there is no documentary evidence to support the counseling.[9]  Indeed, White received an excellent performance review in the Fall of 2013.  She is still the primary care giver at the Lane County Jail.  She feels that everything done with respect to Green was within Corizon policies and procedures.

The second amended complaint alleges the following claims:

(1) Wrongful death under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against defendants Thomas, White, Epperson, Pleich and Corizon based on deliberate indifference to Green's serious medical needs with respect to post-injury treatment.

(2) Monell claims against Corizon and Lane County under section 1983 with respect to polices of not providing mental health screening and lack of proper on-site medical professionals in addition to a policy of delaying care in an anticipation of release.

(3) Supervisor liability pursuant to section 1983 against Defendants Carl Keldie, Justin Montoya, Vicki Thomas, and Corizon based on allowing, approving, and ratifying alleged harm

---

(attached as Exhibit 24 to the Declaration of John T. Devlin (#91-24)) at pp. 38-39, 47.

[9]Corizon asks the court to strike all mention of the sentinel event report or its internal process of implementing the report.  Corizon asserts the report is a remedial measure inadmissable under Fed. R. Ev. 407.  There is no peer review privilege under federal law. Measures taken that would have made an earlier injury less likely to occur are not admissible to prove negligence, but they may come in for impeachment or other purposes.  Here, the evidence appears to be offered to show that Corizon itself had a policy that led to the extent of harm suffered by Green through ratification of the actions of the on-site employees.  Indeed, plaintiffs assert that there were no remedial measures taken, and thus the motion to strike the sentinel report and the process through which it was implemented is denied.  Of course the issue can be revisited prior to trial through an appropriate motion in limine if necessary, but for now it does demonstrate an issue of fact as to whether Corizon itself had a policy of delaying outside hospital treatment as much as possible.  In addition, the report shows that, at least at some point, even Corizon viewed White's actions as reckless which demonstrates an issue of fact as to deliberate indifference which appears to have been condoned by Corizon.

Page 16 - ORDER

causing policies and in failing to adequately train employees and Lane County deputies.

(4)     Wrongful death based on negligence against Corizon and Lane County for failure to conduct an adequate intake screening prior to injury and adequate medical care after injury and for inadequate training.

(5) Wrongful death based on gross negligence for failing to conduct an adequate screening prior to injury and for failing to provide adequate care after the injury, in addition to inadequate training, against Corizon acting through its employees.

Plaintiffs also allege the same claims as survival claims alternative to the first five claims.


## DISCUSSION

The Corizon defendants seek judgment with respect to all claims (state and federal) regarding injuries resulting from the failure to screen Kelly Green during intake after his arrest. The Corizon defendants also seek summary judgment as to the section 1983 claims regarding post-injury actions, but do not otherwise seek summary judgment as to the state law claims for negligence or gross negligence with respect to the alleged injuries resulting from the care of Green after running into the wall. Accordingly, the parties divide their arguments into pre-injury and post-injury claims.


A.     Pre-Injury

As a pre-trial detainee, Green's rights while in custody of the County derived from the Due Process clause rather than the Eighth Amendment's protection against cruel and unusual punishment. Gibson v. Cnty. of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002). "[T]he due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the

Page 17 - ORDER

established right to not have officials remain deliberately indifferent to their serious medical needs.'"

Id. (quoting Carnell v. Grimm, 74 F.3d 977, 979 (9th Cir. 1996)).  This duty to provide medical care

encompasses detainees' psychiatric needs. Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461

(9th Cir. 1988), vac'd, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), opinion reinstated, 886

F.2d 235 (9th Cir.1989).


    1.      Monell Claims Under Section 1983

      Corizon, as an entity contracted to provide medical services to Lane County inmates may be

liable under section 1983 when undertaking duties to treat inmates.  See West v. Atkins, 487 U.S. 42,

54 (1988) ("Respondent, as a physician employed by North Carolina to provide medical services to

state prison inmates, acted under color of state law for purposes of section 1983 when undertaking his

duties in treating petitioner's injury. Such conduct is fairly attributable to the State.").

      In order to comply with the duty not to engage in acts evidencing deliberate indifference to

inmates' medical and psychiatric needs, jails must provide medical staff who are "competent to deal

with prisoners' problems." Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  Failure to screen

for those problems may violate an inmate's rights.  In order to know of the risk of violation, it is not

enough that the person merely "be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, ... he must also draw that inference." Id. If a person should have

been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter

how severe the risk.  Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001). But if a person is aware of

a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical

needs on the basis of either his action or his inaction. Farmer v. Brennan, 511 U.S. 825, 842.

