Elden M. Rosenthal, OSB No. 722174
Email: elden@rgdpdx.com
Michael A. Greene, OSB No. 802445
Email: mike@rgdpdx.com
John T. Devlin, OSB No. 042690
Email: john@rgdpdx.com
Rosenthal Greene & Devlin, P.C.
121 SW Salmon Street, Suite 1090
Portland, OR 97204
Phone: (503) 228-3015
Fax: (503) 228-3269

Of Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| DEREK JOHNSON, personal representative of KELLY CONRAD GREEN II, deceased; KELLY CONRAD GREEN; and SANDY PULVER, | Civil Action No. 6:13-cv-01855-TC |
| Plaintiffs, | **PLAINTIFFS' TRIAL WITNESSES** |
| v. | |
| CORIZON HEALTH, INC., a Tennessee Corporation; LANE COUNTY, an Oregon county; DR. JUSTIN MONTOYA, an individual; VICKI THOMAS, an individual; KIRSTIN WHITE, an individual; and SHARON EPPERSON (née FAGAN), an individual, | |
| Defendants. | |

Pursuant to the Trial Management Order, plaintiffs submit the following list of witnesses who may be called to testify at trial in the above captioned matter.

**1.  Witness Name:**        **Adrian, Farrell**

Address:                18541 Linden Avenue North, No. 6, Shoreline, WA 98133

Occupation:            Retired

Time for Direct:        20 minutes

| | |
|---|---|
| Testimony: | Ms. Adrian has known Sandra Pulver for more than a decade. They met when Ms. Adrian taught a class to families on how to live with a person with schizophrenia. Ms. Adrian is a former president of the NAMI Washington, the state chapter of the National Alliance on Mental Illness. She also has a son with schizophrenia. |
| | Ms. Adrian will testify about her observations regarding Ms. Pulver's efforts to help Casey Green with his mental illness. She became good friends with Ms. Pulver and spoke with her often. Ms. Pulver used Ms. Adrian as a sounding board to help her handle Casey's mental illness. She will explain how Ms. Pulver worked to learn more about schizophrenia. She also will testify that Ms. Pulver made tremendous efforts to try to help Casey. |
| | Ms. Adrian will testify about how Casey's injury and death have impacted Ms. Pulver. |
| **2.   Witness Name:** | **Allen, Bettie** |
| Address: | 260 Ellis Street, North Fort Myers, FL 33903 |
| Occupation: | RN (retired) |
| Time for Direct: | 15 minutes |
| Testimony: | Ms. Allen was an employee of Prison Health Services from 1999 to 2008. She was deposed in the <u>Fields v. Prison Health Services</u> case in Fort Myers, FL on August 27, 2010. Plaintiffs' counsel has provided a copy of her deposition transcript to counsel for defendants in this case. Plaintiff has designated portions of her deposition testimony to be read to the jury. |
| **3.   Witness Name:** | **Balcom, Guy** |
| Address: | c/o Lane County Counsel<br>125 East 8th Avenue<br>Eugene, OR 97401 |
| Occupation: | Deputy Sheriff, Lane County Sheriff's Office |
| Time for Direct: | 15 minutes |
| Testimony: | Deputy Balcom was deposed on January 21, 2014. He was an acting sergeant in the jail who responded to the courtroom on February 12, 2013. Plaintiff has designated portions of his deposition testimony |

to be played at trial. Any additional trial testimony will be based on matters covered in his deposition.

| | | |
|---|---|---|
| **4. Witness Name:** | | **Ball, James** |
| Address: | | c/o Eugene City Attorney's Office<br>125 E. 8th Ave, 2nd Floor<br>Eugene, OR 97401 |
| Occupation: | | Sergeant, Eugene Police Department |
| Time for Direct: | | 20 minutes |
| Testimony: | | Sergeant Ball was deposed on February 27, 2014. He was one of the Eugene police officers who was in the courtroom on February 12, 2013. His trial testimony will be based on matters covered in his deposition. |

| | | |
|---|---|---|
| **5. Witness Name:** | | **Begines, Mark** |
| Address: | | c/o Eugene City Attorney's Office<br>125 E. 8th Ave, 2nd Floor<br>Eugene, OR 97401 |
| Occupation: | | EMT, Eugene Fire & Rescue |
| Time for Direct: | | 20 minutes |
| Testimony: | | Mr. Begines was deposed on January 27, 2014. He was one of the EMTs who responded to the jail on February 12, 2013. His trial testimony will be based on matters covered in his deposition. |

| | | |
|---|---|---|
| **6. Witness Name:** | | **Bourgard, Jona** |
| Address: | | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | | CMA, Corizon Health, Inc. |
| Time for Direct: | | 10 minutes |
| Testimony: | | Ms. Bourgard was deposed on April 16, 2014. She was one of the Corizon employees who responded to the courtroom on February 12, 2013. Plaintiff has designated portions of her deposition testimony |

to be played at trial.  Any additional trial testimony will be based on matters covered in her deposition.

| | |
|---|---|
| 7.  **Witness Name:** | **Brinlee, DeAnna** |
| Address: | 1010 Berntzen Road, Eugene, OR 97402 |
| Occupation: | Licensed tax preparer |
| Time for Direct: | 20 minutes |

Testimony:

Ms. Brinlee has known Sandy Pulver and Kelly Green for over 20 years.  She was a neighbor when they lived in Eugene.  Her son, Chris Jett, was one of Casey Green's best friends.  Ms. Brinlee is a tax preparer who works for Dixson Professional Corporation.

Ms. Brinlee will testify about her observations regarding Casey Green.  She and her family spent a lot of time with Casey when he was a child.  She will testify about spending time with Casey, both before and after he was diagnosed with schizophrenia.

Ms. Brinlee also will testify about how Kelly and Sandy attempted to help Casey.  She will testify that they did what they could to help their son.

Ms. Brinlee will testify about how Casey's injury and death have impacted Sandy Pulver and Kelly Green.

| | |
|---|---|
| 8.  **Witness Name:** | **Brown, Larry** |
| Address: | c/o Lane County Counsel<br>125 East 8th Avenue<br>Eugene, OR  97401 |
| Occupation: | Deputy Sheriff, Lane County Sheriff's Office |
| Time for Direct: | 20 minutes |

Testimony:

Lieutenant Brown was deposed on January 23, 2014.  He is the Lane County employee responsible for supervising the contract with Corizon.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition.

9.    **Witness Name:**        **Burnette, Donald**

Address:                c/o Lane County Counsel
                     125 East 8th Avenue
                     Eugene, OR 97401

Occupation:              Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:           25 minutes

Testimony:               Deputy Burnette was deposed on February 27, 2014. He was one of
                     the Lane County employees who kept a watch on Mr. Green in the
                     seg/med area on February 12, 2013. Plaintiff has designated
                     portions of his deposition testimony to be played at trial. Any
                     additional trial testimony will be based on matters covered in his
                     deposition.

10.   **Witness Name:**        **Burrow, Gayle**

Address:                9719 NE Skidmore Street
                     Maywood Park, Oregon 97220

Occupation:              Correction Health Care Consultant

Time for Direct:           2 hours

Testimony:               Ms. Burrow has been designated as an expert witness by plaintiffs.
                     She will testify consistent with her expert report.

11.   **Witness Name:**        **Correll, Dan**

Address:                c/o Lane County Counsel
                     125 East 8th Avenue
                     Eugene, OR 97401

Occupation:              Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:           15 minutes

Testimony:               Deputy Correll was deposed on January 23, 2014. He was one of the
                     Lane County employees who kept a watch on Mr. Green in the
                     seg/med area on February 12, 2013. Plaintiff has designated
                     portions of his deposition testimony to be played at trial. Any

additional trial testimony will be based on matters covered in his deposition.

| 12. | **Witness Name:** | **Davis, Darreyl** |
|---|---|---|

Address:              c/o Lane County Counsel
                      125 East 8th Avenue
                      Eugene, OR  97401

Occupation:           Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:      15 minutes

Testimony:            Sergeant Davis was deposed on January 23, 2014.  He was an acting sergeant in the jail who responded to the courtroom on February 12, 2013.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition.

| 13. | **Witness Name:** | **Deierling, David** |
|---|---|---|

Address:              c/o Stewart Sokol & Larkin LLC
                      2300 SW First Ave., Suite 200
                      Portland, OR 97201

Occupation:           Unemployed

Time for Direct:      10 minutes

Testimony:            Mr. Deierling was deposed on April 18, 2014.  He was the Corizon HSA at the Lane County Jail in 2012.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition.

| 14. | **Witness Name:** | **Dodds, Angela** |
|---|---|---|

Address:              c/o Lane County Counsel
                      125 East 8th Avenue
                      Eugene, OR  97401

Occupation:           Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:      10 minutes

| | |
|---|---|
| Testimony: | Deputy Dodds was deposed on January 28, 2014. She was one of the Lane County employees who responded to the courtroom on February 12, 2013. Plaintiff has designated portions of her deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in her deposition. |

**15. Witness Name:**    **Dotson, Robert**

Address:

c/o Lane County Counsel
125 East 8th Avenue
Eugene, OR 97401

Occupation:    Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:    10 minutes

Testimony:    Deputy Dotson was deposed on January 21, 2014. He was one of the Lane County employees who responded to the courtroom on February 12, 2013. Plaintiff has designated portions of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition.

**16. Witness Name:**    **Epperson, Sharon**

Address:

c/o Stewart Sokol & Larkin LLC
2300 SW First Ave., Suite 200
Portland, OR 97201

Occupation:    Nurse

Time for Direct:    40 minutes

Testimony:    Nurse Epperson was deposed on February 18, 2014. She was one of the Corizon employees who responded to the courtroom on February 12, 2013. Plaintiff has designated portions of her deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in her deposition.

