**Elden M. Rosenthal, OSB No. 722174**
Email: elden@rgdpdx.com
**Michael A. Greene, OSB No. 802445**
Email: mike@rgdpdx.com
**John T. Devlin, OSB No. 042690**
Email: john@rgdpdx.com
Rosenthal Greene & Devlin, P.C.
121 SW Salmon Street, Suite 1090
Portland, OR 97204
Phone: (503) 228-3015
Fax: (503) 228-3269

Of Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| DEREK JOHNSON, personal representative of KELLY CONRAD GREEN II, deceased; KELLY CONRAD GREEN; and SANDY PULVER,<br><br>Plaintiffs,<br><br>v.<br><br>CORIZON HEALTH, INC., a Tennessee Corporation; LANE COUNTY, an Oregon county; DR. JUSTIN MONTOYA, an individual; VICKI THOMAS, an individual; KIRSTIN WHITE, an individual; and SHARON EPPERSON (née FAGAN), an individual,<br><br>Defendants. | Civil Action No. 6:13-cv-01855-TC<br><br>**PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE** |

///

///

///

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................... 1

**ARGUMENT** ......................................................................................................... 1

    **A.  Motions to Exclude Expert Testimony** ............................................... 1

      **MIL Number 1:** ..................................................................................... 4

        *(a)  Dr. Amanda Ruiz* .......................................................................... 4

        *(b)  Professor Steven Kinder* ............................................................... 6

        *(c)  Nurse Gayle Burrow* ..................................................................... 6

      **MIL Number 2** ...................................................................................... 8

      **MIL Number 3** ...................................................................................... 9

        *(a)  Dr. Amanda Ruiz* .......................................................................... 9

        *(b)  Dr. Jennifer James* ...................................................................... 11

      **MIL Number 4** .................................................................................... 13

      **MIL Number 5 (and MIL Number 3)** ............................................... 14

      *Concluding Comments re MILs 1-5* ..................................................... 19

    **B.  Motions to Limit Punitive Damages Evidence** ............................... 22

      1.  The Punitive Damages Claims Against Individual Defendants ...... 22

      2.  The Punitive Damage Claims Against Corizon. ............................. 24

      **MIL Number 6** .................................................................................... 28

      **MIL Number 7** .................................................................................... 36

      **MIL Number 8** .................................................................................... 37

      **MIL Number 9** .................................................................................... 38

      **MIL Number 10** .................................................................................. 39

      **MIL Number 11** .................................................................................. 46

      **MIL Number 12** .................................................................................. 47

      **MIL Number 13** .................................................................................. 47

      **MIL Number 14** .................................................................................. 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. City of Milwaukee*, 474 F.3d 437 (7th Cir. 2007) ......................................... 12

*Biondo v. City of Chicago*, 382 F.3d 680 (7th Cir. 2004) .................................................. 12

*Bishop v. Gainer*, 272 F.3d 1009 (7th Cir. 2001) ............................................................... 12

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) ............................. 1, 2, 19

*Dickhoff v. Green*, 836 N.W.2d 321 (Minn. 2013) ............................................................. 12

*Doll v. Brown*, 75 F.3d 1200 (7th Cir. 1996) ..................................................................... 12

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2nd Cir. 1986) .............................................. 43

*Fieux v. Cardiovascular & Thoracic Clinic, PC,* 159 Or. App. 637 (1999) .................... 46

*Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001) ............................................................. 31

*Government of V.I. v. Sampson*, 94 F. Supp. 2d 639 (D.V.I. 2000) ..................................... 3

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) ............................................. 30

*Green v. Baca,* 226 F.R.D. 624 (C.D. Cal. 2005) ............................................................... 42

*Heflin v. Stewart County,* 958 F.2d 709 (6th Cir. 1992) .................................................. 18

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) ................................................ 30

*Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777 (3rd Cir. 1996) ........................ 3

*In re Joint Eastern and Southern District Asbestos Litigation*, 827 F.Supp. 1014 (S.D.N.Y. 1993) .............................................................................................................. 38

*In re Paoli R. R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994) ................................... 2

*Joshi v. Providence Health System*, 342 Or. 152 (2006) ................................................... 12

*Karns v. Emerson Electric Co.,* 817 F.2d 1452 (10th Cir. 1987) ...................................... 18

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ............................................... 30

*McCants v. City of Newburgh,* 2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014) ................ 44

*Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978) .............................................. 42, 43, 44

*Parker v. Williams,* 855 F.2d 763 (11th Cir. 1988) ............................................................ 18

*Phillips v. Monroe County*, 311 F.3d 369 (5th Cir. 2002) ................................................... 12

*Richman v. Sheahan,* 415 F. Supp. 2d 929 (N.D. Ill. 2006) .............................................. 17

*Russo v. City of Bridgeport,* 2008 WL 2167881 (D. Conn. May 21, 2008) .................... 44

*Salerno v. Galli*, 2009 WL 3245532 (M.D. Pa. Oct. 7, 2009) ........................................... 45

*Shaw v. Stanley* 2004 WL 2346716, (S.D.N.Y. October 19, 2004) .................................. 38

*Smith v. Providence Health & Services – Oregon*, 270 Or. App. 325 (2015) ................. 12

*Stevenson v. Koskey*, 877 F.2d 1435 (1989) ....................................................................... 12

*Stroud v. Denny's Restaurant Inc.*, 271 Or. 430, (1975) .................................................... 22

*Thomas v. Illinois*, 697 F.3d 612, (2012). ........................................................................ 13

*U.S. v. Morales,* 108 F.3d 1031 (9th Cir. 1997) .................................................................. 3

*United States v. Barile,* 286 F.3d 749 (4th Cir. 2002) ....................................................... 18

*United States v. Hurn,* 368 F.3d 1359 (11th Cir. 2004) ..................................................... 19

*Vann v. Vandenbrook*, 596 F. Supp. 2d 1238 (W.D. Wis. 2009) ...................................... 23

**Statutes**

ORS 677.515 ......................................................................................................................... 6

iii - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

**Rules**

FRE 701 ................................................................................................................... 31

FRE 702 ............................................................................................................. 1, 2, 31

FRE 704 ..................................................................................................................... 3

## INTRODUCTION

The Corizon defendants (hereinafter "Corizon") filed two "Omnibus Motions in Limine." Corizon's Omnibus Motions in Limine Regarding Inadmissible Expert Opinions ("Corizon Expert MIL") contains five separate motions regarding the admissibility of plaintiffs' expert testimony. Corizon's Supplemental Omnibus Motions in Limine ("Corizon Non-Expert MIL") seeks to exclude particular items of evidence.

Plaintiffs address all of Corizon's Omnibus Motions in this brief.

## ARGUMENT

### A. **Motions to Exclude Expert Testimony.**

Before addressing the particular motions, plaintiffs believe it useful to set forth certain general principles relating to expert testimony.

FRE 702, as amended after the *Daubert* decision, provides:

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case."[1]

---

[1] FRE 702.

1 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

The Advisory Committee Notes to the 2000 amendments to FRE 702 state, *inter alia*:

> "*Daubert* sets forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony.  * * *

> No attempt has been made to 'codify' these specific factors.  *Daubert* itself emphasized that the factors were neither exclusive nor dispositive.  * * *

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.  *Daubert* did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'  * * *  Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert.  * * *

> When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable.  * * *  As the court stated in *In re Paoli R. R. Yard PCB Litigation*, 35 F.3d 717, 744 (3rd Cir. 1994), proponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness.'  * * *

> Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."[2]

Regarding the admissibility of medical testimony, it is generally accepted that specialty qualifications are not a requirement, but only go to the weight of the expert testimony.

---

[2] FRE 702, Advisory Committee Notes, 2000 Amendments.

> "Once a doctor is qualified to testify as an expert medical specialist in one area, proof of his qualifications in another specialty is not required before he can testify in that other specialty.  It would be 'an abuse of discretion to exclude testimony simply . . . because the proposed expert does not have the specialization that the court considers most appropriate.'  *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777, 782 (3rd Cir. 1996) (Trial court cannot restrict medical expert's testimony 'based on a requirement that the witness practice a particular specialty to testify concerning certain matters' and court erred in finding that the doctor was not qualified to render a diagnosis or to discuss the pathology report because he was not a pathologist, oncologist or expert in 'definitive cancer diagnosis')."[3]

FRE 704(a) specifically allows expert opinion on an ultimate issue in a case: "An opinion is not objectionable just because it embraces an ultimate issue."[4]  Although FRE 704(b) prohibits an expert witness from testifying whether a criminal defendant "did or did not have a mental state or condition that constitutes an element of the crime,"[5] even in criminal prosecutions case law does not generally disallow expert witnesses testifying regarding state of mind.  In *U.S. v. Morales,*[6] for example, a criminal defendant offered expert testimony that "she had a weak grasp of bookkeeping principles" in order to "establish a predicate from which the jury could infer she lacked the necessary *mens rea* [to be guilty]."[7]  The Court held that the proffered testimony was admissible:

> "In more recent cases we have adopted an interpretation of Rule 704(b) that allows testimony supporting an inference or conclusion that the defendant did or did not have the requisite *mens rea,* so long as the expert does not

---

[3] *Government of the Virgin Islands v. Sampson*, 94 F. Supp. 2d 639, 648 (D.V.I. 2000).

[4] FRE 704(a).

[5] FRE 704(b).

[6] 108 F.3d 1031 (9th Cir. 1997).

[7] *Id.* at 1033.

3 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony."[8]

With these general principles in mind, plaintiffs address the specific motions made by Corizon to exclude expert testimony.

**MIL Number 1:**    Corizon seeks to exclude portions of the proffered expert testimony of Dr. Amanda Ruiz, Professor Steven Kinder, and Nurse Gayle Burrow.[9]

*(a) Dr. Amanda Ruiz*

Dr. Ruiz received her MD degree from the University of Wisconsin in 1997, completed a psychiatry residency at UC San Diego in 2001, and a Forensic Psychiatry Fellowship at UC San Francisco in 2002. She is Board Certified in adult psychiatry and forensic psychiatry, and is a certified Correctional Health Professional by the National Commission for Correctional Health Care. She currently is employed as the Director of Consult Liaison Services psychiatry in the emergency department at Cedars Sinai Hospital in Los Angeles. She previously served as a Senior Psychiatrist Specialist for the California Department of Corrections and Rehabilitation where her work included policy recommendations and peer review, as well as serving as the Chief Psychiatrist for the California Department of Corrections and Rehabilitation. She is also a psychiatrist for the Division of Adult Parole Operations for the California Department of Corrections and Rehabilitation. Since 2007 she has served as a consultant to the United States

---

[8] *Id.* at 1038.