An entity such as Lane County or Corizon cannot be held liable under a theory of respondeat superior. <u>City of Canton v. Harris</u>, 489 U.S. 378, 387 (1989). However, Corizon can be liable under <u>Monell v. Dept. of Soc. Serv. of City of New York</u>, 436 U.S. 658 (1978). Under <u>Monell</u>, a local government body can be held liable under section 1983 for policies of inaction as well as policies of action. <u>See</u> <u>Gibson</u>, 290 F.3d at 1185–86. A policy of action is one in which the governmental body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a governmental body's "failure to implement procedural safeguards to prevent constitutional violations." <u>Tsao v. Desert Palace, Inc.</u>, 698 F.3d 1128, 1143 (9th Cir. 2012).

In inaction cases, the plaintiff must show, first, "that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right." <u>Id.</u> (citations omitted) (internal quotation marks omitted). This requires showing that the defendant "was on actual or constructive notice that its omission would likely result in a constitutional violation." <u>Id.</u> at 1145 (citations omitted). Second, the plaintiff must show "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." <u>Id.</u> at 1143 (citations omitted) (internal quotation marks omitted).

Corizon asserts that Lane County had a policy of not contacting Corizon for inmate screening upon intake. However, as noted above, the contract with the County put that responsibility on Corizon and there is evidence to suggest Corizon was contacted about Green's serious medical condition of schizophrenia. Moreover, As set forth above, suicidal ideation had been implicated even before Green arrived at the jail. Thus, the evidence lends itself to an inference that Corizon, perhaps in conjunction with Lane County, implemented a policy of not screening inmates upon intake.[10]

---

[10]The record supports a finding that Deputy Nelson was not adequately trained to screen for mental health issues. Corizon argues that it was told by Lane County that the County would

Plaintiff's expert, Dr. Amanda Ruiz, notes that national standards require arrestees receive intake medical and mental health screening at the time they are taken to the jail and booked. She asserts that both Lane County and Corizon did not provide an adequate medical/mental health screening and that if Green had received appropriate intake screening when brought in, the risk that he would injure himself would have been substantially reduced. Indeed, Dr. Ruiz opines that in her professional opinion, had Green been appropriately screened at intake and had been appropriately diagnosed and treated after intake, he would not have attempted to injure himself during the court proceedings on February 12, 2013.

Corizon argues Dr. Ruiz's conclusion is "completely meaningless." However, this is the type of opinion experts may provide and a trier of fact determines what weight to give the opinion. Accordingly, a trier of fact could conclude that Corizon had a policy of not providing medical/mental health screening contrary to its own contractual obligations and that policy was a moving force behind Green's injury. In other words, Corizon's policy arguably resulted in a deliberate indifference to Green's serious psychiatric needs and Corizon, per the contract, was aware that failure to provide adequate intake screening would likely result in a constitutional violation.[11] As Dr. Ruiz opines, Corizon could have prevented the violation with an appropriate policy. Accordingly, the motion for

---

handle such training for its deputies. But, as noted, the contract put the screening responsibility on Corizon and it does not show that it provided training to Lane County deputies in this regard.

[11]The contract specifically notes that Coizon's "initial health assessment is an important inquiry ... designed to ensure a newly arrived inmate ... is admitted ... only after an appropriate level of medical intervention. The Corizon intake screening for Lane County will identify inmates with suicidal tendencies.... Intake medical screening will be conducted on all new inmates ... in accordance with current applicable ACA and NCCHC standards.... Corizon intake medical screening at the jail will be conducted ... 24 hours a day ... as part of the bookkeeping process. Corizon feels that the intake screening process is fundamentally one of the most important functions that the medical services team will provide." Personal Services Contract (attached as Exhibit 48 to the Declaration of John T. Devlin (#91-48)) at p. 4.

summary judgment as to the <u>Monell</u> claim is denied. <u>See</u> <u>Gibson</u>, 290 F.3d at 1191 (Summary judgment is inappropriate as long as a jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in plaintiff's situation).

 

2.    <u>Supervisor Liability</u>

Corizon first argues that because the County never requested the screening, there can be no supervisor liability. However, as noted above, there is an issue of fact as to whether Corizon was notified and its contract required intake screening.