**17. Witness Name:**    **Garlick, Ivor**

Address:

c/o Stewart Sokol & Larkin LLC
2300 SW First Ave., Suite 200
Portland, OR 97201

Occupation:    Regional Medical Director, Corizon Health, Inc.

| | |
|---|---|
| Time for Direct: | 40 minutes |
| Testimony: | Dr. Garlick was deposed on October 14, 2014. He was a Regional Medical Director for Corizon, with responsibility for the Lane County Jail, on February 12, 2013. Plaintiff has designated portions of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition. |

**18. Witness Name:** **Gauthier, Edward**

Address: 2057 Berwin Lane, Eugene, OR 97404

Occupation: Truck driver

Time for Direct: 20 minutes

Testimony:

Mr. Gauthier has known Kelly Green for more than a decade. He works as a regional truck driver. He talks with Kelly regularly and sees Kelly several times per year.

Mr. Gauthier will testify about his observations regarding Casey Green, whom he first met when Casey was a teenager. He will testify about spending time with Casey, both before and after he was diagnosed with schizophrenia.

Mr. Gauthier also will testify about how Kelly attempted to help Casey. For example, Kelly would try to include Casey in everyday activities like eating out. He will testify that Mr. Green did what he could to help his son.

Mr. Gauthier will testify about how Casey's injury and death have impacted Mr. Green.

**19. Witness Name:** **Green, Deana**

Address: 4055 Aerial Way, Apt. 155, Eugene, OR 97402

Occupation: Retired

Time for Direct: 30 minutes

Testimony:

Ms. Green was deposed on March 20, 2015. She is the grandmother of Casey Green. She will testify about her relationship with her grandson, both before and after the February 2013 incident at the

jail. She will testify about the impact that Casey's injury and death have had on her and her family. She will testify about Casey's conscious pain and suffering after his February 2013 injury. Any additional trial testimony will be based on matters covered in her deposition.

| 20. | Witness Name: | **Green, Kelly** |
|---|---|---|

Address:              4055 Aerial Way, Apt. 155, Eugene, OR 97402

Occupation:          Truck driver

Time for Direct:     45 minutes

Testimony:           Mr. Green was deposed on June 20, 2014. He is the father of Casey Green. He will testify about his relationship with his son, both before and after the February 2013 incident at the jail. He will testify about the impact that Casey's injury and death have had on him and his ex-wife Sandy Pulver. He will testify about Casey's conscious pain and suffering after his February 2013 injury. Any additional trial testimony will be based on matters covered in his deposition.

| 21. | Witness Name: | **Green, McKenzie** |
|---|---|---|

Address:              12433 Admiralty Way, Apt. L105, Everett, WA 98204

Occupation:          Dental assistant

Time for Direct:     20 minutes

Testimony:           Ms. Green was deposed on February 13, 2015. She is the sister of Casey Green. She will testify about her relationship with her brother, both before and after the February 2013 incident at the jail. She will testify about the impact that Casey's injury and death have had on her and her family. She will testify about Casey's conscious pain and suffering after his February 2013 injury. Any additional trial testimony will be based on matters covered in her deposition

| 22. | Witness Name: | **Green, Thomas** |
|---|---|---|

Address:              3844 Primrose Lane, Apt. 203, Bellingham, WA 98226

Occupation:          Flooring installer

| Time for Direct: | 20 minutes |
|---|---|
| Testimony: | Mr. Green was deposed on February 13, 2015. He is the brother of Casey Green. He will testify about his relationship with his brother, both before and after the February 2013 incident at the jail. He will testify about the impact that Casey's injury and death have had on him and his family. He will testify about Casey's conscious pain and suffering after his February 2013 injury. Any additional trial testimony will be based on matters covered in his deposition |

**23.    Witness Name:    Hallworth, Richard**

| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
|---|---|
| Occupation: | Consultant |
| Time for Direct: | 40 minutes |
| Testimony: | Mr. Hallworth was deposed on February 11, 2015. He was the Chief Executive Officer of Corizon until October 2013.    Plaintiff has designated portions of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition. |

**24.    Witness Name:    Holmes, William**

| Address: | Holmes & Company, LLP<br>7128 SW Gonzaga St. Suite 100<br>Portland, Oregon 97223 |
|---|---|
| Occupation: | Forensic Accountant |
| Time for Direct: | 30 minutes |
| Testimony: | Mr. Holmes has been designated as an expert witness by plaintiffs. He will testify consistent with his expert report. |

**25.    Witness Name:    Hubbard, Eric**

| Address: | c/o Eugene City Attorney's Office<br>125 E. 8th Ave, 2nd Floor<br>Eugene, OR 97401 |
|---|---|

| | |
|---|---|
| Occupation: | Police Officer, Eugene Police Department |
| Time for Direct: | 20 minutes |
| Testimony: | Officer Hubbard was deposed on January 27, 2014. He is a Eugene police officer who arrested Mr. Green on February 11, 2013 and transported him to the Lane County Jail. His trial testimony will be based on matters covered in his deposition. |

**26.   Witness Name:   James, Jennifer**

| | |
|---|---|
| Address: | Northwest Physical Medicine<br>801 Pine St. Suite 100<br>Seattle, WA 98101 |
| Occupation: | Physician |
| Time for Direct: | 2 1/2 hours |
| Testimony: | Dr. James has been designated as an expert witness by plaintiffs. She will testify consistent with her expert report. |

**27.   Witness Name:   Keene, David**

| | |
|---|---|
| Address: | 1171 SE Hawthorne<br>Dallas, OR 97338 |
| Occupation: | Director of Clinical Education, Pacific University School of Physician Assistant Studies |
| Time for Direct: | 1 hour |
| Testimony: | Mr. Keene has been designated as an expert witness by plaintiffs. He will testify consistent with his expert report. |

**28.   Witness Name:   Keldie, Carl**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Consultant |
| Time for Direct: | 15 minutes |

Testimony:                     Dr. Keldie was deposed on March 6, 2014.  He was the Chief
                               Medical Officer of Corizon until April 2013.    Plaintiff has
                               designated portions of his deposition testimony to be played at trial.
                               Any additional trial testimony will be based on matters covered in
                               his deposition.

**29.   Witness Name:**        **Kinder, Steve**

Address:                       Mail Code L473
                               3181 SW Sam Jackson Rd
                               Portland, OR 97239

Occupation:                    Assistant Professor, Division of Management, OHSU

Time for Direct:               90 minutes

Testimony:                     Mr. Kinder has been designated as an expert witness by plaintiffs.
                               He will testify consistent with his expert report.

**30.   Witness Name:**        **Lauer, Greg**

Address:                       Lauer & Currie, P.A.
                               644 SE 5th Avenue
                               Fort Lauderdale, FL 33301

Occupation:                    Attorney

Time for Direct:               45 minutes

Testimony:                     See Exhibit A attached

**31.   Witness Name:**        **Ledbetter, Douglas**

Address:                       c/o Eugene City Attorney's Office
                               125 E. 8th Ave, 2nd Floor
                               Eugene, OR 97401

Occupation:                    Police Officer, Eugene Police Department

Time for Direct:               20 minutes

Testimony:                     Officer Ledbetter was deposed on February 27, 2014.  He was one of
                               the Eugene police officers in the courtroom on February 12, 2013.
                               His trial testimony will be based on matters covered in his
                               deposition.

**32.  Witness Name:**        **Legg, Jeremy**

Address:                c/o Stewart Sokol & Larkin LLC
                   2300 SW First Ave., Suite 200
                   Portland, OR 97201

Occupation:              Vice President of Operations, MHM Services

Time for Direct:           15 minutes

Testimony:              Mr. Legg was deposed on May 13, 2014.  He was a Regional Vice President for Corizon, with responsibility for the Lane County Jail, on February 12, 2013.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition.

**33.  Witness Name:**        **McConnell, Trish**

Address:                662 Willow Lane, Rochester, NY 14580

Occupation:              Retired hospice social worker

Time for Direct:           20 minutes

Testimony:              Ms. McConnell is the aunt of Sandy Pulver, who is Casey Green's mother.  Ms. Connell talks with Sandy regularly and sees Sandy often.

Ms. McConnell will testify about her visit to Eugene shortly after Casey was injured in February 2013.  Ms. McConnell spent two weeks visiting with Casey and helping Sandy.  She also will testify about her visit with Casey in November 2013, about a month before his death.

Ms. McConnell will testify about how Casey's injury and death have impacted Sandy.  She also will testify about Casey Green's conscious pain and suffering.

Ms. McConnell also will testify about how Sandy attempted to help Casey.  She will testify that Ms. Pulver did what she could to help her son.

**34.  Witness Name:**        **Miller, Dennis**

Address:                      25744 Wildwood Road, Venita, OR 97484

Occupation:                   Truck driver

Time for Direct:              20 minutes

Testimony:                    Mr. Miller has known Kelly Green for more than two decades. He works as a regional truck driver. He talks with Kelly regularly and sees Kelly several times per year.

                              Mr. Miller will testify about his observations regarding Casey Green, whom he first met when Casey was a child. He will testify about spending time with Casey, both before and after he was diagnosed with schizophrenia. He will explain how Casey's family and his family spent a lot of time camping, fishing and hunting, among other things.

                              Mr. Miller also will testify about how Kelly attempted to help Casey. He will testify that Mr. Green did what he could to help his son.

                              Mr. Miller will testify about how Casey's injury and death have impacted Mr. Green.

**35.  Witness Name:**        **Mitchell, Collin**

Address:                      c/o Eugene City Attorney's Office
                              125 E. 8th Ave, 2nd Floor
                              Eugene, OR 97401

Occupation:                   EMT, Eugene Fire & Rescue

Time for Direct:              20 minutes

Testimony:                    Mr. Mitchell was deposed on January 27, 2014. He was one of the EMTs who responded to the Lane County Jail on February 12, 2013. His trial testimony will be based on matters covered in his deposition.