[9] Corizon Expert MIL, at 1-7.

4 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

Department of Justice and the United States Department of Homeland Security, and participates currently as a Mental Health Monitor for the Miami Dade Department of Corrections.

Corizon complains that Dr. Ruiz may not testify regarding the neurological significance of Mr. Green's symptoms "including loss of bowel or bladder function," may not testify that if Mr. Green received timely care his "neurological outcome" would be improved, nor that Kirstin White and the Corizon nursing staff acted inappropriately.[10]

Physician's assistants generally provide all of the medical services in the Lane County Jail that a physician would normally provide.  The practice agreement submitted to the Oregon Medical Board by Dr. Montoya – the supervising physician for PA White – provided, *inter alia*, that a physician's assistant is qualified "to provide triage, evaluation, diagnosis, treatment, and consultation for acute and chronic illnesses, and health maintenance services for patients of all ages."[11]   ORS 677.515(1)(c) states that a physician's assistant "may provide any medical service * * * that is within the scope of practice of the supervising physician."   In short, PA White was, for all intents and purposes, acting as a physician in the Lane County Jail.[12]  The medical decisions made by PA White in this case are basic level physician decisions, to wit: how a person should be treated who has run head first into a wall, collapsed on the floor, is bleeding profusely

---

[10] Corizon Expert MIL, at 1-3.

[11] See Declaration of John T. Devlin ("Devlin Decl."), Ex. 1 (Oregon Medical Board Practice Agreement Form).

[12] Corizon refers to both Dr. Montoya and PA White as "providers."

from a head wound, and claims that he cannot move. Any licensed physician, be that person an ER doctor, a family practitioner, or a psychiatrist, is held to the same standard of care under these circumstances. Dr. Ruiz is qualified to testify to this standard of care.

The neurologic significance of Green's symptoms, including the loss of bowel and bladder function, is also an item of basic medicine, as is Dr. Ruiz's opinion that timely care would improve neurologic outcome when there has been a six hour delay in providing care to a man with a fractured cervical spine.

Any complaints that Dr. Ruiz does not have specialized training goes to the weight of her testimony, not its admissibility.

*(b) Professor Steven Kinder*

Corizon complains that Professor Kinder states in his expert report that the failure of the Corizon staff's actions suggest "cognitive bias." Corizon argues that an expert witness may not testify to a party's state of mind.[13] They raise the same issue in their MIL No. 5. Plaintiffs will address this issue in their response to MIL No. 5, *infra*.

*(c) Nurse Gayle Burrow*

Ms. Burrow is the former Health Services Manager for the Multnomah County Jail System. Since retiring in 2012, she has worked as an independent consultant in correctional healthcare and as a surveyor for the NCCHC. Corizon objects to Ms. Burrow's expert opinions regarding the care received by Casey Green in the Lane County

---

[13] Corizon Expert MIL, at 3-4.

Jail, and regarding the standard of care for a physician's assistant.[14]

Ms. Burrow worked as a nurse in hospitals from 1967 to 1985. She entered the profession of correctional healthcare with Multnomah County in 1985. From 2002 through 2012 she was Director of the Corrections Health Program for Multnomah County; she was the Responsible Health Authority for healthcare delivery in all the jails and juvenile facilities in the county. She worked with the medical director and management team to oversee the program and served as the Health Services Manager.

As a nurse and as an administrator, Ms. Burrow is qualified to testify to the significance of Mr. Green stating that "he was paralyzed and could not hear." One of the defendants in the case, Sharon Epperson, is a registered nurse. A nurse is expected to respond appropriately to an injured person's complaints. Ms. Burrow can testify to straightforward emergency medical diagnoses. Ms. Burrow can testify whether nurses are generally aware of how to react to medical emergencies in which they are called to assist. Her interpretation of Casey Green's statements, that he was paralyzed and could not hear ("this means he was not feeling his extremities * * * and also suggests that his head injury was causing his hearing to be impaired"), is the type of basic medical training a nurse is expected to have. Similarly, the nursing significance of a patient with a head and neck injury losing bowel control is the kind of basic medical knowledge every registered nurse should know. Finally, the fact that "further paralysis may have occurred

---

[14] Corizon Expert MIL, at 4-7.

7 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

during his transport and move onto his bed," while perhaps running afoul of the bar on nurses testifying to medical causation, is inconsequential; it is common knowledge that a spinal cord injured patient *may* suffer injury if moved without proper spinal cord protection.

Corizon objects to Ms. Burrow's opinion that neither a PA nor a nurse nor a custody officer has the education or training to diagnose malingering or faking symptoms. That is a statement well within the ken of an experienced head of a jail medical program and a registered nurse (*i.e.* "That's something we can't do.").

Corizon objects to Nurse Burrow offering opinions about the standard of care of a physician's assistant. Ms. Burrow supervised physician's assistants in the Multnomah County Jail System, and is qualified to testify that a physician's assistant should have notified her supervising physician, that a cervical fracture cannot be definitely diagnosed without an x-ray, and that the PA should have called her medical director.

**MIL Number 2:**   Corizon seeks to exclude portions of the proffered expert testimony of Physician's Assistant Keene, Professor Kinder, Dr. Ruiz, and Nurse Burrow that "constitute legal conclusions."[15]   As argued above, experts can testify regarding the standards for providing medical care and the standards of a corporation involved in providing healthcare.

Mr. Keene's conclusion that the staff was "indifferent" to the condition of their

---

[15] Corizon Expert MIL, at 7-10.

patient is not objectionable, it is a word with everyday meaning that describes Corizon's failure to care for Mr. Green, Corizon's failure to respond to Lane County Sheriff's Officer Burnette's telephone calls concerning Mr. Green, PA White's abandoning Mr. Green when he was in critical condition, and Corizon staff failing to call an ambulance in a timely manner.

Plaintiff concedes that Professor Kinder should not use the phrase "wanton disregard" and will instruct him to use a less legal-sounding descriptor in explaining the significance of Corizon's corporate policies.   The use of the phrase "deliberate indifference" is a closer question, but as argued above is appropriate under these circumstances as it is not a phrase with only legal meaning, it is a phrase that describes the intentional failure by Corizon to act responsibly.

Plaintiff concedes that Dr. Ruiz should not use "deliberate indifference" as she did at page 6 of her report.  Plaintiff acknowledges that Ms. Burrow should not refer to the Supreme Court's decision in *Estelle v. Gamble* and the "standard of quality healthcare is guaranteed by the Constitution of the United States."

**MIL Number 3:**

*(a) Dr. Amanda Ruiz*

Corizon argues that Dr. Ruiz's opinions regarding causation "are speculative."[16] Dr. Ruiz stated in her report:

---

[16] Corizon Expert MIL, at 11.

> "Had Lane County Jail provided adequate mental health screening, treatment and supervision, it is likely that the events of February 12, 2013, could have been prevented."[17]

Dr. Ruiz also stated:

> "Modalities which could have been implemented by a qualified mental health provider to keep Mr. Green safe given the fact that he was described as agitated, talking to inanimate objects, cursing, and making suicidal statements include the following:
>
> 1. Place the patient on constant observation;
>
> 2. Review the patient's history and call the on-call site physician/psychiatrist for an emergency medication treatment order;
>
> 3. Transfer the patient to a higher level of care such as an inpatient psychiatric hospital."[18]

In her rebuttal report, Dr. Ruiz further stated:

> "Had Lane County Jail provided adequate mental health screening, treatment, and supervision, it is likely that the events of February 12, 2013, could have been prevented.   Additionally, Mr. Green's injuries were aggravated by the inappropriate delayed handling of his injuries of February 12, 2013."[19]

Corizon is quibbling about Dr. Ruiz's use of the word "could."  As a medical provider, Dr. Ruiz has clearly stated that it is "likely" that the events were preventable. She describes what modalities could have been used to prevent the outcome.  The only fair reading of her expert reports is that it is more likely than not Mr. Green would not

---

[17] Expert Report of Dr. Amanda Ruiz, at 10.

[18] Expert Report of Dr. Amanda Ruiz, at 4.

[19] Rebuttal Expert Report of Dr. Amanda Ruiz, at 2.

have broken his neck if proper screening and follow-up care had occurred. If there is any question about her opinion, plaintiffs will provide a supplemental report from Dr. Ruiz using "magic words" to satisfy Corizon's objections.

*(b) Dr. Jennifer James*

Corizon correctly notes that Dr. James' opinion testimony in her original report is that Mr. Green would have recovered "one to two levels" of spinal cord function, and that there is a "strong possibility" that two levels can be recovered.[20] In her rebuttal report, Dr. James states that "it is my opinion that he would have had neurologic improvement by two levels, if given prompt intervention."[21]

Dr. James should be allowed to testify and explain her thought process and medical opinions, and be subject to cross-examination on those opinions. As the Court is aware, there are varying descriptions of Casey Green's ability to move after his injury was sustained in the courtroom. PA White testified in her deposition that Mr. Green was moving all extremities. Other witnesses contradict her testimony. Dr. James' opinion regarding the level of recovery Mr. Green would have enjoyed is impacted by what factual assumptions are presented.

Regarding causation issues generally, federal courts "turn to the causation factors developed in the common law of torts to supply the necessary causation factor in the civil

---

[20] Corizon Expert MIL, at 12.