Plaintiffs assert Dr. Keldie, the national medical director at Corizon, Dr. Montoya, Corizon's Lane County site medical director, and Thomas are responsible for the pre-injury claims because they were responsible for the lack of intake screening policy.

"A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor." <u>Starr v. Baca</u>, 652 F.3d 1202, 1206-07 (9th Cir. 2011). The supervisor need not be personally involved in the same way as are the individual medical providers on the scene inflicting constitutional injury. <u>Id.</u> at 1205. The supervisor's participation could include his own action or inaction in the training, supervision, or control of his subordinates, his acquiescence in the constitutional deprivations or conduct that showed a reckless or callous indifference to serious medical needs. <u>See, id.</u>, at 1205-06.

Despite Corizon's protestations of the adequate training it provides to its employees, it is undisputed that it indeed had a policy, while perhaps in conjunction with Lane County, to generally not conduct intake screening. And as noted above, there is evidence to suggest that the Lane County

deputy on duty that night was not adequately trained by either Lane County or Corizon to handle mental health screening. Thomas stated that she follows the County's orders regarding intake screening, specifically stating we don't make the rules," but that at the same time, she was unaware of both the contract terms regarding Corizon's responsibilities for intake screening and the training deputies received. Deposition of Vicki Thomas (attached as Exhibit 36 to the Declaration of John T. Devlin (#91-36)) at p. 97-100. This is sufficient to demonstrate her acquiescence in a constitutional deprivation.

Dr. Montoya was responsible for ensuring that the jail complied with national standards regarding screening and he knew Corizon staff did not generally conduct intake screening, but that inmates were evaluated only when they were being housed. This is sufficient for a trier of fact to conclude acquiescence in the alleged constitutional deprivation.

Plaintiff concedes Dr. Keldie is not liable as a supervisor and summary judgment is granted as to Dr. Keldie for pre-injury supervisor liability.


3.    State Law Claims

Plaintiffs bring negligence and gross negligence claims against Corizon based on vicarious liability for the pre-injury claims. The elements of a claim for medical malpractice are: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) harm that is measurable in damages; and (4) a causal link between the breach and the harm. Zehr v. Haugen, 318 Or. 647, 653-54 (1994). Corizon argues that it could have no duty to a detainee it does not know exists. However, as noted above, there is an issue of fact as to whether Corizon was notified by Nelson. In addition, it assumed the duty to conduct intake screening via the contract with Lane County. Accordingly, the

motion for summary judgment as to the state law pre-injury claims is denied.

B.    Post-Injury

1.    Monell Claims under Section 1983

Plaintiffs allege that Corizon and Lane County had a policy, custom or practice of not providing for trained physicians to examine seriously injured Lane County inmates and that they had a policy, custom or practice of denying Lane County inmates necessary medical care if said inmates are thought to be soon released from the jail. Plaintiffs also allege a policy, custom or practice of delaying transferring Lane County inmates to hospitals for necessary emergency medical care in order to first prepare paperwork to effectuate a jail discharge. Finally, plaintiffs allege a policy, custom or practice of failing to meet widely accepted community standards of care with regard to medical services for injured inmates of the Lane County jail.

As noted above, Monell liability can be asserted against the entity employing the people who allegedly engaged in the acts that deprived Green of his constitutional right to not have officials be deliberately indifferent to his serious medical needs if that deprivation resulted from a custom or policy of the employing entity. See Monell 436 U.S. at 694 (municipality liable under section 1983 when execution of a its policy inflicts the injury). To establish municipal liability under section 1983, plaintiffs need to show that (1) Green was deprived of his right to avoid deliberate indifference to his serious medical needs; (2) Corizon had a policy that amounted to a deliberate indifference to Green's serious medical needs; and (3) the policy was the moving force behind the constitutional violation. See Burke v. County of Alameda, 586 F.3d 725, 734 (9th Cir. 2009). As noted previously, plaintiffs must show that Corizon was aware of the risk of its policy to cause constitutional harm. E.g., Farmer,

Page 23 - ORDER

511 U.S. at 837.

With respect to lack of proper on-site trained professionals, Corizon asserts its policy was to have the ranking on-site medical officer (White) either arrange for transport to a hospital or summon Dr. Montoya. Moreover, it asserts the presence of a physician's assistant was appropriate by itself to provide care in the situation. Plaintiffs present evidence that even some Corizon officials felt that White did not see the full picture given her level of training, but that Montoya did not think she needed to call him.