**36.  Witness Name:**        **Montoya, Justin**

Address:                      c/o Stewart Sokol & Larkin LLC
                              2300 SW First Ave., Suite 200
                              Portland, OR 97201

| | |
|---|---|
| Occupation: | Medical Director, Corizon Health, Inc. |
| Time for Direct: | 50 minutes |
| Testimony: | Dr. Montoya was deposed on April 18, 2014 and October 7, 2014. Dr. Montoya is the Site Medical Director for the Lane County Jail. Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition. |

**37.   Witness Name:**   **Mooningham, Tonya**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Clinical Risk Management Analyst, Corizon Health, Inc. |
| Time for Direct: | 20 minutes |
| Testimony: | Ms. Mooningham was deposed on October 16, 2014.   Ms. Mooningham was involved in the Sentinel Event Review of the incident involving Kelly Green.  Plaintiff has designated portions of her deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in her deposition. |

**38.   Witness Name:**   **Nelson, Keri**

| | |
|---|---|
| Address: | c/o Lane County Counsel<br>125 East 8th Avenue<br>Eugene, OR  97401 |
| Occupation: | Deputy Sheriff, Lane County Sheriff's Office |
| Time for Direct: | 20 minutes |
| Testimony: | Deputy Nelson was deposed on January 21, 2014.  She was the Lane County employee who booked Mr. Green into the Lane County Jail on February 11, 2013.  Plaintiff has designated portions of her deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in her deposition. |

**39.   Witness Name:**        **Orr, Harold**

Address:                      c/o Stewart Sokol & Larkin LLC
                              2300 SW First Ave., Suite 200
                              Portland, OR 97201

Occupation:                   Chief Clinical Officer, Corizon Health, Inc.

Time for Direct:              45 minutes

Testimony:                    Dr. Orr was deposed on November 11, 2014.  Dr. Orr was the
                              Regional Medical Director, with responsibility for the Lane County
                              Jail, in 2013 and 2014.  Plaintiff has designated portions of his
                              deposition testimony to be played at trial.  Any additional trial
                              testimony will be based on matters covered in his deposition.

**40.   Witness Name:**        **Pastor, Joseph**

Address:                      c/o Stewart Sokol & Larkin LLC
                              2300 SW First Ave., Suite 200
                              Portland, OR 97201

Occupation:                   Psychiatrist, Corizon Health, Inc.

Time for Direct:              15 minutes

Testimony:                    Dr. Pastor was deposed on March 6, 2014.  He was the Chief Mental
                              Health Officer for Corizon until August 2013.   Plaintiff has
                              designated portions of his deposition testimony to be played at trial.
                              Any additional trial testimony will be based on matters covered in
                              his deposition.

**41.   Witness Name:**        **Peters, Richard**

Address:                      c/o Lane County Counsel
                              125 East 8th Avenue
                              Eugene, OR  97401

Occupation:                   Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:              15 minutes

Testimony:                    Deputy Peters was deposed on February 25, 2014.  Deputy Peters
                              was one of the Lane County employees who responded to the
                              courtroom on February 12, 2013.  Plaintiff has designated portions

of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition.

| | |
|---|---|
| **42. Witness Name:** | **Pinney, Becky** |
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Chief Nursing Officer, Corizon |
| Time for Direct: | 10 minutes |
| Testimony: | Ms. Pinney was deposed on May 13, 2014. She is the Chief Nursing Officer for Corizon. Plaintiff has designated portions of her deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in her deposition. |
| **43. Witness Name:** | **Pleich, Jacob** |
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Mental Health Specialist, Corizon Health, Inc. |
| Time for Direct: | 25 minutes |
| Testimony: | Mr. Pleich was deposed on January 28, 2014. He was one of the Corizon employees who treated Mr. Green on February 12, 2013. Plaintiff has designated portions of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition. |
| **44. Witness Name:** | **Pugh, Charles** |
| Address: | c/o The Claiborne Firm, P.C.<br>410 E. Bay Street<br>Savannah, GA 31401 |
| Occupation: | Medical doctor |
| Time for Direct: | 30 minutes |
| Testimony: | See Exhibit B attached |

**45.  Witness Name:**        **Pulver, Mark**

Address:                      1418 220th Street SW, Bothell, WA 98021

Occupation:                   Software engineer

Time for Direct:              20 minutes

Testimony:                    Mr. Pulver is married to Sandy Pulver, the mother of Casey Green. He works as a software engineer for Spectrum Controls. He knew Casey Green for approximately ten years.

Mr. Pulver will testify about his observations of Casey both before and after the February 2013 incident at the jail. He will testify about spending time with Casey before his injury.

Mr. Pulver also will testify about how Sandy attempted to help Casey, both before and after the February 2013 incident at the jail. He will testify that she did everything she could to help Casey.

He will testify about the impact that Casey's injury and death have had on Sandy Pulver. He also will testify about Casey's conscious pain and suffering after his February 2013 injury.

**46.  Witness Name:**        **Pulver, Sandy**

Address:                      1418 220th Street SW, Bothell, WA 98021

Occupation:                   Not working due to injury

Time for Direct:              45 minutes

Testimony:                    Ms. Pulver was deposed on December 17, 2014. She is the mother of Kelly Green. She will testify about her relationship with her son, both before and after the February 2013 incident at the jail. She will testify about the impact that Casey's injury and death have had on her and her ex-husband Kelly Green. She will testify about Casey's conscious pain and suffering after his February 2013 injury. Any additional trial testimony will be based on matters covered in her deposition.

47. **Witness Name:**     **Rahm, Kelly**

Address:                   c/o Lane County Counsel
                           125 East 8th Avenue
                           Eugene, OR  97401

Occupation:                Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:           15 minutes

Testimony:                 Deputy Rahm was deposed on January 28, 2014.  She was one of the Lane County employees who responded to the courtroom on February 12, 2013.  Plaintiff has designated portions of her deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in her deposition.

48. **Witness Name:**     **Ralph, Robert**

Address:                   c/o Lane County Counsel
                           125 East 8th Avenue
                           Eugene, OR  97401

Occupation:                Deputy Sheriff, Lane County Sheriff's Office

Time for Direct:           25 minutes

Testimony:                 Deputy Ralph was deposed on January 28, 2014.  He was the Lane County employee who accompanied Mr. Green to the hospital on February 12, 2013.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition.

49. **Witness Name:**     **Riner, Betty**

Address:                   c/o The Claiborne Firm, P.C.
                           410 E. Bay Street
                           Savannah, GA 31401

Occupation:                Advanced Practice Registered Nurse

Time for Direct:           30 minutes

Testimony:                 See Exhibit C attached.

**50.  Witness Name:**    **Ruiz, Amanda**

Address:    PO Box 1309
            Studio City, CA 91614

Occupation:    Psychiatrist

Time for Direct:    90 minutes

Testimony:    Dr. Ruiz has been designated as an expert witness by plaintiffs. She will testify consistent with her expert report.

**51.  Witness Name:**    **Shafer, Bruce**

Address:    8510 SW 148th Terrace, Beaverton, OR 97007

Occupation:    Director, Edwards Center

Time for Direct:    20 minutes

Testimony:    Mr. Shafer has known Kelly Green for three decades. He works as a director at the Edwards Center, which helps people with developmental disabilities. He talks with Kelly regularly.

Mr. Shafer will testify about his observations regarding Casey Green, whom he knew since birth. He will testify about spending time with Casey, both before and after he was diagnosed with schizophrenia. He will explain how Casey's family and his family spent a lot of time camping and fishing, among other things.

Mr. Shafer also will testify about how Kelly attempted to help Casey. He will testify that Mr. Green did what he could to help his son.

Mr. Shafer will testify about how Casey's injury and death have impacted Mr. Green.

**52.  Witness Name:**    **Sholey, Jeff**

Address:    c/o Stewart Sokol & Larkin LLC
            2300 SW First Ave., Suite 200
            Portland, OR 97201

Occupation:    Interim Chief Financial Officer, Corizon Health, Inc.

| | |
|---|---|
| Time for Direct: | 10 minutes |
| Testimony: | Mr. Sholey was deposed on November 10, 2014. He is the Interim Chief Financial Officer of Corizon. Plaintiff has designated portions of his deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in his deposition. |

**53.  Witness Name:**    **Smith, Leah**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | LPN, Corizon Health, Inc. |
| Time for Direct: | 15 minutes |
| Testimony: | Nurse Smith was deposed on April 18, 2014. She is one of the Corizon employees who treated Mr. Green on February 12, 2013. Plaintiff has designated portions of her deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in her deposition. |

**54.  Witness Name:**    **Thomas, Vicki**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Regional Clinical Services Manager, Corizon Health, Inc. |
| Time for Direct: | 40 minutes |
| Testimony: | Nurse Thomas was deposed on February 21, 2014. She was one of the Corizon employees who treated Mr. Green on February 12, 2013. Plaintiff has designated portions of her deposition testimony to be played at trial. Any additional trial testimony will be based on matters covered in her deposition. |

**55.  Witness Name:**    **Tomseth, Tracy**

| | |
|---|---|
| Address: | c/o Eugene City Attorney's Office<br>125 E. 8th Ave, 2nd Floor<br>Eugene, OR 97401 |

| | |
|---|---|
| Occupation: | Clerk, Fire Department, City of Eugene |
| Time for Direct: | 30 minutes |
| Testimony: | Ms. Tomseth was deposed on January 28, 2014.  She was the judicial clerk who was present in the courtroom on February 12, 2013.  Her trial testimony will be based on matters covered in her deposition. |

**56.  Witness Name:    Viteri, Pablo**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Vice President of Utilization Management, Corizon Health, Inc. |
| Time for Direct: | 10 minutes |
| Testimony: | Mr. Viteri was deposed on May 12, 2014.  He is the Vice President of Utilization Management for Corizon.  Plaintiff has designated portions of his deposition testimony to be played at trial.  Any additional trial testimony will be based on matters covered in his deposition. |

**57.  Witness Name:    von Zielbauer, Paul**

| | |
|---|---|
| Address: | 953 5th Street, Apt. 5, Santa Monica, CA 90403 |
| Occupation: | Founder, Roadmonkey (travel company) |
| Time for Direct: | 30 minutes |
| Testimony: | See Exhibit D attached |

**58.  Witness Name:    White, Kirstin**

| | |
|---|---|
| Address: | c/o Stewart Sokol & Larkin LLC<br>2300 SW First Ave., Suite 200<br>Portland, OR 97201 |
| Occupation: | Physician's Assistant, Corizon Health, Inc. |
| Time for Direct: | 60 minutes |

Testimony:     Ms. White was deposed on January 27, 2014.  She was one of the Corizon employees who treated Mr. Green on February 12, 2013. Plaintiff has designated portions of her deposition testimony to be played at trial.   Any additional trial testimony will be based on matters covered in her deposition.