[21] Rebuttal Expert Report of Dr. Jennifer James, at 3.

rights field."[22]  Although Oregon courts have declined to apply the "loss of chance"

doctrine,[23] plaintiffs' federal civil rights claims do not rely on Oregon law for the

causation standard.   The issue is unsettled under federal common law.   The "loss of

chance" doctrine has growing acceptance across the country, with support coming from

the Restatement of Torts and similar authorities regarding the common law of torts.[24]

     Plaintiffs could not find any Ninth Circuit case discussing whether the "loss of

chance" standard applies to federal civil rights claims.   Plaintiffs did locate several

decisions from the Seventh Circuit applying that standard to federal civil rights claims in

the context of employment discrimination cases (i.e., because of illegal discrimination,

plaintiff lost his or her chance to be hired or promoted).[25]  The Seventh Circuit described

the doctrine when first adopting it:

> "In the common law tort domain this is called recovery for the loss of a
> chance.   It is illustrated by cases in which, as a result of a physician's
> negligent failure to make a correct diagnosis, his patient's cancer is not

---

[22] *Stevenson v. Koskey*, 877 F.2d 1435, 1438 (9th Cir. 1989).

[23] See *Joshi v. Providence Health System*, 342 Or. 152, 162-164 (2006) (wrongful death claim); *Smith v. Providence Health & Services – Oregon*, 270 Or. App. 325, 329 (2015) (common law claims).

[24] See, *e.g.*, *Dickhoff v. Green*, 836 N.W.2d 321, 333-35 (Minn. 2013) (collecting cases and explaining rationales). The Minnesota Supreme Court stated: "Because the doctrinal underpinnings of the loss of chance doctrine have proved to be fundamentally sound, a growing number of jurisdictions have adopted some form of the doctrine, albeit with divergent rationales." *Id.* at 334.

[25] See *Alexander v. City of Milwaukee*, 474 F.3d 437, 448-451 (7th Cir. 2007) (racial discrimination in employment); *Biondo v. City of Chicago*, 382 F.3d 680, 688 (7th Cir. 2004) (same); *Bishop v. Gainer*, 272 F.3d 1009, 1016-17 (7th Cir. 2001) (same); *Doll v. Brown*, 75 F.3d 1200, 1205-07 (7th Cir. 1996) (disability discrimination in employment).   The Fifth Circuit declined to apply the "loss of chance" doctrine to a federal civil rights claim, without extensive analysis.   See *Phillips v. Monroe County*, 311 F.3d 369, 375 (5th Cir. 2002).

arrested, and he died – but he probably would have died anyway. The trier of fact will estimate the probability that the patient would have survived but for the physician's negligence – say it is 25 percent – and will award that percentage of the damages the patient would have received had it been certain that he would have survived but for the negligence. * * * This basis for an award of damages is not accepted in all jurisdictions, but it is gaining ground and it is in our view basically sound."[26]

In 2012, Seventh Circuit Judge Posner (in dicta) suggested that the "loss of chance" doctrine also would apply to a federal civil rights case filed by a prisoner alleging physical injury as a result of a pest infestation in his cell.[27]

Plaintiffs are confident that Dr. James' testimony meets the "more probable than not" causation standard required under Oregon law. However, given the expected variation in testimony that will be presented regarding Mr. Green's condition after his courtroom injury, the "loss of chance" doctrine may come into play.

**MIL Number 4:**    Corizon complains that each of plaintiffs' medical experts will state opinions regarding the medical care given to Casey Green.[28] Dr. James is a physical medicine spinal cord specialist. Dr. Ruiz is a psychiatrist. David Keene is a physician's assistant and Gayle Burrow is an RN/Jail Administrator. It is true that their testimony overlaps, but each of these witnesses' testimony is offered from the perspective of their specialty.

It is routine in medical malpractice cases in Oregon for a party to offer multiple

---

[26] *Doll*, 75 F.3d at 1205-06.

[27] *Thomas v. Illinois*, 697 F.3d 612, 615-16 (2012).

[28] Corizon Expert MIL, at 13-14.

witnesses on standard of care and causation issues.  Plaintiffs' lead counsel has been trying medical malpractice cases as a regular part of his practice for over thirty-five years, and multiple expert witnesses are invariably presented by both plaintiffs and defendants on all critical medical issues.  In this case, in fact, Corizon offers the testimony of two psychiatrists (Drs. Esguerra and Penn) on the mental health issues presented, and two physicians (Drs. Freedman and Kaufman) on the spinal cord injuries. The two psychiatrists appear to be testifying to basically similar opinions, as do the two physicians.

It is interesting that defendants criticize plaintiffs' efforts to be thorough and present standard of care testimony from a physician's assistant, a registered nurse, a psychiatrist and a physical medicine doctor, and yet at the same time object to much of this testimony on the grounds that the witnesses are not qualified.

The Court should deny Corizon's effort to limit the proffered testimony.

**MIL Number 5 (and MIL Number 3):**  Corizon complains that Professor Kinder improperly states his opinions regarding the state of mind of Corizon staff, and Corizon itself.[29]

Professor Kinder is an Assistant Professor in the Division of Management in the School of Medicine at OHSU in Portland, where he teaches leadership and management in both the Health Care Management Master's program at OHSU and the Health Care

---

[29] Corizon Expert MIL, at 14-15.

14 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

MBA program at OHSU/Portland State University.  Prior to his academic career, Professor Kinder was the CEO of an acute care hospital in Portland, was a Regional Vice President of the Hospital Management Corporation for Brim Health Care out of Brentwood, Tennessee, was the Vice President of a health care consulting firm out of Seal Beach, California, and was the Director of Quality Improvement at Legacy Health Systems for both Legacy Emanuel and Legacy Good Samaritan Hospitals.  Prior to his management career, Professor Kinder was an Intensive Care Unit Staff Nurse.

In his report, Professor Kinder utilizes his unique background both as a nurse and as a health care manger to analyze the events in the jail, and the events in the corporate board room.  It is his opinion:

a. That clinicians make errors based on negative stereotypes (MIL No. 3 – staff's "cognitive bias");

b. Corporate organizations have "a moral and ethical obligation" to "immediately investigate and thoroughly report and review" sentinel events;

c. That Corizon's failure to meaningfully follow up its sentinel investigation process with corrective action "demonstrates wanton disregard for the safety and welfare of patients;"

d. That the total lack of familiarity with the breadth and seriousness of litigation against Corizon that the former Corizon CEO demonstrated in his deposition "suggests, at a minimum, corporate cognitive dissonance;"

e. That his review of the documents and depositions "demonstrate a consistent, methodical and deliberate indifference by Corizon clinical providers, staff, executives and officers to 1) intervene effectively and in the best interest of Kelly Conrad Green, 2) immediately investigate and retrospectively evaluate the environment and actions of care during and after the incident occurrence, 3) effectively use information gathered during sentinel investigation review to improve the provision of care for all future patients, and 4) follow through on recommendations to improve the delivery and conditions of care;" and

15 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

     f.   That the facts of this case are reflective of a corporate perspective "that embraces an attitude of higher concern for financial indicators of success rather than the provision of the highest quality of care."

The trier of fact when confronted with unusual actions wonders "Why?"  Why did the motorist accelerate through the red light?  Why did the anesthesiologist give the wrong drug?  Why did the lawyer file a case after the statute of limitations had run?  Experts can help a jury answer these questions.  The motorist's vision was affected by the setting sun and she saw the light as green.  The anesthesiologist was confronted with two green syringes and picked the wrong one. The lawyer mistakenly thought another jurisdiction's law applied.  These expert opinions all go to the state of mind of the actor.

Professor Kinder's opinions can assist the trier of fact in understanding the events put forth by plaintiffs in this case.  Why was Casey Green ignored?  One possible explanation: "negative stereotypes."  Is it significant that Corizon had an ineffective sentinel investigation process?  Corporate organizations have an obligation to have a thorough and effective sentinel event process, and failure to have such a process "demonstrates a lack of regard" for the population they serve.  What difference does it make if Corizon does not follow up on its sentinel investigations?  Failure to follow up "demonstrates wanton disregard for the safety and welfare of patients."  What difference does it make if the CEO is unaware of Corizon's litigation history?  "The CEO's lack of familiarity with the volume of litigation suggests, at a minimum, corporate cognitive dissonance."

These opinions by Professor Kinder are not "mind reading."  His comment regarding negative stereotypes and cognitive bias describes a well-known trap that nurses

16 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

fall prey to: minimizing a patient's report of symptoms due to bias against the patient. This bias can be based, for example, on race, appearance or behavior. Professor Kinder's comments regarding Corizon's inadequate sentinel event process explain the importance of the process and how the process relates to patient safety. And Professor Kinder's suggestion that Corizon is suffering from "cognitive dissonance" in dismissing as insignificant its litigation docket is a fair description of the gap between former CEO Hallworth's perception of Corizon's litigation history and the reality of that history.

Experts in civil rights cases are permitted to state opinions whether a party has acted reasonably or recklessly, whether a party has acted indifferently.

In *Richman v. Sheahan,*[30] plaintiff's § 1983 claim alleged excessive force on the part of jailers resulting in the death of her son. Plaintiff challenged the admissibility of defense expert testimony that stated various "legal" conclusions, i.e., that the defendants used constitutionally reasonable force.

> "Historically, witnesses were prohibited from testifying about the ultimate issues as a particular aspect of the rule against opinions. * * * Rule 704(a) eliminated that prohibition by providing that the 'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'
>
> Rule 704 does not define 'ultimate issue,' but it is generally thought that ultimate issues under the Rule must be factual and not legal.
>
> * * *
>
> The inquiry should focus on whether the opinion is phrased in terms that

---

[30] 415 F. Supp. 2d 929 (N.D. Ill. 2006).

employ legal criteria that the jury does not understand based upon its own experiences in life.

* * *

There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards.

* * *

How then can an expert be expected to testify about these professional standards and discuss whether there has been adherence to or deviations from those standards without employing the very constitutional or statutory language to which Ms. Richman [the plaintiff] objects?  The Fourth Circuit has suggested that '[t]he best way to determine whether opinion testimony contains legal conclusions is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'  *United States v. Barile,* 286 F.3d 749, 760 (4th Cir. 2002).

* * *

Where the testimony contains terms that have a separate, distinct, and specialized meaning in the law different from that present in the vernacular, the testimony may be deemed to constitute a legal conclusion and exclusion would not be inappropriate.  However, where, as here, the word also has an everyday meaning, the testimony should not be excluded as constituting a legal conclusion.