Post-event evidence may be used to prove the existence of Corizon's policy. See Henry v. County of Shasta, 132 F.3d 512, 518 (9th Cir. 1997). A policy or custom may be inferred if, after Green's allegedly unconstitutional treatment, Corizon officials took no steps to reprimand or discharge White or if it otherwise failed to admit White's conduct was in error. See McRorie v. Shimoda, 795 F.2d 780, 784 (9th Cir. 1986). Despite the policy to contact Montoya or send out for critical care, White arguably did neither. While Corizon asserts she was capable of handling the situation, Corizon's review, at least at one point, found her actions reckless. See Sentinel Event Review Form (attached as Exhibit 65 to the Declaration of John T. Devlin (#91-65)) at p. 9; Deposition of Tonya Mooningham (attached as Exhibit 24 to the Declaration of John T. Devlin (#91-24)) at p. 39 (found reckless behavior at the time because Green should have been sent to the ER immediately and the facility should have had a C collar). Recklessness goes beyond mere negligence or gross negligence and amounts to the deliberate indifference prohibited by the Eighth Amendment:

> A deliberate indifference claim contains two requirements. The first requirement is objective: "the alleged deprivation of adequate medical care must be 'sufficiently serious.'" Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (quoting Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The second requirement is subjective: the charged officials must be subjectively **reckless** in their denial of medical care. Id. at 280. This means "that the charged official [must] act or

Page 24 - ORDER

fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. Officials need only be aware of the risk of harm, not intend harm. Id. And awareness may be proven "from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S.Ct. 1970.

Spavone v. New York State Dept. of Correctional Services, 719 F.3d 127, 138 (2d Cir. 2013).

While Corizon asserts some sort of training may have occurred post-incident, an inference can be drawn that no action was taken against White by Corizon for failing to ensure adequately trained medical providers were on-site or that Green could be transported to such a site. Indeed, Corizon refuses to now admit that White's treatment was not in accordance with the proper standard of care and White believes she complied with Corizon policies. Accordingly, a trier of fact could infer that Corizon had a custom or policy of failing to provide adequately trained medical personnel at the jail.

The remaining Monell claims involve a policy to deny or delay care if an inmate is soon to be released, and discourage transfer to a hospital. Even White testified that she felt that Green's transfer to a hospital could wait an hour or so while Lane County prepared his release to then provide a "courtesy drop," i.e., walk Green into the ER and leave him. As noted above, However, Mooningham, during the sentinel review, felt it was reckless to not immediately send Green to the ER. There appears to be no discipline for this behavior and thus an inference can be drawn that Corizon had a policy of delaying treatment to await an inmate's release.

Moreover, there is some suggestion via Corizon's handling of other inmate cases nationwide that efforts were made to avoid transfer to a hospital while an inmate was in the care of Corizon. See, e.g., Declaration of Charles Pugh (#94), former Corizon site medical director in Georgia, at ¶ 2-4 (constant pressure from superiors in Corizon to minimize ER visits to save money and constant monitoring of hospitalizations). White participated in weekly calls with Corizon corporate

Page 25 - ORDER

headquarters in which the primary topic of discussion was the status of every Corizon hospitalized patient.

Corizon asserts that even if such a policy existed, it could have no impact in this case since technically Green was in the Custody of the Eugene police and thus the hospital bill would not be their responsibility. However, at the time "Corizon said they would probably pay for the ER while pt was in custody ... but it was found that 'pt arrived after release from custody.'" Exhibit 59 to the declaration of John T. Devlin (#91-59) at p. 1. In addition, White testified that she was aware that when a custodial inmate is sent to the hospital, Corizon pays for anybody from Lane County jail regardless of which agency had arrested the inmate. Deposition of Kirstin White (attached as Exhibit 39 to the Declaration of John T. Devlin (#91-39)) at p. 64-65.[12] Thus, an inference can be drawn that Corizon did have a policy of delaying treatment at the ER to avoid the cost of hospitalization and that policy was a moving force behind the decision to not immediately send Green to the ER. This is especially true given the apparent lack of reprimand given to White.