**59.   Witness Name:        White, William**

Address:           23923 233rd Way SE, Maple Valley, WA 98038

Occupation:        Owner, Ethos Windows and Doors

Time for Direct:   20 minutes

Testimony:     Mr. White has known Kelly Green for more than two decades.  He owns a window and door installation company.  He talks with Kelly regularly and sees Kelly a couple of times per year.

Mr. White will testify about his observations regarding Casey Green, whom he first met when Casey was a child.  He will testify about spending time with Casey, both before and after he was diagnosed with schizophrenia.  He will explain how Casey's family and his family spent a lot of time camping, fishing and hunting, among other things.

Mr. White also will testify about how Kelly attempted to help Casey. He will testify that Mr. Green did what he could to help his son.

Mr. White will testify about how Casey's injury and death have impacted Mr. Green.

Dated this 18th day of May, 2015.

Respectfully submitted,

/s/ Elden M. Rosenthal
Elden M. Rosenthal, OSB No. 722174
Email:  elden@rgdpdx.com
Michael A. Greene, OSB No. 802445
Email: mike@rgdpdx.com
John T. Devlin, OSB No. 042690
Email: john@rgdpdx.com
Phone: (503) 228-3015
Fax: (503) 228-3269

## EXHIBIT A – Greg Lauer

Greg Lauer was the attorney for Brett Fields, an inmate of the Lee County jail in Florida. On behalf of Mr. Fields, Mr. Lauer filed a lawsuit in August 2009 against Prison Health Services alleging that he was partially paralyzed as a result of receiving inadequate medical care during his jailing. The case went to trial in March 2011 in the United States District Court for the Middle District of Florida. The jury found in favor of Mr. Fields, and against Corizon Health, Inc. (Prison Health Services ("PHS") had become Corizon by the time of trial), awarding $700,000 in compensatory damages and $500,000 in punitive damages. The jury concluded that PHS, through its policy or custom, refused to provide Mr. Fields proper medical attention in violation of the Eighth Amendment. Specifically, the jury concluded that Mr. Fields had a serious medical need, that PHS was deliberately indifferent to his serious medical need, and that PHS's actions proximately caused Mr. Fields' damages.

The case was appealed by Corizon to the United States Court of Appeals for the Eleventh Circuit. The Eleventh Circuit unanimously (3-0) affirmed the verdict in September 2012. The Eleventh Circuit issued its opinion five months before the events at issue in this case.

Mr. Lauer will testify to the facts of the case as set forth in the Eleventh Circuit's opinion (see attached opinion with pertinent facts highlighted). Specifically, Mr. Lauer will relate that the Eleventh Circuit concluded that the evidence presented justified the trial jury to conclude that Mr. Fields suffered partial paralysis because PHS employees refused to treat symptoms of paralysis and refused to send him to a hospital for evaluation, because of PHS policies and customs designed to save costs. The nurse primarily responsible for responding to Mr. Fields' repeated requests for medical assistance, Ms. Bettie Allen, testified in deposition (the deposition was read into evidence at trial) that supervisors yelled at nurses because inmates were sent to hospitals, and that three PHS supervisors repeatedly emphasized that it cost "so much money" every time an inmate was sent to a hospital. Mr. Lauer will testify that the Eleventh Circuit opinion stated:

> "The jury could have thus concluded that Prison Health delayed treatment to save money, which is not a medical justification. Although an entity like Prison Health can generally include cost allocations in formulating its policies, see *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1312 (11th Cir.2011), cost is not a factor which can justify the lack of timely medical treatment for something as serious as paralysis: "Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment of inmates.""

490 Fed.Appx. 174
This case was not selected for publication in the
Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Eleventh Circuit Rules
36-2, 36-3. (Find CTA11 Rule 36-2 and Find CTA11
Rule 36-3)
United States Court of Appeals,
Eleventh Circuit.

Brett FIELDS, Plaintiff–Appellee,
v.
CORIZON HEALTH, INC. f.k.a. Prison Health
Services, Inc., Defendant–Appellant.
No. 11–14594. | Sept. 6, 2012.

**Synopsis**
**Background:** Inmate brought action against medical
services provider, as well as a doctor and nurse employed
by provider for their alleged deliberate indifference to his
medical emergency that resulted in inmate's partial
paralysis, in violation of Eighth Amendment protections
against cruel and unusual punishment. After jury found in
favor of inmate, provider moved for judgment as a matter
of law and a new trial. The United States District Court
for the Middle District of Florida, No. 2:09–cv–00529–
JES–DNF, 2011 WL 3878373, John E. Steele, J., denied
the motion. Provider appealed.

**Holdings:** The Court of Appeals held that:

[1] testimony was sufficient to establish that provider had a
policy defining emergencies only as life or death
situations;

[2] failure of nurse to respond to inmate's medical
emergency constituted deliberate indifference;

[3] testimony by doctors was sufficient to establish causal
link between provider's policy of restricting the
transportation of inmates to hospitals and inmate's
paralysis;

[4] provider waived inconsistent verdicts challenge; and

[5] "malice" could be defined as "reckless or callous
disregard."

Affirmed.

West Headnotes (5)

[1]    **Civil Rights**
       ⬤═Criminal law enforcement; prisons

       Testimony by nurse employed by private
       medical services provider contracted to provide
       medical services to prison inmates, that
       definition of "emergency" was restricted to only
       "life-or-death" situations, as well as evidence
       that a prison inmate was refused help after
       hitting the emergency call button in his cell
       hundreds of times, and that provider's staff
       refused to assist inmate in any way other than by
       putting him under observation after he was
       partially paralyzed, created a fact issue as to
       whether provider's policy for treatment of
       inmates defined "emergency" only as a "life-or-
       death" situation, in inmate's action against
       provider and nurse for their allegedly deliberate
       indifference that violated Eighth Amendment.
       U.S.C.A. Const.Amend. 8.

       5 Cases that cite this headnote

[2]    **Civil Rights**
       ⬤═Criminal law enforcement; prisons

       Evidence of failure by nurse, doctor, and
       medical services provider to respond to inmate's
       paralysis that was clearly demonstrated by his
       failure to react to being hit with a reflex
       hammer, his inability to walk, and his
       incontinence, was sufficient to create fact issue
       for jury as to whether defendants were
       deliberately indifferent to inmate's medical
       emergency in inmate's action for violation of the
       protection against cruel and unusual punishment
       under the Eighth Amendment; no medical
       justification explained delay in sending inmate
       to a hospital for treatment, and evidence
       supported conclusion that inmate was refused
       treatment due to its potential cost. U.S.C.A.
       Const.Amend. 8.

       Cases that cite this headnote

[3]    **Civil Rights**
       ⬤═Criminal law enforcement; prisons

       Testimony by doctors, that timely medical
       attention to relieve the pressure on inmate's

spine would likely have averted inmate's partial paralysis was sufficient to create fact issue for jury as to whether there was a causal link between inmate's paralysis and provider's policy restricting the transportation of inmates with serious medical needs to hospitals, in inmate's action against nurse and provider alleging deliberate indifference to his medical emergency in violation of Eighth Amendment protections against cruel and unusual punishment. U.S.C.A. Const.Amend. 8.

4 Cases that cite this headnote

[4]    **Federal Civil Procedure**
⟺Special Verdict
**Federal Civil Procedure**
⟺Verdict or Findings Contrary to Law or Evidence

Medical services provider's failure to object to the form of the jury's verdict and the jury's answers at the time they were announced constituted a waiver of inconsistent verdicts challenge in provider's motion for a new trial based on jury's determination that two of provider's employees were not liable, but that provider was liable in inmate's action against provider for deliberate indifference to his medical emergency that resulted in his partial paralysis in violation of Eighth Amendment protection against cruel and unusual punishment. U.S.C.A. Const.Amend. 8. Fed.Rules Civ.Proc.Rule 49(b), 28 U.S.C.A.

Cases that cite this headnote

[5]    **Civil Rights**
⟺Exemplary or Punitive Damages

"Malice" could be defined as "reckless or callous disregard" rather than "evil intent" for the purposes of determining whether inmate was entitled to punitive damages, in his § 1983 action against medical services provider for deliberate indifference to his medical emergency that resulted in his partial paralysis. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**Attorneys and Law Firms**
*175 Dion J. Cassata, Cassata & Hanson, PL, Gregory

McNeill Lauer, Greg M. Lauer, PA, Ft. Lauderdale, FL, for Plaintiff–Appellee.

Nancy Wood Gregoire, Kirschbaum Birnbaum Lippman & Gregoire, Ft. Lauderdale, FL, Gregg A. Toomey, Bunnell & Woulfe, PA, Fort Myers, FL, for Defendant–Appellant.

Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 2:09–cv–00529–JES–DNF.
Before DUBINA, Chief Judge, JORDAN, and ALARCÓN,* Circuit Judges.
*    The Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

**Opinion**

PER CURIAM:

Brett Fields sued Prison Health Services, Inc.,[1] the provider of medical services for Lee County jails, as well as two Prison Health employees (Bettie Joyce Allen and Joseph Richards), for their allegedly unconstitutional refusal to furnish the medical care that he urgently needed. This refusal, said Mr. Fields, constituted cruel and unusual punishment. The case went to trial, where a jury found that Prison Health, through its policy or custom, refused to provide Mr. Fields proper medical attention in violation of the Eighth Amendment. Prison Health moved for judgment as a matter of law and, in the *176 alternative, for a new trial. The district court denied these requests, and Prison Health now appeals the district court's rulings.[2] After reading the briefs, reviewing the record, and considering the parties' presentations at oral argument, we affirm.

[1]    Prison Health changed its name to Corizon Health, Inc. in June of 2011, hence the name in the caption. The parties, however, refer to the entity as "Prison Health Services, Inc." throughout their briefs, and for simplicity's sake we do the same.

[2]    Prison Health also seeks review of the district court's denial of its summary judgment motion. But, after a trial on the merits, we cannot review the denial of a summary judgment motion. See Lind v. UPS, 254 F.3d 1281, 1285 (11th Cir.2001).