* * *

Under similar circumstances, courts have allowed the kind of testimony to which Ms. Richman objects.  In *Parker v. Williams,* 855 F.2d 763 (11th Cir. 1988), an expert in the field of correctional facilities testified that the defendant was 'grossly negligent' in hiring a jailer who raped a prisoner.  * * *  *See also Heflin v. Stewart County, Tennessee,* 958 F.2d at 715 (permissible for expert in the field of correctional institutions to testify that sheriff's deputies were recklessly indifferent to the decedent prisoner's serious medical needs since the phrase was used in the way an ordinary layman would describe such conduct, not as a legal conclusion); *Karns v. Emerson Electric Co.,* 817 F.2d 1452 (10th Cir. 1987) (expert allowed to testify in a products liability suit that the device was unreasonably

dangerous beyond the expectation of the average user and that the defendant acted recklessly in producing and distributing it). *Cf. United States v. Hurn,* 368 F.3d 1359, 1365 (11th Cir. 2004)) (expert can testify that the defendant's belief in the legality of his acts was reasonable)."[31]

Professor Kinder is not telling the jury how to decide the case. Professor Kinder is not reading the mind of any particular Corizon employee. Rather, Professor Kinder is setting forth the standards for operating health care corporations, explaining why the standards are important and stating his opinions that the actions of Corizon, as demonstrated by the facts in this case, show that Corizon was deliberately indifferent towards its patient population in general and Mr. Green in particular.

Here, it will certainly assist a trier of fact to hear from an expert witness with actual experience in the healthcare corporate world, explaining the serious departure from norm of Corizon's corporate practices, and the impact that practice has on the health, safety and well-being of its patient population.

### *Concluding Comments re MILs 1-5*

"In light of the ubiquity of experts in modern federal litigation * * * and the gatekeeping function *Daubert* has imposed on trial judges, there is scarcely a case in which pretrial challenges to the admissibility of expert testimony are not raised. This case is no exception."[32]

Plaintiffs' counsel faces a tremendous burden in this case. A young man was rendered quadriplegic, lived ten months on a ventilator and died. The critical defense

---

[31] *Id.* at 944-48.

[32] *Id.* at 931.

witness, PA Kirstin White, wrote chart notes and testified in deposition that she performed a complete neurological examination of Mr. Green in the courtroom, that she "cleared" him neurologically, and that he subsequently deteriorated in his jail cell. After reviewing her case, Corizon found little to fault, and gave her positive employment reviews. Corizon has retained her as the lead physician's assistant at the jail.[33] Corizon denied that White was negligent in its Answers filed to the Complaint, Amended Complaint and Second Amended Complaint.

In the process of putting together the Pretrial Order, plaintiffs' counsel learned for the first time that Corizon is changing tactics, and is now admitting that White was negligent.[34] Then, in an expert report authored by a neurosurgeon and submitted by Corizon as a "rebuttal" report on May 6, 2015, plaintiffs' counsel learned that Corizon is now claiming that White has been lying all along. Corizon's neurosurgeon's report states:

> "The examination supposedly performed by Kristin [sic] White, P.A. did not occur. * * *
>
> The observations of Kristin [sic] White, a physician's assistant who was ostensibly the lead medical person throughout his care in the Lane County

---

[33] In its recent proposal to renew the Lane County contract, submitted just last month, Corizon stated that "Ms. White has served as the Physician Assistant at the Jail since June 2012. She has 10 years of PA experience in cancer treatment, emergency department and psychiatric treatment." See Trial Exhibit 168.

[34] Proposed Pretrial Order, p. 28.

20 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

Jail, are not credible * * *."[35]

Both of Corizon's experts on the spinal cord injury issue assume, as a core premise of their opinions, that PA White is lying about Mr. Green's condition in the courtroom, and about how she reacted to it. Corizon submitted those expert reports in this case at the same time that it was touting her experience to Lane County in an effort to renew the contract.

Plaintiffs accept the burden of proof required in § 1983 claims to prove by a preponderance of the evidence that White and the other defendants were "deliberately indifferent," and that the actions of Corizon were "malicious, oppressive or in reckless disregard of Casey Green's rights." Plaintiffs accept the burden of proof required by Oregon law to prove their entitlement to punitive damages by clear and convincing evidence. If an award of punitive damages is made, plaintiffs must defend the award against constitutional due process challenges. Proving reprehensibility is critical to earning, and retaining, a punitive damages award. Plaintiffs must be allowed to prove their case to the hilt.

In order to overcome the lying now admitted by Corizon, in order to meet plaintiffs' burden of proof, plaintiffs have assembled evidence from percipient witnesses and experts to prove their claims. This case should not be tried on paper, but to a jury.

---

[35] Expert Report of Dr. Andrew Kaufman, at 3-5. Corizon's other expert on this issue made similar comments, although he was less blunt. See Expert Report of Dr. Samuel Freedman, at 5 ("To be clear, I am of the opinion that PA White's physical exam findings are not accurate as to Mr. Green's condition at the time immediately following his injuries.").

Expert witnesses write their own reports with some guidance from counsel.  Their words are significant, but should not be parsed like a Supreme Court opinion.  Plaintiffs will, of course, accept guidance from the Court in advising their experts not to use words that could be construed as "legal conclusions."  But their opinions should be evaluated by the jury in the full context of the trial as it unfolds.

### B.  Motions to Limit Punitive Damages Evidence

The punitive damages claims against the Corizon *individuals* are based upon their deliberate indifference and gross negligence following Casey Green's self-inflicted injury in the courtroom on February 12, 2013.  Plaintiffs' punitive damages claims against Corizon Health, Inc. are based upon Corizon corporate policy, upon Corizon's history of corporate misconduct and upon the misconduct of its employees.[36]

Several of the MILs filed by Corizon (Corizon MILs Nos. 6, 7, 8, 9 and 10) are directed against evidence that supports plaintiffs' punitive damages claims.  Plaintiffs believe it will be helpful to the Court in thinking about these MILs to consider Plaintiffs' punitive damages evidence in a complete context.

### 1.  The Punitive Damages Claims Against Individual Defendants.

Punitive damages are sought from PA White, Nurse Thomas and Nurse Epperson for their actions and inactions in the courtroom and in the jail on February 12, 2013.  In addition to proving their care and treatment of Casey Green was deliberately indifferent

---

[36] There is *respondeat superior* liability for punitive damages under Oregon law.  See *Stroud v. Denny's Restaurant Inc.*, 271 Or. 430, 437 (1975).

and reckless, "far afield from professional standards,"[37] plaintiffs will present the following evidence:

a) Casey Green needed to be hospitalized directly from the courtroom. Defendants failed to arrange for that hospitalization because of terrible medical decision making, and because – consistent with Corizon's corporate culture, custom and policy – a conscious decision was made to keep Mr. Green in custody for however long it took for Lane County to arrange his release from jail.

b) PA White abandoned Casey Green minutes before 4:00 p.m. when she knew that he had suffered a severe spinal cord injury and was in spinal shock, a potentially fatal condition.

c) Nurse Thomas and Nurse Epperson both took time to clean up Casey Green before calling an ambulance, when they knew that he had suffered a severe spinal cord injury and was in spinal shock, a potentially fatal condition. Neither of them waited to meet the EMTs and convey information regarding Casey Green's medical condition.

d) A cover-up of the events of February 12th was attempted by PA White and HSA Thomas:

- White altered the file by removing Nurse Epperson's chart note. White made a chart note on February 13, 2013 that was self-serving and intended to appear as though it was prepared on February 12th.

- White altered the file by removing the Emergency Room Referral authored by Corizon Nurse Smith, and replaced it with a self-serving bogus Emergency Room Referral.

- Thomas made a "late entry" and testified in her deposition that the late entry was made either on February 12th or February 13th. Lane County has indicated that it intends to call a witness to testify that Thomas' chart note was not in the chart 1-2 weeks after the event.

---

[37] *Vann v. Vandenbrook*, 596 F. Supp. 2d 1238, 1243 (W.D. Wis. 2009).

23 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

- Thomas did not file a Sentinel Event Report as required by Corizon corporate policy. No Sentinel Event Report was filed until plaintiffs' counsel notified Corizon of plaintiffs' intention to sue.

- Thomas and White both falsely claim that they told Lane County sheriff deputies in the morning that Mr. Green had to go to the hospital.

e) Although Corizon promised in its contract to perform intake screening, HSA Thomas and Dr. Montoya, in their supervisory capacities, made no effort whatsoever to train Corizon employees regarding the need for intake screening, nor did they insist that Corizon employees perform intake screening.

2. <u>The Punitive Damage Claims Against Corizon.</u>

Punitive damages are sought from Corizon based on long-standing Corizon corporate policies, customs and practices, and based on Corizon's *respondeat superior* liability under Oregon common law. Plaintiffs will prove:

a) Corizon was formed in 2011 by the merger of Prison Health Services (PHS) and Correctional Medical Services (CMS).

b) In 2005 Paul von Zielbauer authored a series of articles in *The New York Times* chronicling PHS's track record of providing inadequate medical care. Mr. von Zielbauer will testify for plaintiffs.

c) Between 2004 and 2014, a series of government investigation reports were issued that were critical of Corizon's provision of medical care. Plaintiffs have offered official investigation reports from New York, Baltimore, Delaware, Maine, ICE, Idaho, Louisville, and Pittsburgh.

d) In 2009, *Fields v. Corizon Health, Inc*. was tried to a verdict in a federal district court in Florida. Greg Lauer, counsel for plaintiff Fields, will testify to the timing, claims, evidence and decisions in the case. Plaintiffs will read to the jury the deposition testimony of Bettie Allen, a Corizon nurse who testified in the *Fields* case that she

and other nurses were "yelled at" by Corizon leadership for sending jail patients to the hospital because it "cost so much money." The Eleventh Circuit affirmed the $1,200,000 jury verdict in September 2012. In its opinion, the Eleventh Circuit stated that the trial jury could have concluded that medical treatment was delayed in order "to save money." Corizon's Chief Medical Officer, Dr. Keldie, and Corizon's CEO, Mr. Hallworth, had only the vaguest knowledge of the verdict or the opinions of the district court or appellate court.[38]

e) Corizon has been sued over a thousand times in the last five years. Although the majority of those lawsuits were filed *pro se* by prisoners, approximately 40 percent of the cases were filed by attorneys. Corizon's leadership consistently mischaracterizes its litigation docket. Corizon's CEO at the time of Mr. Green's injuries, Mr. Hallworth, testified that "95 to 97 percent" of all the cases filed against Corizon were filed *pro se* by prisoners, and were settled for $50.00 apiece. Corizon's current CEO, Dr. Myers, recently wrote that 77 percent of the cases filed against Corizon were filed *pro se* by prisoners.