This failure and subsequent lack of remedial action also demonstrates a policy of failing to conform to widely accepted standards of care for seriously injured inmates. Accordingly, the motion for summary judgment as to post-injury Monell claims is denied.

2.    <u>Deliberate Indifference</u>

Plaintiffs assert direct claims against Corizon, Thomas, White, Epperson, and Pleich. Because

---

[12]Defendants object to the admissibility of White's testimony regarding when Corizon pays arguing it assumes incorrect facts. Corizon seeks to strike the statement. However, the statement, correct or not, is evidence of White's adherence to Corizon policy that resulted in injury to Green. Furthermore, such evidence is relevant to White's state of mind and rebuts any argument by Corizon that White would have had no motive to delay Green's transport to the hospital pursuant to Corizon policy.

Page 26 - ORDER

a private entity that acts under color of law enjoys the same protections against respondeat superior

liability under section 1983 as a public entity, Corizon cannot be liable for the actions of its employees

beyond Monell liability.    Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1138-39 (9th Cir. 2012).

Accordingly, the motion for summary judgment as to the post-injury claims in plaintiffs' first cause

of action against Corizon (respondeat superior liability) is granted.[13]

   Plaintiff alleges the deliberate indifference with respect to the individual defendants:

   a. In failing to provide prompt medical attention to his serious medical needs;

   b. In failing to provide any neck or spine precautions;

   c. In failing to promptly transfer Mr. Green from the Lane County jail to a hospital for
   diagnosis and treatment;

   d. In seriously aggravating his medical condition by authorizing the moving, dragging
   and careless manipulation of Mr. Green's body after he suffered a serious neck
   fracture;

   e. In seriously aggravating his medical condition by moving, dragging and carelessly
   manipulating Mr. Green's body after he suffered a serious neck fracture;

   f. In seriously aggravating his medical condition by ignoring his medical plight for
   almost six hours; and

   g. In allowing and causing him to lie naked, not moving and in his own feces on a jail
   bed from approximately 11:30 a.m. until approximately 4:00 p.m.

Second Amended Complaint (#66) at ¶ 33.

   In addition, plaintiffs allege that defendant Pleich was deliberately indifferent in

   a. In failing to promptly report defendant Pleich's interaction with and observations of
   Casey Green to Corizon medical or nursing staff; and

   b. In failing to make any effort to arrange for emergency medical care for Casey Green
   after being told by Casey Green that he was paralyzed.

---

   [13]Plaintiffs' novel argument to the contrary, this court may not overrule the Ninth Circuit
and reach a different conclusion.

Page 27 - ORDER

Id. at ¶ 34.

Plaintiff also alleges further indifference on the part of White in that she:

a. ... did not take the necessary steps to have Mr. Green immediately taken by ambulance to a hospital after examining him at approximately 3:40 p.m. on February 12, 2013; and

b. Defendant White abandoned Mr. Green at approximately 3:57 p.m. when she left the jail knowing that he had suffered a significant neurological injury, knowing that his blood pressure and pulse were critically low, knowing that he was in neurogenic shock, and knowing that no other physician's assistant or medical doctor was in the jail to provide necessary emergency medical care.

Id. at ¶ 35.

As noted above, Green enjoys rights while in custody of the County derived from the Due Process clause imposing, at a minimum, the Eighth Amendment's protection against cruel and unusual punishment.

In order to establish a violation of that right, Plaintiffs must establish a "serious medical need" such that "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Next, Plaintiffs must show that defendants' response to the serious medical need was deliberately indifferent. Id. Deliberate indifference may be established by evidence of "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. Deliberate indifference may be shown where prison officials or practitioners "deny, delay or intentionally interfere with medical treatment." Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). In contrast, "mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." Id. See Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (prisoner's deliberate indifference allegations were sufficient where he alleged "prison officials were

Page 28 - ORDER

aware of his bleeding gums, breaking teeth, and his inability to eat properly, yet failed to take any action to relieve his pain or to prescribe a soft food diet until new dentures could be fitted.").

"The state of mind for deliberate indifference is subjective recklessness." Snow v. McDaniel, 681 F.3d 978, 985–86 (9th Cir. 2012).  However, the standard is "less stringent in cases involving a prisoner's medical needs ... because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (partially overruled on other grounds) (quoting Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995 (1992)) (alterations omitted). "Similarly, '[i]n deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" Snow, 681 F.3d at 985 (quoting Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989)).  "Although the deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be subjectively aware that serious harm is likely to result from a failure to provide medical care." Gibson, 290 F.3d at 1193.