**I. FACTUAL BACKGROUND**
When we review a district court's denial of a Rule 50 motion for judgment as a matter of law, we consider the

whole record. But we "disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached.' " *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). We also "draw all inferences in favor of the non-moving party." *Nurse "BE" v. Columbia Palms W. Hosp. Ltd.*, 490 F.3d 1302, 1308 (11th Cir.2007). With these standards in mind, we chronicle the facts that the jury was entitled to find.

### A. MR. FIELDS' INJURY

On July 6, 2007, Mr. Fields was being held in the Lee County jail after being convicted of two misdemeanors. At the time, Mr. Fields was an athletic 24–year–old man. He was by all accounts healthy, except for a bump about half the size of a tennis ball that swelled in his left arm. The bump resulted from a spider bite, and Mr. Fields had covered the bump and bite with gauze.

As soon as he entered the jail, Mr. Fields was sent to a concrete room. There two corrections officers checked him for drugs and weapons. The officers forced Mr. Fields to remove the gauze and then sent him to a nurse. The nurses and medical staff at the jail all worked for Prison Health, a company that contracted with Lee County to provide medical services to prisoners in the County's jails. Mr. Fields was seen by a nurse named Bettie Joyce Allen. Ms. Allen found Mr. Fields to be in good health. This was the first time Mr. Fields met Ms. Allen, but it would not be the last time, nor the most significant time.

The jail's medical staff sent Mr. Fields to an isolated part of the jail, where they treated him for a staphylococcal infection, which is commonly known as a staph infection. The treatment did not work, however. The swollen arm remained swollen, and so on July 14th Mr. Fields complained about his open lesion.

The reason for the treatment's failure was simple. A staph infection is caused by bacteria, which is generally treated by a form of penicillin called methicillin. But Mr. Fields did not have the garden-variety bacteria that causes a staph infection. His infection was caused, rather, by methicillin-resistant *Staphylococcus aureus*, commonly known as MRSA. As its name implies, MRSA is resistant to treatment through methicillin. So Mr. Fields' treatment did not work.

Mr. Fields again requested treatment on July 24th. In a medical-request form, Mr. Fields wrote that "the meds that were given to" him were "not helping the open wound." **Trial Ex. 1 at 15.** Apparently, the Prison Health medical staff eventually sent Mr. Fields to a medical block at the jail that dealt with MRSA infections. It appears that the Prison Health staff provided lax treatment, so that additional treatment also did not work.

*177 On August 6th Mr. Fields felt his back go sore and numb. At first, as the young and healthy are apt to do, Mr. Fields swiped all concerns away. He believed that the soreness resulted from a pinched nerve or something trivial. But his pain increased.

On August 7th uncontrollable twitching affected his legs. For six hours, Mr. Fields dealt with the pain. By a little after midnight on August 8th Mr. Fields could no longer tolerate the pain. The cell had an emergency button, and Mr. Fields, as well as his roommate, began to thump the button. Mr. Fields testified that he hit the button hundreds of times.

A Prison Health employee—a nurse—eventually showed up, and Mr. Fields explained the pain that he felt. The nurse did nothing, and told Mr. Fields that he would have to wait until the morning, when a doctor could examine him. His legs twitching uncontrollably, Mr. Fields continued to bang the emergency button to no avail. A corrections officer eventually ordered Mr. Fields and his roommate to stop pressing the button.

On the morning of August 8th Mr. Fields dragged himself to the shower. As he tried to return to his cell, his legs gave out, and he collapsed. Using walls and tables to counterbalance gravity, Mr. Fields hoisted himself to his cell, where he again collapsed.

By now, Mr. Fields could not walk and his lower body felt numb. Prisoners throughout screamed "man down," a prisoner-created alarm that, in theory, informed the medical staff of an emergency. Some corrections officers and nurses thereafter appeared at Mr. Fields' cell. They commanded Mr. Fields to get up, but he couldn't. Mr. Fields stayed on the floor until an officer brought a wheelchair. The officers lifted Mr. Fields from the floor and placed him on the wheelchair. They then rolled him to the jail's medical department.

A nurse examined Mr. Fields at 8:55 a.m. In her notes, she wrote that Mr. Fields complained that he could not walk. *See* **Trial Ex. 1 at 13.** As soon as the nurse finished her examination, Mr. Fields met Joseph Richards, a physician's assistant who worked for Prison Health. Now, August 8th was a Wednesday, and Mr. Richards did not normally examine inmates on Wednesdays. But Mr. Fields' case constituted a medical emergency, Mr. Richards testified, and he therefore examined Mr. Fields. *See* **R. Vol. 8:118 at 92–93.** Mr. Fields recounted his symptoms, which included weakness, numbness, muscle spasms, and pain. He described his pain as a ten on a ten-point scale. Mr. Richards too wrote that Mr. Fields complained that he couldn't walk. *See* **Trial Ex. 1 at 13.**

Mr. Richards used a reflex hammer to test Mr. Fields' patellar reflex, i.e., to test his knee-jerk reaction. Nothing happened; Mr. Fields had no reflex at all. Mr. Richards also scraped Mr. Fields' feet with a pin. Although Mr. Fields could just feel the pin, he had no reaction whatsoever.

Despite these warning signs, and his realization that there was a medical emergency, Mr. Richards gave Mr. Fields only Tylenol before he left. A nurse and a corrections officer took Mr. Fields back to his cell. It was now about 9:30 a.m. on August 8th, and a nurse recommend that Mr. Fields be housed in the medical block. After fifteen minutes, Mr. Fields was thrown into the back of a van. Corrections officers dragged him from the van, placed him in a wheelchair, and took him to the medical block. The officers placed Mr. Fields on the floor in a new cell and took the wheelchair.

*178 Still in pain and now exhausted from lack of sleep, Mr. Fields asked every Prison Health nurse that came by his cell that day—about ten by Mr. Fields' calculation— for help. He informed them that he was exhausted, that his legs twitched without relent, that his lower body was numb, that his legs were weak. Like clockwork, or maybe as if by pact, all the nurses agreed on the same approach: they did nothing.

A little after midnight on August 9th, Mr. Fields attempted to use the bathroom for the first time in days. He crawled to the toilet, but then he felt his intestines escaping from his rectum. Mr. Fields panicked, and the inmates in his cell begin to holler "man down." Ms. Allen—the nurse who had checked Mr. Fields on his first day in jail—soon appeared. The inmates begged Ms. Allen to take Mr. Fields to the hospital. After corrections officers cleared the cell, Ms. Allen walked in. Mr. Fields explained that his intestines were coming out, and Ms. Allen demanded that Mr. Fields roll over. Mr. Fields, who was on the floor, explained that he couldn't move the lower half of his body. Ms. Allen jerked Mr. Fields' body, obtained some K-Y Jelly, and pushed the intestines back in.

Once she finished, Ms. Allen pushed Mr. Fields' legs back and forth. Mr. Fields, however, did not react. When she was done, Ms. Allen called Mr. Fields a liar. Ms. Allen stated that, if Mr. Fields had not gone to the bathroom for days, he would be in severe pain as she moved his legs. Mr. Fields explained that he could not feel anything below his stomach.

By now it was nearing 3:00 a.m. On Ms. Allen's orders, the corrections officers dragged Mr. Fields on top of a sheet and carried him on the sheet to an observation room. His pleas having been rejected by Ms. Allen, Mr. Fields dragged himself around the room, set up his bed, and tried to make himself comfortable. Ms. Allen, by her own deposition testimony, which was read to the jury, did not

examine Mr. Fields further once he was placed in the observation room. In other words, there was no observation of Mr. Fields in the observation room.

Mr. Fields lay in agony throughout the early hours of August 9th. While in the observation room, Mr. Fields begged six Prison Health employees for help. Again, none so much as lifted a finger.

Dr. Noel Dominguez, a doctor who worked for Prison Health, arrived at work at the Lee County jail at 8:00 a.m. on August 9th—about 24 hours after Mr. Fields' paralysis began. Incredibly, neither Ms. Allen nor the other six Prison Health employees with whom Mr. Fields spoke informed Dr. Dominguez about Mr. Fields, despite the fact that August 9th was a relatively light work day. Dr. Dominguez (who as noted was unaware of Mr. Fields' condition) therefore did not see Mr. Fields until 10:30 a.m. There is no explanation in the record for the two-and-a-half-hour delay, but the jury certainly could have inferred that the delay was in part due to the Prison Health employees' lack of concern about Mr. Fields and failure to tell Dr. Dominguez about Mr. Fields' condition.

Upon seeing Mr. Fields, Dr. Dominguez asked him what was wrong. Mr. Fields told him his symptoms. Dr. Dominguez then ran the same tests that Mr. Richards had performed. Immediately, he thought that there was something seriously wrong with Mr. Fields. Concluding that Mr. Fields needed an MRI, Dr. Dominguez commanded that Mr. Fields be sent to a hospital's emergency room right away.

*179 Dr. Dominguez gave the command as soon as he finished his examination of Mr. Fields, but no one called an ambulance until 12:23 p.m. *See* **Trial Ex. 2** at 3. The ambulance arrived within five minutes of being summoned.

Doctors at the hospital took an MRI of Mr. Fields' spine. The MRI showed that an abscess was compressing the spine. An abscess is a collection of pus that forms around tissue to protect other tissue from bacterial infection. Mr. Fields' abscess, unfortunately, formed near his spine, and, as it grew, it damaged the nerves in his spinal cord. This compression of his spine and damage to his nerves caused Mr. Fields' numbness and eventual paralysis. Within hours of Mr. Fields' arrival at the emergency room, Dr. Jaime Alvarez operated on him to relieve the compression.

Time is crucial where an abscess compresses the spine. According to Dr. Dominguez, as well as Mr. Fields' medical expert, a patient who has the abscess removed within 24 hours of paralysis stands a good chance of recovery. That is, where a patient afflicted by spinal compression has an operation within 24 hours of his paralysis setting in, he or she is likely to walk again. But the odds plummet after those initial 24 hours.

The record shows that paralysis (as compared to numbness) afflicted Mr. Fields sometime after 8:30 a.m. on August 8th. Therefore, had Mr. Fields received treatment around that time on August 9th—around 24 hours later—he could have averted permanent damage to his legs. But he did not receive that treatment because Prison Health delayed his treatment. Because of this delay, Mr. Fields missed the critical 24-hour window. Though Mr. Fields can, after years of rehabilitation, now travel with a walker, he is still partially paralyzed from the waist down.