f) Corizon is carrying on its books $73,000,000.00 that it has already expensed (without actually spending or setting the money aside) as money necessary to settle pending professional liability claims. Corizon recently represented to Lane County in its proposal to renew the Lane County contract that Corizon settled 64 cases from March 1, 2010 to February 28, 2015. Dr. Myers wrote in March 2015 that Corizon settled 117 lawsuits from June 1, 2009 to May 31, 2014. Given Corizon's expensed item of $73,000,000.00 and the number of settled cases, former CEO Hallworth's statement that Corizon was settling cases for $50 each is simply not true.

g) Dr. Carl Keldie was the Chief Medical Officer for PHS and then Corizon from 2000 through the end of 2010, and again from December 2011 through April 1, 2013. Dr. Keldie was unaware of

---

[38] See Devlin Decl., Ex. 2 (March 6, 2014 deposition of Carl Keldie, at 92-93) & Ex. 3 (February 11, 2015 deposition of Richard Hallworth, at 67-69).

the *Fields* case, had only minimal knowledge of Corizon litigation nationwide and of government investigation reports critical of Corizon.

h)   Corizon's contract with Lane County provided that Corizon received a fixed fee for providing medical services to all Lane County inmates, including the cost of emergency room referrals and other hospital care.

i)   PA White understood that Corizon was responsible for all medical costs of hospitalization.   White attended weekly telephone conferences with other Corizon medical staff from the Corizon Western Region, the primary purpose of which was to review in detail, with a Corizon corporate executive, all West Coast Corizon patients in hospitals.

j)   Corizon has a long standing national policy, custom or practice, of saving money by discouraging sending patients to the hospital.  This policy will be proven by the testimony of events in Mr. Green's case, by the testimony of the *Fields* lawyer and nurse, and by the testimony of former Corizon employees (Dr. Charles Pugh and Nurse Betty Riner) from Savannah, Georgia.

k)   Corizon ratified the misconduct of White, Thomas, Epperson and Montoya.  This ratification occurred in a number of ways:

- The Sentinel Event process was a sham.  No effort was made to collect information readily available, information that plaintiffs' counsel developed in this litigation.  No effort was made to determine with whom LSCO Burnette spoke on February 12th regarding his concerns that Casey Green was not moving in his jail cell.  No Corizon employee ever looked at the jail videotape.  No Corizon employee ever looked at the LCSO incident reports prepared by each sheriff's deputy that was involved with Casey Green on February 12, 2013.  Additionally, even after a reviewing nurse at Corizon concluded that White's

behavior was "reckless,"[39] the Sentinel Event process broke down completely.  Although the Sentinel Event Report called for supplemental training of Corizon staff regarding the handling of head and spine injuries, the training never occurred.  The only training that occurred was on April 27, <u>2015</u> (!) and that training consisted of simply giving handouts to some members of the Corizon staff.  It appears that this training was a response to the pending trial.  Even so, it is difficult to understand why it didn't occur until April 27, 2015.

- White testified in her deposition that she was never disciplined.  Dr. Garlick, the former and current Corizon West Coast Regional Medical Director, testified that he gave White positive employment reviews.[40]  Corizon employees Dr. Montoya, the Site Medical Director, and Dr. Orr, the Regional Medical Director, testified in deposition that White met Corizon's expectations in her treatment of Mr. Green, and did not violate the standard of care expected of a physician assistant.

- Incredibly, Corizon continues to employ White as the primary medical provider in the Lane County Jail, Dr. Montoya remains as the site Medical Director, and Nurse Thomas has been promoted to a corporate position.

- Meanwhile, Corizon's litigation team was procuring an expert report from a neurosurgeon that calls PA White's chart notes and deposition testimony lies: "The examination supposedly performed by Kristin [sic] White, PA did not occur.  * * * The observations of Kristin [sic] White, a physician's assistant who was ostensibly the lead

---

[39] Eighteen months after reaching her conclusion that White had acted recklessly, the Corizon nurse – Tonya Mooningham – recanted her conclusion during her deposition.  This appears to be a continuation of the attempted cover-up.

[40] Last week, Corizon belatedly produced Dr. Garlick's review, dated August 2014, which states that PA White "provides excellent medical care to our inmates.  * * * Very grateful for excellent medical care by Kris."  See Trial Exhibit 416.

27 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

medical person throughout his care in the Lane County Jail, are not credible * * * ."[41]

- In other words, at the same time Corizon's lawyers were presenting an expert report that declares PA White's chart notes and deposition testimony to be lies, Corizon was praising White in an effort to win a renewal of the Lane County contract.[42]

With this background, the Court can analyze each of Corizon's motions in limine.

**MIL Number 6:**    Corizon seeks to exclude evidence of the Sentinel Event Report and all related testimony.  This Court should reject the various arguments put forth by Corizon on this issue.

The Court addressed the Sentinel Event Report in its summary judgment opinion:

Corizon's policy require[s] a review process in situations like this, but it did not initiate the process (sentinel review) until after plaintiffs gave it notice of the lawsuit.  The review did not include interviews with any Lane County staff and only included an interview of White.  No effort appears to have been made to determine who Burnette called.  Although, the review did find White to be "reckless," a Corizon official rescinded that assessment in depositions.  It appears that Corizon officials found the standard of care mostly adequate.  Although Corizon claims it took corrective action via 'counseling' for White and now has a backboard and C collar on site, there is no documentary evidence supporting the counseling.  Indeed, White received an excellent performance review in the Fall of 2013.  She is still the primary care giver at the Lane County Jail. She feels that everything done with respect to Green was within Corizon policies and procedures.[43]

Plaintiffs have learned three additional facts since the Court issued its opinion.  <u>First</u>,

---

[41]  Expert Report of Dr. Andrew Kaufman, at 3-5.

[42] See Trial Exhibit 168.

[43] April 6, 2015 Order, at 15-16.

Corizon provided training to its employees, in the form of some handouts regarding spinal injuries, on April 27, 2015.[44]   Second, Dr. Ivor Garlick gave PA White an excellent peer review in August 2014, writing that PA White "provides excellent medical care to our inmates.  * * * Very grateful for excellent medical care by Kris."[45]   Third, Corizon touted PA White's experience in its 2015 proposal to renew the Lane County contract.[46]

Corizon argues that the Sentinel Event Report is not admissible as evidence of any policy or custom.  In its Order denying summary judgment, the Court correctly noted that "[p]ost-event evidence may be used to prove the existence of Corizon's policy.  A policy or custom may be inferred if, after Green's allegedly unconstitutional treatment, Corizon officials took no steps to reprimand or discharge White or if it otherwise failed to admit White's conduct was in error."[47]

Corizon essentially asks the Court to reconsider this ruling by arguing that there must be a complete absence of any remedial measures to prove a policy or custom.  The problem for Corizon is that the cited cases do not support that rule.  To the contrary, the cited cases support the Court's ruling that the Sentinel Event Report is relevant evidence. All of these quotes, taken from the cases cited by Corizon, could be describing the

---

[44] See Trial Exhibit 140.

[45] See Trial Exhibit 416.

[46] See Trial Exhibit 168.

[47] April 6, 2015 Order, at 24.

conduct at issue in this case:

> *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir. 1985): "The disposition of the policymaker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger. If prior policy had been violated, we would expect to see a different reaction. If what the officers did and failed to do on August 11, 1981 was not acceptable to the police chief, changes would have been made. This reaction to so gross an abuse of the use of deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force. * * * After August 11, 1981, we all know of the dangerous recklessness of that police force. If the police chief had not known and approved of it beforehand, we would expect a change when he, too, learned the facts. But there is no sign of any concern except that the City avoid liability."

> *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991): "The LAPD's treatment of the Lazares' complaint tended to corroborate Fyfe's testimony about LAPD complaint investigations in general. * * * As we have indicated in our factual discussion, pursuant to his two-year study of LAPD complaints, which was unrebutted by defendants, Fyfe concluded that it was 'almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen,' noting that it was as if 'something had to be done on film for the department to buy the citizen's story.' * * * Aside from these allegedly flawed procedures, there was evidence of a departmental policy or custom of resorting to the use of excessive force. The jury properly could find such policy or custom from the failure of Gates to take any remedial steps after the violations."

> *Henry v. County of Shasta*, 132 F.3d 512, 519-520 (9th Cir. 1997): "[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving a municipal defendant's policy or custom, but is highly probative with respect to that inquiry. * * * If a municipal defendant's failure to fire or reprimand officers evidences a policy of deliberate indifference to their misconduct, surely its failure even after being sued to correct a blatantly unconstitutional course of treatment * * * is even more persuasive evidence of deliberate indifference or of a policy encouraging

such official misconduct."

*Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001): "[A] policy-maker's pronouncement that he has not or will not discipline officers that retaliated against prison litigators is sufficient evidence of a policy or custom * * *. The findings of fact detail the top administrators' failure to investigate the retaliation complaints, the lack of reprimand or discipline for the officers involved even when their supervisors were aware of the complaints, and the delegation of investigation to officers involved in the grievances.  This turn-a-blind-eye approach does not insulate the Department.  On the contrary, the findings are more than sufficient to support the conclusion that the retaliatory acts were condoned by the officials, sufficient to 'ma[k]e clear to officers that . . . they could get away with anything.'  The Department's failure to investigate or correct constitutional violations supports the district court's finding that there was a policy or custom that led to violation of the inmates' rights."