It is undisputed that Green suffered a serious medical need.  The role of each defendant with respect Green's treatment of that serious medical need is discussed below.

     a.    Defendant White

As noted above, there is evidence from Corizon itself that PA White's failure to immediately send Green to the ER was reckless.  Accordingly, the motion for summary judgment is denied with respect to all allegations regarding White's initial and recurring failure to send Green to the ER and in abandoning Green prior to the arrival of the EMTs.

In addition, a trier of fact could conclude the need for a neurological exam was obvious enough to a qualified medical practitioner that the purported failure to conduct one is also deliberately indifferent.[14]  Moreover, a fact-finder could also conclude the alleged subsequent lack of precautions regarding the neck and spine and the failure to prevent the rough handling of Green without those precautions was deliberately indifferent.  The motion for summary judgment as to the deliberate indifference of White is denied.


   b.  Defendant Epperson

As noted above, Epperson does not recall a neurological exam being done and a trier of fact could conclude that the need for such was obvious to this medical professional.  Epperson did not seek to ensure an exam was done and nonetheless stood by while no precautions were taken regarding Green's neck and spine.  Simply relying on White as her superior does not relieve her of her own deliberate indifference without some showing that the she attempted to engage in medically necessary treatment and was prevented by White.  In addition, there is evidence from which a trier of fact could conclude that Epperson twice took calls from Deputy Burnette about Green's complete lack of movement and simply replied that as long as Green is breathing, he is fine.  A trier of fact could conclude that such action constitutes deliberate indifference.  In addition, a trier of fact could conclude that Epperson's handling of Green's neck and spine during the process of cleaning, even assuming the use of soft collar (removed to clean his backside), was also deliberately indifferent to the now even more obvious spinal trauma.  The motion for summary judgment as to the deliberate indifference of Epperson is denied.

---

[14]While White contends she did conduct a neurological exam immediately after Green's injury, her testimony is contradicted by other evidence in the record.

Page 30 - ORDER

c.    Defendant Thomas

Thomas was also of the belief that Green needed to go to the hospital but, at a minimum, agreed to await the supposed hour or so to get a discharge from custody. In addition, Thomas participated in the cleaning of Green without adequate precautions for his neck and spine. The motion for summary judgment as to the deliberate indifference of Thomas is denied.

d.    Defendant Pleich

Pleich is a mental health specialist with no medical training. Pleich was not present in the courtroom or in the medical clinic during treatment of the head wound and loss of bowel control. While there is evidence that Pleich ignored Green's paralysis in the cell during about a six minute discussion with Green, there is no suggestion he was subjectively aware of the extent of the spinal injury as he believed Green was faking. At best, Pleich's actions were negligent, but not deliberately indifferent. The motion for summary judgment as to the section 1983 claim against Pleich is granted.

3.    Supervisory Claims

Plaintiff concedes that defendants Thomas and Montoya are not liable under a theory of supervisory liability for the post-injury claims and the motion for summary judgment as to these claims is granted with respect to them.

Plaintiffs assert that Dr. Keldie, as the chief medical officer for Corizon from September of 2000 through the end of 2010 and again from late 2011 until April 1, 2013 was aware of the alleged policy to delay hospitalization until an inmate was discharged. In addition, plaintiffs present evidence that Dr. Keldie was aware of previous cases in which Corizon was found liable for such policy.

Page 31 - ORDER

However, this is more appropriately framed as a <u>Monell</u> claim rather than one for supervisor liability as there is insufficient evidence that Keldie supervised this particular treatment or was aware of it. His implementation of the policy demonstrates he was a policy-maker for purposes of Monell liability, but does not sufficiently demonstrate personal supervisor liability. Although Keldie could be liable as a supervisor if he had ratified White's conduct by failing to discipline or otherwise correct the alleged reckless behavior, plaintiffs do not present evidence of his participation in the sentinel review and subsequent acquiescence in her behavior. The motion for summary judgment with respect to Dr. Keldie's liability for supervising the alleged post-injury deliberate indifference to Green is granted.

## CONCLUSION

For the reasons stated above, the Corizon defendants motion for partial summary judgment (#69) is granted in part and denied in part.

DATED this __6th__ day of April 2015.

THOMAS M. COFFIN
United States Magistrate Judge