### B. PRISON HEALTH'S POLICIES

Remarkably, neither side introduced Prison Health's policy manual at trial. Instead, the parties introduced evidence of Prison Health's medical policies through the testimony of Ms. Allen and Prison Health's corporate representative. Prison Health's corporate representative testified that nurses and physicians could send inmates to hospitals only in emergencies. *See* R. Vol. 8:118 at 187. Prison Health's corporate representative defined an emergency as a critical injury or life-threatening "injury or illness," but she never testified that this definition was communicated to the medical staff. R. Vol. 8:118 at 187. Ms. Allen corroborated part of this testimony. Nurses, Ms. Allen said, "weren't trained to designate whether somebody" had "to go to the ER;" to the contrary, "that's a doctor's job to do." R. Vol. 8:118 at 71. Hence, Prison Health allowed nurses to send inmates to the hospital only in an emergency, but then left them to figure out what an emergency was. To Ms. Allen, an emergency was narrowly defined as when someone is "dying any minute." R. Vol. 8:118 at 71. Ms. Allen elaborated on her definition by giving examples of "emergencies." She, for instance, had called ambulances where a man was beaten half to death and where a man had no pulse, but had placed inmates with partial paralysis in an observation room. *See* R. Vol. 8:118 at 79–80, 86–87.

Prison Health enforced its restrictive policy against sending inmates to the hospital. Ms. Allen testified that, at monthly nurses' meetings, medical supervisors "yelled a lot about nurses" sending inmates to hospitals. *See* Vol. 8:118 at 65. Repeatedly, Prison Health instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital. *See* Vol. 8:118 at 71. In fact, Ms. Allen remembered three separate supervisors who emphasized the *180 policy to her.[3]

---

[3]    Because Prison Health's policy manual was not introduced at trial, the jury never heard evidence as to which definition of emergency—that provided by Prison Health's corporate representative or the more narrow one used by Ms. Allen and/or other Prison Health staff—was the operative one. Prison Health

introduced a written policy at the summary judgment stage and now argues that we must consider it, even though it chose not to introduce that evidence at trial. This argument is frivolous. The legal standard for a motion for judgment as a matter of law requires courts to determine whether evidence introduced *at trial* supports the jury's conclusion. *See Bill John's Rests., Inc. v. NLRB*, 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). It is incoherent to say that evidence that a jury never saw somehow supports (or undermines) that jury's conclusion. *See Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1137 (5th Cir. Apr.1981) (noting that in deciding a motion for judgment as a matter of law courts look at the evidence introduced at trial).

As noted above, the abscess presented life-changing consequences for Mr. Fields if left untreated for more than 24 hours. It thus constituted an objective medical emergency.

In fact, Mr. Richards—one of Prison Health's own employees—saw Mr. Fields because the situation was a medical emergency. Both Dr. Dominguez and Mr. Fields' medical expert also testified that Mr. Fields had a medical emergency. After he tapped Mr. Fields with the reflex hammer and saw no response, Dr. Dominguez believed that Mr. Fields "needed to be sent to the emergency room right away." R. Vol. 8:118 at 161. And Mr. Fields' medical expert testified that there was no medical justification for refusing to send Mr. Fields to a hospital once he could no longer walk. *See* R. Vol. 7:117 at 111. Dr. Alvarez, the surgeon, agreed with the other two doctors. "[A]ny discovery of weakness in the legs," he said, "warrants immediate attention, immediate action, to find out what's causing it." R. Vol. 8:118 at 13. He bluntly said that it is an emergency to find the cause of the legs' weakness. *See* R. Vol. 8:118 at 14.

Finally, like Mr. Fields' medical expert, Dr. Alvarez testified that, with Mr. Fields' symptoms, no medical justification existed for not taking an MRI. *See* R. Vol. 8:118 at 24. "[I]f the paralysis is obvious, any nurse or physician's assistant, any health-care personnel with some training, would be able to recognize that." R. Vol. 8:118 at 34. Even Mr. Richards recognized that partial paralysis would result from tumors, trauma to the spinal cord, or spinal compression. *See* R. Vol. 8:118 at 129. Significantly, there was no contrary testimony from Prison Health: Prison Health's medical expert testified that back pain was not a dire emergency but did not opine that paralysis is not a medical emergency.

Although these doctors testified that weakness in the legs requires, at the least, an MRI, Ms. Allen incredibly testified that she would not send someone with paralysis to the hospital. Prison Health had no MRI available in Lee County jails, but, when Ms. Allen had encountered inmates with symptoms of partial paralysis, she had

simply "put them in an observation cell and put them down to see a doctor." R. Vol. 8:118 at 86. This was, Ms. Allen assured the jury, the norm. *See* R. Vol. 8:118 at 87. In light of this testimony by Ms. Allen, the jury was entitled to reject the testimony of Prison Health's corporate representative as to what constituted an emergency and find that Prison Health had a custom or policy of not sending inmates with paralysis to the hospital unless they were near death.

## C. PROCEDURAL HISTORY

After four days of trial, the jury found that Mr. Richards and Ms. Allen had not violated the Eighth Amendment. The **\*181** jury, however, found that Prison Health had a custom or policy that did violate Mr. Fields' constitutional rights. Specifically, the jury concluded that Mr. Fields had a serious medical need, that Prison Health was deliberately indifferent to his serious medical need, and that Prison Health's actions proximately caused Mr. Fields' damages. The jury awarded Mr. Fields $700,000 in economic damages and $500,000 in punitive damages.

In post-trial motions, Prison Health asked the district court to grant it judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Prison Health argued that there was insufficient evidence to show that it had a policy or custom of refusing to send inmates to hospitals. Prison Health also argued that Mr. Fields had not shown that its policy caused his injury. In the alternative, Prison Health requested a new trial under Rule 59. A new trial should have been granted, Prison Health asserted, because the jury did not follow the jury instructions, because the jury's verdict was inconsistent, and because the jury instructions were incorrect with regard to the punitive damages.

In a thorough 29–page order, the district court denied Prison Health's motion for judgment as a matter of law or, alternatively, for a new trial. Prison Health appealed.

## II. STANDARD OF REVIEW

We undertake de novo review of a district court's denial of a motion for judgment as a matter of law. *See Lambert v. Fulton Cnty.*, 253 F.3d 588, 594 (11th Cir.2001). Nevertheless, we must affirm the jury's decision "if there is evidence from which" the jury "reasonably could have resolved the matter the way it did." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir.2008).

We reverse a district court's decision on a motion for new trial only if the district court abused its discretion. *See Lambert*, 253 F.3d at 595. A district court should grant a new trial only where the "great weight" of evidence

contradicts the jury's verdict. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir.2001).

## III. ANALYSIS

The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. CONST. amend. VIII. The prohibition against cruel and unusual punishment applies to states under the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

For years, courts have recognized that a prison staff's deliberate indifference "to an inmate's serious medical needs violates the inmate's right to be free from cruel and unusual punishment." *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir.1989). And a prisoner whose Eighth Amendment rights are violated may sue the prison staff members who violated those rights under 42 U.S.C. § 1983. That statute also allows the prisoner to sue the municipality—like a county—who runs the prison system. To do so, the prisoner must show that the municipality had a "custom or policy that constituted deliberate indifference to that constitutional right." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir.2004). The prisoner must show too that the custom or policy caused the constitutional violation, as respondeat superior liability is not permitted. *See id.* Although Prison Health is not a governmental entity, "[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity," that private **\*182** entity, like a municipality, may be held liable under § 1983. *Ancata v. Prison Health Servs.*, 769 F.2d 700, 703 (11th Cir.1985).

## A. SUFFICIENCY OF EVIDENCE AS TO POLICY OR CUSTOM

To show that the government denied him medical care in violation of his Eighth Amendment rights, a prisoner must show an objectively serious medical need and show that "the prison official's response to that need was poor enough to constitute an unnecessary and wanton infliction of pain." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir.2011) (per curiam) (internal quotation marks omitted). A medical need is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003). The prisoner must additionally demonstrate that the prison official or municipality acted with deliberate indifference. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir.2000).

As noted above, a municipality or entity like Prison Health is liable only where its custom or policy causes the constitutional injury. *See AFL–CIO v. City of Miami,* 637 F.3d 1178, 1187 (11th Cir.2011). "When a municipal policy itself violates federal law ... resolving issues of fault and causation is straightforward." *Id.* (internal quotation marks omitted). But, if the policy or custom is facially lawful, "the plaintiff must establish that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Id.*

Prison Health does not dispute that Mr. Fields had a serious medical need. Instead, Prison Health contends that Mr. Fields offered insufficient evidence to show that it had a policy or custom (1) that was deliberately indifferent to Mr. Fields' medical needs, and (2) that violated Mr. Fields' constitutional rights. After a review of the trial transcript and the exhibits, we disagree and conclude that the jury "reasonably could have resolved the matter the way it did." *Rodriguez,* 518 F.3d at 1264.

Prison Health is a private entity that provides medical services to prisoners in Lee County's place, and so it can be held liable only if it had a "custom or policy that constituted deliberate indifference to [a] constitutional right." *McDowell,* 392 F.3d at 1289. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Goebert v. Lee Cnty.,* 510 F.3d 1312, 1332 (11th Cir.2007). A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented with "deliberate indifference as to its known or obvious consequences." *McDowell,* 392 F.3d at 1291.

We have repeatedly held that "deliberate indifference" includes "the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem," where "the delay does seriously exacerbate the medical problem," and where "the delay is medically unjustified." *Harper v. Lawrence Cnty.,* 592 F.3d 1227, 1235 (11th Cir.2010) (quoting *Taylor,* 221 F.3d at 1259–60). A delay of even hours may be deliberately indifferent given the "reason for the delay and the nature of the medical need." *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir.1999). The evidence at trial supports the jury's determination that Prison Health had a policy that delayed treatment of serious medical problems.