Corizon argues that the Sentinel Event Report cannot be used against it because Corizon did take some steps to address the problems uncovered.  The Sentinel Event Report resulted in a "Corrective Action Plan" that called for three things: (1) an in-service training regarding head and neck injuries; (2) an instruction that all chart entries should be timed and dated; and (3) an instruction that clinician orders must be written on standard order sheets.[48]  While making this argument, Corizon acknowledges (as it must) that the "Corrective Action Plan" in the Sentinel Event Report was woefully inadequate. In fact, Corizon suggests that the investigation might have been "negligently administered."[49]

There is no evidence that Corizon performed any of the woefully inadequate items

---

[48] See Trial Exhibit 132.

[49] Corizon Non-Expert MIL, at 6; see also *id.* at 7 (referring to the "arguably negligent failure to properly administer policies designed to remedy misconduct").

31 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

in the "Corrective Action Plan." For example, there is no evidence that any in-service training occurred. Dr. Montoya testified that he did not attend any such training, although he heard that one occurred.[50] Plaintiffs asked Corizon to produce any written documentation showing that an in-service training had occurred. Nothing was produced until earlier this month, when plaintiffs' counsel received paperwork from Corizon indicating that Corizon's Lane County staff had been given literature regarding head and spinal cord injuries on April 27th, 2015.[51] This failure by Corizon to follow up in any meaningful or timely way is evidence that the Sentinel Event Report and investigation process is a sham, and is relevant to the punitive damages claims.

Corizon can argue to the jury that "[t]he Sentinel Event Report is not evidence of a complete absence of remedial steps following Plaintiff's injury, but the exact opposite: it is evidence of the remedial steps that Corizon actually took, pursuant to an established Corizon policy designed to correct mistakes and prevent reoccurrence of sentinel events."[52] After reviewing all of the evidence, the jury will conclude that Corizon's Sentinel Event investigation was simply another part of the cover up. Dr. Montoya, the Site Medical Director, and Dr. Orr, the Regional Medical Director, did not perform anything approaching a competent and thorough investigation. They did not review the video. They did not speak with any sheriff's deputies or review the available reports

---

[50] Dr. Orr, on the other hand, testified that Dr. Montoya told him that the training had been completed.

[51] See Trial Exhibit 140.

[52] Corizon Non-Expert MIL, at 7.

32 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

written by those deputies.  They did not interview any Corizon employees, except perhaps PA White.  They simply adopted the version of events that PA White and Nurse Thomas put into Mr. Green's medical chart.

Corizon admits that "[i]t may be, now that this litigation has drawn out substantially more factual detail about Green's injury than was known to Corizon employees at the time that they prepared the Sentinel Event Report, that the report could have recommended different or additional corrective actions."[53]  But Corizon could have uncovered all of the same facts in its Sentinel Event investigation, if it had cared to do so.  All of the evidence about what happened in the Lane County Jail on February 11th and February 12th was available to Corizon before this lawsuit was filed.  Yet no one from Corizon made any effort to gather that information.  And then, after an internal review concluded that reckless behavior had occurred, there was no follow-up from the Patient Safety Committee pursuant to Patient Safety Committee policy.[54]

Corizon's lack of interest in actually fixing its problems continues to this day.  There is evidence that both PA White and Nurse Thomas created false records in Mr. Green's chart and lied repeatedly during their depositions.  Despite this evidence, Corizon has taken no steps to discipline or terminate either of them.  PA White remains the main medical provider in the Lane County jail, while Nurse Thomas has been promoted to a higher-level position within Corizon.

---

[53] Corizon Non-Expert MIL, at 8.

[54] See Devlin Decl., Ex. 4 (January 27, 2014 Deposition of Tonya Mooningham, at 68-69).

Corizon, like most national corporations, can produce voluminous written policies and procedures which, on paper, portray a corporation as a model citizen. However, it is the practice and custom of a corporation that truly reveals its nature. Here the Sentinel Event process which cleared White and Thomas of any wrongdoing, the failure of Corizon to discipline or terminate White or Thomas, and the continued representation to a potential client that White is a valued member of the medical team while at the same time representing to this court through an expert report that White has been lying throughout this litigation, are ample evidence to support a finding of ratification.

Here, a jury could reasonably conclude that Dr. Montoya, Dr. Orr and the Patient Safety Committee were uninterested in the fact that its two lead people at Lane County Jail (White and Thomas) were willing to delay sending a patient to the hospital in order to allow time for Lane County to release the patient from custody. Neither Dr. Montoya, nor Dr. Orr, nor the Patient Safety Committee even mentioned the unconscionable delay in arranging for Mr. Green to be seen in the hospital. Why? Because that was the standard operating procedure at the Lane County Jail, and at Corizon nationally: don't send people to the hospital – if at all possible – until they are released from jail.

Corizon also argues that the Sentinel Event Report cannot be used as evidence of ratification, because the Sentinel Event Report contains "nothing showing express approval of any conduct surrounding Green's injury or the basis for that conduct."[55] For

---

[55] Corizon Non-Expert MIL, at 9.

all the reasons noted above, a reasonable juror could conclude that the Sentinel Event process did ratify the misconduct of White, Thomas, and Epperson. In addition, both Dr. Montoya and Dr. Orr testified in their depositions that PA White's conduct met the relevant standard of care.

Finally, Corizon argues that Ms. Mooningham's conclusion that White acted recklessly is opinion testimony that fails to meet the requirements of FRE 701 and 702. Corizon asserts that "[o]ffering Mooningham's characterization on the Sentinel Event Review form would be no different than selecting at random an individual from the gallery of the courtroom and asking him or her to characterize the conduct involved."[56] But Corizon ignores one critical distinction -- Mooningham was the Corizon employee assigned by Corizon to evaluate White's performance. Her conclusion that White acted recklessly is an admission by Corizon and is admissible as such.[57]

In addition, during her deposition in 2014, Ms. Mooningham recanted her May 2013 conclusion that defendant White had acted recklessly. The recanting of the conclusion eighteen months later, during the latter stages of discovery in this lawsuit, is evidence that as of October 2014 (the date of Mooningham's deposition) Corizon was continuing its effort to cover up the misbehavior of its employee White. As such, the evidence is relevant to plaintiffs' punitive damages claims.

---

[56] Corizon Non-Expert MIL, at 11.

[57] It is interesting that although Corizon complains that Nurse Burrow cannot comment upon PA White's actions, Corizon assigned its own nurse, Ms. Mooningham, to evaluate PA White's conduct.

**MIL Number 7:**    Corizon seeks to preclude evidence of White's termination of employment from Oregon Neurosurgery Specialists, White's prior disciplinary history with Corizon and White's previous self-prescribing of controlled substances.[58]

Defendant White was fired from Oregon Neurosurgery Specialists in Eugene, her last job before beginning at Corizon.[59]  White did not advise Corizon that she had worked for Oregon Neurosurgery Specialists, nor that she had been fired.  This information came to light in her deposition on January 27, 2014.  Corizon apparently will argue to the jury that her falsified medical chart on Mr. Green, and lying in her deposition, were not a sufficient basis for disciplining or terminating her.  Under these circumstances, the fact that she also lied on her employment application (and her disciplinary history with Corizon) is admissible to strengthen plaintiffs' argument that her continued employment is a ratification of her misconduct.[60]

Plaintiffs have no intention of presenting, in their case in chief, evidence of White's prior problems with self-prescribing prescription medication.

---

[58] Corizon Non-Expert MIL, at 13-15.

[59] See Devlin Decl., Ex. 5 (January 27, 2014 Deposition of Kirstin White, at 15).

[60] In fact, Corizon repeated PA White's inaccurate employment history in its submission to Lane County last month.  See Trial Exhibit 168 (Corizon resume for Kirstin White omitting her employment at Oregon Neurosurgery Specialists).

**MIL Number 8:**    Corizon seeks to exclude evidence that White was aware that Corizon paid inmate hospital bills.[61]

Plaintiffs' evidence will be substantial that Corizon has a policy of discouraging hospitalization of its patients.  Corizon's claim that it was not potentially responsible for Casey Green's emergency room medical bills is not correct.  Corizon's contract with Lane County does not distinguish between Eugene Municipal pretrial detainees and Lane County pretrial detainees:

> "Contractor will identify the need, schedule, coordinate and pay for all non-emergency and emergency health care rendered to inmates inside or outside the jail." [62]

Although it is true that Lane County had the ability to seek reimbursement for pretrial detainees' care from the City of Eugene on municipal charges, it was not obligated to do so under its contract with Corizon.

Regardless of the correctness or incorrectness of White's understanding of the Corizon contract, White was correct in her understanding that Corizon discouraged hospitalizing patients if they could first be discharged.  That is the policy in Georgia, that is the policy in Florida, and that was the policy in Lane County.  It was this policy – whether White applied it correctly or not – that motivated her and Thomas to not send Casey Green to the hospital in the hope that he would first be discharged.

---

[61] Corizon Non-Expert MIL, at 15-16.

[62] See Trial Exhibit 36, at 16.  Lane County also will be taking this position at trial.

This motion in limine is nothing more than a motion for reconsideration by Corizon's new attorneys, because the Court addressed this issue in its April 6, 2015 Order:

> Defendants object to the admissibility of White's testimony regarding when Corizon pays arguing it assumes incorrect facts. Corizon seeks to strike the statement. However, the statement, correct or not, is evidence of White's adherence to Corizon policy that resulted in injury to Green. Furthermore, such evidence is relevant to White's state of mind and rebuts any argument by Corizon that White would have had no motive to delay Green's transport to the hospital pursuant to Corizon policy.[63]

**MIL Number 9:**    Corizon asks the Court to prohibit the introduction of any media reports of Corizon's misdeeds.[64]

Plaintiffs acknowledge that newspaper reports can be hearsay. However, if newspaper reports are not offered to prove the truth of the matters asserted in the article, they may be relevant as providing notice to Corizon that their business model endangered their patient population.[65] Plaintiffs have not offered any newspaper reports as evidence in their case in chief. However, newspaper reports of case settlements against Corizon arising from failure to hospitalize patients may become relevant during the trial of this case. Plaintiffs request the opportunity to be heard on this issue if Corizon opens the

---

[63] April 6, 2015 Order, at 26 n.12.

[64] Corizon Non-Expert MIL, at 16-20.