[1] Both Ms. Allen and Prison Health's corporate representative testified that Prison Health did not allow nurses or physician's *183 assistants to send inmates to hospitals, except in emergencies. *See* R. Vol. 8:118 at 70, 187. Prison Health's representative defined "emergency" as a critical injury or life-threatening injury or illness, but the definition was not communicated to the medical staff, and the jury could have reasonably found that Ms. Allen and the rest of the staff defined "emergency" much more

narrowly. According to Ms. Allen, under Prison Health's definition, the word "emergency" was restricted to a life-or-death situation. Except for those life-or-death situations, it was for a doctor to send an inmate to the hospital. *See* R. Vol. 8:118 at 71. Given the failure of Prison Health to introduce its policy manual, the jury could have accepted Ms. Allen's more-restrictive definition of emergency as the operative one.

The evidence at trial, moreover, supports Ms. Allen's definition over the corporate representative's. The nurse's reaction on the night that Mr. Fields hit the emergency button hundreds of time and the refusal of over a dozen Prison Health medical staff members to do anything in response to Mr. Fields' pleas for help indicate that "emergency" meant only a life-or-death situation. After all, the nurse told Mr. Fields that he would have to wait until a doctor saw him, and the staff members who later saw Mr. Fields or heard his pleas for help did absolutely nothing. Critically, Ms. Allen further testified that the norm at Prison Health was to put inmates with partial paralysis in an observation room and wait for a doctor to see them. It is, in fact, what she had done the previous times that she had come across partially paralyzed inmates. *See* R. Vol. 8:118 at 86–87. And, as noted earlier, Prison Health never introduced a manual or policy guide at trial that described any other policy. Nor did Prison Health introduce anything in writing defining "emergency."

Despite not being a life-or-death situation, Mr. Fields' situation undoubtedly constituted a serious medical need under the Constitution. For Eighth Amendment purposes, the "medical need of the prisoner need not be life threatening." *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir.1989). *Accord Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir.2010) ("A medical condition need not be life threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."). Thus, we have recognized that injuries like fractured hips and broken feet—which are unlikely to cause death and are far less serious than paralysis—constitute "serious medical needs." *See Brown v. Hughes,* 894 F.2d 1533, 1538 (11th Cir.1990) (per curiam); *Mandel v. Doe,* 888 F.2d 783, 790 (11th Cir.1989). Constitutionally, paralysis is a serious medical need; medically, paralysis is a serious emergency.

[2] At trial, the doctors testified without contradiction that *any form of paralysis,* partial or total, or weakness of the legs constituted a medical emergency. Mr. Fields' lack of reaction after being hit with a reflex hammer, Dr. Dominguez explained, was an emergency. *See* R. Vol. 8:118 at 161. And the doctors testified that delay in treatment would "detrimentally exacerbate" Mr. Fields' medical problems. Treatment within 24 hours was critical to anyone in Mr. Fields' situation. Plus, anyone with any medical training (and for that matter anyone without any

medical training) should have realized that Mr. Fields' paralysis required transportation to a hospital. *See* R. Vol. 8:118 at 34. Given Prison Health's extremely narrow definition of "emergency," and given the testimony presented at trial, the jury could reasonably conclude that Prison Health *184 had a policy that improperly delayed treatment of serious medical needs, like paralysis, where such delay would detrimentally exacerbate an inmate's condition.

The jury could also have reasonably concluded that the delay here was medically unjustified. The doctors at trial testified that *no* medical justification existed for not sending Mr. Fields to a hospital and that any person with medical training would have known that Mr. Fields required medical help. *See* R. Vol. 7:117 at 111; R. Vol. 8:118 at 13–14, 24. And paralysis is such an uncommon, serious, and traumatic event that even someone without any medical training would have recognized the situation as requiring immediate care by a doctor. *See Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir.1998) (noting that being wheelchair bound is a serious medical need to which even laymen are aware); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir.2004) (quoting *Taylor v. Franklin Cnty.*, 104 Fed.Appx. 531, 538 (6th Cir.2004)) ("Such obvious signs of reoccurring incontinence and debilitating immobility were clear symptoms of a serious problem, even if Defendants did not choose to believe Plaintiff.").

Mr. Fields' objectively verified inability to walk, lack of reflexes, and incontinence so alarmed his fellow inmates that they begged Ms. Allen to take Mr. Fields to the hospital. Yet over a dozen Prison Health nurses ignored Mr. Fields' pleas. Mr. Fields also testified that Mr. Richards examined his reflexes and sensation—just like Dr. Dominguez did—with a similar result. *See* R. Vol. 9:119 at 51–52. But, unlike Dr. Dominguez, Mr. Richards did nothing except give Mr. Fields Tylenol. Mr. Richards acknowledged that trauma, tumors, and spinal compression would cause partial paralysis—all of which are weighty medical problems. *See* R. Vol. 8:118 at 129. A reasonable jury could have concluded that no medical justification explained the delay. The evidence, in sum, sufficed to permit a finding of deliberate indifference: "[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." *Ancata*, 769 F.2d at 704. *See also Brown*, 894 F.2d at 1538 ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

Plus, if the jury did ask itself why Prison Health delayed treatment for Mr. Fields' paralysis, it could have concluded that it delayed treatment to save costs. Ms. Allen noted that the Prison Health supervisors yelled at nurses because the nurses sent inmates to hospital. *See* R. Vol. 8: 118 at 65. Although Ms. Allen mentioned that some nurses sent inmates to hospitals when the inmates had no medical problems—testimony, by the way, that the

jury was free to reject given its lack of corroboration[4]— she also said that Prison Health underscored that it cost "so much money" every time an inmate went to the hospital. R. Vol. 8:118 at 70. Apparently, Ms. Allen heard this mantra from three different Prison Health supervisors. *See* R. Vol. 8:118 at 70–72. The jury could have thus concluded that Prison Health delayed treatment to save money, which is *185 not a medical justification. Although an entity like Prison Health can generally include cost allocations in formulating its policies, *see Craig v. Floyd Cnty.*, 643 F.3d 1306, 1312 (11th Cir.2011), cost is not a factor which can justify the lack of timely medical treatment for something as serious as paralysis: "Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment of inmates." *Ancata*, 769 F.2d at 705. *See also Anderson v. City of Atlanta*, 778 F.2d 678, 688 n. 14 (11th Cir.1985) (noting that lack of funds cannot justify unconstitutional treatment of inmates).

[4]   Ms. Allen also testified that she acted properly because she did not believe Mr. Fields was really in medical trouble. But the jury was not required to believe this portion of her self-serving testimony. This is especially true because Ms. Allen requested that the corrections officers move Mr. Fields to the observation room. As the Seventh Circuit wrote about a similar case, "why put him in" an observation room "if this was all an act?" *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir.2012). Ms. Allen further testified that she had placed partially paralyzed inmates in observation rooms before, and the jury could have found that this was how she dealt with such a serious medical problem.

To hold Prison Health liable, Mr. Fields had to prove as well that Prison Health implemented its policy with "'deliberate indifference' as to [the policy's] known or obvious consequences." *AFL–CIO*, 637 F.3d at 1187. Three doctors testified that Mr. Fields faced dire consequences without timely medical treatment. Even Mr. Richards testified that only trauma, tumors, or compression to the spine, all of which are obvious dangers, would explain a healthy man's inability to walk. Partial paralysis, according to the medical testimony, would be an obvious emergency that required at the very least an MRI. And yet Prison Health's policy did not allow nurses to send inmates to hospitals in this very situation, as reflected not only by what happened to Mr. Fields but also by what Ms. Allen had done in prior cases of paralysis. Without prompt medical attention, the medical testimony indicated, the likelihood of paralysis skyrocketed. With this evidence, a jury could conclude that Prison Health implemented a policy while knowing that the policy would exacerbate inmate's paralysis.

[3]   Finally, a "plaintiff must prove causation by demonstrating that the municipality's 'deliberate conduct ... was the "moving force" behind [his] injury.'" *McDowell*, 392 F.3d at 1292 (alterations in original)

(emphasis omitted). *See also Cuesta v. Sch. Bd. of Miami–Dade Cnty.*, 285 F.3d 962, 967 (11th Cir.2002) ("A plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (internal quotation marks omitted). Here, Mr. Fields had a serious medical need that Prison Health's policy did not recognize as sufficient to warrant hospital care. And testimony at trial indicated that, had Prison Health sent Mr. Fields to the hospital earlier, paralysis could have been averted. A jury could therefore reasonably conclude that Prison Health's policy restricting the transportation to hospitals of inmates with serious medical needs was a direct cause of Mr. Fields' injuries.

### B. MOTION FOR NEW TRIAL

After the district court discharged the jury, Prison Health filed a written motion for a new trial under Rule 59. Prison Health sought a new trial on three grounds. First, the jury's verdict was inconsistent. Second, the district court inadequately instructed the jury on punitive damages. Third, the jury did not follow the jury instructions. Prison Health now raises these arguments on appeal, but each of them fails.

### 1. INCONSISTENT VERDICTS

[4] In its first argument, Prison Health notes that the jury found neither Mr. Richards nor Ms. Allen liable but found Prison Health liable. The jury, Prison Health maintains, thus rendered inconsistent verdicts. Whatever the merits of this argument, Prison Health has forfeited it.

The verdict form, by Prison Health's admission, was "unquestionably a general verdict with answers to written questions." Appellant's Br. at 46. This type of verdict form falls within the bounds of *186 Federal Rule of Civil Procedure 49(b). "As a general rule, a party must raise a Rule 49(b) challenge to the form of the verdict and the jury's answers at the time they are announced...." *Wilbur v. Corr. Servs.*, 393 F.3d 1192, 1200 n. 4 (11th Cir.2004). If a party does not object before a jury is discharged, that party forfeits the argument that the verdict is inconsistent. *See, e.g., id.; Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 534–35 (5th Cir.1974). "The reason for this particular raise-it-or-lose-it rule is that, if the inconsistency is raised before the jury is discharged, the jury can be sent back for further deliberations to resolve the inconsistency in its verdict or interrogatory answers. Once the jury is gone ... that is not possible." *Pensacola Motor Sales, Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1225 (11th Cir.2012). Having failed to object to the inconsistent verdict before the district court discharged the jury, Prison Health has forfeited this argument.