[65] See, e.g., *Shaw v. Stanley* 2004 WL 2346716, at *10 (S.D.N.Y. October 19, 2004) (defendant put on "inquiry notice" by media reports in shareholder fraud suit), *aff'd*, 435 F.3d 244 (2d Cir. 2006); *In re Joint Eastern and Southern District Asbestos Litigation*, 827 F. Supp. 1014, 1057 (S.D.N.Y. 1993) *reversed and reinstated in part on other grounds*, *affirmed in part* 52 F.2d 1124 (2d Cir. 1995) ("USMP also put into evidence newspaper articles and media reports, which may have served to provide constructive notice.").

door during trial.

**MIL Number 10:**    Corizon seeks to preclude evidence of lawsuits filed against

Corizon.[66]

Plaintiffs have offered ten federal court complaints as exhibits.  A brief summary

of each pleading follows:

> A. ***Tackberry v. County of Alameda* (N.D. Cal.) (Ex. 189) – Death in jail from meningitis.**  In 2007, Jeremiah Woodman died in the Santa Rita Jail from meningitis.  Plaintiffs claimed that PHS "denied medical treatment, although Decedent obviously needed immediate medical attention, and had repeatedly asked for medical attention."  Prison Health Services settled this wrongful death lawsuit for $150,000 in 2010.  Dr. Harold Orr was the medical director responsible for the jail at the time of Mr. Woodman's death.  He also was the Regional Medical Director responsible for the Lane County Jail when the Sentinel Event Investigation was performed.  He is listed as a trial witness by Corizon.

> B. ***James v. City of Philadelphia* (E.D. Pa.) (Ex. 190) -- Quadriplegia in jail from seizures.**  In 2007, Charles James had several seizures during a three month period while in a  Philadelphia prison.  Plaintiff claimed that PHS had "permitted a custom, practice, and procedure to exist in which incarcerated persons are denied appropriate and necessary medical care," including "refusing, delaying, or otherwise interfering with inmates' necessary medical treatment with medical specialists." Mr. James was diagnosed as a quadriplegic when he was finally taken to a hospital to undergo surgery.  Mr. James claimed in this lawsuit that he would not have become a quadriplegic if Prison Health Services had provided proper medical care.   Prison Health Services settled this lawsuit for a confidential amount in 2010.

> C. ***Campbell v. Prison Health Services* (M.D. Fla.) (Ex. 191) – Facial fractures in jail not treated.**  In 2007, Walter Campbell suffered multiple facial fractures while in the Sarasota County Jail.  He was not taken to the hospital for three weeks.  Prison Health Services settled this

---

[66] Corizon Non-Expert MIL, at 20-25.

lawsuit for a confidential amount at a mediation in 2009.

D. ***Fenton v. Alameda County*** **(N.D. Cal.) (Ex. 192) – Brain damage in jail from stroke.**  In 2007, Michael Fenton suffered a stroke in the Santa Rita Jail.  Plaintiff claimed that PHS "failed to provide adequate and timely medical care for plaintiff * * *.  Plaintiff suffered a stroke but was denied medical care, thus resulting in permanent brain damage and disability."  Prison Health Services settled this lawsuit for a confidential amount in 2009.  Dr. Harold Orr was the medical director responsible for the jail at the time of Mr. Woodman's death.  He also was the Regional Medical Director responsible for the Lane County Jail when the Sentinel Event Investigation was performed.  He is listed as a trial witness by Corizon.

E. ***Scott v. Alameda County*** **(N.D. Cal.) (Ex. 193) – Loss of vision in jail.**  Between 2006 and 2008, Terri Scott was in the Santa Rita Jail.  She claimed in her lawsuit that Prison Health Services denied her medical treatment for a variety of conditions and failed to obey a court order requiring an eye exam, which resulted in the loss of vision in one eye.  Plaintiff alleged that PHS violated her "right to diagnosis and treatment for a serious medical need where failure to treat an inmate's condition could result in further significant injury or the unnecessary and wanton infliction of pain."  Prison Health Services settled this lawsuit for a confidential amount in 2009.  Dr. Harold Orr was the medical director responsible for the jail at the time of Mr. Woodman's death.  He also was the Regional Medical Director responsible for the Lane County Jail when the Sentinel Event Investigation was performed.  He is listed as a trial witness by Corizon.

F. ***Macy v. Santa Barbara County*** **(C.D. Cal.) (Ex. 194) – Untreated head injury in jail.**  In 2008, Keith Macy was detained in the Santa Barbara County Municipal Jail.  He claimed in his lawsuit that he received grossly inadequate psychiatric and medical treatment after he struck his head in his cell.  Plaintiff alleged that PHS "intentionally delay[ed] necessary medical care, despite repeated requests for such care by plaintiff" and that PHS acted pursuant to customs and policies that "resulted in delayed or substandard medical care for the purposes of saving money at the risk of Plaintiff's health."  One of the allegations was "the refusal to transfer and release him to an appropriate medical facility."  Prison Health Services settled this lawsuit at a mediation for a confidential amount in 2010.  Dr. Harold Orr was the medical director responsible for the jail at the time of Mr. Woodman's death.  He also

was the Regional Medical Director responsible for the Lane County Jail when the Sentinel Event Investigation was performed. He is listed as a trial witness by Corizon.

**G. *Jones v. Campbell* (N.D. Fla.) (Ex. 195) – Untreated head injury in jail.** In 2008, Daryl Jones was not taken to the hospital for 10 days after he suffered a serious head injury in jail. Plaintiff alleged that PHS "knew of the medical needs of the plaintiff, yet unnecessarily delayed care of the plaintiff" and that plaintiff's injuries "were so obvious that even a lay person would have recognized the necessity for the immediate medical treatment of the plaintiff." Plaintiff alleged that Corizon "withheld much needed medical care despite knowing that Plaintiff suffered from a serious medical condition" and "ignored Plaintiff's repeated complaints about his deteriorating medical condition, and refused Plaintiff's repeated requests for medical care." He ultimately was diagnosed with an acute subdural hematoma, requiring immediate emergency medical treatment. Corizon settled this lawsuit for a confidential amount in 2013.

**H. *Ellis v. City of Philadelphia* (E.D. Pa.) (Ex. 196) – Untreated facial fractures in jail.** In 2009, Antoine Ellis was taken to a Philadelphia jail while suffering from facial fractures. Prior to his incarceration, a hospital had advised follow up medical care with an oral maxillofacial clinic in one week. Mr. Ellis did not receive surgery for more than two months. Plaintiff alleged that PHS "breached its duty of insuring that prisoners were provided with appropriate medical care and treatment" and "failed to insure that prisoners like Plaintiff obtained timely referrals to outside medical facilities." Prison Health Services settled this lawsuit for a confidential amount in 2012.

**I. *Suain v. Collier County Sheriff* (M.D. Fla.) (Ex. 197) – Untreated stroke in jail.** In 2010, Jermaine Suain suffered a stroke in the Collier County Jail. He was not taken to a hospital for more than a day following his stroke. Plaintiff alleged that a PHS employee failed to render care to him and instead told him "that some people only think they are having a stroke when they are not." Prison Health Services settled this lawsuit for a confidential amount in 2013.

**J. *Hammond v. Soll* (D. Minn.) (Ex. 198) – Untreated pulmonary emboli in jail.** In 2011, Jerrell Hammond died in a Minnesota prison from pulmonary emboli in both lungs. He experienced worsening symptoms for two weeks but was never taken to a hospital. Plaintiff alleged that Corizon "failed to provide Mr. Hammond appropriate

medical care for a full ten day period * * * despite his obvious
continuing distress and his consistently reported symptoms during that
period of time.    Those symptoms were clearly indicative of the
condition from which he ultimately died, namely disseminated
pulmonary emboli in both of Mr. Hammond's legs."    Plaintiff also
alleged that Corizon's "deliberate indifference evinces both an
adamantine and deeply ingrained institutional bias of very long standing
against crediting the serious health complaints of Minnesota prisoners,
as well as an institutionalized contractual incentive for not crediting
such complaints, and for otherwise denying Minnesota prisoners their
constitutional rights to adequate medical care, especially offsite
specialty care and emergency offsite medical care."    The Minnesota
Department of Corrections settled the case for $375,000, and Corizon
settled the case for a confidential amount, in 2015.

All of the offered complaints and settlements are cases where a jail inmate

asserted against Corizon (or one of its predecessor companies) that an inmate suffered a

serious medical problem and was denied treatment and/or denied transfer to a hospital.

These pleadings and the fact of settlement are offered to support plaintiffs' claim that

Corizon was on notice of the consequences of its business model, and the documents

therefore are relevant and essential to establishing *Monell* liability.[67]    Courts across the

country have allowed evidence of prior lawsuits under similar circumstances.

In *Green v. Baca,*[68] a former detainee in county jail alleged in his § 1983 action

that the defendant sheriff's policies and customs deprived him of his Fourteenth

Amendment right to be released from custody promptly after the reason for confinement

ended.    Plaintiff offered into evidence prior settlements against the sheriff alleging

---

[67] Corizon cites cases involving negligence and breach of contract claims to support its
argument, but the existence of *Monell* liability alters the analysis in this case.

[68] 226 F.R.D. 624 (C.D. Cal. 2005).

42 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN
LIMINE

similar claims.

> "Lastly, plaintiff argues that the settlements are admissible to prove that defendant had notice that over-detentions were occurring at the jail. Although Rule 408 prohibits the admission of settlements to prove liability for or the invalidity of a claim or its amount, it 'does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.' Fed. R. Evid. 408. 'The use of the phrase "such as" implies that the ensuing list is not exhaustive, but is only illustrative.' * * * In *Spell v. McDaniel,* 842 F.2d 1380, 1400 (4th Cir. 1987), the Fourth Circuit held that evidence of a city's settlement of an earlier police brutality action was properly admitted to show that the city was sufficiently aware of aggressive conduct by police officers; *see also United States v. Austin,* 54 F.3d 394, 400 (7th Cir. 1995) (holding that evidence of a past settlement was admissible to show that defendant had notice that conduct was wrongful).