### 2. JURY INSTRUCTIONS

[5] Prison Health next argues that the district court should have defined "malice" in a certain way in its jury instructions. The verdict form asked the jury, when deciding whether to award punitive damages, to consider whether Prison Health "acted with malice or reckless indifference to" Mr. Fields' "federally protected rights." Prison Health wanted the instruction to define the word "malice" as "evil intent." The district court did not do so, and Prison Health contends that it is therefore entitled to a new trial. We disagree.

Simply put, a district court "enjoys broad discretion to formulate jury instructions provided those instructions are correct statements of the law," *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir.2012) (per curiam), and we cannot conclude that the district court abused its discretion here. To the contrary, Prison Health's proposed definition of malice—"evil intent"—is too restrictive. Indeed, the Supreme Court has rejected the argument that "evil intent" is a prerequisite to an award of punitive damages under § 1983, deciding instead that a "reckless or callous disregard" standard suffices. *See Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

### 3. THE JURY'S FAILURE TO FOLLOW INSTRUCTIONS

Finally, Prison Health asserts that it deserves a new trial because the jury did not follow the jury instructions. Prison Health describes this argument as follows:

> [T]he jury could not have followed the Jury Instructions because it found that both Allen and Richards were not aware of Fields' serious medical need and, therefore, could not have found that any PHS policy or custom causing [*sic* ] them to deny him necessary medical care for that serious medical need.

Reply Br. at 11. If this is its argument, then Prison Health is again arguing that the jury rendered an inconsistent verdict. But, as already explained above, Prison Health forfeited that argument.

### IV. CONCLUSION

The judgment in favor of Mr. Fields and against Prison Health is affirmed.

**AFFIRMED.**

**Parallel Citations**
2012 WL 3854592 (C.A.11 (Fla.))

End of Document                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

### EXHIBIT B – Charles Pugh

Dr. Pugh was the Corizon Site Medical Director in 2013 and 2014 at the Chatham County Jail in Savannah, Georgia. He will testify that as the Corizon Site Medical Director he was required by Corizon to submit all physician consults and, for the last six months of his employment, emergency room transfer requests to the Corizon Regional Medical Director, and he was under constant pressure from his superior in Corizon to minimize emergency room referrals, as well as referrals to outside physicians for specialized consultations, in order to save Corizon money. Similar to the Corizon contract with Lane County, the Corizon contract with Chatham County required Corizon to pay for emergency room visits by jail inmates.

Twice a week Dr. Pugh was required to participate in telephone conferences with the Corizon Regional Medical Director regarding which Chatham County jail inmates were in the hospital. He was under constant pressure to avoid hospitalizations, to monitor all hospitalizations, to do whatever he could to have hospitalized patients discharged from the hospital and returned to the jail, to minimize hospital stays.

Dr. Pugh will explain that Corizon's constant efforts to reduce costs interfered with his ability, and the ability of his jail medical and nursing staff, to provide appropriate levels of care to inmates of the Chatham County Jail.

On August 26, 2014, Dr. Pugh, along with two Corizon nurses, met with the Chatham County Sheriff and Chief Deputy. At that meeting Dr. Pugh, and the nurses, expressed their concerns about patient safety issues and the poor quality of care being provided to Chatham County Jail inmates. Prior to August 26th, Dr. Pugh had never been disciplined or warned of any problems that Corizon had with his service. Upon learning of the meeting, Corizon began an internal investigation of Dr. Pugh and the two nurses. On September 2, Dr. Pugh and one of the nurses met again with the Sheriff and Chief Deputy. On September 12th Dr. Pugh was given a "Final Warning" by Corizon. He was then terminated from Corizon on September 24th with the excuse that that he was not meeting Corizon's scheduling needs.

Dr. Pugh will testify that at the Chatham County jail, Corizon performs intake screening at the time a person is booked into the jail.

As a site medical director, Dr. Pugh was invited to attend annual meetings with other site medical directors (and others) in Tennessee, and he attended these meetings both in 2013 and 2014. At the 2014 meetings there was a presentation one day after lunch by someone from utilization management that lasted approximately an hour- and-a-half, and was focused on how to save money. One of the topics that was emphasized was minimizing the number of emergency room referrals of jail inmates.

       Immediately before lunch, the Corizon CEO, Dr. Woodrow Myers, took the stage. He told the audience that the primary function of Corizon was to make money and that he was not embarrassed to say it.   Dr. Pugh will testify that he felt the message was inappropriate for a healthcare provider's CEO to announce, as the primary function of any healthcare provider is to practice good medicine and take proper care of its patients. It is Dr. Pugh's view that the CEO's message correctly states the priority of Corizon, that is, profits first and care second.

**EXHIBIT C – Betty Riner**

Betty Riner began working for Corizon on February 17, 2014, until September 2014 (7 months), as an advanced practice RN, clinical nurse specialist in the Chatham County Jail.

Ms. Riner will testify that the indoctrination or training that she got when she started with Corizon was one that she called "patchwork medicine." She defined that as meaning just patch up the folks that are in jail and hopefully they'll get out and won't be a financial burden for Corizon. She will testify that there was pressure not to send patients out to a hospital. If there was a desire to send a patient out to a hospital, the site medical director had to be notified who then would in turn talk to the regional medical director.

The regional medical director during her months at Corizon was a Dr. Kennedy who was then replaced by a Dr. Gonzalez. Dr. Kennedy was promoted to the Chief of Quality Control or Quality Assurance in Brentwood, Tennessee.

Ms. Riner recalls a specific example of how she sent a patient to a hospital who was suffering seizures. It turned out that the hospital diagnosed that they were pseudo seizures, not true seizures. Dr. Kennedy then called her up and lectured her for thirty minutes about showing poor judgment. This incident occurred within a few weeks of being hired. The phone call happened about two weeks after the incident.

During her job interview and orientation with Dr Kennedy – one-on-one – he said "we have to contain costs and hospital and ER visits. It costs too much money to send people out and we need to keep that at a minimum."

The HSA's name at the jail was Virginia O'Neill. She said on numerous occasions (re inmates with high dollar problems, ie colitis, baby deformed) "Let's see if we can get these people out of jail before hospitalizing." On a daily basis, Ms. Riner was expected to tell O'Neill who needed significant medical treatment. O'Neill's usual first response was, "Can we get the person released?" Ms. Riner recalls several situations where emergency care was delayed to try to arrange to have the inmate released from jail. One case – hgb of 6 but sent to doctor rather than ER. Her understanding was that Corizon had to pay for any hospitalizations. She recalls being criticized for sending an inmate with colitis to the hospital. In that situation, the inmates outside doctor (John Northrup) wrote Corizon a very critical letter. Dr. Northup then resigned from the case because Corizon would not let him keep patient in hospital.

The site medical director during all of this time was Dr. Pugh. Riner recalls that Dr. Pugh would get chewed out on a regular basis for approving hospital referrals.

Ms. Riner's recollection is that Dr. Kennedy came to the facility once after he was promoted to the Corizon headquarters office in Brentwood, Tennessee. At that site visit, he complained about the use of certain costly dietary supplements and skin emollients.

Ms. Riner recalls that were regular teleconference meetings with the regional medical director and representatives from other Corizon jails and prisons in the Florida and Georgia Region to review patients in the hospital. She indicated that at these weekly meetings the regional medical director would chastise people for sending folks offsite to hospitals.

Ms. Riner was one of the nurses who accompanied Dr. Pugh on August 26, 2014 and again on September 2, 2014, to express concerns to the County Sheriff about the quality of care being provided by Corizon to Chatham County Jail inmates. Prior to those meetings she had never been disciplined or warned in any way about her work at Corizon. On September 2, 2014, Ms. Riner was placed, involuntarily, on unpaid administrative leave. On September 15, 2014, Ms. Riner was fired by Corizon.

**EXHIBIT D – Paul von Zielbauer**

Mr. von Zielbauer worked as a reporter for the New York Times from 1999 to 2009. In 2005, Mr. von Zielbauer wrote a series of articles (entitled "Harsh Medicine") for the New York Times about the performance of Prison Health Services, Inc. ("PHS"). Plaintiffs' counsel has sent copies of Mr. von Zielbauer's articles to defense counsel.

Mr. von Zielbauer will testify that he became interested in PHS while covering jails and prisons for the Metro desk of the New York Times. His initial interest was sparked by a series of suicides at the Rikers Island jail. He then learned that PHS provided medical and mental health care at Rikers.

He spent a year investigating PHS's performance at jails and prisons in New York State and across the country. As part of that investigation, he interviewed government regulators, law enforcement officials, legal experts, and medical specialists. He also interviewed current and former employees of PHS, including the top executives of the company. Two of the executives (Dr. Carl Keldie and Becky Pinney) were deposed in this case. Finally, he reviewed thousands of pages of documents. He also will testify that PHS hired a public relations specialist to serve as a liaison while he was investigating PHS.

Mr. von Zielbauer will testify that his investigation uncovered a series of problems with the performance of PHS. Those problems included: (1) lack of adequate medical staff; (2) lack of qualified medical staff; (3) failure to provide prescribed medications; (4) failure to discipline employee misconduct; (5) failure to provide adequate medical care; and (6) failure to provide adequate mental health care. He also reported that PHS would settle lawsuits and resign from contracts in order to cover up any problems that threatened to become public.

Mr. von Zielbauer will testify that the New York Times published the results of his investigation in a three-part series on February 27, 2005, February 28, 2005, and March 1, 2005, along with a follow up article on August 1, 2005. The New York Times nominated his series for a Pulitzer Prize.

Mr. von Zielbauer will testify that he performed his investigation and published the results in order to bring attention to PHS, which was operating in New York without public scrutiny. He hoped that his investigation would shed light on PHS practices to create a meaningful dialogue – among not only company executives but also government agencies responsible for hiring and supervising the company's performance, as well as among a general public that must regard adequate jail and prison health care as a sine quo non of a just society – and instigate changes to benefit the public health in general.

Mr. von Zielbauer will testify he met with PHS officials throughout his investigation. He also will testify that he met with several high-level PHS officials (including Dr. Keldie and Ms. Pinney) to present the results of his investigation. During that meeting, which took place over several hours, the PHS officials had no interest in addressing the problems identified by his investigation, and instead adopted a defensive approach to his questions.