> The court agrees that showing defendant was aware of the number of alleged over-detentions is essential to establish liability under *Monell*, and that evidence of the number of settlements into which he entered may be admissible to prove knowledge. Defendant's contention that the probative value of the settlements is substantially outweighed by the danger of unfair prejudice can be adequately addressed by instructing the jury that it may consider the evidence only for the purpose of assessing defendant's knowledge of the over-detention problem."[69]

In *Fiacco v. City of Rensselaer,*[70] third party claims and complaints were used by plaintiff in a § 1983 claim to establish a policy of deficient supervision of police officers by defendant city. The use of the evidence was affirmed by the Second Circuit:

> "Fed.R.Evid, 403 grants the trial judge broad discretion to determine whether to allow the introduction of relevant, but prejudicial, matters into evidence. * * * We have no doubt that, in the context of a theory that the

---

[69] *Id.* at 641-642.

[70] 783 F.2d 319 (2d Cir. 1986).

City negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality had been made by other persons against the City, together with evidence as to the City's treatment of these claims, was relevant. *Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice* that there was a possibility that its police officers had used excessive force."[71]

In *McCants v. City of Newburgh,*[72] plaintiffs § 1983 complaint detailed "seventeen excessive force claims made against the City in the 7 year time period prior to [plaintiff decedent's] death in 2012."[73]  The defendants argued that a majority of the claims were settled for nuisance value, did not involve deadly force and were too far removed in time to be admissible.  The Court disagreed:

> "Defendants are correct the seventeen instances simply demonstrate 'other individuals [] plausibly alleged that they experienced similar violations . . . not that these violations actually occurred.'  * * *  However it matters not that the instances only prove a claimant asserted a violation, *because they evidence the City was on notice* to the possible use of excessive force by its police officers on seventeen different occasions.  * * * Plaintiffs allege the City, in the face of these instances of alleged police misconduct, failed properly to discipline its officers or train them in the use of excessive force.  This evidences deliberate indifference * * *."[74]

In *Russo v. City of Bridgeport,*[75] plaintiff submitted evidence of prior million dollar jury verdicts against defendant City when the City sought summary judgment on plaintiff's *Monell* claims.  The trial court concluded:

---

[71] *Id.* at 327-328 (emphasis added).

[72] 2014 WL 6645987 (S.D.N.Y. Nov. 21, 2014).

[73] *Id.* at *4.

[74] *Id.* (emphasis added).

[75] 2008 WL 2167881 (D. Conn. May 21, 2008).

"Moreover, the record contains some additional evidence that a jury could rely on to find in plaintiff's favor on his claim against the City. Plaintiff points to million dollar jury verdicts, returned before the events at issue here, in cases against Bridgeport and New Haven, in which police officers withheld exculpatory evidence leading to false imprisonment. *Plaintiff plausibly argues that these verdicts put the City on notice* of a need to provide its police officers with better training and supervision regarding the proper handling of exculpatory evidence."[76]

In *Salerno v. Galli*,[77] a § 1983 plaintiff offered evidence of prior suits against defendant police officer. Each of the prior lawsuits "settled without any liability determination."[78]

"The fact that prior litigation ended with settlements with no admission of liability is not, contrary to Defendants' suggestions, controlling. 'Whether or not the [prior] claims had validity, the very assertion of a number of such claims put the [Borough] on notice that there was a possibility that' Sergeant Galli may be violating citizens' constitutional rights."[79]

Here, plaintiffs have identified ten federal complaints, all of which involved significant injuries and an allegation that Corizon failed to provide necessary medical care. Seven of the cases were settled before Casey Green's injuries. Three were settled after his injury. These complaints provided notice to Corizon that its business model was causing serious injuries and deaths. When combined with the other evidence set forth above, such as the millions of dollars that Corizon has set aside for legal claims and the consistently misleading statements by Corizon CEOs about its litigation history, the jury

---

[76] *Id.* at *2 (emphasis added).

[77] 2009 WL 3245532 (M.D. Pa. Oct. 7, 2009).

[78] *Id.* at *2.

[79] *Id.* at *8.

45 - PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

is entitled to infer that Corizon has policies, customs or practices of discouraging transferring patients to a hospital for care, of failing to meet widely accepted community standards of care. The jury is entitled to infer that Corizon's actions in Lane County are reprehensible, as they are the product of a corporation ignoring warning signs of endangering patients' health and lives.

**MIL Number 11:**    Corizon seeks to exclude opinion testimony from Lane County Sheriff's Officers regarding the "diagnosis, cause, extent, or proper treatment of Green's injuries."[80]

While plaintiffs generally agree that lay witnesses are not competent to testify regarding complex medical issues, it is unclear how far Corizon's MIL is intended to reach. Some medical issues are so obvious that they do not require expert medical testimony to establish.[81] Lay witnesses are certainly competent to testify that, when someone collapses in a pool of blood and claims that he cannot move, it is reasonable to treat the patient carefully and protect the patient's spinal cord. Tracy Tomseth, for example, testified in her deposition that she was flabbergasted that Mr. Green was not sent to the hospital. Various sheriff's deputies testified in their depositions that they were concerned and inquired as to whether Mr. Green should be sent to the hospital. Deputy Burnette testified that he was concerned and called the medical office twice to report that Mr. Green was not moving.

---

[80] Corizon Non-Expert MIL, at 25-27.

[81] *Fieux v. Cardiovascular & Thoracic Clinic, PC,* 159 Or. App. 637, 641 (1999).

Plaintiff respectfully urges the Court to be cautious in ruling on MIL No. 11, protecting the right of witnesses to explain what they saw and what they were thinking.

**MIL Number 12:**   Corizon asks the Court to preclude evidence or testimony "related to the claims against dismissed defendants Pleich and Keldie."[82]

Plaintiffs are uncertain precisely what Corizon's motion is directed against. Plaintiffs concede that it would be inappropriate to discuss the fact that Pleich and Keldie were defendants and no longer are defendants.  However, Corizon goes further in its argument and states: "Therefore, evidence related to any alleged culpability or malfeasance of the dismissed defendants Pleich and Keldie should be excluded * * *."[83] This statement is incorrect.  Pleich and Keldie are both employees of Corizon, and their alleged "culpability or malfeasance" is relevant on numerous issues in both the § 1983 and the state law claims (where *respondeat superior* is applicable).

**MIL Number 13:**   Corizon asks the Court to exclude evidence regarding former defendant Pleich's interaction with Mr. Green.[84]

The Court previously ruled that plaintiffs had not sustained their burden of proof in holding Mr. Pleich deliberately indifferent.  That ruling, however, does not mean that Mr. Pleich's conduct is not admissible: (a) to prove the chain of events on the afternoon of February 12th; (b) to prove Casey Green's continued complaints of paralysis; (c) to

---

[82] Corizon Non-Expert MIL, at 27.

[83] Corizon Non-Expert MIL, at 27.

[84] Corizon Non-Expert MIL, at 28-29.

prove Casey Green's emotional and physical pain and suffering; and (d) as evidence of Corizon's negligence and gross negligence under the common law claims.

One concrete example of the relevance of Mr. Pleich's contact with Mr. Green is that Corizon intends to argue that it did not know that Mr. Green had been placed in a segregation cell.  The video presents clear evidence that Mr. Pleich, a Corizon employee, knew that Mr. Green had been moved from the medical clinic to a segregation cell.

In addition, the jury can consider Mr. Pleich's attitude during that portion of the video when it is evaluating Mr. Pleich's actions during his contact with Mr. Green later that afternoon.

**MIL Number 14:**  Corizon asks the Court to preclude plaintiffs from "suggesting the jurors put themselves in the position of Green."[85]  Plaintiffs have no intention of doing so.

DATED this 26th day of May, 2015.

ROSENTHAL GREENE & DEVLIN, P.C.


 /s/ Elden M. Rosenthal
Elden M. Rosenthal, OSB No. 722174
Email:  elden@rgdpdx.com
Michael A. Greene, OSB No. 802445
Email: mike@rgdpdx.com
John T. Devlin, OSB No. 042690
Email: john@rgdpdx.com
Phone: (503) 228-3015
Fax: (503) 228-3269

---

[85] Corizon Non-Expert MIL, at 29.

# CERTIFICATE OF SERVICE

I hereby certify that I served true and correct copies of the foregoing:

1. **PLAINTIFFS' RESPONSE TO CORIZON DEFENDANTS' OMNIBUS MOTIONS IN LIMINE**

on the following:

| | |
|---|---|
| James Daigle | Richard K. Hansen |
| Adam Heder | Anne M. Talcott |
| *Stewart Sokol & Larkin LLC* | *Schwabe, Williamson & Wyatt, P.C.* |
| 2300 SW First Ave., Suite 200 | 1211 SW 5th Ave., Suite 1900 |
| Portland, OR 97201 | Portland, OR 97204 |
| jmdaigle@lawssl.com | rhansen@schwabe.com |
| aheder@lawssl.com | atalcott@schwabe.com |
| | |
| Of Attorneys for Corizon defendants. | Of Attorneys for Corizon defendants. |
| | |
| Robert L. Goldstucker | Sebastian Tapia |
| *Nall & Miller, LLP* | Stephen Dingle |
| 235 Peachtree St., NE | *Lane County Counsel* |
| Suite 1500 – North Tower | 125 East 8th Avenue |
| Atlanta, GA 30303-1418 | Eugene, OR  97401 |
| bgoldstucker@nallmiller.com | Sebastian.tapia@co.lane.or.us |
| | Stephen.dingle@co.lane.or.us |
| | |
| Of Attorneys for Corizon defendants. | Of Attorneys for Lane Co. defendant. |

by the following method/s:

| | |
|---|---|
| _____ | mail with postage prepaid, deposited in the US mail at Portland, OR |
| ___X___ | service made via electronic mailing and/or CM/ECF filing |
| _____ | hand delivery |
| _____ | facsimile transmission |
| _____ | overnight delivery. |

Dated this 26th day of May, 2015.

/s/ Elden M. Rosenthal
ELDEN M. ROSENTHAL, OSB No. 722174
MICHAEL A. GREENE, OSB No. 802445
JOHN T. DEVLIN, OSB No. 042690
*Of Attorneys for Plaintiffs*